No. 26-1473

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CAREFIRST OF MARYLAND, INC.; GROUP
HOSPITALIZATION AND MEDICAL SERVICES, INC.;
CAREFIRST BLUECHOICE, INC., on behalf of themselves and all
others similarly situated,

*Plaintiffs-Appellees,*

v.

AMGEN INC.; IMMUNEX CORPORATION; AMGEN
MANUFACTURING LIMITED LLC,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Eastern District of Virginia
Case No. 2:24-cv-00484-AWA-LRL

### OPENING BRIEF OF DEFENDANTS-APPELLANTS

Rohit Singla
Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000
Rohit.Singla@mto.com
Justin.Raphael@mto.com

Adam Lawton
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adam.Lawton@mto.com

Elaine J. Goldenberg
Sarah E. Weiner
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
 Suite 500 E
Washington, DC 20001
(202) 220-1100
Elaine.Goldenberg@mto.com
Sarah.Weiner@mto.com

*Counsel for Defendants-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, Defendants-Appellants state:

Amgen Inc. is a publicly held corporation, it has no parent corporation, and no publicly held company owns 10% or more of its stock.  Amgen Manufacturing Limited LLC is wholly owned by Amgen International Holdings Inc., which is wholly owned by Amgen Inc.  Immunex Corporation is a wholly owned subsidiary of Amgen Inc.

Defendants-Appellants are not aware of any other publicly held corporation that has a direct financial interest in the outcome of this litigation.

DATED:  June 8, 2026                 MUNGER, TOLLES & OLSON LLP

By: */s/ Elaine J. Goldenberg*
Elaine J. Goldenberg
*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS............................................................................ ii

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT ...........................................................3

ISSUES PRESENTED..............................................................................4

STATEMENT OF THE CASE ...................................................................4

SUMMARY OF ARGUMENT .................................................................12

STANDARD OF REVIEW .....................................................................15

ARGUMENT .......................................................................................16

I.    CareFirst's Claims Must Be Dismissed Because Final Federal-Court Injunctions Are The Cause Of CareFirst's Alleged Injury............................16

    A.    CareFirst's Theory Of Causation Is Not Cognizable ..........................16

        1.    A Final Government Decision Breaks The Chain Of Causation Between Amgen's Licensing Of Roche's Patent Applications And CareFirst's Claimed Overpayment Injury .................................................................16

        2.    The *Noerr-Pennington* Doctrine Independently Immunizes Amgen From Any Liability For The Results Of Petitioning Activity.................................................25

        3.    The District Court's Analysis And CareFirst's Arguments Are Fatally Flawed................................................28

    B.    CareFirst Lacks Article III Standing To Pursue Its Federal Claim .................................................................................34

II.    CareFirst's Claims Must Be Dismissed Because The Complaint Fails To Allege Actionable Exclusionary Conduct................................................39

    A.    The Act Of Licensing Patent Applications, Standing Alone, Cannot Give Rise To A Claim For Unlawful Monopolization..........40

1. Amgen's Acquisition Of Rights To Roche's Patent Applications Is Not Exclusionary Conduct ..............................40

2. *Noerr-Pennington* Immunizes Acquisition Of Rights To A Patent Application ................................................44

B. The District Court's Analysis Is Legally Erroneous ..........................47

1. The District Court's Analysis Runs Afoul Of The *Noerr-Pennington* Doctrine ...................................................47

2. The District Court's Analysis Is Erroneous In Numerous Other Respects .................................................50

3. The District Court's Erroneous Analysis Would Have Harmful Effects, Including By Disincentivizing Innovation ............................................................54

III. The State-Law Claims Must Be Dismissed.....................................56

CONCLUSION.................................................................................57

REQUEST FOR ORAL ARGUMENT .................................................59

CERTIFICATE OF COMPLIANCE...................................................60

CERTIFICATE OF SERVICE ..........................................................61

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*2311 Racing v. Nat'l Ass'n for Stock Car Auto Racing,*
   139 F.4th 404 (4th Cir. 2025) ......................................................14, 40

*A.D. Bedell Wholesale v. Philip Morris,*
   263 F.3d 239 (3d Cir. 2001) ....................................................14, 25, 29

*ABS Global v. Inguran,*
   2016 WL 3963246 (W.D. Wis.) .........................................................52

*Advanced Health-Care Servs. v. Radford Cmty. Hosp.,*
   910 F.2d 139 (4th Cir. 1990) ...................................................16, 30, 32

*Aerotec Int'l v. Honeywell Int'l,*
   836 F.3d 1171 (9th Cir. 2016) ...........................................................52

*Allied Tube & Conduit v. Indian Head,*
   486 U.S. 492 (1988).........................................................................45

*Am. Online v. GreatDeals.Net,*
   49 F. Supp. 2d 851 (E.D. Va. 1999) ..................................................53

*Am. President Lines v. Matson,*
   775 F. Supp. 3d 379 (D.D.C. 2025).....................................................53

*Amphastar Pharms. v. Momenta Pharms.,*
   850 F.3d 52 (1st Cir. 2017)................................................................26

*Andrx Pharms. v. Biovail Corp. Int'l,*
   256 F.3d 799 (D.C. Cir. 2001)...............................................13, 19, 29

*Aronson v. Quick Point Pencil,*
   440 U.S. 257 (1979).........................................................................55

*ASARCO v. Kadish,*
   490 U.S. 605 (1989).........................................................................38

*Associated Gen. Contractors v. California State Council of Carpenters*,
459 U.S. 519 (1983) ...................................................................16, 19

*Atl. Richfield v. USA Petroleum*,
495 U.S. 328 (1990) ........................................................................16

*Automated Bldg. Components v. Trueline Truss*,
318 F. Supp. 1252 (D. Or. 1970) .....................................................43

*Automatic Radio Mfg. v. Hazeltine Rsch.*,
339 U.S. 827 (1950), *overruled on other grounds by
Lear v. Adkins*, 395 U.S. 653 (1969) ..............................................43

*Baltimore Scrap v. David J. Joseph*,
237 F.3d 394 (4th Cir. 2001) .....................................................passim

*BE & K Const. v. NLRB*,
536 U.S. 516 (2002) ........................................................................26

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946) ...................................................................16, 19

*Bishop v. Bartlett*,
575 F.3d 419 (4th Cir. 2009) ..........................................................35

*BNLfood Invs. v. Martek Biosciences*,
2011 WL 6439451 (D. Md.) ............................................................34

*Brooke Grp. v. Brown & Williamson Tobacco*,
509 U.S. 209 (1993).........................................................................53

*Brunswick v. Pueblo Bowl-O-Mat*,
429 U.S. 477 (1977).........................................................................16

*Burlington Indus. v. Milliken*,
690 F.2d 380 (4th Cir. 1982)...........................................................54

*C.R. Bard v. M3 Systs.*,
157 F.3d 1340 (Fed. Cir. 1998) .......................................................45

*California Motor Transp. v. Trucking Unlimited,*
404 U.S. 508 (1972)...................................................................................27

*In re Canadian Imp. Antitrust Litig.,*
470 F.3d 785 (8th Cir. 2006) ..............................................................19, 33

*Cardinal Chem. v. Morton Int'l,*
508 U.S. 83 (1993)....................................................................................19

*Carefirst of Maryland v. Johnson & Johnson,*
745 F. Supp. 3d 288 (E.D. Va. 2024) ...............................11, 29, 30, 41

*Cargill v. Monfort of Colorado,*
479 U.S. 104 (1986)............................................................................16, 21

*Carolina-Virginia Racing Ass'n v. Cahoon,*
214 F.2d 830 (4th Cir. 1954) .............................................................19, 36

*Celotex v. Edwards,*
514 U.S. 300 (1995)..................................................................................36

*City of Pittsburgh v. W. Penn Power,*
147 F.3d 256 (3d Cir. 1998) .....................................................................19

*City of Wheeling v. John F. Casey,*
89 F.2d 308 (4th Cir. 1937) ......................................................................19

*Crete Carrier v. EPA,*
363 F.3d 490 (D.C. Cir. 2004)..................................................................38

*Davison v. Randall,*
912 F.3d 666 (4th Cir. 2019) ....................................................................34

*Delmarva Fisheries Ass'n v. Atl. States Marine Fisheries Comm'n,*
127 F.4th 509 (4th Cir. 2025) .............................................................34, 37

*Diamond Alternative Energy v. EPA,*
606 U.S. 100 (2025)..................................................................................38

*Dickson v. Microsoft,*
309 F.3d 193 (4th Cir. 2002) ....................................................................52

*Doe v. Virginia Dep't of State Police*,
713 F.3d 745 (4th Cir. 2013) .......................................................38

*Duplan v. Deering Milliken*,
540 F.2d 1215 (4th Cir. 1976) ....................................................42

*ERR Presidents Conf. v. Noerr Motor Freight*,
365 U.S. 127 (1961).............................................................18, 27

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)..................................................................35

*Goldfarb v. Mayor & City Council of Baltimore*,
791 F.3d 500 (4th Cir. 2015) .......................................................8

*Hecht v. Pro-Football*,
570 F.2d 982 (D.C. Cir. 1977).................................................33, 34

*IGEN Int'l v. Roche Diagnostics*,
335 F.3d 303 (4th Cir. 2003) ......................................................56

*Immunex v. Sandoz*,
395 F. Supp. 3d 366 (D.N.J. 2019),
*aff'd*, 964 F.3d 1049 (Fed. Cir. 2020)..........................................6, 8

*Int'l Wood Processors v. Power Dry*,
792 F.2d 416 (4th Cir. 1986) ......................................................54

*Intellectual Ventures I v. Capital One Financial*,
280 F. Supp. 3d 691 (D. Md. 2017)..............................................49

*It's My Party v. Live Nation*,
811 F.3d 676 (4th Cir. 2016) ......................................................56

*Lawline v. ABA*,
956 F.2d 1378 (7th Cir. 1992) ....................................................23

*Marion Healthcare v. Becton Dickinson*,
952 F.3d 832 (7th Cir. 2020) ......................................................54

*Marsh v. Nichols, Shepherd & Co.*,
128 U.S. 605 (1888)..................................................................41

*Maryland v. U.S. Dep't of Agric.*,
  151 F.4th 197 (4th Cir. 2025) ...................................................................34, 37

*Massachusetts Sch. of L. v. ABA*,
  107 F.3d 1026 (3d Cir. 1997) ..............................................................................23

*Mayor and City Council of Baltimore v. AbbVie*,
  42 F.4th 709 (7th Cir. 2022) ...................................................41, 48, 49, 50

*MedImmune v. Genentech*,
  2003 WL 25550611 (C.D. Cal.) ........................................................................29

*Memorylink v. Motorola Sols.*,
  773 F.3d 1266 (Fed. Cir. 2014) ........................................................................41

*Mercatus Grp. v. Lake Forest Hosp.*,
  641 F.3d 834 (7th Cir. 2011) ..............................................................................48

*Mills Novelty v. Monarch Tool & Mfg.*,
  49 F.2d 28 (6th Cir. 1931) ....................................................................................45

*N.C. Elec. Membership v. Carolina Power & Light*,
  666 F.2d 50 (4th Cir. 1981) ..................................................................................10

*Navient Solutions v. Lohman*,
  136 F.4th 518 (4th Cir. 2025) ......................................................................45, 46

*Nemet Chevrolet v. Consumeraffairs.com*,
  591 F.3d 250 (4th Cir. 2009) ..............................................................................16

*Nobelpharma AB v. Implant Innovations*,
  141 F.3d 1059 (Fed. Cir. 1998) ........................................................................18

*Novell v. Microsoft*,
  505 F.3d 302 (4th Cir. 2007) ..............................................................................13

*Novell v. Microsoft*,
  731 F.3d 1064 (10th Cir. 2013) ..................................................................52, 53

*Olympia Equip. Leasing v. W. Union Tel.*,
  797 F.2d 370 (7th Cir. 1986) ......................................................................52, 53

*Orange-Crush v. Am. Ornamental Bottle*,
60 F.2d 518 (4th Cir. 1932) ...................................................................41

*Premier Elec. Const. v. Nat'l Elec. Contractors Ass'n*,
814 F.2d 358 (7th Cir. 1987) ............................................................25, 26

*R. J. Reynolds Tobacco v. Philip Morris.*,
199 F. Supp. 2d 362 (M.D.N.C. 2002),
*aff'd*, 67 F. App'x 810 (4th Cir. 2003) ..............................................57

*Reyes v. Waples Mobile Home Park*,
903 F.3d 415 (4th Cir. 2018) ...................................................................15

*RSA Media v. AK Media Grp.*,
260 F.3d 10 (1st Cir. 2001)......................................................................19

*Sandoz v. Amgen*,
582 U.S. 1 (2017)...............................................................................7, 39

*Sandy River Nursing Care v. Aetna Casualty*,
985 F.2d 1138 (1st Cir. 1993)............................................................21, 22

*SCM v. Xerox*,
645 F.2d 1195 (2d Cir. 1981) ..................................................................42

*Sessions Tank Liners v. Joor Manufacturing*,
17 F.3d 295 (9th Cir. 1994) ............................................................22, 23, 25

*Sosa v. DIRECTV*,
437 F.3d 923 (9th Cir. 2006) ..................................................................46

*Spokeo v. Robins*,
578 U.S. 330 (2016)................................................................................35

*In re Suboxone Antitrust Litig.*,
2017 WL 4642285 (E.D. Pa.) ..................................................................57

*In re Tamoxifen Citrate Antitrust Litig.*,
277 F. Supp. 2d 121 (E.D.N.Y. 2003),
*aff'd*, 466 F.3d 187 (2d Cir. 2006)..............................................56, 57

*TransUnion v. Ramirez*,
594 U.S. 413 (2021)..........................................................................35

*United Mine Workers of Am. v. Pennington*,
381 U.S. 657 (1965)......................................................................passim

*United States v. Microsoft*,
253 F.3d 34 (D.C. Cir. 2001).............................................................52

*United States v. Singer Manufacturing*,
374 U.S. 174 (1963).........................................................................42

*Verizon Comms. v. L. Offs. of Curtis V. Trinko*,
540 U.S. 398 (2004)....................................................................52, 54

*Vermont Agency of Nat. Res. v. Stevens*,
529 U.S. 765 (2000).........................................................................35

*In re Wellbutrin XL Antitrust Litig.*,
868 F.3d 132 (3d Cir. 2017) .........................................................18, 19

**FEDERAL STATUTES**

28 U.S.C. § 1292(b) ................................................................3, 12, 32

28 U.S.C. § 1331 ..................................................................................3

28 U.S.C. § 1332(d)(2)........................................................................3

28 U.S.C. § 1337(a) .............................................................................3

28 U.S.C. § 1367(a) .............................................................................3

35 U.S.C. § 154(a)(1)........................................................................41

35 U.S.C. § 154(a)(2)........................................................................41

42 U.S.C. § 262(a) ..............................................................................7

42 U.S.C. § 262(k) ..............................................................................7

**FEDERAL RULES**

Fed. R. Civ. P. 13(a)..................................................................20

**OTHER AUTHORITIES**

Areeda & Hovenkamp, *Antitrust Law* (2026).......................................18, 21, 26, 53

Nick Corwin, *The Failures of the Biologics Price Competition and Innovation Act*,
39 Notre Dame J.L. Ethics & Pub. Pol'y Online Supp. 793 (2025)...................39

Hovenkamp & Hovenkamp, *Buying Monopoly: Antitrust Limits on Damages for Externally Acquired Patents*,
25 Tex. Intell. Prop. L.J. 39 (2017) ...............................................55

# INTRODUCTION

In this antitrust action, the district court denied Amgen's motion to dismiss based on a series of legal errors. The court's decision misapplies antitrust law, undermines the First Amendment right to petition, and threatens the incentives for innovation that patent law is designed to provide. This Court should reverse.

Amgen markets Enbrel®, a biologic medicine used to treat autoimmune disorders. In 2004, Amgen licensed rights to two patent applications from another pharmaceutical company, Roche, and then took over prosecution of those applications before the U.S. Patent and Trademark Office ("PTO"). The PTO eventually granted those applications—after seven years of prosecution—and issued two patents covering etanercept, the active ingredient in Enbrel. When different pharmaceutical manufacturers later sought approval from the Food and Drug Administration ("FDA") to market biosimilar versions of Enbrel, Amgen filed patent-infringement actions in the U.S. District Court for the District of New Jersey. That court entered final judgments in Amgen's favor and permanently enjoined those manufacturers from marketing etanercept-containing drugs in the United States until April 2029, when the last of the two patents will expire.

In this putative class action, CareFirst alleges that by licensing rights to those patent applications more than two decades ago, Amgen unlawfully prevented biosimilar versions of Enbrel from later entering the market and thereby raised

1

CareFirst's costs.  CareFirst asserts one federal antitrust claim for unlawful monopolization—for which CareFirst seeks only prospective relief—and state-law claims that rest on the same theory of liability as the federal claim.

It is undisputed that Amgen cannot be subject to antitrust liability for prosecuting the patent applications at the PTO for many years, and then—after the PTO granted the applications and issued patents—successfully suing in court to enforce the resulting patents and obtain the injunctions barring U.S. sales of infringing Enbrel biosimilars until 2029.  The *Noerr-Pennington* doctrine "guarantees citizens their First Amendment right to petition the government for redress without fear of antitrust liability," *Baltimore Scrap v. David J. Joseph*, 237 F.3d 394, 398 (4th Cir. 2001), regardless of the purpose or effect of the petitioning. That principle suffuses this case because CareFirst's theory runs straight through Amgen's protected petitioning and the resulting government action.

Once Amgen's petitioning activity is removed from the analysis, the complaint alleges no actionable conduct.  There are the New Jersey federal-court injunctions barring sales of Enbrel biosimilars in the United States, which are the result of Amgen's petitioning and the reason that biosimilar versions of Enbrel have not entered the market.  And there is Amgen's much earlier acquisition of rights to pending Roche patent applications, which happened well before Amgen's patent prosecution and enforcement and which is the *only conduct* by Amgen that

CareFirst claims was unlawful. Those facts do not support a claim that Amgen has excluded competitors from the market, as required to prove antitrust liability. Amgen cannot be liable when a discretionary court decision causes competing products to stay off the market, and a patent application alone does not exclude competition in any respect. Each one of those problems independently dooms CareFirst's claims.

The stakes here are high. The ability to license patent applications *before* they are granted provides inventors much-needed protection against the costs, delays, and uncertainties of patent prosecution. Injecting the possibility of antitrust liability into that licensing process—based on potential government actions that might occur years later—creates a grave risk of undermining inventors' ability to benefit from their inventions and therefore of disincentivizing innovation in the first instance. This Court should not allow that result to stand.

## JURISDICTIONAL STATEMENT

CareFirst invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1332(d)(2), 1337(a), and 1367(a). JA0228. The district court certified for interlocutory appeal its order denying Amgen's motion to dismiss, JA0534, and this Court granted Amgen's timely petition for leave to appeal, JA0570. This Court has jurisdiction under 28 U.S.C. § 1292(b).

## ISSUES PRESENTED

1.  Whether a plaintiff whose alleged injury is caused by final federal-court injunctions can establish causation under antitrust law.

2.  Whether CareFirst has failed to plausibly allege that prospective relief could redress its claimed overpayment injury.

3.  Whether acquiring exclusive rights to pending patent applications, standing alone, can qualify as exclusionary conduct under the antitrust laws.

## STATEMENT OF THE CASE

**1.** Amgen markets Enbrel, a groundbreaking biologic medicine that treats rheumatoid arthritis and a range of other autoimmune disorders. JA0235-0236. The active ingredient in Enbrel is etanercept, a synthetic protein that binds to a chemical messenger called "tumor necrosis factor" or "TNF." JA0237. By rendering TNFs biologically inactive before they reach the body's TNF receptors, etanercept reduces patients' inflammatory responses. JA0004.

Enbrel was developed by Immunex Corporation. JA0006. In November 1998, after receiving approval from the FDA, Immunex began marketing Enbrel in the United States. JA0006. But another company, F. Hoffman La-Roche AG ("Roche"), had also been researching TNF-blocking proteins. Beginning in 1989, Roche filed several patent applications relating to TNF-blocking proteins— including U.S. Patent Application No. 08/444,790 (the "'790 application") and

4

U.S. Patent Application No. 08/444,791 (the "'791 application")—that potentially affected Immunex's freedom to operate. JA0005-0006. In 1999, Immunex obtained a retroactive co-exclusive license from Roche to that family of "patents and patent applications," including any patents that might issue from Roche's '790 and '791 applications. JA0006-0007. In exchange, Immunex agreed to pay Roche a royalty on net sales of Enbrel. JA0007.

Under the 1999 license agreement (which was retroactive to 1998), Roche retained the right to manufacture etanercept or to authorize one designee to do so. JA0007. But Roche did neither of those things. JA0251.

Amgen acquired Immunex in 2002. JA0009-0010. In 2004, Amgen and Roche restructured the licensing agreement, entering into an accord and satisfaction. Amgen bought out its ongoing royalty obligation to Roche with a lump-sum payment, and Roche granted Amgen an exclusive license to Roche's patents relating to TNF-blocking proteins as well as any patents that might issue from Roche's then-pending patent applications. JA0010, JA0252. As part of that accord and satisfaction, Roche gave Amgen the right to prosecute those pending applications, including the '790 and '791 applications. JA0010.[1]

---

[1] Amgen's marketing partner for Enbrel, Wyeth, was also a party to the deal. The agreement granted Wyeth certain distribution and co-promotion rights. JA0251.

Over the next seven years, Amgen prosecuted the '790 and '791 applications before the PTO.  Amgen amended each application several times in response to PTO actions.  JA0011, JA0257-0258.  For example, Amgen amended the '791 application "to include several references related to the full amino acid sequence" for the relevant TNF receptor in order to overcome the PTO's rejection for "insufficient written description."[2]  JA0257-0258.  Despite those amendments, the patent examiner rejected both applications, and Amgen appealed those rejections to the PTO's appellate tribunal.  JA0257-0258.

At every stage, the PTO's response was slow, thus accounting for the length of the process, *see Immunex v. Sandoz*, 395 F. Supp. 3d 366, 419 (D.N.J. 2019), *aff'd*, 964 F.3d 1049 (Fed. Cir. 2020)—but the PTO ultimately granted the applications and issued patents.  In November 2011, the PTO granted the '790 application and issued U.S. Patent No. 8,063,182 (the "'182 patent"), which claims "a fusion protein consisting of … the extracellular region of" a TNF receptor combined with portions of an antibody.  JA0257; *see* JA0005.  In April 2012, the PTO granted the '791 application and issued U.S. Patent No. 8,163,522 (the "'522 patent"), which claims a method of producing the fusion protein defined in the

---

[2] The Second Amended Complaint erroneously refers to the '790 application in discussing that amendment.  JA0257-0258.

'182 patent.  JA0258; *see* JA0005.  The '182 patent expires on November 22, 2028, and the '522 patent expires on April 24, 2029.  JA0011.

**2.**  Etanercept is a "biologic"—a complex molecule produced using living cells.  JA0237.  Biologics "differ from traditional drugs, which are typically synthesized from chemicals."  *Sandoz v. Amgen*, 582 U.S. 1, 6 (2017).

Under a statute enacted in 2010, a biologic drug can receive FDA approval in two different ways.  *See* 42 U.S.C. § 262(a), (k).  One is the "default" route, which allows the FDA to "license a new biologic if, among other things, the manufacturer demonstrates that [the drug] is 'safe, pure, and potent.'"  *Sandoz*, 582 U.S. at 6-7.  The other is the "abbreviated route," which is available only for "biosimilar" drugs—i.e., drugs that closely resemble a "reference" biologic that the FDA has previously approved.  *Id*. at 7.  On the abbreviated route, the FDA will grant approval if the biosimilar manufacturer "show[s] that its product is 'highly similar' to the reference product and that there are no 'clinically meaningful differences' between the two in terms of 'safety, purity, and potency.'"  *Id.*

In 2015, Sandoz Inc. sought FDA approval for a biosimilar version of etanercept called Erelzi.  JA0012.  Amgen sued Sandoz in New Jersey federal district court, alleging that Erelzi infringed the '182 and '522 patents (as well as other patents).  JA0012.  Sandoz did not contest patent infringement.  Instead, it argued that the patents were invalid, primarily on the ground that the 2004 license

improperly extended Amgen's patent term—but the district court rejected those arguments, and the Federal Circuit affirmed. *See Sandoz*, 395 F. Supp. 3d at 380-423, *aff'd*, 964 F.3d 1049 (Fed. Cir. 2020).

In October 2019, the district court entered a permanent injunction barring Sandoz "from making, using, offering to sell, or selling within the United States, or importing into the Untied States any product containing etanercept." JA0213; *see* JA0259.[3] Thus, although the FDA approved Erelzi, JA0012, the injunction bars Sandoz from marketing Erelzi in this country. The injunction terminates on April 24, 2029, after both the '182 and '522 patents expire. JA0213.

In 2019, Amgen filed a second patent-infringement action in the same federal district court against Samsung Bioepis Co., Ltd. ("Samsung"), which had developed and received FDA approval for an etanercept biosimilar called Eticovo. JA0013. As in *Sandoz*, the district court entered judgment in Amgen's favor and enjoined Samsung "from making, using, offering to sell, or selling within the United States, or importing into the United States any product containing

---

[3] When considering a motion to dismiss, a "court may properly take judicial notice of 'matters of public record,'" including judicial records like the permanent injunction, "without converting the proceeding into a motion for summary judgment." *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). The district court did so here.

etanercept." JA0216; *see* JA0261. Like the *Sandoz* injunction, the *Samsung* injunction terminates on April 24, 2029. JA0216, JA0261.

**3.** In August 2024, a group of CareFirst, Inc. subsidiaries (collectively, "CareFirst") filed this putative class action against Amgen in the Eastern District of Virginia, claiming that Amgen violated Section 2 of the Sherman Act and various state laws. According to CareFirst, by allegedly "wrongfully acquiring an exclusive license to" the Roche patent applications, Amgen unlawfully maintained "monopoly power in the U.S. market for etanercept." JA0269, JA0279-282.

CareFirst amended the complaint several times to narrow its theory about exactly what conduct by Amgen was allegedly anticompetitive. Importantly, the operative complaint does *not* allege that "Amgen's patent prosecution and litigation to enforce those patents" was unlawful. JA0483; *see* JA0274-0275. Rather, that complaint alleges that "Amgen's acquisition" of rights to Roche's pending patent applications "*alone*" was the "anticompetitive conduct" that allegedly gives rise to liability. JA0024-0025 (emphasis added); *see* JA0028-0029.

CareFirst's claimed injury is that Enbrel biosimilars are not available for sale in the U.S. market. JA0227, JA0269, JA0279-0282. In CareFirst's view, since 2021 it and other putative class members have been forced to pay higher prices for etanercept than they would have paid if Enbrel biosimilars had been available. JA0281. Under federal antitrust law, CareFirst seeks unspecified injunctive relief

and "a declaratory judgment that Amgen's conduct" violates the Sherman Act—but no damages of any kind.  JA0228, JA0282.  Under state antitrust laws, CareFirst seeks compensatory damages.  JA0016.[4]

**4. a.**  The district court denied Amgen's motion to dismiss CareFirst's federal antitrust claim and most of its state-law claims.  JA0030-0039, JA0056-0057.

The district court correctly observed that the *Noerr-Pennington* doctrine "exempts from antitrust liability any petitioning activity designed to influence legislative bodies or governmental agencies"—including "patent prosecutions before the PTO" and "filing lawsuits" alleging patent infringement.  JA0020-0021 (quoting *N.C. Elec. Membership v. Carolina Power & Light*, 666 F.2d 50, 52 (4th Cir. 1981)).  The court also correctly explained that an antitrust plaintiff like CareFirst must demonstrate "antitrust standing" to seek injunctive relief, JA0021-0023, which (among other things) requires showing that the "defendant's allegedly anticompetitive conduct was the actual and proximate cause" of the plaintiff's claimed injury, JA0035.

---

[4] Based on the same conduct by Amgen that CareFirst claims violated antitrust law, CareFirst also asserts state-law claims—and seeks damages—for unjust enrichment and violation of state consumer-protection laws.  JA0015-0016, JA0282-0350.

Yet the district court decided to allow CareFirst to continue to seek relief for injury allegedly caused by federal-court injunctions that resulted from Amgen's "prosecution of the '790 and the '791 Application[s]" at the PTO and "enforcement of the '182 and '522 Patents" in court. JA0035, JA0038. First, the district court essentially refused to decide whether the existence of those injunctions raises a legal barrier to CareFirst's claims. The court acknowledged "several out of circuit cases" holding that, "where the government plays a discretionary role in [an] antitrust injury," as when a court enjoins a would-be competitor, "such injury is not actionable." JA0036. But finding no directly on-point decision from this Court on that issue, the district court declined to dismiss. The court noted the existence of a decision from another district court in this Circuit stating that, although "*Noerr-Pennington*-immunized conduct cannot be the basis for antitrust liability," "such conduct" can still "provide the basis for antitrust injury." JA0029 (emphasis omitted); *see* JA0038 (quoting *Carefirst of Maryland v. Johnson & Johnson*, 745 F. Supp. 3d 288, 317 (E.D. Va. 2024), *appeal pending* (No. 26-1248)).

Second, the district court rejected Amgen's independently dispositive argument that licensing pending patent *applications*, rather than issued patents, cannot constitute anticompetitive conduct under the antitrust laws because patent applications do not confer exclusionary power. JA0032. The court acknowledged

that CareFirst had failed to cite a single case in which the act of acquiring rights to patent applications, standing alone, was deemed sufficient to state a claim for unlawful monopolization. JA0030. But because the complaint alleged that "obtaining [Roche's] patent applications" was "valuable" to Amgen and "important" to Amgen's alleged effort to "entrench [a] monopoly in etanercept" through petitioning activity at the PTO and in the courts, the district court ultimately concluded that CareFirst had "plausibly alleged anticompetitive conduct." JA0032-0035.

**b.** Recognizing that its order denying the motion to dismiss involved "controlling question[s] of law" as to which there are "substantial ground[s] for difference of opinion," the district court certified the order under 28 U.S.C. § 1292(b). JA0526-0532. This Court granted Amgen's petition for permission to appeal. JA0570.

**SUMMARY OF ARGUMENT**

The district court erred in denying Amgen's motion to dismiss. A company cannot be held liable under the antitrust laws for petitioning the government successfully, even if the company's request is that the government exclude competitors from the market. That dispositive principle is relevant to all of Amgen's arguments: that CareFirst's claims cannot proceed in light of existing federal-court injunctions that block U.S. sales of two Enbrel biosimilars, and that

12

the conduct by Amgen that CareFirst says gives rise to liability is not cognizable exclusionary conduct.  Each of those arguments independently requires reversal— and each requires dismissal of CareFirst's state-law claims along with its federal claim.

**I.  A.**  Causation is an indispensable requirement for every antitrust claim. *Novell v. Microsoft*, 505 F.3d 302, 310-16 (4th Cir. 2007).  CareFirst's claims all fail as a matter of law because it cannot plead the requisite causal link between Amgen's licensing of pending patent applications and CareFirst's alleged overpayment injury.

The defect in CareFirst's causation theory is straightforward.  CareFirst's only alleged injury is higher costs allegedly resulting from the absence of lower-priced biosimilar etanercept products in the U.S. market.  JA0274-0275.  But the 2004 licensing agreement between Amgen and Roche did not bar those products from the market; final federal-court injunctions did.  Where "anticompetitive harm is caused by the decision of a court," "no private restraint of trade occurs because the intervening government action breaks the causal chain." *Andrx Pharms. v. Biovail Corp. Int'l*, 256 F.3d 799, 818 (D.C. Cir. 2001).

The *Noerr-Pennington* doctrine independently compels the same result. Under that doctrine, a defendant "is immune from antitrust liability" regardless of whether the plaintiff's asserted "injuries are caused by the act of petitioning or are

caused by government action which results from the petitioning." *A.D. Bedell Wholesale v. Philip Morris*, 263 F.3d 239, 251 (3d Cir. 2001). CareFirst cannot evade that rule by ostensibly challenging only the 2004 license yet seeking relief for the market consequences of later successful PTO and court petitioning. Allowing such a claim to proceed would chill patent enforcement and permit collateral attacks on final judgments.

**B.** The same two final federal-court injunctions also render CareFirst's federal claim unredressable, which means that a required element of Article III standing is lacking. CareFirst seeks only prospective injunctive and declaratory relief under federal law for its alleged overpayment injury, yet no order in this case could authorize Sandoz or Samsung to market their FDA-approved biosimilars before the New Jersey federal-court injunctions expire. Nor does the complaint plausibly allege that some other manufacturer could obtain approval and launch a biosimilar product before that time.

**II.** CareFirst's claims also fail on a separate and independently dispositive ground: the complaint does not allege cognizable exclusionary conduct, which is a necessary element of an antitrust claim. *See 2311 Racing v. Nat'l Ass'n for Stock Car Auto Racing*, 139 F.4th 404, 410 (4th Cir. 2025). That is true for two reasons. First, patent applications are not exclusionary. A patent application is a request that the PTO grant a patent, and the right to exclude begins only if and when a

14

patent issues.  Second, because patent applications are themselves petitions to the government seeking relief, the *Noerr-Pennington* doctrine immunizes the acquisition of rights to pending patent applications.  The acquisition of application rights is inextricably intertwined with and incidental to the act of petitioning the PTO for a patent, and acts that are incidental to petitioning are covered by *Noerr-Pennington*.

The district court reached the opposite conclusion only by factoring in what came later:  Amgen's prosecution of the applications, the PTO's issuance of patents, Amgen's enforcement suits, and the New Jersey court's injunctions.  But those later acts are protected petitioning and government action.  At minimum, *Noerr-Pennington* forbids using those later events to transform a non-exclusionary license to patent applications into actionable exclusionary conduct.

**III.**  CareFirst's state-law claims all fall with its federal antitrust claim.  The state-law claims run afoul of *Noerr-Pennington*, and they fail on the merits for the same reasons that CareFirst's federal claim fails:  failure to adequately allege causation or exclusionary conduct.

## STANDARD OF REVIEW

This Court "review[s] a district court's ruling on a motion to dismiss de novo."  *Reyes v. Waples Mobile Home Park*, 903 F.3d 415, 423 (4th Cir. 2018).  Although the Court "must assume all well-pled facts to be true" and "draw all

reasonable inferences in favor of the plaintiff," it "need not accept" implausible allegations, "unwarranted inferences," or "legal" or "unreasonable conclusions." *Nemet Chevrolet v. Consumeraffairs.com*, 591 F.3d 250, 253 (4th Cir. 2009).

## ARGUMENT

**I.    CareFirst's Claims Must Be Dismissed Because Final Federal-Court Injunctions Are The Cause Of CareFirst's Alleged Injury**

**A.    CareFirst's Theory Of Causation Is Not Cognizable**

**1.    A Final Government Decision Breaks The Chain Of Causation Between Amgen's Licensing Of Roche's Patent Applications And CareFirst's Claimed Overpayment Injury**

A plaintiff in a private antitrust action like this one must "show a reasonably probable causal link between the antitrust violation" and the plaintiff's asserted injury. *Advanced Health-Care Servs. v. Radford Cmty. Hosp.*, 910 F.2d 139, 149 (4th Cir. 1990); *see Atl. Richfield v. USA Petroleum*, 495 U.S. 328, 334 (1990); *see also Cargill v. Monfort of Colorado*, 479 U.S. 104, 109 (1986); *Brunswick v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 488 (1977). No such causal link exists where a plaintiff's claimed injury is "shown to be attributable to" causes other than anticompetitive conduct. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946); *see Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 542 (1983) (plaintiff lacked antitrust standing, in part, because "the alleged effects on [plaintiff] may have been produced by independent factors").

Here, CareFirst's theory depends on an attenuated chain of alleged causation that runs right through a federal court's independent decision to issue permanent injunctions. At one end of the chain is the only action by Amgen that CareFirst says gives rise to liability: acquisition of rights to pending Roche patent applications in 2004.[5] JA0256-0258, JA0274-0275. At the other end of the chain are the New Jersey federal-court injunctions issued in 2019 and 2021 that bar sales of Enbrel biosimilars in the United States until 2029, thus allegedly forcing CareFirst to pay more for etanercept than it otherwise would have. JA0261. And in between those two ends of the chain are a series of actions by Amgen that everyone, including the court below, agrees cannot give rise to any liability for Amgen because they are immunized under the *Noerr-Pennington* doctrine, which "guarantees citizens their First Amendment right to petition the government for redress without fear of antitrust liability," *Baltimore Scrap*, 237 F.3d at 398— regardless of whether the petitioning is "intended to eliminate competition," *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965). Those immunized actions are prosecuting the patent applications at the PTO for many years, and then—after the PTO granted the applications and issued patents—successfully

[5] As explained below, that conduct is not exclusionary under the antitrust laws. *See* Part II, *infra*. Part I of this brief assumes for the sake of argument that the conduct is exclusionary and explains why CareFirst's claims nonetheless fail.

suing in court to enforce the resulting patents and obtain the injunctions barring

U.S. sales of infringing Enbrel biosimilars until 2029.  JA0257-0262; *see*

*Nobelpharma AB v. Implant Innovations*, 141 F.3d 1059, 1068-71 (Fed. Cir. 1998)

(immunizing petitioning the PTO to issue patents); *Baltimore Scrap*, 237 F.3d at

399 (immunizing filing lawsuits in the courts).

CareFirst cannot establish causation on those alleged facts.  When

government action is the precipitating cause of the alleged harm, the causal chain

is broken as a matter of law.  That rule applies whether the government acts

independently of any conduct by the defendant or in response to the defendant's

petitioning the government to take the action.  And it remains true even where

some anticompetitive conduct by the defendant might be said to have led to the

government action.  As one leading antitrust treatise sums up the state of the law,

although "private parties may have influenced or persuaded the government to

act," the "government's decision to act reflects an independent governmental

choice, constituting a supervening 'cause' that breaks the link between a private

party's request and the plaintiff's injury."  Areeda & Hovenkamp, *Antitrust Law*

¶ 202c (2026); *see id.* ¶ 201a, ¶ 202b, ¶ 338b; *see, e.g.*, *ERR Presidents Conf. v.*

*Noerr Motor Freight*, 365 U.S. 127, 136 (1961) ("[W]here a restraint upon trade or

monopolization is the result of valid governmental action, as opposed to private

action, no violation of the Act can be made out."); *In re Wellbutrin XL Antitrust*

*Litig.*, 868 F.3d 132, 165 (3d Cir. 2017) ("beyond fair dispute" that government action "can break the chain of causation in an antitrust case").[6]

The injunctions here qualify as just such government action. As the D.C. Circuit has explained, "[i]f anticompetitive harm is caused by the decision of a court, even though granted at the request of a private party, no private restraint of trade occurs because the intervening government action breaks the causal chain." *Andrx*, 256 F.3d at 818.

Indeed, the conclusion that government action breaks any causal chain is even more obvious with respect to federal-court injunctions than it is with respect to other forms of government action. Unlike statutes or administrative actions, injunctions—once final after all appeals have been exhausted, as is true here—are not open to collateral attack. *See Carolina-Virginia Racing Ass'n v. Cahoon*, 214 F.2d 830, 833 (4th Cir. 1954); *City of Wheeling v. John F. Casey*, 89 F.2d 308, 310 (4th Cir. 1937). Such an attack undermines our system of justice and deprives litigants of the finality that they are promised when they resolve their disputes in court. *See Cardinal Chem. v. Morton Int'l*, 508 U.S. 83, 100 (1993) ("[O]ur prior

---

[6] *See also, e.g.*, *Bigelow*, 327 U.S. at 264 (no causation where a plaintiff's claimed injury is "shown to be attributable to" causes other than anticompetitive conduct); *Associated Gen. Contractors*, 459 U.S. at 542; *In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 787-92 (8th Cir. 2006); *City of Pittsburgh v. W. Penn Power*, 147 F.3d 256, 265-69 (3d Cir. 1998); *RSA Media v. AK Media Grp.*, 260 F.3d 10, 15 (1st Cir. 2001).

cases have identified a strong public interest in the finality of judgments in patent litigation."); Fed. R. Civ. P. 13(a). But a collateral attack is exactly what CareFirst's claim of injury amounts to, as illustrated by the fact that CareFirst seeks an injunction and a declaratory judgment that would somehow attempt to undo the injunctions' bar on U.S. sales of etanercept biosimilars until 2029. *See* pp. 34-37, *infra*.

Even assuming that Amgen's acquisition of rights to the patent applications were non-immune conduct, that lack of immunity would not alter the analysis here.[7] Government action breaks a chain of causation even where the defendant engaged in some wrongful, non-immune conduct in addition to immune petitioning conduct, and even if it could be said that the non-immune conduct ultimately led to the government action.

That principle follows from *Pennington* itself—one of the two decisions that gave the *Noerr-Pennington* doctrine its name, and a case in which government action broke the chain of causation despite seriously wrongful activity by the defendant. There, a coal company asserted an antitrust claim against a miners' union, alleging that the union had conspired to push smaller coal companies out of the Tennessee Valley Authority ("TVA") coal market by, among other things,

---

[7] As discussed below, Amgen's acquisition of rights is in fact immune under *Noerr-Pennington*. *See* pp. 44-46, *infra*.

"wag[ing] a destructive and collusive price-cutting campaign" and petitioning the Secretary of Labor to require companies selling to the TVA to pay their workers a high minimum wage that the smaller companies could not afford. 381 U.S. at 660-61. The trial court had "admitted evidence" concerning the union's minimum-wage petitioning and instructed the jury to award "all damages resulting directly from any act which was found to be part of" the union's overall scheme. *Id.* at 671-72. The Supreme Court agreed that the union's overall scheme was anticompetitive. But the Court nevertheless held that the company "could not collect any damages under the Sherman Act for any injury which it suffered from the action of the Secretary," because "set[ting] a minimum wage for government purchases of coal was the act of a public official." *Id.* at 671.[8]

The courts of appeals have similarly refused to allow antitrust claims to go forward where government action triggered the claimed injury, even if there was some non-immune, anticompetitive private action that preceded and gave rise to that government action. Those decisions have not always framed the issue in terms of the breaking of a causal chain, but they nonetheless support the conclusion that government action breaks any such chain. For instance, in *Sandy River Nursing*

---

[8] *Pennington* involved damages, not injunctive relief, but its ruling applies to injunctive relief as well. *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 202c; *Cargill*, 479 U.S. at 112.

*Care v. Aetna Casualty*, 985 F.2d 1138 (1st Cir. 1993), a group of employers asserted an antitrust claim that defendant insurance companies—which were subject to tight rate regulation by the state government—had unlawfully boycotted the workers' compensation market by "refusing to insure employers voluntarily," hoping through that action "to induce legislation authorizing rate increases" that harmed the employers. *Id.* at 1140. That stratagem was successful: to prevent "all workers' compensation insurers" from leaving the state, the legislature passed a statute allowing the insurers to charge higher rates, and the Secretary of Insurance implemented the statute. *Id.* The First Circuit concluded that the boycott itself was not immune under *Noerr-Pennington* and accepted that the boycott had effectively "coerce[d]" the new statute. *Id.* at 1142-44. But the court of appeals agreed with the insurers that government action—in that case, action by a State rather than by a federal court—"superseded defendants' previous conduct, rendering the rate hikes 'an act of government' … rather than an injury inflicted by defendants' conspiracy." *Id.* at 1143-44; *see id.* at 1147-48.

The Ninth Circuit's decision in *Sessions Tank Liners v. Joor Manufacturing*, 17 F.3d 295, 296 (9th Cir. 1994), is likewise instructive. In that case, the defendant had taken misleading steps that "caused a prominent" private "standard-setting organization to amend its influential model fire code" in a way that severely affected the operations of the defendant's competitors in the steel-tank business.

*Id.* at 296-97.  Various government bodies then chose to follow the privately

generated standards, and those bodies "den[ied] [the plaintiff's] requests for

permits" and took other action that harmed the plaintiffs.  *Id.* at 299-301.  Despite

the trial court's finding that the defendant's actions were the factual "cause of" the

"local [government] officials' decisions," the court of appeals concluded that the

defendant was "shielded from liability" because the plaintiff's injuries were "the

direct result of governmental action"—i.e., "the actions of municipal authorities"

in following the privately generated model code.  *Id.* at 299-301.  Any other result,

the Ninth Circuit cautioned, would improperly make the defendant "liable for

injuries flowing from *governmental decision-makers'* imposition of an

anticompetitive restraint."  *Id.* at 300 (emphasis added).[9]

The result here should be no different.  Without the judicial issuance of the

injunctions, CareFirst would not have any injury at all.  If Amgen had simply

---

[9] Other federal appellate decisions are in accord with *Sandy River* and *Sessions Tank Liners*.  *See, e.g.*, *Massachusetts Sch. of L. v. ABA*, 107 F.3d 1026, 1036-38 (3d Cir. 1997) (unaccredited law school could not show injury caused by ABA's assertedly anticompetitive licensing criteria—despite the fact that "the ABA [had] petitioned the states … to prohibit graduates from unaccredited schools from taking bar examinations"—because "[w]ithout state action, the ABA's accreditation decisions would not affect state bar admissions requirements"); *Lawline v. ABA*, 956 F.2d 1378, 1381, 1383 (7th Cir. 1992) (defendant bar associations were not liable for injuries flowing from "two legal ethics rules" recommended by the defendants because "[i]t is because of [the rules'] adoption by … governmental bodies that plaintiffs [were] supposedly" harmed).

obtained rights to the Roche patent applications and done nothing further, no bar on U.S. sales of Enbrel biosimilars would exist. Nor would such a bar exist if Amgen had petitioned the PTO for patents and then *unsuccessfully* asserted those patents in litigation before the New Jersey district court. The injunctions are therefore the critical link in the causal chain—and they break it. Even assuming that Amgen's licensing of the Roche patent applications was both (1) an anticompetitive act (like the boycott in *Sandy River* or the misleading conduct in *Sessions*), and (2) a but-for cause of the PTO's decision to issue the '182 and '522 patents and the court's decision to issue injunctions (like the State's decision to enact and enforce new legislation in *Sandy River* or the local authorities' decision to deny permits in *Sessions*), there is no adequate causal connection between Amgen's conduct and CareFirst's claimed injury.

That defect is especially clear in this case because of the extreme attenuation of CareFirst's alleged causal chain. The alleged chain spans more than a decade and includes multiple layers of protected petitioning and independent government action by the PTO and the courts. Imposing antitrust liability in those circumstances stretches the concept of antitrust causation beyond its limits and places too much weight on the many links in the chain that are made up of Amgen's immunized petitioning.

**2. The *Noerr-Pennington* Doctrine Independently Immunizes Amgen From Any Liability For The Results Of Petitioning Activity**

CareFirst's antitrust claims also fail for an independently sufficient reason: the *Noerr-Pennington* doctrine bars CareFirst from recovering for alleged injuries caused by the injunctions. That doctrine necessarily immunizes not only a party's petitioning of the courts but also the *results* of that petitioning—regardless of any other considerations, including what may have happened before the petitioning occurred.[10] *Noerr-Pennington* thus yields the same result as the causation analysis, but arrives at that result via a different doctrinal route.

The Third Circuit has plainly stated the governing rule: a party that petitions the government "is immune from antitrust liability whether or not the injuries are caused by the act of petitioning or are caused by government action which results from the petitioning." *A.D. Bedell*, 263 F.3d at 251. And numerous other courts have agreed that the results of petitioning a court are so intrinsically linked to the petitioning itself, and so central to the First Amendment's protection of the right to petition, that a plaintiff cannot claim injury from those results consistent with that constitutional protection. *See, e.g., Sessions*, 17 F.3d at 299-301; *Premier Elec.*

---

[10] In addition, as discussed below, here *all* of Amgen's conduct is immunized under *Noerr-Pennington*—including the initial acquisition of the rights to the patent applications. *See* pp. 44-46, *infra*. That is an independent First-Amendment-based reason why the district court's decision should be reversed.

*Const. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358, 376 (7th Cir. 1987) ("[i]f

the injury" to competition "is caused by persuading the government, then the

antitrust laws do not apply to the squelching" or "the persuasion"); Areeda &

Hovenkamp, *Antitrust Law* ¶ 202b; *see also Pennington*, 381 U.S. at 670-71

(excluding from consideration in an antitrust case any injury caused by the act of a

government official whom the defendant petitioned and stating that "efforts to

influence public officials … to eliminate competition" are "not illegal, either

standing alone or as part of a broader scheme itself violative of the Sherman

Act").[11]

Any other rule would create substantial chilling effects and would

undermine the fundamental purposes of the *Noerr-Pennington* doctrine.  If a party

that wishes to petition the courts knows that if it prevails it could be held

responsible for injury caused by a resulting judicial decision, then that party would

be deterred from petitioning in the first place.  The First Amendment forbids that

result.  *See BE & K Const. v. NLRB*, 536 U.S. 516, 528, 531 (2002) (courts should

---

[11] Some courts have recognized an exception for recovering the costs of litigation (which do not result from the outcome of litigation) where an antitrust defendant uses the courts to enforce a "private contract" that is anticompetitive, *Premier*, 814 F.2d at 376, or where the antitrust claims are rooted in misrepresentations or fraud (whether that fraud is on a court, agency, or standard-setting body), *see Amphastar Pharms. v. Momenta Pharms.*, 850 F.3d 52, 54 (1st Cir. 2017).  Those decisions have no bearing on this case, where CareFirst's alleged injuries result from federal-court injunctions enforcing validly issued patents and no fraud is alleged.

avoid "chilling effect" on the exercise of First Amendment petitioning rights); *California Motor Transp. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972) (avoiding ruling that "would be destructive of rights of association and of petition"). Indeed, the *Noerr* decision warns against exposing antitrust defendants to liability for the "incidental effect[s]" of their petitioning—even though it is "inevitable that those conducting [such a] campaign would be aware of, and possibly even pleased by, the prospect of such injury"—because "[t]o hold that the knowing infliction of such injury renders the campaign itself illegal would … be tantamount to outlawing all such campaigns." 365 U.S. at 143-44. A court's ruling is far more than an incidental effect of a petition to a court, and it is therefore covered by *Noerr-Pennington* immunity.

More generally, allowing liability for injury triggered by a court decision would be destructive of respect for and confidence in our court system. It would permit what is in effect a collateral attack on injunctions and decisions of other courts, transforming those orders from instruments of justice into mechanisms for imposing punitive after-the-fact liability on the litigants. And it would treat the courts as if they are mere tools of the parties, easily manipulated for some anticompetitive end. That is, of course, far from the truth. When a court looks at the law and the facts and reaches its own independent decision in the best exercise of its judgment, that decision should not later be used to punish one of the parties

27

under antitrust law.  That rule may perhaps allow some exclusionary conduct to escape the reach of the antitrust laws—but that is exactly what the *Noerr-Pennington* doctrine contemplates, in service of more important constitutional values.  *See Baltimore Scrap*, 237 F.3d at 399.

### 3. The District Court's Analysis And CareFirst's Arguments Are Fatally Flawed

**a.** The district court did not so much reject Amgen's arguments that Amgen cannot be held liable for the effects of the federal-court injunctions as decline to resolve those arguments.  The district court correctly determined that the complaint's causal chain in this case runs straight through discretionary government action.  JA0035 (CareFirst "sufficiently allege[d]" that Amgen's conduct "resulted in permanent court injunctions against Sandoz and Samsung which allowed Amgen to keep its competitors off the market").  The court also accurately recognized that, as CareFirst has "concede[d]," "Amgen cannot face antitrust liability for its prosecution of the '790 … [and] '791 Application[s], nor for its enforcement litigation of the '182 … [and] '522 Patent[s]," because "such activity is well-established to be petitioning activity under *Noerr-Pennington*." JA0028-0029.

The district court then cited and discussed multiple decisions, including decisions of other circuits, that stand for the proposition that "where the government plays a discretionary role in the antitrust injury, such injury is not

actionable." JA0036-0038 (citing the D.C. Circuit's decision in *Andrx Pharmaceuticals*, 256 F.3d at 818, the Third Circuit's decision in *A.D. Bedell*, 263 F.3d at 251, 266-67, and a district-court decision in *MedImmune v. Genentech*, 2003 WL 25550611, at *11 (C.D. Cal.)). In the face of those decisions, the court below cited only a lone district-court decision from within this Circuit, *Carefirst of Maryland v. Johnson & Johnson*, 745 F. Supp. 3d 288 (E.D. Va. 2024) ("*J&J*"), that attempted to distinguish between "antitrust injury," which that decision said could properly arise from discretionary government action like a judicial order, and "antitrust liability," which the decision said could not properly arise from such discretionary government action. JA0038 (citing *J&J*, 745 F. Supp. 3d at 317). But the court below did not analyze those competing points of view and decide that the approach in *J&J* is legally superior. Instead, the court simply stated that absent an on-point decision of this Court it would "decline" to dismiss at this juncture. JA0038-0039. That failure should not be construed as a rejection of Amgen's arguments.

In any event, the novel distinction that *J&J* attempted to draw between "antitrust liability" (by which that decision apparently meant to refer to the element of exclusionary conduct) and "antitrust injury" (by which that decision apparently meant to refer to the element of causation) does not withstand scrutiny. As an initial matter, that distinction fails to recognize that causation of injury from

anticompetitive conduct is an element of antitrust liability for that conduct.

*Advanced Health-Care Servs.*, 910 F.2d at 147 ("To prevail on a monopolization claim, a plaintiff must show possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and causal … injury."). Thus, there can be no antitrust liability where a discretionary government decision breaks a causal chain that begins with allegedly anticompetitive conduct. *See* pp. 16-24, *supra*. Put another way, permitting government action to be a source of antitrust injury would permit government action to be a source of antitrust liability, which is impermissible and inconsistent with *Noerr-Pennington*.

In addition, *J&J* is factually distinguishable from this case in a critical way, and its reasoning therefore should not be carried over to this very different context. Unlike this case, *J&J* did not involve any kind of injury-causing government decision, let alone an earlier-issued injunction from a federal court. *See J&J*, 745 F. Supp. 3d at 302, 316. Rather, in *J&J* the alleged injury—delayed biosimilar entry into the relevant market—resulted from a private settlement agreement between a patentee and an accused infringer. *See id.* Given that distinction, it is improper to read *J&J* as opining about whether a viable antitrust claim exists when an alleged injury arises from government action that is itself the result of protected petitioning.

Overlooking that distinction and applying the *J&J* decision as the district court did here would seriously weaken the *Noerr-Pennington* doctrine's protections. To eliminate a defendant's *Noerr-Pennington* immunity, an antitrust plaintiff would need only allege that the defendant had engaged in a *single* anticompetitive act at *any* time prior to protected petitioning, and then claim that the resulting government action is attributable to that earlier-in-time, non-immunized conduct. The district-court decision in this case is a cautionary example of how easily an antitrust plaintiff could use the *J&J* rule to end run *Noerr-Pennington*: CareFirst alleges that Amgen's acquisition of rights to pending patent applications in 2004 caused CareFirst injury starting in 2016 because, in the many intervening years, Amgen successfully prosecuted those patent applications and successfully sought judicial enforcement of the resulting patents. JA0274-0275.

CareFirst thus seeks to expose Amgen to liability for its petitioning conduct; there is simply no other way to understand the complaint. If that gambit were allowed to succeed, it would effectively eviscerate the protections of *Noerr-Pennington* and, in doing so, dissuade would-be petitioners of the government from exercising the very rights that *Noerr-Pennington* is supposed to protect. This Court has strenuously cautioned against such a result, explaining that *Noerr-Pennington* demands "that the rights of petition and association trump any

31

anticompetitive effects that might occur from asking the government for redress." *Baltimore Scrap*, 237 F.3d at 399.

**b.** CareFirst's answer below and in response to Amgen's Section 1292(b) petition was that the 2004 license foreseeably led to later patent prosecution, issued patents, enforcement suits, injunctions, and higher prices. But antitrust causation is not satisfied by any sequence of events that begins with allegedly anticompetitive conduct by the defendant and ends with the plaintiff's injury. When the injury exists only because of discretionary government action, the causal chain is broken and the defendant cannot be liable. That is true here, where the alleged injury exists only because independent government actors granted patents and final injunctions after years of protected petitioning.

First, CareFirst's argument that Amgen cannot "retroactively immunize[]" anticompetitive conduct by seeking to "enforc[e] unlawfully obtained rights," JA0482, incorrectly presumes that Amgen's acquisition of rights to the patent applications *itself* harmed CareFirst. But no antitrust claim exists where the essential element of causation is lacking. *See Advanced Health-Care*, 910 F.2d at 149. And, as discussed above, CareFirst's claimed injury is caused by federal-court injunctions blocking manufacturers of biosimilar Enbrel from entering the U.S. market. *See* pp. 16-24, *supra*. In other words, the injunctions caused

CareFirst's claimed injury in the first place; they did not "retroactively" insulate from antitrust scrutiny any unlawful (or even harmful) conduct by Amgen.

Second, CareFirst cannot plausibly allege that any *non-enjoined* biosimilar manufacturer is somehow excluded from the etanercept market because of Amgen's acquisition of rights to Roche's patent applications. The complaint identifies Sandoz and Samsung as the only "drug compan[ies] seeking to launch a biosimilar etanercept product to compete with Enbrel." JA0224; *see* JA0224-0225, JA0265.

Moreover, any notion that Roche or some other unnamed pharmaceutical company would have obtained FDA approval and then "launched its own biosimilar product" if Amgen had not acquired rights to Roche's patent applications is pure speculation.[12] JA0264-0265. That kind of speculation is not a permissible basis to withstand a motion to dismiss—especially given that a plaintiff attempting to show harm from its inability to enter a market is required to plead actual "preparedness to do so," including "sufficient financial capability" and "actual and substantial affirmative steps toward entry." *Hecht v. Pro-Football*, 570

---

[12] Notably, the complaint does not allege that—in the face of competition from Amgen, Sandoz, and Samsung—some unspecified manufacturer was prepared to "invest[] significant time and money into developing and getting FDA approval for" a *fourth* etanercept-containing drug. JA0265; *see Canadian Imp. Antitrust Litig.*, 470 F.3d at 792 ("'vaguely defined links' in the chain of causation" are "insufficient to establish antitrust standing" (citation omitted)).

F.2d 982, 994 (D.C. Cir. 1977); *see BNLfood Invs. v. Martek Biosciences*, 2011

WL 6439451, at *3 & n.13 (D. Md.) (collecting cases).

Indeed, the complaint alleges no facts plausibly suggesting that Roche would

have obtained the requisite approval and launched an Enbrel biosimilar absent

Amgen's acquisition of the patent-application rights.  According to the complaint,

after Roche filed the '790 and '791 applications in 1995, Roche made no apparent

effort for nearly a decade to develop or commercialize a biosimilar version of

etanercept.  And before the 2004 restructuring, Roche was earning a royalty on

Enbrel sales.  JA0240, JA0244, JA0251.  There is thus no plausible basis to believe

that Roche would have entered the market.

### B. CareFirst Lacks Article III Standing To Pursue Its Federal Claim

CareFirst's federal claim independently fails for a separate reason related to

the existence of the two injunctions:  CareFirst lacks Article III standing to pursue

that claim.[13]

A critical element of Article III standing is redressability—that is, a

substantial likelihood that a plaintiff's claimed injury "would be redressed by the

requested judicial relief."  *Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197, 211

---

[13] "[S]tanding to sue is a jurisdictional issue of constitutional dimensions, and it may be raised and addressed for the first time on appeal."  *Davison v. Randall*, 912 F.3d 666, 677 (4th Cir. 2019) (citation omitted); *see Delmarva Fisheries Ass'n v. Atl. States Marine Fisheries Comm'n*, 127 F.4th 509, 514 (4th Cir. 2025).

(4th Cir. 2025) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024)); *see Vermont Agency of Nat. Res. v. Stevens*, 529 U.S. 765, 771 (2000). CareFirst "bears the burden" of "clearly … alleg[ing] facts demonstrating" redressability in its complaint, *Spokeo v. Robins*, 578 U.S. 330, 338 (2016) (omission in original); *see Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009)— and of doing so as to each claim and "each form of relief" that it seeks, *TransUnion v. Ramirez*, 594 U.S. 413, 431 (2021).

But CareFirst has failed to carry that burden as to its federal claim.[14]  As noted, as to that claim CareFirst's alleged injury is that it has been paying, and will continue to pay, "higher prices for etanercept" due to the lack of "biosimilar etanercept" in the U.S. market, JA0281, and CareFirst seeks only injunctive and declaratory relief, JA0228, JA0282; *see* JA0350-0351; *see also* JA0228 (seeking damages only as to state-law claims).  But CareFirst has not alleged, and could not allege, that there is a substantial likelihood that such relief would result in sales of biosimilar etanercept in the United States before April 2029—at which point no barrier to biosimilar market entry will remain to be redressed.

---

[14] Amgen does not challenge CareFirst's Article III standing to bring its state-law claims for damages; those claims fail on the merits, as does CareFirst's federal claim.  *See* pp. 56-57, *infra*.

The April 2029 date is highly significant. The injunctions issued by the New Jersey federal court strictly prohibit Sandoz and Samsung, which have obtained FDA approval for their biosimilar etanercept products, "from making, using, offering to sell, or selling within the United States, or importing into the United States any product containing etanercept" until April 2029. JA0213 (Sandoz), JA0216 (Samsung). Those injunctions reflect final judicial determinations that the Sandoz and Samsung biosimilars infringe valid patents owned by Roche and exclusively licensed to Amgen, the last of which expires in April 2029. JA0265, JA0280. Thus, the complaint alleges that Amgen's alleged "monopoly power" will not "extend" past April 2029, the date when Sandoz and Samsung will be able to bring their Enbrel biosimilars to market. JA0265, JA0280.

But CareFirst has not pleaded that the district court could redress the alleged injury by making Sandoz's or Samsung's biosimilar drugs available earlier than April 2029—and that relief would not be possible. The existing federal injunctions prevent Sandoz and Samsung from marketing those products before that date, and the district court in this case cannot erase or otherwise grant relief from those injunctions, as one court cannot "enjoin the use of the injunctive power by another." *Cahoon*, 214 F.2d at 833; *see Celotex v. Edwards*, 514 U.S. 300, 313 (1995) (permitting a party "to collaterally attack" another court's injunction "in the

36

federal courts" "cannot be permitted … without seriously undercutting the orderly process of the law").  Nor would a ruling for CareFirst on its federal claim do anything to undermine the patent-infringement determination that underlies those injunctions.

CareFirst also has not pleaded that injunctive or declaratory relief in this case would cause some *other* biosimilar manufacturer to bring an etanercept-containing drug to the market prior to 2029.  It is not clear what that relief could consist of—and CareFirst's complaint, which requests relief only in the most generic terms, sheds no light on that subject.  JA0351, JA0282; *see Maryland*, 151 F.4th at 211.  In any event, as the complaint acknowledges, only Sandoz and Samsung have received FDA approval for biosimilar Enbrel.  JA0265.  The complaint does not allege that any other company has shown any interest in developing a biosimilar version of Enbrel—much less that a company would have the scientific, regulatory, economic, and logistical wherewithal to develop that product and secure FDA approval within the next three years.  JA0264-0268, JA0274-0282.

The Court may not speculate on that subject.  Where "choices by an 'independent actor[]'" would be necessary to redress an alleged injury, *Delmarva Fisheries Ass'n v. Atl. States Marine Fisheries Comm'n*, 127 F.4th 509, 515 (4th Cir. 2025) (citation omitted), the requirement of showing redressability is

especially strict, and it is satisfied only where the "third part[y] will likely react" to "judicial relief" in "predictable ways" that will in fact remedy the injury, *Diamond Alternative Energy v. EPA*, 606 U.S. 100, 112 (2025); *see Crete Carrier v. EPA*, 363 F.3d 490, 492-94 (D.C. Cir. 2004) (trucking companies lacked standing to challenge 2004 emissions standard because, in light of "the necessity of meeting yet another standard by January 2007," they could not show that third-party engine manufacturers would revert to offering pre-2004 engine models for sale even if the 2004 standard was rescinded); *ASARCO v. Kadish*, 490 U.S. 605, 615 (1989) (standing lacking for "claims of economic injury" where redressability "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict"); *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013).

No such predictability is alleged here. Indeed, CareFirst's complaint highlights how implausible it would be to conclude that an entity other than Sandoz or Samsung could commercialize biosimilar Enbrel before 2029. As the complaint explains, Sandoz and Samsung "invested significant time and money into developing and getting FDA approval for … biosimilar etanercept." JA0265. In Sandoz's case, for instance, Sandoz did not file an application with the FDA until several years after the earliest date when such an application was permissible,

and the subsequent FDA approval process took nearly a year.  JA0242, JA0259; *see Sandoz*, 582 U.S. at 7.  The complaint also notes that other potential etanercept manufacturers fell out of the running long ago:  neither Roche nor Serono ("a Swiss pharmaceutical company" that was "developing a soluble TNF receptor") *ever* commercialized biosimilar etanercept or any other TNF-blocking protein, despite holding or licensing relevant patents for years.  JA0223-0224, JA0243-0244, JA0248, JA0251; *see, e.g.*, Nick Corwin, *The Failures of the Biologics Price Competition and Innovation Act*, 39 Notre Dame J.L. Ethics & Pub. Pol'y Online Supp. 793, 796 (2025) (bringing a biosimilar product to market requires, on average, "eight to ten years" and hundreds of millions of dollars).

## II. CareFirst's Claims Must Be Dismissed Because The Complaint Fails To Allege Actionable Exclusionary Conduct

CareFirst's failure to allege actionable exclusionary conduct is an independent basis for disposing of this case in Amgen's favor.  All of CareFirst's claims rest on a single act by Amgen:  licensing of Roche's pending patent applications.  That act did not exclude anyone from doing anything; patent applications are nothing more than *requests* for exclusionary rights.  In addition, the license itself is protected under the *Noerr-Pennington* doctrine because it is "incidental to" petitioning activity.  There is thus no actionable exclusionary conduct alleged in this case.

The district court disagreed, but found an exclusionary effect only by looking forward to Amgen's later successful patent prosecution, the PTO's issuance of patents, Amgen's patent-enforcement suits, and the New Jersey federal court injunctions—events that the court recognized were protected petitioning or government action. JA0030. And the court placed unwarranted emphasis on patent applications' value as property and Amgen's supposed intent to maintain monopoly power, neither of which supplies the missing anticompetitive effect. The district court's flawed approach would convert routine licensing into an antitrust hazard, and the law does not permit that result.

### A. The Act Of Licensing Patent Applications, Standing Alone, Cannot Give Rise To A Claim For Unlawful Monopolization

#### 1. Amgen's Acquisition Of Rights To Roche's Patent Applications Is Not Exclusionary Conduct

To state a claim for unlawful monopolization under federal or state antitrust law, CareFirst must plausibly allege that Amgen "engaged in anticompetitive conduct — *i.e.*, conduct intended to 'exclude rivals on some basis other than efficiency.'" *2311 Racing*, 139 F.4th at 410 (citation omitted). Again, the *only* conduct by Amgen that CareFirst claims is exclusionary is Amgen's exclusive licensing of pending patent applications—indeed, CareFirst amended its complaint to make clear that no other conduct is at issue. JA0256-0258, JA0274-0275

(relying solely on Amgen's exclusive license to the '790 and '791 applications, which years later issued as the '182 and '522 patents).

But acquiring such rights to a patent application is not exclusionary as a matter of law. Issued patents "grant to the patentee … the right to exclude others," 35 U.S.C. § 154(a)(1), but pending patent applications do not, *see* 35 U.S.C. § 154(a)(2) ("right to exclude" begins "on the date on which the patent issues"). Thus, before a patent issues, "there is no property right" in a pending patent application that the "inventor can enforce." *Marsh v. Nichols, Shepherd & Co.*, 128 U.S. 605, 612 (1888); *see Orange-Crush v. Am. Ornamental Bottle*, 60 F.2d 518, 520 (4th Cir. 1932) ("there can be no infringement of a patent" except in "the period which follows the issuance of a patent").

As the Seventh Circuit has explained, it follows that "[p]atent applications, successful or not, do not impose costs on rivals; only issued patents do so." *Mayor and City Council of Baltimore v. AbbVie*, 42 F.4th 709, 714 (7th Cir. 2022). Issued patents "exclude rivals from the market" and ensure that "competitors cannot use the patented invention." *J&J*, 745 F. Supp. 3d at 315 (addressing only issued patents). Patent *applications*, by contrast, provide no exclusionary rights at all—indeed, the mere existence of an application is no "guarantee that a patent" will ever "issue." *Memorylink v. Motorola Sols.*, 773 F.3d 1266, 1272 (Fed. Cir. 2014).

41

In light of those principles, courts have held that the "acquisition of a *patent*" can satisfy the exclusionary-conduct element of an antitrust claim, *e.g.*, *SCM v. Xerox*, 645 F.2d 1195, 1207 (2d Cir. 1981) (emphasis added)—but they have never held that acquiring a license to patent *applications* alone can do so. Amgen is not aware of any such case, and neither the district court nor CareFirst has identified one.

The district court acknowledged that antitrust cases in which courts have mentioned pending patent applications arise in the "context of a broader patent portfolio" that includes issued patents or "a broader conspiracy or agreement to restrict competition." JA0030, JA0522. *United States v. Singer Manufacturing*, 374 U.S. 174 (1963), a case on which CareFirst has heavily relied, *see* Resp.19-20, No. 26-139 (Apr. 9, 2026), falls into that very category. It involves issued patents and patent applications, not patent applications alone, and it points to specific conduct involving the issued patents in concluding that an antitrust violation occurred. *See Singer*, 374 U.S. at 189, 194-95 (finding a conspiracy to "destroy" the "sale of infringing machines" by "placing" an issued "patent in Singer's hands" and having Singer enforce it); *Duplan v. Deering Milliken*, 540 F.2d 1215, 1221 (4th Cir. 1976) (*Singer* is based on the "totality of" conspiratorial conduct, including Singer's "purchas[ing] a United States patent" and an agreement to give Singer the ability to enforce the patent); *see also, e.g.*, *Automated Bldg.*

42

*Components v. Trueline Truss*, 318 F. Supp. 1252, 1259-61 (D. Or. 1970) (firm acquired critical equipment and materials, along with patent applications, in furtherance of an "continuing conspiracy" that began several years earlier).

No such broader conduct is at issue in this case, and the only conduct on which CareFirst's antitrust claims rest cannot, as a matter of law, constitute exclusionary conduct in violation of the antitrust laws.  It was not until *seven years* after Amgen took an exclusive license to the '790 and '791 patent applications that the PTO granted those applications and issued the '182 and '522 patents, JA0257; *see* pp. 5-7, *supra*—and Amgen did not obtain from Roche any power to exclude competitors until that issuance occurred.[15]

It is also striking that CareFirst's operative complaint does not allege that Roche's patent applications even covered etanercept at the time of the 2004 agreement under which Amgen obtained the license.  In fact, an earlier version of that complaint affirmatively alleged that the patent applications "*did not cover etanercept*" at that time.  JA0106; *see* JA0107 (first amended complaint alleging that Amgen "substantially rewrote" and "reshaped" the patent applications).  Thus, there is no plausible allegation that the applications would have excluded Enbrel

---

[15] Given that patents are by nature exclusionary, "[t]he mere accumulation of patents, no matter how many," is not "illegal" under the antitrust laws.  *Automatic Radio Mfg. v. Hazeltine Rsch.*, 339 U.S. 827, 834 (1950), *overruled on other grounds by Lear v. Adkins*, 395 U.S. 653 (1969).

biosimilars if those applications had issued as patents as they existed on the day that Amgen licensed them—which makes it all the more obvious that Amgen's acquisition of the license had no exclusionary effect.

Finally, the complaint does not allege that Amgen's licensing of the patent applications had some anticompetitive effect *other than* ultimate issuance of the patents. For example, even assuming *arguendo* that CareFirst could state a claim for unlawful monopolization by alleging that a biosimilar manufacturer exited the etanercept market or delayed development of a relevant product due to Amgen's licensing of the patent applications, the complaint alleges no such thing. In fact, the complaint alleges just the *opposite*—that following the 2004 transaction in which Amgen obtained that license, Sandoz and Samsung doubled down on their commitment to entering the market by "invest[ing] significant time and money into developing and getting FDA approval for … biosimilar etanercept." JA0265; *see* JA0259, JA0261.

### 2. *Noerr-Pennington* Immunizes Acquisition Of Rights To A Patent Application

Even if acquiring exclusive rights to patent applications were exclusionary conduct (which it is not), Amgen's acquisition of such rights in this case is conduct that is directly covered by *Noerr-Pennington* immunity because it is conduct that is incidental to petitioning. Amgen therefore cannot be held liable for it—and CareFirst does not claim that any other conduct by Amgen violates the law.

A pending patent application is *itself* a petition to the government:  a request that the PTO grant the application and issue a patent.  It is, in effect, the complaint in "a lawsuit brought by the inventor to persuade or compel" the PTO to create exclusionary rights.  *Mills Novelty v. Monarch Tool & Mfg.*, 49 F.2d 28, 31 (6th Cir. 1931); *see C.R. Bard v. M3 Systs.*, 157 F.3d 1340, 1371 (Fed. Cir. 1998).  And that request that the government issue a patent remains active for the entire time that the application is pending, regardless of whether any activity is happening at the PTO at any given time.  Accordingly, the filing and prosecution of a patent application is plainly covered by the *Noerr-Pennington* doctrine.

So, too, is acquisition of rights to a pending patent application—i.e., the only conduct by Amgen that CareFirst says gives rise to any liability in this case.  That is because the *Noerr-Pennington* doctrine extends beyond the act of petitioning to cover non-petitioning conduct that is "incidental" (or "preliminary") to a petition to the government.  *Navient Solutions v. Lohman*, 136 F.4th 518, 525 (4th Cir. 2025); *see Allied Tube & Conduit v. Indian Head*, 486 U.S. 492, 503 (1988); *Baltimore Scrap*, 237 F.3d at 401.  Amgen's acquisition of rights to pending patent applications, which included the right to prosecute the applications at the PTO, plainly meets that standard.  Indeed, it is hard to think of anything more incidental to petitioning than acquiring the rights *to a petition*.  Amgen effectively stepped into the petitioner's shoes, and was asking the government for relief, from the very

45

moment that the acquisition occurred—before Amgen took any affirmative steps to do anything at the PTO. There is simply no way to disentangle the acquisition of the rights in the applications from the fundamental nature of the applications as petitions asking the PTO to issue patents.

Certainly, acquiring rights to a patent application is not *less* incidental to petitioning the government than conduct like litigation funding and pre-suit letters, both of which courts have found protected under *Noerr-Pennington* under the "incidental" standard. *See, e.g.*, *Navient*, 136 F.4th at 525; *Baltimore Scrap*, 237 F.3d at 401. Litigation funding, which fills the gap when "litigation cannot be entirely financed out of the pocket of the party bringing suit," *Baltimore Scrap*, 237 F.3d at 401, and gives the funder a stake in the litigation, is a particularly apt analogy. Like litigation funding, licensing of a patent application is often done to place the right to press the application before the PTO in the hands of a party with the financial means to do so. *See Sosa v. DIRECTV*, 437 F.3d 923, 933-34 (9th Cir. 2006) (when conduct is "intimately related to … petitioning activity," the First Amendment "preclude[s] burdening [it] so as to preserve the breathing space required for the effective exercise of the rights it protects"). In both situations, "the costs of supporting … access to public bodies" should "not entail the defense of a collateral antitrust suit." *Baltimore Scrap*, 237 F.3d at 401.

### B. The District Court's Analysis Is Legally Erroneous

#### 1. The District Court's Analysis Runs Afoul Of The *Noerr-Pennington* Doctrine

The district court stated that the acquisition of rights to pending patent applications was actionable because that acquisition enabled Amgen to later prosecute the applications, obtain patents, and enforce those patents. JA0030, JA0034. That reasoning, however, does not account for the fact that acquiring rights to such patent applications is immunized under the First Amendment as "incidental to" protected petitioning. *See* pp. 44-46, *supra*. That problem alone is enough to require reversal: if Amgen cannot be liable for the acquisition of those rights, then there is nothing left of CareFirst's complaint.

But even assuming that *Noerr-Pennington* does not foreclose liability for the acquisition of the rights, the district court's decision is still fatally flawed. The court reasoned that Amgen's acquisition of rights to pending patent applications was actionable under the antitrust laws because it "gave [Amgen] the ability to resume prosecution" of those applications and "empowered it to enforce any patents to exclude competitors from the etanercept market." JA0030, JA0034. In other words, to conclude that the *licensing* of patent applications constituted exclusionary conduct, the court relied on the exclusionary effects of Amgen's subsequent successful *patent prosecution and enforcement*. And the court did so even though it elsewhere agreed, as CareFirst conceded below, that *Noerr-*

*Pennington* immunizes both patent prosecution (a petition to the PTO) and patent enforcement by way of a suit (a petition to the courts). *See, e.g.*, JA0020-0021.

That reasoning ignores the well-established principle that conduct immunized under *Noerr-Pennington* must be *eliminated* from the analysis of whether Amgen did anything that constitutes exclusionary conduct under the antitrust laws. That is because "aggregat[ing] the effects of conduct immunized from antitrust liability with the effects of conduct not so immunized" would "nullify the immunity." *Mercatus Grp. v. Lake Forest Hosp.*, 641 F.3d 834, 839 (7th Cir. 2011). Indeed, *Pennington* disapproves of that type of aggregation, explaining that "efforts to influence public officials … to eliminate competition" are "not illegal" whether they are "standing alone" or are "part of a broader scheme" that includes non-immunized conduct. 381 U.S. at 670. Once a court properly disregards any conduct immunized under *Noerr-Pennington*, all that is left to do is "consider the evidence of the remaining challenged conduct in the aggregate to see if it is sufficient to support … liability." *Mercatus*, 641 F.3d at 839.

The Seventh Circuit's decision in *Mayor and City Council of Baltimore v. AbbVie*, 42 F.4th 709 (7th Cir. 2022), shows exactly how the analysis is supposed to work—and it does so in a factual setting that is highly analogous to this case. There, some of the defendant pharmaceutical manufacturer's challenged conduct

leading up to "obtaining" issued patents and "invoking them against the biosimilars" was not immunized by *Noerr-Pennington*. *See id.* at 713. But the Seventh Circuit concluded that dismissal was warranted because the plaintiffs' antitrust claim was necessarily premised on "concern about the successful outcome of [the defendant's] petitioning" before the PTO, which is protected under *Noerr-Pennington*. *Id.* at 714. Before those petitions succeeded, the court of appeals explained, the defendant held only patent applications—and "[p]atent applications, successful or not, do not impose costs on rivals; only issued patents do so." *Id.*; *see, e.g.*, *Intellectual Ventures I v. Capital One Financial*, 280 F. Supp. 3d 691, 706 (D. Md. 2017) (dismissing antitrust claims premised on acquisition of patents and subsequent patent litigation because the "purported [anticompetitive] 'campaign[]' … could not succeed absent" the litigation).

The same thing is true here. The district court did not dispute that Amgen's rights to the patent applications, standing alone, did not exclude anyone or impose any costs on CareFirst or on any rival. And Amgen's "resum[ption]" of "prosecution" of those applications and its "enforce[ment]" of "any patents to exclude competitors from the etanercept market," JA0030, JA0034, must be eliminated from the analysis. Without that protected petitioning and government action, nothing exclusionary remains. The court should have dismissed the

antitrust claims because any alleged exclusionary effect of the 2004 license depended on later protected petitioning.

Yet the district court got the analysis backwards. Far from eliminating consideration of Amgen's immunized acts and "concern about the successful outcome of [that] petitioning," *AbbVie*, 42 F.4th at 714, the court put those acts and that concern front and center. The court's conclusion that CareFirst had pleaded exclusionary conduct rested entirely—and quite expressly—on Amgen's petitioning of the PTO and the New Jersey federal court and the fact that Amgen's petitioning ultimately had a "successful outcome." *Id.*; *see* JA0030, JA0034. A simple counterfactual cements the point: if Amgen had simply obtained exclusive rights to the patent applications and left them in a drawer, Amgen would never have done the very things that the district court said were exclusionary, i.e., "resum[ing] prosecution" of the applications and ultimately "enforc[ing] any patents to exclude competitors." JA0030, JA0034. Obtaining those rights to the applications therefore cannot constitute exclusionary conduct.

### 2. The District Court's Analysis Is Erroneous In Numerous Other Respects

In addition to the fundamental *Noerr-Pennington* flaw in its analysis, the district court made several basic errors of law in accepting that CareFirst's claims could proceed.

**a.** First, the district court seems to have treated the applications' alleged value to Amgen as a substitute for exclusionary effect. The court recognized that the applications did not "confer" any "exclusionary power" on Amgen, but deemed it significant that rights to the applications "were enormously valuable to Amgen." JA0032. That was erroneous, regardless of what the district court meant by "valuable."

One thing that the district court could have meant was that the applications had value because they later resulted in issued patents. JA0032-0035. As discussed above, however, resting liability on that ground is just another way of penalizing Amgen for protected petitioning activity at the PTO, and that penalty is impermissible under the *Noerr-Pennington* doctrine. *See* pp. 25-28, *supra*.

Alternatively, the district court could have meant that the rights to the patent applications were economically "valuable" in and of themselves. But value is not exclusion. Almost every commercial asset has value in some sense, and many valuable assets do not exclude rivals from anything. It therefore cannot be the case that simply entering into a "valuable" licensing agreement, JA0032, indicates that Amgen's conduct violated the antitrust laws. If that were true, then ordinary economic activity that cannot possibly be described as anticompetitive would be suspect, even though antitrust law condemns only "anticompetitive conduct."

*Verizon Comms. v. L. Offs. of Curtis V. Trinko*, 540 U.S. 398, 407-08 (2004); *see, e.g., Novell v. Microsoft*, 731 F.3d 1064, 1076 (10th Cir. 2013) (Gorsuch, J.).

**b.** Second, in a footnote, the district court erroneously focused on Amgen's purported *intent* to exclude. Deeming it irrelevant that the licensed "patent applications themselves" did not "actually allow[] Amgen to exclude competitors," the court stated that "'the relevant question is *not* whether the patent acquisitions actually enhanced [the defendant's] market power, but rather whether they reflect [the defendant's] intent to maintain monopoly power through anticompetitive means.'" JA0034 (quoting *ABS Global v. Inguran*, 2016 WL 3963246, at *19 (W.D. Wis.)).

That is flatly incorrect as a matter of law because intent is not sufficient to prove the antitrust violations CareFirst has alleged. Because "anticompetitive effect" is an essential element of an antitrust violation, *Dickson v. Microsoft*, 309 F.3d 193, 211 (4th Cir. 2002), courts have long recognized that, regardless of "intent," no antitrust violation exists unless the "effect of" challenged conduct is anticompetitive. *United States v. Microsoft*, 253 F.3d 34, 58-59 (D.C. Cir. 2001); *see also, e.g., Aerotec Int'l v. Honeywell Int'l*, 836 F.3d 1171, 1184 (9th Cir. 2016); *Olympia Equip. Leasing v. W. Union Tel.*, 797 F.2d 370, 379 (7th Cir. 1986) (Posner, J.) (it "has become an antitrust commonplace" that "if conduct is not objectively anticompetitive the fact that it was motivated by hostility to

competitors" has no significance). Without an "objectively anticompetitive" act, an intent "to make money at the expense of" competitors is simply irrelevant. *Olympia*, 797 F.2d at 380.[16]

That principle reflects a core purpose of antitrust law: to "permit[]"—and, indeed, "encourage[]"—businesses "to compete aggressively on the merits." *Olympia*, 797 F.2d at 375. A "competitively aggressive firm always 'intends' to harm rivals if injury to rivals is a consequence of one's own increase in market share." Areeda & Hovenkamp, *Antitrust Law* ¶ 601. If intent alone were enough to give rise to liability, then all competitive acts would qualify. That state of affairs would inevitably "deter[] vigorous competition" and decrease "consumer welfare." *Novell*, 731 F.3d at 1078; *see* Areeda & Hovenkamp, *Antitrust Law* ¶ 601 (anticompetitive "intent can accompany competitive, socially beneficial acts").

---

[16] *See also Brooke Grp. v. Brown & Williamson Tobacco*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws."); *Am. Online v. GreatDeals.Net*, 49 F. Supp. 2d 851, 859 (E.D. Va. 1999) ("general intent to gain monopoly status is not sufficient absent some predatory conduct"); *Am. President Lines v. Matson*, 775 F. Supp. 3d 379, 410 (D.D.C. 2025) (similar). Intent to monopolize also does not erase the protections of *Noerr-Pennington*. *See Pennington*, 381 U.S. at 669 ("[n]othing could be clearer" than that an "anticompetitive purpose did not illegalize" lobbying the government for laws that would harm the trucking industry).

### 3. The District Court's Erroneous Analysis Would Have Harmful Effects, Including By Disincentivizing Innovation

All of the district court's erroneous reasoning endorses a deeply harmful, innovation-stifling result. Such a result is a strong indication that antitrust law has been stretched too far. As this Court has explained, when "analyzing whether a particular patent-related practice" is "unlawful[]," a court "should hesitate to apply antitrust sanctions" if doing so would "discourage innovation and investment." *Int'l Wood Processors v. Power Dry*, 792 F.2d 416, 427 (4th Cir. 1986); *see Verizon*, 540 U.S. at 414.

If the mere licensing of a patent application can be deemed exclusionary conduct that triggers antitrust liability, such licensing would become fraught with risk for both the licensor and the licensee, as each could be subject to such liability merely for participating in the licensing transaction. *See Burlington Indus. v. Milliken*, 690 F.2d 380, 394 (4th Cir. 1982) (courts have "engraft[ed] the doctrine of joint and several liability onto the express remedies of the antitrust laws"); *Marion Healthcare v. Becton Dickinson*, 952 F.3d 832, 839 (7th Cir. 2020) ("antitrust liability is joint and several"). Potential licensees would be forced to scrutinize every patent application to assess whether it might later mature into a patent that could one day cover a competing product. And as the facts of this case illustrate, that could well require assessment of what might happen many years in

54

the future, JA0257 (seven years from Amgen's license to the applications to issuance of the patents)—a daunting, time-consuming, and expensive task.

The stark negative effects of such a legal regime are clear. Not all inventors will have the resources or ability to petition the government for patents to secure the rewards of their innovation. The Supreme Court thus has recognized that allowing inventors to "make enforceable agreements licensing" their patent applications offers an important "incentive to invention," as the practice permits an innovator to monetize its invention even while there remains "the possibility that a patent might not issue." *Aronson v. Quick Point Pencil*, 440 U.S. 257, 261-62 (1979). That incentive is especially important in the pharmaceutical industry, where "the incentive to develop a pharmaceutical drug may *depend on* the permissibility of exclusive licensing."[17] Hovenkamp & Hovenkamp, *Buying Monopoly: Antitrust Limits on Damages for Externally Acquired Patents*, 25 Tex. Intell. Prop. L.J. 39, 65 n.126 (2017) (emphasis added). And in many circumstances, the best license partner will be a company that owns related technologies and patents, because such a company is in the best position to put a patent to productive use (if a patent eventually issues) and to do so at the lowest

---

[17] Indeed, a licensee would have little incentive to acquire the right to prosecute a patent application or invest in bringing a product described in the application to market if the licensee could not preclude others (via an exclusive license) from practicing any patent that ultimately issues.

marginal cost.  Yet that is exactly the kind of company that would be most deterred from investment in patent applications under the novel rule that CareFirst champions.  That deterrence would, in turn, significantly weaken the incentives for the research, development, and innovation that give rise to a patent application in the first place.

## III.    The State-Law Claims Must Be Dismissed

CareFirst's state-law claims must be dismissed for the same reasons as its federal antitrust claim.  As the district court correctly observed, "because the *Noerr-Pennington* doctrine is premised on the exercise of a federal constitutional right, it immunizes Amgen's conduct not only from antitrust liability, but also from liability under all manner of state-law business torts."  JA0040; *see IGEN Int'l v. Roche Diagnostics*, 335 F.3d 303, 310 (4th Cir. 2003).

Even setting *Noerr-Pennington* aside, because CareFirst's "state antitrust law claims echo its allegations under the Sherman Act," they "fail" on the merits for the same reasons that the federal antitrust claim fails on the merits.  *It's My Party v. Live Nation*, 811 F.3d 676, 687 n.* (4th Cir. 2016); *see* JA0282 (complaint alleging that "conduct that violates the Sherman Act will, if proven, establish a claim under each of the [state antitrust] laws"); *see also, e.g., In re Tamoxifen*

*Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003), *aff'd*, 466 F.3d 187 (2d Cir. 2006).[18]

The same is true for CareFirst's consumer-protection and unjust-enrichment claims. Courts "dismiss[] state consumer protection and unfair trade practices claims" where, as here, they "simply mirror deficient" claims under "federal antitrust laws." *In re Suboxone Antitrust Litig.*, 2017 WL 4642285, at *12 (E.D. Pa.); *see* JA0288 (complaint's consumer-protection claims based on "unlawfully delaying the entry of etanercept biosimilars"), JA0324 (same as to unjust-enrichment claims); *see also, e.g.*, *R. J. Reynolds Tobacco v. Philip Morris.*, 199 F. Supp. 2d 362, 396 (M.D.N.C. 2002) ("state common law and statutory claims" premised on same conduct as "failed federal claims … fail as well"), *aff'd*, 67 F. App'x 810 (4th Cir. 2003).

## CONCLUSION

The district court's order denying Amgen's motion to dismiss should be reversed.

---

[18] The district court concluded as much, and the two states it identified with antitrust laws that do not perfectly track federal antitrust law (Tennessee and Colorado) nonetheless require anticompetitive conduct and causation, JA0043, JA0047-0050—both of which are absent here, *see* pp. 16-28, 40-46, *supra*.

Respectfully submitted,

DATED: June 8, 2026

MUNGER, TOLLES & OLSON LLP

By: */s/ Elaine J. Goldenberg*

Rohit Singla
Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000
Rohit.Singla@mto.com
Justin.Raphael@mto.com

Adam Lawton
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adam.Lawton@mto.com

Elaine J. Goldenberg
Sarah E. Weiner
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
  Suite 500 E
Washington, DC 20001
(202) 220-1100
Elaine.Goldenberg@mto.com
Sarah.Weiner@mto.com

*Counsel for Defendants-Appellants*

## REQUEST FOR ORAL ARGUMENT

Pursuant to Fourth Circuit Rule 34(a), Amgen requests oral argument because—as Amgen argued when petitioning the Court to hear this interlocutory appeal under Section 1292(b)—the legal issues are important, this Court's guidance on those issues is needed in this Circuit, and this case is of serious consequence to Amgen.  Counsel believe that argument will significantly assist the Court.

DATED:  June 8, 2026                MUNGER, TOLLES & OLSON LLP

By: */s/ Elaine J. Goldenberg*
Elaine J. Goldenberg
*Counsel for Defendants-Appellants*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,973 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  I further certify that this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced 14-point Times New Roman font using Microsoft Word.

DATED:  June 8, 2026                         MUNGER, TOLLES & OLSON LLP

                                        By: */s/ Elaine J. Goldenberg*
                                             Elaine J. Goldenberg
                                             *Counsel for Defendants-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2026, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which sent notification of such filing to all registered CM/ECF users.

DATED: June 8, 2026            MUNGER, TOLLES & OLSON LLP

By: */s/ Elaine J. Goldenberg*
Elaine J. Goldenberg
*Counsel for Defendants-Appellants*