**No. 26-1473**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CAREFIRST OF MARYLAND, INC.; GROUP
HOSPITALIZATION AND MEDICAL SERVICES, INC.;
CAREFIRST BLUECHOICE, INC., on behalf of themselves and all
others similarly situated,

*Plaintiffs-Appellees,*

v.

AMGEN INC.; IMMUNEX CORPORATION; AMGEN
MANUFACTURING LIMITED LLC,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Eastern District of Virginia
Case No. 2:24-cv-00484-AWA-LRL

**JOINT APPENDIX
(PAGES JA0001 TO JA0570)**

| | |
|---|---|
| Thomas M. Sobol | Elaine J. Goldenberg |
| Hannah W. Brennan | Sarah E. Weiner |
| Rachel A. Downey | MUNGER, TOLLES & OLSON LLP |
| HAGENS BERMAN SOBOL SHAPIRO, LLP | 601 Massachusetts Avenue NW |
| 1 Faneuil Hall Square, 5th Floor | Suite 500 E |
| Boston, MA 02109 | Washington, DC 20001 |
| (617) 482-3700 | (202) 220-1100 |
| tom@hbsslaw.com | Elaine.Goldenberg@mto.com |
| hannahb@hbsslaw.com | Sarah.Weiner@mto.com |
| racheld@hbsslaw.com | |

*Counsel for Plaintiffs-Appellees*          *Counsel for Defendants-Appellants*

(additional counsel on inside cover)

David Zimmer
ZIMMER CITRON & CLARKE LLP
130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9421
david@zimmercitronclarke.com

Peter D. St. Phillip
Uriel Rabinovitz
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
(914) 997-0500
pstphillip@lowey.com
urabinovitz@lowey.com

Marc C. Greco
GLASSER & GLASSER, P.L.C.
Crown Center, Suite 600
580 East Main Street
Norfolk, VA 23510
(757) 625-6787
marcg@glasserlaw.com

*Counsel for Plaintiffs-Appellees*

Rohit Singla
Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000
Rohit.Sinlga@mto.com
Justin.Raphael@mto.com

Adam Lawton
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adam.Lawton@mto.com

*Counsel for Defendants-Appellants*

| Starting Page | Document Description | Date | Docket Number |
|---|---|---|---|
| JA0001 | Order Granting In Part and Denying In Part Defendants' Motion to Dismiss the Second Amended Complaint | 09/30/2025 | 66 |
| JA0058 | Docket Report No. 2:24-cv-00484 (ED Va.) | | |
| JA0068 | First Amended Class Action Complaint and Demand For Jury Trial | 10/11/2024 | 40 |
| JA0207 | Declaration of Adam R. Lawton In Support of Defendants' Motion to Dismiss the First Amended Complaint | 11/04/2024 | 49 |
| JA0210 | Exhibit 1 - Final Judgment and Order of Permanent Injunction in *Immunex Corp. v. Sandoz Inc.*, No. 2:16-cv-1118 (D.N.J.) | 11/04/2024 | 49-1 |
| JA0215 | Exhibit 2 - Final Judgment and Order of Permanent Injunction in *Immunex Corp. v. Samsung Bioepis Co., Ltd.*, No. 2:19-cv-11755 (D.N.J.) | 11/04/2024 | 49-2 |
| JA0218 | Second Amended Class Action Complaint And Demand for Jury Trial | 11/25/2024 | 52 |
| JA0354 | Exhibit 1 - License Agreement for ETANERCEPT Among Immunex Corporation, Hoffman-La Roche Inc., and F. Hoffman-La Roche LTD | 11/25/2024 | 52-1 |
| JA0401 | Exhibit 2 - Accord and Satisfaction | 11/25/2024 | 52-2 |
| JA0431 | Exhibit 3 - Venue Affidavit of Jeffrey Blend | 11/25/2024 | 52-3 |
| JA0433 | Defendants' Memorandum in Support of Motion to Dismiss the Second Amended Complaint | 01/08/2025 | 56 |
| JA0463 | Plaintiffs' Opposition to Defendants' Motion to Dismiss Second Amended Complaint | 01/29/2025 | 57 |
| JA0498 | Defendants' Reply in Support of Motion to Dismiss Second Amended Complaint | 02/19/2025 | 58 |
| JA0522 | Order Granting Defendants' Motion for Certification Under 28 U.S.C. § 1292(b) | 03/18/2026 | 97 |

| Starting Page | Document Description | Date | Docket Number |
|---|---|---|---|
| JA0535 | Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b) | 03/27/2026 | No. 26-139, ECF 2-1 |
| JA0570 | Order Granting Respondents' Motion for Permission to Appeal | 04/20/2026 | No. 26-139, ECF 28 |

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., and CARE-FIRST BLUECHOICE, INC., on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>AMGEN, INC., IMMUNEX CORPORA-TION, and AMGEN MANUFACTURING LIMITED LLC,<br><br>          Defendants. | Civil No. 2:24cv484 |

## <u>ORDER</u>

Pending before the Court are a Motion to Dismiss for Failure to State a Claim (the "Motion") (ECF No. 55) and a Memorandum in Support thereof (ECF No. 56) filed by Defendants Amgen, Inc., Immunex Corporation, and Amgen Manufacturing Limited LLC (collectively, "Defendants" or "Amgen"). The Court has determined that a hearing on the Motion is unnecessary, as the issues for decision are adequately presented in the briefs. *See* E.D. Va. Local Civ. R. 7(J). For the following reasons, the Motion (ECF No. 55) is **GRANTED in part** and **DENIED in part**.

1

**JA0001**

## I.   BACKGROUND

### A.   Factual Background

When ruling on a motion to dismiss for failure to state a claim, courts accept a complaint's well-pled factual allegations as true and draw any reasonable inferences in favor of the non-moving party. *See, e.g.*, *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012). The court is "not so bound with respect to a complaint's legal conclusions." *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991) (quoting *District 28, United Mine Workers, Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085–86 (4th Cir. 1979)) (cleaned up). Accordingly, the Court accepts as true the factual allegations made by Plaintiffs Carefirst of Maryland, Inc. ("CFMI"), Group Hospitalization and Medical Services, Inc. ("GHMSI"), and CareFirst BlueChoice, Inc. ("BlueChoice") (collectively, "Plaintiffs" or "CareFirst") on behalf of themselves and all others similarly situated, in their Second Amended Complaint. *See generally* Second. Am. Compl., ECF No. 52 ("Second Am. Compl."). CareFirst brings this case against Amgen, alleging that it unlawfully delayed competition for its blockbuster drug, Enbrel. Second Am. Compl. ¶ 1.

### 1.   *Scientific Background of Etanercept*

The immune system is made up of various cells and antibodies that protect the human body from foreign invaders. *Id.* ¶ 56. One component of the immune system is called a cytokine. *Id.* ¶ 58. Cytokines have a wide range of functions, including initiating immune responses, such as regulating inflammation in the body. *Id.* One of the dozens of cytokines made by the human body is tumor necrosis factor ("TNF").

**JA0002**

*Id.* TNF is associated with rheumatoid arthritis, psoriatic arthritis, ankylosing spondylitis, and juvenile idiopathic arthritis. *Id.* TNF activates inflammatory pathways by binding to TNF receptors ("TNFRs"). *Id.* ¶ 59. There are two distinct TNFRs that exist naturally on cell surfaces: one with a molecular weight of approximately 55 kilodaltons ("p55"), and another weighing approximately 75 kilodaltons ("p75"). *Id.* Etanercept, the drug at issue in this case, consists of the extracellular region of a p75 TNFR coupled with an antibody. *Id.* ¶ 60. Etanercept renders TNF biologically inactive and thereby reduces inflammatory responses in patients. *Id.* Scientists have also been successful in using the p55 TNFR to inhibit inflammatory immune responses. *Id.* ¶ 63.

## 2.    *Scientific Breakthroughs to Treat Autoimmune Conditions and Associated Patents*[1,2]

Rheumatoid arthritis, psoriatic arthritis, ankylosing spondylitis, and plaque psoriasis are autoimmune disorders which result from malfunctions of the body's immune system that cause it to attack its own cells or tissues. *Id.* ¶ 51. These internal attacks can take various forms, including prolonged inflammatory responses that can damage the body's vital organs. *Id.* As many as 50 million Americans—80% of whom are women—have an autoimmune disease. *Id.* In the mid-1980s, advances in understanding inflammatory diseases generated significant interest developing a drug to render TNF biologically inactive. *Id.* ¶¶ 60–61.

---

[1] CareFirst has provided a helpful "patent tree" which summarizes the evolution of these patent applications and patents. Second Am. Compl. at 23.

[2] This Order uses ECF-generated pagination.

3

**JA0003**

F. Hoffman La-Roche AG ("Roche") is a Swiss multinational healthcare company.[3] In the 1980s, a Roche research team made fundamental contributions to the development of TNFRs. *Id.* ¶¶ 61–62. This Roche team was the first to experimentally prove the existence of two distinct human TNFRs, the p55 and p75, and set out to isolate, purify, sequence, and clone them. *Id.* ¶ 62. In April 1990, the Roche scientists published the amino acid sequences for the p55 TNFR and its encoding DNA. *Id.* In July 1990, Roche published the same for the p75 TNFR. *Id.*

Roche filed three patent applications in Switzerland in 1989 and 1990 which related to the p55 and p75 TNFRs.[4] *Id.* ¶ 64. On August 31, 1990, Roche filed European Patent Application No. 90116707.2 (the "EP '707 Application"), claiming priority to the three earlier applications it had filed in Switzerland which related to the p55 and p75 TNFRs.[5] *Id.* ¶ 64. On September 13, 1990, Roche filed U.S. Patent Application No. 07/580,013 (the "'013 Application"), claiming priority to the EP '707

---

[3] *Our history*, https://www.roche.com/about/history (last visited Sept. 18, 2025). Generally, in evaluating a motion to dismiss under Rule 12(b)(6), the court may not look beyond the pleadings without converting the motion into one for summary judgment. Fed. R. Civ. P. 12(d). However, the court may properly take judicial notice of matters of public record in evaluating a Rule 12(b)(6) motion, so long as these facts are construed in the light most favorable to the plaintiff along with the well-pleaded factual allegations of the complaint. *See Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013).

[4] This includes Swiss Application No. 3319/89 (filed on September 12, 1989), Swiss Application No. 746/90 (filed on March 8, 1990), and Swiss Application No. 1347/90 (filed on April 20, 1990). Second Am. Compl. ¶ 64 n.23.

[5] Patent applications can claim "priority" to an earlier-filed patent application, which allows them to use the date of the earlier-filed application. Second Am. Compl. ¶ 64 n.22.

**JA0004**

Application. *Id.* ¶ 65. Roche later abandoned the '013 Application and, on July 21, 1993, filed U.S. Application No. 08/095,640 (the "'640 Application") as a continuation.[6] *Id.* ¶ 66. During Roche's prosecution of the '640 Application, the United States Patent and Trademark Office ("PTO") placed a restriction requirement on the '640 Application: because the '640 Application claimed multiple distinct inventions, related to the p55 and p75 fusion proteins, Roche would be limited to only one of the claimed inventions unless it elected to pursue only claims related to *one* of the fusion proteins in the application. *Id.* Roche decided to pursue claims related to the p55 fusion protein in the '640 Application, which later issued as U.S. Patent No. 5,610,279 (the "'279 Patent"). *Id.* In order to pursue the non-elected claims, i.e., those related to the p75 fusion protein, Roche was required to file separate divisional applications. *Id.* On May 19, 1995, Roche therefore filed two divisional applications: (1) U.S. Patent Application No. 08/444,790 (the "'790 Application"), which would later issue as U.S. Patent No. 8,063,182 (the "'182 Patent"), and (2) U.S. Patent Application No. 08/444,791 (the "'791 Application"), which would later issue as U.S. Patent No. 8,163,522 (the "'522 Patent").[7] *Id.*

---

[6] Filing a patent application as a "continuation" of a previous patent application allows the second patent application to retain the effective filing date of the initial patent application. *In re Owens*, 710 F.3d 1362, 1366 (Fed. Cir. 2013).

[7] Paragraph 66 of the Second Amended Complaint states that the '791 Application issued as U.S. Patent No. 8,163,*192* rather than U.S. Patent No. 8,163,*522*. Second Am. Compl. ¶ 66. The Court considers this a typographical error, as the '522 Patent is consistently referenced throughout the Second Amended Complaint.

### 3.    *Immunex Obtains License Rights to Roche's Patents*

Immunex Corporation ("Immunex") is a large pharmaceutical company which was acquired by Amgen, Inc. in 2002. *Id.* ¶ 3. In the 1980s, before that acquisition occurred, Immunex was independently researching TNFRs, focusing on the p75 TNFR. *Id.* ¶ 67. In late 1990, Immunex successfully combined the extracellular portion of a p75 receptor with the antibody IgG1—*i.e.* etanercept, which is the active ingredient in Enbrel. *Id.* ¶ 68. Immunex applied for and obtained a series of its own patents directed to etanercept. *Id.* ¶¶ 69–72.[8] On November 2, 1998, the United States Food and Drug Administration (the "FDA") approved Enbrel for the treatment of moderate to severe rheumatoid arthritis. *Id.* ¶ 73. On November 6, 1998, Immunex launched Enbrel in the United States. *Id.* At the time of the launch, Immunex neither owned nor had a license to Roche's EP '707 Application which pertained to p75 TNFRs. *Id.* ¶ 75. While Immunex had its own etanercept-related patents, *see supra* p. 6 n.8, because the EP '707 Application gave Roche *priority* to the technology used to create etanercept, Immunex needed such a license from Roche to continue selling Enbrel. *Id.* ¶¶ 75–77. Immunex therefore sought and obtained from Roche a license to Roche's patent rights, including all "patents and patent applications that issue

---

[8] On May 10, 1990, Immunex filed U.S. Patent Application No. 07/523,635, which issued as U.S. Patent No. 5,395,760 (the "'760 Patent") on March 7, 1995. Second Am. Compl. ¶ 70. It expired on March 7, 2012. *Id.* On February 8, 1995, Immunex filed U.S. Patent Application No. 08/383,229, which issued as U.S. Patent No. 5,605,690 (the "'690 Patent") on February 25, 1997. *Id.* ¶ 71. It expired on February 25, 2014. *Id.* On January 27, 1998, Immunex filed U.S. Patent Application No. 08/346,555, which issued as U.S. Patent No. 5,712,155 (the "'155 Patent") on November 29, 1994. *Id.* ¶ 72. It expired on March 7, 2012. *Id.*

**JA0006**

from or that claim priority of Swiss Patent Application Nos. 3319/89, 746/90, and/or 1347/90, including, but not limited to, European Application No. 90116707.2 and U.S. Patent Application No. 07/580,013." (the "Roche Patent Rights"). *Id.* ¶ 76 (citing Second Am. Compl. Ex. 1 § 1.2, ECF No. 52-1).

On September 15, 1999, Roche and Immunex executed a retroactive license agreement (the "1998 License Agreement"), with an effective date of November 6, 1998. *Id.* ¶ 77. Under the 1998 License Agreement, Roche granted Immunex a co-exclusive license (the "1998 License") under the Roche Patent Rights to make, use, sell, and import etanercept worldwide. *Id.* "Co-exclusive" meant that Immunex and Roche each had the right to commercialize etanercept worldwide. *Id.* In other words, in 1998, Roche maintained the right to manufacture etanercept itself or to allow a third party other than Immunex to do so. *Id.* The 1998 License also expressly provided that Roche would retain ownership of the Roche Patent Rights and was responsible at its own discretion for their prosecution and maintenance. *Id.* ¶ 78 (citing Second Am. Compl. Ex. 1 §§ 3.1, 3.4, ECF No. 52-1). Therefore, in 1998, Roche maintained all core patent rights—the right to prosecute, maintain, and enforce the Roche Patent Rights. *Id.* In exchange for the non-exclusive license grant, Immunex agreed to pay royalties of 4% of its net sales of etanercept products. *Id.* ¶ 79 (citing Second Am. Compl. Ex. 1 § 5.2, ECF No. 52-1).

### 4.    *Enbrel's Launch*

When Immunex launched Enbrel in November 1998, it was an immediate blockbuster, earning Immunex $13 million in sales in the United States in its first

7

**JA0007**

few weeks on the market. *Id.* ¶ 80. In its 1998 annual report, Immunex touted Enbrel's launch as a "key milestone event" and predicted that Enbrel would "drive a revenue 'step change' for Immunex" that would "provide substantial cash flow and fuel the company's growth." *Id.* By the end of 1999, Enbrel had become an "unprecedented commercial success for Immunex, with $367 million in U.S. sales." *Id.* ¶ 81. Immunex continued "quarter for quarter" to "set new records for sales of Enbrel." *Id.* ¶ 83. By November 2000, there were more than one thousand patients on a waiting list for the drug, and total sales by year end exceeded $650 million. *Id.* Sales in 2001 increased by 17% to $762 million, cementing Enbrel's launch as the most successful launch in history for a biologic product.[9] *Id.* As Immunex put it, as a "targeted, potent intervention for inflammation, Enbrel has changed the practice of rheumatology." *Id.*

### 5. *Amgen, Inc. Acquires Immunex*

Amgen, Inc. is an American biopharmaceutical company, and in 2001, it was already the largest biotechnology company in the world. *Id.* ¶¶ 3, 85. In December 2001, Amgen, Inc. announced that it was buying Immunex for $16 billion in cash and stock—the highest sum ever paid for a biotech acquisition. *Id.* ¶ 85. Enbrel was the

---

[9] Biologics include a wide range of products, including vaccines, gene therapies, blood components, and recombinant proteins. Second Am. Compl. ¶ 37. A biosimilar is a drug that is highly similar, but not structurally identical to, a brand-name biologic (referred to as the innovator or reference product). *Id.* ¶ 39. A biosimilar manufacturer may not submit an abbreviated BLA ("aBLA") until four years after the reference product is first licensed, and an aBLA may not be approved until twelve years after the reference product is first licensed. *Id.* ¶ 42. Thereafter, biosimilars are free to compete—subject to lawful patent restraints. *Id.* Here, etanercept is a biologic, Enbrel is Immunex's brand name of that biologic, and competitors to Immunex have produced biosimilars to Enbrel. *Id.* ¶¶ 50, 126–143.

key driver of the deal for Amgen, Inc., which had not launched a significant new drug in a decade. *Id.* ¶ 86. Amgen, Inc.'s new CEO, Kevin Sharer, who took the helm in 2000, had promised investors at least 20% annual growth in sales and earnings per share and revenues of $8–9 billion by 2005. *Id.* Amgen, Inc.'s executives boasted to investors that Enbrel had the potential to generate more than $3 billion in annual sales by 2005, and Amgen, Inc. was "enthusiastic about the long-term potential of Enbrel," which it predicted would reach $3 billion by 2005. *Id.* ¶ 87.

Amgen, Inc.'s acquisition of Immunex, and the impact it was expected to have on the market of drugs used to treat immunological conditions, drew immediate antitrust concerns from government agencies and industry watchdogs. *Id.* ¶ 88. After reviewing the proposed acquisition, the FTC issued a complaint against Amgen, Inc. and Immunex stating that the "effects of the Merger, if consummated, may be to lessen competition and to tend to create a monopoly" in violation of federal antitrust law by, *inter alia*, "reducing innovation" and "eliminating potential competition" in the TNF inhibitor market. *Id.* ¶ 90. Because of the significant difficulty, cost, and time required to develop TNF inhibitors, the FTC concluded that the consolidation of Amgen, Inc.'s and Immunex's "substantial proprietary rights" in this market could "create large and potentially insurmountable barriers to entry." *Id.* Amgen, Inc. and Immunex settled the FTC's antitrust charges by entering a consent order requiring them, *inter alia*, to license certain patents to Serono—a Swiss pharmaceutical company that was "developing a soluble TNF receptor, Onercept, for use in Europe, but [that did] not possess the patent rights necessary to market the product in the United

9

States"—to ensure the continued development of TNF inhibitors for sale in the United States and "to remedy the lessening of competition" in that market that would result from the acquisition. *Id.* ¶ 91. On July 12, 2002, the FTC announced that it would allow Amgen, Inc's acquisition of Immunex to proceed under the terms of the consent agreement. *Id.* ¶ 92. On July 16, 2002, Amgen, Inc's acquisition of Immunex was completed, giving Amgen, Inc. all rights to Enbrel in the United States and Canada. *Id.*

### 6.    *Amgen Buys the Roche Patent Rights*

Amgen's returns were almost immediate. *Id.* ¶ 94. By December 2002, it had recorded $362.1 million in Enbrel sales; combined with Immunex's sales for the first half of the year, the total 2002 sales of Enbrel exceeded $770 million. *Id.* While Amgen had thus far benefited handsomely from its acquisition of Immunex, and thus Enbrel, it saw a cliff ahead. *Id.* ¶ 100. Absent action, Enbrel could soon face competition from a competing biosimilar etanercept product launched either directly by Roche or by a competing company that could obtain a license to the Roche Patent Rights, as had been reserved by Roche in the 1998 License. *Id.* ¶ 101. Therefore, in June 2004, Amgen bought out all of the Roche Patent Rights that Roche had retained for itself in the original 1998 License. *Id.* The transaction made Amgen the exclusive licensee of the Roche Patent Rights and gave it the ability to resume prosecution of any pending patent applications within the Roche Patent Rights (the "2004 Exclusive License"). *Id.* The agreement also granted Amgen the first right to sue over suspected infringement of the licensed patents at its sole expense and under its sole control—

10

i.e., Amgen had the right to sue other drug companies whose products, like biosimilar etanercept, Amgen believed infringed the patents. *Id.* ¶ 106.

Therefore, as of 2004, Amgen obtained all rights to control the prosecution of the '790 and '791 Applications. *Id.* ¶ 117. Amgen immediately set out to finish prosecution of those applications. *Id.* For about seven years, Amgen prosecuted the '790 and '791 Applications. *Id.* ¶ 119. On November 22, 2011, the PTO approved the '790 Application and issued the '182 Patent, with an expiration date of November 22, 2028. *Id.* ¶ 121. On April 24, 2012, the PTO issued the '522 Patent, with an expiration date of April 24, 2029. *Id.* ¶ 123.

Prior to Amgen's purchase of the Roche Patent Rights, which eventually resulted in the '182 and the '522 Patents, Amgen already enjoyed significant market exclusivity via its own patents that it had acquired over the years[10] and via the license rights that it had acquired from the 1998 License with Roche.[11] *Id.* ¶ 111–113. Amgen needed nothing further from Roche to be able to commercialize Enbrel without fear of running afoul of Roche's technology and its related intellectual property. *Id.* ¶ 113.

---

[10] *See* U.S. Patent No. 5,606,690; U.S. Patent No. 5,395,760; U.S. Patent No. 5,712,155; U.S. Patent No. 11,491,223; U.S. Patent No. 10,307,483; U.S. Patent No. 8,119,604.

[11] Amgen was enjoying the twelve-year exclusivity period for etanercept under § 351(k)(7) of the Public Health Service Act. which prohibited the FDA from approving any § 351(k) application for a proposed Enbrel biosimilar until November 2, 2010. Second Am. Compl. ¶ 114.

11

**JA0011**

       7.     *Amgen Sues Competitors For Infringement of the '182 and '522 Patents*

          a.     *Sandoz*

Sandoz, a major pharmaceutical manufacturer, became the first potential Enbrel competitor with its "Erelzi" drug. *Id.* ¶ 126. On September 29, 2015, the FDA accepted Sandoz's aBLA seeking authorization from the FDA to market Erelzi, a biosimilar version of Enbrel (etanercept). *Id.* ¶ 127. Amgen asserted infringement of the '182 and '522 Patents (which were obtained after prosecuting the pending patent applications in the Roche Patent Rights) as well as three of Amgen's own patents, 7,915,225 ("the '225 Patent"), 8,119,605 ("the '605 Patent"), and 8,722,631 ("the '631 Patent") (collectively, the "Psoriasis Patents"). *Id.* ¶ 128. Amgen sought an injunction to prohibit Sandoz from commercializing its biosimilar etanercept prior to the expiry of all the patents. *Id.* Over the course of the litigation, Amgen narrowed its infringement claims against Sandoz to the '182 and '522 Patents, dropping its claims over the Psoriasis Patents and relying exclusively on the patents obtained from the Roche Patent Rights to deny Sandoz access to the etanercept market. *Id.* ¶ 129. On August 11, 2016, and subject to the terms of a confidential stipulation, a United States District Court in the District of New Jersey entered a preliminary injunction prohibiting Sandoz from commercializing its etanercept product (the "*Sandoz* Court"). *Id.* ¶ 130. On August 30, 2016, the FDA approved Erelzi. *Id.* ¶ 131. Given the injunction, however, Sandoz could not launch its biosimilar. *Id.* On September 10, 2018, the *Sandoz* Court entered an order which stated that commercialization of Sandoz's biosimilar etanercept product would infringe upon the '182 and '522 Patents. *Id.* ¶ 132. On

**JA0012**

August 9, 2019, after a bench trial, the *Sandoz* Court issued a decision upholding the validity of the '182 and '522 Patents. *Id.* ¶ 133. On July 1, 2020, the Federal Circuit affirmed the *Sandoz* Court's judgment upholding the validity of the '182 and '522 Patents. *Id.* ¶ 135. On May 17, 2021, Sandoz's petition for certiorari to the U.S. Supreme Court was denied. *Id.* ¶ 136. Sandoz therefore has not been able to launch Erelzi to this day. *Id.* ¶ 137.

> b.    *Samsung Bioepis Co., Ltd. ("Samsung")*

On April 25, 2019, the FDA approved Samsung's aBLA for its etanercept product Eticovo, another biosimilar to Enbrel. *Id.* ¶ 139. On April 30, 2019, Amgen sued Samsung, alleging infringement of the '182 Patent and the '522 Patent (the "*Samsung* Case"). *Id.* ¶ 140. Amgen sought an injunction to prohibit Samsung from commercializing its biosimilar etanercept prior to the expiry of the patents. *Id.* The *Sandoz* decisions had a significant impact on the *Samsung* Case. *Id.* ¶ 142. On November 3, 2021, Samsung was permanently enjoined from commercializing any product containing etanercept in the United States. *Id.* This injunction terminates on April 24, 2029, after both the '182 Patent and the '522 Patent expire. *Id.*

> 8.    *Enbrel's Success to Date*

A 2020 investigation of Amgen's pricing of Enbrel by the House of Representatives' Committee on Oversight and Reform found that, since acquiring the rights to Enbrel in 2002, Amgen raised its price 27 times, including by nearly 30% within one 12-month period. *Id.* ¶ 145. By 2020, a 50-mg dose of Enbrel cost $1,414 per unit, $5,556 per month, or $72,240 a year: a 457% increase from the date Amgen acquired

it. *Id.* In total, Amgen has amassed more than $86 billion from cumulative worldwide sales of Enbrel. *Id.* ¶ 3. Enbrel worldwide gross sales exceeded $3.6 billion in 2023. *Id.* ¶ 12. At all relevant times, Amgen's market share in the etanercept market was and remains 100%. *Id.* ¶ 192.

### 9. Harms Suffered by CareFirst

Plaintiff CFMI is a not-for-profit corporation organized and existing under the laws of Maryland. *Id.* ¶ 15. Plaintiff GHMSI is a not-for-profit corporation founded pursuant to an act of Congress, with its principal place of business in the District of Columbia. *Id.* ¶ 16. Plaintiff BlueChoice is a corporation organized and existing under the laws of the District of Columbia. *Id.* ¶ 20. Plaintiffs CFMI, GHMSI, and Blue-Choice are indirect subsidiaries of CareFirst, Inc., a corporation organized and existing under the laws of Maryland. *Id.* ¶ 22. Jointly, Plaintiffs provide or administer health insurance for millions of individuals. *Id.* CareFirst purchases prescription drugs at third-party pharmacies, like CVS, Walgreens, and Rite Aid, where Care-First's health plan members have prescriptions filled. *Id.* ¶ 23. CareFirst incurs substantial costs associated with its members' transactions at these third-party pharmacies. *Id.*

CareFirst alleges that Amgen has substantially affected and continues to substantially affect commerce throughout the United States, causing injury to CareFirst and class members. *Id.* ¶ 36. It claims that Amgen, directly and through its agents, has engaged and continues to engage in activities to suppress competition, drive up brand sales, and fix, raise, maintain, and/or stabilize the price of Enbrel in the United

14

**JA0014**

States. *Id.* CareFirst asserts that this conduct has unreasonably restrained trade and adversely affected the market for the direct sale and purchase of etanercept throughout the United States, including in this district, and continues to do so. *Id.* Because of Amgen's practices, CareFirst claims that purchasers of etanercept in the United States have overpaid at least $3 billion collectively for the drug. *Id.* ¶ 13.

Amgen's monopoly power over etanercept would have expired no later than 2019—and as early as 2016—when Amgen's patents had expired and biosimilars entered the market. *Id.* ¶ 218. Instead, due to Amgen's purchase of the Roche Patent Rights, Amgen's alleged monopoly power over etanercept will extend until April 24, 2029 when the '182 and '522 Patents expire. *Id.*

### B.     Procedural History

On November 25, 2024, CareFirst, on behalf of themselves and all others similarly situated, filed its Second Amended Complaint in this Court. *See generally* Second Am. Compl. Therein, CareFirst brings one federal claim and three state claims for relief. *Id.* ¶¶ 213–711. Count One alleges that Amgen knowingly, willfully, and improperly maintained its monopoly power and engaged in anticompetitive conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. *Id.* ¶¶ 213–227. Count Two alleges that Amgen engaged in monopolization and monopolistic conduct in violation of the laws of thirty states, Puerto Rico, and the District of Columbia. *Id.* ¶¶ 228–246. Count Three alleges that Amgen violated the consumer protection laws of thirty-six states and the District of Columbia. *Id.* ¶¶ 247–487. Count Four alleges that Amgen engaged in inequitable conduct constituting unjust enrichment in

**JA0015**

violation of the laws of forty-eight states, Puerto Rico, and the District of Columbia. *Id.* ¶¶ 488–711. This action seeks declaratory and injunctive relief under Sections 7 and 16 of the Clayton Act, codified in 15 U.S.C. §§ 18, 26, and monetary relief pursuant to state laws. *Id.* ¶ 28.

On January 8, 2025, Amgen filed the instant Motion pursuant to Federal Rule of Civil Procedure 12(b)(6), Mot., ECF No. 55, and a Memorandum in Support thereof, Mem. Supp., ECF No. 56 ("Mem. Supp."). On January 29, 2025, CareFirst filed its Response in Opposition to the Motion. Resp. Opp'n, ECF No. 57 ("Resp. Opp'n"). On February 19, 2025, CareFirst filed its Reply. Reply, ECF No. 58 ("Reply"). The Motion is ripe for adjudication.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to seek dismissal based on a plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss for failure to state a claim should be granted if the complaint does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). An adequate claim requires more than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A threadbare recitation of the "elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule

16

12(b)(6) purposes." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). Although the truth of the facts alleged is assumed, and the facts are taken in the light most favorable to the plaintiff, courts are not bound by "legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

A motion to dismiss pursuant to Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," so as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Fair notice is provided by setting forth enough facts for the complaint to be "plausible on its face" and to "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555, 570 (internal citations and footnote omitted). A complaint may survive a motion to dismiss "even if it appears that a recovery is very remote and unlikely." *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)) (internal quotation marks omitted).

## III.    ANALYSIS

The Court first evaluates CareFirst's federal antitrust claim, monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count One), and then

17

considers CareFirst's state law claims for monopolistic conduct (Count Two), consumer protection (Count Three), and unjust enrichment (Count Four).

### A. Federal Antitrust Claim: Monopolization in Violation of 15 U.S.C. § 2 (Count One)

The Court will analyze CareFirst's federal claim in three parts. First, the Court provides an overview of the relevant statutes and doctrines that arise in federal antitrust matters, including the Sherman Act, the Clayton Act, and the *Noerr-Pennington* doctrine. Second, the Court considers whether Plaintiffs have antitrust standing to bring this federal claim as indirect purchasers of Enbrel. Third, the Court analyzes whether CareFirst has stated a claim that Amgen violated the Sherman Act, considering whether CareFirst has sufficiently alleged that: (1) Amgen has monopoly power over the market for etanercept; (2) Amgen's conduct was anticompetitive; and (3) CareFirst suffered an antitrust injury as a result of Amgen's conduct.

#### 1. *Relevant Statutes and Doctrines*

##### a. *The Sherman Act and the Clayton Act*

In this action, Plaintiffs allege violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and seek declaratory and injunctive relief under Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 18, 26. Second Am. Compl. ¶ 28.[12] Adopted in 1890, "[t]he

---

[12] The Second Amended Complaint states, "This action alleges violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and of state antitrust, consumer protection, and related laws. This action seeks declaratory and injunctive relief under Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 18, 26, and seeks monetary relief pursuant to state laws." Second Am. Compl. ¶ 28. However, the Court struggles to ascertain, and the pleadings do not address, how Defendants are in violation of *Section 7* of the Clayton Act. "Section 7 of the Clayton Act prohibits mergers and acquisitions 'where in any line of commerce or in any activity affecting commerce in any section of the country,

18

Sherman Act was enacted to address the unlawful combination of private businesses." *A.D. Bedell Wholesale Co. v. Philip Morris, Inc.*, 263 F.3d 239, 255 (3rd Cir. 2001); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 491 (1940). "The Clayton Act was passed in 1914 against a background of disappointment with the Supreme Court's interpretation of the Sherman Act." *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1282 (7th Cir. 1990). In terms of the relief available upon proving a Section 2 violation of the Sherman Act, "Section 16 of the Clayton Act allows private parties to obtain injunctive relief 'against threatened loss or damage by a violation of the antitrust laws.'" *Steves & Sons, Inc., v. JELD-WEN, Inc.*, 345 F. Supp. 3d 614, 648 (E.D. Va. 2018) (quoting 15 U.S.C. § 26); *see also Kruman v. Christie's Intern. PLC*, 284 F.3d 384, 397 (2nd Cir. 2002) ("The Sherman Act . . . defines substantive standards that prohibit certain forms of anticompetitive conduct by defendants. The Clayton Act . . . sets forth the requirement that a plaintiff must suffer an injury or be threatened with an injury caused by a Sherman Act violation in order to bring suit.")

---

the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.'" *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1083 (N.D. Cal. 2023) (citing 15 U.S.C. § 18). As discussed *infra,* Plaintiffs have not alleged facts to suggest that the merger of two companies or the acquisition of one company by another is part of the anticompetitive conduct at issue here. Lacking any facts in support, the Court declines to consider an alleged violation of Section 7 of the Clayton Act in the analysis that follows and focuses instead on alleged violations of Section 2 of the Sherman Act.

**JA0019**

### b.    *The* Noerr-Pennington *Doctrine*

The *Noerr-Pennington* doctrine[13] is "an affirmative defense which exempts from anti-trust liability any petitioning activity designed to influence legislative bodies or governmental agencies." *N.C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 666 F.2d 50, 52 (4th Cir. 1981). In other words, conduct which might otherwise be deemed anticompetitive is immune from liability pursuant to *Noerr-Pennington* when such conduct involves petitioning the government. Courts have held that patent prosecutions before the PTO and *inter partes* review proceedings before the Patent Trial and Appeal Board ("PTAB") is "petitioning" conduct which is protected by the *Noerr-Pennington* doctrine. *See, e.g. In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 831 (N.D. Ill. 2020) ("[Defendant's] petitioning before

---

[13] "The *Noerr-Pennington* doctrine is an outgrowth of two anti-trust cases in the 1960s, *Eastern Railroad Conference v. Noerr Freight Co.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The Noerr case came about when the railroads attempted to beat back the competition of the trucking companies in Pennsylvania by conducting adverse publicity campaigns and by petitioning the legislature for anti-trucking statutes. Forty-one trucking companies brought suit, alleging that the railroad association was violating the monopoly provisions of the Sherman Act. The Supreme Court held that activities designed to influence legislation, including publicity campaigns, are protected by the first amendment right to petition. Five years later the Supreme Court decided Pennington. In that case the United Mine Workers (UMW) sued a small mine operator for royalty payments and the operator cross claimed, alleging that the UMW and the large operators conspired to force small operators out of business in violation of federal anti-trust laws. At trial, Pennington presented evidence that the UMW and the large mine operators had jointly approached the Secretary of Labor and the Tennessee Valley Authority in furtherance of their scheme. The Supreme Court held that the district court should have instructed the jury that this legislative petitioning was not illegal." *N. C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 666 F.2d 50, 52 (4th Cir. 1981).

JA0020

the USPTO and the PTAB is protected by *Noerr-Pennington*."). Courts have also held that filing lawsuits in courts is protected activity. *See, e.g., Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 399 (4th Cir. 2001) ("*Noerr-Pennington* immunity from antitrust laws extends to petitioning the courts as well."); *Organon Inc. v. Mylan Pharms., Inc.*, 293 F. Supp. 2d 453, 457 (D.N.J. 2003) ("[*Noerr-Pennington*] has been expanded to include litigation to protect rights such as patents."). In the instant Motion, Amgen argues forcefully that all the conduct which CareFirst alleges is anticompetitive and in violation of the Sherman Act is actually protected activity pursuant to the *Noerr-Pennington* doctrine. *See, e.g.*, Mem. Supp. at 8 ("[Noerr-Pennington] forecloses liability for the entire series of events alleged in the operative Complaint that resulted in biosimilar versions of Enbrel not being able to enter the market.").

### 2.    *Antitrust Standing*

The Court must first consider whether Plaintiffs, as indirect purchasers of Enbrel, have standing to bring antitrust claims against Amgen pursuant to Section 2 of the Sherman Act, and to request declaratory and injunctive relief based on Section 16 of the Clayton Act.[14] Section 16 of the Clayton Act states in pertinent part:

---

[14] "The Supreme Court has defined an indirect purchaser as one who is not the immediate buyer from the alleged antitrust violator, or one who does not purchase the monopolized product directly from the antitrust defendant." *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169 (8th Cir. 1998) (cleaned up) (citations omitted). While Plaintiffs and Defendants never specifically refer to CareFirst as an "indirect purchaser" in the pleadings, CareFirst alludes to being an indirect purchaser in its Second Amended Complaint. *See* Second Am. Compl. ¶ 18 ("CareFirst BCBS indirectly purchases Enbrel for members of its private healthcare plans[.]"); *see also id.* ¶ 23 ("CareFirst purchases prescription drugs at third-party pharmacies, like CVS, Walgreens, and Rite Aid, where CareFirst's health plan members have prescriptions filled. CareFirst incurs substantial costs associated with its members' transactions at

21

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . .

15 U.S.C. § 26. Section 4 of the Clayton Act, by contrast, "authorizes treble damages for antitrust violations." *Cia Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 407 (1st Cir. 1985). In *Cia Petrolera*, the First Circuit summarized distinctions that the Supreme Court has drawn between antitrust standing under Sections 4 and 16 of the Clayton Act:

> The [Supreme] Court pointed out that a § 4 claim requires an *injury* to "business or property" that § 16 omits. The Court noted that, by contrast, § 16 provides that "any individual *threatened with injury* by an antitrust violation may . . . sue for injunctive relief against violations of the antitrust laws . . . Plainly, Congress empowered a broader range of plaintiffs to bring § 16 actions because the standards to be met are less exacting than those under § 4; under § 16, a plaintiff need only show a threat of injury rather than an accrued injury.

*Id.* at 407–08. While Congress empowered a broader range of antitrust plaintiffs under Section 16 of the Clayton Act, in *Illinois Brick Company v. Illinois*, the Supreme Court prohibited indirect purchasers, such as CareFirst here, from recovering *antitrust damages* under violations of federal law. *Ill. Brick Co. v. Ill.*, 431 U.S. 720, 745–748 (1977) ("*Illinois Brick*"). However, "[t]he Fourth Circuit has stated that indirect purchasers are not *per se* barred from bringing a claim for *injunctive relief.*" *Carefirst of Md., Inc. v. Johnson & Johnson*, 745 F. Supp. 3d 288, 307 (E.D. Va. 2024)

---

these third-party pharmacies.") Therefore, the Court considers CareFirst to be indirect purchasers for purposes of a standing analysis.

22

("*Johnson*") (emphasis added); *see Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 n.24 (4th Cir. 2002) ("*Illinois Brick*'s indirect purchaser rule, when applicable, bars only compensatory damages relief and does not apply to injunctive relief."). Here, for Care-First to demonstrate antitrust standing, the Court must determine whether Plaintiffs have sufficiently alleged an antitrust injury pursuant to Section 16 of the Clayton Act, which the Court analyzes below and finds that they have. Therefore, Plaintiffs have sufficiently demonstrated antitrust standing.

>         3.      *Alleged Violations of the Sherman Act*

Having found that Plaintiffs have established antitrust standing, the Court turns to whether Plaintiffs have stated a claim for relief pursuant to the Sherman Act. Section Two of the Sherman Act makes it an offense "for any person to monopolize any part of the trade or commerce among the several States." *United States v. Grinnell Corp.*, 384 U.S. 563, 566 (1966) (cleaned up). "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* at 570–71. However, "[a]nticompetitive conduct alone does not establish a monopolization claim. A plaintiff must also connect that anticompetitive conduct to a corresponding antitrust injury." *Johnson,* 745 F. Supp. 3d at 316 (citing *Crawl Space Door Sys., Inc. v. SmartVent Prods., Inc.*, No. 2:19cv320, 2020 WL 13691776, at *5 (E.D. Va. Apr. 28, 2020) (stating that for conduct to be exclusionary "a monopolist's act must have an anti-competitive effect" and it

23

"must harm the competitive process and thereby harm consumers")). Therefore, the Court will consider: (1) whether Amgen possesses monopoly power in the relevant market; (2) whether Amgen's actions constitute anticompetitive conduct; and (3) whether CareFirst has suffered an injury that resulted from that anticompetitive conduct.

### a.     Monopoly Power

As to the first prong, CareFirst has sufficiently pled that Amgen possesses monopoly power over the sale of etanercept in the relevant market, and Amgen does not appear to dispute that characterization. *See* Second Am. Compl. ¶¶ 177–96 (alleging that Amgen charges supracompetitive prices for Enbrel, has never lowered prices for Enbrel, and that Amgen's market share in the etanercept market is 100%); *see generally* Mem. Supp. (focusing all arguments on the second prong of the Sherman Act and neglecting to dispute CareFirst's allegation that Amgen possesses monopoly power over the sale of etanercept); *see also CoStar Grp., Inc. v. Com. Real Est. Exch. Inc.*, No. 23-55662, 2025 WL 2573045, at *6 (9th Cir. Sept. 5, 2025) ("Because monopoly power is the ability (1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion, evidence of supracompetitive pricing is direct proof of the actual exercise of monopoly power.") (cleaned up). Accordingly, the first prong is easily met.

### b.     Anticompetitive Conduct

As to the second prong, which focuses on anticompetitive conduct, CareFirst alleges that Amgen's acquisition of the Roche Patent Rights alone was

24

**JA0024**

anticompetitive conduct in violation of the Sherman Act. Second Am. Compl. ¶¶ 100–116. CareFirst clarifies that "the subsequent prosecution of the '790 and '791 Applications and enforcement of the '182 and '552 Patents issued therefrom *caused anticompetitive harm*," *id.* ¶ 198 (emphasis added), by blocking would-be competitors from launching expensive biosimilar versions of Enbrel, *id.* ¶¶ 125–143.

As an initial matter, numerous courts have grappled with whether each alleged action of anticompetitive conduct should be analyzed separately, or collectively as a "scheme."[15] The Fourth Circuit held in *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC* that alleged anticompetitive conduct should be considered collectively. 111 F.4th 337, 354–55 (4th Cir. 2024) ("[I]t is a misapplication of antitrust doctrine for a court to treat a plaintiff's allegation of anticompetitive conduct as if they were five completely separate and unrelated lawsuits, effectively tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.") (internal quotation marks and citation omitted). However, in *Duke*, the Fourth

---

[15] *See, e.g., In re Humira*, 465 F. Supp. 3d at 833 ("The foregoing raises the question as to what conduct should be considered part of the alleged overarching scheme to destroy competition and what parts should be swept aside as lawful petitioning. There is a risk that by focusing only on each individual action in a series, a broader pattern of anticompetitive conduct might escape policing and remedy. Plaintiffs must be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each, but at the same time, conduct immunized from antitrust liability cannot be aggregated with nonimmunized conduct without nullifying the immunity.") (cleaned up); *Johnson*, 745 F. Supp. 3d at 305 ("The Court will discuss each component of the scheme separately because of the complex factual allegations related to each. However, because plaintiffs have alleged a scheme, and consistent with Fourth Circuit case law, the Court will consider each as part of a single campaign to foreclose competition.") (internal quotation marks and citation omitted).

Circuit was not grappling with whether certain conduct within the scheme was immunized from *Noerr-Pennington*, but rather, whether several acts which on their own might not violate the Sherman Act should be viewed in the aggregate. *Id.* at 355–56. The *Duke* court did not cite to *Noerr-Pennington*. Defendants bristle at CareFirst's attempts to center their allegations on the purchase of the Roche Patent Rights, stating, "Plaintiffs' wordplay, such as editing the word 'scheme' out of their complaint, does not avoid the clear legal rule that the First Amendment forecloses antitrust liability for a course of conduct that depends on petitioning the government." Mem. Supp. at 23.

Here, whether Amgen's actions—purchasing the Roche Patent Rights, prosecuting the '790 Application and the '791 Application, and enforcing the '182 Patent and the '522 Patents in courts—are treated as a scheme or as individual acts, is really of no import, because the *Noerr-Pennington* immunity that Amgen receives for the latter two actions, the prosecution and enforcement, does not immunize Amgen from the allegedly anticompetitive conduct of purchasing the Roche Patent Rights.

To be clear, the Court has no trouble finding, pursuant to *In re Humira*, *Baltimore Scrap*, *Organon*, and dozens of other precedents, that Amgen's prosecution of the '790 Application and the '791 Application, which resulted in the '182 Patent and the '522 Patent respectively, as well as Amgen's patent enforcement lawsuits against Sandoz and Samsung, constitute protected activity pursuant to the *Noerr-Pennington* doctrine. Amgen is immune from antitrust *liability* under the Sherman Act for such acts.

26

**JA0026**

However, the Court disagrees with Defendants' contention that the entire scheme is "immunized" because it includes, in part, lawful petitioning activity pursuant to *Noerr-Pennington*. *See, e.g., Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*, 850 F.3d 52, 57 (1st Cir. 2017) ("The mere existence of a lawsuit does not retroactively immunize prior anti-competitive conduct."); *Intel Corp. v. Fortress Inv. Grp. LLC*, No. 19cv7651, 2020 WL 6390499, at *16 (N.D. Cal. July 15, 2020) ("[L]iability cannot be predicated on petitioning activity but if a defendant engages in anticompetitive conduct which does not constitute petitioning activity, it cannot immunize itself from liability for litigation-related damages if it asserts or tries to assert its unwarranted accumulation of market power through litigation.")

Defendants cite numerous cases to suggest that Amgen's immunity "for its petitioning of the Patent Office and of a federal court forecloses liability for the series of events challenged in the Complaint." Mem. Supp. at 20. Amgen goes on to note that, "[t]he Supreme Court has made clear that constitutionally protected petitioning activity 'is not illegal' even '*as part of a broader scheme itself* violative of the Sherman Act.'" *Id.* (quoting *Pennington*, 381 U.S. at 670). The Court agrees with Defendants that, with respect to the series of events currently before the Court, the *petitioning activity* is not illegal—but the acquisition of the Roche Patent Rights remains. The same is true for Defendants' reliance on *Hospital Building Company v. Trustees of Rex Hospital*: "The Fourth Circuit has confirmed that even '[i]f the courts are used or litigation is filed as part of an overall scheme to attempt to monopolize or exclude competition from the marketplace or otherwise violate the antitrust laws, that

27

**JA0027**

conduct' still enjoys antitrust immunity." Mem. Supp. at 20 (citing *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 691 F.2d 678, 688 (4th Cir. 1982)). In that context, when the Fourth Circuit refers to "that conduct," it is referring to the *petitioning activity*, not the overall scheme. Defendants next cite *Mercatus Group, LLC v. Lake Forest Hospital* for the proposition that, "Plaintiffs cannot impose liability on Amgen's petitioning activity by combining it with non-immunized conduct. Courts do not 'aggregate the effects of conduct immunized from antitrust liability with the effects of conduct not so immunized' because doing so 'would nullify the immunity.'" Mem. Supp. at 20 (citing *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 839 (7th Cir. 2011)). In citing that case, Defendants left out a crucial sentence which followed:

> That does not mean, however, that we will aggregate the effects of conduct immunized from antitrust liability with the effects of conduct not so immunized. That approach would nullify the immunity. *For that reason, we must first identify any conduct that is immunized. After we do so, we consider the evidence of the remaining challenged conduct in the aggregate to see if it is sufficient to support antitrust liability.*

*Id.* (emphasis added).[16] That is exactly how Plaintiffs have stated their claim here. CareFirst concedes, and the Court agrees, that Amgen cannot face antitrust liability

---

[16] Defendants also point to *Intell. Ventures I LLC, et al., v. Capital One Fin. Corp., et al.*, where Capital One argued that, "IV's aggregation of patents to create market power would support substantial Section 2 and Section 7 claims on its own." 280. F. Supp. 3d 691, 706 (D. Md. 2017). The District Court of Maryland rejected that argument because Capital One's pleadings relied on *a purported campaign*, and the court therefore declined to consider whether the aggregation of patents to create market power could stand on its own to support antitrust liability. *Id.* Here, Plaintiffs allege the opposite—that the acquisition of the Roche Patent Rights on its own supports antitrust liability. Furthermore, this Court is not so moved that a Plaintiff's allegations of a scheme or individual actions is of significant import. "[A] reviewing court must disregard 'labels and conclusions.'" *Wiseman v. First Mariner Bank*, 2013 WL 5375248, at *18 (D. Md. Sept. 23, 2013). The crucial question is instead which parts

28

for its prosecution of the '790 Application and the '791 Application before the PTO, nor for its enforcement litigation of the '182 Patent and the '522 Patent against Sandoz and Samsung, as such activity is well-established to be petitioning activity under *Noerr-Pennington*. The "remaining challenged conduct" is the acquisition of the Roche Patent Rights, and such alleged anticompetitive conduct does not enjoy immunity under *Noerr-Pennington*. *See also Amphastar*, 850 F.2d at 57 n.3 ("*Noerr* does not retroactively protect unlawful agreements or schemes to acquire, maintain, or jointly exercise market power that defendants subsequently exploit through litigation."); *Premier Elec. Const. Co. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358, 376 (7th Cir. 1978) ("There is no such thing as the lawful enforcement of a private cartel.")

---

of the scheme, perhaps all, render Defendants immune from liability pursuant to *Noerr-Pennington*. Finally, Defendants cite *In re Humira*, where the court found that, "Some of [Defendant's] conduct was not immunized by the *Noerr-Pennington* doctrine—including what plaintiffs allege to be the heart of their monopolization claim—but much of what preceded and followed that conduct was immunized, which makes the entirety of alleged monopolization scheme immune, because plaintiffs' theory depends on all the components of [Defendant's] conduct as the means to suppress competition . . . [b]ut even if [Defendant's] nonimmunized conduct is sufficient to be a standalone scheme of monopolization, the complaint still fails for lack of an antitrust injury because it is not plausible that [Defendant's] nonimmunized conduct intimidated the other defendants into delaying the launch of their biosimilars (or otherwise caused any antitrust injury)." 465 F. Supp. 3d at 834–835. The Court declines to follow *In re Humira* for three reasons. First, with due respect to the Northern District of Illinois, that court's holding is not binding upon this Court. Second, the *In re Humira* court did not cite to any authority that supports the finding that an entire scheme is immunized because certain acts within that scheme are immunized pursuant to *Noerr-Pennington*. Third, pursuant to our sister court's holding in *Johnson*, the *In re Humira* court seemingly confuses antitrust liability with antitrust injury. Pursuant to *Johnson*, this Court agrees that just because *Noerr-Pennington*-immunized conduct cannot be the basis for antitrust *liability*, that does not mean such conduct cannot provide the basis for antitrust *injury*.

29

**JA0029**

Having determined that the acquisition of the Roche Patent Rights does not enjoy *Noerr-Pennington* immunity, the Court next must determine whether, at the motion to dismiss stage, the acquisition of *pending patent applications* by a monopolist is sufficient to state a claim of monopolistic conduct under the Sherman Act. Amgen turns its nose up to CareFirst's argument that antitrust laws can be violated by acquisition of pending patent *applications. See* Reply at 13 ("Plaintiffs do not cite any case in which a court has recognized a claim that a defendant violated the antitrust laws simply by acquiring rights under pending patent applications."); *see also id.* at 14 ("Plaintiffs have cited no authority that acquiring rights to a patent application alone can be exclusionary conduct.").

While true, Defendants have not cited any authority specifically finding that the acquisition of pending patent applications *does not* constitute an effort to monopolize a market. A theory is not necessarily legally unsound just because it is novel, especially at the motion to dismiss stage. CareFirst cites numerous cases where courts considered pending patent applications and their relevance to Sherman Act violations in the context of a broader patent portfolio or as part of a broader conspiracy or agreement to restrict competition. *See, e.g., ABS Global, Inc. v. Inguran, LLC,* No. 14cv503, 2016 WL 3963246, at *3 (W.D. Wis. July 21, 2016) (denying defendants' summary judgment motions on Sherman Act claims where monopolist acquired two of the four patents at issue by purchasing pending patent applications from Monsanto, stating that the defendant "purchased several pending patent applications related to sexed semen processing from Monsanto Company. Those applications

30

**JA0030**

matured into 24 U.S. patents, including [patents] that remain in suit here.") (cleaned up); *United States v. Singer Mfg. Co.*, 374 U.S. 174, 197–99 (1963) (White, J., concurring) (stating that patent owners violated Sherman Act, among other "concerted actions," when they entered into a "general cross-licensing agreement providing that the parties were not to attack one another's patent applications" nor "do anything to restrict one another's claims in patents or applications"); *Automated Bldg. Components v. Trueline Truss Co.*, 318 F. Supp. 1252, 1259–61 (D. Or. 1970) (finding that company's acquisition of a patent application was part of a conspiracy "to harass defendants and to force defendants out of the truss manufacturing business"); *Mason City Tent & Awning Co. v. Clapper*, 144 F. Supp. 754, 767 (W.D. Mo. 1956) (finding that cross-license agreement which included pending patent applications is "invalid according to Sherman Act Standards."); *United States v. Hartford-Empire Co.*, 46 F. Supp. 541, 620 (N.D. Ohio 1942) (finding acquisition of patent applications part of a "concerted action with others in violation of the anti-trust laws.").[17] While none of these cases specifically comments on the relative value of the patent applications within a patent portfolio or the applications' aggravating value within the context of

---

[17] "Then followed a course of procedure involving a shifting of claims between the patent applications of the two companies in such a manner as to obtain the strongest patents possible. This was done through the joint cooperation of the legal staffs of the two companies. As a result, patents issued virtually as the two cooperating companies desired, and this, of course, set up a distinct handicap to inventors having applications in the Patent Office for patents that might come into competition with those sought by and issued to Hartford. This joint method of action in the Patent Office in order to prevail over their adversaries resulted in distinct advantages to the two companies that otherwise might not have been obtained." *Hartford-Empire*, 46 F. Supp. at 611.

31

a larger conspiracy of anticompetitive conduct, considering the facts as alleged by CareFirst here, the '790 Application and the '791 Application were enormously valuable to Amgen.[18]

While Defendants also contend that patent applications do not confer exclusionary power, as stated *supra* but which bears repeating here, CareFirst's Second Amended Complaint illustrates just how important and powerful obtaining those patent applications was to entrench Amgen's monopoly in etanercept. Prior to obtaining the Roche Patent Rights, Amgen (then Immunex) already had an agreement with Roche which allowed them to sell Enbrel worldwide: On November 6, 1998, Immunex launched Enbrel. Second Am. Compl. ¶ 75. On September 15, 1999, Roche and

---

[18] *See* Resp. Opp'n at 23–24:

> While only an issued patent confers the right to bring litigation, a patent application is nonetheless a valuable property right. Patent applications, like patents, are transferrable legal interests that can be assigned by written instrument. 35 U.S.C. § 261. The "rights afforded to a patent applicant put him in a strong bargaining position," even if the applicant fails to exercise those rights or the patent never issues. *Keen, Inc. v. Gecker*, 264 F. Supp. 2d 659, 663 (N.D. Ill. 2003) (quoting *Meehan v. PPG Indus., Inc.*, 802 F.2d 881 (7th Cir. 1986)). Courts have recognized that patent applications are sufficiently valuable to be included under the definition of bankruptcy property and subjected to attorney's liens. *See id.*; *In re Engage, Inc.*, 544 F.3d 50, 53c54 (1st Cir. 2008). The filing of a patent application also determines the priority date for any patent that issues from that application or any divisional or continuation applications that claim priority to it, which confers certain exclusionary rights. Since an application becomes invalidating prior art for any subsequently filed applications for the same invention, it can be used as a defense to block the issuance of other patents. 35 U.S.C. § 102(a)(2). An applicant can also, through the filing of an application, provoke an interference with another application or patent or petition to institute a derivation proceeding and thereby exclude other applicants from patenting the same invention. *See* 35 U.S.C. § 135 (pre-AIA); 37 C.F.R. §§ 1.137, 41.202.

Immunex executed the 1998 License Agreement, with a retroactive effective date of November 6, 1998—the date of Immunex's Enbrel launch, which granted Immunex a co-exclusive license to make, use, sell, and import etanercept worldwide. *Id.* ¶ 77. Co-exclusive meant that Immunex and Roche each had the right to commercialize etanercept worldwide. *Id.* The 1998 License also expressly provided that Roche would retain ownership of the Roche Patent Rights and was responsible at its own discretion for their prosecution and maintenance. *Id.* ¶ 78.

Enbrel was an immediate blockbuster, earning Immunex $13 million in U.S. sales in its first few weeks on the market in 1998. *Id.* ¶ 80. In December 2001, Amgen acquired Immunex for $16 billion—the highest sum ever paid for a biotechnology acquisition. *Id.* ¶ 85. From Enbrel's launch in November 1998, through 2004, Immunex and later Amgen reaped monumental benefits from their monopoly in the etanercept market in the United States, enjoying high profit margins generated by supracompetitive pricing and annual price increases. *Id.* ¶ 98. With future sales of Enbrel projected to exceed $3 billion per year, protecting its golden-goose blockbuster became a crucial priority for Amgen. *Id.* Amgen went to work to protect its Enbrel monopoly with a thicket of patents, filing dozens of applications for patents claiming Enbrel manufacturing processes, formulations, methods of use, and administration devices. *Id.* ¶ 99. But Amgen knew none of these patents were likely to prevent competing biosimilars from launching after the expiration of Amgen's key Enbrel patents, which were set to expire in 2012. *Id.* Absent action, Enbrel could soon face competition from a competing biosimilar etanercept product launched either directly by Roche or by a

33

competing company that could obtain a license to the Roche Patent Rights. *Id.* ¶ 100. So, in June 2004, Amgen bought out all of the Roche Patent Rights. *Id.* ¶ 101. The transaction made Amgen the exclusive licensee of the Roche Patent Rights, gave it the ability to resume prosecution of any pending patent applications included within the Roche Patent Rights, and empowered it to enforce any patents to exclude competitors from the etanercept market.[19] *Id.*

The Court finds it compelling that, in 2004, Amgen was already reaping astronomical profits from Enbrel pursuant to its own patents which were set to expire in 2012, and pursuant to the 1998 License Agreement with Roche. Why then, did Amgen need to additionally acquire the Roche Patent Rights, including the '790 Application and the '791 Application? As held by our sister court in *Johnson*, "a monopolist's acquisition of exclusive rights to patents related to the subject matter of the monopoly can constitute anticompetitive conduct as a matter of law." *Johnson*, 745 F. Supp. 3d at 314. Amgen may be able to offer procompetitive justification for its acquisition of the Roche Patent Rights at a later stage of litigation. That would be "a classic issue of disputed fact." *ABS*, 2016 WL 3963246, at *19; *see also Johnson*, 745 F. Supp. 3d at 315–16 ("It may very well be true that defendants had a procompetitive reason for

---

[19] Amgen argues vociferously that it prosecuted the '790 and '791 Application before the PTO for seven years before actual patents issued from those applications, and that it was the '182 Patent and '522 Patent which issued that actually allowed Amgen to exclude competitors—not the patent applications themselves. Reply at 6–7. However, "the relevant question is *not* whether the patent acquisitions actually enhanced [the monopolist's] market power, but rather whether they reflect [the monopolist's] intent to *maintain* monopoly power through anticompetitive means." *ABS*, 2016 WL 3963246, at *19 (citing *Ford Motor Co. v. United States*, 405 U.S. 562, 576 n.11 (1972)).

34

acquiring Momenta and its patent portfolio, and at a later stage of litigation, defendants may pursue this argument."). But, at this stage, the Court finds that CareFirst has plausibly alleged anticompetitive conduct pursuant to Federal Rule of Civil Procedure 12(b)(6).[20]

### c.    Antitrust Injury

"Anticompetitive conduct alone does not establish a monopolization claim. A plaintiff must also connect that anticompetitive conduct to a corresponding antitrust injury." *Johnson,* 745 F. Supp. 3d at 316 (citing *Crawl Space Door Sys., Inc. v. SmartVent Prods., Inc.*, No. 2:19cv320, 2020 WL 13691776, at \*5 (E.D. Va. Apr. 28, 2020) (stating that for conduct to be exclusionary "a monopolist's act must have an anti-competitive effect" and it "must harm the competitive process and thereby harm consumers")). Plaintiffs must show that "defendant's allegedly anticompetitive conduct was the actual and proximate cause of that antitrust injury." *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 762 (E.D. Pa. 2015). Here, Plaintiffs sufficiently allege that the purchase of the Roche Patent Rights, the prosecution of the '790 and the '791 Application, and the enforcement of the '182 and '522 Patents resulted in permanent court injunctions against Sandoz and Samsung which allowed Amgen to keep its competitors off the market and extend its Enbrel monopoly. Plaintiffs further allege that this created antitrust injury by requiring CareFirst and its

---

[20] The parties also extensively litigate whether the '790 Application and the '791 Application technically covered etanercept at the time that the applications were purchased by Amgen. That is a factual determination which is not relevant to the Court's analysis at the motion to dismiss stage.

class members to pay supracompetitive prices for etanercept. Second Am. Compl. ¶¶ 125–43, 204–08. Such allegations—that patent enforcement resulted in delayed market entry of biosimilars and resulted in supracompetitive pricing—has been upheld by other courts as a sufficient allegation of antitrust injury. *See, e.g., Johnson*, 745 F. Supp. 3d at 308 ("Plaintiffs' alleged injury—the payment of supra-competitive prices for ustekinumab—is undoubtably an injury that the antitrust laws were intended to prevent."); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 534 (D.N.J. Sept. 29, 2004) ("Plaintiffs have alleged that these agreements caused them to pay higher prices for K-Dur, the type of injury that antitrust laws are intended to prevent. Plaintiffs are not required to plead more.")

Amgen argues that, even if the acquisition of Roche's Patent Rights were an antitrust violation that caused a downstream antitrust injury, the "causal chain" was broken by intervening government action—here, the permanent court injunction issued against Sandoz and Samsung by the District of New Jersey. In other words, Amgen argues that because Sandoz and Samsung were enjoined from bringing their biosimilar products to market by the district court, while an antitrust injury indeed may have occurred in-fact, such antitrust injury cannot be attributed to Amgen, but instead to the government.

Defendants cite, and the Court has independently found, several out of circuit cases which seem to stand for the proposition that where the government plays a discretionary role in the antitrust injury, such injury is not actionable. "If anticompetitive harm is caused by the decision of a court, even though granted at the request

36

**JA0036**

of a private party, no private restraint of trade occurs because the intervening government action breaks the causal chain." *Andrx Pharm., Inc. v. Biovail Corp. Intern.*, 256 F.3d 799, 818 (D.C. Cir. 2001). In *Andrx,* the D.C. Circuit acknowledged that it "may be correct that a plaintiff cannot be injured in fact by private conduct excluding him from the market when [government action] prevents him from entering that market in any event." *Id.* at 809 (cleaned up). Later on, although it is not entirely clear whether the court is commenting on immunity from antitrust *liability* versus antitrust *injury*, the court acknowledged that while anticompetitive harms stemming from court decisions might fall under *Noerr-Pennington*, anticompetitive harms stemming from private agreements, such as settlement agreements, would not "enjoy Noerr-Pennington immunity." *Id.* at 819. *MedImmune, Inc. v. Genentech, Inc.* takes a similar approach:

> Where a plaintiff fail[s] to prove that its injuries result from anything other than governmental action, *Noerr-Pennington* immunity will attach. With the exception of the price fixing argument dismissed . . . above, MedImmune has not pled an injury that was the result of the Defendants' settlement agreement. In the absence of government action in resolving priority and issuing the New Cabilly patent, MedImmune would have suffered no harm from the Defendants' settlement. Because the alleged restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, *Noerr-Pennington* immunity applies.

No. 3cv2567, 2003 WL 25550611, at *11 (C.D. Cal. Dec. 23, 2003) (internal citations and quotation marks omitted). The Third Circuit in *A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.* commented directly on whether *Noerr-Pennington* applies to both antitrust liability and antitrust injury:

> Under the *Noerr–Pennington* doctrine, private parties may be immunized against liability stemming from antitrust injuries flowing from valid petitioning. This includes two distinct types of actions. A petitioner may be immune from the antitrust injuries which result from the petitioning itself. Also, and particularly relevant here, parties are immune from liability arising from the antitrust injuries caused by government action which results from the petitioning. Therefore, if its conduct constitutes valid petitioning, the petitioner is immune from antitrust liability whether or not the injuries are caused by the act of petitioning or are caused by government action which results from the petitioning.

263 F.3d at 251, 266–67 (finding that while "plaintiffs properly pleaded an antitrust injury, the right to petition the government is paramount" and holding the defendants immune from anti-trust liability under the *Noerr-Pennington* doctrine).

While some courts appear to have accepted this proposition, the Court finds no support for this stance in the Fourth Circuit. On the contrary, in a recently decided case within this district brought by the same Plaintiffs, the court found that, "[T]here is a distinction between antitrust *liability* and antitrust *injury*. *Noerr-Pennington* stands for the proposition that litigation enforcing lawfully acquired patents cannot serve as a basis for antitrust liability. It does not, however, serve as a bar to asserting that patent enforcement litigation constitutes antitrust injury." *Johnson*, 745 F. Supp. 3d at 317.

Therefore, while recognizing the existing disagreement amongst courts regarding whether *Noerr-Pennington* immunizes antitrust injury which was created in part by government action, absent precedent from the Fourth Circuit and given the recent decision of our sister court, the Court declines to dismiss this case at the motion to dismiss stage, and allows Plaintiffs' federal claim to proceed on the merits. *See, e.g., In re Newbold Corp.*, No. 9cv33421, 2012 WL 5880441, at *8 (W.D.N.C. Nov. 20, 2012)

(finding the law unclear as to the plaintiff's claim and accordingly denying the defendants' motion to dismiss).

*    *    *

In sum, CareFirst has established antitrust standing for injunctive and declaratory relief pursuant to the Clayton Act. CareFirst has also sufficiently pled that Amgen possessed and continues to possess monopoly power and that Amgen's acquisition of the Roche Patent Rights was anticompetitive conduct in violation of the Sherman Act. Finally, Plaintiffs have alleged that it has suffered the type of injury that federal antitrust laws are intended to prevent. Therefore, Amgen's Motion to Dismiss Count One of CareFirst's Second Amended Complaint is **DENIED**.

### B.    State Law Claims: Monopolistic Conduct (Count Two), Consumer Protection (Count Three), and Unjust Enrichment (Count Four)

Count Two alleges that Amgen engaged in monopolization and monopolistic conduct in violation of the laws of thirty states, Puerto Rico, and the District of Columbia.[21] Second Am. Compl. ¶¶ 228–46. Count Three alleges that Amgen violated the consumer protection laws of thirty-six states and the District of Columbia.[22] *Id.*

---

[21] Such states include Alabama, Arizona, California, Colorado, Connecticut, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. Second Am. Compl. ¶ 245.

[22] Such states include Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Louisiana, Massachusetts, Maryland, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, South

39

¶¶ 247–487. Count Four alleges that Amgen engaged in inequitable conduct consti-

tuting unjust enrichment in violation of the laws of forty-eight states, Puerto Rico,

and the District of Columbia.[23] *Id.* ¶¶ 488–711. Amgen does not raise any affirmative

defenses or arguments with respect to CareFirst's state law claims, arguing only that

because Amgen is immunized for its conduct pursuant to *Noerr-Pennington* under

federal law, it is also immune "from liability under all manner of state-law business

torts.[24] Reply at 4 n.1. The Court, having found that Amgen is not immune under

---

Carolina, South Dakota, Texas, Utah, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming. Second Am. Compl. ¶¶ 263–487.

[23] Such states include Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. Second Am. Compl. ¶¶ 498–711.

[24] In its Motion to Dismiss, Amgen states that, "Plaintiffs' federal and state law claims are premised on the same theory. Plaintiffs allege 'exclusionary, anticompetitive conduct that was designed to create and maintain Amgen's improper monopoly over etanercept and exclude or substantially exclude its biosimilars from the market.'" Mem. Supp. at 18. In CareFirst's Response in Opposition to the Motion to Dismiss, Plaintiffs state, "Amgen does not argue for dismissal of the plaintiffs' claims under state consumer protections laws or assert any statute-specific challenges to the plaintiffs' state antitrust law claims." Resp. Opp'n at 9 n.3. Amgen replied, "As Amgen's motion papers explained, and Plaintiffs do not dispute, all of Plaintiffs' claims 'are premised on the same theory.' ECF No. 56 at 13. Thus, Amgen's motion requests dismissal of the entire Complaint rather than only a subset of claims. *Id.* at 23. Indeed, because the *Noerr-Pennington* doctrine is premised on the exercise of a federal constitutional right, it immunizes Amgen's conduct not only from antitrust liability, but also from liability under all manner of state-law business torts. *See IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003). Likewise, state law cannot undo the effect of federal-court injunctions." Reply at 3–4 n.1.

**JA0040**

federal law, turns to whether CareFirst has stated a claim upon which relief can be granted under those state tort laws based upon the facts alleged in the Second Amended Complaint.

>    1.    *Preemption*

Before determining whether Plaintiffs have sufficiently pleaded the elements of their state law claims, the Court must consider whether those state law claims are preempted by federal law. To so determine, "[t]he Court must assess whether the tort action *is based on conduct* that is protected or governed by federal patent law. If the conduct at issue is protected by federal patent law, the tort action is preempted." *CardioVention, Inc. v. Medtronic, Inc.*, 430 F. Supp. 2d 933, 939 (D. Minn. 2006) (emphasis added). In *Hunter-Douglas*, the Federal Circuit identified two types of conduct where federal patent law immunizes (or preempts) state tort liability: "(1) conduct entirely before the PTO, unless it amounts to fraud and (2) publicization of a patent, unless done in bad faith." *Johnson*, 745 F. Supp. 3d at 319 (citing *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1335–36 (Fed. Cir. 1998)). Here, the anticompetitive conduct alleged is Amgen's acquisition of the Roche Patent Rights. This does not constitute conduct entirely before the PTO, nor does it constitute publicization of a patent. Therefore, the conduct at issue does not fall into either *Hunter-Douglas* category which would require federal law pre-emption over state tort liability. *Johnson*, 745 F. Supp. at 320 (finding the plaintiffs' state-law claims require allegations apart from fraud on the PTO, as "[a]ntitrust claims require a showing of anticompetitive conduct, consumer protection requires proof of consumer deception,

41

and unjust enrichment requires proof of enrichment upon a defendant that would be inequitable to accept or retain."). Therefore, CareFirst's state law claims are not preempted by federal law pursuant to *Hunter-Douglas*.

2. *Count Two: Monopolization and Monopolistic Conduct under State Law*

CareFirst alleges that Amgen engaged in monopolistic conduct in violation of the laws of Puerto Rico, the District of Columbia, and thirty states: Alabama, Arizona, California, Colorado, Connecticut, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. First, the Court must evaluate whether CareFirst, as an indirect purchaser of Enbrel, has standing to bring such antitrust claims under state law. Then, the Court will consider whether CareFirst has sufficiently pled the elements of monopolistic conduct under the aforementioned laws of each state.

a. *Standing*

"[T]he doctrine of antitrust standing works to distinguish, out of all the parties whose injuries might conceivably be traced to an antitrust violation, which of those parties have recourse under antitrust law." *Davis v. Hanna Holdings, Inc.*, 771 F. Supp. 3d 552, 572 (E.D. Pa. 2025) (internal quotation marks and citations omitted). "It is axiomatic that in determining state law a federal court must look first and foremost to the law of the state's highest court . . ." *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1002 (4th Cir. 1998). The Supreme Court set forth a test to determine

42

antitrust standing in *Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), and most states at issue here "apply the factors from *AGC* or use a substantially similar test." *Johnson*, 745 F. Supp. 3d at 322. The Court finds that, as to the states at issue here, the District of Columbia, Alabama, Arizona, California, Connecticut, Illinois, Iowa, Kansas, Maryland, Michigan, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin apply the factors from *AGC* or use a substantially similar test.[25] The remaining states or territories at issue here which apply alternative tests are Puerto Rico, Colorado, Florida, Hawaii, Maine, Minnesota, and North Carolina. The Court will therefore first consider Plaintiffs' state antitrust standing with respect to the states applying the *AGC* test, and then turn to the states applying alternative tests.

> i.    *States Applying the* AGC *Test*

The five *AGC* Factors are:

> (1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended;
> (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws;
> (3) the directness of the alleged injury;

---

[25] *See Johnson*, 745 F. Supp. 3d at 322 ("The Court finds that Alabama, Arizona, California, Connecticut, the District of Columbia, Illinois, Iowa, Kansas, Maryland, Michigan, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, and Wisconsin either explicitly apply the factors from *AGC* or use a substantially similar test."); *see also id.* n.23 (finding that while no court in Utah or West Virginia has provided a clear statement laying out an antitrust test, each state has a harmonization provision, which persuaded the Court that the application of the AGC factors in those states was appropriate).

(4) the existence of more direct victims of the alleged antitrust injury; and
(5) problems of identifying damages and apportioning them among those directly and indirectly harmed.

*Kloth v. Microsoft*, 444 F.3d 312, 324 (4th Cir. 2006) (citing *AGC*, 459 U.S. at 537–545) (internal quotation marks and citations omitted). Courts have simplified the first two factors of the *AGC* test and asked simply whether the alleged harm is the correct type of injury. *Johnson*, 745 F. Supp. at 323. The Court has already determined *supra* that CareFirst has suffered an antirust injury which was the type of injury that antitrust laws are designed to protect against, so the "correct injury" prong is met. The Court will therefore consider whether the last three factors weigh in favor of finding that CareFirst has standing in the states applying the *AGC* test.

The directness of alleged injury weighs in favor of standing. CareFirst alleges that, absent Amgen's monopolistic and unlawful acquisition of the Roche Patent Rights, "at least one biosimilar would have entered the market and lowered the price of [Enbrel]." *Johnson*, 745 F. Supp. at 324. While the injury here still required prosecution of the applications and enforcement of the patents, "because the high price of [Enbrel] is the end goal of the alleged anticompetitive conduct", *id.*, the directness of the injury weighs in favor of standing.

The fourth factor, the existence of more direct victims of the alleged antitrust injury, is best evaluated by considering whether the states at issue have passed *Illinois Brick* repealer statutes. "[T]ypically these [concerns about whether there are more direct victims] carry little weight in the standing analysis in states with *Illinois Brick* repealers." *Johnson*, 745 F. Supp. 3d at 325 (analyzing the fourth *AGC* factor

and finding that whether there are more direct victims is of little import in states with repeater statutes, but finding such considerations more relevant amidst *Walker Process* fraud claims); *see also In re Lithium Ion Batteries Antitrust Litig.*, No. 13cv2420, 2014 WL 4955377, at *7 (N.D. Cal. Oct. 2, 2014) ("The issue ultimately is not whether to apply the principles of AGC. The critical issue, rather, is how *repealer* states have chosen to limit indirect-purchaser standing."). As mentioned *supra*, in *Illinois Brick*, the Supreme Court prohibited indirect purchasers, such as CareFirst, from recovering antitrust damages pursuant to violations of federal law. 431 U.S. at 745–748. Then, in *California v. Arc America Corp.*, the Supreme Court provided a carve-out: states could pass laws "repealing" *Illinois Brick*, and state courts could decline to follow *Illinois Brick* as applied to state antitrust laws. 490 U.S. 93 (1989). These statutes or holdings expressly permit indirect purchasers to recover damages for violations of state antitrust laws. *See, e.g.*, Ala. Code. § 6-5-60(a) (2025) ("Any person, firm, or corporation injured or damaged by an unlawful trust, combine, or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of $500 and all actual damages[.]"); *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 102 (Ariz. 2003) (holding that *Illinois Brick* was not binding on Arizona courts). Here, all the states at issue that apply the *AGC* test have passed repealer statutes or its courts have affirmed that *Illinois Brick* does not bar indirect purchasers from bringing claims pursuant to state laws.[26] By way of those statutes

---

26 **District of Columbia**: D.C. Code § 28-4509 (2025); **Alabama**: Ala. Code § 6-5-60 (2025); **Arizona**: *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 102 (Ariz. 2003) ("Nothing in [the Arizona Antitrust Act] . . . precludes indirect purchasers from

45

and rulings, these states have expressly stated that the existence of more direct victims of the alleged antitrust injury should not preclude standing. Therefore, the Court finds that this factor weighs heavily in favor of antitrust standing.

Finally, the final factor—"problems of identifying damages and apportioning them among those directly and indirectly harmed"—weighs against Plaintiffs here:

> For plaintiffs to succeed on their overcharge claim, they would need to address—among other things—whether the price for [the drug] would have been lower, what the competitor's price for it would have been, and how many competitors would have entered the market and what effect that would have on the price had the alleged anticompetitive conduct not occurred. This is a rather complex and speculative world that plaintiffs find themselves in, which diminishes the justification for granting standing.

*Johnson,* 745 F. Supp. 3d at 325. In this case, such a determination would indeed be complex and speculative. However, given that the majority of the factors weigh in

---

suing."); **California:** Cal. Bus. & Prof. Code § 16750(a) (2025); **Connecticut**: Conn. Gen. Stat. § 35-46a (2025); **Illinois:** 740 Ill. Comp. Stat. Ann. 10/7 (LexisNexis 2025); **Iowa:** *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 445 (Iowa 2002) ("We conclude the Iowa Competition Law creates a cause of action for *all* consumers, regardless of one's technical status as a direct or indirect purchaser."); **Kansas:** Kan. Stat. Ann. § 50-161(b) (2025); **Maryland:** Md. Code Ann., Com. Law § 11-209(b)(2) (LexisNexis 2025); **Michigan:** Mich. Comp. Laws Serv. § 445.778 (LexisNexis 2025); **Mississippi:** Miss. Code. Ann. § 75-21-9 (2024); **Nebraska**: Neb. Rev. Stat. Ann. § 59-821 (LexisNexis 2025); **Nevada**: Nev. Rev. Stat. Ann. § 598A.210 (LexisNexis 2025); **New Hampshire**: N.H. Rev. Stat. Ann. § 356:11 (LexisNexis 2025); **New Mexico**: N.M. Stat. Ann. § 57-1-3 (LexisNexis 2025); **New York**: N.Y. Gen. Bus. Law § 340(6) (LexisNexis 2025); **North Dakota**: N.D. Cent. Code § 51-08.1-08 (2025); **Oregon:** Or. Rev. Stat. § 646.780 (2025); **Rhode Island**: 6 R.I. Gen. Laws § 6-36-7(d) (2025); **South Dakota**: S.D. Codified Laws § 37-1-33 (2025); **Tennessee**: *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 517 (Tenn. 2005) ("We conclude that an indirect purchaser may bring an action under [the Tennessee Trade Practices Act.]"); **Utah**: Utah Code Ann. § 76-16-511 (LexisNexis 2025); **Vermont:** VT. Stat. Ann. tit. 9, § 2465(b) (2025); **West Virginia**: W. Va. Code Ann. § 142-9-2 (LexisNexis 2025); **Wisconsin**: Wis. Stat. § 133.18(1)(a) (2025).

favor of standing, the Court finds that CareFirst has antitrust standing in the states applying the *AGC* test. Therefore, CareFirst has standing to bring the monopolistic conduct state law claims in the District of Columbia, Alabama, Arizona, California, Connecticut, Illinois, Iowa, Kansas, Maryland, Michigan, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

ii.      *States Applying Alternative Tests*

For the purposes of analyzing antitrust standing, the remaining states at issue are Puerto Rico, Colorado, Florida, Hawaii, Maine, Minnesota, and North Carolina. Each state applies an alternative test:

- **Puerto Rico**: Indirect purchasers do not have standing to bring antitrust claims in Puerto Rico. *See In re Broiler Chicken Antitrust Litig.*, No. 16cv8637, 2020 WL 4032932, at *4 (N.D. Ill. July 15, 2020) ("Puerto Rico's existing anti-trust law precludes indirect purchasers from recovering for the harm caused by Defendants."). Therefore, CareFirst lacks standing to bring an antitrust claim against Amgen pursuant to Puerto Rican law and that claim is **DISMISSED**.

- **Colorado**: Colorado simply asks whether the Plaintiff has been injured "by reason of the anticompetitive effect of [Defendant's] alleged conduct," similar to federal standing requirements. *Winther v. DEC Intern., Inc.*, 625 F. Supp. 100, 104 (D. Col. 1985). Therefore, because the Court has already determined that CareFirst has antitrust standing under the

47

**JA0047**

federal laws, the Court similarly finds that it has antitrust standing under Colorado's state antitrust law.

- **Florida**: "Florida allows indirect purchasers to bring actions under its consumer protection statute for antitrust violations." *Johnson*, F. Supp. 3d at 322 n. 22 (citing *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 108 (Fla. Dist. Ct. App. 1996)). The Court therefore finds that CareFirst has antitrust standing pursuant to Florida law.

- **Hawaii**: "The Hawai'i Supreme Court has recognized that to establish antitrust standing there must be a direct injury . . . [t]he focus of the standing inquiry, therefore, is on the directness of the injury." *Johnson*, F. Supp. 3d at 325 (citing *Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, Inc.*, 113 Hawai'i 77, 148 P.3d 1179, 1206 (2006)). Having stated above that the Court finds that the directness of the injury weighs in favor of standing, the Court finds that CareFirst has antitrust standing under Hawaiian law.

- **Maine**: In Maine, a trial court indicated that Maine would likely apply the AGC factors, except to the extent that such factors would be in contravention with the legislature's adoption of the *Illinois Brick* repealer. *Knowles v. Visa U.S.A.*, No. 2003cv707, 2004 WL 2475284, at *5 (Me. Super. Ct. Oct. 20, 2004). Given that Maine has passed an *Illinois Brick* repealer statute, the Court finds that CareFirst has antitrust standing under Maine law.

48

**JA0048**

- **Minnesota**: In Minnesota, Minn. Stat. § 325D.57 (2025) provides that any person injured directly or indirectly by antitrust violations can recover three times the actual damages sustained. Such statute also constitutes an *Illinois Brick* repealer statute, and the Court therefore finds that CareFirst has antitrust standing under Minnesota law.

- **North Carolina**: In North Carolina, a Court of Appeals found that North Carolina's antitrust law, N.C. Gen. Stat. § 75-16 (2025), allows indirect purchasers to sue for antitrust violations. *Hyde v. Abbott Labs., Inc.*, 473 S.E.2d 680, 683 (N.C. Ct. App. 1996). The Court therefore finds that CareFirst has antitrust standing under North Carolina law.

Therefore, CareFirst has standing to bring the monopolistic conduct state law claims in Colorado, Florida, Hawaii, Maine, Minnesota, and North Carolina. The monopolistic conduct state law claim (Count Two) as to Puerto Rico is **DISMISSED**.

      *b.    Remaining Elements*

Having considered that indirect purchasers have antitrust standing under all the state laws at issue except Puerto Rico, the Court will now consider the remaining elements of those state antitrust laws to determine whether CareFirst has sufficiently stated a claim that the acquisition of the Roche patent applications was in violation of state antitrust laws. The Court finds that that it has. Each state at issue

here, with the exception of Tennessee[27] and Colorado[28], has included a harmonization provision[29] in their state antitrust law, or has Sherman Act "analogues," or its state courts have otherwise stated that state laws should be interpreted in harmony with federal law.[30,] As such, because the Court has already found that the Second

---

[27] Tennessee state law provides that, "All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in trade or commerce affecting this state, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed or which tend to advance, reduce, or control the price or the cost to the producer or the consumer of any product or service in trade or commerce affecting this state, are declared to be against public policy, unlawful, and void." Tenn. Code Ann. § 47-25-101 (2025). The Court finds that CareFirst has, pursuant to Tennessee state law, sufficiently alleged that Amgen entered into a contract with a view to lessen full and free competition in trade or commerce.

[28] Colorado state law provides that "Entering into or engaging in any of the following in restraint of trade or commerce is illegal (a) a contract; (b) a combination in the form of a trust or other form of combination; or (c) a conspiracy." Colo. Rev. Stat. § 6-4-104 (2025). It further provides that, "It is illegal for any person to monopolize, attempt to monopolize, or combine or conspire with any other person to monopolize any part of trade or commerce." Colo. Rev. Stat. § 6-4-105 (2025). The Court finds that CareFirst has, pursuant to Colorado state law, sufficiently alleged that Amgen entered into a contract in restraint of trade and monopolized a part of commerce.

[29] A harmonization provision typically provides that state laws should be construed *in harmony with* prevailing judicial interpretations of federal antitrust statutes.

[30] **District of Columbia**: D.C. Code § 28-4515 (2025) ("In construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes."); **Alabama**: *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 555 n.8 (11th Cir. 1998) (federal antitrust law "prescribes the terms of unlawful monopolies and restraints of trade" pursuant to Alabama law); **Arizona**: Ariz. Rev. Stat. § 44-1412 (LexisNexis 2025) ("courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes"); **California**: *Marin Cnty. Bd. of Realtors, Inc. v. Palsson*, 549 P.2d 833, 835 (Cal. 1976) ("A long line of California cases has concluded that the Cartwright Act is patterned after the Sherman Act and both statutes have their roots in the common law. Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act."); **Connecticut**: Conn. Gen. Stat. § 35-44B (2025) ("[T]he courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes."); **Florida**: Fla. Stat. Ann. § 542.32 (LexisNexis

2025) ("due consideration and great weight [should] be given to the interpretations of the federal courts relating to comparable federal antitrust statutes"); **Hawaii**: Haw. Rev. Stat. Ann. § 480-3 (LexisNexis 2025) ("This chapter shall be construed in accordance with judicial interpretations of similar federal antitrust statutes[.]"); **Illinois**: 740 Ill. Comp. Stat. Ann. 10/11 (LexisNexis 2025) ("When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act."); **Iowa**: Iowa Code Ann. § 553.2 (2025) ("This chapter shall be construed to complement and be harmonized with the applied laws of the United States[.]"); **Kansas**: Kan. Stat. Ann. § 50-163(b) (2025) ("Except as otherwise provided in subsections (d) and (e), the Kansas restraint of trade act shall be construed in harmony with ruling judicial interpretations of federal antitrust law by the United States supreme court."); **Maine**: *Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000) ("We have noted that the 'Maine antitrust statutes parallel the Sherman Act,' and thus have analyzed claims thereunder according to doctrines developed in relation to federal law."); **Maryland**: Md. Code Ann., Com. Law §11-202(a)(2) (LexisNexis 2025) ("[C]ourts . . . [should] be guided by the interpretation given by the federal courts to the various statutes dealing with [antitrust laws.]"); **Michigan**: Mich. Comp. Laws Serv. § 445.784(2) (LexisNexis 2025) ("[T]he courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes[.]"); **Minnesota**: *State by Humphrey v. Alpine Air Prods.,* 490 N.W.2d 888, 894 (Minn. App. 1992) ("Minnesota antitrust law is to be interpreted consistently with the federal courts' construction of federal antitrust law."); **Mississippi**: *Walker v. U-Haul of Miss.*, 734 F.2d 1068, 1070 n.5 (5th Cir. 1984) ("The parties and district court have treated the state and federal antitrust claims as analytically identical. We follow suit."); **Nebraska**: Neb. Rev. Stat. Ann. § 59-829 (LexisNexis 2025) ("[Courts] shall follow the construction given to the federal law by the federal courts."); **Nevada**: Nev. Rev. Stat. Ann. § 598A.050 (LexisNexis 2025) ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes."); **New Hampshire**: N.H. Rev. Stat. Ann. § 356:14 (LexisNexis 2025) ("[C]ourts may be guided by interpretations of the United States' antitrust laws."); **New Mexico**: N.M. Stat. Ann. § 57-1-15 (LexisNexis 2025) ("[T]he Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws."); **New York**: *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007) (noting that New York's state antitrust law is "generally construe[d]" in light of federal antitrust case law); **North Carolina**: *Hyde v. Abbott Labs., Inc.*, 473 S.E.2d 680, 684 (N.C. Ct. App. 1996) ("Federal case law interpretations of the federal antitrust laws are persuasive authority in construing our own antitrust statutes."); **North Dakota**: N.D. Cent. Code § 51-08.1-02 (2025) and § 51-08.1-03 (2025) (Sherman Act analogues); **Oregon**: OR. Rev. Stat. § 646.715(2) (2025) ("The decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority[.]"); **Rhode Island**: 6 R.I. Gen. Laws Ann. § 6-36-2(b) (2025) ("This chapter shall be construed in harmony with judicial interpretations of comparable antitrust statutes[.]"); **South**

51

**JA0051**

Amended Complaint sufficiently alleges that the acquisition of the Roche patent applications was anticompetitive, the Court finds that CareFirst has sufficiently alleged such monopolistic conduct under the laws of each state at issue as well.

### 3. Count Three: Consumer Protection

CareFirst brings consumer protection claims under the laws of the District of Columbia, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Louisiana, Massachusetts, Maryland, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming.

In the Second Amended Complaint, under Count Three, CareFirst first incorporates the preceding sixty-five pages worth of factual allegations. Second Am. Compl. ¶ 247. CareFirst then provides each of the aforementioned states' statutes and factual allegations about how Amgen allegedly violated each statute. *Id.* ¶¶ 248–487. "Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain

---

**Dakota**: S.D. Codified Laws § 37-1-22 (2025) ("[T]he courts may use as a guide interpretations given by the federal or state courts to comparable antitrust statutes."); **Utah:** Utah Code Ann. § 76-16-502 (LexisNexis 2025) ("[T]he courts . . . .will be guided by interpretations given by the federal courts to comparable federal antitrust statutes[.]"); **Vermont**: VT. Stat. Ann. tit. 9, § 2453a(c) (2025) ("[T]he courts of this State shall be guided by the construction of federal antitrust law and the Sherman Act[.]"); **West Virginia**: W. Va. Code Ann. § 47-18-16 (LexisNexis 2025) ("This article shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes."); **Wisconsin**: *Grams v. Boss,* 294 N.W.2d 473, 480 (Wis. 1980) ("We have repeatedly stated that . . . the question of what acts constitute a combination or conspiracy in restraint of trade is controlled by federal decisions under the Sherman Act.")

statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the ground upon which it rests." *Twombly*, 550 U.S. at 545 (cleaned up). The Court finds that CareFirst has more than met that standard here. Accordingly, Amgen's Motion to Dismiss Count Three of CareFirst's Second Amended Complaint is **DENIED**.

### 4.    *Count Four: Unjust Enrichment*

CareFirst brings unjust enrichment claims under the laws of Puerto Rico, the District of Columbia, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

To state a claim of unjust enrichment, "almost all states at minimum require plaintiffs to allege that they conferred a benefit or enrichment upon defendant and that it would be inequitable or unjust for defendant to accept and retain the benefit." *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 541 (E.D. Pa. 2020). Such unjust enrichment claims take one of two forms—either autonomous or parasitic. *Id.* "Autonomous unjust enrichment claims are those that are not derived from a violation of some other state law but rather serve as independent grounds for restitution.

53

**JA0053**

Whereas parasitic claims—as the name suggests—arise from a violation of another state law." *Johnson*, 745 F. Supp. 3d at 331.

As mentioned *supra*, in *Illinois Brick*, the Supreme Court prohibited indirect purchasers from recovering damages for violations of antitrust laws, but in response to this holding many states have passed "repealer statutes" which permit indirect purchasers to recover damages for violations of state antitrust laws. In states that continue to follow *Illinois Brick*, *i.e.*—states where a repealer statute has not been passed, "courts have held that an autonomous unjust enrichment may not be used as an end-run around a state's prohibition against antitrust claims brought by indirect purchasers in accordance with *Illinois Brick*." *In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 703–04 (E.D. Pa. 2014). Therefore, if the state does not follow *Illinois Brick*, both autonomous and parasitic unjust enrichment claims are viable. If the state follows *Illinois Brick* and its unjust enrichment claim is autonomous, it will not survive the motion to dismiss. If the state follows *Illinois Brick* and its unjust enrichment claim is parasitic, such parasitic claim must have another state law claim to which it can attach. Therefore, the only unjust enrichment claims warranting dismissal at this stage are those claims brought in states that follow *Illinois Brick*, and where no other state law claim has survived the motion to dismiss—either the monopolistic conduct claim or consumer protection claim—to which a parasitic claim could attach.

CareFirst brought unjust enrichment claims pursuant to the laws of forty-eight states, as well as Puerto Rico and the District of Columbia. Of those states and

54

**JA0054**

territories, nineteen follow *Illinois Brick* or have not explicitly passed *Illinois Brick*

repealer statutes: Alaska, Arkansas, Georgia, Idaho, Indiana, Kentucky, Louisiana,

Massachusetts, Missouri, Montana, New Jersey, Ohio, Oklahoma, Pennsylvania,

South Carolina, Texas, Virginia, Washington, and Puerto Rico.[31] Of those nineteen

states who follow *Illinois Brick*, there are seven states (and one territory) where no

---

[31] **Alaska**: Alaska Stat. § 45.50.577(i) (2025) (stating that the Alaska Attorney General may bring claims of indirect harm); **Arkansas**: Ark. Code Ann. §§ 4-75-212 (2025) (Arkansas Attorney General may bring claims of indirect harm); **Georgia**: *In re Novartis & Par Antitrust Litig.*, 2019 WL 3841711, at *6 (S.D.N.Y. Aug. 15, 2019) (noting that Georgia follows *Illinois Brick*); **Idaho**: Idaho Code Ann. § 48-108(2) (2025) (Idaho Attorney General may bring claims of indirect harm); **Indiana**: Ind. Code § 24-1-2-5.1 (2025) (Indiana Attorney General may bring claims for indirect harm); **Kentucky**: *Arnold v. Microsoft*, No. 2000-ca-2144, 2001 WL 1835377, at *3 (Ky. Ct. App. Nov. 21, 2001) (following *Illinois Brick*); **Louisiana**: *Free v. Abbott Labs.*, 176 F.3d 298, 301 (5th Cir.1999) (following *Illinois Brick*); **Massachusetts**: *Ciardi v. F. Hoffman-La Roche, Ltd.*, 436 Mass. 53, 62 (Mass. 2002) (indirect purchasers cannot bring claim under antitrust law); **Missouri**: *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420, 2014 WL 4955377, at *19 (N.D. Cal. Oct. 2, 2014) (indirect purchasers cannot bring antitrust claims under Missouri law); **Montana**: *Miami Prod. & Chem. Co. v. Olin Corp.*, 546 F. Supp. 3d 223, 246 (W.D.N.Y. 2021) ("[U]nder Montana law, lawsuits by indirect purchasers are barred pursuant to *Illinois Brick*.") (cleaned up); **New Jersey**: *Miami Prod.*, 546 F. Supp. 3d at 237 ("[U]nder *Illinois Brick*, indirect purchasers have no standing to assert a private right of action under the New Jersey Antitrust Act.") (cleaned up); **Ohio**: *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 798 (Ohio 2005) ("[W]e adopt and follow *Illinois Brick*'s direct purchaser requirement and hold that an indirect purchaser of goods may not assert a Valentine Act claim for alleged violations of Ohio antitrust law.); **Oklahoma**: *Major v. Microsoft Corp.*, 60 P.3d 511, 517 (Okla. Civ. App. 2002) (following *Illinois Brick*); **Pennsylvania** (no antitrust statute—so federal antitrust law controls); **South Carolina**: *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 821 (N.D. Ill. 2017) ("South Carolina has not passed an *Illinois Brick* repealer."); **Texas**: *Abbott Labs, Inc. (Ross Labs Div.), v. Segura*, 907 S.W.2d 503, 505 (Tex. 1995) (following *Illinois Brick*); **Virginia**: *In re Novartis and Par Antitrust Litig.*, 2019 WL 3841711, at *6 (S.D.N.Y. Aug. 15, 2019) (finding that Virginia follows *Illinois Brick*); **Washington**: Wash. Rev. Code. Ann. § 19.86.090 (LexisNexis 2025) (state may sue due to indirect injury); **Puerto Rico**: *In re Broiler Chicken Antitrust Litig.*, No. 16-c-8637, 2020 WL 4032932, at *4 (N.D. Ill. July 15, 2020) (finding that Puerto Rico follows *Illinois Brick*).

other state law claim was brought, or no other such claim survives the motion to dismiss: Idaho, Kentucky, Montana, New Jersey, Ohio, Oklahoma, Washington, and Puerto Rico. Therefore, the state law claims for unjust enrichment under the laws of Idaho, Kentucky, Montana, New Jersey, Ohio, Oklahoma, Washington, and Puerto Rico are **DISMISSED** from this action.

As with Plaintiffs' claims for consumer protection, in alleging that Amgen violated state unjust enrichment laws, CareFirst begins by incorporating the preceding 487 paragraphs of allegations. CareFirst then alleges, state by state, that it "conferred a benefit or enrichment upon [Amgen] and that it would be inequitable or unjust for defendant to accept and retain the benefit." *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d at 541; *see also* Second Am. Compl. ¶¶ 488–711. The Court therefore finds that CareFirst has sufficiently stated a claim of unjust enrichment in the states that remain. Amgen's Motion to Dismiss as to all other state law claims for unjust enrichment in the District of Columbia and the remaining forty-one states is therefore **DENIED.**

## IV.    CONCLUSION

For the foregoing reasons, Amgen's Motion (ECF No. 55) is **GRANTED in part** and **DENIED in part**:

1.    Amgen's Motion to Dismiss is **DENIED** in full as to Count One.

2.    Amgen's Motion to Dismiss as to Count Two is **DENIED** as to all states except Puerto Rico. CareFirst's claim for monopolistic conduct in violation of the laws of Puerto Rico is therefore **DISMISSED**.

3.    Amgen's Motion to Dismiss is **DENIED** in full as to Count Three.

4.    Amgen's Motion to Dismiss as to Count Four is **DENIED** as to all states except Idaho, Kentucky, Montana, New Jersey, Ohio, Oklahoma, Washington, and Puerto Rico. CareFirst's claims for unjust enrichment in violation of the laws of Idaho, Kentucky, Montana, New Jersey, Ohio, Oklahoma, Washington, and Puerto Rico are therefore **DISMISSED**.

The Clerk is **REQUESTED** to forward a copy of this Order to counsel of record for all parties.

**IT IS SO ORDERED.**

_____/s/_____
Arenda L. Wright Allen
United States District Judge

September 30, 2025
Norfolk, Virginia

# U.S. District Court
## Eastern District of Virginia - (Norfolk)
## CIVIL DOCKET FOR CASE #: 2:24-cv-00484-AWA-LRL

Carefirst of Maryland, Inc. et al v. Amgen, Inc. et al
Assigned to: District Judge Arenda L. Wright Allen
Referred to: Magistrate Judge Lawrence R. Leonard
Cause: 15:2 Antitrust Litigation

Date Filed: 08/06/2024
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 08/06/2024 | 1 | Complaint ( Filing fee $ 405, receipt number AVAEDC-9671194.), filed by Carefirst of Maryland, Inc., Carefirst Bluechoice, Inc., Group Hospitalization and Medical Services, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Civil Cover Sheet)(Monroe, William) (Entered: 08/06/2024) |
| 08/06/2024 | 2 | Financial Interest Disclosure Statement (Local Rule 7.1) by Carefirst of Maryland, Inc.. (Monroe, William) (Entered: 08/06/2024) |
| 08/06/2024 | 3 | Financial Interest Disclosure Statement (Local Rule 7.1) by Group Hospitalization and Medical Services, Inc.. (Monroe, William) (Entered: 08/06/2024) |
| 08/06/2024 | 4 | Financial Interest Disclosure Statement (Local Rule 7.1) by Carefirst Bluechoice, Inc.. (Monroe, William) (Entered: 08/06/2024) |
| 08/06/2024 | | Initial Case Assignment to District Judge Arenda L. Wright Allen and Magistrate Judge Robert J. Krask. (ptom) (Entered: 08/06/2024) |
| 08/07/2024 | | Case Reassigned to Magistrate Judge Lawrence R. Leonard. Magistrate Judge Robert J. Krask no longer assigned to the case. (bwell) (Entered: 08/07/2024) |
| 08/07/2024 | 5 | Proposed Summons re 1 Complaint, *Amgen, Inc.* by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc. (Monroe, William) (Entered: 08/07/2024) |
| 08/07/2024 | 6 | Proposed Summons re 1 Complaint, *Amgen Manufacturing, Limited* by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc. (Monroe, William) (Entered: 08/07/2024) |
| 08/07/2024 | 7 | Proposed Summons re 1 Complaint, *Immunex Corporation* by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc. (Monroe, William) (Entered: 08/07/2024) |

| | | |
|---|---|---|
| 08/08/2024 | 8 | Summons Issued as to Amgen Manufacturing, Limited, Amgen, Inc., Immunex Corporation, NOTICE TO ATTORNEY: Please remove the headers and print two duplexed copies of the Electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention and electronically file it using the filing events, Summons Returned Executed or Summons Returned Unexecuted. (Attachments: # 1 Civil Motions Procedures)(bwell) (Entered: 08/08/2024) |
| 08/13/2024 | 9 | Motion to appear Pro Hac Vice by Abbye Rose Klamann Ognibene and Certification of Local Counsel William H. Monroe, Jr. Filing fee $ 75, receipt number AVAEDC-9682129. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Monroe, William) (Entered: 08/13/2024) |
| 08/13/2024 | 10 | Motion to appear Pro Hac Vice by Claudia Morera and Certification of Local Counsel William H. Monroe, Jr. Filing fee $ 75, receipt number AVAEDC-9682147. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Monroe, William) (Entered: 08/13/2024) |
| 08/13/2024 | 11 | Motion to appear Pro Hac Vice by Rachel Downey and Certification of Local Counsel William H. Monroe, Jr. Filing fee $ 75, receipt number AVAEDC-9682155. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Monroe, William) (Entered: 08/13/2024) |
| 08/13/2024 | 12 | Motion to appear Pro Hac Vice by Thomas Sobol and Certification of Local Counsel William H. Monroe, Jr. Filing fee $ 75, receipt number AVAEDC-9682167. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Monroe, William) (Entered: 08/13/2024) |
| 08/21/2024 | 13 | ORDER granting 9 a Motion to Appear Pro Hac Vice by Abbye Rose Klamann Ognibene, as certified by local counsel William H. Monroe, Jr. for Plaintiffs. Signed by District Judge Arenda L. Wright Allen on 08/21/2024. (Allen, Arenda) (Entered: 08/21/2024) |
| 08/21/2024 | 14 | ORDER granting 10 a Motion to Appear Pro Hac Vice by Claudia Morera, as certified by local counsel William H. Monroe, Jr. for Plaintiffs. Signed by District Judge Arenda L. Wright Allen on 08/21/2024. (Allen, Arenda) (Entered: 08/21/2024) |
| 08/21/2024 | 15 | ORDER granting 11 a Motion to Appear Pro Hac Vice by Rachel Downey, as certified by local counsel William H. Monroe, Jr. for Plaintiffs. Signed by District Judge Arenda L. Wright Allen on 08/21/2024. (Allen, Arenda) (Entered: 08/21/2024) |
| 08/21/2024 | 16 | ORDER granting 12 a Motion to Appear Pro Hac Vice by Thomas Sobol, as certified by local counsel William H. Monroe, Jr. for Plaintiffs. Signed by District Judge Arenda L. Wright Allen on 08/21/2024. (Allen, Arenda) (Entered: 08/21/2024) |
| 08/22/2024 | 17 | Motion to appear Pro Hac Vice by Thomas K. Griffith and Certification of Local Counsel William H. Monroe, Jr. Filing fee $ 75, receipt number AVAEDC-9698965. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Monroe, William) (Entered: 08/22/2024) |
| 08/22/2024 | 18 | Motion to appear Pro Hac Vice by Raymond P. Girnys and Certification of Local Counsel William H. Monroe, Jr. Filing fee $ 75, receipt number AVAEDC-9699034. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Monroe, William) (Entered: 08/22/2024) |
| 08/22/2024 | 19 | Motion to appear Pro Hac Vice by Peter Dexter St. Phillip, Jr. and Certification of Local Counsel William H. Monroe, Jr. Filing fee $ 75, receipt number AVAEDC-9699059. by |

| | | |
|---|---|---|
| | | Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Monroe, William) (Entered: 08/22/2024) |
| 08/22/2024 | 20 | Motion to appear Pro Hac Vice by Uriel Rabinovitz and Certification of Local Counsel William H. Monroe, Jr. Filing fee $ 75, receipt number AVAEDC-9699079. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Monroe, William) (Entered: 08/22/2024) |
| 08/23/2024 | 21 | ORDER granting 17 a Motion to Appear Pro Hac Vice by Thomas K. Griffith, as certified by local counsel William H. Monroe, Jr. for Plaintiffs. Signed by District Judge Arenda L. Wright Allen on 08/23/2024. (Allen, Arenda) (Entered: 08/23/2024) |
| 08/23/2024 | 22 | ORDER granting 18 a Motion to Appear Pro Hac Vice by Raymond P. Girnys, as certified by local counsel William H. Monroe, Jr. for Plaintiffs. Signed by District Judge Arenda L. Wright Allen on 08/23/2024. (Allen, Arenda) (Entered: 08/23/2024) |
| 08/23/2024 | 23 | ORDER granting 19 a Motion to Appear Pro Hac Vice by Peter Dexter St. Phillip, Jr., as certified by local counsel William H. Monroe, Jr. for Plaintiffs. Signed by District Judge Arenda L. Wright Allen on 08/23/2024. (Allen, Arenda) (Entered: 08/23/2024) |
| 08/23/2024 | 24 | ORDER granting 20 a Motion to Appear Pro Hac Vice by Uriel Rabinovitz, as certified by local counsel William H. Monroe, Jr. for Plaintiffs. Signed by District Judge Arenda L. Wright Allen on 08/23/2024. (Allen, Arenda) (Entered: 08/23/2024) |
| 09/02/2024 | 25 | NOTICE of Appearance by Stephen Edward Noona on behalf of Amgen, Inc., Immunex Corporation (Noona, Stephen) (Entered: 09/02/2024) |
| 09/02/2024 | 26 | Consent MOTION for Extension of Time to File Answer re 1 Complaint, *and Memorandum in Support* by Amgen, Inc., Immunex Corporation. (Attachments: # 1 Exhibit 1(Proposed Agreed Order))(Noona, Stephen) (Entered: 09/02/2024) |
| 09/02/2024 | 27 | Financial Interest Disclosure Statement (Local Rule 7.1) by Amgen, Inc.. (Noona, Stephen) (Entered: 09/02/2024) |
| 09/02/2024 | 28 | Financial Interest Disclosure Statement (Local Rule 7.1) by Immunex Corporation. (Noona, Stephen) (Entered: 09/02/2024) |
| 09/03/2024 | | MOTIONS REFERRED to Magistrate Judge Lawrence R. Leonard. 26 Consent MOTION for Extension of Time to File Answer re 1 Complaint, *and Memorandum in Support* (bwell) (Entered: 09/03/2024) |
| 09/04/2024 | 29 | AGREED ORDER granting 26 Consent MOTION for Extension of Time for Defendants Amgen, Inc. and Immunex Corporation to File Responsive Pleadings to the Complaint. They shall have through and including November 4, 2024 in which to answer, plead, claim, move or otherwise respond to the Complaint filed by the Plaintiffs in this action. Signed by Magistrate Judge Douglas E. Miller on 9/4/24. (bwell) (Entered: 09/04/2024) |
| 09/06/2024 | 30 | Motion to appear Pro Hac Vice by Adam Russell Lawton and Certification of Local Counsel Stephen Edward Noona Filing fee $ 75, receipt number AVAEDC-9726599. by Amgen, Inc., Immunex Corporation. (Noona, Stephen) (Entered: 09/06/2024) |
| 09/06/2024 | 31 | Motion to appear Pro Hac Vice by Faye Paul Teller and Certification of Local Counsel Stephen Edward Noona Filing fee $ 75, receipt number AVAEDC-9726617. by Amgen, Inc., Immunex Corporation. (Noona, Stephen) (Entered: 09/06/2024) |
| 09/10/2024 | 32 | ORDER granting 30 a Motion to Appear Pro Hac Vice by Adam Russell Lawton, as certified by local counsel Stephen Edward Noona for Defendants Amgen, Inc. and Immunex Corporation. Signed by District Judge Arenda L. Wright Allen on 09/10/2024. (Allen, Arenda) (Entered: 09/10/2024) |

| | | |
|---|---|---|
| 09/10/2024 | 33 | ORDER granting 31 a Motion to Appear Pro Hac Vice by Faye Paul Teller, as certified by local counsel Stephen Edward Noona for Defendants Amgen, Inc. and Immunex Corporation. Signed by District Judge Arenda L. Wright Allen on 09/10/2024. (Allen, Arenda) (Entered: 09/10/2024) |
| 09/10/2024 | 34 | Motion to appear Pro Hac Vice by Justin Paul Raphael and Certification of Local Counsel Stephen Edward Noona Filing fee $ 75, receipt number AVAEDC-9732325. by Amgen, Inc., Immunex Corporation. (Noona, Stephen) (Entered: 09/10/2024) |
| 09/12/2024 | 35 | Motion to appear Pro Hac Vice by Jonathan Ian Kravis and Certification of Local Counsel Stephen Edward Noona Filing fee $ 75, receipt number AVAEDC-9735532. by Amgen, Inc., Immunex Corporation. (Noona, Stephen) (Entered: 09/12/2024) |
| 09/16/2024 | 36 | ORDER granting 34 a Motion to Appear Pro Hac Vice by Justin Paul Raphael, as certified by local counsel Stephen Edward Noona for Defendants Amgen, Inc. and Immunex Corporation. Signed by District Judge Arenda L. Wright Allen on 09/16/2024. (Allen, Arenda) (Entered: 09/16/2024) |
| 09/16/2024 | 37 | ORDER granting 35 a Motion to Appear Pro Hac Vice by Jonathan Ian Kravis, as certified by local counsel Stephen Edward Noona for Defendants Amgen, Inc. and Immunex Corporation. Signed by District Judge Arenda L. Wright Allen on 09/16/2024. (Allen, Arenda) (Entered: 09/16/2024) |
| 09/23/2024 | 38 | Motion to appear Pro Hac Vice by Rohit Kumar Singla and Certification of Local Counsel Stephen Edward Noona Filing fee $ 75, receipt number AVAEDC-9754916. by Amgen, Inc., Immunex Corporation. (Noona, Stephen) (Entered: 09/23/2024) |
| 09/24/2024 | 39 | ORDER granting 38 a Motion to Appear Pro Hac Vice by Rohit Kumar Singla, as certified by local counsel Stephen Edward Noona for Defendants Amgen, Inc. and Immunex Corporation. Signed by District Judge Arenda L. Wright Allen on 09/24/2024. (Allen, Arenda) (Entered: 09/24/2024) |
| 10/11/2024 | 40 | AMENDED COMPLAINT against All Defendants, filed by Carefirst of Maryland, Inc., Carefirst Bluechoice, Inc., Group Hospitalization and Medical Services, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Monroe, William) (Entered: 10/11/2024) |
| 10/22/2024 | 41 | WAIVER OF SERVICE Returned Executed by Carefirst of Maryland, Inc., Carefirst Bluechoice, Inc., Group Hospitalization and Medical Services, Inc.. Amgen Manufacturing, Limited waiver sent on 10/14/2024, answer due 12/13/2024. (Monroe, William) (Entered: 10/22/2024) |
| 10/23/2024 | 42 | NOTICE of Appearance by Stephen Edward Noona on behalf of Amgen Manufacturing Limited LLC (Noona, Stephen) (Entered: 10/23/2024) |
| 10/23/2024 | 43 | Joint MOTION Joint Motion Regarding Rule 12 Briefing Schedule re 40 Amended Complaint by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Attachments: # 1 Exhibit 1 (Proposed Order))(Noona, Stephen) (Entered: 10/23/2024) |
| 10/23/2024 | 44 | Financial Interest Disclosure Statement (Local Rule 7.1) by Amgen Manufacturing Limited LLC. (Noona, Stephen) (Entered: 10/23/2024) |
| 11/04/2024 | 45 | NOTICE by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc. *Notice of the filing of the Declaration of Abbye R. K. Ognibene Confirming Service on Attorneys General and Exhibits 1-3 to the Declaration* (Monroe, William) (Entered: 11/04/2024) |
| 11/04/2024 | 46 | Declaration re 45 NOTICE, *Declaration of Abbye R. K. Ognibene Confirming Service on Attorneys General* by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group |

| | | |
|---|---|---|
| | | Hospitalization and Medical Services, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Monroe, William) (Entered: 11/04/2024) |
| 11/04/2024 | 47 | MOTION to Dismiss for Failure to State a Claim *(Defendants' Motion to Dismiss the First Amended Complaint)* by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Attachments: # 1 Exhibit A (Proposed Order))(Noona, Stephen) (Entered: 11/04/2024) |
| 11/04/2024 | 48 | Memorandum in Support re 47 MOTION to Dismiss for Failure to State a Claim *(Defendants' Motion to Dismiss the First Amended Complaint)* filed by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Noona, Stephen) (Entered: 11/04/2024) |
| 11/04/2024 | 49 | Declaration re 48 Memorandum in Support, *(of Adam R. Lawton)* by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Noona, Stephen) (Entered: 11/04/2024) |
| 11/05/2024 | 50 | ORDER GRANTING 43 Joint Motion Regarding Rule 12 Briefing Schedule. See Order for details. Signed by District Judge Arenda L. Wright Allen on 11/5/24. (bwell) (Entered: 11/05/2024) |
| 11/25/2024 | 51 | NOTICE by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc. - *Plaintiffs Notice of Amending Its Complaint* (Monroe, William) (Entered: 11/25/2024) |
| 11/25/2024 | 52 | AMENDED COMPLAINT - *Second Amended Class Action Complaint and Demand for Jury Trial* against Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation, filed by Carefirst of Maryland, Inc., Carefirst Bluechoice, Inc., Group Hospitalization and Medical Services, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Monroe, William) (Entered: 11/25/2024) |
| 12/02/2024 | 53 | Consent MOTION for Extension of Time to File Response/Reply as to 52 Amended Complaint, *and Memorandum in Support of Consent Motion* by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Attachments: # 1 Exhibit 1 (Proposed Order))(Noona, Stephen) (Entered: 12/02/2024) |
| 12/03/2024 | | MOTIONS REFERRED to Magistrate Judge: Lawrence R. Leonard. 53 Consent MOTION for Extension of Time to File Response/Reply as to 52 Amended Complaint, *and Memorandum in Support of Consent Motion* (bwell) (Entered: 12/03/2024) |
| 12/06/2024 | 54 | ORDER granting 53 Consent MOTION for Extension of Time to File Response/Reply as to 52 Amended Complaint. The Defendants shall have until January 8, 2025 to answer, plead, claim, move or otherwise respond to the Second Amended Complaint. Plaintiffs shall have through and including January 29, 2025 to respond to any motion or pleading filed by the Defendants. The Defendants shall have through February 19, 2025 to file a reply. Signed by Magistrate Judge Lawrence R. Leonard on 12/6/24. (bwell) (Entered: 12/06/2024) |
| 01/08/2025 | 55 | MOTION to Dismiss for Failure to State a Claim *(Defendants' Motion to Dismiss the Second Amended Complaint)* by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Attachments: # 1 Exhibit A (Proposed Order))(Noona, Stephen) (Entered: 01/08/2025) |
| 01/08/2025 | 56 | Memorandum in Support re 55 MOTION to Dismiss for Failure to State a Claim *(Defendants' Motion to Dismiss the Second Amended Complaint)* filed by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Noona, Stephen) (Entered: 01/08/2025) |

| | | |
|---|---|---|
| 01/29/2025 | 57 | Opposition to 55 MOTION to Dismiss for Failure to State a Claim *(Defendants' Motion to Dismiss the Second Amended Complaint) - Plaintiffs' Opposition to Defendants' Motion to Dismiss Second Amended Complaint* filed by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Monroe, William) (Entered: 01/29/2025) |
| 02/19/2025 | 58 | REPLY to Response to Motion re 55 MOTION to Dismiss for Failure to State a Claim *(Defendants' Motion to Dismiss the Second Amended Complaint) (Defendants' Reply Memorandum In Support Of Motion To Dismiss )* filed by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Noona, Stephen) (Entered: 02/19/2025) |
| 02/23/2025 | 59 | Request for Hearing by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation re 55 MOTION to Dismiss for Failure to State a Claim *(Defendants' Motion to Dismiss the Second Amended Complaint) (Joint Notice of Request for Oral Argument)* (Noona, Stephen) (Entered: 02/23/2025) |
| 06/20/2025 | 60 | Motion to appear Pro Hac Vice by April Dawn Lambert and Certification of Local Counsel William H. Monroe, Jr. Filing fee $ 75, receipt number AVAEDC-10248740. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Greco, Marc) (Entered: 06/20/2025) |
| 06/20/2025 | 61 | Motion to appear Pro Hac Vice by John Radice and Certification of Local Counsel William H. Monroe, Jr. Filing fee $ 75, receipt number AVAEDC-10248809. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Greco, Marc) (Entered: 06/20/2025) |
| 06/23/2025 | 62 | Motion to appear Pro Hac Vice by Charles Kopel and Certification of Local Counsel William H. Monroe, Jr. Filing fee $ 75, receipt number AVAEDC-10251668. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Greco, Marc) (Entered: 06/23/2025) |
| 07/02/2025 | 63 | ORDER granting 60 a Motion to Appear Pro Hac Vice by April Dawn Lambert, as certified by local counsel William H. Monroe, Jr. for Plaintiffs Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., and Group Hospitalization and Medical Services, Inc. Signed by District Judge Arenda L. Wright Allen on 07/02/2025. (Allen, Arenda) (Entered: 07/02/2025) |
| 07/02/2025 | 64 | ORDER granting 61 a Motion to Appear Pro Hac Vice by John Radice, as certified by local counsel William H. Monroe, Jr. for Plaintiffs Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., and Group Hospitalization and Medical Services, Inc. Signed by District Judge Arenda L. Wright Allen on 07/02/2025. (Allen, Arenda) (Entered: 07/02/2025) |
| 07/02/2025 | 65 | ORDER granting 62 a Motion to Appear Pro Hac Vice by Charles Kopel, as certified by local counsel William H. Monroe, Jr. for Plaintiffs Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., and Group Hospitalization and Medical Services, Inc. Signed by District Judge Arenda L. Wright Allen on 07/02/2025. (Allen, Arenda) (Entered: 07/02/2025) |
| 09/30/2025 | 66 | ORDER granting in part and denying in part 55 Motion to Dismiss for Failure to State a Claim. Signed by District Judge Arenda L. Wright Allen on 9/30/25. (bwell) (Entered: 09/30/2025) |
| 09/30/2025 | | Refer for 16(b) (bwell) (Entered: 09/30/2025) |
| 10/07/2025 | 67 | MOTION for Extension of Time to File Answer re 52 Amended Complaint, 66 Order on Motion to Dismiss for Failure to State a Claim *(Unopposed Motion for an Extension of Time for Defendants to Answer the Second Amended Complaint and Memorandum in Support)* by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Attachments: # 1 Exhibit 1(Proposed Order))(Noona, Stephen) (Entered: 10/07/2025) |

| | | |
|---|---|---|
| 10/07/2025 | | MOTIONS REFERRED to Magistrate Judge: Lawrence R. Leonard. 67 MOTION for Extension of Time to File Answer re 52 Amended Complaint, 66 Order on Motion to Dismiss for Failure to State a Claim *(Unopposed Motion for an Extension of Time for Defendants to Answer the Second Amended Complaint and Memorandum (bwell) (Entered: 10/07/2025)* |
| 10/09/2025 | 68 | ORDER granting 67 Motion for Extension of Time to Answer. Defendants shall have an extension of time to and including November 7, 2025 to file their answer to the Second Amended Complaint. Signed by Magistrate Judge Lawrence R. Leonard on 10/9/25. (bwell) (Entered: 10/09/2025) |
| 10/20/2025 | 69 | MOTION Defendants' Motion For Certification Under 28 U.S.C. § 1292(b) re 66 Order on Motion to Dismiss for Failure to State a Claim by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Attachments: # 1 Exhibit 1(Proposed Order)) (Noona, Stephen) (Entered: 10/20/2025) |
| 10/20/2025 | 70 | Memorandum in Support re 69 MOTION Defendants' Motion For Certification Under 28 U.S.C. § 1292(b) re 66 Order on Motion to Dismiss for Failure to State a Claim filed by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Noona, Stephen) (Entered: 10/20/2025) |
| 10/20/2025 | 71 | Declaration re 70 Memorandum in Support, *(of Rohit K. Singla)* by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Noona, Stephen) (Entered: 10/20/2025) |
| 10/31/2025 | 72 | Motion to appear Pro Hac Vice by Hannah Warring Brennan and Certification of Local Counsel Marc C. Greco Filing fee $ 75, receipt number AVAEDC-10560816. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Greco, Marc) (Entered: 10/31/2025) |
| 11/03/2025 | 73 | Motion to appear Pro Hac Vice by David Jacob Zimmer and Certification of Local Counsel Marc C. Greco Filing fee $ 75, receipt number AVAEDC-10563120. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Greco, Marc) (Entered: 11/03/2025) |
| 11/03/2025 | 74 | Motion to appear Pro Hac Vice by Edwina Bullard Clarke and Certification of Local Counsel Marc C. Greco Filing fee $ 75, receipt number AVAEDC-10564567. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Greco, Marc) (Entered: 11/03/2025) |
| 11/03/2025 | 75 | Opposition to 69 MOTION Defendants' Motion For Certification Under 28 U.S.C. § 1292(b) re 66 Order on Motion to Dismiss for Failure to State a Claim filed by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Greco, Marc) (Entered: 11/03/2025) |
| 11/04/2025 | 76 | ORDER granting 72 a Motion to Appear Pro Hac Vice by Hannah Warring Brennan, as certified by local counsel Marc C. Greco for Plaintiffs Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., and Group Hospitalization and Medical Services, Inc. Signed by District Judge Arenda L. Wright Allen on 11/04/2025. (Allen, Arenda) (Entered: 11/04/2025) |
| 11/04/2025 | 77 | ORDER granting 73 a Motion to Appear Pro Hac Vice by David Jacob Zimmer, as certified by local counsel Marc C. Greco for Plaintiffs Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., and Group Hospitalization and Medical Services, Inc. Signed by District Judge Arenda L. Wright Allen on 11/04/2025. (Allen, Arenda) (Entered: 11/04/2025) |

| | | |
|---|---|---|
| 11/04/2025 | 78 | ORDER granting 74 a Motion to Appear Pro Hac Vice by Edwina Bullard Clarke, as certified by local counsel Marc C. Greco for Plaintiffs Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., and Group Hospitalization and Medical Services, Inc. Signed by District Judge Arenda L. Wright Allen on 11/04/2025. (Allen, Arenda) (Entered: 11/04/2025) |
| 11/07/2025 | 79 | ANSWER to Complaint *Defendants' Answer to the Second Amended Complaint* by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation.(Noona, Stephen) (Entered: 11/07/2025) |
| 11/10/2025 | 80 | REPLY to Response to Motion re 69 MOTION Defendants' Motion For Certification Under 28 U.S.C. § 1292(b) re 66 Order on Motion to Dismiss for Failure to State a Claim filed by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Noona, Stephen) (Entered: 11/10/2025) |
| 11/11/2025 | 81 | Motion to appear Pro Hac Vice by Justin Nicholas Boley and Certification of Local Counsel Marc C. Greco Filing fee $ 75, receipt number AVAEDC-10580000. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Greco, Marc) (Entered: 11/11/2025) |
| 11/11/2025 | 82 | Motion to appear Pro Hac Vice by Tyler Joseph Story and Certification of Local Counsel Marc C. Greco Filing fee $ 75, receipt number AVAEDC-10580004. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Greco, Marc) (Entered: 11/11/2025) |
| 11/11/2025 | 83 | Motion to appear Pro Hac Vice by Kenneth Avers Wexler and Certification of Local Counsel Marc C. Greco Filing fee $ 75, receipt number AVAEDC-10580011. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Greco, Marc) (Entered: 11/11/2025) |
| 11/11/2025 | 84 | Motion to appear Pro Hac Vice by Andrew James Grant and Certification of Local Counsel Marc C. Greco Filing fee $ 75, receipt number AVAEDC-10580015. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Greco, Marc) (Entered: 11/11/2025) |
| 11/11/2025 | 85 | NOTICE by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation re 69 MOTION Defendants' Motion For Certification Under 28 U.S.C. § 1292(b) re 66 Order on Motion to Dismiss for Failure to State a Claim *(Joint Notice Relating to Oral Argument)* (Noona, Stephen) (Entered: 11/11/2025) |
| 11/12/2025 | 86 | ORDER granting 81 a Motion to Appear Pro Hac Vice by Justin Nicholas Boley, as certified by local counsel Marc C. Greco for Plaintiffs Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., and Group Hospitalization and Medical Services, Inc. Signed by District Judge Arenda L. Wright Allen on 11/12/2025. (Allen, Arenda) (Entered: 11/12/2025) |
| 11/12/2025 | 87 | ORDER granting 82 a Motion to Appear Pro Hac Vice by Tyler Joseph Story, as certified by local counsel Marc C. Greco for Plaintiffs Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., and Group Hospitalization and Medical Services, Inc. Signed by District Judge Arenda L. Wright Allen on 11/12/2025. (Allen, Arenda) (Entered: 11/12/2025) |
| 11/12/2025 | 88 | ORDER granting 83 a Motion to Appear Pro Hac Vice by Kenneth Avers Wexler, as certified by local counsel Marc C. Greco for Plaintiffs Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., and Group Hospitalization and Medical Services, Inc. Signed by District Judge Arenda L. Wright Allen on 11/12/2025. (Allen, Arenda) (Entered: 11/12/2025) |

| | | |
|---|---|---|
| 11/12/2025 | 89 | ORDER granting 84 a Motion to Appear Pro Hac Vice by Andrew James Grant, as certified by local counsel Marc C. Greco for Plaintiffs Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., and Group Hospitalization and Medical Services, Inc. Signed by District Judge Arenda L. Wright Allen on 11/12/2025. (Allen, Arenda) (Entered: 11/12/2025) |
| 01/21/2026 | 90 | MOTION to Withdraw as Attorney *Motion and Memorandum in Support of Motion to Withdraw Appearance of Andrew James Grant as Counsel for Carefirst of Maryland, Inc.* by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Attachments: # 1 Proposed Order)(Greco, Marc) (Entered: 01/21/2026) |
| 01/22/2026 | 91 | ORDER granting 90 Motion to Withdraw as Attorney. It is ORDERED that Mr. Grant is relieved of any further representation of Plaintiff CareFirst of Maryland, Inc. in this case. Signed by District Judge Arenda L. Wright Allen on 1/22/26. (bwell) (Entered: 01/22/2026) |
| 01/29/2026 | 92 | RULE 26(f) PRETRIAL ORDER: Rule 16(b) Telephone Scheduling Conference set for 3/9/2026 at 09:30 AM. Signed by Magistrate Judge Lawrence R. Leonard on 1/29/2026. (lcur) (Entered: 01/30/2026) |
| 03/04/2026 | 93 | Motion to appear Pro Hac Vice by Whitney Street and Certification of Local Counsel Marc C. Greco Filing fee $ 75, receipt number AVAEDC-10827501. by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Greco, Marc) (Entered: 03/04/2026) |
| 03/05/2026 | 94 | ORDER granting 93 a Motion to Appear Pro Hac Vice by Whitney Street, as certified by local counsel Marc C. Greco for Plaintiffs Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., and Group Hospitalization and Medical Services, Inc. Signed by District Judge Arenda L. Wright Allen on 03/05/2026. (Allen, Arenda) (Entered: 03/05/2026) |
| 03/17/2026 | 95 | Joint MOTION to Amend/Correct 92 RULE 26(f) PRETRIAL ORDER: Rule 16(b) *Parties' Joint Motion for an Amended Scheduling Order* by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Attachments: # 1 Proposed Order)(Greco, Marc) (Entered: 03/17/2026) |
| 03/17/2026 | 96 | Memorandum in Support re 95 Joint MOTION to Amend/Correct 92 RULE 26(f) PRETRIAL ORDER: Rule 16(b) *Parties' Joint Motion for an Amended Scheduling Order* filed by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Greco, Marc) (Entered: 03/17/2026) |
| 03/18/2026 | 97 | ORDER - The Motion (ECF No. 69 ) is GRANTED. The Court CERTIFIES its September 30, 2025 order (ECF No. 66 ) for interlocutory appeal. Any Motion to Stay shall be filed no later than April 1, 2026. Signed by District Judge Arenda L. Wright Allen on 3/18/2026. (dbra, ) (Entered: 03/18/2026) |
| 04/01/2026 | 98 | MOTION to Stay re 97 Order on Motion for Miscellaneous Relief, *(Defendants' Motion to Stay Pending Interlocutory Appeal)* by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Attachments: # 1 Exhibit A (Proposed Order))(Noona, Stephen) (Entered: 04/01/2026) |
| 04/01/2026 | 99 | Memorandum in Support re 98 MOTION to Stay re 97 Order on Motion for Miscellaneous Relief, *(Defendants' Motion to Stay Pending Interlocutory Appeal)* filed by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Noona, Stephen) (Entered: 04/01/2026) |
| 04/01/2026 | 100 | Declaration re 99 Memorandum in Support, *(of Adam R. Lawton)* by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Exhibit 1)(Noona, Stephen) (Entered: 04/01/2026) |
| 04/08/2026 | 101 | Consent MOTION to Withdraw as Attorney *(Consent Motion and Memorandum in Support of Consent Motion to Withdraw Appearance of Jonathan I. Kravis as Counsel for Defendants)* by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Attachments: # 1 Exhibit 1 (Proposed Order))(Noona, Stephen) (Entered: 04/08/2026) |
| 04/09/2026 | 102 | ORDER. The Motion to Withdraw (ECF No. 101) is GRANTED. It is ORDERED that Mr. Kravis is relieved of any further representation of the Defendants in this case. Signed by District Judge Arenda L. Wright Allen on 4/9/26. (bwell) (Entered: 04/09/2026) |
| 04/09/2026 | 103 | Consent MOTION to Withdraw as Attorney - *Consent Motion and Memorandum in Support of Motion to Withdraw Appearance of Abbye R. K. Ognibene as Counsel for Plaintiffs* by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Attachments: # 1 Proposed Order)(Greco, Marc) (Entered: 04/09/2026) |
| 04/14/2026 | 104 | ORDER granting 103 Motion to Withdraw as Attorney. It is ORDERED that Ms. Ognibene is relieved of any further representation of the Plaintiffs in this case. Signed by District Judge Arenda L. Wright Allen on 4/14/26. (bwell) (Entered: 04/14/2026) |
| 04/15/2026 | 105 | RESPONSE in Opposition re 98 MOTION to Stay re 97 Order on Motion for Miscellaneous Relief, *(Defendants' Motion to Stay Pending Interlocutory Appeal)* filed by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Greco, Marc) (Entered: 04/15/2026) |
| 04/20/2026 | 106 | ORDER of USCA granting permission to appeal and assigned docket number 26-1473. (bwell) (Entered: 04/21/2026) |
| 04/21/2026 | 107 | MOTION to Withdraw as Attorney *Consent Motion and Memorandum in Support of Motion to Withdraw Appearance of William H. Monroe, Jr. as Counsel for Plaintiffs* by Carefirst Bluechoice, Inc., Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc.. (Attachments: # 1 Proposed Order)(Greco, Marc) (Entered: 04/21/2026) |
| 04/21/2026 | 108 | REPLY to Response to Motion re 98 MOTION to Stay re 97 Order on Motion for Miscellaneous Relief, *(Defendants' Motion to Stay Pending Interlocutory Appeal)* *(Defendants' Reply Memorandum in Support of Motion to Stay Pending Interlocutory Appeal)* filed by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Noona, Stephen) (Entered: 04/21/2026) |
| 04/22/2026 | 109 | ORDER granting 107 Motion to Withdraw as Attorney. It is ORDERED that Mr. Monroe is relieved of any further representation of the Plaintiffs in this case. Signed by District Judge Arenda L. Wright Allen on 4/22/26. (bwell) (Entered: 04/22/2026) |
| 04/23/2026 | | Electronic Fee Pay as to 106 Docket Annotation by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation. Filing fee $ 605, receipt number AVAEDC-10943786.. (Noona, Stephen) (Entered: 04/23/2026) |
| 05/05/2026 | 110 | NOTICE by Amgen Manufacturing Limited LLC, Amgen, Inc., Immunex Corporation re 98 MOTION to Stay re 97 Order on Motion for Miscellaneous Relief, *(Defendants' Motion to Stay Pending Interlocutory Appeal) (Statement On Oral Argument Regarding Defendants' Motion To Stay)* (Noona, Stephen) (Entered: 05/05/2026) |

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

GROUP HOSPITALIZATION AND
MEDICAL SERVICES, INC., and
CAREFIRST BLUECHOICE, INC., on
behalf of themselves and all others similarly
situated,

                Plaintiffs,

        v.

AMGEN INC., AMGEN
MANUFACTURING LIMITED LLC, and
IMMUNEX CORPORATION,

                Defendants.

Civil Action No. 2:24-cv-00484-AWA-LRL

**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

**JA0068**

**TABLE OF CONTENTS**

I.      INTRODUCTION ..........................................................................................................1

II.     PARTIES .......................................................................................................................4

III.    JURISDICTION AND VENUE ....................................................................................6

IV.     REGULATORY AND ECONOMIC BACKGROUND ................................................8

      A.     The relevant federal regulatory structure encourages competition among
           pharmaceutical companies. ...............................................................................8

      B.     Biosimilar competition lowers drug prices. .........................................................11

V.      FACTS ...........................................................................................................................14

      A.     Etanercept is a biologic that reduces the symptoms of inflammatory
           diseases. ...............................................................................................................14

      B.     In the mid-1980s, researchers at Roche and Immunex raced to develop and
           patent technologies to treat autoimmune conditions..............................................16

           1.     Roche scientists were the first to sequence the p55 TNFR and
                  create TNFR-Ig fusion proteins, paving the way for new
                  treatments................................................................................................16

           2.     Immunex scientists were the first to sequence the p75 TNFR and
                  create etanercept......................................................................................20

      C.     Immunex launches Enbrel and obtains a non-exclusive license to the
           Brockhaus Patent Rights. ......................................................................................21

           1.     The FDA approves Enbrel as the first TNF inhibitor monotherapy
                  to treat rheumatoid arthritis....................................................................21

           2.     Immunex seeks and gets a non-exclusive license from Roche for
                  the Brockhaus Patent Rights. ..................................................................21

           3.     Enbrel is a phenomenal commercial success for Immunex, with
                  $762 million in annual sales by 2001. ......................................................23

      D.     Biotech giant Amgen acquires Immunex and adds Enbrel to its waning
           portfolio................................................................................................................25

           1.     The FTC requires Amgen and Immunex to license certain TNFR
                  patents to prevent an unlawful monopoly in the TNR inhibitor
                  market. ....................................................................................................26

ii

2.    Amgen reaps the rewards of its acquisition as Enbrel becomes one of the most profitable drugs in the world..................................................28

E.    With patent expiration and biosimilar competition on the horizon, Amgen buys out Roche's remaining rights to the Brockhaus Patents................................30

F.    Amgen rewrites Roche's '790 and '791 Applications to cover etanercept and relentlessly prosecutes them to extend its Enbrel monopoly to 2029. ............35

G.    Amgen uses the '182 and '522 Patents to block would-be competitors from launching less expensive biosimilar versions. ...............................................38

1.    Amgen successfully sues Sandoz for infringement of the '182 and '522 Patents, preventing the launch of its Enbrel biosimilar....................39

2.    Amgen sues Samsung Bioepis for infringement of the '182 and '522 Patents and blocks the launch of its Enbrel biosimilar.....................40

H.    Amgen exploited its Enbrel monopoly with annual price hikes that helped the company secure more than $86 billion in net revenues. .................................41

I.    Amgen uses its exclusive license to the Brockhaus Patent Rights to unlawfully buttress and entrench its monopoly. ....................................................43

VI.    CLASS ALLEGATIONS ........................................................................................48

VII.    MARKET POWER AND MARKET DEFINITION ..........................................51

A.    Direct evidence demonstrates Amgen's market power. ........................................51

B.    Indirect evidence demonstrates Amgen's market power.......................................53

VIII.    MARKET EFFECTS AND CLASS DAMAGES ...............................................54

IX.    ANTITRUST IMPACT ..........................................................................................57

X.    IMPACT ON INTERSTATE COMMERCE..........................................................58

XI.    FEDERAL CLAIMS FOR RELIEF .....................................................................58

COUNT ONE  MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2) SEEKING DECLARATORY AND INJUNCTIVE RELIEF..................................................................................................58

XII.    STATE CLAIMS FOR RELIEF............................................................................61

COUNT TWO  MONOPOLIZATION AND MONOPOLISTIC SCHEME UNDER STATE LAW ..........................................................................................................61

**JA0070**

COUNT THREE  VIOLATIONS OF STATE CONSUMER PROTECTION LAWS................66

COUNT FOUR  UNJUST ENRICHMENT UNDER STATE LAW..........................................105

DEMAND FOR RELIEF.................................................................................................132

JURY DEMAND ...........................................................................................................133

**JA0071**

The plaintiffs, CareFirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc., and CareFirst BlueChoice, Inc. (collectively, "CareFirst"), on behalf of themselves and all others similarly situated, allege the following against the defendants, Amgen Inc. and wholly owned subsidiaries Amgen Manufacturing Limited LLC and Immunex Corporation (collectively, "Amgen"). The plaintiffs' allegations are based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## I.     INTRODUCTION

1.     The plaintiffs, who provide healthcare benefits to millions of Americans, bring this case against Amgen for unlawfully delaying competition for its blockbuster drug, Enbrel (etanercept). Amgen engaged in a long-running and successful scheme to build and buttress its monopoly power over Enbrel, reaping billions in profits while denying purchasers and patients access to the lower prices they would have paid in a competitive market.

2.     The pharmaceutical company Immunex launched etanercept under the brand name Enbrel in 1998. Enbrel is a biologic medicine used to treat a range of disabling inflammatory diseases, including rheumatoid arthritis, psoriasis, psoriatic arthritis, ankylosing spondylitis, and juvenile idiopathic arthritis.

3.     After biopharmaceutical giant Amgen acquired Immunex and the rights to Enbrel in 2002, Enbrel quickly became Amgen's most lucrative asset. And despite having been launched in the United States more than a quarter-century ago, Enbrel remains a crown jewel of Amgen's $28-billion-a-year portfolio. Enbrel's extraordinarily high prices—which Amgen has increased nearly every single year—are a result of Amgen's unlawful campaign to thwart competition. In total, Amgen and Immunex have amassed more than $86 billion from cumulative worldwide sales of Enbrel.

**JA0072**

4. Amgen's staggering Enbrel profits for at least the last five years are attributable to its unlawful campaign to buttress and entrench what was once a legitimate, patent-protected Enbrel monopoly by preventing competition from biosimilar versions of the drug. Like generics, biosimilar drugs have no meaningful differences in safety or effectiveness but are significantly less expensive than their brand-name counterparts. But every drug company that has tried to bring a competing biosimilar version of Enbrel to market has been blocked by Amgen's unlawful actions. If not enjoined, Amgen's illegal monopoly will remain in place until at least 2029, at which point Amgen will have enjoyed *three decades* of market exclusivity—far more than the patent or antitrust laws permit.

5. Amgen first began crafting its anticompetitive scheme in the mid-2000s. Just three years after acquiring the rights to Enbrel, Amgen was raking in massive profits. By mid-2004, annual sales were approaching $2 billion per year, the FDA had approved the drug for multiple indications, and, free of competition, Amgen was able to increase the price of Enbrel annually without any drop in sales. Amgen enjoyed all the economic perks of a monopolist, and its short- and mid-term Enbrel projections showed that it would continue to reap massive profits as a result of its supracompetitive pricing.

6. However, the long-term Enbrel sale projections presented a major problem. The patent portfolio that Amgen had built to protect Enbrel from competition would likely fail to hold back biosimilar versions of etanercept beyond 2015. By then, the Immunex patents that Amgen had acquired would expire, and any additional patents Amgen might be able to obtain were unlikely to keep competing drugs fully off the market.

7. At the same time, Amgen faced another threat: a competing drug company, F. Hoffman-La Roche AG ("Roche"), owned some of the key patents covering Enbrel. While

- 2 -
**JA0073**

Roche had granted Amgen a non-exclusive license to those patent rights, nothing prevented Roche from licensing them to other drug companies seeking to develop biosimilar etanercept products to compete with Enbrel (or from developing a competing product itself)—a threat that would likely be realized once Amgen's own Enbrel patents expired.

8. Amgen therefore had a choice: accept that its monopoly over etanercept would come to a natural end (and with it, the massive profits Amgen had been collecting year-over-year) or take steps to extend its monopoly beyond the lawful limits.

9. Amgen chose the latter. Sitting atop a monopoly on the U.S. etanercept market, Amgen sought to maintain, extend, and further entrench its power by buying up exclusive patent rights from Roche that otherwise would have enabled a competitor to enter the market at least by 2019 (and as early as 2016). In mid-2004, Amgen obtained exclusive rights to Roche's patents and patent applications, taking over the prosecution of those pending applications so it could amend them to protect Enbrel and enforce them against any would-be competitors—thereby buying itself decades more monopoly power and pricing.

10. Armed with a reinforced patent portfolio, Amgen weaponized those patents against would-be competitors. Beginning in 2016, Amgen sued every drug company seeking to launch a biosimilar etanercept product to compete with Enbrel. In its lawsuits, Amgen relied on the Roche patents it had unlawfully acquired, suing competitors for allegedly infringing the Roche patents and then utilizing the strength of its overall portfolio to strong-arm competitors into settlement agreements that guaranteed Enbrel would face no competition before 2029. Amgen's goal was clear: block biosimilar competitors, perpetuate supracompetitive pricing, and extend anticompetitive sales of Enbrel for many more years.

11.     While the settlement and license agreements have prevented any biosimilar etanercept products from competing with Enbrel and driving down prices, these competitors have stood at the ready for years. Etanercept manufacturers were some of the first drug companies to obtain FDA approval of biosimilar products—deemed safe and identical to Enbrel in all significant ways—securing the necessary regulatory approval to launch their biosimilars by at least 2019, if not earlier. If not enjoined, Amgen will succeed in its efforts to unlawfully delay biosimilar entry in the U.S. for over a decade.

12.     Amgen's anticompetitive strategy has worked. Once it controlled the Roche patents, Amgen was able to illegally prolong its U.S. Enbrel monopoly for at least 10 more years—so far. Despite Amgen's chokehold on the U.S. etanercept market, biosimilar etanercept launched in Europe *eight years ago*. Meanwhile, although it launched in the United States more than a quarter-century ago, Enbrel worldwide gross sales exceeded $3.6 billion in 2023 alone.

13.     Because of Amgen's unlawful acts, purchasers of etanercept in the United States have overpaid at least $3–4 billion to date and continue to pay supracompetitive prices for the drug. If Amgen's conduct is not enjoined, purchasers' damages will continue to mount for at least five more years until the Roche patents expire.

14.     CareFirst, on behalf of a class of purchasers, alleges violation of federal and state antitrust and related laws. Injunctive relief is sought to, among other things, enjoin Amgen's *exclusive* use of the Roche etanercept patents. Monetary relief is sought for overcharges caused by the wrongdoing, and, where appropriate, the damages should be doubled or trebled under law.

## II.     PARTIES

15.     Plaintiff CareFirst of Maryland, Inc. (CFMI) is a not-for-profit corporation organized and existing under the laws of the State of Maryland, with a principal place of business at 1501 South Clinton Street, Baltimore, Maryland 21224.

16. Plaintiff Group Hospitalization and Medical Services, Inc. (GHMSI) is a not-for-profit corporation founded pursuant to an act of Congress, with a principal place of business at 840 First Street, NE, Washington, DC 20065.

17. CFMI and GHMSI both do business as CareFirst BlueCross BlueShield (CareFirst BCBS), and both are independent licensees of the Blue Cross and Blue Shield Association.

18. In fulfillment of its mission to provide affordable and accessible health benefits to its members, including employees of the federal government residing and/or employed in Maryland, the District of Columbia, and Virginia, including Hampton Roads, CareFirst BCBS indirectly purchases Enbrel for members of its private healthcare plans and its Medicare Advantage plans. For Medicare Advantage members that receive Enbrel injections from a physician, these purchases are provided as part of Medicare Part B coverage. For Medicare Advantage members that perform their own Enbrel injections at home (or receive injections from caregivers at home), these purchases are provided as part of Medicare Part D coverage.

19. CareFirst BCBS has purchased Enbrel for its members for several years and anticipates continuing to purchase Enbrel for its members through at least 2029.

20. Plaintiff CareFirst BlueChoice, Inc. (BlueChoice) is a corporation organized and existing under the laws of the District of Columbia, with a principal place of business at 840 First Street, NE, Washington, DC 20065. BlueChoice, an independent licensee of Blue Cross Blue Shield Association, provides health benefit plans for employees of the federal government residing and/or employed in Maryland, the District of Columbia, and Virginia, including Hampton Roads.

21. BlueChoice has purchased Enbrel for its members for several years and anticipates continuing to purchase Enbrel for its members through at least 2029.

**JA0076**

22.     All the plaintiffs, collectively referred to herein as "CareFirst," are indirect subsidiaries of CareFirst, Inc., a corporation organized and existing under the laws of the State of Maryland. Jointly, these plaintiffs provide or administer health insurance for millions of individuals.

23.     CareFirst purchases prescription drugs at third-party pharmacies, like CVS, Walgreens, and Rite Aid, where CareFirst's health plan members have prescriptions filled. CareFirst incurs substantial costs associated with its members' transactions at these third-party pharmacies.

24.     Defendant Amgen Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at One Amgen Center Drive, Thousand Oaks, California 91320.

25.     Defendant Amgen Manufacturing Limited LLC is a limited liability company existing under the laws of the Territory of Bermuda, with its principal place of business at Road 31 Km 24.6, Juncos, Puerto Rico 00777. Amgen Manufacturing is a wholly owned subsidiary of Amgen Inc.

26.     Defendant Immunex Corporation is a corporation organized and existing under the laws of the State of Washington with its principal place of business at One Amgen Center Drive, Thousand Oaks, California 91320. Amgen Inc. acquired Immunex in July 2002, and Immunex became a wholly owned subsidiary of Amgen Inc.

27.     In this complaint, Amgen Inc., Amgen Manufacturing, and Immunex are collectively referred to as "Amgen."

### III.     JURISDICTION AND VENUE

28.     This action alleges violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and of state antitrust, consumer protection, and related laws. This action seeks declaratory and

- 6 -
**JA0077**

injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and seeks monetary relief pursuant to state laws. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1332(d)(2) (class action exceeding $5 million), § 1337(a) (antitrust enforcement), and § 1367(a) (supplemental jurisdiction).

29. Venue is proper in this district pursuant to 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because, during the class period, Amgen resided, transacted business, was found, or had agents in this district, and a substantial portion of the alleged activity affecting interstate trade and commerce discussed below has been carried out in this district.

30. This Court has personal jurisdiction over Amgen. Amgen conducts business throughout the United States, including in this district, and has purposefully availed itself of the laws of the United States.

31. During the class period, Amgen manufactured, sold, and shipped Enbrel in a continuous and uninterrupted flow of interstate commerce, which included sales of Enbrel in this district, advertisement of Enbrel in media in this district, monitoring prescriptions of Enbrel by prescribers within this district, and employment of product detailers in this district, who, as agents of Amgen, marketed Enbrel to prescribers in this district.

32. As alleged below, CareFirst purchased Enbrel for its members who are located within this district, including in Norfolk and Virginia Beach.

33. Because of Enbrel's high treatment persistence rate and the chronic nature of the diseases it treats, CareFirst anticipates continuing to purchase Enbrel for members located in this district and this division.

34. Amgen, throughout the United States and including in this district, has transacted business, maintained substantial contracts, or committed overt acts in furtherance of its illegal

**JA0078**

scheme. Amgen's unlawful conduct has had a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this district.

35.     Aside from sales of Enbrel, Amgen transacts substantial business in this district, including business related to the promotion and development of Enbrel and to the unlawful scheme alleged here.

36.     By reason of the unlawful activities alleged herein, Amgen has substantially affected and continues to substantially affect commerce throughout the United States, causing injury to CareFirst and class members. Amgen, directly and through its agents, has engaged and continues to engage in activities to suppress competition, drive up brand sales, and fix, raise, maintain, and/or stabilize the price of Enbrel in the United States. This conduct has unreasonably restrained trade and adversely affected the market for the direct sale and purchase of etanercept throughout the United States, including in this district, and continues to do so.

## IV.     REGULATORY AND ECONOMIC BACKGROUND

**A.     The relevant federal regulatory structure encourages competition among pharmaceutical companies.**

37.     Biologics are large, complex molecules derived from living organisms like human cells, animal cells, and microorganisms (e.g., bacteria or yeast) and often produced through biotechnical or other more recently developed methods. They include a wide range of products, including vaccines, gene therapies, blood components, and recombinant proteins. Unlike traditional small-molecule drugs that are chemically synthesized and have a well-defined structure, biologics are complex mixtures that are not easily identified or characterized.

38.     Biologics are licensed under § 351 of the Public Health Service Act (PHSA). To get approval to market a new biologic product, an applicant must submit a biologics license

- 8 -
**JA0079**

application (BLA) to the FDA.[1] The FDA may grant the BLA if, among other things, the manufacturer has demonstrated that the biologic and its manufacturing processes and facilities meet standards to assure that the product is safe, pure, and potent.[2]

39. A biosimilar is a drug that is highly similar, but not structurally identical to, a brand-name biologic (referred to as the innovator or reference product). Before 2010, biosimilars were, like small-molecule brand and generic drugs, approved under the Food, Drug and Cosmetic Act (FDCA). But because of the complexity of biologics and the fact that they often require complex, sensitive manufacturing processes, it is not feasible to create an exact duplicate of an existing biologic. Biosimilars therefore could not be approved via the abbreviated pathway for generic small-molecule drugs established by the Hatch-Waxman Act, which requires the sponsor to show the generic has the same active ingredients, strength, dosage form, and route of administration and is bioequivalent to an approved brand-name drug.

40. Recognizing the need for an abbreviated approval process for biosimilars,[3] Congress passed the Biologics Price Competition and Innovation Act (BPCIA) as part of the

---

[1] 42 U.S.C. § 262(a).

[2] 42 U.S.C. § 262(a)(2)(C)(i)(I).

[3] In February 2009, the Obama administration proposed establishing a "workable regulatory, scientific, and legal pathway for generic versions of biologic drugs" to "accelerate access to" biosimilars and combat the "high and rising" costs of prescription drugs. Office of Mgmt. & Budget, *A New Era of Responsibility*: *Renewing America's Promise* at 28 (2009), https://www.govinfo.gov/content/pkg/BUDGET-2010-BUD/pdf/BUDGET-2010-BUD.pdf. While debating the yet-enacted BPCIA in June 2009, Senator Sherrod Brown argued that "[p]erhaps nowhere [is the need to bring down costs and increase access] more obvious than the area of biopharmaceuticals or so-called biologics . . . . With costs to biologics ranging anywhere from $10,000 to $200,000 per patient per year, biologic treatments pose a significant financial challenge for patients, for insurance companies, for employers who are paying the bills, and for Federal and State governments that are also paying the bills." 155 Cong. Rec. S6793 (daily ed. June 18, 2009). Representative Frank Pallone similarly stated that "[i]f biologics are the future, then we should do everything we can now to control costs while aiding innovation, just like

Affordable Care Act, signed into law on March 23, 2010. The purpose of the BPCIA was to create a regime for biosimilars, similar to the one created by the Hatch-Waxman Act for generic drugs, in order to promote competition and lower prices in the biologics markets.

41.     The BPCIA amended the PHSA to create an abbreviated licensure pathway for biosimilars. Under § 351(k) of the PHSA, a company seeking to market a biosimilar product in the United States must first submit to the FDA an abbreviated biologics license application (aBLA) with information demonstrating, among other things, biosimilarity to the reference (brand) product based on data from analytical studies, animal studies, and clinical studies. The FDA will grant approval if this data shows the product is "highly similar" to the reference product and that there are no "clinically meaningful differences" between the two in terms of "safety, purity, and potency."[4]

42.     A biosimilar manufacturer may not submit an aBLA until four years after the reference product is first licensed, and an aBLA may not be approved until twelve years after the reference product is first licensed.[5] Put another way, the manufacturer of a new biologic drug enjoys a statutory twelve-year monopoly over its product without biosimilar competition. Thereafter, biosimilars are free to compete—subject to lawful patent restraints.

43.     Under certain circumstances, pursuant to the BPCIA, the FDA can also designate a biosimilar as "interchangeable," meaning the biosimilar "may be substituted for the reference product without the intervention of the health care provider who prescribed the reference

---

Hatch-Waxman did." *Emerging Health Care Issues: Follow-On Biologic Drug Competition: Hearing Before the Subcomm. on Health of the H. Comm. on Energy & Commerce*, 111th Cong. 2 (2009).

[4] 42 U.S.C. § 262(i)(2); *see also* 42 U.S.C. § 262(k)(2)(A).

[5] 42 U.S.C. § 262(k)(7).

**JA0081**

product."[6] Depending on the relevant state's laws, an interchangeable biosimilar may be substituted for the biologic at the pharmacy without a new prescription in the same way that generics can be. These state laws, referred to as automatic substitution laws, are designed to save purchasers money on their prescription drugs.

44.     To obtain an interchangeability designation, a biosimilar applicant must submit to the FDA data sufficient to demonstrate that its product "is biosimilar to the reference product [and] can be expected to produce the same clinical results as the reference product in any given patient . . . ."[7] The first biosimilar approved as interchangeable to the reference product enjoys an exclusivity period. The length of the exclusivity period depends on (a) whether, at the time the FDA granted the biosimilar maker's application for interchangeability, any patent infringement litigation related to that application (i) had already concluded, (ii) was ongoing, or (iii) had not yet begun; and (b) the date on which the interchangeable biosimilar was first commercially marketed.[8]

**B.     Biosimilar competition lowers drug prices.**

45.     Biosimilar competition is a relatively recent source of healthcare savings. The FDA approved the first biosimilar in 2015. As of June 2024, the FDA had approved only 56 biosimilars—including two etanercept biosimilars, Erelzi and Eticovo, in August 2016 and April 2019, respectively.[9]

---

[6] 42 U.S.C. § 262(i)(3).

[7] 42 U.S.C. § 262(k)(4).

[8] 42 U.S.C. § 262(k)(6).

[9] Biosimilar Product Information, FDA, https://www.fda.gov/drugs/biosimilars/biosimilar-product-information (last visited July 1, 2024).

**JA0082**

46.     While there are some differences in distribution, pharmacy-counter substitution, and prescription writing practices of biosimilar and generic drugs, the same general economic principle applies: biosimilar competition, like generic competition, lowers drug prices and saves healthcare dollars. According to the FDA, as of 2021, biosimilars in the United States "launched with initial list prices 15% to 35% lower than comparative list prices of the reference products."[10] According to the 2023 U.S. Generic and Biosimilar Medicines Savings report, "biosimilars, on average, are priced more than 50 percent lower than the brand biologic[] price at the time of biosimilar launch."[11] And the "[b]rand biologics respond to biosimilar entry by lowering their prices to date, by 25 percent on average."[12]

47.     Numerous studies have estimated the amount of savings (determined by estimated price reductions, penetration, and the like) resulting from the introduction of biosimilars. A 2014 Rand review of studies examining individual biosimilars' price impact and market penetration found that in the coming decade, on average, biosimilars would gain a market penetration of 60% and would reduce prices by 35% and would result in about $44 billion in savings over those ten years.[13] The review study also noted that 60% market penetration was a conservative

---

[10] Press Release, FDA, FDA Approves First Interchangeable Biosimilar Insulin Product for Treatment of Diabetes (July 28, 2021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-interchangeable-biosimilar-insulin-product-treatment-diabetes.

[11] Assoc. for Accessible Medicines, *The U.S. Generic & Biosimilar Medicines Savings Report* at 30 (2023), https://accessiblemeds.org/sites/default/files/2023-09/AAM-2023-Generic-Biosimilar-Medicines-Savings-Report-web.pdf.

[12] *Id*.

[13] Andrew W. Mulcahy, Zachary Predmore & Soeren Mattke, RAND, *The Cost Savings Potential of Biosimilar Drugs in the United States* at 7 & n.17 (2014), https://www.rand.org/pubs/perspectives/PE127.html.

estimate and that the Congressional Budget Office anticipated a 40% price reduction in the long term.[14]

48.     Actual savings far exceeded expectations. A more recent Rand review from 2022, projecting U.S. savings from biosimilar entry from 2021 to 2025, found that total estimated savings from 2014 to 2025 would amount to $102.5 billion, $38.4 billion of which was projected savings from 2021 through 2025 from expanded biosimilar competition.[15]

49.     The 2023 *U.S. Generic and Biosimilar Medicines Savings* report found that biosimilars generated $23.6 billion in savings since 2015, including over $9.4 billion in 2022 alone.[16] And a third study estimated that biosimilar entry could result in $100 billion in savings between 2020 and 2024.[17] These results were also confirmed by the 2022 Rand study published in the *American Journal of Managed Car*e and a 2023 IQVIA study. Assuming a higher biosimilar entry probability ($46.5 billion), higher biosimilar volume share ($48.3 billion), lower biosimilar prices ($52.8 billion), and lower prices for reference biologics ($82.4 billion), the study found potential savings could reach $124.2 billion between 2021 and 2025.[18] In 2023, an

---

[14] *Id*.

[15] Andrew W. Mulcahy & Christine Buttorff, *Projected US Savings from Biosimilars, 2021–2025*, 28 Am. J. Managed Care 329, 331 (2022), https://www.ajmc.com/view/projected-us-savings-from-biosimilars-2021-2025.

[16] Assoc. for Accessible Medicines, *The U.S. Generic & Biosimilar Medicines Savings Report* at 27 (2023), https://accessiblemeds.org/sites/default/files/2023-09/AAM-2023-Generic-Biosimilar-Medicines-Savings-Report-web.pdf.

[17] IQVIA, *Biosimilars in the United States: 2020–2024* at 17 (2020), https://www.iqvia.com/insights/the-iqvia-institute/reports/biosimilars-in-the-united-states-2020-2024 ("IQVIA Biosimilars Report").

[18] Mulcahy & Buttorff, *supra* note 15, at 234.

IQVIA study concluded that savings from biosimilars would balloon to $181 billion between 2023 and 2027.[19]

### V.     FACTS

**A.     Etanercept is a biologic that reduces the symptoms of inflammatory diseases.**

50.     Enbrel is a brand-name biologic approved by the FDA for the treatment of rheumatoid arthritis, plaque psoriasis, psoriatic arthritis, ankylosing spondylitis, and polyarticular juvenile idiopathic arthritis. The active ingredient in Enbrel is etanercept. It is sold in single-dose prefilled syringes that patients generally self-administer via weekly injections (typically, one 50-mg injection per week).

51.     Rheumatoid arthritis, psoriatic arthritis, ankylosing spondylitis, and plaque psoriasis are autoimmune disorders which result from malfunctions of the body's immune system that cause it to attack its own cells or tissues. These internal attacks can take various forms, including prolonged inflammatory responses that can damage the body's vital organs. As many as 50 million Americans—80% of whom are women—have an autoimmune disease.

52.     Rheumatoid arthritis, which affects more than 1.3 million Americans, occurs when the immune system attacks the lining of the joints, leading to chronic inflammation that can cause pain, stiffness, swelling and, over time, bone erosion and joint deformity. It can also cause fatigue, fevers, and loss of appetite and affect the heart, lungs, blood, nerves, eyes, and skin.

53.     Plaque psoriasis is a chronic condition in which the immune system causes skin cells to multiply too quickly, causing patches of skin to become scaly and inflamed. Some people

---

[19] IQVIA, *Biosimilars in the United States: 2023–2027* at 29 (2023), https://www.iqvia.com/ insights/the-iqvia-institute/reports-and-publications/reports/biosimilars-in-the-united-states-2023-2027.

with psoriasis develop psoriatic arthritis (PsA), which causes pain, swelling, and stiffness of the joints, tendons, and ligaments. Psoriasis also increases the risk of cardiovascular events like heart attack and strokes, mental health problems, certain cancers, Crohn's diseases, diabetes, metabolic syndrome, obesity, osteoporosis, eye inflammation, liver disease, and kidney disease.

54.     Ankylosing spondylitis causes inflammation in the joints and ligaments of the spine, resulting in back pain, stiffness, and loss of flexibility. In severe cases, it can cause the vertebrae to fuse, making the spine rigid and inflexible. People with ankylosing spondylitis can suffer from severe, ongoing pain and may also develop inflammatory diseases of the eye, skin, or gut.

55.     Juvenile idiopathic arthritis (JIA) includes several chronic disorders in children involving inflammation of the joints, causing pain, swelling, warmth, stiffness, and loss of motion. While the origins of JIA are not understood, it begins with inflammation caused by overactivation of the immune system. JIA can last for only a few months or years but, in some cases, becomes a lifelong disease requiring treatment into adulthood.

56.     The immune system is made up of various cells and antibodies that protect the human body from foreign invaders. Antibodies have two main functions: (1) binding to foreign substances called antigens, preventing the antigens from infecting cells or spreading throughout the body, and (2) recruiting[20] other parts of the immune system to attack antigens.

57.     One form of antibody is called immunoglobulin G (Ig),[21] which has four subclasses in humans: IgG1, IgG2, IgG3, and IgG4. IgG is protein that consists of two heavy and

---

[20] Antibodies recruit other immune cells by marking the antigens so that immune cells can then recognize and destroy them.

[21] IgG is the most common antibody in the bloodstream making up about 75% of total antibodies in the human body. In addition to IgG, there are four other types of immunoglobulins: IgA, IgM, IgD, and IgE.

**JA0086**

two light amino acid chains, each of which has variable and constant regions. The constant regions interact with other components of the immune system to elicit a response, while the variable regions bind to antigens.

58.     Another component of the immune system is called a cytokine. Cytokines are messenger proteins with a wide range of functions, including initiating immune responses, such as regulating inflammation in the body. One of the dozens of cytokines made by the human body is tumor necrosis factor (TNF). TNF is associated with rheumatoid arthritis, PsA, ankylosing spondylitis, and JIA.

59.     TNF activates inflammatory pathways by binding to TNF receptors (TNFRs). TNFRs have three regions: intracellular, transmembrane, and extracellular. The extracellular portion can be split off to produce a fragment of TNFR that can bind to TNF. There are two distinct TNFRs that exist naturally on cell surfaces: one with a molecular weight of approximately 55 kilodaltons (p55), and another weighing approximately 75 kilodaltons (p75).

60.     Etanercept, a fusion protein produced by combining DNA sequences encoding parts of different proteins into one sequence and introducing that sequence into host cells, consists of the extracellular region of a p75 TNFR combined with an IgG1. It works by making a soluble protein that binds to TNR and blocks its interaction with cell surface TNFRs. By rendering TNF biologically inactive, etanercept reduces inflammatory responses in patients with diseases that cause TNF elevation.

**B.     In the mid-1980s, researchers at Roche and Immunex raced to develop and patent technologies to treat autoimmune conditions.**

   **1.     Roche scientists were the first to sequence the p55 TNFR and create TNFR-Ig fusion proteins, paving the way for new treatments.**

61.     In the mid-1980s, advances in understanding the role of cytokines in inflammatory diseases, along with the development of new molecular tools enabling scientists to

study cytokine expression and regulation, generated significant interest in the study of TNR and the potential therapeutic applications of inhibiting its ability to bind to TNFRs.

62.     A Roche research team led by Dr. Werner Lesslauer made fundamental contributions to the development of TNFR fusion proteins. This Roche team was the first to experimentally prove the existence of two distinct human TNFRs, the p55 and p75, and set out to isolate, purify, sequence, and clone them. In April 1990, the Roche scientists published the amino acid sequences for the p55 TNFR and its encoding DNA. In July 1990, Roche published the same for the p75 TNFR.

63.     The Roche scientists were also the first to investigate combining the extracellular regions of TNFRs with portions of immunoglobulins to inhibit inflammatory immune responses and ultimately succeeded in creating fusion proteins using both p55 and p75 TNFRs. While the Roche team's initial fusion protein used IgG3, its experimental work also contemplated the creation of fusion proteins with IgG1 and IgG2.

64.     On August 31, 1990, the Roche scientists filed European Patent Application No. 90116707.2 (the "EP '707 Application"), claiming priority[22] to three earlier applications it had filed in Switzerland,[23] which disclosed and taught the concept of fusing the extracellular regions of the p55 and p75 TNFRs with a specific region of a human IgG heavy chain. The patents that would later issue from these applications (shown in Figure 1 below) are referred to as the "Brockhaus Patents."

---

[22] An application that properly claims priority to an earlier-filed patent application receives the filing date of the earlier-filed application, which determines what prior art references can and cannot be asserted against the application during its examination.

[23] Swiss Application Nos. 3319/89 (filed September 12, 1989), 746/90 (filed March 8, 1990), and 1347/90 (filed April 20, 1990).

65. On September 13, 1990, Roche filed U.S. Patent Application No. 07/580,013 (the "'013 Application"), claiming priority to the EP '707 Application.

66. Roche abandoned the '013 Application and, on July 21, 1993, filed U.S. Application No. 08/095,640 (the "'640 Application") as a continuation. The '640 Application was subject to a restriction requirement—because it claimed multiple distinct inventions (related to the p55 and p75 fusion proteins), Roche would be limited to only one of the claimed inventions unless it amended and pursued only one in the application. Roche decided to pursue claims related to the p55 fusion protein in the '640 Application (which later issued as U.S. Patent No. 5,610,279 (the "'279 Patent")). Roche was nonetheless able to pursue the p75 fusion protein claims by filing two divisional applications on May 19, 1995: (1) U.S. Patent Application No. 08/444,790 (the "'790 Application," which would later issue as U.S. Patent No. 8,063,182), claiming the p75 fusion protein, and (2) U.S. Patent Application No. 08/444,791 (the "'791 Application," which would later issue as U.S. Patent No. 8,163,192), claiming a method of producing the p55 fusion protein.

**JA0089**

**Figure 1. Brockhaus Patent Tree**



JA0090

2.      **Immunex scientists were the first to sequence the p75 TNFR and create etanercept.**

67.     Meanwhile, Immunex was independently researching TNFRs and TNFR fusion proteins, focusing on the p75 TNFR. In May 1990—two months before Roche—Immunex scientists published the amino acid sequence for the p75 and reported that they had isolated a cDNA clone of its receptor.

68.     In late 1990, Immunex successfully combined the extracellular portion of a p75 receptor with the hinge-CH2-CH3 portion of a human IgG1—i.e. the fusion protein etanercept, the active ingredient in Enbrel.

69.     Immunex obtained a series of patents directed to etanercept and methods of using etanercept stemming from various continuations-in-part of U.S. Patent Application No. 07/403,241, filed September 5, 1989 (abandoned).

70.     On May 10, 1990, Immunex filed U.S. Patent Application No. 07/523,635, which issued as U.S. Patent No. 5,395,760 (the "'760 Patent") on March 7, 1995. Entitled "DNA Encoding Tumor Necrosis Factor-α and -β Receptors," the '760 Patent claims specified isolated DNA sequences that encode soluble human TNFRs, including the p75. It expired on March 7, 2012.

71.     On February 8, 1995, Immunex filed U.S. Patent Application No. 08/383,229, which issued as U.S. Patent No. 5,605,690 (the "'690 Patent") on February 25, 1997. The '690 Patent, entitled "Methods of Lowering Active TNF-α Levels in Mammals Using Tumor Necrosis Factor Receptor," claims methods of treating TNF-dependent inflammatory diseases in mammals by administering a TNF antagonist such as a soluble TNFR. It expired on February 25, 2014.

72.     On January 27, 1998, Immunex filed U.S. Patent Application No. 08/346,555, which issued as U.S. Patent No. 5,712,155 (the "'155 Patent") on November 29, 1994. Entitled

- 20 -

**JA0091**

"DNA Encoding Tumor Necrosis Factor-α and -β Receptors," the '155 Patent claims specified isolated DNA sequences that encode soluble human TNFRs, including the p75. It expired on March 7, 2012.

**C.      Immunex launches Enbrel and obtains a non-exclusive license to the Brockhaus Patent Rights.**

**1.      The FDA approves Enbrel as the first TNF inhibitor monotherapy to treat rheumatoid arthritis.**

73.      On November 2, 1998, the FDA approved Enbrel for the treatment of moderate to severe rheumatoid arthritis in patients with an inadequate response to one or more disease-modifying, antirheumatic drugs. Immunex launched Enbrel in the United States on November 6, 1998.

74.      Enbrel was hailed as a breakthrough in rheumatoid arthritis treatment. Before its launch, the gold standard for rheumatoid arthritis treatment was low-dose methotrexate, which had favorable responses in only 30% of patients and often could not be tolerated for extended periods. More recent rheumatoid arthritis therapies like Remicade and Anakinra were either used in combination with methotrexate or targeted a later disease stage. Enbrel, therefore, "st[ood] alone as an adult and juvenile rheumatoid arthritis treatment that can be used with or without" methotrexate, including in early stages of the disease, and had "no real competitor."[24]

**2.      Immunex seeks and gets a non-exclusive license from Roche for the Brockhaus Patent Rights.**

75.      On November 6, 1998, Immunex launched Enbrel for the treatment of early and moderate to severely active rheumatoid arthritis. At the time, Immunex neither owned nor had a

---

[24] Debra Robertson, *Immunex Takes Premature Step to Guarantee Enbrel Market Share*, 19 Nature Biotech. 108, 109 (Feb. 2001).

license to Roche's EP '707 Application teaching the fusion of extracellular regions of p75 TNFRs with a specific region of a human IgG heavy chain.

76.     Because the EP '707 Application gave Roche priority to the p75-IgG1 fusion technology used to create Enbrel, Immunex sought and obtained from Roche a license to the "Brockhaus Patent Rights," i.e., all "patents and patent applications that issue from or that claim priority of Swiss Patent Application Nos. 3319/89, 746/90, and/or 1347/90, including, but not limited to, European Application No. 90116707.2 and U.S. Patent Application No. 07/580,013."[25]

77.     Roche and Immunex executed a license agreement (the "1998 License Agreement") on September 15, 1999, with an effective date of November 6, 1998 (the date of Enbrel's launch). Under the 1998 License Agreement, Roche granted Immunex a co-exclusive license (the "1998 License") under the Brockhaus Patent Rights to make, use, sell, and import etanercept worldwide. "Co-exclusive" meant that Immunex and Roche each had the right to commercialize etanercept worldwide. Roche also had the right to grant co-exclusive rights in each country to (a) one licensee in lieu of or in collaboration with Roche, (b) a single third-party to distribute etanercept within that country in lieu of Roche and its licensee, and (c) a contract manufacturer to manufacture etanercept for use, sale, importation, and/or distribution by Roche and its licensee.[26] In other words, Roche in 1998 maintained the right to manufacture etanercept itself or to allow a non-Immunex third-party to do so.

78.     The 1998 License also expressly provided that Roche would retain ownership of the Brockhaus Patents and was responsible at its own discretion for their prosecution and

---

[25] License Agreement for Etanercept Among Immunex Corp., Hoffman-La Roche Inc., and F. Hoffman-La Roche Ltd. § 1.2 (Sept. 15. 1999) (attached as Ex. 1).

[26] *Id.* § 2.1.

maintenance.[27] Roche also retained the sole right to address infringement of the Brockhaus

Patents, including initiating suit, but Immunex agreed to provide reasonable assistance to Roche

in taking any such steps and had the right to join any infringement litigation initiated by Roche

and to obtain any damages awarded, including lost profits.[28] In other words, Roche in 1998

maintained all core patent rights—the right to prosecute, maintain, and enforce the Brockhaus

Patents.

79.     In exchange for the non-exclusive license grant, Immunex agreed to pay royalties

of 4% of its net sales of etanercept products.[29] Roche also received an option to obtain a

worldwide, nonexclusive license from Immunex to certain of its patent rights relating to p55

TNFR fusion proteins, subject to certain conditions.[30]

**3.      Enbrel is a phenomenal commercial success for Immunex, with $762 million
          in annual sales by 2001.**

80.     Enbrel was an immediate blockbuster, earning Immunex $13 million in U.S. sales

in its first few *weeks* on the market. In its 1998 annual report, Immunex touted Enbrel's launch

as a "key milestone event" and predicted that Enbrel would "drive a revenue 'step change' for

Immunex" that would "provide substantial cash flow and fuel the company's growth."[31]

81.     Seeking to expand the Enbrel market, Immunex sought and, on May 27, 1999,

received, FDA approval of Enbrel for the treatment for polyarticular JIA, making it the first

FDA-approved therapy for this indication. Immunex also announced in 1999 that it was

---

[27] *Id.* §§ 3.1, 3.4.

[28] *Id.* § 3.5.

[29] *Id.* § 5.2.

[30] *Id.* § 2.2.

[31] Immunex Corp., *Annual Report* at 11, 13 (1998), https://digitalcollections.lib.washington.edu/digital/collection/reports/id/24178.

conducting pilot studies and clinical trials to investigate the use of Enbrel for additional indications and partnered with American Home Products Corporation to expand manufacturing capacity. By year end, Enbrel had become an "unprecedented commercial success for Immunex, with $367 million in U.S. sales."[32]

82.    In June 2000, the FDA approved an expanded indication for Enbrel, adding reduction of the signs and symptoms and delay of the progression of structural damage in patients with moderately to severely active rheumatoid arthritis. It also eliminated the need for patients to demonstrate an insufficient response to one or more other rheumatic drugs before starting Enbrel treatment—allowing more patients to access Enbrel sooner.

83.    Immunex continued "quarter for quarter" to "set new records for sales of Enbrel."[33] By November 2000, there were more than 1,000 patients on a waiting list for the drug; total sales by year end exceeded $650 million. Sales in 2001 increased 17% to $762 million, cementing Enbrel's launch as the most successful ever for a biologic product. As Immunex put it, as a "targeted, potent intervention for inflammation, Enbrel has changed the practice of rheumatology."[34]

---

[32] Immunex Corp., *Annual Report* at 23–24 (1999), https://digitalcollections.lib.washington. edu/digital/collection/reports/id/24288.

[33] Immunex Corp., *Annual Report* at 1 (2002), https://www.sec.gov/Archives/edgar/vprr/ 0202/02029646.pdf.

[34] *Id.*

**JA0095**

**Figure 2. Immunex's U.S. Sales of Enbrel, 1999-2001**



84.     Immunex also steadily increased the price of Enbrel. When Immunex launched Enbrel in 1998, it set the WAC price at $220 per 50-mg dose ($886 per month). By 2002, Immunex was charging $249 per 50-mg dose ($996 per month).

**D.      Biotech giant Amgen acquires Immunex and adds Enbrel to its waning portfolio.**

85.     In December 2001, Amgen Inc., already the largest biotechnology company in the world, announced that it was buying Immunex for $16 billion in cash and stock—the highest sum *ever paid* for a biotech acquisition.

86.     Enbrel was the key driver of the deal for Amgen, which had not launched a significant new drug in a decade. Sales of its aging blockbusters Epogen (an anemia treatment) and Neopogen (used to prevent infections in cancer patients undergoing chemotherapy)—once $1-billion-a-year sellers—were floundering. And ten years of substantial investment in inflammation research had garnered few returns. The FDA had approved Amgen's interleukin-1 inhibitor, Kineret (anakinra), for the treatment of moderate to severe rheumatoid arthritis in

November 2001, but sales were projected to be (and were) lackluster. Amgen's second-generation TNR inhibitor, pegsunercept, was only in Phase II development. Yet Amgen's new CEO, Kevin Sharer, who took the helm in 2000, had promised investors at least 20% annual growth in sales and earnings per share and revenues of $8–9 billion by 2005.

87.     Enbrel was the solution to Amgen's problems. Amgen executives boasted to investors that Enbrel had the potential to generate more than $3 billion in annual sales by 2005, and Amgen was "enthusiastic about the long-term potential of Enbrel," which it predicted would reach $3 billion by 2005.[35]

### 1.     The FTC requires Amgen and Immunex to license certain TNFR patents to prevent an unlawful monopoly in the TNR inhibitor market.

88.     Amgen's acquisition of Immunex, and the impact it would have on the market of drugs used to treat immunological conditions, drew immediate antitrust concerns from government agencies and industry watchdogs.

89.     The acquisition was subject to review by the Federal Trade Commission (FTC). The FTC's Bureau of Competition is empowered to prevent "acquisitions that are likely to reduce competition and lead to higher prices, lower quality goods or services, or less innovation."[36] When the Bureau becomes aware of a merger, "bureau lawyers, along with economists from the FTC's Bureau of Economics, investigate market dynamics" to determine if

---

[35] Andrew Pollack, *Amgen Reports Its Takeover of Immunex*, N.Y. Times, July 17, 2002, https://www.nytimes.com/2002/07/17/business/amgen-reports-its-takeover-of-immunex.html#:~:text="Some%20of%20the%20things%20we,million%20in%20sales%20last%20year.

[36] FTC, *Merger Review*, https://www.ftc.gov/enforcement/merger-review (last visited July 3, 2024).

**JA0097**

the merger or acquisition will harm consumers.[37] When deemed necessary, the FTC may take steps before approving the merger or acquisition to protect consumers.

90.     After reviewing the proposed acquisition, the FTC issued a complaint against Amgen and Immunex stating that the "effects of the Merger, if consummated, may be to lessen competition and to tend to create a monopoly" in violation of federal antitrust law by, *inter alia*, "reducing innovation" and "eliminating potential competition in" the TNF inhibitor market.[38] The complaint noted that Amgen and Immunex were the only two firms in the United States marketing or developing soluble TNF receptor products and two of only five firms developing any type of TNF inhibitors to treat rheumatoid arthritis and other inflammatory diseases.[39] Because of the significant difficulty, cost, and time required to develop TNF inhibitors, the FTC concluded that the consolidation of Amgen's and Immunex's "substantial proprietary rights" in this market could "create large and potentially insurmountable barriers to entry."[40]

91.     Amgen and Immunex settled the FTC's antitrust charges by entering a consent order requiring them, *inter alia*, to license certain patents to Serono—a Swiss pharmaceutical company that was "developing a soluble TNF receptor, Onercept, for use in Europe, but [that did] not possess the patent rights necessary to market the product in the United States"[41]—to

---

[37] *Id.*

[38] Compl. ¶ 25, *In re Amgen Inc. & Immunex Corp.*, Docket No. C-4053 (F.T.C. July 12, 2002).

[39] *Id.* ¶ 20.

[40] *Id.* ¶¶ 22–24.

[41] *Id.* ¶ 20.

ensure the continued development of TNF inhibitors for sale in the United States and "to remedy the lessening of competition" in that market that would result from the acquisition.[42]

92.     The FTC announced on July 12, 2002, that it would allow the acquisition to proceed under the terms of the consent agreement. The acquisition was completed on July 16, 2002, giving Amgen all rights to Enbrel in the United States and Canada.

**2.     Amgen reaps the rewards of its acquisition as Enbrel becomes one of the most profitable drugs in the world.**

93.     Once in control of Enbrel, Amgen immediately set out to maximize its return—and make good on its CEO's promises to investors—by increasing Enbrel sales, including by obtaining FDA approval to use Enbrel to treat new immunological conditions and raising Enbrel prices.

94.     Amgen's returns were almost immediate. By December 2002, it had recorded $362.1 million in Enbrel sales; combined with Immunex's sales for the first half of the year, total 2002 sales of Enbrel exceeded $770 million. With an estimated 80,000 people taking Enbrel, supply constraints began impacting sales. To keep up with demand, Amgen immediately built a new Enbrel manufacturing facility in Rhode Island.

95.     By the time Amgen's acquisition of Immunex was complete, the FDA had approved Enbrel for the treatment of psoriatic arthritis (PsA). At the time, Enbrel was the only FDA-approved treatment for PsA. But even while touting that Enbrel had "the broadest range of indications of any biologic therapy in rheumatic diseases," Amgen set out to obtain even more

---

[42] Decision & Order at 19, *In re Amgen Inc. & Immunex Corp.*, Docket No. C-4056 (F.T.C. Sept. 3, 2002). Serono's TNF inhibitor, Onercept, was never commercialized.

indications to further bolster sales of the blockbuster.[43] In 2003 and 2004, Amgen succeeded in getting FDA approval for the use of Enbrel to reduce signs and symptoms of ankylosing spondylitis, to treat moderate to severe plaque psoriasis, and to induce a major clinical response (i.e., high level of disease control) in active rheumatoid arthritis. Amgen also introduced new dosing regimens and formulations and got approvals for new age groups.

96.     With the expanded indications ushering in new patients in the rheumatology and dermatology marketplaces, Enbrel sales skyrocketed to $1.25 billion in 2003—a 175% increase from the prior year. The 2004 sales increased another 46% to $1.83 billion.

97.     As Amgen was expanding Enbrel's indication list, it was also raising its price. Every single year post acquisition, Amgen was able to increase what it charged purchasers, including CareFirst, for Enbrel—all without losing sales to other therapeutic alternatives. These high prices set Amgen and Immunex up to enjoy high profit margins from Enbrel sales.

98.     From Enbrel's launch in November 1998 through 2004, Immunex and later Amgen reaped monumental benefits from their monopoly in the U.S. etanercept market, enjoying high profit margins generated by supracompetitive pricing and annual price increases. With future sales of Enbrel projected to exceed $3 billion per year, protecting its golden-goose blockbuster became a crucial priority for Amgen.

99.     Amgen went to work to protect its Enbrel monopoly with a thicket of patents, filing dozens of applications for patents claiming Enbrel manufacturing processes, formulations,

---

[43] Press Release, Amgen, *Amgen Submits Data to FDA Supporting Once-Weekly Dosing of Enbrel* (Dec. 23, 2002), https://www.amgen.com/newsroom/press-releases/2002/12/amgen-submits-data-to-fda-supporting-once-weekly-dosing-of-enbrel.

methods of use, and administration devices.[44] But Amgen knew none of these patents were likely to prevent competing biosimilars from launching after the expiration of Amgen's key Enbrel patents in 2012 (indeed, as explained below, all of these patents were ultimately abandoned in later patent litigation). So, Amgen turned to another strategy: buttressing and entrenching its monopoly by blocking access to patents competitors could use to launch biosimilar etanercept products that would compete with Enbrel.

**E.      With patent expiration and biosimilar competition on the horizon, Amgen buys out Roche's remaining rights to the Brockhaus Patents.**

100.    While Amgen had thus far benefited handsomely from its acquisition of Immunex, and thus Enbrel, it saw a cliff ahead. Absent action, Enbrel could face competition from a competing biosimilar etanercept drug launched either directly by Roche or a competing company that obtained rights to Roche's patents—just as Immunex had.

101.    Amgen attempted to shore up its defenses to this threat by foreclosing Roche's ability to permit competition. In June 2004, Amgen bought out all of Roche's license rights that Roche had retained for itself in the original 1998 License—i.e., the Brockhaus Patent Rights. The transaction made Amgen the exclusive licensee of the Brockhaus Patents, gave it the ability to further prosecute (and amend) pending patent applications to ensure maximum protection for Enbrel, and enabled it to enforce the Brockhaus Patents and exclude competitors from the etanercept market.

---

[44] *See* Jonathan Gardner, *A Three-Decade Monopoly: How Amgen Built a Patent Thicket Around its Top-Selling Drug*, BioPharma Dive (Nov. 1, 2021), https://www.biopharmadive.com/news/amgen-enbrel-patent-thicket-monopoly-biosimilar/609042/; Jeffrey Wu & Claire Wan-Chiung Cheng, *Into the Woods: A Biologic Patent Thicket Analysis*, 19 Chi.-Kent J. Intell. Prop. 93 (2020). A 2018 report found that 72% of the at least 57 applications for patents on Enbrel were filed after the product was approved and launched. *See* I-Mak, *Overpatented, Overpriced Special Edition: Enbrel*, https://www.i-mak.org/wp-content/uploads/2018/12/i-mak.enbrel.report-2018-11-30F.pdf.

**JA0101**

102.    On June 7, 2004, Amgen and Roche (through Hoffman-La Roche Inc. and F. Hoffman-La Roche Ltd.) signed an "Accord and Satisfaction" (the "2004 Exclusive License") concerning the same patent family (the Brockhaus Patents) that were the subject of the 1998 License.[45]

103.    The stated purpose of the agreement was "to eliminate the continuing obligations to pay royalties to Roche" pursuant to the 1998 License.[46] Under the 2004 Exclusive License, Roche agreed to waive future royalty payments, and Amgen agreed to make lump sum payments to Roche totaling $150 million.[47]

104.    But the 2004 Exclusive License was far more than an agreement to eliminate the headaches of having to pay royalties calculated over time. The agreement also effectuated a significant change in the license rights of Roche's Brockhaus Patents for Amgen and, in doing so, significantly altered the competitive landscape for etanercept.

105.    Under the 2004 Exclusive License, Roche granted Amgen a paid-up, irrevocable, exclusive license, with the sole right to grant sublicenses, to the Brockhaus Patents in North America for the commercialization of etanercept.[48] The only reservation of license rights to

---

[45] *See* Accord & Satisfaction Among Hoffmann-La Roche Inc., F. Hoffman-La Roche Ltd., Wyeth, AHP Manufacturing B.V., Amgen Inc. & Immunex Corp. (June 7, 2004) (attached as Ex. 2). Wyeth, a Philadelphia-based pharmaceutical company acquired by Pfizer in 2009, and its wholly owned subsidiary AHP Manufacturing were Amgen's marketing partners for Enbrel. The agreement granted Wyeth the "exclusive right to distribute products comprising Etanercept outside North America" and the right to "co-promote products comprising Etanercept within North America." *Id.* at 1. Further, the agreement assigned to Wyeth "(a) all right, title and interest in and to all Ex-North America Brockhaus Patents; and (b) the right to sue and recover for any acts of infringement of any Ex-North America Brockhaus Patents." *Id.* at 3.

[46] *Id.* at 1.

[47] *Id.* at 7.

[48] *Id.* at 4 (Article 3.1).

- 31 -
**JA0102**

Roche was for internal, non-clinical research.[49] With respect to patent prosecution, Amgen purchased the right to prosecute patent applications in the U.S. patent family.[50]

106.    Thus, as of 2004, Amgen controlled the prosecution of the Brockhaus Patents, including pending applications. The agreement granted Amgen the first right to sue over suspected infringement of the licensed patents at its sole expense and under its sole control—i.e., Amgen had the right to sue other drug companies whose products (like biosimilar etanercept) Amgen believed infringed the patents.[51] Amgen would also keep any award of damages or lost profits resulting from such an infringement suit. Roche is obligated to cooperate in these patent suits, including by participating as a party to the extent required by the court or by providing evidence and testimony in connection with any proceeding affecting the validity of the patents-in-suit.[52] Amgen also has the right to convert its exclusive license to an assignment upon request and upon payment of a relatively trivial sum of $50,000. (If "requested . . . Roche shall execute an assignment of" the patents).[53]

107.    As part of the 2004 agreement, Roche retains the secondary right, but not obligation, to sue if Amgen fails to rectify infringement or initiate an action for patent infringement within 180 days after written notification by Roche.[54] The agreement further provides that, once Roche's secondary right to sue is triggered, Roche may, at its sole expense

---

[49] *Id.* (Article 3.2).

[50] *Id.* at 5 (Article 3.3).

[51] *Id.* (Article 3.5).

[52] *Id.* (Article 3.4).

[53] *Id.* (Article 3.3).

[54] *Id.* at 6 (Article 3.6).

**JA0103**

and under its sole control and direction, initiate suit and may retain the entirety of any award of damages or lost profits as a result of such suit.[55]

108.    The description of the 2004 Exclusive License as an "Accord & Satisfaction" is, and appears intended by Amgen to be, misleading. In an accord and satisfaction, parties simply settle a previous unliquidated debt. Roche and Amgen could have accomplished that goal by simply agreeing to a lump sum payment in exchange for future royalties and do so without a fundamental change in the nature of the underlying license rights. But Roche and Amgen did not stop there.

109.    Instead, the intended and effectuated goal was for Amgen—then a monopolist in the U.S. market for etanercept—to extend and further entrench its monopoly position by foreclosing competition in the United States by Roche or any assignee of Roche to the Brockhaus Patents. Through the 2004 Exclusive License, Amgen bought up Roche's U.S. retained rights to a co-exclusive launch of etanercept products and to commercialize any p75 fusion protein.

110.    The 2004 Exclusive License was also falsely labeled because, although it moved functional control of the Brockhaus Patent rights in the U.S. to Amgen, it was structured to leave ostensible back-up rights to Roche. This would later enable Amgen to argue, in any future proceedings, that Amgen did not "own" the Brockhaus Patent rights, and thus the patents that Amgen already did own were not in common ownership with the owner of the Brockhaus Patents (as one observer put it, the agreement "went right up to the line of ownership without

---

[55] *Id.* (Article 3.6).

actually crossing it"[56]). By doing so, Amgen could seek to extend Enbrel's patent protection by layering on the later-expiring Brockhaus Patents without running afoul of the legal doctrine of double-patenting.[57]

111.    The purpose and effect of Amgen's acquisition of the 2004 Exclusive License was wholly anticompetitive. Amgen already had significant rights to market exclusivity under the BPCIA and its existing patents. It sought to prolong that market exclusivity—and entrench its monopoly—by acquiring patents covering a substantial share of the etanercept market, a maneuver prohibited by antitrust laws.

112.    *First*, Amgen had its own patents that it had acquired over the years and used to launch Enbrel and protect its sales.[58]

113.    *Second*, to the extent that Amgen needed a license from Roche to the Brockhaus Patents, Immunex had already acquired those license rights (effective the date of Enbrel's launch) through the 1998 License granted to Immunex, and that license provided co-exclusive rights. Amgen needed nothing further from Roche to be able to commercialize Enbrel without fear of running afoul of Roche's technology.

114.    *Third*, Amgen was enjoying exclusivity under § 351(k)(7) of the PHSA for etanercept that would prohibit the submission, or approval, of any § 351(k) application for a

---

[56] Doug Robinson, Dickey & Pierce, P.L.C., *End of The Enbrel Battle: How Amgen Beat Sandoz* (Sept. 8, 2020), https://www.biosimilardevelopment.com/doc/end-of-the-enbrel-battle-how-amgen-beat-sandoz-0001.

[57] The double-patenting doctrine, put simply, prevents the same inventor from obtaining additional years of patent protection by patenting the same thing, or an obvious variant thereof, twice.

[58] *See* U.S. Patent No. 5,606,690; U.S. Patent No. 5,395,760; U.S. Patent No. 5,712,155; U.S. Patent No. 11,491,223; U.S. Patent No. 10,307,483; U.S. Patent No. 8,119,604.

**JA0105**

proposed biosimilar (or interchangeable) to Enbrel (etanercept) that would not expire until November 2, 2010.[59]

115.    Nor was elimination of Roche's co-exclusive rights necessary for the successful development of Enbrel. Immunex (and later Amgen) had already succeeded in reaching blockbuster sales for years. Despite the retained Roche license rights, Immunex and Amgen had made investments in, and gained a monopoly position in, the U.S. market for etanercept.

116.    In sum, Amgen's acquisition of an exclusive license to the Brockhaus Patents was intended do, and did in fact, further maintain, extend, and entrench Amgen's existing etanercept monopoly; the acquisition was anticompetitive with no procompetitive benefits.

**F.    Amgen rewrites Roche's '790 and '791 Applications to cover etanercept and relentlessly prosecutes them to extend its Enbrel monopoly to 2029.**

117.    As a part of the 2004 Exclusive License, Amgen obtained all rights to control the prosecution of Roche's '790 and '791 Applications—patent applications that had been pending for nearly 10 years. At the time Amgen took over control of these patent applications, *they did not cover etanercept*, instead targeting a different fusion protein altogether.

118.    But having secured the rights under the 2004 Exclusive License to take over and steer ongoing patent prosecutions, Amgen immediately set out to make sure that the pending Brockhaus Patents would buttress and protect its Enbrel monopoly. Amgen notified the PTO that Amgen lawyers would be acting as Roche's representatives in the patent prosecutions in October 2004.

---

[59] Amgen's BLA No. 103795 for Enbrel was first licensed by the FDA under § 351(a) of the PHSA on November 2, 1998, and additional supplements for changes and updates to the approved labeling were approved after this date. The dates that are four and 12 years after the date of first licensure of Enbrel are November 2, 2002, and November 2, 2010, respectively. A licensure of a supplement does not trigger a separate period of exclusivity.

119. Once in control of the '790 and '791 Applications, Amgen substantially rewrote them to include claims directed to the p75-IgG1 fusion protein—and thus reshaped them to cover Enbrel. Amgen would prosecute the applications relentlessly for nearly a decade.

120. On December 13, 2004, Amgen filed its first response to the PTO in the prosecution of the '791 Application. Its first step was to cancel all pending claims (the claims drafted by Roche), add 29 new claims, and modify the specification. Amgen did so to shift the application away from the p55 fusion protein and onto the p75 fusion protein—thus covering etanercept. The examiner entered a final rejection of the patent application on March 12, 2007.

121. Amgen did not give up. In May 2007, it filed a petition for review. On August 22, 2007, the PTO reversed course and withdrew the final rejection. The examiner issued two more non-final rejections, another restriction requirement, and, on June 24, 2011, another final rejection. Amgen countered the examiner's reasons for rejection on November 23, 2011, and, on December 22, 2011, filed for an appeal. The gambit paid off. The examiner issued a notice of allowance less than two months later, on February 15, 2012. The '522 Patent issued on April 24, 2012, and will not expire until April 24, 2029.

122. On January 18, 2005, Amgen filed its first response in the '790 prosecution. In a July 2004 office action entered while Roche controlled the prosecution, the examiner had rejected the claims for non-statutory subject matter (proteins found in nature) and anticipation (the claims were anticipated by prior art—and thus not novel). In its 2005 response, Amgen cancelled, amended, and added claims—again to adjust the applications so that they applied to etanercept. In 2006, Amgen further modified the claims and the specification. The examiner issued two more non-final rejections, followed by a final rejection on February 23, 2007.

123. Amgen did not stand down. It filed its response in August 2007 and requested an oral hearing. On February 28, 2008, Amgen filed an appeal, with its initial briefing alone comprising more than 500 pages. The patent board issued a final decision on November 22, 2010, reversing the examiner. The examiner issued one more non-final rejection in March 2011. Then, on August 31, 2011, the examiner issued a notice of allowance for the '790 application. On November 22, 2011, the PTO issued the U.S. Patent No. 8,063,182 (the "'182 Patent"), which will not expire until November 22, 2028.

124. The amount of time, effort, and expense that Amgen poured into these two applications underscores the importance it placed on the Brockhaus Patents—and its Enbrel monopoly.

125. The timing and targeting of the Brockhaus Patent prosecutions were no coincidence. The '790 and '791 Applications had been filed on May 19, 1995, a few weeks before a critical statute—the Uruguay Round Agreements of the General Agreement on Tariffs and Trade ("GATT")—took effect.[60] GATT impacted how long patent exclusivity terms would run and how they were calculated. As a result of the GATT amendment, patents that issue from applications filed after June 8, 1995 receive a 20-year term from their effective filing date.

---

[60] Before June 1995, 35 U.S.C. § 154 provided that the term of a utility or plant patent ended seventeen years from the date of patent grant. To comply with Article 33 of the Trade-Related Aspects of Intellectual Property Rights (TRIPS) Agreement resulting from GATT, the United States was required to establish a minimum term for patent protection ending no earlier than twenty years from the date the application was filed. Thus, the Uruguay Round Agreements Act amended 35 U.S.C. § 154 in June of 1995 to change the term of utility and plant patents from ending 17 years from the date of patent grant to ending 20 years from the filing date of the application (or 20 years from the earliest filing date claimed under 35 U.S.C. §§ 120, 121, or 365(c)). With this change, 35 U.S.C. § 154 was also amended to provide for patent term extension in the event that issuance of the application as a patent was delayed due to secrecy order, interference or successful appellate review, subject to a five-year cap on any patent term extension under 35 U.S.C. § 154(b).

Patents claiming priority to applications filed before June 8, 1995, however, are entitled to a term that is the greater of 20 years from the filing date of the application *or* 17 years from the date of patent issuance.

126. The late issuance of the Roche etanercept patents (in 2011 and 2012) from applications that had been filed pre-GATT (in 1995) was an incredible boon for Amgen. By the time the patents issued, Enbrel had already been on the U.S. marketplace since 1998, about 13 years. Sales were in the billions of dollars every year. With the pre-GATT filing date permitting an additional 17 years of patent protection, use of these patents would mean Amgen could protect sales of Enbrel and avoid competition from any biosimilar versions for *more than 30 years*.

127. Soon after '182 Patent issued, analysts at Sanford C. Bernstein estimated that *this one* patent alone added $6 per share to Amgen's stock price.[61] With approximately 870 million outstanding shares, this single patent issuance potentially added about $5 billion to Amgen's value.

**G. Amgen uses the '182 and '522 Patents to block would-be competitors from launching less expensive biosimilar versions.**

128. Since Amgen secured the issuance of the '182 and '522 Patents from Roche's '790 and '791 Applications, it has used them to block biosimilar entrants into the U.S. market for etanercept—the final step in unlawfully entrenching and expanding its monopoly.

---

[61] *See* Staff of H. Comm. on Oversight and Reform, *Drug Pricing Investigation: Amgen— Enbrel and Sensipar* at 24 (Oct. 2020), https://oversightdemocrats.house.gov/sites/evo-subsites/ democrats-oversight.house.gov/files/Amgen%20Staff%20Report0%2010-1-20.pdf; *see also New Patent Could Be Worth $6 a Share to Amgen*, Forbes, Nov. 28, 2011, www.forbes.com/sites/ matthewherper/2011/11/28/new-patent-could-be-worth-6-a-share-to-amgen/#4be44a7a46e1.

1.      **Amgen successfully sues Sandoz for infringement of the '182 and '522 Patents, preventing the launch of its Enbrel biosimilar.**

129.    Sandoz, a major pharmaceutical manufacturer, became the first potential Enbrel competitor with its Erelzi drug.

130.    On September 29, 2015, the FDA accepted Sandoz's aBLA seeking authorization from the FDA to market Erelzi, a biosimilar version of Enbrel (etanercept).

131.    On February 26, 2016, Immunex and Amgen Manufacturing (the two subsidiaries of Amgen), along with Roche, filed a lawsuit against Sandoz (the "*Sandoz* case"). Amgen asserted infringement of the two Roche Patents (the '182 and '522 Patents) as well as three of its own patents, 7,915,225 ("the '225 Patent"), 8,119,605 ("the '605 Patent"), and 8,722,631 ("the '631 Patent") (collectively, the "Psoriasis Patents"). Amgen sought an injunction to prohibit Sandoz from commercializing its biosimilar etanercept prior to the expiry of all the patents.

132.    Over the course of the litigation, Amgen narrowed its infringement claims against Sandoz to the '182 and '522 Patents, dropping its claims over the Psoriasis Patents and relying exclusively on the Roche Patents to deny its competitor access to the etanercept market.

133.    On August 11, 2016, and subject to the terms of a confidential stipulation, the *Sandoz* court entered a preliminary injunction prohibiting Sandoz from commercializing Sandoz's etanercept product.

134.    On August 30, 2016, the FDA approved Erelzi. Given the injunction, however, Sandoz could not launch its biosimilar.

135.    On September 10, 2018, the *Sandoz* court entered an order which stated that commercialization of Sandoz's biosimilar etanercept product would infringe the two Roche Patents (the '182 and '522 Patents).

**JA0110**

136. On August 9, 2019, and after a bench trial, the *Sandoz* court issued a decision upholding the validity of the '182 and '522 Patents.

137. On July 1, 2020, the Federal Circuit affirmed the district court judgment upholding the validity of the '182 and '522 Patents.

138. On May 17, 2021, Sandoz's petition for *certiorari* with the U.S. Supreme Court was denied.

139. Amgen was therefore able to keep Sandoz off the market based entirely on the Roche Patents.

### 2. Amgen sues Samsung Bioepis for infringement of the '182 and '522 Patents and blocks the launch of its Enbrel biosimilar.

140. The next potential competitor was Samsung Bioepis Co., Ltd. ("Bioepis").

141. On April 25, 2019, the FDA approved Bioepis's aBLA for its etanercept product Eticovo (etanercept-ykro), another biosimilar to Enbrel.

142. On April 30, 2019, Amgen sued Bioepis (the "*Bioepis* case"), alleging infringement of the Roche Patents (the '182 Patent and the '522 Patent) and the same three Psoriasis Patents (the '225, '605, and '631 Patents) that had been asserted against Sandoz. Amgen sought an injunction to prohibit Bioepis from commercializing its biosimilar etanercept prior to the expiry of the patents.

143. On December 23, 2019, Amgen amended its complaint against Bioepis. Amgen (i) maintained the allegations regarding the Roche Patents, but (ii) withdrew the allegations regarding the Psoriasis Patents, and (iii) added infringement allegations regarding three other manufacturing patents that were later dismissed.

144. The *Sandoz* decisions had a significant impact on the *Bioepis* case. On November 3, 2021, Amgen successfully used the Roche Patents to preclude biosimilar entry by Bioepis

when the *Bioepis* court entered judgment in favor of Immunex and against Bioepis on the claims for infringement of the Roche '182 Patent and '522 Patent. Bioepis was permanently enjoined from commercializing in the United States any product containing etanercept. Bioepis was also required to immediately destroy any Bioepis etanercept product that had been imported into the United States. The injunction terminates on April 24, 2029, once both the '182 Patent and the '522 Patent expire.

145.    Once again, it was the Roche Patents that allowed Amgen to keep its competitor off the market and extend its Enbrel monopoly.

**H.      Amgen exploited its Enbrel monopoly with annual price hikes that helped the company secure more than $86 billion in net revenues.**

146.    Amgen capitalized on its monopolist position by continuously raising the per unit price of Enbrel.

147.    A 2020 investigation of Amgen's pricing of Enbrel by the House of Representatives' Committee on Oversight and Reform found that, since acquiring the rights to Enbrel in 2002, Amgen raised its price 27 times, including by nearly 30% within one 12-month period. By 2020, a 50-mg dose of Enbrel cost $1,414 per unit, $5,556 per month, or $72,240 a year: a 457% increase from the date Amgen acquired it.

**Figure 3. Price Per 50-mg Dose of Enbrel, 2002–2024[62]**



148.    Since 2020, Amgen has increased the price of Enbrel at least six more times. A 50-mg dose of Enbrel now costs patients $7,401.83 per month: *643% more* than it cost when launched in 1998.

149.    These price increases fueled Amgen's massive profits from Enbrel sales. Its Enbrel revenues increased every year from 2002 to 2016, culminating in $5.72 billion in 2016. One case study found that 100% of Enbrel's revenue growth between 2011 and 2021 came from price increases alone. And despite recent declines in prescription volumes, Amgen has continued to reap billions annually, profiting $3.65 billion in 2023.

150.    All told, Amgen has grossed more than $86.33 billion in sales of Enbrel. And Enbrel remains one of Amgen's best-selling products both in the United States and worldwide, delivering nearly $3.7 billion in total sales in 2023.

---

[62] WAC per 50-mg dose of Enbrel for NDC 58406-0435-01 for 2002–2022 period and for NDC 58406-0021-01(pre-filled syringe) for 2023–2024 period.

**Figure 4. U.S. Sales of Enbrel, 1998–2023**



## I.      Amgen uses its exclusive license to the Brockhaus Patent Rights to unlawfully buttress and entrench its monopoly.

151.    Amgen has successfully used the rights it acquired under the 2004 Exclusive License—the exclusive license rights to the Brockhaus Patents, the right to prosecute patents under them, and the right to bring enforcement actions—to unlawfully entrench and strengthen its monopoly, blocking biosimilar entry into the U.S. market for etanercept.

152.    Were it not for Amgen's unlawful acquisition of those rights, and its later use of them to block biosimilar entry, one or more Enbrel biosimilar products would have entered the U.S. market no later than 2019, increasing competition and driving down prices. Amgen's ceaseless efforts to thwart such competition runs afoul of state and federal antitrust and consumer protection laws.

153.    *First*, without Amgen's acquisition of exclusive rights in the 2004 Exclusive License, Roche would have retained the "co-exclusive" right to license the Brockhaus Patents to

**JA0114**

another competitor or use them itself. Unable (under the law) to sell that highly valuable right to Amgen (a monopolist in the etanercept market), a reasonable company in the position of Roche would have monetized those rights by either launching its own biosimilar product or licensing another to enter the market.

154.    *Second*, two sophisticated pharmaceutical companies, Sandoz and Bioepis, had invested significant time and money into developing and getting FDA approval for (in 2016 and 2019, respectively) biosimilar etanercept. A reasonable company in Roche's position would not simply sit on valuable, unused patent rights but instead would license them to a company who had demonstrated a commitment to investing in a competing biosimilar product—like Sandoz or Bioepis. Indeed, Roche already had several long-term manufacturing and other agreements with biosimilar companies, including Bioepis.

155.    *Third*, were it not for Amgen's unlawful acquisition of the exclusive license to the Brockhaus Patents and the right to prosecute patents under them, the '182 and '522 Patents would likely never have issued or would have issued in a different form. When Roche controlled the applications, it prosecuted them for its development of work in connection with sequencing the p55 version of the human TNF receptors and *did not cover etanercept*. It was only after Amgen acquired the right to prosecute the applications that the applications were re-crafted to more clearly and directly protect etanercept, a p75 version of the human TNF receptors. If Amgen had not acquired patent prosecution rights, amended the claims to cover etanercept, and fought hard for years to secure issuance, it is highly doubtful that the '182 and '522 Patents—if they issued at all—would have protected etanercept. Amgen *relied solely* on the '182 and '522 Patents to successfully block biosimilar entry in the *Bioepis* and *Sandoz* cases. Absent Amgen's

unlawful acquisition of these patents to buttress and prolong its monopoly, multiple biosimilars could and would have entered the market before 2020.

156. Samsung would have launched its etanercept biosimilar, Erelzi, at least by August 13, 2019 (when the Psoriasis Patents expired), but potentially as early as August 16, 2016 (when the FDA granted final approval of Sandoz's aBLA).

157. Bioepis would have launched its etanercept biosimilar, Eticovo, at least by August 13, 2019, as well, but potentially as early as April 25, 2019 (when the FDA granted final approval of Bioepis's aBLA).

158. Amgen knew that biosimilar entry would have an immediate adverse effect on Enbrel sales. With multiple biosimilar entrants, "competition [would] intensif[y] rapidly, resulting in greater net price declines for both the reference and biosimilar products and a greater effect on product sales."[63]

159. Erelzi and Eticovo would likely have launched at Wholesale Acquisition Cost (WAC) prices 15%–37% lower than that of Enbrel[64] and captured 20%–25% of the etanercept market within one year of entry[65]—saving purchasers approximately $151–467 million in the

---

[63] Amgen Inc., Annual Report (Form 10-K) at 18 (Feb. 27, 2024).

[64] *See* Amgen, *2020 Biosimilar Trends Report* at 14, 18 (Sept. 2020), https://www.amgen biosimilars.com/-/media/Themes/Amgen/amgenbiosimilars-com/Amgenbiosimilars-com/pdf/ USA-CBU-80723-2020-Amgen-Biosimilar-Trends-Report.pdf ("Amgen 2020 Biosimilar Trends Report") (reporting that "manufacturers are launching biosimilars at a WAC price that is generally 15% to 37% lower than the reference product WAC"); *see also* IQVIA Biosimilars Report at 2 (noting that price discounts for biosimilars "range significantly," but "appear to reflect prior assumptions of roughly 30% discounts").

[65] *See* Amgen 2020 Biosimilar Trends Report ("Within the first year, biosimilar share generally ranged from 20% to 25%."); *see also* IQVIA Biosimilars Report at 10 (indicating that earlier biosimilars achieved 25% share of molecule volume within the first year and 39% after two years, but also noting that two biosimilars launched in 2019 had achieved significantly higher first-year uptake of 38% and 42%).

- 45 -
**JA0116**

first year alone.[66] Uptake of the etanercept biosimilars would have continued to increase over time, capturing approximately 75% of the market after three years, saving purchasers nearly $1 billion annually.[67] Had both biosimilar competitors launched on August 13, 2019, purchasers of etanercept collectively would have saved at least $3–4 billion to date.[68]

160.    Amgen acted with the intent of keeping prices high—after all, Amgen itself acknowledges the extraordinary benefits of biosimilar entry. As Amgen has observed:

> Since the first biosimilar entered the US marketplace in 2015, 39 biosimilars have been approved, 22 of which have been launched. Biosimilars have gained significant share in the majority of therapeutic areas where they have been introduced. The US marketplace is poised to see further growth in the number of biosimilars approved and welcome many new biosimilars in the years to come. Additional competition may lead to significant savings for the healthcare system, and these savings can be deployed to newer, innovative treatments.[69]

161.    Amgen admits that "[c]ompetitive mechanisms are in place to support biosimilar uptake" and that "[b]iosimilars have the potential to reduce healthcare costs by providing significant wholesale acquisition cost (WAC) and average sales price (ASP) savings at launch and through price competition, resulting in the opportunity for additional savings over time."[70] It notes that the "rate of biosimilar uptake is generally increasing over time" and that "first-to-

---

[66] Based on Amgen's reported Enbrel sales of $5.05 billion for FY2019.

[67] *See* Amgen, *2022 Biosimilar Trends Report* at 14 (Oct. 2022), https://www.amgen biosimilars.com/commitment/2022-Biosimilar-Trends-Report ("Amgen 2022 Biosimilar Trends Report") ("For therapeutic areas with biosimilars launched in the last 3 years, the average share was 75%.").

[68] A 30% WAC discount and market share of 25% after the first year and increasing to 60% the fifth year would result in a savings of $2.66B in total sales.

[69] Amgen 2022 Biosimilar Trends Report at 6.

[70] *Id.* at 6, 12.

**JA0117**

launch biosimilars tend to capture a greater portion of the segment compared to later entrants."[71]
It notes that, for "therapeutic areas with biosimilars launched in the last 3 years, the average
share was 75%" and "the cumulative savings in drug spend for classes with biosimilar
competition is estimated to have been $21 billion over the past 6 years."[72]

162.    The fact that Amgen has been able to block biosimilar entry for etanercept since
the late 2010s or early 2020s is egregious given that entry of a biosimilar Enbrel should and
likely would have been the first biosimilar drug in the extraordinarily costly autoimmune
therapeutic area. In 2021, global sales of autoimmune drugs totaled more than $40 billion. As
Amgen has remarked about the autoimmune space, "the planned launches of biosimilars to
Humira [another autoimmune drug used to treat similar conditions as Enbrel] in 2023 could be a
pivotal moment."[73] But that pivotal moment could, and should, have first occurred with Enbrel.
And as Amgen has admitted, "More biosimilars to treat autoimmune conditions will be coming
to market this decade, offering an opportunity to inject competition and reduce healthcare
costs."[74]

163.    The absence of a biosimilar for Enbrel in the U.S. is particularly disturbing
considering that a biosimilar product was first developed and approved *eight years ago*. Despite
companies with biosimilar versions of Enbrel having undergone a thorough FDA approval
process, they remain unable to enter the market.

164.    But because of the unlawful monopoly conferred by the '182 and '522 Patents,
purchasers continue to be overcharged hundreds of millions of dollars per year for etanercept

---

[71] *Id.* at 14.

[72] *Id*. at 14–15.

[73] *Id.* at 24.

[74] *Id.*

purchases. For at least 26 years—from November 1998 (Enbrel's launch) through the filing of this complaint—Amgen has enjoyed exclusive sales of Enbrel, and if not enjoined, will continue to do so until 2029.

165. In sum, Amgen knowingly and willfully acquired the exclusive license to Roche's patent applications and subsequent patents to delay competition from would-be etanercept biosimilar competitors and to further entrench its etanercept monopoly. Amgen's acquisition of the Roche Patents and patent applications was for the purpose, and has had the consequence of, unlawfully extending and maintaining Amgen's monopoly in the market for etanercept in the United States.

## VI.    CLASS ALLEGATIONS

166. The plaintiffs, on behalf of themselves and the putative class members, seek damages (measured as overcharges) against Amgen based on their allegations of anticompetitive conduct in the market for etanercept in the United States.

167. The plaintiffs bring this action on behalf of themselves and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as representatives of the class defined as:

> All end payors (including any assignees of such end payors) in the United States and its territories who purchased and/or paid all or part of the purchase price of Enbrel from July 2020 until the anticompetitive effects of the defendants' conduct cease ("class period").

168. Excluded from the class are the defendants and any of their officers, directors, management, employees, subsidiaries, and affiliates.

169. Also excluded from the class are: (1) the government of the United States and all agencies thereof, and (2) all state or local governments and all agencies thereof.

170.    Class members are so numerous and geographically dispersed that joinder of all members is impracticable. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together.

171.    The plaintiffs' claims are typical of those of the class members. The same wrongful conduct damaged the plaintiffs and all class members—i.e., they paid and will pay artificially inflated prices for etanercept and were deprived of earlier and more robust competition from cheaper biosimilar versions of etanercept because of Amgen's wrongful conduct.

172.    The plaintiffs will fairly and adequately protect and represent the class's interests. The plaintiffs' interests are coincident with, and not antagonistic to, those of the other class members.

173.    Counsel representing the plaintiffs are experienced in the prosecution of antitrust class action litigation and have extensive experience with class action antitrust litigation involving pharmaceutical products.

174.    Questions of law and fact common to the class members predominate over questions that may affect only individual class members because Amgen has acted on grounds generally applicable to the entire class. This conduct renders appropriate overcharge damages with respect to the class as a whole. Such generally applicable conduct is inherent to Amgen's wrongful actions.

175.    Questions of law and fact common to the proposed class include:

      a.     whether Amgen willfully and improperly maintained monopoly power over etanercept in the United States;

      b.     whether Amgen intentionally acquired the exclusive license to the Roche Patents and Patent Applications to unlawfully delay competition and to unlawfully maintain its monopoly over etanercept;

- 49 -

**JA0120**

c. whether Amgen unlawfully used the Roche Patents to delay etanercept biosimilar competition;

d. whether Amgen unlawfully excluded competitors and potential competitors from the market for etanercept;

e. whether Amgen unlawfully delayed or prevented manufacturers of etanercept biosimilars from coming to market in the United States;

f. whether Amgen improperly maintained monopoly power by delaying biosimilar entry;

g. whether the law requires a definition of a relevant market when direct proof of monopoly power is available, and if so, the definition of the relevant market;

h. whether Amgen's activities as alleged herein have substantially affected interstate commerce;

i. whether, and if so to what extent, Amgen's conduct caused antitrust injury (i.e., overcharges) to the plaintiffs and the class members; and

j. the quantum of aggregate overcharge damages to the plaintiffs and class members.

176. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require. The benefits of proceeding through the class mechanism—including providing injured persons or entities with a method for obtaining redress on claims that they could not practicably pursue on an individual basis—substantially outweigh potential difficulties in management of this class action.

177. Amgen's anticompetitive conduct has imposed and will continue to impose (unless the plaintiffs obtain equitable relief) a common antitrust injury on the plaintiffs and all class members. Amgen's anticompetitive conduct and its relationships with the class members have been substantially uniform. Amgen has acted and refused to act on grounds that apply to the

**JA0121**

class generally, and injunctive and other equitable relief is appropriate respecting the class as a whole.

178.    The plaintiffs know of no special difficulty in litigating this action that would preclude its maintenance as a class action.

## VII.    MARKET POWER AND MARKET DEFINITION

179.    The relevant geographic market is the United States and its territories.

180.    The relevant product market is etanercept.

181.    At all times relevant to this civil action, Amgen had monopoly power in the market for etanercept in the United States.

**A.    Direct evidence demonstrates Amgen's market power.**

182.    *Supracompetitive prices*. At all times relevant to this civil action, Amgen charged supracompetitive prices for Enbrel—i.e., prices that were and are markedly higher than those Amgen could have charged had there been biosimilar competition for etanercept. Amgen also steadily *increased* the price of Enbrel over the years.

183.    From 1998 to the present, Amgen *never* lowered Enbrel prices or lost sales volume in response to the pricing of other drugs, even though other biologic products were available in the U.S. to treat rheumatoid arthritis, psoriasis, PsA, ankylosing spondylitis, and JIA, indicating that its sales are not constrained by any other products.

184.    *Supracompetitive profit margins.* At all times relevant to this action, Amgen enjoyed extraordinarily high profit margins from the sale of Enbrel.

185.    *Combination patent protection and other barriers*. From Enbrel's 1998 launch through the filing of this complaint, Amgen has enjoyed and continues to enjoy patent protection for etanercept. As a result, Amgen has the power to exclude competition from etanercept biosimilars.

186.    *Lack of interchangeability*. Etanercept is not readily interchangeable with other treatments for rheumatoid arthritis, psoriasis, PsA, ankylosing spondylitis, or JIA. Etanercept is a unique treatment for these diseases, ostensibly offering advantages over other available treatments for these conditions.

187.    *Biosimilar competition*. Recent reports regarding biosimilars confirm that biosimilar competition has a significant effect in lowering price among equally effective therapies.

188.    Recent biosimilars have achieved high market volume share, reaching more than 60% of a given biologic's volume within the first three years on the market. The introduction of biosimilars frequently leads to higher utilization of the treatment as lower costs improve patient access.

189.    Introduction of lower cost biosimilars precipitates reductions in overall drug costs per unit at invoice prices over time. Indeed, such competition typically lowers the per unit cost of both the brand and biosimilar drug. Costs are down between 18% and 50% per unit for drugs with biosimilars.

190.    Amgen, in its 2022 Biosimilar Trends report, admitted that biosimilar entrants are typically successful at taking market share from the reference biologic drug. Amgen's report states: "Biosimilars have gained significant share in the majority of therapeutic areas where they have been introduced."[75] Amgen further remarked: "For therapeutic areas with biosimilars launched in the last 3 years, the average share was 75%," and "[f]or therapeutic areas with biosimilars launched prior to 2019, the average share after 3 years was 39%."[76]

---

[75] Amgen 2022 Biosimilar Trends Report at 14.

[76] *Id.*

191.    A 2022 study published in the *Journal of the American Medical Association* found that "[b]iosimilars in the US that entered the market more recently were estimated to experience a faster uptake (as measured by the market share 1 year after launch). . . ."[77]

192.    The effects of biosimilar competition in the U.S. market for etanercept would also have substantial downward pressure on the price of etanercept.

193.    Direct evidence shows that Amgen has monopoly power over the sale of etanercept in the United States and that entry of a biosimilar etanercept would cause significant downward pressure on price, resulting in more affordable and accessible etanercept products.

**B.    Indirect evidence demonstrates Amgen's market power.**

194.    To the extent the plaintiffs are legally required to prove monopoly power through circumstantial evidence by first defining a relevant product market, the relevant product market is the sale of etanercept in the United States and has, thus far, consisted solely of Enbrel. Biosimilar versions of etanercept will also be in the relevant market once they are available. At all relevant times, Amgen's market share in the market was and remains 100%.

195.    Amgen, at all relevant times, enjoyed high barriers to entry with respect to competition in the product market of etanercept due, in large part, to legally and illegally created patent protections.

196.    Enbrel does not exhibit significant, positive cross-elasticity of demand with any other medication. The existence of non-etanercept products that may be used to treat similar indications as etanercept has not constrained Amgen's ability to raise or maintain Enbrel prices

---

[77] David L. Carl, Yannic Laube & Miguel Serra-Burriel, *Comparison of Uptake and Prices of Biosimilars in the US, Germany, and Switzerland*, 5 JAMA Netw. Open 1, 6 (2022).

without losing substantial sales. As a result, those other drug products do not occupy the same relevant antitrust market as Enbrel.

197. Amgen needed to control only etanercept, and no other products, to maintain a supracompetitive price for Enbrel while preserving all or virtually all its sales. Only market entry of a competing, biosimilar etanercept would undermine Amgen's ability to keep Enbrel prices high without losing substantial sales.

198. Indirect evidence shows that Amgen had monopoly power in an antitrust market of the sale of etanercept in the United States.

## VIII. MARKET EFFECTS AND CLASS DAMAGES

199. In the absence of the anticompetitive conduct alleged above, multiple manufacturers would have entered the market with etanercept biosimilars at least by August 2019, and potentially as early as August 2016.

200. Instead, Amgen willfully and unlawfully maintained its monopoly power in the market for etanercept through the following an anticompetitive scheme: (i) Amgen unlawfully acquired an exclusive license to the Roche Patent rights; and (iii) Amgen used those patent rights to buttress and entrench its monopoly and delay competition from would-be etanercept biosimilar competitors. These acts, individually and in combination, were anticompetitive.

201. Amgen's scheme had, and continues to have, the purpose and effect of preventing biosimilar competition, permitting Amgen to maintain supracompetitive monopoly prices for Enbrel and enabling Amgen to sell Enbrel without competition. Absent Amgen's conduct, biosimilar versions of etanercept would have been available sooner.

202. Competition among drug manufacturers enables all purchasers of their drugs to buy biosimilar versions of the drugs at substantially lower prices and/or to buy the reference biologic products at reduced prices. Consequently, reference (i.e., brand) biologic manufacturers

have a strong incentive to delay biosimilar competition. Purchasers experience substantial cost inflation from that delay.

203. If competition from biosimilar manufacturers had not been restrained and forestalled in the case of etanercept, end payers like the plaintiffs and class members would have paid less for etanercept by: (i) purchasing, and providing reimbursement for, biosimilar versions of etanercept instead of the more expensive Enbrel, and (ii) purchasing, and providing reimbursement for, Enbrel at lower prices.

204. As a result, Amgen's conduct has forced and will continue to force the plaintiffs and class members to pay more for Enbrel and biosimilar etanercept than they would have paid absent Amgen's misconduct.

205. CareFirst has purchased Enbrel for its members in 45 states and the District of Columbia. Between 2021 and 2023, CareFirst paid more than $109 million for members' Enbrel prescriptions. The breakdown by state is shown in the figure below.

**Figure 5. CareFirst's Enbrel Purchases by State, 2021–2023**

JA0127

## IX. ANTITRUST IMPACT

206. The effect of Amgen's conduct is to net Amgen billions of dollars in revenue at the expense of end payers, including the plaintiffs and class members, who will pay hundreds of millions, if not billions, of dollars in unlawful overcharges.

207. During the relevant period, the plaintiffs and class members purchased substantial amounts of Enbrel indirectly from Amgen.

208. As a direct and proximate result of Amgen's anticompetitive conduct, the plaintiffs and class members have paid and will continue to pay supracompetitive prices for etanercept because (1) the price of Enbrel was and is artificially inflated by Amgen's anticompetitive conduct, and (2) the plaintiffs and class members were and are deprived of the opportunity to purchase lower-priced biosimilar versions of etanercept.

209. As a result, the plaintiffs and class members have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount, forms, and components of such damages will be calculated after discovery and upon proof at trial.

210. The overcharges resulting from Amgen's conduct are directly traceable through the pharmaceutical distribution chain to the plaintiffs and other class members. Amgen first sells Enbrel to wholesalers based on Enbrel's listed WAC, minus applicable discounts. Wholesalers then sell Enbrel to specialty pharmacies, which in turn sell it to consumers. In this short chain of distribution, drug products are not altered or incorporated into other products. Each drug purchase is documented and closely tracked by pharmacies, pharmacy benefit managers, and third-party payers (such as insurers and health and welfare funds). The products and their prices are thus directly traceable from manufacturer to consumer.

**JA0128**

## X.   IMPACT ON INTERSTATE COMMERCE

211.   Amgen's efforts to monopolize and restrain competition in the market for etanercept have substantially affected interstate and foreign commerce.

212.   At all material times, Amgen manufactured, sold, and shipped substantial amounts of Enbrel across state lines in an uninterrupted flow of commerce across state and national lines throughout the United States.

213.   At all material times, Amgen transmitted funds as well as contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Enbrel.

214.   To further its monopolization and restraint on competition in the market for etanercept, Amgen used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign wire commerce. Amgen engaged in illegal activities, as charged herein, within the flow of—and substantially affecting—interstate commerce, including in this district.

## XI.   FEDERAL CLAIMS FOR RELIEF

### COUNT ONE

**MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT
(15 U.S.C. § 2) SEEKING DECLARATORY AND INJUNCTIVE RELIEF**

215.   The plaintiffs repeat and incorporate the above paragraphs as though fully set forth herein.

216.   At all relevant times, Amgen possessed and continues to possess substantial market power (i.e., monopoly power) in the market for etanercept in the United States. Amgen possessed and continues to possess the power to control prices in, prevent prices from falling in, and exclude competitors from the U.S. market for etanercept.

- 58 -

**JA0129**

217.    Amgen's market power is coupled with strong regulatory and contractual barriers to entry.

218.    At all relevant times, Amgen knowingly, willfully, and improperly maintained its monopoly power in the U.S. market for etanercept from as early as 2016 until the present through restrictive and exclusionary conduct, rather than through growth or development resulting from a superior product, business acumen, or historic accident, and thereby injured the plaintiffs and class members. Amgen's conscious objective was to further its dominance and monopoly power in the market for etanercept in the United States.

219.    Amgen knowingly, willfully, and improperly maintained its monopoly power and substantially reduced and harmed competition in the market for etanercept in the United States by:

- wrongfully acquiring an exclusive license to the Roche Patents and Patent Applications to delay and/or prevent would-be competitors from developing etanercept biosimilars and entering the market; and

- using and/or enforcing the wrongfully acquired exclusive license to the Roche Patents to unlawfully delay competition from would-be etanercept biosimilar competitors, including Sandoz and Bioepis.

220.    Amgen's monopoly power over etanercept should have expired no later than 2019—and as early as 2016—when Amgen's patents had expired and biosimilar entered the market. Instead, due to its unlawful acquisition and enforcement of the Roche Patent rights, Amgen's monopoly power will extend at least five years too long, until Amgen is enjoined or the Roche Patents expire on April 24, 2029. As a result of Amgen's unlawful anticompetitive scheme, no other entity currently sells biosimilar etanercept in the United States. This is true even though the FDA has already approved two etanercept biosimilars.

221. The goal, purpose, and effect of Amgen's overarching anticompetitive scheme was to delay and/or block etanercept biosimilars from entering the market, maintain its monopoly in that market, and maintain its supracompetitive prices for Enbrel.

222. Amgen's anticompetitive scheme substantially reduced and harmed competition in the relevant market and was an unreasonable restraint on trade.

223. Had Amgen competed on the merits, instead of unlawfully maintaining its monopoly in the market for etanercept, one or more etanercept biosimilars would have been available by no later than 2019, and as early as 2016. The plaintiffs and class members would have substituted the lower-priced etanercept biosimilar products for the higher-priced brand Enbrel (or purchased Enbrel at lower prices) for some or all their etanercept requirements. As a result, they would have paid substantially lower prices for etanercept.

224. To the extent that Amgen is permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for its exclusionary conduct that outweighs that conduct's harmful effects. Even if there were some conceivable justifications that Amgen were permitted to assert, Amgen's conduct is and was broader than necessary to achieve such a purpose.

225. Amgen's anticompetitive activities have directly, foreseeably, and proximately caused injury to the plaintiffs and class members throughout the United States. The plaintiffs' and class members' injuries consist of: (a) being denied the opportunity to purchase lower-priced Enbrel from Amgen; (b) paying higher prices for etanercept than they would have paid in the absence of Amgen's unfair, illegal, and deceptive conduct; and (c) being denied the opportunity to purchase biosimilar etanercept at a price substantially lower than what they were forced to pay

- 60 -

for Enbrel. These injuries are of the type that the antitrust laws were designed to prevent, and they flow from that which makes Amgen's conduct unlawful.

226. The plaintiffs and the class members are the proper entities to bring a case concerning Amgen's unlawful anticompetitive scheme.

227. The plaintiffs and class members have been injured, and unless Amgen's unlawful conduct is enjoined, the plaintiffs and class members will continue to be injured, in their businesses and property, as a direct and proximate result of Amgen's continuing monopolization in violation of Section 2 of the Sherman Act.

228. Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), the plaintiffs and the class members seek a declaratory judgment that Amgen's conduct seeks to prevent competition as described in the preceding paragraphs violates § 2 of the Sherman Act.

229. Pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, the plaintiffs and class members further seek equitable and injunctive relief to correct for the anticompetitive market effects Amgen's unlawful conduct caused and to ensure that similar anticompetitive conduct does not occur in the future.

## XII. STATE CLAIMS FOR RELIEF

## COUNT TWO

### MONOPOLIZATION AND MONOPOLISTIC SCHEME UNDER STATE LAW

230. The plaintiffs repeat and incorporate the above paragraphs as though fully set forth herein.

231. Count Three is pleaded on behalf of the plaintiffs and class members under the antitrust laws of each jurisdiction identified below.

- 61 -

**JA0132**

232. Count Three arises from Amgen's exclusionary, anticompetitive scheme that was designed to create and maintain Amgen's improper monopoly over etanercept and exclude or substantially exclude its biosimilars from the market.

233. The essential elements of each antitrust claim in Count Three are the same. The above-alleged conduct that violates the Sherman Act will, if proven, establish a claim under each of the laws cited below.

234. At all relevant times, Amgen possessed and continues to possess substantial market power (i.e., monopoly power) in the market for etanercept. Amgen possessed and continues to possess the power to control prices in, prevent prices from falling in, and exclude competitors from the U.S. market for etanercept.

235. Through its overarching anticompetitive scheme, as alleged above, Amgen willfully maintained its monopoly power in the market for etanercept in the United States after 2004, when it obtained its exclusive license from Roche, using restrictive or exclusionary conduct, rather than by means of a superior product, business acumen, or historic accident, and thereby injured the plaintiffs and the class members. Amgen engaged in its anticompetitive scheme with the specific intent to maintain its monopoly in the market for etanercept in the United States.

236. Amgen accomplished its anticompetitive scheme by: (i) wrongfully acquiring the rights to the Roche Patents; and (iii) using the wrongfully acquired Roche Patents to unlawfully delay competition from would-be etanercept biosimilar competitors.

237. The goal, purpose, and effect of Amgen's overarching anticompetitive scheme was to delay and/or block etanercept biosimilars from entering the market, extend Amgen's monopoly in that market, and maintain its supracompetitive prices for Enbrel.

**JA0133**

238.    Amgen's anticompetitive scheme substantially reduced and harmed competition in the relevant market and was an unreasonable restraint on trade.

239.    Amgen's anticompetitive scheme directly impacts and disrupts commerce within each jurisdiction below.

240.    Had Amgen competed on the merits, instead of unlawfully maintaining its monopoly in the market for etanercept, one or more etanercept biosimilars would have been available at least by August 13, 2019 (the date the Psoriasis Patents expired), but potentially as early as August 16, 2016. The plaintiffs and class members would have substituted the lower-priced etanercept biosimilars for the higher-priced brand Enbrel (or paid less for Enbrel) for some or all their etanercept requirements. As a result, they would have paid substantially lower prices for etanercept.

241.    During the class period, Enbrel, manufactured and sold by Amgen, was shipped into each state and was sold to or paid for by the plaintiffs and the class.

242.    During the class period, in connection with the purchase and sale of Enbrel, money changed hands and business communications and transactions occurred in each state.

243.    Amgen's conduct as set forth in this Complaint had substantial effects on intrastate commerce in that, *inter alia*, retailers within each state were foreclosed from offering cheaper generic Enbrel to end payors purchasing inside each respective state. This impairment of competition directly impacts and disrupts commerce within each state.

244.    Amgen's anticompetitive activities have directly, foreseeably, and proximately caused injury to the plaintiffs and class members throughout the United States. The plaintiffs' and class members' injuries consist of: (a) being denied the opportunity to purchase lower-priced Enbrel from Amgen; (b) paying higher prices for etanercept than they would have paid in the

- 63 -

**JA0134**

absence of Amgen's unfair, illegal, and deceptive conduct; and (c) being denied the opportunity to purchase biosimilar etanercept at prices substantially lower than what they were forced to pay for Enbrel. These injuries are of the type that the laws of the jurisdictions below were designed to prevent, and they flow from that which makes Amgen's conduct unlawful.

245. The plaintiffs and class members are the proper entities to bring a case concerning Amgen's unlawful anticompetitive scheme.

246. The defendants are jointly and severally liable for all damages suffered by the plaintiffs and the class members.

247. By engaging in the foregoing conduct, Amgen intentionally and flagrantly maintained its monopoly power over etanercept in the United States in violation of the following state laws:

    a. Ala. Code § 8-10-3 with respect to the plaintiffs' and class members' purchases in Alabama.

    b. Ariz. Arizona Rev. Stat. §§ 44-1401, *et seq.*, including Ariz. Rev. Stat. § 44-1403, with respect to the plaintiffs' and class members' purchases in Arizona.

    c. Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and §§ 17200, *et seq.*, with respect to the plaintiffs' and class members' purchases in California.

    d. Col. Rev. Stat. Ann. §§ 6-4-105, *et seq.*, with respect to the plaintiffs' and class members' purchases in Colorado.

    e. Conn. Gen. Stat. §§ 35-24, *et seq.*, with respect to the plaintiffs' and class members' purchases in Connecticut.

    f. D.C. Code §§ 28-4501, *et seq.*, with respect to the plaintiffs' and class members' purchases in the District of Columbia.

    g. Fla. Stat. §§ 501.201, *et seq.*, with respect to the plaintiffs' and class members' purchases in Florida.

    h. Haw. Rev. Stat. §§ 480-13.3, *et seq.*, with respect to class members' purchases in Hawaii.

**JA0135**

i.   740 Ill. Comp. Stat. 10/1, *et seq.*, including 740 Ill. Comp. Stat. 10/3, with respect to the plaintiffs' and class members' purchases in Illinois.

j.   Iowa Code §§ 553.1 *et seq.*, including Iowa Code § 553.5, with respect to the plaintiffs' and class members' purchases in Iowa.

k.   Kan. Stat. Ann. §§ 50-101, *et seq.*, including Kan. Stat. Ann. § 50-132, with respect to the plaintiffs' and class members' purchases in Kansas.

l.   Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*, including Me. Rev. Stat. Ann. tit. 10, §1102, with respect to the plaintiffs' and class members' purchases in Maine.

m.   Md. Code Com. Law § 11-201, *et seq.*, including Md. Code Com. Law § 11-204, with respect to the plaintiffs' and class members' purchases in Maryland.

n.   Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to the plaintiffs' and class members' purchases in Michigan.

o.   Minn. Stat. Ann. §§ 325D.49, *et seq.*, including Minn. Stat. Ann. § 325D.52 and Minn. Stat. Ann. § 8.31, *et seq.*, with respect to the plaintiffs' and class members' purchases in Minnesota.

p.   Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to the plaintiffs' and class members' purchases in Mississippi.

q.   Neb. Code Ann. §§ 59-801, *et seq.*, including Neb. Code Ann. § 59-802, with respect to the plaintiffs' and class members' purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*, including Nev. Rev. Stat. Ann. § 598A.060, with respect to class members' purchases in Nevada.

s.   N.H. Rev Stat. Ann. §§ 356.1, *et seq.*, including N.H. Rev. Stat. Ann. § 356.3, with respect to the plaintiffs' and class members' purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-1, *et seq.*, including N.M. Stat. Ann. § 57-1-2, with respect to the plaintiffs' and class members' purchases in New Mexico.

u.   N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to the plaintiffs' and class members' purchases in New York.

v.   N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*, including N.C. Gen. Stat. Ann. § 75-2.1, with respect to the plaintiffs' and class members' purchases in North Carolina.

**JA0136**

w.  N.D. Cent. Code §§ 51-08.1-01, *et seq.*, including N.D. Cent. Code §§ 51-08.1-03, with respect to the plaintiffs' and class members' purchases in North Dakota.

x.  Or. Rev. Stat. §§ 646.705, *et seq.*, including Or. Rev. Stat. §§ 646.730, with respect to the plaintiffs' and class members' purchases in Oregon.

y.  10 L.P.R.A. §§ 257, *et seq.*, with respect to class members' purchases in Puerto Rico.

z.  R.I. Gen. Laws §§ 6-36-1, *et seq.*, including R.I. Gen. Laws §§ 6-36-5, with respect to the plaintiffs' and class members' purchases in Rhode Island.

aa.  S.D. Codified Laws §§ 37-1-3.1, *et seq.*, including S.D. Codified Laws §§ 37-1-3.2, with respect to class members' purchases in South Dakota.

bb.  Tenn. Code Ann §§ 47-25-101, *et seq.*, with respect to the plaintiffs' and class members' purchases in Tennessee.

cc.  Utah Code Ann. §§ 76-10-3101, *et seq.*, including Utah Code Ann. §§ 76-10-3104, with respect to purchases in Utah by class members that are Utah residents or citizens.

dd.  Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*, with respect to the plaintiffs' and class members' purchases in Vermont.

ee.  W.Va. Code §§ 47-18-1, *et seq.*, including § 47-18-4, with respect to the plaintiffs' and class members' purchases in West Virginia.

ff.  Wis. Stat. §§ 133.01, *et seq.*, including Wis. Stat. §§ 133.04, with respect to the plaintiffs' and class members' purchases in Wisconsin.

248.  As a result of the unlawful and anticompetitive conduct described above, the plaintiffs and/or members of the class paid artificially inflated prices for Enbrel, in each of these listed jurisdictions.

**COUNT THREE**

**VIOLATIONS OF STATE CONSUMER PROTECTION LAWS**

249.  The plaintiffs repeat and incorporate the above paragraphs as though fully set forth herein.

- 66 -
**JA0137**

250.    As described above, Amgen has engaged and continues to engage in unfair competition or unfair, unconscionable, deceptive, and/or fraudulent conduct, acts, or practices in violation of the state consumer protection statutes set forth below. As a direct and proximate result of Amgen's anticompetitive, deceptive, unfair, unconscionable, and/or fraudulent conduct, the plaintiffs have been and continue to be deprived of the opportunity to purchase lower-priced biosimilar versions of etanercept.

251.    Amgen established, maintained, and/or used a monopoly, or attempted to establish a monopoly, and to restrain trade or commerce in the U.S. market for etanercept. A substantial part of this conduct occurred within each jurisdiction identified below. Amgen intended to injure competitors and exclude or substantially lessen competition. Amgen intended to injure consumers by unlawfully reaping supracompetitive profits.

252.    By unlawfully delaying the entry of etanercept biosimilars, Amgen, as a supplier, engaged in a fraudulent or deceptive act or practice in connection with a consumer transaction.

253.    Amgen's conduct constitutes consumer-oriented deceptive acts or practices that resulted in consumer injury and broad adverse impact on the public at large. Amgen's conduct thereby harmed consumers' interest in an honest marketplace where economic activity is conducted in a competitive manner.

254.    Amgen withheld material facts and information from the plaintiffs and class members, including that Amgen was unlawfully excluding manufacturers of biosimilar etanercept from the market and monopolizing the market for etanercept (and thereby profiting from the resulting supracompetitive prices that the plaintiffs and class members who purchased or reimbursed purchases of Enbrel paid).

255. Amgen's conduct was willful and knowing. Amgen intended to deceive the plaintiffs and class members regarding the nature of its actions within the stream of commerce in each jurisdiction below.

256. Amgen's acts, omissions, misrepresentations, practices, and/or non-disclosures constituted a common, continuous, and continuing course of conduct of deceptive and unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices.

257. The plaintiffs and class members purchased (or reimbursed their members for purchases of) etanercept primarily for personal, family, or household purposes.

258. The plaintiffs and class members who do not profit from purchasing etanercept or from reimbursing their members for purchases of etanercept are "consumers" under the consumer protection laws of the jurisdictions below.

259. There was and is a gross disparity between the price that the plaintiffs and class members paid for etanercept and the value they received given that less expensive biosimilar versions of etanercept should have been available and would have been but for Amgen's unlawful conduct.

260. As a direct and proximate result of Amgen's unlawful conduct, the plaintiffs and class members have been injured and are threatened with continued injury.

261. As a direct and proximate result of Amgen's unfair, unconscionable, deceptive, and fraudulent conduct in violation of the state consumer protection statutes listed below, the plaintiffs and class members were denied the opportunity to purchase lower-priced etanercept biosimilars and paid higher prices for Enbrel than they would otherwise have paid.

**JA0139**

262.    The gravity of harm from Amgen's unlawful conduct significantly outweighs any conceivable utility from that conduct. The plaintiffs and class members could not reasonably have avoided injury from Amgen's conduct.

263.    Amgen's unlawful conduct substantially affected the trade and commerce of each jurisdiction in which etanercept was sold.

264.    Amgen's unfair and deceptive acts described above were knowing, willful, and unconscionable and constitute violations or flagrant violations of the following unfair trade practices and consumer protection statutes.

265.    As a result of the unfair and deceptive conduct described above, the plaintiffs and/or members of the class paid artificially inflated prices for Enbrel, in each of these listed jurisdictions.

1.    **Ala. Code §§ 8-19-1 et seq. (with respect to the plaintiffs' and class members' purchases in Alabama)**

266.    Section 8-19-5 of the Alabama Code declares unlawful "engaging in any . . . unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

267.    As set forth in detail above, Amgen violated §§ 8-19-1 et seq. of the Alabama Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unconscionable, misleading, and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

268.     As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

269.     The plaintiffs' and class members' injuries are of the type that §§ 8-19-1 et seq. of the Alabama Code was intended to prevent.

270.     The plaintiffs are entitled to bring this action for damages pursuant to § 8-19-10 of the Alabama Code. As required by § 8-19-10(e), the plaintiffs served the defendants with a written demand for relief identifying the plaintiffs and reasonably describing the unfair or deceptive acts and the injury suffered at least 15 days prior to bringing a claim under §§ 8-19-1 et seq.

271.     The plaintiffs are entitled to recover their actual damages, which may be trebled at the Court's discretion, along with costs of suit and reasonable attorneys' fees pursuant to § 8-19-10(a) of the Alabama Code.

   **2.      Alaska Stat. §§ 45.50.471 et seq. (with respect to the plaintiffs' and class members' purchases in Alaska)**

272.     Section 45.50.471 of the Alaska Statutes declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce," which include "engaging in… conduct creating a likelihood of confusion or misunderstanding and that misleads, deceives, or damages a buyer or competitor in connection with the sale or advertisement of goods or services" and "using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing or suppressing, or omitting material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged."

273.   As set forth in detail above, Amgen violated §§ 45.50.471 et seq. of the Alaska Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

274.   As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

275.   The plaintiffs' and class members' injuries are of the type that §§ 45.50.471 et seq. of the Alaska Statutes was intended to prevent.

276.   The plaintiffs are entitled to bring this action pursuant to §§ 45.50.531 and 45.50.535 of the Alaska Statutes. As required by § 45.50.535, the plaintiffs provided the defendants with written notice that the plaintiffs would seek an injunction if the defendants failed to promptly stop their unlawful acts before bringing a claim under §§ 45.50.471 et seq.

277.   The plaintiffs are entitled to recover three times their actual damages, punitive damages, injunctive relief, reasonable attorneys' fees and costs, and any other relief the Court considers necessary and proper pursuant to §§ 45.50.531, 45.50.535, and 45.50.537 of the Alaska Statutes.

**3.     Ariz. Rev. Stat. §§ 44-1521 et seq. (with respect to the plaintiffs' and class members' purchases of etanercept in Arizona)**

278.   Section 44-1522 of the Arizona Revised Statutes provides:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person

- 71 -

**JA0142**

has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

279.    As set forth in detail above, Amgen violated § 44-1522 of the Arizona Revised Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

280.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

281.    The plaintiffs' and class members' injuries are of the type that § 44-1522 of the Arizona Revised Statutes was intended to prevent.

282.    The plaintiffs are entitled to bring this action for damages pursuant to § 44-1533 of the Arizona Revised Statutes.

283.    The plaintiffs are entitled to recover actual damages and punitive damages because Amgen's conduct was wanton, was reckless, shows spite or ill will, and demonstrates a reckless indifference to the interests of others.

**4.      Ark. Code Ann. §§ 4-88-101 et seq. (with respect to class members' purchases in Arkansas)**

284.    Section 4-88-107 of the Arkansas Code provides as follows:

> (a) Deceptive and unconscionable trade practices made unlawful and prohibited by this chapter include, but are not limited to, the following: . . .

> (10) Engaging in any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade; . . .

> (b) The deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade

practices actionable at common law or under other statutes of this state.

285.    As set forth in detail above, Amgen violated § 4-88-107 of the Arkansas Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

286.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

287.    The plaintiffs' and class members' injuries are of the type that § 4-88-107 of the Arkansas Code was intended to prevent.

288.    The plaintiffs are entitled to bring this action for damages pursuant to § 4-88-113 of the Arkansas Code.

289.    The plaintiffs are entitled to recover their actual damages, along with reasonable attorneys' fees, pursuant to § 4-88-113(f) of the Arkansas Code.

**5.    Cal. Civ. Code §§ 1750 et seq. (with respect to the plaintiffs' and class members' purchases in California)**

290.    Section 1770 of the California Civil Code declares unlawful, "unfair methods of competition and unfair or deceptive acts or practices . . . undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer," including "misrepresenting the source, sponsorship, approval, or certification of goods or services" and "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have." Section

§ 1760 instructs that §§ 1750 et seq. "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."

291.    As set forth in detail above, Amgen violated §§ 1750 et seq. of the California Civil Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

292.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

293.    The plaintiffs' and class members' injuries are of the type that §§ 1750 et seq. of the California Civil Code was intended to prevent.

294.    The plaintiffs are entitled to bring this action for damages pursuant to §§ 1780 and 1781 of the California Civil Code. As required by § 1782, the plaintiffs provided the defendants with written notice via certified mail of the alleged violations of § 1770 and demanded that the defendants rectify those violations at least thirty days before bringing a claim under §§ 1750 et seq.

295.    Pursuant to § 1780(d) of the California Civil Code, an affidavit stating facts showing that the action has been commenced in a county that is the proper place for the trial of the action is attached hereto as Exhibit 3.

296.    The plaintiffs are entitled to recover their actual damages, punitive damages, injunctive relief, reasonable attorneys' fees and costs, and any other relief that the Court deems proper pursuant to § 1780 of the California Civil Code.

### 6.    Colo. Rev. Stat. § 6-1-105 et seq. (with respect to the plaintiffs' and class members' purchases in Colorado)

297.    Colorado Revised Statute § 6-1-105(1) (as amended and effective as of August 7, 2024) provides that "a person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person . . . . [e]ither knowingly or recklessly engages in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice . . . ."

298.    The Colorado Revised Statute is clear that the "deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state." Colo. Rev. Stat. § 6-1-105(3).

299.    As alleged above in Count Two, the Colorado Revised Statute § 6-4-105 specifically provides that it is "illegal for any person to monopolize, attempt to monopolize, or combine or conspire with any other person to monopolize any part of trade or commerce."

300.    As set forth in detail above, Amgen violated § 6-1-105 et seq. of the Colorado Revised Statute (as well as § 6-4-105) by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

**JA0146**

301. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

302. The plaintiffs' and class members' injuries are of the type that § 6-1-105 *et seq.* was intended to prevent.

303. The plaintiffs are entitled to bring this action for damages pursuant to § 6-1-105, *et seq.* of the Colorado Revised Code.

304. The plaintiffs are entitled to recover their actual damages and injunctive relief, along with reasonable attorneys' fees and costs, pursuant to § 6-1-113 of the Colorado Revised Code.

**7. D.C. Code §§ 28-3901 et seq. (with respect to the plaintiffs' and class members' purchases in the District of Columbia)**

305. District of Columbia Code § 28-3904 provides that "[i]t shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice. . . ."

306. District of Columbia Code § 28-4502 provides that every contract or conspiracy "in restraint of trade or commerce all or any part of which is within the District of Columbia is declared to be illegal."

307. District of Columbia Code § 28-4503 provides that it shall be unlawful for any person "to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce, all or any part of which is within the District of Columbia."

308. As set forth in detail above, Amgen violated §§ 28-3901 *et seq.* of the District of Columbia Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal,

- 76 -
**JA0147**

purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending

Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for

Enbrel.

309.   As a direct and proximate result of Amgen's conduct, the plaintiffs and class

members suffered injury and actual damages in the form of paying higher prices for etanercept

than they would have paid but for Amgen's conduct.

310.   The plaintiffs' and class members' injuries are of the type that §§ 28-3901 *et seq.*

of the District of Columbia Code was intended to prevent.

311.   The plaintiffs are entitled to bring this action for damages pursuant to § 28-3905

of the District of Columbia Code.

312.   The plaintiffs are entitled to recover their actual damages, treble damages, and

punitive damages, along with reasonable attorneys' fees as expenses, pursuant to § 28-3905(k) of

the District of Columbia Code.

**8.     Fla. Stat. §§ 501.201 et seq. (with respect to the plaintiffs' and class members' purchases in Florida)**

313.   Section 501.204(1) of the Florida Statutes declares unlawful "[u]nfair methods of

competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

conduct of any trade or commerce."

314.   As set forth in detail above, Amgen violated §§ 501.201 et seq. of the Florida

Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully

delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose,

and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's

monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

315.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

316.    The plaintiffs' and class members' injuries are of the type that §§ 501.201 et seq. of the Florida Statutes was intended to prevent.

317.    The plaintiffs are entitled to bring this action for damages pursuant to § 501.211 of the Florida Statutes.

318.    The plaintiffs are entitled to recover their actual damages, along with reasonable attorneys' fees and expenses, pursuant to §§ 501.211 and 501.2015 of the Florida Statutes.

**9.      Ga. Code §§ 10-1-390 et seq. (with respect to the plaintiffs' and class members' purchases in Georgia)**

319.    Section 10-1-393 of the Georgia Code declares unlawful "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce."

320.    As set forth in detail above, Amgen violated §§ 10-1-390 et seq. of the Georgia Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

321.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

322.    The plaintiffs' and class members' injuries are of the type that §§ 10-1-390 et seq. of the Georgia Code was intended to prevent.

323.    The plaintiffs are entitled to bring this action for damages pursuant to § 10-1-399 of the Georgia Code. As required by § 10-1-399(b), the plaintiffs delivered to the defendants a written demand for relief reasonably describing the alleged unfair or deceptive acts and the injury suffered therefrom at least 30 days prior to bringing a claim under §§ 10-1-390 et seq.

324.    The plaintiffs are entitled to recover up to three times their actual damages, punitive damages, and injunctive relief, along with reasonable attorneys' fees and expenses, pursuant to § 10-1-399 of the Georgia Code.

**10.    815 Ill. Comp. Stat. Ann. §§ 505/1 et seq. (with respect to the plaintiffs' and class members' purchases in Illinois)**

325.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Illinois Compiled Statutes § 505/2, makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce."

326.    As set forth in detail above, Amgen violated §§ 505/1 et seq. of the Illinois Compiled Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

327.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

**JA0150**

328. The plaintiffs' and class members' injuries are of the type that §§ 505/1 et seq. of the Illinois Compiled Statutes was intended to prevent.

329. The plaintiffs are entitled to bring this action for damages pursuant to § 505/10a of the Illinois Compiled Statutes.

330. The plaintiffs are entitled to recover their actual damages and punitive damages, along with reasonable attorneys' fees and costs, pursuant to §§ 505/10a(a) & 505/10a(c) of the Illinois Compiled Statutes.

**11.    Ind. Code §§ 24-5-0.5-3 et seq. (with respect to the plaintiffs' and class members' purchases in Indiana)**

331. Section 24-5-0.5-3(a) of the Indiana Code provides as follows:

> A supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations.

332. As set forth in detail above, Amgen violated §§ 24-5-0.5-3 et seq. of the Indiana Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

333. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

334. The plaintiffs' and class members' injuries are of the type that §§ 24-5-0.5-3 et seq. of the Indiana Code was intended to prevent.

- 80 -

**JA0151**

335.    The plaintiffs are entitled to bring this action for damages pursuant to § 24-5-0.5-4 of the Indiana Code. As required by § 24-5-0.5-5, the plaintiffs provided the defendants with written notice stating fully the nature of the alleged deceptive act and the actual damage suffered therefrom at least 30 days before bringing a claim under §§ 24-5-0.5-3 et seq., and the defendants have made no offer to cure.

336.    The plaintiffs are entitled to recover up to three times their actual damages, along with reasonable attorneys' fees and costs, pursuant to § 24-5-0.5-4 of the Indiana Code.

**12.    La. Rev. Stat. Ann. § 51:1401 et seq. (with respect to the plaintiffs' and class members' purchasers in Louisiana)**

337.    The Louisiana Unfair Trade Practices and Consumer Protection Law, §§ 51:1401 et seq. of the Louisiana Revised Statutes, declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

338.    As set forth in detail above, Amgen violated the Louisiana Unfair Trade Practices and Consumer Protection Law by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

339.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

340.    The plaintiffs' and class members' injuries are of the type that Louisiana Unfair Trade Practices and Consumer Protection Law was intended to prevent.

341.   The plaintiffs are entitled to bring this action for damages pursuant to § 51:1409 of the Louisiana Revised Statutes.

**13.   Mass. Gen. Laws ch. 93A, §§ 1 et seq. (with respect to the plaintiffs' and class members' purchases in Massachusetts)**

342.   Chapter 93A, § 2 of the Massachusetts General Laws declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

343.   As set forth in detail above, Amgen violated c. 93A, §§ 1 et seq. of the Massachusetts General Laws by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

344.   As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

345.   The plaintiffs' and class members' injuries are of the type that c. 93A, §§ 1 et seq. of the Massachusetts General Laws was intended to prevent.

346.   The plaintiffs are entitled to bring this action for damages pursuant to c. 93A, § 9 of the Massachusetts General Laws. As required by § 9(3), the plaintiffs mailed to the defendants a written demand for relief reasonably describing the alleged unfair or deceptive acts and the injury suffered therefrom at least thirty days prior to bringing a claim under c. 93A, §§ 1 et seq.

**JA0153**

347.     The plaintiffs are entitled to up to three times their actual damages, injunctive

relief, attorneys' fees and costs, and any other equitable relief the Court deems necessary and

proper pursuant to c.93A, § 9 of the Massachusetts General Laws.

**14.     5 Md. Code, Com. Law §§ 13-301 et seq. (with respect to the plaintiffs' and class members' purchasers in Maryland)**

348.     Section 13-303 of the Maryland Code provides that "[a] person may not engage in

any unfair, abusive, or deceptive trade practice, as defined in this subtitle or as further defined by

the Division, in . . . [t]he sale, lease, rental, loan, or bailment of any consumer goods, consumer

realty, or consumer services . . . ."

349.     As set forth in detail above, Amgen violated the §§ 13-301 et seq. of the

Maryland Code by wrongfully acquiring the rights to the Roche Patents and using them to

unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal,

purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending

Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for

Enbrel.

350.     As a direct and proximate result of Amgen's conduct, the plaintiffs and class

members suffered injury and actual damages in the form of paying higher prices for etanercept

than they would have paid but for Amgen's conduct.

351.     The plaintiffs' and class members' injuries are of the type that §§ 13-301 et seq.

of the Maryland Code was intended to prevent.

352.     The plaintiffs are entitled to bring this action for damages pursuant to § 13-408 of

the Maryland Code.

**JA0154**

**15.     Me. Stat. tit. 5, §§ 207 et seq. (with respect to the plaintiffs' and class members' purchases in Maine)**

353.     Title 5, § 207 of the Maine Statutes declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

354.     As set forth in detail above, Amgen violated tit. 5, §§ 207 et seq. of the Maine Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

355.     As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

356.     The plaintiffs' and class members' injuries are of the type that tit. 5, §§ 207 et seq. of the Maine Statutes was intended to prevent.

357.     The plaintiffs are entitled to bring this action for damages pursuant to tit. 5, § 213 of the Maine Statutes. As required by § 213(1-A), the plaintiffs provided the defendants with a written demand for relief reasonably describing the unfair and deceptive acts alleged and the injuries suffered therefrom at least thirty days prior to bringing a claim under tit. 5, §§ 207 et seq. of the Maine Statutes.

358.     The plaintiffs are entitled to actual damages, injunctive relief, reasonable attorneys' fees and costs, and any other relief the Court deems necessary and proper pursuant to tit. 5, § 213 of the Maine Statutes.

**16. Mich. Comp. Laws Ann. §§ 445.901 et seq. (with respect to the plaintiffs' and class members' purchasers in Michigan)**

359. Section 445.903 of the Michigan Compiled Laws provides that "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful."

360. As set forth in detail above, Amgen violated §§ 445.901 *et seq.* of the Michigan Compiled Laws by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair, unconscionable, and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

361. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

362. The plaintiffs' and class members' injuries are of the type that §§ 445.901 *et seq.* of the Michigan Compiled Laws was intended to prevent.

363. The plaintiffs are entitled to bring this action for damages pursuant to § 445.911 of the Michigan Compiled Statutes.

364. The plaintiffs are entitled to recover their actual damages and punitive damages, along with reasonable attorneys' fees, pursuant to § 445.911 of the Michigan Compiled Statutes.

**17. Minn. Stat. §§ 325F.68 et seq. (with respect to the plaintiffs' and class members' purchases in Minnesota).**

365. Section 325D.44 of the Minnesota Statutes provides that "[a] person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person . . . engages in (i) unfair methods of competition, or (ii) unfair or unconscionable acts or practices."

366.     Section 325F.69 of the Minnesota Statutes provides:

> The act, use, or employment by any person of any fraud, unfair or
> unconscionable practice, false pretense, false promise,
> misrepresentation, misleading statement or deceptive practice, with
> the intent that others rely thereon in connection with the sale of any
> merchandise, whether or not any person has in fact been misled,
> deceived, or damaged thereby, is enjoinable . . . .

367.     As set forth in detail above, Amgen violated §§ 325D.43 *et seq*. of the Minnesota

Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully

delay and/or block competition—unfair and unconscionable acts that had the goal, purpose, and

effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's

monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

368.     As a direct and proximate result of Amgen's conduct, the plaintiffs and class

members suffered injury and actual damages in the form of paying higher prices for etanercept

than they would have paid but for Amgen's conduct.

369.     The plaintiffs' and class members' injuries are of the type that §§ 325D.43 *et seq*.

of the Minnesota Statutes was intended to prevent.

370.     The plaintiffs are entitled to bring this action for damages pursuant to § 8.31 of

the Minnesota Statutes

371.     The plaintiffs are entitled to recover their actual damages, along with reasonable

attorneys' fees and costs, pursuant to § 8.31 of the Minnesota Statutes.

**18.      Miss. Code Ann. §§ 75-24-5 et seq. (with respect to the plaintiffs' and class
          members' purchases in Mississippi)**

372.     Section 75-24-5 of the Mississippi Code prohibits "unfair methods of competition

affecting commerce and unfair or deceptive trade practices in or affecting commerce."

373.     As set forth in detail above, Amgen violated §§ 75-24-5 et seq. of the Mississippi

Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay

and/or block competition—unfair and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

374. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

375. The plaintiffs' and class members' injuries are of the type that §§ 75-24-5 et seq. of the Mississippi Code was intended to prevent.

376. The plaintiffs are entitled to bring this action for damages pursuant to § 75-24-15 of the Mississippi Code

**19. Mo. Rev. Stat. §§ 407.010 et seq. (with respect to the plaintiffs' and class members' purchases in Missouri)**

377. Section 407.020 of the Missouri Statutes provides:

> [T]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice.

378. As set forth in detail above, Amgen violated §§ 407.010 *et seq.* of the Missouri Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

**JA0158**

379.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

380.    The plaintiffs' and class members' injuries are of the type that §§ 407.20 *et seq.* of the Missouri Statutes was intended to prevent.

381.    The plaintiffs are entitled to bring this action for damages pursuant to § 407.025 of the Missouri Statutes.

**20.    Neb. Rev. Stat. §§ 59-1601 et seq. (with respect to the plaintiffs' and class members' purchases in Nebraska)**

382.    Nebraska's Consumer Protection Act, Nebraska Revised Statutes §§ 59-1602, provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."

383.    Section 59-1603 of the Nebraska Revised Statutes provides that "any contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce shall be unlawful."

384.    Section 59-1604 of the Nebraska Revised Statutes provides that "it shall be unlawful for any person to monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of trade or commerce."

385.    As set forth in detail above, Amgen violated §§ 59, 1602, 59-1603 & 59-1604 of the Nebraska Revised Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

386.     As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

387.     The plaintiffs' and class members' injuries are of the type that §§ 59-1601 *et seq.* of the Nebraska Revised Statutes was intended to prevent.

388.     The plaintiffs are entitled to bring this action for damages pursuant to § 59-1609 of the Nebraska Revised Statutes.

**21.     Nev. Rev. Stat. §§ 598.0903 et seq. (with respect to class members' purchases in Nevada)**

389.     Section 41.600 of the Nevada Revised Statutes provides that "an action may be brought by any person who is a victim of consumer fraud. "Consumer fraud" means "a deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive.

390.     Section 598.015 of the Nevada Revised Statutes provides:

> A person engages in a "deceptive trade practice" if, in the course of his or her business or occupation, he or she . . . [m]akes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions.

391.     Section 598.0923 of the Nevada Revised Statutes provides that "[a] person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly . . . uses an unconscionable practice in a transaction."

392.     As set forth in detail above, Amgen violated §§ 598.0903 et seq. of the Nevada Revised Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

- 89 -

**JA0160**

393.     As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

394.     The plaintiffs' and class members' injuries are of the type that §§ 598.0903 et seq. of the Nevada Revised Statutes was intended to prevent.

395.     The plaintiffs are entitled to bring this action for damages pursuant to § 41.600 of the Nevada Revised Statutes.

396.     The plaintiffs are entitled to recover actual damages, along with costs and reasonable attorneys' fees, pursuant to § 41.600 of the Nevada Revised Statutes.

**22.     N.H. Rev. Stat. §§ 358-A:1 et seq. (with respect to the plaintiffs' and class members' purchases in New Hampshire)**

397.     Section 358-A:2 of the New Hampshire Revised Statutes provides:

> It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state. Such unfair method of competition or unfair or deceptive act or practice shall include, but is not limited to, the following:
>
> . . .
>
> XIV. Pricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition, including the pricing of generic prescription drugs.

398.     As set forth in detail above, Amgen violated §§ 358-A:1 et seq. of the New Hampshire Revised Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

399.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

400.    The plaintiffs' and class members' injuries are of the type that §§ 358-A:1 et seq. of the New Hampshire Revised Statutes was intended to prevent.

401.    The plaintiffs are entitled to bring this action for damages pursuant to § 358-A:10 of the New Hampshire Revised Statutes.

402.    Because Amgen's conduct constitutes a willful or knowing violation of § 358-A:2 of the New Hampshire Revised Statutes, the plaintiffs are entitled to recover a damages award up to three times the amount of their actual damages, along with the costs of suit and reasonable attorneys' fees, pursuant to § 358-A:10 of the New Hampshire Revised Statutes.

**23.    N.M. Stat. Ann. §§ 57-12-1 et seq. (with respect to the plaintiffs' and class members' purchases in New Mexico)**

403.    Section 57-12-3 of the New Mexico Statutes provides that "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."

404.    As set forth in detail above, Amgen violated §§ 57-12-1 et seq. of the New Mexico Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair, deceptive acts, and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

405.     As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

406.     The plaintiffs' and class members' injuries are of the type that §§ 57-12-1 et seq. of the New Mexico Statutes was intended to prevent.

407.     The plaintiffs are entitled to bring this action for damages pursuant to § 57-12-10 of the New Mexico Statutes.

408.     Because Amgen's conduct constitutes a willful violation of § 57-12-10 of the New Mexico Statutes, the plaintiffs are entitled to recover a damages award up to three times the amount of their actual damages, along with the costs of suit and reasonable attorneys' fees, pursuant to § 57-12-10 of the New Mexico Statutes.

**24.     N. Y. Gen. Bus. Law §§ 349 et seq. (with respect to the plaintiffs' and class members' purchases in New York)**

409.     Section 349(a) of the New York General Business Law provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

410.     As set forth in detail above, Amgen violated §§ 349 et seq. of the New York General Business Law by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair, deceptive acts, and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

**JA0163**

411. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

412. The plaintiffs' and class members' injuries are of the type that §§ 349 et seq. of the New York General Business Law was intended to prevent.

413. The plaintiffs are entitled to bring this action for damages pursuant to § 349(h) of the New York General Business Law.

414. Because Amgen's conduct constitutes a willful or knowing violation of § 349(a) of the New York General Business Law, the plaintiffs are entitled to recover a damages award up to three times the amount of their actual damages up to one thousand dollars, along reasonable attorneys' fees, pursuant to § 349(h) of the New York General Business Law.

**25. N.C. Gen. Stat. §§ 75-1.1 et seq. (with respect to the plaintiffs' and class members' purchases in North Carolina)**

415. Section 75-1.1(a) of the North Carolina General Statutes provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

416. As set forth in detail above, Amgen violated §§ 75-1.1 et seq. of the North Carolina General Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

**JA0164**

417. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

418. The plaintiffs' and class members' injuries are of the type that §§ 75-1.1 et seq. of the North Carolina General Statutes was intended to prevent.

419. The plaintiffs are entitled to bring this action for damages pursuant to § 75-16 of the North Carolina General Statutes.

420. The plaintiffs are entitled to recover a damages award up to three times the amount of their actual damages pursuant to § 75-16.1 of the North Carolina General Statutes. Because Amgen's conduct constitutes a willful violation of § 75-1.1(a) of the North Carolina General Statutes, the plaintiffs are also entitled to recover costs of suit and reasonable attorneys' fees.

**26. Or. Rev. Stat. §§ 646.605 et seq. (with respect to the plaintiffs' and class members' purchases in Oregon)**

421. Section 646.608 of the Oregon Revised Statutes provides that "[a] person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person . . . [e]ngages in any other unfair or deceptive conduct in trade or commerce."

422. As set forth in detail above, Amgen violated §§ 646.605 et seq. of the Oregon Revised Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

423. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

424. The plaintiffs' and class members' injuries are of the type that §§ 646.605 et seq. of the Oregon Revised Statutes was intended to prevent.

425. The plaintiffs are entitled to bring this action for damages pursuant to § 646.648 of the Oregon Revised Statutes.

426. The plaintiffs are entitled to their actual damages and punitive damages, along with reasonable attorneys' fees and costs, pursuant to § 646.638 of the Oregon Revised Statutes.

**27.   73 Pa. Stat. Ann. §§ 201-1 et seq. (with respect to the plaintiffs' and class members' purchases in Pennsylvania)**

427. Section 201-3 of the Pennsylvania Statutes declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

428. As set forth in detail above, Amgen violated §§ 201-1 et seq. of the Pennsylvania Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

429. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

430. The plaintiffs' and class members' injuries are of the type that §§ 201-1 et seq. of the Pennsylvania Statutes was intended to prevent.

431. The plaintiffs are entitled to bring this action for damages pursuant to § 201-9.2 of the Pennsylvania Statutes.

432. The plaintiffs are entitled to a damages award of up to three times the amount of their actual damages, along with reasonable attorneys' fees and costs, pursuant to § 201-9.2 of the Pennsylvania Statutes.

**28.     R.I. Gen. Laws §§ 6-13.1-1 et seq. (with respect to the plaintiffs' and class members' purchases in Rhode Island)**

433. Section 6-13.1-2 of the Rhode Island General Laws declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

434. As set forth in detail above, Amgen violated §§ 6-13.1 et seq. of the Rhode Island General Laws by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

435. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

436. The plaintiffs' and class members' injuries are of the type that §§ 6-13.1 et seq. of the Rhode Island General Laws was intended to prevent.

437. The plaintiffs are entitled to bring this action for pursuant to § 6-13.1-5.2 of the Rhode Island General Laws.

**JA0167**

438.   The plaintiffs are entitled to a damages award of up to three times the amount of their actual damages, reasonable attorneys' fees and costs, and any equitable relief the Court deems necessary or proper pursuant to § 26-13.1-5.2 of the Rhode Island General Laws.

### 29.   S.C. Stat. §§ 39-5-10 et seq. (with respect to the plaintiffs' and class members' purchases in South Carolina)

439.   Section 39-50-20 of the Code of Laws of South Carolina provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

440.   As set forth in detail above, Amgen violated §§ 39-50-10 et seq. of the Code of Laws of South Carolina by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

441.   As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

442.   The plaintiffs' and class members' injuries are of the type that §§ 39-50-10 et seq. of the Code of Laws of South Carolina was intended to prevent.

443.   The plaintiffs are entitled to bring this action for damages pursuant to § 39-5-140 of the Code of Laws of South Carolina.

444.   Because Amgen's conduct constitutes a willful or knowing violation of § 39-5-20, the plaintiffs are entitled to a damages award of up to three times the amount of their actual

damages, along with reasonable attorneys' fees, pursuant to § 39-5-140 of the Code of Laws of South Carolina.

**30.    S.D. Codified Laws §§ 37-24-1 et seq. (with respect to class members' purchases in South Dakota)**

445.    Section 37-24-6 of the South Dakota Codified Laws provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

> It is a deceptive act or practice for any person to . . . [k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise or the solicitation of contributions for charitable purposes, regardless of whether any person has in fact been misled, deceived, or damaged thereby . . . .

446.    As set forth in detail above, Amgen violated §§ 37-24-1 et seq. of the South Dakota Codified Laws by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

447.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

448.    The plaintiffs' and class members' injuries are of the type that §§ 37-24-1 et seq. of the South Dakota Codified Laws was intended to prevent.

449.    The plaintiffs are entitled to bring this action for damages pursuant to § 37-24-31 of the South Dakota Codified Laws.

- 98 -

**31.    Tex. Bus. & Com. Code §§ 17.41 et seq. (with respect to the plaintiffs' and class members' purchases in Texas)**

450.    Section 17.46 of the Texas Business & Commerce Code declares unlawful "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce."

451.    As set forth in detail above, Amgen violated §§ 17.41 et seq. of the Texas Business & Commerce Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

452.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

453.    The plaintiffs' and class members' injuries are of the type that §§ 17.41 et seq. of the Texas Business & Commerce Code was intended to prevent.

454.    Pursuant to § 17.50(a) of the Texas Business & Commerce Code, the plaintiffs are entitled to bring this action for damages caused by the defendants' "unconscionable action or course of action" and employment of enumerated false, misleading, or deceptive acts on which the plaintiffs relied to their detriment. As required by § 17.505, the plaintiffs provided the defendants with written notice advising them in reasonable detail of the plaintiffs' specific complaint and the damages incurred therefrom at least sixty days before prior to bringing a claim under §§ 17.41 et seq.

455. The plaintiffs are entitled to up to three times their actual damages, injunctive relief, reasonable attorneys' fees and court costs, and any other relief the Court deems proper pursuant to § 17.50(b) of the Texas Business & Commerce Code.

**32.    Utah Code Ann. §§ 13-11-1 et seq. (with respect to the plaintiffs' and class members' purchases in Utah)**

456. Section 13-11-5 of the Utah Code provides that "[a]n unconscionable act or practice by a supplier in connection with a consumer transaction violates this act whether it occurs before, during, or after the transaction."

457. As set forth in detail above, Amgen violated §§ 13-11-1 et seq. of the Utah Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

458. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

459. The plaintiffs' and class members' injuries are of the type that §§ 13-11-1 et seq. of the Utah Code was intended to prevent.

460. The plaintiffs are entitled to bring this action for damages pursuant to § 13-1119 of the Utah Code.

461. The plaintiffs are entitled to recover their actual damages, along with reasonable attorneys' fees and court costs, pursuant to § 13-11-19 of the Utah Code.

**33.     Vt. Stat. Ann. tit. 9, §§ 2453 et seq. (with respect to the plaintiffs' and class members' purchases in Vermont)**

462.     Section 2453 of the Vermont Statutes provides that "[a]n unconscionable act or practice by a supplier in connection with a consumer transaction violates this act whether it occurs before, during, or after the transaction."

463.     As set forth in detail above, Amgen violated §§ 2453 et seq. of the Vermont Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

464.     As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

465.     The plaintiffs' and class members' injuries are of the type that §§ 2453 et seq. of the Vermont Statutes was intended to prevent.

466.     The plaintiffs are entitled to bring this action for damages pursuant to § 2453 of the Vermont Statutes.

**34.     Va. Code Ann. §§ 59.1-196 et seq. (with respect to the plaintiffs' and class members' purchases in Virginia)**

467.     Section 59-1-200 of the Virginia Code provides:

A. The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful:

. . .

14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

- 101 -

**JA0172**

468. As set forth in detail above, Amgen violated §§ 59-1-196 et seq. of the Virginia Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

469. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

470. The plaintiffs' and class members' injuries are of the type that §§ 59-1-196 et seq. of the Virginia Code was intended to prevent.

471. The plaintiffs are entitled to bring this action for damages pursuant to § 59-1.204 of the Virginia Code.

472. Because Amgen's conduct was willful, the plaintiffs are entitled to a damages award of up to three times the amount of their actual damages, along with reasonable attorneys' fees and court costs, pursuant to § 59.1-204 of the Virginia Code.

**35. W. Va. Code §§ 46A-6-101 et seq. (with respect to the plaintiffs' and class members' purchases in West Virginia)**

473. Section 46A-6-104 of the West Virginia Code declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

474. As set forth in detail above, Amgen violated §§ 46A-6-101 et seq. of the West Virginia Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose,

and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

475. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

476. The plaintiffs' and class members' injuries are of the type that §§ 46A-6-101 et seq. of the West Virginia Code was intended to prevent.

477. The plaintiffs are entitled to bring this action for damages pursuant to § 46A-6-104 of the West Virginia Code

### 36. Wis. Stat. § 100.20, et. seq. (with respect to the plaintiffs' and class members' purchases in Wisconsin)

478. Section 100-20 of the Wisconsin Statutes prohibits "[u]nfair methods of competition in business and unfair trade practices in business."

479. As set forth in detail above, Amgen violated §§ 100.20 et seq. of the Wisconsin Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

480. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

481. The plaintiffs' and class members' injuries are of the type that §§ 100.20 et seq. of the Wisconsin Statutes was intended to prevent.

482.     The plaintiffs are entitled to bring this action for damages pursuant to § 100.20 of the Wisconsin Statutes.

483.     The plaintiffs are entitled to a damages award of twice the amount of their actual pecuniary loss, along with reasonable attorneys' fees and court costs, pursuant to § 100.20(5) of the Wisconsin Statutes.

**37.     Wyo. Stat. §§ 40-12-101 et seq. (with respect to class members' purchases in Wyoming)**

484.     Section 40-12-105(a) of the Wyoming Statutes provides

> A person engages in a deceptive trade practice unlawful under this act when, in the course of his business and in connection with a consumer transaction, he knowingly . . . [e]ngages in unfair or deceptive acts or practices[.]

485.     As set forth in detail above, Amgen violated §§ 40-12-101 et seq. of the Wyoming Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

486.     As a direct and proximate result of Amgen's conduct, class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

487.     The class members' injuries are of the type that §§ 40-12-101 et seq. of the Wyoming Statutes was intended to prevent.

488.     The plaintiffs are entitled to bring this action for damages pursuant to § 40-12-108 of the Wyoming Statutes. As required by § 40-12-109, the plaintiffs provided notice to the defendants of the alleged unlawful deceptive trade practices within one year after their initial

- 104 -
**JA0175**

discovery, and the defendants did not make an offer to cure the violations within 15 days of receipt.

489.   The plaintiffs may recover their actual damages and reasonable attorneys' fees pursuant to § 40-12-108 of the Wyoming Statutes.

## COUNT FOUR

### UNJUST ENRICHMENT UNDER STATE LAW

490.   The plaintiffs repeat and incorporate the above paragraphs as though fully set forth herein.

491.   To the extent required, this claim is pleaded in the alternative to the other claims in this complaint.

492.   As a result of its unlawful conduct described above, Amgen has and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits from sales of etanercept. Amgen's financial benefits are traceable to the plaintiffs' and class members' overpayments for etanercept. Amgen has received a benefit from the class in the form of revenue resulting from unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class. Amgen has benefited from its unlawful acts, and it would be inequitable for Amgen to retain any of the ill-gotten gains resulting from the plaintiffs' and class members' overpayments for etanercept during the class period.

493.   It would be futile for the plaintiffs and class members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Enbrel, as those intermediaries are not liable for, and would not compensate the plaintiffs and class members for, Amgen's unlawful conduct.

494. The economic benefit Amgen derived from the plaintiffs' and class members' purchases of etanercept is a direct and proximate result of Amgen's unlawful and anticompetitive practices.

495. The financial benefits Amgen derived are ill-gotten gains that rightfully belong to the plaintiffs and class members who paid and continue to pay artificially inflated prices that inured to Amgen's benefit.

496. It would be inequitable under unjust enrichment principles under the laws of the jurisdictions identified below for Amgen to retain any of the benefits Amgen derived from its unfair, anticompetitive, and unlawful methods, acts, and trade practices.

497. Amgen is aware of and appreciates the benefits that the plaintiffs and class members have bestowed upon it.

498. Amgen should be ordered to disgorge all unlawful or inequitable proceeds it received to a common fund for the benefit of the plaintiffs and class members who collectively have no adequate remedy at law.

499. A constructive trust should be imposed upon all unlawful or inequitable sums Amgen received that are traceable to the plaintiffs and class members.

500. By engaging in the unlawful or inequitable conduct described above, which deprived the plaintiffs and class members of the opportunity to purchase lower-priced biosimilar versions of etanercept and forced them to pay higher prices for Enbrel, Amgen has been unjustly enriched in violation of the common law of the following jurisdictions:

**1. Alabama**

501. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Alabama. The plaintiffs

and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

502. Amgen received money from the plaintiffs and class members as a direct result of the unlawful overcharges and has retained this money.

503. Amgen has benefitted at the expense of the plaintiffs and class members from revenue resulting from unlawful overcharges for etanercept.

504. It is inequitable for Amgen to accept and retain the benefits received without compensating the plaintiffs and class members.

**2.  Alaska**

505. Amgen unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for etanercept in Alaska. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

506. Amgen has received a benefit from class members in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen, to the economic detriment of class members.

507. Amgen appreciated the benefits bestowed upon it by class members.

508. Amgen accepted and retained the benefits bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to class members.

509. Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating class members.

**3.  Arizona**

510. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Arizona. The plaintiffs and

class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

511.    Amgen has been enriched by revenue resulting from unlawful overcharges for etanercept.

512.    The plaintiffs and class members have been impoverished by the overcharges for etanercept resulting from Amgen's unlawful conduct.

513.    Amgen's enrichment and the impoverishment of the plaintiffs and class members are connected. Amgen has paid no consideration to any other person for any benefits it received from the plaintiffs and class members.

514.    There is no justification for Amgen's receipt of the benefits causing its enrichment and the impoverishment of the plaintiffs and class members because the plaintiffs and class members paid supracompetitive prices that inured to Amgen's benefit, and it would be inequitable for Amgen to retain any revenue gained from its unlawful overcharges.

515.    The plaintiffs and class members have no adequate remedy at law.

**4.      Arkansas**

516.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Arkansas. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

517.    Amgen received money from the plaintiffs and class members as a direct result of the unlawful overcharges and has retained this money.

518.    Amgen has paid no consideration to any other person in exchange for this money.

519.    Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the plaintiffs and the class.

**JA0179**

**5.  California**

520.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in California. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

521.    Amgen received a benefit from the plaintiffs and the class as a direct result of Amgen's fraudulent and misleading conduct and the resulting unlawful overcharges to the class.

522.    Amgen retained the benefits bestowed upon it under inequitable and unjust circumstances at the expense of the plaintiffs and the class.

523.    The plaintiffs and members of the class are entitled to restitution from Amgen.

**6.  Colorado**

524.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Colorado. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen 's actions.

525.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

526.    Amgen retained the benefit bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to the plaintiffs and the class.

527.    Under the circumstances, it would be inequitable and unjust for Amgen to retain such benefits without compensating the plaintiffs and class members.

### 7.  Connecticut

528.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Connecticut. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

529.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

530.    Amgen has paid no consideration to any other person in exchange for this benefit.

531.    Amgen retained the benefits bestowed upon it under inequitable and unjust circumstances at the expense of the plaintiffs and class members.

532.    Under the circumstances, it would be inequitable and unjust for Amgen to retain such benefits.

### 8.  Delaware

533.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Delaware. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

534.    Amgen has been enriched by revenue resulting from unlawful overcharges for branded etanercept.

535.    The plaintiffs and the class have been impoverished by the overcharges for branded etanercept resulting from Amgen's unlawful conduct.

536. Amgen's enrichment and the impoverishment of the plaintiffs and the class are connected. Amgen has paid no consideration to any other person for any benefits they received from the plaintiffs and class members.

537. There is no justification for Amgen's receipt of the benefits causing its enrichment and the impoverishment of the plaintiffs and the class because the plaintiffs and the class paid supracompetitive prices that inured to Amgen's benefit, and it would be inequitable for Amgen to retain any revenue gained from its unlawful overcharges.

538. The plaintiffs and the class have no remedy at law.

**9.     District of Columbia**

539. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in the District of Columba. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

540. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen, to the economic detriment of the plaintiffs and the class.

541. Amgen accepted and retained the benefit bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to the class.

542. Under the circumstances, it would be inequitable and unjust for Amgen to retain such benefits.

**10.    Florida**

543. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Florida. The plaintiffs and

class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

544.   Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

545.   Amgen appreciated and retained the benefit bestowed upon it by the plaintiffs and class members.

546.   It is inequitable and unjust for Amgen to accept and retain such benefits without compensating the plaintiffs and class members.

**11.   Georgia**

547.   Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Georgia. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

548.   Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

549.   Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the plaintiffs and the class.

**12.   Hawaii**

550.   Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Hawaii. Class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

**JA0183**

551.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

552.    It is unjust for Amgen to retain such benefits without compensating the plaintiffs and the class.

**13.    Idaho**

553.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Idaho. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

554.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

555.    Amgen appreciated the benefit conferred upon it by the class.

556.    Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

**14.    Illinois**

557.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Illinois. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

558.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

**JA0184**

559. Amgen retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to the class.

560. It is against equity, justice, and good conscience for Amgen to be permitted to retain the revenue resulting from its unlawful overcharges without compensating the plaintiffs and class members.

**15. Iowa**

561. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Iowa. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

562. Amgen has been enriched by revenue resulting from unlawful overcharges for etanercept, which revenue resulted from anticompetitive prices paid by the class, which inured to Amgen's benefit.

563. Amgen's enrichment has occurred at the expense of the class.

564. It is against equity and good conscience for Amgen to retain such benefits without compensating the class.

**16. Kansas**

565. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Kansas. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

566. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

567.     Amgen retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to the class.

568.     Amgen was unjustly enriched at the expense of the plaintiffs and the class members.

### 17.     Kentucky

569.     Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Kentucky. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

570.     Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

571.     Amgen appreciated the benefit bestowed upon it by the class.

572.     Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

### 18.     Louisiana

573.     Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Louisiana. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

574.     Amgen has been enriched by revenue resulting from unlawful overcharges for etanercept.

575.     The plaintiffs and class members have been impoverished by the overcharges for etanercept resulting from Amgen's unlawful conduct.

**JA0186**

576. Amgen's enrichment and the impoverishment of the plaintiffs and the class are connected.

577. There is no justification for Amgen's receipt of the benefits causing its enrichment and the class's impoverishment because the plaintiffs and the class paid supracompetitive prices that inured to Amgen's benefit, and it would be inequitable for Amgen to retain any revenue gained from its unlawful overcharges.

578. The plaintiffs and the class have no other remedy at law.

**19.    Maine**

579. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Maine. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

580. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

581. Amgen was aware of or appreciated the benefit bestowed upon it by the plaintiffs and the class.

582. Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

**20.    Maryland**

583. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Maryland. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

- 116 -

584.     Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen, to the economic detriment of the plaintiffs and the class.

585.     Amgen was aware of or appreciated the benefit bestowed upon it by the class.

586.     Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

### 21.     Massachusetts

587.     Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Massachusetts. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

588.     Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

589.     Amgen was aware of and/or appreciated the benefit conferred upon it by the class.

590.     Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class. Fairness and good conscience require Amgen not be permitted to retain the revenue resulting from its unlawful overcharges at the expense of the plaintiffs and class members.

### 22.     Michigan

591.     Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Michigan. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

**JA0188**

592.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen.

593.    Amgen retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to the class.

594.    Amgen was unjustly enriched at the expense of the plaintiffs and the class members.

### 23.    Minnesota

595.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Minnesota. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

596.    Amgen appreciated and knowingly accepted the benefits bestowed upon it by the plaintiffs and class members. Amgen has paid no consideration to any other person for any of the benefits they have received from the plaintiffs and class members.

597.    It would be inequitable for Amgen to accept and retain such benefits without compensating the class.

### 24.    Mississippi

598.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Mississippi. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

599.    Amgen received money from the class as a direct result of the unlawful overcharges. Amgen retains the benefit of overcharges received on the sales of brand etanercept,

which in equity and good conscience belong to the class on account of Amgen's anticompetitive conduct.

600.    Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

**25.    Missouri**

601.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Missouri. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

602.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

603.    Amgen appreciated the benefit bestowed upon it by the class.

604.    Amgen accepted and retained the benefit bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to the class.

**26.    Montana**

605.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Montana. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

606.    The plaintiffs and the class have conferred an economic benefit upon Amgen in the form of revenue resulting from unlawful overcharges to the economic detriment of the plaintiffs and the class.

607. Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

### 27. Nebraska

608. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Nebraska. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

609. Amgen received money from the class as a direct result of the unlawful overcharges and have retained this money. Amgen has paid no consideration to any other person in exchange for this money.

610. In justice and fairness, Amgen should disgorge such money and remit the overcharged payments back to the class.

### 28. Nevada

611. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Nevada. Class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

612. The plaintiffs and the class have conferred an economic benefit upon Amgen in the form of revenue resulting from unlawful overcharges.

613. Amgen appreciated the benefits bestowed upon it by the class, for which it has paid no consideration to any other person.

614. Amgen has knowingly accepted and retained the benefits bestowed upon it by the plaintiffs and class members.

**JA0191**

615. The circumstance under which Amgen has accepted and retained the benefits bestowed on it by the plaintiffs and the class are inequitable in that they result from Amgen's unlawful overcharges.

### 29. New Hampshire

616. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in New Hampshire. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

617. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

618. Under the circumstances, it would be unconscionable for Amgen to retain such benefits.

### 30. New Jersey

619. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in New Jersey. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

620. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

621. The benefits conferred upon defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the plaintiffs and class members.

622.    Amgen has paid no consideration to any other person for any of the unlawful benefits they received from the plaintiffs and class members with respect to Amgen's sales of brand etanercept.

623.    Under the circumstances, it would be unjust for defendants to retain such benefits without compensating the plaintiffs and class members.

**31.    New Mexico**

624.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in New Mexico. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

625.    Amgen has knowingly benefitted at the expense of the class from revenue resulting from unlawful overcharges for etanercept.

626.    To allow Amgen to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Amgen's benefit and because Amgen has paid no consideration to any other person for any of the benefits it received.

**32.    New York**

627.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in New York. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

628.    Amgen has been enriched by revenue resulting from unlawful overcharges for brand etanercept, which revenue resulted from anticompetitive prices paid by the class, which inured to Amgen's benefit.

629.    Amgen's enrichment has occurred at the expense of the class.

630. It is against equity and good conscience for Amgen to be permitted to retain the revenue resulting from its unlawful overcharges.

### 33. North Carolina

631. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in North Carolina. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

632. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

633. The class did not interfere with Amgen's affairs in any manner that conferred these benefits upon Amgen.

634. The benefits conferred upon Amgen were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from Amgen's actions in delaying entry of generic versions of etanercept to the market and preventing fulsome generic competition in the market for etanercept.

635. The benefits conferred on Amgen are measurable, in that the revenue Amgen has earned due to unlawful overcharges are ascertainable by review of sales records.

636. Amgen consciously accepted the benefits conferred upon it and continues to do so as of the date of this filing.

### 34. North Dakota

637. Amgen unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for etanercept in North Dakota. Class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

**JA0194**

638. Amgen has been enriched by revenue resulting from unlawful overcharges paid by plaintiffs and members of the class.

639. The class has been impoverished by the overcharges for etanercept resulting from Amgen's unlawful conduct.

640. Amgen's enrichment and the class's impoverishment are connected. Amgen has paid no consideration to any other person for any benefits it received directly or indirectly from class members.

641. There is no justification for Amgen's receipt of the benefits causing its enrichment because the class paid supracompetitive prices that inured to Amgen's benefit, and it would be inequitable for Amgen to retain any revenue gained from its unlawful overcharges.

642. The class has no remedy at law.

**35. Oklahoma**

643. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Oklahoma. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

644. Amgen received money from the plaintiffs and class members as a direct result of the unlawful overcharges and have retained this money.

645. Amgen has paid no consideration to any other person in exchange for this money.

646. The plaintiffs and class members have no remedy at law.

647. It is against equity and good conscience for Amgen to be permitted to retain the revenue resulting from its unlawful overcharges.

- 124 -

### 36.    Oregon

648.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Oregon. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

649.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

650.    Amgen was aware of the benefit bestowed upon it by the class.

651.    Under the circumstances, it would be unjust for Amgen to retain any of the overcharges derived from its unfair conduct without compensating the plaintiffs and the class.

### 37.    Pennsylvania

652.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Pennsylvania. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

653.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

654.    Amgen was aware of and/or appreciated the benefit bestowed upon it by the class.

655.    Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

**JA0196**

**38.    Puerto Rico**

656.    Amgen unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for etanercept in Puerto Rico. Class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

657.    Amgen has been enriched by revenue resulting from unlawful overcharges.

658.    The class has been impoverished by the overcharges for etanercept resulting from Amgen's unlawful conduct.

659.    Amgen's enrichment and the class's impoverishment are connected.

660.    There is no justification for Amgen's receipt of the benefits causing its enrichment and the class's impoverishment because the class paid supracompetitive prices that inured to Amgen's benefit, and it would be inequitable for Amgen to retain any revenue gained from its unlawful overcharges.

661.    The class has no remedy at law.

**39.    Rhode Island**

662.    Amgen unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for etanercept in Rhode Island. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

663.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the class.

664.    Amgen was aware of and/or recognized the benefit bestowed upon it by the class.

665.    Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

### 40. South Carolina

666. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in South Carolina. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

667. The benefits conferred upon Amgen were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from unlawful overcharges to the class.

668. Amgen realized value from the benefit bestowed upon it by the class.

669. Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

### 41. South Dakota

670. Amgen unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for etanercept in South Dakota. Class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

671. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the class.

672. Amgen was aware of the benefit bestowed upon it by the class.

673. Under the circumstances, it would be inequitable and unjust for Amgen to retain such benefits without reimbursing the class.

### 42. Tennessee

674. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Tennessee. The plaintiffs

and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

675.     Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

676.     Amgen was aware of or appreciated the benefit bestowed upon it by the class.

677.     Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

678.     It would be futile for the class to seek a remedy from any party with whom they have privity of contract. Amgen has paid no consideration to any other person for any of the unlawful benefits they received indirectly from the class with respect to Amgen's sale of etanercept. It would be futile for the class to exhaust all remedies against the entities with which the class has privity of contract because the class did not purchase etanercept directly from any defendant.

**43.     Texas**

679.     Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Texas. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

680.     Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen, to the economic detriment of the plaintiffs and class members.

681.     Amgen was aware of and/or appreciated the benefit bestowed upon it by the plaintiffs and class members.

682. The circumstances under which Amgen has retained the benefits bestowed upon it by the plaintiffs and class members are inequitable in that they result from Amgen's unlawful conduct.

683. The plaintiffs and class members have no remedy at law.

**44. Utah**

684. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Utah. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

685. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

686. Amgen was aware of and/or appreciated the benefit bestowed upon it by the class.

687. Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

**45. Vermont**

688. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Vermont. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

689. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

690. Amgen accepted the benefit bestowed upon it by the class.

**JA0200**

691. Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

**46.    Virginia**

692. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Virginia. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

693. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

694. Amgen was aware of the benefit bestowed upon it.

695. Amgen should reasonably have expected to repay the class.

696. The benefits conferred upon Amgen were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from the Amgen's illegal and unfair actions to inflate the prices of etanercept.

697. Amgen has paid no consideration to any other person for any of the benefits it has received from the class.

**47.    Washington**

698. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Washington. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

**JA0201**

699. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

700. Amgen was aware of and/or appreciated the benefit bestowed upon it by the class.

701. Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

### 48. West Virginia

702. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in West Virginia. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

703. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

704. Amgen was aware of and/or appreciated the benefit bestowed upon it by the class.

705. Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

### 49. Wisconsin

706. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Wisconsin. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

707.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

708.    Amgen was aware of and/or appreciated the benefit bestowed upon it by the class.

709.    Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

**50.    Wyoming**

710.    Amgen unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for etanercept in Wyoming. Class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

711.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the class.

712.    Amgen accepted, used, and enjoyed the benefits bestowed upon it by the class under inequitable and unjust circumstances arising from unlawful overcharges to class members.

713.    Under the circumstances, it would be inequitable for Amgen to retain such benefits.

**DEMAND FOR RELIEF**

WHEREFORE, the plaintiffs, on behalf of themselves and the class members, respectfully demand that this Court:

A.    Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure; direct that reasonable notice of this action, as provided by Rule 23(c)(2), be provided to the class; and declare the plaintiffs as the class representatives;

- 132 -

**JA0203**

B.  Grant permanent injunctive relief pursuant to § 16 of the Clayton Act to remedy the ongoing anticompetitive effects of Amgen's unlawful monopolization in the market for etanercept in the United States;

C.  Grant permanent injunctive relief pursuant to § 16 of the Clayton Act to remedy Amgen attempted monopolization in the market for etanercept in the United States;

D.  Conduct expedited discovery proceedings leading to a prompt trial on the merits before a jury on all claims and defenses;

E.  Enter judgment against Amgen and in favor of the plaintiffs and the class;

F.  Award the class damages (including double or treble damages, where appropriate) in an amount to be determined at trial, plus interest in accordance with law;

G.  Award the plaintiffs and the class members their costs of suit, including reasonable attorneys' fees as provided by law; and

H.  Award such further and additional relief as is necessary to correct for the anticompetitive market effects Amgen's unlawful conduct caused and as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the plaintiffs, on behalf of themselves and the proposed class, demand a trial by jury on all issues so triable.

Dated: October 11, 2024       Respectfully submitted,

                */s/ William H. Monroe, Jr.*
                William H. Monroe, Jr. (VSB No. 27441)
                Marc C. Greco (VSB No. 41496)
                GLASSER AND GLASSER, P.L.C.
                Crown Center, Suite 600
                580 East Main Street
                Norfolk, VA 23510

**JA0204**

(757) 625-6787
bill@glasserlaw.com
marcg@glasserlaw.com

Thomas M. Sobol (*pro hac vice*)
Abbye R. K. Ognibene (*pro hac vice*)
Rachel Downey (*pro hac vice*)
Claudia Morera (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
One Faneuil Hall Square, 5th Floor
Boston, MA 02109
(617) 482-3700
tom@hbsslaw.com
abbyeo@hbsslaw.com
racheld@hbsslaw.com
claudiam@hbsslaw.com

Peter D. St. Phillip (*pro hac vice*)
Uriel Rabinovitz (*pro hac vice*)
Raymond Girnys (*pro hac vice*)
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
(914) 997-0500
PStPhillip@lowey.com
URabinovitz@lowey.com
Rgirnys@lowey.com

**JA0205**

**CERTIFICATE OF SERVICE**

I, William H. Monroe, Jr., certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record, and parties may access the filing through the Court's system.

Dated: October 11, 2024

/s/ William H. Monroe, Jr.
William H. Monroe, Jr. (VSB No. 27441)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

CAREFIRST OF MARYLAND, INC. et al.,

                Plaintiffs,

      v.

AMGEN INC. et al.,

                Defendants.

No. 2:24-cv-00484-AWA-LRL

**DECLARATION OF ADAM R. LAWTON IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

I, Adam R. Lawton, declare:

1.      I am an attorney with the law firm of Munger, Tolles & Olson LLP, counsel for Defendants in this matter. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could competently testify to them.

2.      **Exhibit 1** is a true and correct copy of the document titled "Final Judgment and Order of Permanent Injunction" from *Immunex Corp. v. Sandoz Inc.*, No. 2:16-cv-1118 (D.N.J.).

3.      **Exhibit 2** is a true and correct copy of the document titled "Final Judgment and Order of Permanent Injunction" from *Immunex Corp. v. Samsung Bioepis Co., Ltd.*, No. 2:19-cv-11755 (D.N.J.).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

November 4, 2024                        _____
                                            Adam R. Lawton

1

Dated: November 4, 2024

Respectfully submitted,

  /s/ *Stephen E. Noona*
Stephen E. Noona (VSB No. 25367)
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510-1665
Telephone: (757) 624-3239
Facsimile: (888) 360-9092
senoona@kaufcan.com

Jonathan I. Kravis (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500 E
Washington, DC 20001
Telephone: (202) 220-1100
jonathan.kravis@mto.com

Rohit K. Singla (*pro hac vice*)
Justin P. Raphael (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
rohit.singla@mto.com
justin.raphael@mto.com

Faye P. Teller (*pro hac vice*)
Adam R. Lawton (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
faye.teller@mto.com
adam.lawton@mto.com

*Attorneys for Defendants Amgen Inc., Amgen*
*Manufacturing Limited LLC, and Immunex*
*Corporation*

**JA0208**

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2024, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

all counsel of record.

 /s/ *Stephen E. Noona*
Stephen E. Noona (VSB No. 25367)
Kaufman & Canoles, P.C.
150 West Main Street, Suite 2100
Norfolk, VA  23510
Telephone: (757) 624-3239
Facsimile: (888) 360-9092
senoona@kaufcan.com

*Counsel for Defendants Amgen Inc., Amgen
Manufacturing Limited LLC, and Immunex
Corporation*

3

**JA0209**

# EXHIBIT 1

JA0210

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

IMMUNEX CORPORATION; )
AMGEN MANUFACTURING, LIMITED; )
and HOFFMANN-LA ROCHE INC.; )        Civil Action No.: 2:16-cv-01118-CCC-MF
)
Plaintiffs, )
v. )
)
SANDOZ INC.; SANDOZ )
INTERNATIONAL GMBH; and SANDOZ )
GMBH; )
)
Defendants. )

### FINAL JUDGMENT AND ORDER OF PERMANENT INJUNCTION

**THIS MATTER** was brought by Plaintiffs, Immunex Corporation, Amgen Manufacturing, Limited (collectively, "Immunex"), and Hoffmann-La Roche Inc. ("Roche") (collectively, "Plaintiffs"), against Defendants, Sandoz Inc., Sandoz International GmbH, and Sandoz GmbH (collectively, "Defendants"). After a bench trial, the Court issued its Opinion and Order in the above-captioned case on August 9, 2019 (ECF No. 689, 690).

**It is ORDERED, ADJUDGED, and DECREED** as follows:

1. The Court has jurisdiction over the subject matter of the above-captioned case pursuant to 28 U.S.C. §§ 1331 and 1338(a).

2. The Court has personal jurisdiction over the parties, and venue is proper as to all parties pursuant to 28 U.S.C. §§ 1391(b), (c), and 1400(b).

3. The Court retains jurisdiction to enforce or supervise performance under this Final Judgment and Order of Permanent Injunction.

### I.    The Patents-In-Suit

4. Sandoz Inc.'s submission of abbreviated Biologics License Application ("aBLA") No. 761042 infringed claims 11-12 and 35-36 of U.S. Patent No. 8,063,182 (the "'182 Patent").

**JA0211**

5.    Defendants' making, using, offering to sell, or selling of any product containing the fusion protein known as etanercept and described in the Court's opinion in this case at ECF No. 689 at 6 ("etanercept") within the United States, or Defendants' importation of any product containing etanercept into the United States, will infringe claims 11-12 and 35-36 of the '182 Patent.

6.    For the reasons stated in the Court's August 9, 2019 Opinion (ECF No. 689), the Court finds that Defendants failed to prove that claims 11-12 and 35-36 of the '182 Patent are invalid or unenforceable.

7.    Judgment is hereby entered against Defendants regarding infringement of the '182 Patent.

8.    Any claim of infringement of any claims of the '182 Patent other than claims 11-12 and 35-36 is hereby dismissed with prejudice.

9.    Sandoz Inc.'s submission of aBLA No. 761042 infringed claims 3, 8, and 10 of U.S. Patent No. 8,163,522 (the "'522 Patent").

10.    Defendants' making, using, offering to sell, or selling of any product containing etanercept within the United States, or Defendants' importation of any product containing etanercept into the United States, will infringe claims 3, 8, and 10 of the '522 Patent.

11.    For the reasons stated in the Court's August 9, 2019 Opinion (ECF No. 689), the Court finds that Defendants failed to prove that claims 3, 8, and 10 of the '522 Patent are invalid or unenforceable.

12.    Judgment is hereby entered against Defendants regarding infringement of the '522 Patent.

**JA0212**

13. Any claim of infringement of any claims of the '522 Patent other than claims 3, 8, and 10 is hereby dismissed with prejudice.

14. Based on the stipulation dated October 7, 2019, Defendants, and each of them, and each of their affiliates, subsidiaries, successors, and partners, and all of their officers, agents, servants, employees, and attorneys, and all persons and entities acting on behalf or at the direction of, or in active concert or participation or privity with any of them, are hereby enjoined from making, using, offering to sell, or selling within the United States, or importing into the United States any product containing etanercept. This paragraph does not restrict Defendants' activities that fall within the scope of 35 U.S.C. § 271(e)(1). This permanent injunction shall terminate no later than the later of the expiration of any infringed and valid claim of the '182 Patent on November 22, 2028 or any infringed and valid claim of the '522 Patent on April 24, 2029.

## II. Immunex Patents

15. Pursuant to the stipulation filed June 7, 2018 (ECF No. 510), any claim of infringement under 35 U.S.C. § 271(b) or 35 U.S.C. § 271(e)(2)(C) of any claim in U.S. Patent No. 7,915,225, U.S. Patent No. 8,119,605, or U.S. Patent No. 8,722,631 is hereby dismissed with prejudice. (ECF No. 1 ¶¶ 114-167.)

## III. Prior Preliminary Injunctions

16. Prior stipulated preliminary injunctions ECF Nos. 95, 96, and 509 are hereby terminated. Paragraph 5(b) of Confidential ECF No. 510 remains in effect until the issuance of a mandate from the Federal Circuit. Paragraph 8 of Confidential ECF No. 510 remains in effect until the conclusion of (or expiration of time to seek) review by the United States Supreme Court of the Federal Circuit's decision and shall terminate if any one of claims 11-12 and 35-36 of the '182 Patent or claims 3, 8, and 10 of the '522 Patent is not rendered invalid following the

conclusion of (or expiration of time to seek) such review.  The remainder of Confidential ECF No. 510 is hereby terminated.

17.    Pursuant to Fed. R. Civ. P. 58(a), this is the **FINAL JUDGMENT** of the Court.

SO ORDERED:

Dated: October 8, 2019

Hon. Claire C. Cecchi, U.S.D.J.

**JA0214**

# EXHIBIT 2

JA0215

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IMMUNEX CORPORATION;<br>AMGEN MANUFACTURING, LIMITED;<br>and HOFFMANN-LA ROCHE INC.;<br><br>        Plaintiffs,<br><br>   v.<br><br>SAMSUNG BIOEPIS CO., LTD;<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.: 2:19-cv-11755-CCC-LDW

***Electronically Filed***

**FINAL JUDGMENT AND ORDER OF PERMANENT INJUNCTION**

**THIS MATTER** was brought by Plaintiffs, Immunex Corporation, Amgen Manufacturing, Limited (collectively, "Immunex") and Hoffmann-La Roche Inc. ("Roche"), against Defendant Samsung Bioepis Co., Ltd. ("Bioepis"). In view of the parties' Confidential Stipulation entered at D.E. __127__, **it is ORDERED, ADJUDGED, and DECREED** as follows:

1. Judgment is entered in favor of Plaintiffs Immunex and Roche, and against Defendant Bioepis, on each of Plaintiffs' claims for infringement of U.S. Patent No. 8,063,182 (the "'182 Patent") and U.S. Patent No. 8,163,522 (the "'522 Patent").

2. Bioepis and each of its affiliates, subsidiaries, successors, and partners, and all of their officers, agents, servants, employees, and attorneys, and all persons and entities acting on behalf or at the direction of, or in active concert or participation or privity with any of them, are hereby permanently enjoined from making, using, offering to sell, or selling within the United States, or importing into the United States any product containing etanercept, and shall immediately destroy any remaining Bioepis etanercept product that has been imported into the United States. This paragraph does not restrict Bioepis' activities that fall within the scope of 35 U.S.C. § 271(e)(1). This permanent injunction shall terminate once both the '182 Patent and the

**JA0216**

'522 Patent have expired on April 24, 2029.

3. Within thirty (30) days of this Order, Bioepis shall certify to Immunex the destruction of any remaining Bioepis etanercept product imported into the United States.

4. Plaintiff Immunex's claims for infringement of U.S. Patent Nos. 6,872,549, 6,924,124, and 7,157,557 are hereby dismissed without prejudice.

5. The Court retains jurisdiction to enforce or supervise performance under this Final Judgment and Order of Permanent Injunction.

6. The parties shall each bear their own costs and attorneys' fees.

7. Pursuant to Fed. R. Civ. P. 58(a), this is the **FINAL JUDGMENT** of the Court.

**SO ORDERED this** __3__ **, day of**

__November__ **, 2021**

**Hon. Claire C. Cecchi, U.S.D.J.**

**JA0217**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

|  |  |
|---|---|
| CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., and CAREFIRST BLUECHOICE, INC., on behalf of themselves and all others similarly situated,<br><br>                      Plaintiffs,<br><br>        v.<br><br>AMGEN INC., AMGEN MANUFACTURING LIMITED LLC, and IMMUNEX CORPORATION,<br><br>                    Defendants. | Civil Action No. 2:24-cv-00484-AWA-LRL |

**SECOND AMENDED CLASS ACTION COMPLAINT AND**
**DEMAND FOR JURY TRIAL**

**JA0218**

**TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................................1

II.    PARTIES ................................................................................................................5

III.    JURISDICTION AND VENUE ............................................................................7

IV.    REGULATORY AND ECONOMIC BACKGROUND .......................................8

    A.    The relevant federal regulatory structure encourages competition among pharmaceutical companies. ...................................................................8

    B.    Biosimilar competition lowers drug prices. ............................................11

V.    FACTS .................................................................................................................14

    A.    Etanercept is a biologic that reduces the symptoms of inflammatory diseases. ..................................................................................14

    B.    In the mid-1980s, researchers at Roche and Immunex raced to develop and patent technologies to treat autoimmune conditions.............................................16

        1.    Roche scientists were the first to sequence the p55 TNFR and create TNFR-Ig fusion proteins, paving the way for new treatments. .......................................................................................16

        2.    Immunex scientists also develop a p75 TNFR fusion protein. ..................20

    C.    Immunex launches Enbrel and obtains a non-exclusive license to the Brockhaus Patent Rights. ........................................................................21

        1.    The FDA approves Enbrel as the first TNF inhibitor monotherapy to treat rheumatoid arthritis.......................................................................21

        2.    Immunex seeks and gets from Roche a non-exclusive license to the Brockhaus Patent Rights. ...........................................................21

        3.    Enbrel is a phenomenal commercial success for Immunex, with $762 million in annual sales by 2001. .....................................................23

    D.    Biotech giant Amgen acquires Immunex and adds Enbrel to its waning portfolio..................................................................................................25

        1.    The FTC requires Amgen and Immunex to license certain TNFR patents to prevent an unlawful monopoly in the TNR inhibitor market. ...........................................................................................26

**JA0219**

2.      Amgen reaps the rewards of its acquisition as Enbrel becomes one of the most profitable drugs in the world.................................................28

E.      With patent expiration and biosimilar competition on the horizon, Amgen buys out Roche's remaining Brockhaus Patent Rights. .........................................30

F.      Amgen uses its exclusive license to the Brockhaus Patent Rights to obtain the '182 and '522 Patents.........................................................35

G.      Amgen uses the '182 and '522 Patents to block would-be competitors from launching less expensive biosimilar versions. .............................................37

1.      Amgen successfully sues Sandoz for infringement of the '182 and '522 Patents, preventing the launch of its Enbrel biosimilar.....................38

2.      Amgen sues Samsung Bioepis for infringement of the '182 and '522 Patents and blocks the launch of its Enbrel biosimilar.....................40

H.      Amgen exploited its Enbrel monopoly with annual price hikes that helped the company secure more than $86 billion in net revenues. ................................41

I.      Amgen uses its exclusive license to the Brockhaus Patent Rights to unlawfully buttress and entrench its monopoly. ....................................................43

VI.      CLASS ALLEGATIONS ........................................................................47

VII.      MARKET POWER AND MARKET DEFINITION ........................................50

A.      Direct evidence demonstrates Amgen's market power. ........................................50

B.      Indirect evidence demonstrates Amgen's market power. ......................................52

VIII.      MARKET EFFECTS AND CLASS DAMAGES ..............................................53

IX.      ANTITRUST IMPACT .........................................................................57

X.      IMPACT ON INTERSTATE COMMERCE................................................57

XI.      FEDERAL CLAIMS FOR RELIEF ........................................................58

COUNT ONE: MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2) .......................................................58

XII.      STATE CLAIMS FOR RELIEF..............................................................61

COUNT TWO: MONOPOLIZATION AND MONOPOLISTIC CONDUCT UNDER STATE LAW ........................................................................61

COUNT THREE: VIOLATIONS OF STATE CONSUMER PROTECTION LAWS ...............66

JA0220

COUNT FOUR: UNJUST ENRICHMENT UNDER STATE LAW..........................................103

DEMAND FOR RELIEF.......................................................................................................129

JURY DEMAND ...................................................................................................................130

**JA0221**

The plaintiffs, CareFirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc., and CareFirst BlueChoice, Inc. (collectively, "CareFirst"), on behalf of themselves and all others similarly situated, allege the following against the defendants, Amgen Inc. and wholly owned subsidiaries Amgen Manufacturing Limited LLC and Immunex Corporation (collectively, "Amgen"). The plaintiffs' allegations are based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## I.      INTRODUCTION

1.      The plaintiffs, which provide healthcare benefits to millions of Americans, bring this case against Amgen for unlawfully delaying competition for its blockbuster drug, Enbrel (etanercept). Back in 2004, while monopolizing the U.S. market for etanercept, Amgen unlawfully purchased patent rights from a would-be competitor and used those rights over the following years to engage in a long-running and successful effort to further entrench and extend its monopoly power over etanercept—reaping billions in profits while denying purchasers and patients access to the lower prices they would have paid in a competitive market.

2.      The pharmaceutical company Immunex launched etanercept under the brand name Enbrel in 1998. Enbrel is a biologic medicine used to treat a range of disabling inflammatory diseases, including rheumatoid arthritis, psoriasis, psoriatic arthritis, ankylosing spondylitis, and juvenile idiopathic arthritis.

3.      After biopharmaceutical giant Amgen acquired Immunex and the rights to Enbrel in 2002, Enbrel quickly became Amgen's most lucrative asset. And despite having been launched in the United States more than a quarter-century ago, Enbrel remains a crown jewel of Amgen's $28-billion-a-year portfolio. Enbrel's extraordinarily high prices—which Amgen has increased nearly every single year—are a result of Amgen's unlawful campaign to thwart competition. In total, Amgen and Immunex have amassed more than $86 billion from cumulative

- 1 -

**JA0222**

worldwide sales of Enbrel.

4.       Amgen's staggering Enbrel profits for at least the last five years are attributable to its unlawful campaign to buttress and entrench what was once a legitimate, patent-protected Enbrel monopoly by preventing competition from biosimilar versions of the drug. Like generics, biosimilar drugs have no meaningful differences in safety or effectiveness from but are significantly less expensive than their brand-name counterparts. But every drug company that has tried to bring a competing biosimilar version of Enbrel to market has been blocked by Amgen's unlawful actions. If not enjoined, Amgen's illegal monopoly will remain in place until at least 2029, at which point Amgen will have enjoyed *three decades* of market exclusivity—far more than the patent or antitrust laws permit.

5.       Amgen first began crafting its anticompetitive plan to extend its monopoly back in 2004. Just three years after acquiring the rights to Enbrel, Amgen was raking in massive profits. By mid-2004, annual sales were approaching $2 billion per year, the FDA had approved the drug for multiple indications and, free of competition, Amgen was able to increase the price of Enbrel annually without any drop in sales. Amgen enjoyed all the economic perks of a monopolist, and its short- and mid-term Enbrel projections showed that it would continue profit handsomely from its supracompetitive pricing.

6.       However, the long-term Enbrel sale projections presented a major problem. The patent portfolio that Amgen had built to protect Enbrel from competition would likely fail to hold back biosimilar versions of etanercept beyond 2015. By then, the Immunex patents that Amgen had acquired would expire, and any additional patents Amgen might be able to obtain were unlikely to keep competing drugs fully off the market.

7.       At the same time, Amgen faced another threat: a competing drug company, F.

Hoffman-La Roche AG ("Roche"), owned some of the key patents and patent applications relating to TNFR fusion proteins, including etanercept (the "Brockhaus Patent Rights"). While Roche had granted Amgen a non-exclusive license to the Brockhaus Patent Rights, nothing prevented Roche from licensing those rights to another drug company seeking to develop a biosimilar to compete with Enbrel (or from developing a competing product itself)—a threat that would likely be realized once Amgen's own Enbrel patents expired.

8.      Amgen therefore had a choice: accept that its monopoly over etanercept would come to a natural end (and with it, the massive profits Amgen had been collecting year-over-year) or take steps to extend its monopoly beyond the lawful limits.

9.      Amgen chose the latter. Sitting atop a monopoly on the U.S. etanercept market, Amgen sought to maintain, extend, and further entrench its power by buying up exclusive patent rights from Roche that otherwise would have enabled a competitor to enter the market at least by 2019 (and as early as 2016). In mid-2004, Amgen obtained an exclusive license to the Brockhaus Patent Rights, thereby extending its arsenal to prevent biosimilar competition and buying itself decades more monopoly power and pricing for Enbrel.

10.      Armed with a reinforced patent portfolio, Amgen weaponized those patents against would-be competitors. Beginning in 2016, Amgen sued every drug company seeking to launch a biosimilar etanercept product to compete with Enbrel. In its lawsuits, Amgen relied on the Brockhaus Patent Rights it had unlawfully acquired, suing competitors for allegedly infringing those rights and then exploiting the strength of its ill-gotten portfolio to strong-arm competitors into settlement agreements that guaranteed Enbrel would face no competition before 2029. Amgen's goal was clear: block biosimilar competitors, perpetuate supracompetitive pricing, and extend anticompetitive sales of Enbrel for many more years.

**JA0224**

11.     While Amgen's wrongful acquisition of the Brockhaus Patent Rights has been used to prevent all would-be biosimilar etanercept entrants from competing with Enbrel and driving down prices, these competitors have stood at the ready for years. Etanercept manufacturers were some of the first drug companies to obtain FDA approval of biosimilar products—deemed safe and identical to Enbrel in all significant ways—and had secured the necessary regulatory approval to launch their biosimilars by at least 2019, if not earlier. If not enjoined, Amgen will succeed in its efforts to unlawfully delay biosimilar entry in the U.S. for over a decade.

12.     Amgen's anticompetitive strategy has worked. Since gaining control of the Brockhaus Patent Rights, Amgen has been able to illegally prolong its U.S. Enbrel monopoly for at least ten additional years—so far. While Amgen has maintained its chokehold on the U.S. market, biosimilar versions of etanercept launched in Europe *eight years ago*. Meanwhile, despite having launched in the United States more than a quarter-century ago, Enbrel worldwide gross sales exceeded $3.6 billion in 2023 alone.

13.     Because of Amgen's unlawful acts, purchasers of etanercept in the United States have overpaid at least $3–4 billion to date and continue to pay supracompetitive prices for the drug. If Amgen's conduct is not enjoined, purchasers' damages will continue to mount for at least five more years until the last patents issued from the Brockhaus Patent Rights expire.

14.     CareFirst, on behalf of a class of purchasers, alleges violation of federal and state antitrust and related laws and seeks injunctive relief to, among other things, enjoin Amgen's exclusive use of the Roche etanercept patents and monetary relief for overcharges caused by the wrongdoing, which, where appropriate, should be doubled or trebled under law.

## II.    PARTIES

15.    Plaintiff CareFirst of Maryland, Inc. (CFMI) is a not-for-profit corporation organized and existing under the laws of the State of Maryland, with a principal place of business at 1501 South Clinton Street, Baltimore, Maryland 21224.

16.    Plaintiff Group Hospitalization and Medical Services, Inc. (GHMSI) is a not-for-profit corporation founded pursuant to an act of Congress, with a principal place of business at 840 First Street, NE, Washington, DC 20065.

17.    CFMI and GHMSI both do business as CareFirst BlueCross BlueShield (CareFirst BCBS), and both are independent licensees of the Blue Cross and Blue Shield Association.

18.    In fulfillment of its mission to provide affordable and accessible health benefits to its members, including employees of the federal government residing and/or employed in Maryland, the District of Columbia, and Virginia, including Hampton Roads, CareFirst BCBS indirectly purchases Enbrel for members of its private healthcare plans and its Medicare Advantage plans. For Medicare Advantage members that receive Enbrel injections from a physician, these purchases are provided as part of Medicare Part B coverage. For Medicare Advantage members that perform their own Enbrel injections at home (or receive injections from caregivers at home), these purchases are provided as part of Medicare Part D coverage.

19.    CareFirst BCBS has purchased Enbrel for its members for several years and anticipates continuing to purchase Enbrel for its members through at least 2029.

20.    Plaintiff CareFirst BlueChoice, Inc. (BlueChoice) is a corporation organized and existing under the laws of the District of Columbia, with a principal place of business at 840 First Street, NE, Washington, DC 20065. BlueChoice, an independent licensee of Blue Cross Blue Shield Association, provides health benefit plans for employees of the federal government

- 5 -
**JA0226**

residing and/or employed in Maryland, the District of Columbia, and Virginia, including Hampton Roads.

21.     BlueChoice has purchased Enbrel for its members for several years and anticipates continuing to purchase Enbrel for its members through at least 2029.

22.     All the plaintiffs, collectively referred to herein as "CareFirst," are indirect subsidiaries of CareFirst, Inc., a corporation organized and existing under the laws of the State of Maryland. Jointly, these plaintiffs provide or administer health insurance for millions of individuals.

23.     CareFirst purchases prescription drugs at third-party pharmacies, like CVS, Walgreens, and Rite Aid, where CareFirst's health plan members have prescriptions filled. CareFirst incurs substantial costs associated with its members' transactions at these third-party pharmacies.

24.     Defendant Amgen Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at One Amgen Center Drive, Thousand Oaks, California 91320.

25.     Defendant Amgen Manufacturing Limited LLC is a limited liability company existing under the laws of the Territory of Bermuda, with its principal place of business at Road 31 Km 24.6, Juncos, Puerto Rico 00777. Amgen Manufacturing is a wholly owned subsidiary of Amgen Inc.

26.     Defendant Immunex Corporation is a corporation organized and existing under the laws of the State of Washington with its principal place of business at One Amgen Center Drive, Thousand Oaks, California 91320. Amgen Inc. acquired Immunex in July 2002, and Immunex became a wholly owned subsidiary of Amgen Inc.

**JA0227**

27.     In this complaint, Amgen Inc., Amgen Manufacturing, and Immunex are collectively referred to as "Amgen."

### III.     JURISDICTION AND VENUE

28.     This action alleges violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and of state antitrust, consumer protection, and related laws. This action seeks declaratory and injunctive relief under Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 18, 26, and seeks monetary relief pursuant to state laws. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1332(d)(2) (class action exceeding $5 million), § 1337(a) (antitrust enforcement), and § 1367(a) (supplemental jurisdiction).

29.     Venue is proper in this district pursuant to 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because, during the class period, Amgen resided, transacted business, was found, or had agents in this district, and a substantial portion of the alleged activity affecting interstate trade and commerce discussed below has been carried out in this district.

30.     This Court has personal jurisdiction over Amgen. Amgen conducts business throughout the United States, including in this district, and has purposefully availed itself of the laws of the United States.

31.     During the class period, Amgen manufactured, sold, and shipped Enbrel in a continuous and uninterrupted flow of interstate commerce, which included sales of Enbrel in this district, advertisement of Enbrel in media in this district, monitoring prescriptions of Enbrel by prescribers within this district, and employment of product detailers in this district, who, as agents of Amgen, marketed Enbrel to prescribers in this district.

32.     As alleged below, CareFirst purchased Enbrel for its members who are located within this district, including in Norfolk and Virginia Beach.

33.     Because of Enbrel's high treatment persistence rate and the chronic nature of the

- 7 -

**JA0228**

diseases it treats, CareFirst anticipates continuing to purchase Enbrel for members located in this district and this division.

34. Amgen, throughout the United States and including in this district, has transacted business, maintained substantial contracts, or committed overt acts in furtherance of its illegal conduct. Amgen's unlawful conduct has had a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this district.

35. Aside from sales of Enbrel, Amgen transacts substantial business in this district, including business related to the promotion and development of Enbrel and to the unlawful conduct alleged here.

36. By reason of the unlawful activities alleged herein, Amgen has substantially affected and continues to substantially affect commerce throughout the United States, causing injury to CareFirst and class members. Amgen, directly and through its agents, has engaged and continues to engage in activities to suppress competition, drive up brand sales, and fix, raise, maintain, and/or stabilize the price of Enbrel in the United States. This conduct has unreasonably restrained trade and adversely affected the market for the direct sale and purchase of etanercept throughout the United States, including in this district, and continues to do so.

### IV. REGULATORY AND ECONOMIC BACKGROUND

**A. The relevant federal regulatory structure encourages competition among pharmaceutical companies.**

37. Biologics are large, complex molecules derived from living organisms like human cells, animal cells, and microorganisms (e.g., bacteria or yeast) and often produced through biotechnical or other more recently developed methods. They include a wide range of products, including vaccines, gene therapies, blood components, and recombinant proteins. Unlike traditional small-molecule drugs that are chemically synthesized and have a well-defined

structure, biologics are complex mixtures that are not easily identified or characterized.

38.    Biologics are licensed under § 351 of the Public Health Service Act (PHSA). To get approval to market a new biologic product, an applicant must submit a biologics license application (BLA) to the FDA.[1] The FDA may grant the BLA if, among other things, the manufacturer has demonstrated that the biologic and its manufacturing processes and facilities meet standards to assure that the product is safe, pure, and potent.[2]

39.    A biosimilar is a drug that is highly similar, but not structurally identical to, a brand-name biologic (referred to as the innovator or reference product). Before 2010, biosimilars were, like small-molecule brand and generic drugs, approved under the Food, Drug and Cosmetic Act (FDCA). But because of the complexity of biologics and the fact that they often require complex, sensitive manufacturing processes, it is not feasible to create an exact duplicate of an existing biologic. Biosimilars therefore could not be approved via the abbreviated pathway for generic small-molecule drugs established by the Hatch-Waxman Act, which requires the sponsor to show the generic has the same active ingredients, strength, dosage form, and route of administration and is bioequivalent to an approved brand-name drug.

40.    Recognizing the need for an abbreviated approval process for biosimilars,[3]

---

[1] 42 U.S.C. § 262(a).

[2] 42 U.S.C. § 262(a)(2)(C)(i)(I).

[3] In February 2009, the Obama administration proposed establishing a "workable regulatory, scientific, and legal pathway for generic versions of biologic drugs" to "accelerate access to" biosimilars and combat the "high and rising" costs of prescription drugs. Office of Mgmt. & Budget, *A New Era of Responsibility*: *Renewing America's Promise* at 28 (2009), https://www.govinfo.gov/content/pkg/BUDGET-2010-BUD/pdf/BUDGET-2010-BUD.pdf. While debating the yet-enacted BPCIA in June 2009, Senator Sherrod Brown argued that "[p]erhaps nowhere [is the need to bring down costs and increase access] more obvious than the area of biopharmaceuticals or so-called biologics . . . . With costs to biologics ranging anywhere from $10,000 to $200,000 per patient per year, biologic treatments pose a significant financial

Congress passed the Biologics Price Competition and Innovation Act (BPCIA) as part of the Affordable Care Act, signed into law on March 23, 2010. The purpose of the BPCIA was to create a regime for biosimilars, similar to the one created by the Hatch-Waxman Act for generic drugs, in order to promote competition and lower prices in the biologics markets.

41. The BPCIA amended the PHSA to create an abbreviated licensure pathway for biosimilars. Under § 351(k) of the PHSA, a company seeking to market a biosimilar product in the United States must first submit to the FDA an abbreviated biologics license application (aBLA) with information demonstrating, among other things, biosimilarity to the reference (brand) product based on data from analytical studies, animal studies, and clinical studies. The FDA will grant approval if this data shows the product is "highly similar" to the reference product and that there are no "clinically meaningful differences" between the two in terms of "safety, purity, and potency."[4]

42. A biosimilar manufacturer may not submit an aBLA until four years after the reference product is first licensed, and an aBLA may not be approved until twelve years after the reference product is first licensed.[5] Put another way, the manufacturer of a new biologic drug enjoys a statutory twelve-year monopoly over its product without biosimilar competition. Thereafter, biosimilars are free to compete—subject to lawful patent restraints.

---

challenge for patients, for insurance companies, for employers who are paying the bills, and for Federal and State governments that are also paying the bills." 155 Cong. Rec. S6793 (daily ed. June 18, 2009). Representative Frank Pallone similarly stated that "[i]f biologics are the future, then we should do everything we can now to control costs while aiding innovation, just like Hatch-Waxman did." *Emerging Health Care Issues: Follow-On Biologic Drug Competition: Hearing Before the Subcomm. on Health of the H. Comm. on Energy & Commerce*, 111th Cong. 2 (2009).

[4] 42 U.S.C. § 262(i)(2); *see also* 42 U.S.C. § 262(k)(2)(A).

[5] 42 U.S.C. § 262(k)(7).

**JA0231**

43.     Under certain circumstances, pursuant to the BPCIA, the FDA can also designate a biosimilar as "interchangeable," meaning the biosimilar "may be substituted for the reference product without the intervention of the health care provider who prescribed the reference product."[6] Depending on the relevant state's laws, an interchangeable biosimilar may be substituted for the biologic at the pharmacy without a new prescription in the same way that generics can be. These state laws, referred to as automatic substitution laws, are designed to save purchasers money on their prescription drugs.

44.     To obtain an interchangeability designation, a biosimilar applicant must submit to the FDA data sufficient to demonstrate that its product "is biosimilar to the reference product [and] can be expected to produce the same clinical results as the reference product in any given patient . . . ."[7] The first biosimilar approved as interchangeable to the reference product enjoys an exclusivity period. The length of the exclusivity period depends on (a) whether, at the time the FDA granted the biosimilar maker's application for interchangeability, any patent infringement litigation related to that application (i) had already concluded, (ii) was ongoing, or (iii) had not yet begun; and (b) the date on which the interchangeable biosimilar was first commercially marketed.[8]

**B.      Biosimilar competition lowers drug prices.**

45.     Biosimilar competition is a relatively recent source of healthcare savings. The FDA approved the first biosimilar in 2015. As of June 2024, the FDA had approved only 56 biosimilars—including two etanercept biosimilars, Erelzi and Eticovo, in August 2016 and April

---

[6] 42 U.S.C. § 262(i)(3).

[7] 42 U.S.C. § 262(k)(4).

[8] 42 U.S.C. § 262(k)(6).

2019, respectively.[9]

46.     While there are some differences in distribution, pharmacy-counter substitution, and prescription writing practices of biosimilar and generic drugs, the same general economic principle applies: biosimilar competition, like generic competition, lowers drug prices and saves healthcare dollars. According to the FDA, as of 2021, biosimilars in the United States "launched with initial list prices 15% to 35% lower than comparative list prices of the reference products."[10] According to the 2023 U.S. Generic and Biosimilar Medicines Savings report, "biosimilars, on average, are priced more than 50 percent lower than the brand biologic[] price at the time of biosimilar launch."[11] And the "[b]rand biologics respond to biosimilar entry by lowering their prices to date, by 25 percent on average."[12]

47.     Numerous studies have estimated the amount of savings (determined by estimated price reductions, penetration, and the like) resulting from the introduction of biosimilars. A 2014 Rand review of studies examining individual biosimilars' price impact and market penetration found that in the coming decade, on average, biosimilars would gain a market penetration of 60% and would reduce prices by 35% and would result in about $44 billion in savings over those ten years.[13] The review study also noted that 60% market penetration was a conservative

---

[9] Biosimilar Product Information, FDA, https://www.fda.gov/drugs/biosimilars/biosimilar-product-information (last visited July 1, 2024).

[10] Press Release, FDA, FDA Approves First Interchangeable Biosimilar Insulin Product for Treatment of Diabetes (July 28, 2021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-interchangeable-biosimilar-insulin-product-treatment-diabetes.

[11] Assoc. for Accessible Medicines, *The U.S. Generic & Biosimilar Medicines Savings Report* at 30 (2023), https://accessiblemeds.org/sites/default/files/2023-09/AAM-2023-Generic-Biosimilar-Medicines-Savings-Report-web.pdf.

[12] *Id*.

[13] Andrew W. Mulcahy, Zachary Predmore & Soeren Mattke, RAND, *The Cost Savings Potential of Biosimilar Drugs in the United States* at 7 & n.17 (2014), https://www.rand.org/

estimate and that the Congressional Budget Office anticipated a 40% price reduction in the long term.[14]

48.     Actual savings far exceeded expectations. A more recent Rand review from 2022, projecting U.S. savings from biosimilar entry from 2021 to 2025, found that total estimated savings from 2014 to 2025 would amount to $102.5 billion, $38.4 billion of which was projected savings from 2021 through 2025 from expanded biosimilar competition.[15]

49.     The 2023 *U.S. Generic and Biosimilar Medicines Savings* report found that biosimilars generated $23.6 billion in savings since 2015, including over $9.4 billion in 2022 alone.[16] And a third study estimated that biosimilar entry could result in $100 billion in savings between 2020 and 2024.[17] These results were also confirmed by the 2022 Rand study published in the *American Journal of Managed Car*e and a 2023 IQVIA study. Assuming a higher biosimilar entry probability ($46.5 billion), higher biosimilar volume share ($48.3 billion), lower biosimilar prices ($52.8 billion), and lower prices for reference biologics ($82.4 billion), the study found potential savings could reach $124.2 billion between 2021 and 2025.[18] In 2023, an

---

pubs/perspectives/PE127.html.

[14] *Id.*

[15] Andrew W. Mulcahy & Christine Buttorff, *Projected US Savings from Biosimilars, 2021–2025*, 28 Am. J. Managed Care 329, 331 (2022), https://www.ajmc.com/view/projected-us-savings-from-biosimilars-2021-2025.

[16] Assoc. for Accessible Medicines, *The U.S. Generic & Biosimilar Medicines Savings Report* at 27 (2023), https://accessiblemeds.org/sites/default/files/2023-09/AAM-2023-Generic-Biosimilar-Medicines-Savings-Report-web.pdf.

[17] IQVIA, *Biosimilars in the United States: 2020–2024* at 17 (2020), https://www.iqvia.com/insights/the-iqvia-institute/reports/biosimilars-in-the-united-states-2020-2024 ("IQVIA Biosimilars Report").

[18] Mulcahy & Buttorff, *supra* note 15, at 234.

**JA0234**

IQVIA study concluded that savings from biosimilars would balloon to $181 billion between 2023 and 2027.[19]

## V.      FACTS

**A.      Etanercept is a biologic that reduces the symptoms of inflammatory diseases.**

50.      Enbrel is a brand-name biologic approved by the FDA for the treatment of rheumatoid arthritis, plaque psoriasis, psoriatic arthritis, ankylosing spondylitis, and polyarticular juvenile idiopathic arthritis. The active ingredient in Enbrel is etanercept. It is sold in single-dose prefilled syringes that patients generally self-administer via weekly injections (typically, one 50-mg injection per week).

51.      Rheumatoid arthritis, psoriatic arthritis, ankylosing spondylitis, and plaque psoriasis are autoimmune disorders which result from malfunctions of the body's immune system that cause it to attack its own cells or tissues. These internal attacks can take various forms, including prolonged inflammatory responses that can damage the body's vital organs. As many as 50 million Americans—80% of whom are women—have an autoimmune disease.

52.      Rheumatoid arthritis, which affects more than 1.3 million Americans, occurs when the immune system attacks the lining of the joints, leading to chronic inflammation that can cause pain, stiffness, swelling and, over time, bone erosion and joint deformity. It can also cause fatigue, fevers, and loss of appetite and affect the heart, lungs, blood, nerves, eyes, and skin.

53.      Plaque psoriasis is a chronic condition in which the immune system causes skin cells to multiply too quickly, causing patches of skin to become scaly and inflamed. Some people

---

[19] IQVIA, *Biosimilars in the United States: 2023–2027* at 29 (2023), https://www.iqvia.com/insights/the-iqvia-institute/reports-and-publications/reports/biosimilars-in-the-united-states-2023-2027.

with psoriasis develop psoriatic arthritis (PsA), which causes pain, swelling, and stiffness of the joints, tendons, and ligaments. Psoriasis also increases the risk of cardiovascular events like heart attack and strokes, mental health problems, certain cancers, Crohn's diseases, diabetes, metabolic syndrome, obesity, osteoporosis, eye inflammation, liver disease, and kidney disease.

54.     Ankylosing spondylitis causes inflammation in the joints and ligaments of the spine, resulting in back pain, stiffness, and loss of flexibility. In severe cases, it can cause the vertebrae to fuse, making the spine rigid and inflexible. People with ankylosing spondylitis can suffer from severe, ongoing pain and may also develop inflammatory diseases of the eye, skin, or gut.

55.     Juvenile idiopathic arthritis (JIA) includes several chronic disorders in children involving inflammation of the joints, causing pain, swelling, warmth, stiffness, and loss of motion. While the origins of JIA are not understood, it begins with inflammation caused by overactivation of the immune system. JIA can last for only a few months or years but, in some cases, becomes a lifelong disease requiring treatment into adulthood.

56.     The immune system is made up of various cells and antibodies that protect the human body from foreign invaders. Antibodies have two main functions: (1) binding to foreign substances called antigens, preventing the antigens from infecting cells or spreading throughout the body, and (2) recruiting[20] other parts of the immune system to attack antigens.

57.     One form of antibody is called immunoglobulin G (Ig),[21] which has four subclasses in humans: IgG1, IgG2, IgG3, and IgG4. IgG is protein that consists of two heavy and

---

[20] Antibodies recruit other immune cells by marking the antigens so that immune cells can then recognize and destroy them.

[21] IgG is the most common antibody in the bloodstream making up about 75% of total antibodies in the human body. In addition to IgG, there are four other types of immunoglobulins: IgA, IgM, IgD, and IgE.

**JA0236**

two light amino acid chains, each of which has variable and constant regions. The constant regions interact with other components of the immune system to elicit a response, while the variable regions bind to antigens.

58. Another component of the immune system is called a cytokine. Cytokines are messenger proteins with a wide range of functions, including initiating immune responses, such as regulating inflammation in the body. One of the dozens of cytokines made by the human body is tumor necrosis factor (TNF). TNF is associated with rheumatoid arthritis, PsA, ankylosing spondylitis, and JIA.

59. TNF activates inflammatory pathways by binding to TNF receptors (TNFRs). TNFRs have three regions: intracellular, transmembrane, and extracellular. The extracellular portion can be split off to produce a fragment of TNFR that can bind to TNF. There are two distinct TNFRs that exist naturally on cell surfaces: one with a molecular weight of approximately 55 kilodaltons (p55), and another weighing approximately 75 kilodaltons (p75).

60. Etanercept, a fusion protein produced by combining DNA sequences encoding parts of different proteins into one sequence and introducing that sequence into host cells, consists of the extracellular region of a p75 TNFR combined with an IgG1. It works by making a soluble protein that binds to TNR and blocks its interaction with cell surface TNFRs. By rendering TNF biologically inactive, etanercept reduces inflammatory responses in patients with diseases that cause TNF elevation.

**B.    In the mid-1980s, researchers at Roche and Immunex raced to develop and patent technologies to treat autoimmune conditions.**

**1.    Roche scientists were the first to sequence the p55 TNFR and create TNFR-Ig fusion proteins, paving the way for new treatments.**

61. In the mid-1980s, advances in understanding the role of cytokines in inflammatory diseases, along with the development of new molecular tools enabling scientists to

study cytokine expression and regulation, generated significant interest in the study of TNR and the potential therapeutic applications of inhibiting its ability to bind to TNFRs.

62.     A Roche research team led by Dr. Werner Lesslauer made fundamental contributions to the development of TNFR fusion proteins. This Roche team was the first to experimentally prove the existence of two distinct human TNFRs, the p55 and p75, and set out to isolate, purify, sequence, and clone them. In April 1990, the Roche scientists published the amino acid sequences for the p55 TNFR and its encoding DNA. In July 1990, Roche published the same for the p75 TNFR.

63.     The Roche scientists were also the first to investigate combining the extracellular regions of TNFRs with portions of immunoglobulins to inhibit inflammatory immune responses and ultimately succeeded in creating fusion proteins using both p55 and p75 TNFRs. While the Roche team's initial fusion protein used IgG3, its experimental work also contemplated the creation of fusion proteins with IgG1 and IgG2.

64.     On August 31, 1990, the Roche scientists filed European Patent Application No. 90116707.2 (the "EP '707 Application"), claiming priority[22] to three earlier applications it had filed in Switzerland,[23] which disclosed and taught the concept of fusing the extracellular regions of the p55 and p75 TNFRs with a specific region of a human IgG heavy chain. The applications in this patent family are referred to herein as the "Brockhaus Patent Applications," the patents that would issue from them are referred to as the "Brockhaus Patents," and the applications and patents and all rights thereto are collectively referred to as the "Brockhaus Patent Rights." The

---

[22] An application that properly claims priority to an earlier-filed patent application receives the filing date of the earlier-filed application, which determines what prior art references can and cannot be asserted against the application during its examination.

[23] Swiss Application Nos. 3319/89 (filed September 12, 1989), 746/90 (filed March 8, 1990), and 1347/90 (filed April 20, 1990).

relationships between the Brockhaus Applications and Patents are depicted in Figure 1 below.

65. On September 13, 1990, Roche filed U.S. Patent Application No. 07/580,013 (the "'013 Application"), claiming priority to the EP '707 Application.

66. Roche abandoned the '013 Application and, on July 21, 1993, filed U.S. Application No. 08/095,640 (the "'640 Application") as a continuation. During prosecution, the PTO placed a restriction requirement on the '640 Application: because it claimed multiple distinct inventions (related to the p55 and p75 fusion proteins), Roche would be limited to only one of the claimed inventions unless it elected to pursue only claims related to one of the fusion proteins in the application. Roche decided to pursue claims related to the p55 fusion protein in the '640 Application, which later issued as U.S. Patent No. 5,610,279 (the "'279 Patent"). In order to pursue the non-elected claims, i.e., those related to the p75 fusion protein, Roche was required to file separate divisional applications. Roche therefore filed two divisional applications on May 19, 1995: (1) U.S. Patent Application No. 08/444,790 (the "'790 Application"), which would later issue as U.S. Patent No. 8,063,182, and (2) U.S. Patent Application No. 08/444,791 (the "'791 Application"), which would later issue as U.S. Patent No. 8,163,192.

**JA0239**

**Figure 1. Brockhaus Patent Tree**



JA0240

**2.      Immunex scientists also develop a p75 TNFR fusion protein.**

67.      Meanwhile, Immunex was independently researching TNFRs and TNFR fusion proteins, focusing on the p75 TNFR. In May 1990—two months before Roche—Immunex scientists published the amino acid sequence for the p75 and reported that they had isolated a cDNA clone of its receptor.

68.      In late 1990, Immunex successfully combined the extracellular portion of a p75 receptor with the hinge-CH2-CH3 portion of a human IgG1—i.e. the fusion protein etanercept, the active ingredient in Enbrel.

69.      Immunex obtained a series of patents directed to etanercept and methods of using etanercept stemming from various continuations-in-part of U.S. Patent Application No. 07/403,241, filed September 5, 1989 (abandoned).

70.      On May 10, 1990, Immunex filed U.S. Patent Application No. 07/523,635, which issued as U.S. Patent No. 5,395,760 (the "'760 Patent") on March 7, 1995. Entitled "DNA Encoding Tumor Necrosis Factor-α and -β Receptors," the '760 Patent claims specified isolated DNA sequences that encode soluble human TNFRs, including the p75. It expired on March 7, 2012.

71.      On February 8, 1995, Immunex filed U.S. Patent Application No. 08/383,229, which issued as U.S. Patent No. 5,605,690 (the "'690 Patent") on February 25, 1997. The '690 Patent, entitled "Methods of Lowering Active TNF-α Levels in Mammals Using Tumor Necrosis Factor Receptor," claims methods of treating TNF-dependent inflammatory diseases in mammals by administering a TNF antagonist such as a soluble TNFR. It expired on February 25, 2014.

72.      On January 27, 1998, Immunex filed U.S. Patent Application No. 08/346,555, which issued as U.S. Patent No. 5,712,155 (the "'155 Patent") on November 29, 1994. Entitled "DNA Encoding Tumor Necrosis Factor-α and -β Receptors," the '155 Patent claims specified

isolated DNA sequences that encode soluble human TNFRs, including the p75. It expired on March 7, 2012.

**C.    Immunex launches Enbrel and obtains a non-exclusive license to the Brockhaus Patent Rights.**

**1.    The FDA approves Enbrel as the first TNF inhibitor monotherapy to treat rheumatoid arthritis.**

73.    On November 2, 1998, the FDA approved Enbrel for the treatment of moderate to severe rheumatoid arthritis in patients with an inadequate response to one or more disease-modifying, antirheumatic drugs. Immunex launched Enbrel in the United States on November 6, 1998.

74.    Enbrel was hailed as a breakthrough in rheumatoid arthritis treatment. Before its launch, the gold standard for rheumatoid arthritis treatment was low-dose methotrexate, which had favorable responses in only 30% of patients and often could not be tolerated for extended periods. More recent rheumatoid arthritis therapies like Remicade and Anakinra were either used in combination with methotrexate or targeted a later disease stage. Enbrel, therefore, "st[ood] alone as an adult and juvenile rheumatoid arthritis treatment that can be used with or without" methotrexate, including in early stages of the disease, and had "no real competitor."[24]

**2.    Immunex seeks and gets from Roche a non-exclusive license to the Brockhaus Patent Rights.**

75.    On November 6, 1998, Immunex launched Enbrel for the treatment of early and moderate to severely active rheumatoid arthritis. At the time, Immunex neither owned nor had a license to Roche's EP '707 Application teaching the fusion of extracellular regions of p75 TNFRs with a specific region of a human IgG heavy chain.

---

[24] Debra Robertson, *Immunex Takes Premature Step to Guarantee Enbrel Market Share*, 19 Nature Biotech. 108, 109 (Feb. 2001).

76. Because the EP '707 Application gave Roche priority to the p75-IgG1 fusion technology used to create Enbrel, Immunex sought and obtained from Roche a license to the "Brockhaus Patent Rights," i.e., all "patents and patent applications that issue from or that claim priority of Swiss Patent Application Nos. 3319/89, 746/90, and/or 1347/90, including, but not limited to, European Application No. 90116707.2 and U.S. Patent Application No. 07/580,013."[25]

77. Roche and Immunex executed a license agreement (the "1998 License Agreement") on September 15, 1999, with an effective date of November 6, 1998 (the date of Enbrel's launch). Under the 1998 License Agreement, Roche granted Immunex a co-exclusive license (the "1998 License") under the Brockhaus Patent Rights to make, use, sell, and import etanercept worldwide. "Co-exclusive" meant that Immunex and Roche each had the right to commercialize etanercept worldwide. Roche also had the right to grant co-exclusive rights in each country to (a) one licensee in lieu of or in collaboration with Roche, (b) a single third-party to distribute etanercept within that country in lieu of Roche and its licensee, and (c) a contract manufacturer to manufacture etanercept for use, sale, importation, and/or distribution by Roche and its licensee.[26] In other words, Roche in 1998 maintained the right to manufacture etanercept itself or to allow a non-Immunex third-party to do so.

78. The 1998 License also expressly provided that Roche would retain ownership of the Brockhaus Patent Rights and was responsible at its own discretion for their prosecution and maintenance.[27] Roche also retained the sole right to address infringement of the Brockhaus

---

[25] License Agreement for Etanercept Among Immunex Corp., Hoffman-La Roche Inc., and F. Hoffman-La Roche Ltd. § 1.2 (Sept. 15. 1999) (attached as Ex. 1).

[26] *Id.* § 2.1.

[27] *Id.* §§ 3.1, 3.4.

- 22 -

Patents, including initiating suit, but Immunex agreed to provide reasonable assistance to Roche in taking any such steps and had the right to join any infringement litigation initiated by Roche and to obtain any damages awarded, including lost profits.[28] In other words, Roche in 1998 maintained all core patent rights—the right to prosecute, maintain, and enforce the Brockhaus Patent Rights.

79.     In exchange for the non-exclusive license grant, Immunex agreed to pay royalties of 4% of its net sales of etanercept products.[29] Roche also received an option to obtain a worldwide, nonexclusive license from Immunex to certain of its patent rights relating to p55 TNFR fusion proteins, subject to certain conditions.[30]

**3.     Enbrel is a phenomenal commercial success for Immunex, with $762 million in annual sales by 2001.**

80.     Enbrel was an immediate blockbuster, earning Immunex $13 million in U.S. sales in its first few *weeks* on the market. In its 1998 annual report, Immunex touted Enbrel's launch as a "key milestone event" and predicted that Enbrel would "drive a revenue 'step change' for Immunex" that would "provide substantial cash flow and fuel the company's growth."[31]

81.     Seeking to expand the Enbrel market, Immunex sought and, on May 27, 1999, received, FDA approval of Enbrel for the treatment for polyarticular JIA, making it the first FDA-approved therapy for this indication. Immunex also announced in 1999 that it was conducting pilot studies and clinical trials to investigate the use of Enbrel for additional indications and partnered with American Home Products Corporation to expand manufacturing

---

[28] *Id.* § 3.5.

[29] *Id.* § 5.2.

[30] *Id.* § 2.2.

[31] Immunex Corp., *Annual Report* at 11, 13 (1998), https://digitalcollections.lib.washington. edu/digital/collection/reports/id/24178.

capacity. By year end, Enbrel had become an "unprecedented commercial success for Immunex, with $367 million in U.S. sales."[32]

82.     In June 2000, the FDA approved an expanded indication for Enbrel, adding reduction of the signs and symptoms and delay of the progression of structural damage in patients with moderately to severely active rheumatoid arthritis. It also eliminated the need for patients to demonstrate an insufficient response to one or more other rheumatic drugs before starting Enbrel treatment—allowing more patients to access Enbrel sooner.

83.     Immunex continued "quarter for quarter" to "set new records for sales of Enbrel."[33] By November 2000, there were more than 1,000 patients on a waiting list for the drug; total sales by year end exceeded $650 million. Sales in 2001 increased 17% to $762 million, cementing Enbrel's launch as the most successful ever for a biologic product. As Immunex put it, as a "targeted, potent intervention for inflammation, Enbrel has changed the practice of rheumatology."[34]

---

[32] Immunex Corp., *Annual Report* at 23–24 (1999), https://digitalcollections.lib.washington.edu/digital/collection/reports/id/24288.

[33] Immunex Corp., *Annual Report* at 1 (2002), https://www.sec.gov/Archives/edgar/vprr/0202/02029646.pdf.

[34] *Id.*

**Figure 2. Immunex's U.S. Sales of Enbrel, 1999-2001**



84. Immunex also steadily increased the price of Enbrel. When Immunex launched Enbrel in 1998, it set the WAC price at $220 per 50-mg dose ($886 per month). By 2002, Immunex was charging $249 per 50-mg dose ($996 per month).

**D. Biotech giant Amgen acquires Immunex and adds Enbrel to its waning portfolio.**

85. In December 2001, Amgen Inc., already the largest biotechnology company in the world, announced that it was buying Immunex for $16 billion in cash and stock—the highest sum *ever paid* for a biotech acquisition.

86. Enbrel was the key driver of the deal for Amgen, which had not launched a significant new drug in a decade. Sales of its aging blockbusters Epogen (an anemia treatment) and Neopogen (used to prevent infections in cancer patients undergoing chemotherapy)—once $1-billion-a-year sellers—were foundering. And ten years of substantial investment in inflammation research had garnered few returns. The FDA had approved Amgen's interleukin-1 inhibitor, Kineret (anakinra), for the treatment of moderate to severe rheumatoid arthritis in

- 25 -

**JA0246**

November 2001, but sales were projected to be (and were) lackluster. Amgen's second-generation TNR inhibitor, pegsunercept, was only in Phase II development. Yet Amgen's new CEO, Kevin Sharer, who took the helm in 2000, had promised investors at least 20% annual growth in sales and earnings per share and revenues of $8–9 billion by 2005.

87.     Enbrel was the solution to Amgen's problems. Amgen executives boasted to investors that Enbrel had the potential to generate more than $3 billion in annual sales by 2005, and Amgen was "enthusiastic about the long-term potential of Enbrel," which it predicted would reach $3 billion by 2005.[35]

### 1.     The FTC requires Amgen and Immunex to license certain TNFR patents to prevent an unlawful monopoly in the TNR inhibitor market.

88.     Amgen's acquisition of Immunex, and the impact it would have on the market of drugs used to treat immunological conditions, drew immediate antitrust concerns from government agencies and industry watchdogs.

89.     The acquisition was subject to review by the Federal Trade Commission (FTC). The FTC's Bureau of Competition is empowered to prevent "acquisitions that are likely to reduce competition and lead to higher prices, lower quality goods or services, or less innovation."[36] When the Bureau becomes aware of a merger, "bureau lawyers, along with economists from the FTC's Bureau of Economics, investigate market dynamics" to determine if the merger or acquisition will harm consumers.[37] When deemed necessary, the FTC may take

---

[35] Andrew Pollack, *Amgen Reports Its Takeover of Immunex*, N.Y. Times, July 17, 2002, https://www.nytimes.com/2002/07/17/business/amgen-reports-its-takeover-of-immunex.html#:~: text="Some%20of%20the%20things%20we,million%20in%20sales%20last%20year.

[36] FTC, *Merger Review*, https://www.ftc.gov/enforcement/merger-review (last visited July 3, 2024).

[37] *Id.*

steps before approving the merger or acquisition to protect consumers.

90.     After reviewing the proposed acquisition, the FTC issued a complaint against Amgen and Immunex stating that the "effects of the Merger, if consummated, may be to lessen competition and to tend to create a monopoly" in violation of federal antitrust law by, *inter alia*, "reducing innovation" and "eliminating potential competition in" the TNF inhibitor market.[38] The complaint noted that Amgen and Immunex were the only two firms in the United States marketing or developing soluble TNF receptor products and two of only five firms developing any type of TNF inhibitors to treat rheumatoid arthritis and other inflammatory diseases.[39] Because of the significant difficulty, cost, and time required to develop TNF inhibitors, the FTC concluded that the consolidation of Amgen's and Immunex's "substantial proprietary rights" in this market could "create large and potentially insurmountable barriers to entry."[40]

91.     Amgen and Immunex settled the FTC's antitrust charges by entering a consent order requiring them, *inter alia*, to license certain patents to Serono—a Swiss pharmaceutical company that was "developing a soluble TNF receptor, Onercept, for use in Europe, but [that did] not possess the patent rights necessary to market the product in the United States"[41]—to ensure the continued development of TNF inhibitors for sale in the United States and "to remedy the lessening of competition" in that market that would result from the acquisition.[42]

92.     The FTC announced on July 12, 2002, that it would allow the acquisition to

---

[38] Compl. ¶ 25, *In re Amgen Inc. & Immunex Corp.*, Docket No. C-4053 (F.T.C. July 12, 2002).

[39] *Id.* ¶ 20.

[40] *Id.* ¶¶ 22–24.

[41] *Id.* ¶ 20.

[42] Decision & Order at 19, *In re Amgen Inc. & Immunex Corp.*, Docket No. C-4056 (F.T.C. Sept. 3, 2002). Serono's TNF inhibitor, Onercept, was never commercialized.

proceed under the terms of the consent agreement. The acquisition was completed on July 16, 2002, giving Amgen all rights to Enbrel in the United States and Canada.

**2.      Amgen reaps the rewards of its acquisition as Enbrel becomes one of the most profitable drugs in the world.**

93.      Once in control of Enbrel, Amgen immediately set out to maximize its return—and make good on its CEO's promises to investors—by increasing Enbrel sales, including by obtaining FDA approval to use Enbrel to treat new immunological conditions and raising Enbrel prices.

94.      Amgen's returns were almost immediate. By December 2002, it had recorded $362.1 million in Enbrel sales; combined with Immunex's sales for the first half of the year, total 2002 sales of Enbrel exceeded $770 million. With an estimated 80,000 people taking Enbrel, supply constraints began impacting sales. To keep up with demand, Amgen immediately built a new Enbrel manufacturing facility in Rhode Island.

95.      By the time Amgen's acquisition of Immunex was complete, the FDA had approved Enbrel for the treatment of psoriatic arthritis (PsA). At the time, Enbrel was the only FDA-approved treatment for PsA. But even while touting that Enbrel had "the broadest range of indications of any biologic therapy in rheumatic diseases," Amgen set out to obtain even more indications to further bolster sales of the blockbuster.[43] In 2003 and 2004, Amgen succeeded in getting FDA approval for the use of Enbrel to reduce signs and symptoms of ankylosing spondylitis, to treat moderate to severe plaque psoriasis, and to induce a major clinical response (i.e., high level of disease control) in active rheumatoid arthritis. Amgen also introduced new

---

[43] Press Release, Amgen, Amgen Submits Data to FDA Supporting Once-Weekly Dosing of Enbrel (Dec. 23, 2002), https://www.amgen.com/newsroom/press-releases/2002/12/amgen-submits-data-to-fda-supporting-once-weekly-dosing-of-enbrel.

dosing regimens and formulations and got approvals for new age groups.

96.     With the expanded indications ushering in new patients in the rheumatology and dermatology marketplaces, Enbrel sales skyrocketed to $1.25 billion in 2003—a 175% increase from the prior year. The 2004 sales increased another 46% to $1.83 billion.

97.     As Amgen was expanding Enbrel's indication list, it was also raising its price. Every single year post acquisition, Amgen was able to increase what it charged purchasers, including CareFirst, for Enbrel—all without losing sales to other therapeutic alternatives. These high prices set Amgen and Immunex up to enjoy high profit margins from Enbrel sales.

98.     From Enbrel's launch in November 1998 through 2004, Immunex and later Amgen reaped monumental benefits from their monopoly in the U.S. etanercept market, enjoying high profit margins generated by supracompetitive pricing and annual price increases. With future sales of Enbrel projected to exceed $3 billion per year, protecting its golden-goose blockbuster became a crucial priority for Amgen.

99.     Amgen went to work to protect its Enbrel monopoly with a thicket of patents, filing dozens of applications for patents claiming Enbrel manufacturing processes, formulations, methods of use, and administration devices.[44] But Amgen knew none of these patents were likely to prevent competing biosimilars from launching after the expiration of Amgen's key Enbrel patents in 2012 (indeed, as explained below, all of these patents were ultimately abandoned in

---

[44] *See* Jonathan Gardner, *A Three-Decade Monopoly: How Amgen Built a Patent Thicket Around its Top-Selling Drug*, BioPharma Dive (Nov. 1, 2021), https://www.biopharmadive.com/news/amgen-enbrel-patent-thicket-monopoly-biosimilar/609042/; Jeffrey Wu & Claire Wan-Chiung Cheng, *Into the Woods: A Biologic Patent Thicket Analysis*, 19 Chi.-Kent J. Intell. Prop. 93 (2020). A 2018 report found that 72% of the at least 57 applications for patents on Enbrel were filed after the product was approved and launched. *See* I-Mak, *Overpatented, Overpriced Special Edition: Enbrel* (2020), https://www.i-mak.org/wp-content/uploads/2018/12/i-mak.enbrel.report-2018-11-30F.pdf.

later patent litigation). So, Amgen turned to another strategy: buttressing and entrenching its Enbrel monopoly by blocking access to patents its competitors could use to launch competing biosimilar products.

**E.     With patent expiration and biosimilar competition on the horizon, Amgen buys out Roche's remaining Brockhaus Patent Rights.**

100.     While Amgen had thus far benefited handsomely from its acquisition of Immunex, and thus Enbrel, it saw a cliff ahead. Absent action, Enbrel could soon face competition from a competing biosimilar etanercept product launched either directly by Roche or by a competing company that could obtain a license to the Brockhaus Patent Rights (as had been reserved in the 1998 License).

101.     In 2004, Amgen undertook to further entrench and extend its monopoly over the U.S. market for etanercept by precluding the use of the Brockhaus Patent Rights by Roche or a Roche assignee and using those rights to keep all others out of the market. In June 2004, Amgen bought out all of the Brockhaus Patent Rights that Roche had retained for itself in the original 1998 License. The transaction made Amgen the exclusive licensee of the Brockhaus Patent Rights, gave it the ability to resume prosecution of any pending Brockhaus Patent Applications, and empowered it to enforce any Brockhaus Patents to exclude competitors from the etanercept market.

102.     On June 7, 2004, Amgen and Roche (through Hoffman-La Roche Inc. and F. Hoffman-La Roche Ltd.) signed an agreement titled "Accord & Satisfaction" (the "2004 Exclusive License") concerning the same patent family (the Brockhaus Patent Rights) that was the subject of the 1998 License.[45]

_____

[45] *See* Accord & Satisfaction Among Hoffmann-La Roche Inc., F. Hoffman-La Roche Ltd., Wyeth, AHP Manufacturing B.V., Amgen Inc. & Immunex Corp. (June 7, 2004) (attached as Ex.

103.    The stated purpose of the agreement was "to eliminate the continuing obligations to pay royalties to Roche" pursuant to the 1998 License.[46] Under the 2004 Exclusive License, Roche agreed to waive future royalty payments, and Amgen agreed to make lump sum payments to Roche totaling $150 million.[47]

104.    But the 2004 Exclusive License was far more than an agreement to eliminate the headaches of having to pay royalties calculated over time. The agreement also effectuated a significant change in the license rights of Roche's Brockhaus Patent Rights for Amgen and, in doing so, significantly altered the competitive landscape for etanercept.

105.    Under the 2004 Exclusive License, Roche granted Amgen a paid-up, irrevocable, exclusive license, with the sole right to grant sublicenses, to the Brockhaus Patent Rights in North America for the commercialization of etanercept.[48] The only reservation of license rights to Roche was for internal, non-clinical research.[49] With respect to patent prosecution, Amgen purchased the right to prosecute patent applications in the U.S. patent family.[50]

106.    Thus, as of 2004, Amgen controlled the prosecution of the Brockhaus Patent Rights, including pending Brockhaus Patent Applications. The agreement granted Amgen the

---

2). Wyeth, a Philadelphia-based pharmaceutical company acquired by Pfizer in 2009, and its wholly owned subsidiary AHP Manufacturing were Amgen's marketing partners for Enbrel. The agreement granted Wyeth the "exclusive right to distribute products comprising Etanercept outside North America" and the right to "co-promote products comprising Etanercept within North America." *Id.* at 1. Further, the agreement assigned to Wyeth "(a) all right, title and interest in and to all Ex-North America Brockhaus Patents; and (b) the right to sue and recover for any acts of infringement of any Ex-North America Brockhaus Patents." *Id*. at 3.

[46] *Id.* at 1.

[47] *Id.* at 7.

[48] *Id.* at 4 (Article 3.1).

[49] *Id.* (Article 3.2).

[50] *Id.* at 5 (Article 3.3).

**JA0252**

first right to sue over suspected infringement of the licensed patents at its sole expense and under its sole control—i.e., Amgen had the right to sue other drug companies whose products (like biosimilar etanercept) Amgen believed infringed the patents.[51] Amgen would also keep any award of damages or lost profits resulting from such an infringement suit. Roche was obligated to cooperate in these patent suits, including by participating as a party to the extent required by the court or by providing evidence and testimony in connection with any proceeding affecting the validity of the patents-in-suit.[52] Amgen also had the right to convert its exclusive license to an assignment upon request and upon payment of a relatively trivial sum of $50,000. (If "requested . . . Roche shall execute an assignment of" the patents).[53]

107.    As part of the 2004 agreement, Roche retained the secondary right, but not obligation, to sue if Amgen fails to rectify infringement or initiate an action for patent infringement within 180 days after written notification by Roche.[54] The agreement further provides that, once Roche's secondary right to sue is triggered, Roche may, at its sole expense and under its sole control and direction, initiate suit and may retain the entirety of any award of damages or lost profits as a result of such suit.[55]

108.    The description of the 2004 Exclusive License as an "Accord & Satisfaction" is, and appears intended by Amgen to be, misleading. In an accord and satisfaction, parties simply settle a previous unliquidated debt. Roche and Amgen could have accomplished that goal by simply agreeing to a lump sum payment in exchange for future royalties without fundamentally

---

[51] *Id.* (Article 3.5).

[52] *Id.* (Article 3.4).

[53] *Id.* (Article 3.3).

[54] *Id.* at 6 (Article 3.6).

[55] *Id.* (Article 3.6).

**JA0253**

changing the nature of the underlying license rights. But Roche and Amgen did not stop there.

109.    The intended and effectuated goal was for Amgen—then a monopolist in the U.S. market for etanercept—to extend and further entrench its monopoly position by foreclosing competition in the U.S. market for etanercept by Roche or another company to which Roche could have assigned the Brockhaus Patent Rights. Through the 2004 Exclusive License, Amgen bought up Roche's U.S. retained rights to a co-exclusive launch of etanercept products and to commercialize any p75 fusion protein and, consequently, procured the ability to use the Brockhaus Patent Rights to preclude competitors from the market.

110.    The 2004 Exclusive License was also falsely labeled because, although it moved functional control of the Brockhaus Patent rights in the U.S. to Amgen, it was structured to leave ostensible back-up rights to Roche. This would later enable Amgen to argue, in any future proceedings, that Amgen did not "own" the Brockhaus Patent Rights, and thus the patents that Amgen already did own were not in common ownership with the owner of the Brockhaus Patent Rights (as one observer put it, the agreement "went right up to the line of ownership without actually crossing it"[56]). By doing so, Amgen could seek to extend Enbrel's patent protection by layering on later-expiring Brockhaus Patents without running afoul of the legal doctrine of double-patenting.[57]

111.    The purpose and effect of Amgen's acquisition of the 2004 Exclusive License was wholly anticompetitive. Amgen already had significant rights to market exclusivity under the

---

[56] Doug Robinson, Dickey & Pierce, P.L.C., *End of The Enbrel Battle: How Amgen Beat Sandoz* (Sept. 8, 2020), https://www.biosimilardevelopment.com/doc/end-of-the-enbrel-battle-how-amgen-beat-sandoz-0001.

[57] The double-patenting doctrine, put simply, prevents the same inventor from obtaining additional years of patent protection by patenting the same thing, or an obvious variant thereof, twice.

**JA0254**

BPCIA and its existing patents. It sought to prolong that market exclusivity—and entrench its monopoly—by acquiring patent rights for the entire U.S. market for etanercept, a maneuver prohibited by antitrust laws.

112. *First*, Amgen had its own patents that it had acquired over the years and used to launch Enbrel and protect its sales.[58]

113. *Second*, to the extent that Amgen needed a license from Roche to the Brockhaus Patent Rights, Immunex had already acquired those license rights (effective as of the date of Enbrel's launch) through the 1998 License, and that license provided co-exclusive rights. Amgen needed nothing further from Roche to be able to commercialize Enbrel without fear of running afoul of Roche's technology and its related intellectual property.

114. *Third*, Amgen was enjoying the twelve-year exclusivity period for etanercept under § 351(k)(7) of the PHSA, which prohibited the FDA from approving any § 351(k) application for a proposed Enbrel biosimilar until November 2, 2010.[59]

115. Nor was elimination of Roche's co-exclusive rights necessary for the successful development of Enbrel. Immunex (and later Amgen) had already succeeded in reaching blockbuster sales for years. Despite the retained Roche license rights, Immunex and Amgen had made investments in, and gained a monopoly position in, the U.S. market for etanercept.

116. In sum, Amgen's acquisition of an exclusive license to the Brockhaus Patent Rights was intended to, and did in fact, further maintain, extend, and entrench Amgen's existing

---

[58] *See* U.S. Patent No. 5,606,690; U.S. Patent No. 5,395,760; U.S. Patent No. 5,712,155; U.S. Patent No. 11,491,223; U.S. Patent No. 10,307,483; U.S. Patent No. 8,119,604.

[59] Amgen's BLA No. 103795 for Enbrel was first licensed by the FDA under § 351(a) of the PHSA on November 2, 1998, and additional supplements for changes and updates to the approved labeling were approved after this date. The dates that are four and 12 years after the date of first licensure of Enbrel are November 2, 2002, and November 2, 2010, respectively. A licensure of a supplement does not trigger a separate period of exclusivity.

etanercept monopoly. The acquisition was anticompetitive with no procompetitive benefits.

**F. Amgen uses its exclusive license to the Brockhaus Patent Rights to obtain the '182 and '522 Patents.**

117. As a part of the 2004 Exclusive License, Amgen obtained all rights to control the prosecution of the '790 and '791 Applications (i.e., the Roche applications that pursued non-elected claims from the '640 Application, which was subject to a restriction requirement).[60] Amgen immediately set out to finish prosecution of those applications. Amgen notified the PTO that Amgen lawyers would be acting as Roche's representatives in the patent prosecutions in October 2004.

118. The timing and targeting of the Brockhaus Patent prosecutions were no coincidence. The '790 and '791 Applications had been filed on May 19, 1995, a few weeks before a critical statute—the Uruguay Round Agreements of the General Agreement on Tariffs and Trade ("GATT")—took effect.[61] GATT impacted how long patent exclusivity terms would

---

[60] After abandoning the '013 Application, Roche filed the '640 Application as a continuation on July 21, 1993. During prosecution of the '640 Application, the examiner issued a restriction requirement requiring Roche to choose between the p55 and p75 fusion proteins. Roche elected to pursue claims related to the p55 fusion protein only in that application, which issued as the '279 Patent on March 11, 1997. Roche then filed two divisional applications on May 19, 1995— the '790 Application and the '791 Application—to pursue non-elected claims from the '640 Application. *See supra* Section V.B.1 & Figure 1.

[61] Before June 1995, 35 U.S.C. § 154 provided that the term of a utility or plant patent ended seventeen years from the date of patent grant. To comply with Article 33 of the Trade-Related Aspects of Intellectual Property Rights (TRIPS) Agreement resulting from GATT, the United States was required to establish a minimum term for patent protection ending no earlier than twenty years from the date the application was filed. Thus, the Uruguay Round Agreements Act amended 35 U.S.C. § 154 in June of 1995 to change the term of utility and plant patents from ending 17 years from the date of patent grant to ending 20 years from the filing date of the application (or 20 years from the earliest filing date claimed under 35 U.S.C. §§ 120, 121, or 365(c)). With this change, 35 U.S.C. § 154 was also amended to provide for patent term extension in the event that issuance of the application as a patent was delayed due to secrecy order, interference or successful appellate review, subject to a five-year cap on any patent term extension under 35 U.S.C. § 154(b).

run and how they were calculated. As a result of the GATT amendment, patents that issue from applications filed after June 8, 1995 receive a 20-year term from their effective filing date. Patents claiming priority to applications filed before June 8, 1995, however, are entitled to a term that is the greater of 20 years from the filing date of the application *or* 17 years from the date of patent issuance. The late issuance of any patents from pending Brockhaus Patent Applications that had been filed pre-GATT (in 1995) would be an incredible boon for Amgen.

119.    For about seven years, Amgen prosecuted the '790 and '791 Applications.

120.    As to the '790 Application, Amgen amended that application twice (in 2005 and 2006). Neither amendment added new matter, the claims were supported by the original specification, and the amendments brought the application into consonance with the earlier PTO restriction requirement. A patent would issue after a successful appeal to the Board of Patent Appeals following an examiner rejection.

121.    On November 22, 2011, the PTO approved the '790 Application and issued the '182 Patent, entitled "Human TNF Receptor Fusion Protein," with an expiration of November 22, 2028. The claims in the '182 Patent (those that Amgen would later assert) define a fusion protein consisting of parts of two different proteins: the extracellular region of p75 fused to all of the domains of the human IgG1 constant region other than the first domain.

122.    As to the '790 Application, Amgen amended that application three times (in 2004, 2007, and 2010) to include several references related to the full amino acid sequence for p75. None of the amendments added new matter, the claims were supported by the original specification, and the amendment brought the application into consonance with the earlier PTO restriction requirement. Like the amendments to the '182 Patent, these amendments were also triggered by PTO actions, which rejected the '791 Application for obviousness and insufficient

written description.  Despite the amendments, the '791 Application was still rejected, but that rejection was eventually overcome by citing the '790 Application BPAI Opinion which dealt with similar issues.

123.    On April 24, 2012, the PTO issued the '522 Patent, entitled "Human TNF Receptor," with an expiration of April 24, 2029. The claims in the '522 Patent that Amgen would later assert define a method of producing the fusion protein defined in the '182 Patent.[62] By the time the patents issued, Enbrel had already been on the U.S. marketplace since 1998, about 13 years. Sales were in the billions of dollars every year. With the pre-GATT filing date permitting an additional 17 years of patent protection, use of these patents would mean Amgen could protect sales of Enbrel and avoid competition from any biosimilar versions for *more than 30 years*.

124.    Soon after '182 Patent issued, analysts at Sanford C. Bernstein estimated that *this one* patent alone added $6 per share to Amgen's stock price.[63] With approximately 870 million outstanding shares, this single patent issuance potentially added about $5 billion to Amgen's value.

**G.    Amgen uses the '182 and '522 Patents to block would-be competitors from launching less expensive biosimilar versions.**

125.    Since Amgen secured the issuance of the '182 and '522 Patents from Roche's '790 and '791 Applications, it has used them to block biosimilar entrants into the U.S. market for

---

[62] The '522 Patent issued from the '791 Application, which (along with the '790 Application, which issued as the '182 Patent) was filed on May 19, 1995 as a divisional of the '640 Application.

[63] *See* Staff of H. Comm. on Oversight and Reform, *Drug Pricing Investigation: Amgen— Enbrel and Sensipar* at 24 (Oct. 2020), https://oversightdemocrats.house.gov/sites/evo-subsites/ democrats-oversight.house.gov/files/Amgen%20Staff%20Report0%2010-1-20.pdf; *see also New Patent Could Be Worth $6 a Share to Amgen*, Forbes, Nov. 28, 2011, www.forbes.com/sites/ matthewherper/2011/11/28/new-patent-could-be-worth-6-a-share-to-amgen/#4be44a7a46e1.

etanercept—the final step in unlawfully entrenching and expanding its monopoly.

**1.      Amgen successfully sues Sandoz for infringement of the '182 and '522 Patents, preventing the launch of its Enbrel biosimilar.**

126.      Sandoz, a major pharmaceutical manufacturer, became the first potential Enbrel competitor with its Erelzi drug.

127.      On September 29, 2015, the FDA accepted Sandoz's aBLA seeking authorization from the FDA to market Erelzi, a biosimilar version of Enbrel (etanercept).

128.      On February 26, 2016, Immunex and Amgen Manufacturing (the two subsidiaries of Amgen), along with Roche, filed a lawsuit against Sandoz (the "*Sandoz* case").[64] Amgen asserted infringement of the '182 and '522 Patents as well as three of its own patents, 7,915,225 ("the '225 Patent"), 8,119,605 ("the '605 Patent"), and 8,722,631 ("the '631 Patent") (collectively, the "Psoriasis Patents"). Amgen sought an injunction to prohibit Sandoz from commercializing its biosimilar etanercept prior to the expiry of all the patents.

129.      Over the course of the litigation, Amgen narrowed its infringement claims against Sandoz to the '182 and '522 Patents, dropping its claims over the Psoriasis Patents and relying exclusively on the Brockhaus Patents to deny its competitor access to the etanercept market.

130.      On August 11, 2016, and subject to the terms of a confidential stipulation, the *Sandoz* court entered a preliminary injunction prohibiting Sandoz from commercializing Sandoz's etanercept product.

131.      On August 30, 2016, the FDA approved Erelzi. Given the injunction, however, Sandoz could not launch its biosimilar.

132.      On September 10, 2018, the *Sandoz* court entered an order which stated that

---

[64] *Immunex Corp. v. Sandoz Inc.*, No. 16-cv-1118 (D.N.J.).

commercialization of Sandoz's biosimilar etanercept product would infringe the two Roche Patents (the '182 and '522 Patents).

133. On August 9, 2019, and after a bench trial, the *Sandoz* court issued a decision upholding the validity of the '182 and '522 Patents.

134. At trial, Sandoz argued, *inter alia*, that Amgen's "decision to take over the prosecution and amend the specifications of the ['790 and '791 Applications] is a clear indication that the original specifications as filed by Roche were deficient" and that amendments Amgen made to the specifications constituted "new matter" not previously included in the application. Amgen opposed these arguments. The *Sandoz* district court decision rejected Sandoz's arguments, finding that the material added in the amendments was sufficiently described in the applications as originally filed and that the amendments "did not add new matter."[65]

135. On July 1, 2020, the Federal Circuit affirmed the district court judgment upholding the validity of the '182 and '522 Patents. As to Sandoz's argument on appeal "that later amendments show that the Roche inventors did not have possession of the full p75 sequence at the time of invention," the Federal Circuit held that the district court had not erred in finding that the amendments did not add new matter.[66]

136. On May 17, 2021, Sandoz's petition for *certiorari* to the U.S. Supreme Court was denied.[67]

---

[65] *Immunex Corp. v. Sandoz Inc.*, 395 F. Supp. 3d 366, 386–87 (D.N.J. 2019), *aff'd*, 964 F.3d 1049 (Fed. Cir. 2020), *cert. denied sub nom.*, *Sandoz Inc. v. Immunex Corp.*, 141 S. Ct. 2623 (2021).

[66] *Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1064 (Fed. Cir. 2020), *cert. denied sub nom.*, *Sandoz Inc. v. Immunex Corp.*, 141 S. Ct. 2623 (2021).

[67] *Sandoz Inc. v. Immunex Corp.*, 141 S. Ct. 2623 (2021).

**JA0260**

137.    Amgen was therefore able to keep Sandoz off the market based on its 2004 unlawful acquisition of the Brockhaus Patent Rights.

**2.    Amgen sues Samsung Bioepis for infringement of the '182 and '522 Patents and blocks the launch of its Enbrel biosimilar.**

138.    The next potential competitor was Samsung Bioepis Co., Ltd. ("Bioepis").

139.    On April 25, 2019, the FDA approved Bioepis's aBLA for its etanercept product Eticovo (etanercept-ykro), another biosimilar to Enbrel.

140.    On April 30, 2019, Amgen sued Bioepis (the "*Bioepis* case"), alleging infringement of the '182 Patent and the '522 Patent and the same three Psoriasis Patents (the '225, '605, and '631 Patents) that had been asserted against Sandoz. Amgen sought an injunction to prohibit Bioepis from commercializing its biosimilar etanercept prior to the expiry of the patents.

141.    On December 23, 2019, Amgen amended its complaint against Bioepis. Amgen (i) maintained the allegations regarding the '182 Patent and the '522 Patent, but (ii) withdrew the allegations regarding the Psoriasis Patents, and (iii) added infringement allegations regarding three other manufacturing patents that were later dismissed.

142.    The *Sandoz* decisions had a significant impact on the *Bioepis* case. On November 3, 2021, Amgen successfully used the Brockhaus Patent Rights to preclude biosimilar entry by Bioepis when the *Bioepis* court entered judgment in favor of Immunex and against Bioepis on the claims for infringement of the '182 and '522 Patents. Bioepis was permanently enjoined from commercializing in the United States any product containing etanercept. Bioepis was also required to immediately destroy any Bioepis etanercept product that had been imported into the United States. The injunction terminates on April 24, 2029, once both the '182 Patent and the '522 Patent expire.

143. Once again, it was Amgen's monopolistic acquisition of the Brockhaus Patent Rights that allowed Amgen to keep its competitor off the market and extend its Enbrel monopoly.

**H. Amgen exploited its Enbrel monopoly with annual price hikes that helped the company secure more than $86 billion in net revenues.**

144. Amgen capitalized on its monopolist position by continuously raising the per unit price of Enbrel.

145. A 2020 investigation of Amgen's pricing of Enbrel by the House of Representatives' Committee on Oversight and Reform found that, since acquiring the rights to Enbrel in 2002, Amgen raised its price 27 times, including by nearly 30% within one 12-month period. By 2020, a 50-mg dose of Enbrel cost $1,414 per unit, $5,556 per month, or $72,240 a year: a 457% increase from the date Amgen acquired it.



**Figure 3. Price Per 50-mg Dose of Enbrel, 2002–2024[68]**

146.    Since 2020, Amgen has increased the price of Enbrel at least six more times. A 50-mg dose of Enbrel now costs patients $7,401.83 per month: *643% more* than it cost when launched in 1998.

147.    These price increases fueled Amgen's massive profits from Enbrel sales. Its Enbrel revenues increased every year from 2002 to 2016, culminating in $5.72 billion in 2016. One case study found that 100% of Enbrel's revenue growth between 2011 and 2021 came from price increases alone. And despite recent declines in prescription volumes, Amgen has continued to reap billions annually, profiting $3.65 billion in 2023.

148.    All told, Amgen has grossed more than $86.33 billion in sales of Enbrel. And Enbrel remains one of Amgen's best-selling products both in the United States and worldwide, delivering nearly $3.7 billion in total sales in 2023.

---

[68] WAC per 50-mg dose of Enbrel for NDC 58406-0435-01 for 2002–2022 period and for NDC 58406-0021-01(pre-filled syringe) for 2023–2024 period.

**JA0263**

**Figure 4. U.S. Sales of Enbrel, 1998–2023**



## I.     Amgen uses its exclusive license to the Brockhaus Patent Rights to unlawfully buttress and entrench its monopoly.

149.     Amgen has successfully used the rights it acquired under the 2004 Exclusive License—the exclusive license to the Brockhaus Patent Rights, the right to prosecute patents under them, and the right to bring enforcement actions—to unlawfully entrench and strengthen its monopoly, blocking biosimilar entry into the U.S. market for etanercept.

150.     Were it not for Amgen's unlawful acquisition of those rights, one or more Enbrel biosimilar products would have entered the U.S. market no later than 2019, increasing competition and driving down prices. Amgen's ceaseless efforts to thwart such competition runs afoul of state and federal antitrust and consumer protection laws.

151.     *First*, without Amgen's acquisition of exclusive rights in the 2004 Exclusive License, Roche would have retained the "co-exclusive" right to license the Brockhaus Patent Rights to another competitor or use them itself. Unable (under the law) to sell that highly

valuable right to Amgen (a monopolist in the etanercept market), a reasonable company in the position of Roche would have monetized those rights by either launching its own biosimilar product or licensing another to enter the market.

152.    *Second*, two sophisticated pharmaceutical companies, Sandoz and Bioepis, had invested significant time and money into developing and getting FDA approval for (in 2016 and 2019, respectively) biosimilar etanercept. A reasonable company in Roche's position would not simply sit on valuable, unused patent rights but instead would license them to a company who had demonstrated a commitment to investing in a competing biosimilar product—like Sandoz or Bioepis. Indeed, Roche already had several long-term manufacturing and other agreements with biosimilar companies, including Bioepis.

153.    *Third*, were it not for Amgen's unlawful acquisition of the exclusive license to the Brockhaus Patent Rights and the right to prosecute patents under them, the '182 and '522 Patents would likely never have issued or would have issued in a different form. Amgen *relied solely* on the Brockhaus Patent Rights to successfully block biosimilar entry in the *Bioepis* and *Sandoz* cases. Absent Amgen's unlawful acquisition of those rights to buttress and prolong its monopoly, multiple biosimilars could and would have entered the market before 2020.

154.    Samsung would have launched its etanercept biosimilar, Erelzi, at least by August 13, 2019 (when the Psoriasis Patents expired), but potentially as early as August 16, 2016 (when the FDA granted final approval of Sandoz's aBLA).

155.    Bioepis would have launched its etanercept biosimilar, Eticovo, at least by August 13, 2019, as well, but potentially as early as April 25, 2019 (when the FDA granted final approval of Bioepis's aBLA).

156.    Amgen knew that biosimilar entry would have an immediate adverse effect on

Enbrel sales. With multiple biosimilar entrants, "competition [would] intensif[y] rapidly, resulting in greater net price declines for both the reference and biosimilar products and a greater effect on product sales."[69]

157. Erelzi and Eticovo would likely have launched at Wholesale Acquisition Cost (WAC) prices 15%–37% lower than that of Enbrel[70] and captured 20%–25% of the etanercept market within one year of entry[71]—saving purchasers approximately $151–467 million in the first year alone.[72] Uptake of the etanercept biosimilars would have continued to increase over time, capturing approximately 75% of the market after three years, saving purchasers nearly $1 billion annually.[73] Had both biosimilar competitors launched on August 13, 2019, purchasers of etanercept collectively would have saved at least $3–4 billion to date.[74]

158. Amgen acted with the intent of keeping prices high—after all, Amgen itself

---

[69] Amgen Inc., Annual Report (Form 10-K) at 18 (Feb. 27, 2024).

[70] *See* Amgen, *2020 Biosimilar Trends Report* at 14, 18 (Sept. 2020), https://www.amgen biosimilars.com/-/media/Themes/Amgen/amgenbiosimilars-com/Amgenbiosimilars-com/pdf/ USA-CBU-80723-2020-Amgen-Biosimilar-Trends-Report.pdf ("Amgen 2020 Biosimilar Trends Report") (reporting that "manufacturers are launching biosimilars at a WAC price that is generally 15% to 37% lower than the reference product WAC"); *see also* IQVIA Biosimilars Report at 2 (noting that price discounts for biosimilars "range significantly," but "appear to reflect prior assumptions of roughly 30% discounts").

[71] *See* Amgen 2020 Biosimilar Trends Report ("Within the first year, biosimilar share generally ranged from 20% to 25%."); *see also* IQVIA Biosimilars Report at 10 (indicating that earlier biosimilars achieved 25% share of molecule volume within the first year and 39% after two years, but also noting that two biosimilars launched in 2019 had achieved significantly higher first-year uptake of 38% and 42%).

[72] Based on Amgen's reported Enbrel sales of $5.05 billion for FY2019.

[73] *See* Amgen, *2022 Biosimilar Trends Report* at 14 (Oct. 2022), https://www.amgen biosimilars.com/commitment/2022-Biosimilar-Trends-Report ("Amgen 2022 Biosimilar Trends Report") ("For therapeutic areas with biosimilars launched in the last 3 years, the average share was 75%.").

[74] A 30% WAC discount and market share of 25% after the first year and increasing to 60% the fifth year would result in a savings of $2.66B in total sales.

acknowledges the extraordinary benefits of biosimilar entry. As Amgen has observed:

> Since the first biosimilar entered the US marketplace in 2015, 39 biosimilars have been approved, 22 of which have been launched. Biosimilars have gained significant share in the majority of therapeutic areas where they have been introduced. The US marketplace is poised to see further growth in the number of biosimilars approved and welcome many new biosimilars in the years to come. Additional competition may lead to significant savings for the healthcare system, and these savings can be deployed to newer, innovative treatments.[75]

159. Amgen admits that "[c]ompetitive mechanisms are in place to support biosimilar uptake" and that "[b]iosimilars have the potential to reduce healthcare costs by providing significant wholesale acquisition cost (WAC) and average sales price (ASP) savings at launch and through price competition, resulting in the opportunity for additional savings over time."[76] It notes that the "rate of biosimilar uptake is generally increasing over time" and that "first-to-launch biosimilars tend to capture a greater portion of the segment compared to later entrants."[77] It notes that, for "therapeutic areas with biosimilars launched in the last 3 years, the average share was 75%" and "the cumulative savings in drug spend for classes with biosimilar competition is estimated to have been $21 billion over the past 6 years."[78]

160. The fact that Amgen has been able to block biosimilar entry for etanercept since the late 2010s or early 2020s is egregious given that entry of a biosimilar Enbrel should and likely would have been the first biosimilar drug in the extraordinarily costly autoimmune therapeutic area. In 2021, global sales of autoimmune drugs totaled more than $40 billion. As Amgen has remarked about the autoimmune space, "the planned launches of biosimilars to

---

[75] Amgen 2022 Biosimilar Trends Report at 6.

[76] *Id.* at 6, 12.

[77] *Id.* at 14.

[78] *Id*. at 14–15.

Humira [another autoimmune drug used to treat similar conditions as Enbrel] in 2023 could be a pivotal moment."[79] But that pivotal moment could, and should, have first occurred with Enbrel. And as Amgen has admitted, "More biosimilars to treat autoimmune conditions will be coming to market this decade, offering an opportunity to inject competition and reduce healthcare costs."[80]

161. The absence of a biosimilar for Enbrel in the U.S. is particularly disturbing considering that a biosimilar product was first developed and approved *eight years ago*. Despite companies with biosimilar versions of Enbrel having undergone a thorough FDA approval process, they remain unable to enter the market.

162. But because of the unlawful monopoly conferred by the Brockhaus Patent Rights, purchasers continue to be overcharged hundreds of millions of dollars per year for etanercept purchases. For at least 26 years—from November 1998 (Enbrel's launch) through the filing of this complaint—Amgen has enjoyed exclusive sales of Enbrel, and if not enjoined, will continue to do so until 2029.

163. In sum, Amgen knowingly and willfully acquired the exclusive license to the Brockhaus Patent Rights to delay competition from would-be etanercept biosimilar competitors and to further entrench its etanercept monopoly. Amgen's acquisition of the Brockhaus Patent Rights was for the purpose, and has had the consequence of, unlawfully extending and maintaining Amgen's monopoly in the market for etanercept in the United States.

## VI. CLASS ALLEGATIONS

164. The plaintiffs, on behalf of themselves and the putative class members, seek

---

[79] *Id.* at 24.

[80] *Id.*

damages (measured as overcharges) against Amgen based on their allegations of anticompetitive conduct in the market for etanercept in the United States.

165. The plaintiffs bring this action on behalf of themselves and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as representatives of the class defined as:

> All end payors (including any assignees of such end payors) in the United States and its territories who purchased and/or paid all or part of the purchase price of Enbrel from July 2020 until the anticompetitive effects of the defendants' conduct cease ("class period").

166. Excluded from the class are the defendants and any of their officers, directors, management, employees, subsidiaries, and affiliates.

167. Also excluded from the class are: (1) the government of the United States and all agencies thereof, and (2) all state or local governments and all agencies thereof.

168. Class members are so numerous and geographically dispersed that joinder of all members is impracticable. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together.

169. The plaintiffs' claims are typical of those of the class members. The same wrongful conduct damaged the plaintiffs and all class members—i.e., they paid and will pay artificially inflated prices for etanercept and were deprived of earlier and more robust competition from cheaper biosimilar versions of etanercept because of Amgen's wrongful conduct.

170. The plaintiffs will fairly and adequately protect and represent the class's interests. The plaintiffs' interests are coincident with, and not antagonistic to, those of the other class members.

171. Counsel representing the plaintiffs are experienced in the prosecution of antitrust class action litigation and have extensive experience with class action antitrust litigation

- 48 -

**JA0269**

involving pharmaceutical products.

172. Questions of law and fact common to the class members predominate over questions that may affect only individual class members because Amgen has acted on grounds generally applicable to the entire class. This conduct renders appropriate overcharge damages with respect to the class as a whole. Such generally applicable conduct is inherent to Amgen's wrongful actions.

173. Questions of law and fact common to the proposed class include:

 a. whether Amgen willfully and improperly maintained monopoly power over etanercept in the United States;

 b. whether Amgen intentionally acquired the exclusive license to the Brockhaus Patent Rights to unlawfully delay competition and to unlawfully maintain its monopoly over etanercept;

 c. whether Amgen unlawfully used the Brockhaus Patent Rights to delay etanercept biosimilar competition;

 d. whether Amgen unlawfully excluded competitors and potential competitors from the market for etanercept;

 e. whether Amgen unlawfully delayed or prevented manufacturers of etanercept biosimilars from coming to market in the United States;

 f. whether Amgen improperly maintained monopoly power by delaying biosimilar entry;

 g. whether the law requires a definition of a relevant market when direct proof of monopoly power is available, and if so, the definition of the relevant market;

 h. whether Amgen's activities as alleged herein have substantially affected interstate commerce;

 i. whether, and if so to what extent, Amgen's conduct caused antitrust injury (i.e., overcharges) to the plaintiffs and the class members; and

 j. the quantum of aggregate overcharge damages to the plaintiffs and class members.

174. Class action treatment is a superior method for the fair and efficient adjudication

- 49 -

of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require. The benefits of proceeding through the class mechanism—including providing injured persons or entities with a method for obtaining redress on claims that they could not practicably pursue on an individual basis—substantially outweigh potential difficulties in management of this class action.

175. Amgen's anticompetitive conduct has imposed and will continue to impose (unless the plaintiffs obtain equitable relief) a common antitrust injury on the plaintiffs and all class members. Amgen's anticompetitive conduct and its relationships with the class members have been substantially uniform. Amgen has acted and refused to act on grounds that apply to the class generally, and injunctive and other equitable relief is appropriate respecting the class as a whole.

176. The plaintiffs know of no special difficulty in litigating this action that would preclude its maintenance as a class action.

## VII. MARKET POWER AND MARKET DEFINITION

177. The relevant geographic market is the United States and its territories.

178. The relevant product market is etanercept.

179. At all times relevant to this civil action, Amgen had monopoly power in the market for etanercept in the United States.

## A. Direct evidence demonstrates Amgen's market power.

180. *Supracompetitive prices*. At all times relevant to this civil action, Amgen charged supracompetitive prices for Enbrel—i.e., prices that were and are markedly higher than those Amgen could have charged had there been biosimilar competition for etanercept. Amgen also

steadily *increased* the price of Enbrel over the years.

181. From 1998 to the present, Amgen *never* lowered Enbrel prices or lost sales volume in response to the pricing of other drugs, even though other biologic products were available in the U.S. to treat rheumatoid arthritis, psoriasis, PsA, ankylosing spondylitis, and JIA, indicating that its sales are not constrained by any other products.

182. *Supracompetitive profit margins.* At all times relevant to this action, Amgen enjoyed extraordinarily high profit margins from the sale of Enbrel.

183. *Combination patent protection and other barriers*. From Enbrel's 1998 launch through the filing of this complaint, Amgen has enjoyed and continues to enjoy patent protection for etanercept. As a result, Amgen has the power to exclude competition from etanercept biosimilars.

184. *Lack of interchangeability*. Etanercept is not readily interchangeable with other treatments for rheumatoid arthritis, psoriasis, PsA, ankylosing spondylitis, or JIA. Etanercept is a unique treatment for these diseases, ostensibly offering advantages over other available treatments for these conditions.

185. *Biosimilar competition*. Recent reports regarding biosimilars confirm that biosimilar competition has a significant effect in lowering price among equally effective therapies.

186. Recent biosimilars have achieved high market volume share, reaching more than 60% of a given biologic's volume within the first three years on the market. The introduction of biosimilars frequently leads to higher utilization of the treatment as lower costs improve patient access.

187. Introduction of lower cost biosimilars precipitates reductions in overall drug costs

per unit at invoice prices over time. Indeed, such competition typically lowers the per unit cost of both the brand and biosimilar drug. Costs are down between 18% and 50% per unit for drugs with biosimilars.

188.   Amgen, in its 2022 Biosimilar Trends report, admitted that biosimilar entrants are typically successful at taking market share from the reference biologic drug. Amgen's report states: "Biosimilars have gained significant share in the majority of therapeutic areas where they have been introduced."[81] Amgen further remarked: "For therapeutic areas with biosimilars launched in the last 3 years, the average share was 75%," and "[f]or therapeutic areas with biosimilars launched prior to 2019, the average share after 3 years was 39%."[82]

189.   A 2022 study published in the *Journal of the American Medical Association* found that "[b]iosimilars in the US that entered the market more recently were estimated to experience a faster uptake (as measured by the market share 1 year after launch). . . ."[83]

190.   The effects of biosimilar competition in the U.S. market for etanercept would also have substantial downward pressure on the price of etanercept.

191.   Direct evidence shows that Amgen has monopoly power over the sale of etanercept in the United States and that entry of a biosimilar etanercept would cause significant downward pressure on price, resulting in more affordable and accessible etanercept products.

**B.     Indirect evidence demonstrates Amgen's market power.**

192.   To the extent the plaintiffs are legally required to prove monopoly power through circumstantial evidence by first defining a relevant product market, the relevant product market

---

[81] Amgen 2022 Biosimilar Trends Report at 14.

[82] *Id.*

[83] David L. Carl, Yannic Laube & Miguel Serra-Burriel, *Comparison of Uptake and Prices of Biosimilars in the US, Germany, and Switzerland*, 5 JAMA Netw. Open 1, 6 (2022).

is the sale of etanercept in the United States and has, thus far, consisted solely of Enbrel. Biosimilar versions of etanercept will also be in the relevant market once they are available. At all relevant times, Amgen's market share in the market was and remains 100%.

193. Amgen, at all relevant times, enjoyed high barriers to entry with respect to competition in the product market of etanercept due, in large part, to legally and illegally created patent protections.

194. Enbrel does not exhibit significant, positive cross-elasticity of demand with any other medication. The existence of non-etanercept products that may be used to treat similar indications as etanercept has not constrained Amgen's ability to raise or maintain Enbrel prices without losing substantial sales. As a result, those other drug products do not occupy the same relevant antitrust market as Enbrel.

195. Amgen needed to control only etanercept, and no other products, to maintain a supracompetitive price for Enbrel while preserving all or virtually all its sales. Only market entry of a competing, biosimilar etanercept would undermine Amgen's ability to keep Enbrel prices high without losing substantial sales.

196. Indirect evidence shows that Amgen had monopoly power in an antitrust market of the sale of etanercept in the United States.

## VIII.   MARKET EFFECTS AND CLASS DAMAGES

197. In the absence of the anticompetitive conduct alleged above, multiple manufacturers would have entered the market with etanercept biosimilars at least by August 2019, and potentially as early as August 2016.

198. Instead, Amgen (i) willfully and unlawfully maintained and extended its monopoly power in the U.S. market for etanercept through the unlawful acquisition of the Brockhaus Patent Rights, and then by reason of that acquisition, (ii) prosecuted the '790 and

- 53 -
**JA0274**

'791 Applications to obtain the '182 and '552 Patents, and (iii) used those patents to buttress and entrench its monopoly and delay competition from would-be etanercept biosimilar competitors. The unlawful acquisition was the violation of the antitrust laws, and the subsequent prosecution of the '790 and '791 Applications and enforcement of the '182 and '552 Patents issued therefrom caused anticompetitive harm.

199.    Amgen's conduct had, and continues to have, the purpose and effect of preventing biosimilar competition, permitting Amgen to maintain supracompetitive monopoly prices for Enbrel and enabling Amgen to sell Enbrel without competition. Absent Amgen's conduct, biosimilar versions of etanercept would have been available sooner.

200.    Competition among drug manufacturers enables all purchasers of their drugs to buy biosimilar versions of the drugs at substantially lower prices and/or to buy the reference biologic products at reduced prices. Consequently, reference (i.e., brand) biologic manufacturers have a strong incentive to delay biosimilar competition. Purchasers experience substantial cost inflation from that delay.

201.    If competition from biosimilar manufacturers had not been restrained and forestalled in the case of etanercept, end payers like the plaintiffs and class members would have paid less for etanercept by: (i) purchasing and providing reimbursement for biosimilar versions of etanercept instead of the more expensive Enbrel, and (ii) purchasing and providing reimbursement for Enbrel at lower prices.

202.    As a result, Amgen's conduct has forced and will continue to force the plaintiffs and class members to pay more for Enbrel and biosimilar etanercept than they would have paid absent Amgen's misconduct.

203.    CareFirst has purchased Enbrel for its members in 45 states and the District of

Columbia. Between 2021 and 2023, CareFirst paid more than $109 million for members' Enbrel

prescriptions. The breakdown by state is shown in the figure below.

**Figure 5. CareFirst's Enbrel Purchases by State, 2021–2023**



## IX.    ANTITRUST IMPACT

204.    The effect of Amgen's conduct is to net Amgen billions of dollars in revenue at the expense of end payers, including the plaintiffs and class members, who will pay hundreds of millions, if not billions, of dollars in unlawful overcharges.

205.    During the relevant period, the plaintiffs and class members purchased substantial amounts of Enbrel indirectly from Amgen.

206.    As a direct and proximate result of Amgen's anticompetitive conduct, the plaintiffs and class members have paid and will continue to pay supracompetitive prices for etanercept because (1) the price of Enbrel was and is artificially inflated by Amgen's anticompetitive conduct and (2) the plaintiffs and class members were and are deprived of the opportunity to purchase lower-priced biosimilar versions of etanercept.

207.    As a result, the plaintiffs and class members have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount, forms, and components of such damages will be calculated after discovery and upon proof at trial.

208.    The overcharges resulting from Amgen's conduct are directly traceable through the pharmaceutical distribution chain to the plaintiffs and other class members. Amgen first sells Enbrel to wholesalers based on Enbrel's listed WAC, minus applicable discounts. Wholesalers then sell Enbrel to specialty pharmacies, which in turn sell it to consumers. In this short chain of distribution, drug products are not altered or incorporated into other products. Each drug purchase is documented and closely tracked by pharmacies, pharmacy benefit managers, and third-party payers (such as insurers and health and welfare funds). The products and their prices are thus directly traceable from manufacturer to consumer.

## X.    IMPACT ON INTERSTATE COMMERCE

209.    Amgen's efforts to monopolize and restrain competition in the market for

etanercept have substantially affected interstate and foreign commerce.

210.    At all material times, Amgen manufactured, sold, and shipped substantial amounts of Enbrel across state lines in an uninterrupted flow of commerce across state and national lines throughout the United States.

211.    At all material times, Amgen transmitted funds as well as contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Enbrel.

212.    To further its monopolization and restraint on competition in the market for etanercept, Amgen used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign wire commerce. Amgen engaged in illegal activities, as charged herein, within the flow of—and substantially affecting—interstate commerce, including in this district.

## XI.    FEDERAL CLAIMS FOR RELIEF

## COUNT ONE

### MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2) SEEKING DECLARATORY AND INJUNCTIVE RELIEF

213.    The plaintiffs repeat and incorporate the above paragraphs as though fully set forth herein.

214.    At all relevant times, Amgen possessed and continues to possess substantial market power (i.e., monopoly power) in the market for etanercept in the United States. Amgen possessed and continues to possess the power to control prices in, prevent prices from falling in, and exclude competitors from the U.S. market for etanercept.

215.    Amgen's market power is coupled with strong regulatory and contractual barriers to entry.

216. At all relevant times, Amgen knowingly, willfully, and improperly maintained its monopoly power in the U.S. market for etanercept from as early as 2016 until the present through restrictive and exclusionary conduct, rather than through growth or development resulting from a superior product, business acumen, or historic accident, and thereby injured the plaintiffs and class members. Amgen's conscious objective was to further its dominance and monopoly power in the market for etanercept in the United States.

217. Amgen knowingly, willfully, and improperly maintained its monopoly power and substantially reduced and harmed competition in the market for etanercept in the United States by wrongfully acquiring an exclusive license to the Brockhaus Patent Rights and using those rights to delay and/or prevent would-be competitors, including Sandoz and Bioepis, from developing etanercept biosimilars and entering the market.

218. Amgen's monopoly power over etanercept should have expired no later than 2019—and as early as 2016—when Amgen's patents had expired and biosimilars entered the market. Instead, due to its unlawful acquisition and enforcement of the Brockhaus Patent Rights, Amgen's monopoly power will extend at least five years too long, until Amgen is enjoined or the Brockhaus Patents expire on April 24, 2029. As a result of Amgen's unlawful anticompetitive conduct, no other entity currently sells biosimilar etanercept in the United States. This is true even though the FDA has already approved two etanercept biosimilars.

219. The goal, purpose, and effect of Amgen's acquisition of the Brockhaus Patent Rights was to delay and/or block etanercept biosimilars from entering the market, maintain its monopoly in that market, and maintain its supracompetitive prices for Enbrel.

220. Amgen's anticompetitive conduct substantially reduced and harmed competition in the relevant market and was an unreasonable restraint on trade.

- 59 -

**JA0280**

221.     Had Amgen competed on the merits, instead of unlawfully maintaining its monopoly in the market for etanercept, one or more etanercept biosimilars would have been available by no later than 2019, and as early as 2016. The plaintiffs and class members would have substituted the lower-priced etanercept biosimilar products for the higher-priced brand Enbrel (or purchased Enbrel at lower prices) for some or all their etanercept requirements. As a result, they would have paid substantially lower prices for etanercept.

222.     To the extent that Amgen is permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for its exclusionary conduct that outweighs that conduct's harmful effects. Even if there were some conceivable justifications that Amgen were permitted to assert, Amgen's conduct is and was broader than necessary to achieve such a purpose.

223.     Amgen's anticompetitive activities have directly, foreseeably, and proximately caused injury to the plaintiffs and class members throughout the United States. The plaintiffs' and class members' injuries consist of: (a) being denied the opportunity to purchase lower-priced Enbrel from Amgen; (b) paying higher prices for etanercept than they would have paid in the absence of Amgen's unfair, illegal, and deceptive conduct; and (c) being denied the opportunity to purchase biosimilar etanercept at a price substantially lower than what they were forced to pay for Enbrel. These injuries are of the type that the antitrust laws were designed to prevent, and they flow from that which makes Amgen's conduct unlawful.

224.     The plaintiffs and the class members are the proper entities to bring a case concerning Amgen's unlawful anticompetitive conduct.

225.     The plaintiffs and class members have been injured, and unless Amgen's unlawful conduct is enjoined, the plaintiffs and class members will continue to be injured, in their

businesses and property, as a direct and proximate result of Amgen's continuing monopolization in violation of Section 2 of the Sherman Act.

226. Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), the plaintiffs and the class members seek a declaratory judgment that Amgen's conduct seeks to prevent competition as described in the preceding paragraphs violates § 2 of the Sherman Act.

227. Pursuant to Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 18, 26, and other applicable law, the plaintiffs and class members further seek equitable and injunctive relief to correct for the anticompetitive market effects Amgen's unlawful conduct caused and to ensure that similar anticompetitive conduct does not occur in the future.

## XII. STATE CLAIMS FOR RELIEF

### COUNT TWO

### MONOPOLIZATION AND MONOPOLISTIC CONDUCT UNDER STATE LAW

228. The plaintiffs repeat and incorporate the above paragraphs as though fully set forth herein.

229. Count Three is pleaded on behalf of the plaintiffs and class members under the antitrust laws of each jurisdiction identified below.

230. Count Three arises from Amgen's exclusionary, anticompetitive conduct that was designed to create and maintain Amgen's improper monopoly over etanercept and exclude or substantially exclude its biosimilars from the market.

231. The essential elements of each antitrust claim in Count Three are the same. The above-alleged conduct that violates the Sherman Act will, if proven, establish a claim under each of the laws cited below.

232. At all relevant times, Amgen possessed and continues to possess substantial market power (i.e., monopoly power) in the market for etanercept. Amgen possessed and

- 61 -

continues to possess the power to control prices in, prevent prices from falling in, and exclude competitors from the U.S. market for etanercept.

233.    Through its anticompetitive acts, as alleged above, Amgen willfully maintained its monopoly power in the market for etanercept in the United States after 2004, when it obtained its exclusive license from Roche, using restrictive or exclusionary conduct, rather than by means of a superior product, business acumen, or historic accident, and thereby injured the plaintiffs and the class members. Amgen engaged in its anticompetitive conduct with the specific intent to maintain its monopoly in the market for etanercept in the United States.

234.    Amgen accomplished its anticompetitive acts by: (i) wrongfully acquiring the rights to the Roche Patents; and (iii) using the wrongfully acquired Roche Patents to unlawfully delay competition from would-be etanercept biosimilar competitors.

235.    The goal, purpose, and effect of Amgen's anticompetitive conduct was to delay and/or block etanercept biosimilars from entering the market, extend Amgen's monopoly in that market, and maintain its supracompetitive prices for Enbrel.

236.    Amgen's anticompetitive conduct substantially reduced and harmed competition in the relevant market and was an unreasonable restraint on trade.

237.    Amgen's anticompetitive conduct directly impacts and disrupts commerce within each jurisdiction below.

238.    Had Amgen competed on the merits, instead of unlawfully maintaining its monopoly in the market for etanercept, one or more etanercept biosimilars would have been available at least by August 13, 2019 (the date the Psoriasis Patents expired), but potentially as early as August 16, 2016. The plaintiffs and class members would have substituted the lower-priced etanercept biosimilars for the higher-priced brand Enbrel (or paid less for Enbrel) for

some or all their etanercept requirements. As a result, they would have paid substantially lower prices for etanercept.

239. During the class period, Enbrel, manufactured and sold by Amgen, was shipped into each state and was sold to or paid for by the plaintiffs and the class.

240. During the class period, in connection with the purchase and sale of Enbrel, money changed hands and business communications and transactions occurred in each state.

241. Amgen's conduct as set forth in this Complaint had substantial effects on intrastate commerce in that, *inter alia*, retailers within each state were foreclosed from offering cheaper generic Enbrel to end payors purchasing inside each respective state. This impairment of competition directly impacts and disrupts commerce within each state.

242. Amgen's anticompetitive activities have directly, foreseeably, and proximately caused injury to the plaintiffs and class members throughout the United States. The plaintiffs' and class members' injuries consist of: (a) being denied the opportunity to purchase lower-priced Enbrel from Amgen; (b) paying higher prices for etanercept than they would have paid in the absence of Amgen's unfair, illegal, and deceptive conduct; and (c) being denied the opportunity to purchase biosimilar etanercept at prices substantially lower than what they were forced to pay for Enbrel. These injuries are of the type that the laws of the jurisdictions below were designed to prevent, and they flow from that which makes Amgen's conduct unlawful.

243. The plaintiffs and class members are the proper entities to bring a case concerning Amgen's unlawful anticompetitive conduct.

244. The defendants are jointly and severally liable for all damages suffered by the plaintiffs and the class members.

245. By engaging in the foregoing conduct, Amgen intentionally and flagrantly

- 63 -

maintained its monopoly power over etanercept in the United States in violation of the following

state laws:

a. Ala. Code § 8-10-3 with respect to the plaintiffs' and class members' purchases in Alabama.

b. Ariz. Arizona Rev. Stat. §§ 44-1401 et seq., including Ariz. Rev. Stat. § 44-1403, with respect to the plaintiffs' and class members' purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 16700 et seq., and §§ 17200, et seq., with respect to the plaintiffs' and class members' purchases in California.

d. Col. Rev. Stat. Ann. §§ 6-4-105 et seq., with respect to the plaintiffs' and class members' purchases in Colorado.

e. Conn. Gen. Stat. §§ 35-24 et seq., with respect to the plaintiffs' and class members' purchases in Connecticut.

f. D.C. Code §§ 28-4501 et seq., with respect to the plaintiffs' and class members' purchases in the District of Columbia.

g. Fla. Stat. §§ 501.201 et seq., with respect to the plaintiffs' and class members' purchases in Florida.

h. Haw. Rev. Stat. §§ 480-13.3 et seq., with respect to class members' purchases in Hawaii.

i. 740 Ill. Comp. Stat. 10/1 et seq., including 740 Ill. Comp. Stat. 10/3, with respect to the plaintiffs' and class members' purchases in Illinois.

j. Iowa Code §§ 553.1 et seq., including Iowa Code § 553.5, with respect to the plaintiffs' and class members' purchases in Iowa.

k. Kan. Stat. Ann. §§ 50-101 et seq., including Kan. Stat. Ann. § 50-132, with respect to the plaintiffs' and class members' purchases in Kansas.

l. Me. Rev. Stat. Ann. tit. 10, §§ 1101 et seq., including Me. Rev. Stat. Ann. tit. 10, §1102, with respect to the plaintiffs' and class members' purchases in Maine.

m. Md. Code Com. Law § 11-201 et seq., including Md. Code Com. Law § 11-204, with respect to the plaintiffs' and class members' purchases in Maryland.

n. Mich. Comp. Laws Ann. §§ 445.771 et seq., with respect to the plaintiffs' and class members' purchases in Michigan.

**JA0285**

o.  Minn. Stat. Ann. §§ 325D.49 et seq., including Minn. Stat. Ann. § 325D.52 and Minn. Stat. Ann. § 8.31, et seq., with respect to the plaintiffs' and class members' purchases in Minnesota.

p.  Miss. Code Ann. §§ 75-21-3 et seq., with respect to the plaintiffs' and class members' purchases in Mississippi.

q.  Neb. Code Ann. §§ 59-801 et seq., including Neb. Code Ann. § 59-802, with respect to the plaintiffs' and class members' purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.010 et seq., including Nev. Rev. Stat. Ann. § 598A.060, with respect to class members' purchases in Nevada.

s.  N.H. Rev Stat. Ann. §§ 356.1, et seq., including N.H. Rev. Stat. Ann. § 356.3, with respect to the plaintiffs' and class members' purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-1 et seq., including N.M. Stat. Ann. § 57-1-2, with respect to the plaintiffs' and class members' purchases in New Mexico.

u.  N.Y. Gen. Bus. Law §§ 340 et seq., with respect to the plaintiffs' and class members' purchases in New York.

v.  N.C. Gen. Stat. Ann. §§ 75-1 et seq., including N.C. Gen. Stat. Ann. § 75-2.1, with respect to the plaintiffs' and class members' purchases in North Carolina.

w.  N.D. Cent. Code §§ 51-08.1-01 et seq., including N.D. Cent. Code §§ 51-08.1-03, with respect to the plaintiffs' and class members' purchases in North Dakota.

x.  Or. Rev. Stat. §§ 646.705 et seq., including Or. Rev. Stat. §§ 646.730, with respect to the plaintiffs' and class members' purchases in Oregon.

y.  10 L.P.R.A. §§ 257 et seq., with respect to class members' purchases in Puerto Rico.

z.  R.I. Gen. Laws §§ 6-36-1 et seq., including R.I. Gen. Laws §§ 6-36-5, with respect to the plaintiffs' and class members' purchases in Rhode Island.

aa.  S.D. Codified Laws §§ 37-1-3.1 et seq., including S.D. Codified Laws §§ 37-1-3.2, with respect to class members' purchases in South Dakota.

bb.  Tenn. Code Ann §§ 47-25-101 et seq., with respect to the plaintiffs' and class members' purchases in Tennessee.

cc.    Utah Code Ann. §§ 76-10-3101 et seq., including Utah Code Ann. §§ 76-10-3104, with respect to purchases in Utah by class members that are Utah residents or citizens.

dd.    Vt. Stat. Ann. tit. 9, §§ 2451 et seq., with respect to the plaintiffs' and class members' purchases in Vermont.

ee.    W.Va. Code §§ 47-18-1 et seq., including § 47-18-4, with respect to the plaintiffs' and class members' purchases in West Virginia.

ff.    Wis. Stat. §§ 133.01 et seq., including Wis. Stat. §§ 133.04, with respect to the plaintiffs' and class members' purchases in Wisconsin.

246.    As a result of the unlawful and anticompetitive conduct described above, the plaintiffs and/or members of the class paid artificially inflated prices for Enbrel, in each of these listed jurisdictions.

**COUNT THREE**

**VIOLATIONS OF STATE CONSUMER PROTECTION LAWS**

247.    The plaintiffs repeat and incorporate the above paragraphs as though fully set forth herein.

248.    As described above, Amgen has engaged and continues to engage in unfair competition or unfair, unconscionable, deceptive, and/or fraudulent conduct, acts, or practices in violation of the state consumer protection statutes set forth below. As a direct and proximate result of Amgen's anticompetitive, deceptive, unfair, unconscionable, and/or fraudulent conduct, the plaintiffs have been and continue to be deprived of the opportunity to purchase lower-priced biosimilar versions of etanercept.

249.    Amgen established, maintained, and/or used a monopoly, or attempted to establish a monopoly, and to restrain trade or commerce in the U.S. market for etanercept. A substantial part of this conduct occurred within each jurisdiction identified below. Amgen intended to injure competitors and exclude or substantially lessen competition. Amgen intended

**JA0287**

to injure consumers by unlawfully reaping supracompetitive profits.

250.    By unlawfully delaying the entry of etanercept biosimilars, Amgen, as a supplier, engaged in a fraudulent or deceptive act or practice in connection with a consumer transaction.

251.    Amgen's conduct constitutes consumer-oriented deceptive acts or practices that resulted in consumer injury and broad adverse impact on the public at large. Amgen's conduct thereby harmed consumers' interest in an honest marketplace where economic activity is conducted in a competitive manner.

252.    Amgen withheld material facts and information from the plaintiffs and class members, including that Amgen was unlawfully excluding manufacturers of biosimilar etanercept from the market and monopolizing the market for etanercept (and thereby profiting from the resulting supracompetitive prices that the plaintiffs and class members who purchased or reimbursed purchases of Enbrel paid).

253.    Amgen's conduct was willful and knowing. Amgen intended to deceive the plaintiffs and class members regarding the nature of its actions within the stream of commerce in each jurisdiction below.

254.    Amgen's acts, omissions, misrepresentations, practices, and/or non-disclosures constituted a common, continuous, and continuing course of conduct of deceptive and unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices.

255.    The plaintiffs and class members purchased (or reimbursed their members for purchases of) etanercept primarily for personal, family, or household purposes.

256.    The plaintiffs and class members who do not profit from purchasing etanercept or from reimbursing their members for purchases of etanercept are "consumers" under the consumer protection laws of the jurisdictions below.

257.     There was and is a gross disparity between the price that the plaintiffs and class members paid for etanercept and the value they received given that less expensive biosimilar versions of etanercept should have been available and would have been but for Amgen's unlawful conduct.

258.     As a direct and proximate result of Amgen's unlawful conduct, the plaintiffs and class members have been injured and are threatened with continued injury.

259.     As a direct and proximate result of Amgen's unfair, unconscionable, deceptive, and fraudulent conduct in violation of the state consumer protection statutes listed below, the plaintiffs and class members were denied the opportunity to purchase lower-priced etanercept biosimilars and paid higher prices for Enbrel than they would otherwise have paid.

260.     The gravity of harm from Amgen's unlawful conduct significantly outweighs any conceivable utility from that conduct. The plaintiffs and class members could not reasonably have avoided injury from Amgen's conduct.

261.     Amgen's unlawful conduct substantially affected the trade and commerce of each jurisdiction in which etanercept was sold.

262.     Amgen's unfair and deceptive acts described above were knowing, willful, and unconscionable and constitute violations or flagrant violations of the following unfair trade practices and consumer protection statutes.

263.     As a result of the unfair and deceptive conduct described above, the plaintiffs and/or members of the class paid artificially inflated prices for Enbrel, in each of these listed jurisdictions.

   **1.     Ala. Code §§ 8-19-1 et seq. (with respect to the plaintiffs' and class members' purchases in Alabama)**

264.     Section 8-19-5 of the Alabama Code declares unlawful "engaging in any . . .

- 68 -
**JA0289**

unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

265.    As set forth in detail above, Amgen violated §§ 8-19-1 et seq. of the Alabama Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unconscionable, misleading, and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

266.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

267.    The plaintiffs' and class members' injuries are of the type that §§ 8-19-1 et seq. of the Alabama Code was intended to prevent.

268.    The plaintiffs are entitled to bring this action for damages pursuant to § 8-19-10 of the Alabama Code. As required by § 8-19-10(e), the plaintiffs served the defendants with a written demand for relief identifying the plaintiffs and reasonably describing the unfair or deceptive acts and the injury suffered at least 15 days prior to bringing a claim under §§ 8-19-1 et seq.

269.    The plaintiffs are entitled to recover their actual damages, which may be trebled at the Court's discretion, along with costs of suit and reasonable attorneys' fees pursuant to § 8-19-10(a) of the Alabama Code.

**2.      Alaska Stat. §§ 45.50.471 et seq. (with respect to the plaintiffs' and class members' purchases in Alaska)**

270.    Section 45.50.471 of the Alaska Statutes declares unlawful "[u]nfair methods of

- 69 -
**JA0290**

competition and unfair or deceptive acts or practices in the conduct of trade or commerce," which include "engaging in… conduct creating a likelihood of confusion or misunderstanding and that misleads, deceives, or damages a buyer or competitor in connection with the sale or advertisement of goods or services" and "using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing or suppressing, or omitting material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged."

271. As set forth in detail above, Amgen violated §§ 45.50.471 et seq. of the Alaska Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

272. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

273. The plaintiffs' and class members' injuries are of the type that §§ 45.50.471 et seq. of the Alaska Statutes was intended to prevent.

274. The plaintiffs are entitled to bring this action pursuant to §§ 45.50.531 and 45.50.535 of the Alaska Statutes. As required by § 45.50.535, the plaintiffs provided the defendants with written notice that the plaintiffs would seek an injunction if the defendants failed to promptly stop their unlawful acts before bringing a claim under §§ 45.50.471 et seq.

275. The plaintiffs are entitled to recover three times their actual damages, punitive

damages, injunctive relief, reasonable attorneys' fees and costs, and any other relief the Court considers necessary and proper pursuant to §§ 45.50.531, 45.50.535, and 45.50.537 of the Alaska Statutes.

**3.      Ariz. Rev. Stat. §§ 44-1521 et seq. (with respect to the plaintiffs' and class members' purchases of etanercept in Arizona)**

276.    Section 44-1522 of the Arizona Revised Statutes provides:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

277.    As set forth in detail above, Amgen violated § 44-1522 of the Arizona Revised Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

278.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

279.    The plaintiffs' and class members' injuries are of the type that § 44-1522 of the Arizona Revised Statutes was intended to prevent.

280.    The plaintiffs are entitled to bring this action for damages pursuant to § 44-1533 of the Arizona Revised Statutes.

281.    The plaintiffs are entitled to recover actual damages and punitive damages because Amgen's conduct was wanton, was reckless, shows spite or ill will, and demonstrates a

reckless indifference to the interests of others.

### 4. Ark. Code Ann. §§ 4-88-101 et seq. (with respect to class members' purchases in Arkansas)

282. Section 4-88-107 of the Arkansas Code provides as follows:

(a) Deceptive and unconscionable trade practices made unlawful and prohibited by this chapter include, but are not limited to, the following: . . .

(10) Engaging in any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade; . . .

(b) The deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state.

283. As set forth in detail above, Amgen violated § 4-88-107 of the Arkansas Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

284. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

285. The plaintiffs' and class members' injuries are of the type that § 4-88-107 of the Arkansas Code was intended to prevent.

286. The plaintiffs are entitled to bring this action for damages pursuant to § 4-88-113 of the Arkansas Code.

287. The plaintiffs are entitled to recover their actual damages, along with reasonable attorneys' fees, pursuant to § 4-88-113(f) of the Arkansas Code.

**JA0293**

**5.      Cal. Civ. Code §§ 1750 et seq. (with respect to the plaintiffs' and class members' purchases in California)**

288.      Section 1770 of the California Civil Code declares unlawful, "unfair methods of competition and unfair or deceptive acts or practices . . . undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer," including "misrepresenting the source, sponsorship, approval, or certification of goods or services" and "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have." Section § 1760 instructs that §§ 1750 et seq. "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."

289.      As set forth in detail above, Amgen violated §§ 1750 et seq. of the California Civil Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

290.      As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

291.      The plaintiffs' and class members' injuries are of the type that §§ 1750 et seq. of the California Civil Code was intended to prevent.

292.      The plaintiffs are entitled to bring this action for damages pursuant to §§ 1780 and 1781 of the California Civil Code. As required by § 1782, the plaintiffs provided the defendants

with written notice via certified mail of the alleged violations of § 1770 and demanded that the defendants rectify those violations at least thirty days before bringing a claim under §§ 1750 et seq.

293.    Pursuant to § 1780(d) of the California Civil Code, an affidavit stating facts showing that the action has been commenced in a county that is the proper place for the trial of the action is attached hereto as Exhibit 3.

294.    The plaintiffs are entitled to recover their actual damages, punitive damages, injunctive relief, reasonable attorneys' fees and costs, and any other relief that the Court deems proper pursuant to § 1780 of the California Civil Code.

**6.      Colo. Rev. Stat. § 6-1-105 et seq. (with respect to the plaintiffs' and class members' purchases in Colorado)**

295.    Colorado Revised Statute § 6-1-105(1) (as amended and effective as of August 7, 2024) provides that "a person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person . . . . [e]ither knowingly or recklessly engages in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice . . . ."

296.    The Colorado Revised Statute is clear that the "deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state." Colo. Rev. Stat. § 6-1-105(3).

297.    As alleged above in Count Two, the Colorado Revised Statute § 6-4-105 specifically provides that it is "illegal for any person to monopolize, attempt to monopolize, or combine or conspire with any other person to monopolize any part of trade or commerce."

298.    As set forth in detail above, Amgen violated § 6-1-105 et seq. of the Colorado Revised Statute (as well as § 6-4-105) by wrongfully acquiring the rights to the Roche Patents

and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

299.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

300.    The plaintiffs' and class members' injuries are of the type that § 6-1-105 et seq. was intended to prevent.

301.    The plaintiffs are entitled to bring this action for damages pursuant to § 6-1-105 et seq. of the Colorado Revised Code.

302.    The plaintiffs are entitled to recover their actual damages and injunctive relief, along with reasonable attorneys' fees and costs, pursuant to § 6-1-113 of the Colorado Revised Code.

**7.      D.C. Code §§ 28-3901 et seq. (with respect to the plaintiffs' and class members' purchases in the District of Columbia)**

303.    District of Columbia Code § 28-3904 provides that "[i]t shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice. . . ."

304.    District of Columbia Code § 28-4502 provides that every contract or conspiracy "in restraint of trade or commerce all or any part of which is within the District of Columbia is declared to be illegal."

305.    District of Columbia Code § 28-4503 provides that it shall be unlawful for any person "to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce, all or any part of which is within the

District of Columbia."

306. As set forth in detail above, Amgen violated §§ 28-3901 et seq. of the District of Columbia Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

307. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

308. The plaintiffs' and class members' injuries are of the type that §§ 28-3901 et seq. of the District of Columbia Code was intended to prevent.

309. The plaintiffs are entitled to bring this action for damages pursuant to § 28-3905 of the District of Columbia Code.

310. The plaintiffs are entitled to recover their actual damages, treble damages, and punitive damages, along with reasonable attorneys' fees as expenses, pursuant to § 28-3905(k) of the District of Columbia Code.

**8. Fla. Stat. §§ 501.201 et seq. (with respect to the plaintiffs' and class members' purchases in Florida)**

311. Section 501.204(1) of the Florida Statutes declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

312. As set forth in detail above, Amgen violated §§ 501.201 et seq. of the Florida Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully

- 76 -
**JA0297**

delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

313. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

314. The plaintiffs' and class members' injuries are of the type that §§ 501.201 et seq. of the Florida Statutes was intended to prevent.

315. The plaintiffs are entitled to bring this action for damages pursuant to § 501.211 of the Florida Statutes.

316. The plaintiffs are entitled to recover their actual damages, along with reasonable attorneys' fees and expenses, pursuant to §§ 501.211 and 501.2015 of the Florida Statutes.

9. **Ga. Code §§ 10-1-390 et seq. (with respect to the plaintiffs' and class members' purchases in Georgia)**

317. Section 10-1-393 of the Georgia Code declares unlawful "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce."

318. As set forth in detail above, Amgen violated §§ 10-1-390 et seq. of the Georgia Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

319. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept

than they would have paid but for Amgen's conduct.

320.    The plaintiffs' and class members' injuries are of the type that §§ 10-1-390 et seq. of the Georgia Code was intended to prevent.

321.    The plaintiffs are entitled to bring this action for damages pursuant to § 10-1-399 of the Georgia Code. As required by § 10-1-399(b), the plaintiffs delivered to the defendants a written demand for relief reasonably describing the alleged unfair or deceptive acts and the injury suffered therefrom at least 30 days prior to bringing a claim under §§ 10-1-390 et seq.

322.    The plaintiffs are entitled to recover up to three times their actual damages, punitive damages, and injunctive relief, along with reasonable attorneys' fees and expenses, pursuant to § 10-1-399 of the Georgia Code.

**10.    815 Ill. Comp. Stat. Ann. §§ 505/1 et seq. (with respect to the plaintiffs' and class members' purchases in Illinois)**

323.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Illinois Compiled Statutes § 505/2, makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce."

324.    As set forth in detail above, Amgen violated §§ 505/1 et seq. of the Illinois Compiled Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

325.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

326.    The plaintiffs' and class members' injuries are of the type that §§ 505/1 et seq. of the Illinois Compiled Statutes was intended to prevent.

327.    The plaintiffs are entitled to bring this action for damages pursuant to § 505/10a of the Illinois Compiled Statutes.

328.    The plaintiffs are entitled to recover their actual damages and punitive damages, along with reasonable attorneys' fees and costs, pursuant to §§ 505/10a(a) & 505/10a(c) of the Illinois Compiled Statutes.

**11.    Ind. Code §§ 24-5-0.5-3 et seq. (with respect to the plaintiffs' and class members' purchases in Indiana)**

329.    Section 24-5-0.5-3(a) of the Indiana Code provides as follows:

> A supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations.

330.    As set forth in detail above, Amgen violated §§ 24-5-0.5-3 et seq. of the Indiana Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

331.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

332.     The plaintiffs' and class members' injuries are of the type that §§ 24-5-0.5-3 et seq. of the Indiana Code was intended to prevent.

333.     The plaintiffs are entitled to bring this action for damages pursuant to § 24-5-0.5-4 of the Indiana Code. As required by § 24-5-0.5-5, the plaintiffs provided the defendants with written notice stating fully the nature of the alleged deceptive act and the actual damage suffered therefrom at least 30 days before bringing a claim under §§ 24-5-0.5-3 et seq., and the defendants have made no offer to cure.

334.     The plaintiffs are entitled to recover up to three times their actual damages, along with reasonable attorneys' fees and costs, pursuant to § 24-5-0.5-4 of the Indiana Code.

**12.     La. Rev. Stat. Ann. § 51:1401 et seq. (with respect to the plaintiffs' and class members' purchasers in Louisiana)**

335.     The Louisiana Unfair Trade Practices and Consumer Protection Law, §§ 51:1401 et seq. of the Louisiana Revised Statutes, declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

336.     As set forth in detail above, Amgen violated the Louisiana Unfair Trade Practices and Consumer Protection Law by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

337.     As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

338.     The plaintiffs' and class members' injuries are of the type that Louisiana Unfair

Trade Practices and Consumer Protection Law was intended to prevent.

339.    The plaintiffs are entitled to bring this action for damages pursuant to § 51:1409 of the Louisiana Revised Statutes.

**13.    Mass. Gen. Laws ch. 93A, §§ 1 et seq. (with respect to the plaintiffs' and class members' purchases in Massachusetts)**

340.    Chapter 93A, § 2 of the Massachusetts General Laws declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

341.    As set forth in detail above, Amgen violated c. 93A, §§ 1 et seq. of the Massachusetts General Laws by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

342.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

343.    The plaintiffs' and class members' injuries are of the type that c. 93A, §§ 1 et seq. of the Massachusetts General Laws was intended to prevent.

344.    The plaintiffs are entitled to bring this action for damages pursuant to c. 93A, § 9 of the Massachusetts General Laws. As required by § 9(3), the plaintiffs mailed to the defendants a written demand for relief reasonably describing the alleged unfair or deceptive acts and the injury suffered therefrom at least thirty days prior to bringing a claim under c. 93A, §§ 1 et seq.

345.    The plaintiffs are entitled to up to three times their actual damages, injunctive

- 81 -

**JA0302**

relief, attorneys' fees and costs, and any other equitable relief the Court deems necessary and proper pursuant to c.93A, § 9 of the Massachusetts General Laws.

**14.  5 Md. Code, Com. Law §§ 13-301 et seq. (with respect to the plaintiffs' and class members' purchasers in Maryland)**

346.  Section 13-303 of the Maryland Code provides that "[a] person may not engage in any unfair, abusive, or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in . . . [t]he sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services . . . ."

347.  As set forth in detail above, Amgen violated the §§ 13-301 et seq. of the Maryland Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

348.  As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

349.  The plaintiffs' and class members' injuries are of the type that §§ 13-301 et seq. of the Maryland Code was intended to prevent.

350.  The plaintiffs are entitled to bring this action for damages pursuant to § 13-408 of the Maryland Code.

**15.  Me. Stat. tit. 5, §§ 207 et seq. (with respect to the plaintiffs' and class members' purchases in Maine)**

351.  Title 5, § 207 of the Maine Statutes declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

- 82 -

**JA0303**

352. As set forth in detail above, Amgen violated tit. 5, §§ 207 et seq. of the Maine Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—deceptive and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

353. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

354. The plaintiffs' and class members' injuries are of the type that tit. 5, §§ 207 et seq. of the Maine Statutes was intended to prevent.

355. The plaintiffs are entitled to bring this action for damages pursuant to tit. 5, § 213 of the Maine Statutes. As required by § 213(1-A), the plaintiffs provided the defendants with a written demand for relief reasonably describing the unfair and deceptive acts alleged and the injuries suffered therefrom at least thirty days prior to bringing a claim under tit. 5, §§ 207 et seq. of the Maine Statutes.

356. The plaintiffs are entitled to actual damages, injunctive relief, reasonable attorneys' fees and costs, and any other relief the Court deems necessary and proper pursuant to tit. 5, § 213 of the Maine Statutes.

**16.     Mich. Comp. Laws Ann. §§ 445.901 et seq. (with respect to the plaintiffs' and class members' purchasers in Michigan)**

357. Section 445.903 of the Michigan Compiled Laws provides that "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful."

358. As set forth in detail above, Amgen violated §§ 445.901 et seq. of the Michigan

Compiled Laws by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair, unconscionable, and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

359.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

360.    The plaintiffs' and class members' injuries are of the type that §§ 445.901 et seq. of the Michigan Compiled Laws was intended to prevent.

361.    The plaintiffs are entitled to bring this action for damages pursuant to § 445.911 of the Michigan Compiled Statutes.

362.    The plaintiffs are entitled to recover their actual damages and punitive damages, along with reasonable attorneys' fees, pursuant to § 445.911 of the Michigan Compiled Statutes.

**17.    Minn. Stat. §§ 325F.68 et seq. (with respect to the plaintiffs' and class members' purchases in Minnesota).**

363.    Section 325D.44 of the Minnesota Statutes provides that "[a] person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person . . . engages in (i) unfair methods of competition, or (ii) unfair or unconscionable acts or practices."

364.    Section 325F.69 of the Minnesota Statutes provides:

> The act, use, or employment by any person of any fraud, unfair or unconscionable practice, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable . . . .

365.    As set forth in detail above, Amgen violated §§ 325D.43 et seq. of the Minnesota

**JA0305**

Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

366. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

367. The plaintiffs' and class members' injuries are of the type that §§ 325D.43 et seq. of the Minnesota Statutes was intended to prevent.

368. The plaintiffs are entitled to bring this action for damages pursuant to § 8.31 of the Minnesota Statutes

369. The plaintiffs are entitled to recover their actual damages, along with reasonable attorneys' fees and costs, pursuant to § 8.31 of the Minnesota Statutes.

**18.     Miss. Code Ann. §§ 75-24-5 et seq. (with respect to the plaintiffs' and class members' purchases in Mississippi)**

370. Section 75-24-5 of the Mississippi Code prohibits "unfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce."

371. As set forth in detail above, Amgen violated §§ 75-24-5 et seq. of the Mississippi Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

372. As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept

- 85 -

than they would have paid but for Amgen's conduct.

373.    The plaintiffs' and class members' injuries are of the type that §§ 75-24-5 et seq. of the Mississippi Code was intended to prevent.

374.    The plaintiffs are entitled to bring this action for damages pursuant to § 75-24-15 of the Mississippi Code

**19.    Mo. Rev. Stat. §§ 407.010 et seq. (with respect to the plaintiffs' and class members' purchases in Missouri)**

375.    Section 407.020 of the Missouri Statutes provides:

> [T]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice.

376.    As set forth in detail above, Amgen violated §§ 407.010 et seq. of the Missouri Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

377.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

378.    The plaintiffs' and class members' injuries are of the type that §§ 407.20 et seq. of the Missouri Statutes was intended to prevent.

379.    The plaintiffs are entitled to bring this action for damages pursuant to § 407.025 of the Missouri Statutes.

- 86 -

**20.    Neb. Rev. Stat. §§ 59-1601 et seq. (with respect to the plaintiffs' and class members' purchases in Nebraska)**

380.    Nebraska's Consumer Protection Act, Nebraska Revised Statutes §§ 59-1602, provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."

381.    Section 59-1603 of the Nebraska Revised Statutes provides that "any contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce shall be unlawful."

382.    Section 59-1604 of the Nebraska Revised Statutes provides that "it shall be unlawful for any person to monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of trade or commerce."

383.    As set forth in detail above, Amgen violated §§ 59, 1602, 59-1603 & 59-1604 of the Nebraska Revised Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

384.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

385.    The plaintiffs' and class members' injuries are of the type that §§ 59-1601 et seq. of the Nebraska Revised Statutes was intended to prevent.

386.    The plaintiffs are entitled to bring this action for damages pursuant to § 59-1609 of the Nebraska Revised Statutes.

**21.      Nev. Rev. Stat. §§ 598.0903 et seq. (with respect to class members' purchases in Nevada)**

387.      Section 41.600 of the Nevada Revised Statutes provides that "an action may be brought by any person who is a victim of consumer fraud. "Consumer fraud" means "a deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive.

388.      Section 598.015 of the Nevada Revised Statutes provides:

> A person engages in a "deceptive trade practice" if, in the course of his or her business or occupation, he or she . . . [m]akes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions.

389.      Section 598.0923 of the Nevada Revised Statutes provides that "[a] person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly . . . uses an unconscionable practice in a transaction."

390.      As set forth in detail above, Amgen violated §§ 598.0903 et seq. of the Nevada Revised Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

391.      As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

392.      The plaintiffs' and class members' injuries are of the type that §§ 598.0903 et seq. of the Nevada Revised Statutes was intended to prevent.

393.      The plaintiffs are entitled to bring this action for damages pursuant to § 41.600 of the Nevada Revised Statutes.

394.    The plaintiffs are entitled to recover actual damages, along with costs and reasonable attorneys' fees, pursuant to § 41.600 of the Nevada Revised Statutes.

**22.    N.H. Rev. Stat. §§ 358-A:1 et seq. (with respect to the plaintiffs' and class members' purchases in New Hampshire)**

395.    Section 358-A:2 of the New Hampshire Revised Statutes provides:

> It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state. Such unfair method of competition or unfair or deceptive act or practice shall include, but is not limited to, the following:
>
> . . .
>
> XIV. Pricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition, including the pricing of generic prescription drugs.

396.    As set forth in detail above, Amgen violated §§ 358-A:1 et seq. of the New Hampshire Revised Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

397.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

398.    The plaintiffs' and class members' injuries are of the type that §§ 358-A:1 et seq. of the New Hampshire Revised Statutes was intended to prevent.

399.    The plaintiffs are entitled to bring this action for damages pursuant to § 358-A:10 of the New Hampshire Revised Statutes.

- 89 -

400.     Because Amgen's conduct constitutes a willful or knowing violation of § 358-A:2 of the New Hampshire Revised Statutes, the plaintiffs are entitled to recover a damages award up to three times the amount of their actual damages, along with the costs of suit and reasonable attorneys' fees, pursuant to § 358-A:10 of the New Hampshire Revised Statutes.

**23.     N.M. Stat. Ann. §§ 57-12-1 et seq. (with respect to the plaintiffs' and class members' purchases in New Mexico)**

401.     Section 57-12-3 of the New Mexico Statutes provides that "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."

402.     As set forth in detail above, Amgen violated §§ 57-12-1 et seq. of the New Mexico Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair, deceptive acts, and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

403.     As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

404.     The plaintiffs' and class members' injuries are of the type that §§ 57-12-1 et seq. of the New Mexico Statutes was intended to prevent.

405.     The plaintiffs are entitled to bring this action for damages pursuant to § 57-12-10 of the New Mexico Statutes.

406.     Because Amgen's conduct constitutes a willful violation of § 57-12-10 of the New Mexico Statutes, the plaintiffs are entitled to recover a damages award up to three times the

amount of their actual damages, along with the costs of suit and reasonable attorneys' fees, pursuant to § 57-12-10 of the New Mexico Statutes.

**24.    N. Y. Gen. Bus. Law §§ 349 et seq. (with respect to the plaintiffs' and class members' purchases in New York)**

407.    Section 349(a) of the New York General Business Law provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

408.    As set forth in detail above, Amgen violated §§ 349 et seq. of the New York General Business Law by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair, deceptive acts, and unconscionable acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

409.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

410.    The plaintiffs' and class members' injuries are of the type that §§ 349 et seq. of the New York General Business Law was intended to prevent.

411.    The plaintiffs are entitled to bring this action for damages pursuant to § 349(h) of the New York General Business Law.

412.    Because Amgen's conduct constitutes a willful or knowing violation of § 349(a) of the New York General Business Law, the plaintiffs are entitled to recover a damages award up to three times the amount of their actual damages up to one thousand dollars, along reasonable attorneys' fees, pursuant to § 349(h) of the New York General Business Law.

**25.   N.C. Gen. Stat. §§ 75-1.1 et seq. (with respect to the plaintiffs' and class members' purchases in North Carolina)**

413.   Section 75-1.1(a) of the North Carolina General Statutes provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

414.   As set forth in detail above, Amgen violated §§ 75-1.1 et seq. of the North Carolina General Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

415.   As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

416.   The plaintiffs' and class members' injuries are of the type that §§ 75-1.1 et seq. of the North Carolina General Statutes was intended to prevent.

417.   The plaintiffs are entitled to bring this action for damages pursuant to § 75-16 of the North Carolina General Statutes.

418.   The plaintiffs are entitled to recover a damages award up to three times the amount of their actual damages pursuant to § 75-16.1 of the North Carolina General Statutes. Because Amgen's conduct constitutes a willful violation of § 75-1.1(a) of the North Carolina General Statutes, the plaintiffs are also entitled to recover costs of suit and reasonable attorneys' fees.

**26.    Or. Rev. Stat. §§ 646.605 et seq. (with respect to the plaintiffs' and class members' purchases in Oregon)**

419.    Section 646.608 of the Oregon Revised Statutes provides that "[a] person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person . . . [e]ngages in any other unfair or deceptive conduct in trade or commerce."

420.    As set forth in detail above, Amgen violated §§ 646.605 et seq. of the Oregon Revised Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

421.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

422.    The plaintiffs' and class members' injuries are of the type that §§ 646.605 et seq. of the Oregon Revised Statutes was intended to prevent.

423.    The plaintiffs are entitled to bring this action for damages pursuant to § 646.648 of the Oregon Revised Statutes.

424.    The plaintiffs are entitled to their actual damages and punitive damages, along with reasonable attorneys' fees and costs, pursuant to § 646.638 of the Oregon Revised Statutes.

**27.    73 Pa. Stat. Ann. §§ 201-1 et seq. (with respect to the plaintiffs' and class members' purchases in Pennsylvania)**

425.    Section 201-3 of the Pennsylvania Statutes declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

426.    As set forth in detail above, Amgen violated §§ 201-1 et seq. of the Pennsylvania Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully

delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

427.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

428.    The plaintiffs' and class members' injuries are of the type that §§ 201-1 et seq. of the Pennsylvania Statutes was intended to prevent.

429.    The plaintiffs are entitled to bring this action for damages pursuant to § 201-9.2 of the Pennsylvania Statutes.

430.    The plaintiffs are entitled to a damages award of up to three times the amount of their actual damages, along with reasonable attorneys' fees and costs, pursuant to § 201-9.2 of the Pennsylvania Statutes.

**28.    R.I. Gen. Laws §§ 6-13.1-1 et seq. (with respect to the plaintiffs' and class members' purchases in Rhode Island)**

431.    Section 6-13.1-2 of the Rhode Island General Laws declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

432.    As set forth in detail above, Amgen violated §§ 6-13.1 et seq. of the Rhode Island General Laws by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

433.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class

members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

434.    The plaintiffs' and class members' injuries are of the type that §§ 6-13.1 et seq. of the Rhode Island General Laws was intended to prevent.

435.    The plaintiffs are entitled to bring this action for pursuant to § 6-13.1-5.2 of the Rhode Island General Laws.

436.    The plaintiffs are entitled to a damages award of up to three times the amount of their actual damages, reasonable attorneys' fees and costs, and any equitable relief the Court deems necessary or proper pursuant to § 26-13.1-5.2 of the Rhode Island General Laws.

**29.    S.C. Stat. §§ 39-5-10 et seq. (with respect to the plaintiffs' and class members' purchases in South Carolina)**

437.    Section 39-50-20 of the Code of Laws of South Carolina provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

438.    As set forth in detail above, Amgen violated §§ 39-50-10 et seq. of the Code of Laws of South Carolina by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

439.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

440.    The plaintiffs' and class members' injuries are of the type that §§ 39-50-10 et seq.

of the Code of Laws of South Carolina was intended to prevent.

441.    The plaintiffs are entitled to bring this action for damages pursuant to § 39-5-140 of the Code of Laws of South Carolina.

442.    Because Amgen's conduct constitutes a willful or knowing violation of § 39-5-20, the plaintiffs are entitled to a damages award of up to three times the amount of their actual damages, along with reasonable attorneys' fees, pursuant to § 39-5-140 of the Code of Laws of South Carolina.

**30.    S.D. Codified Laws §§ 37-24-1 et seq. (with respect to class members' purchases in South Dakota)**

443.    Section 37-24-6 of the South Dakota Codified Laws provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

> It is a deceptive act or practice for any person to . . . [k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise or the solicitation of contributions for charitable purposes, regardless of whether any person has in fact been misled, deceived, or damaged thereby . . . .

444.    As set forth in detail above, Amgen violated §§ 37-24-1 et seq. of the South Dakota Codified Laws by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

445.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

446.    The plaintiffs' and class members' injuries are of the type that §§ 37-24-1 et seq. of the South Dakota Codified Laws was intended to prevent.

447.    The plaintiffs are entitled to bring this action for damages pursuant to § 37-24-31 of the South Dakota Codified Laws.

**31.    Tex. Bus. & Com. Code §§ 17.41 et seq. (with respect to the plaintiffs' and class members' purchases in Texas)**

448.    Section 17.46 of the Texas Business & Commerce Code declares unlawful "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce."

449.    As set forth in detail above, Amgen violated §§ 17.41 et seq. of the Texas Business & Commerce Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

450.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

451.    The plaintiffs' and class members' injuries are of the type that §§ 17.41 et seq. of the Texas Business & Commerce Code was intended to prevent.

452.    Pursuant to § 17.50(a) of the Texas Business & Commerce Code, the plaintiffs are entitled to bring this action for damages caused by the defendants' "unconscionable action or course of action" and employment of enumerated false, misleading, or deceptive acts on which the plaintiffs relied to their detriment. As required by § 17.505, the plaintiffs provided the defendants with written notice advising them in reasonable detail of the plaintiffs' specific

- 97 -
**JA0318**

complaint and the damages incurred therefrom at least sixty days before prior to bringing a claim under §§ 17.41 et seq.

453.    The plaintiffs are entitled to up to three times their actual damages, injunctive relief, reasonable attorneys' fees and court costs, and any other relief the Court deems proper pursuant to § 17.50(b) of the Texas Business & Commerce Code.

**32.    Utah Code Ann. §§ 13-11-1 et seq. (with respect to the plaintiffs' and class members' purchases in Utah)**

454.    Section 13-11-5 of the Utah Code provides that "[a]n unconscionable act or practice by a supplier in connection with a consumer transaction violates this act whether it occurs before, during, or after the transaction."

455.    As set forth in detail above, Amgen violated §§ 13-11-1 et seq. of the Utah Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

456.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

457.    The plaintiffs' and class members' injuries are of the type that §§ 13-11-1 et seq. of the Utah Code was intended to prevent.

458.    The plaintiffs are entitled to bring this action for damages pursuant to § 13-1119 of the Utah Code.

459.    The plaintiffs are entitled to recover their actual damages, along with reasonable attorneys' fees and court costs, pursuant to § 13-11-19 of the Utah Code.

**33.    Vt. Stat. Ann. tit. 9, §§ 2453 et seq. (with respect to the plaintiffs' and class members' purchases in Vermont)**

460.    Section 2453 of the Vermont Statutes provides that "[a]n unconscionable act or practice by a supplier in connection with a consumer transaction violates this act whether it occurs before, during, or after the transaction."

461.    As set forth in detail above, Amgen violated §§ 2453 et seq. of the Vermont Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

462.    As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

463.    The plaintiffs' and class members' injuries are of the type that §§ 2453 et seq. of the Vermont Statutes was intended to prevent.

464.    The plaintiffs are entitled to bring this action for damages pursuant to § 2453 of the Vermont Statutes.

**34.    Va. Code Ann. §§ 59.1-196 et seq. (with respect to the plaintiffs' and class members' purchases in Virginia)**

465.    Section 59-1-200 of the Virginia Code provides:

A. The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful:

. . .

14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

- 99 -

466.     As set forth in detail above, Amgen violated §§ 59-1-196 et seq. of the Virginia Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

467.     As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

468.     The plaintiffs' and class members' injuries are of the type that §§ 59-1-196 et seq. of the Virginia Code was intended to prevent.

469.     The plaintiffs are entitled to bring this action for damages pursuant to § 59-1.204 of the Virginia Code.

470.     Because Amgen's conduct was willful, the plaintiffs are entitled to a damages award of up to three times the amount of their actual damages, along with reasonable attorneys' fees and court costs, pursuant to § 59.1-204 of the Virginia Code.

**35.     W. Va. Code §§ 46A-6-101 et seq. (with respect to the plaintiffs' and class members' purchases in West Virginia)**

471.     Section 46A-6-104 of the West Virginia Code declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

472.     As set forth in detail above, Amgen violated §§ 46A-6-101 et seq. of the West Virginia Code by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's

monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

473.   As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

474.   The plaintiffs' and class members' injuries are of the type that §§ 46A-6-101 et seq. of the West Virginia Code was intended to prevent.

475.   The plaintiffs are entitled to bring this action for damages pursuant to § 46A-6-104 of the West Virginia Code

**36.   Wis. Stat. § 100.20, et. seq. (with respect to the plaintiffs' and class members' purchases in Wisconsin)**

476.   Section 100-20 of the Wisconsin Statutes prohibits "[u]nfair methods of competition in business and unfair trade practices in business."

477.   As set forth in detail above, Amgen violated §§ 100.20 et seq. of the Wisconsin Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

478.   As a direct and proximate result of Amgen's conduct, the plaintiffs and class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

479.   The plaintiffs' and class members' injuries are of the type that §§ 100.20 et seq. of the Wisconsin Statutes was intended to prevent.

480.   The plaintiffs are entitled to bring this action for damages pursuant to § 100.20 of the Wisconsin Statutes.

**JA0322**

481. The plaintiffs are entitled to a damages award of twice the amount of their actual pecuniary loss, along with reasonable attorneys' fees and court costs, pursuant to § 100.20(5) of the Wisconsin Statutes.

**37. Wyo. Stat. §§ 40-12-101 et seq. (with respect to class members' purchases in Wyoming)**

482. Section 40-12-105(a) of the Wyoming Statutes provides

> A person engages in a deceptive trade practice unlawful under this act when, in the course of his business and in connection with a consumer transaction, he knowingly . . . [e]ngages in unfair or deceptive acts or practices[.]

483. As set forth in detail above, Amgen violated §§ 40-12-101 et seq. of the Wyoming Statutes by wrongfully acquiring the rights to the Roche Patents and using them to unlawfully delay and/or block competition—unfair and deceptive acts that had the goal, purpose, and effect of delaying and/or blocking the launch of etanercept biosimilars, extending Amgen's monopoly in the etanercept market, and maintaining supracompetitive prices for Enbrel.

484. As a direct and proximate result of Amgen's conduct, class members suffered injury and actual damages in the form of paying higher prices for etanercept than they would have paid but for Amgen's conduct.

485. The class members' injuries are of the type that §§ 40-12-101 et seq. of the Wyoming Statutes was intended to prevent.

486. The plaintiffs are entitled to bring this action for damages pursuant to § 40-12-108 of the Wyoming Statutes. As required by § 40-12-109, the plaintiffs provided notice to the defendants of the alleged unlawful deceptive trade practices within one year after their initial discovery, and the defendants did not make an offer to cure the violations within 15 days of receipt.

487. The plaintiffs may recover their actual damages and reasonable attorneys' fees

pursuant to § 40-12-108 of the Wyoming Statutes.

## COUNT FOUR

### UNJUST ENRICHMENT UNDER STATE LAW

488. The plaintiffs repeat and incorporate the above paragraphs as though fully set forth herein.

489. To the extent required, this claim is pleaded in the alternative to the other claims in this complaint.

490. As a result of its unlawful conduct described above, Amgen has and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits from sales of etanercept. Amgen's financial benefits are traceable to the plaintiffs' and class members' overpayments for etanercept. Amgen has received a benefit from the class in the form of revenue resulting from unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class. Amgen has benefited from its unlawful acts, and it would be inequitable for Amgen to retain any of the ill-gotten gains resulting from the plaintiffs' and class members' overpayments for etanercept during the class period.

491. It would be futile for the plaintiffs and class members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Enbrel, as those intermediaries are not liable for, and would not compensate the plaintiffs and class members for, Amgen's unlawful conduct.

492. The economic benefit Amgen derived from the plaintiffs' and class members' purchases of etanercept is a direct and proximate result of Amgen's unlawful and anticompetitive practices.

493. The financial benefits Amgen derived are ill-gotten gains that rightfully belong to

the plaintiffs and class members who paid and continue to pay artificially inflated prices that inured to Amgen's benefit.

494.   It would be inequitable under unjust enrichment principles under the laws of the jurisdictions identified below for Amgen to retain any of the benefits Amgen derived from its unfair, anticompetitive, and unlawful methods, acts, and trade practices.

495.   Amgen is aware of and appreciates the benefits that the plaintiffs and class members have bestowed upon it.

496.   Amgen should be ordered to disgorge all unlawful or inequitable proceeds it received to a common fund for the benefit of the plaintiffs and class members who collectively have no adequate remedy at law.

497.   A constructive trust should be imposed upon all unlawful or inequitable sums Amgen received that are traceable to the plaintiffs and class members.

498.   By engaging in the unlawful or inequitable conduct described above, which deprived the plaintiffs and class members of the opportunity to purchase lower-priced biosimilar versions of etanercept and forced them to pay higher prices for Enbrel, Amgen has been unjustly enriched in violation of the common law of the following jurisdictions:

**1.     Alabama**

499.   Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Alabama. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

500.   Amgen received money from the plaintiffs and class members as a direct result of the unlawful overcharges and has retained this money.

501.   Amgen has benefitted at the expense of the plaintiffs and class members from

- 104 -

revenue resulting from unlawful overcharges for etanercept.

502. It is inequitable for Amgen to accept and retain the benefits received without compensating the plaintiffs and class members.

**2. Alaska**

503. Amgen unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for etanercept in Alaska. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

504. Amgen has received a benefit from class members in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen, to the economic detriment of class members.

505. Amgen appreciated the benefits bestowed upon it by class members.

506. Amgen accepted and retained the benefits bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to class members.

507. Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating class members.

**3. Arizona**

508. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Arizona. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

509. Amgen has been enriched by revenue resulting from unlawful overcharges for etanercept.

510. The plaintiffs and class members have been impoverished by the overcharges for etanercept resulting from Amgen's unlawful conduct.

**JA0326**

511.    Amgen's enrichment and the impoverishment of the plaintiffs and class members are connected. Amgen has paid no consideration to any other person for any benefits it received from the plaintiffs and class members.

512.    There is no justification for Amgen's receipt of the benefits causing its enrichment and the impoverishment of the plaintiffs and class members because the plaintiffs and class members paid supracompetitive prices that inured to Amgen's benefit, and it would be inequitable for Amgen to retain any revenue gained from its unlawful overcharges.

513.    The plaintiffs and class members have no adequate remedy at law.

**4.    Arkansas**

514.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Arkansas. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

515.    Amgen received money from the plaintiffs and class members as a direct result of the unlawful overcharges and has retained this money.

516.    Amgen has paid no consideration to any other person in exchange for this money.

517.    Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the plaintiffs and the class.

**5.    California**

518.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in California. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

519.    Amgen received a benefit from the plaintiffs and the class as a direct result of

Amgen's fraudulent and misleading conduct and the resulting unlawful overcharges to the class.

520.     Amgen retained the benefits bestowed upon it under inequitable and unjust circumstances at the expense of the plaintiffs and the class.

521.     The plaintiffs and members of the class are entitled to restitution from Amgen.

**6.     Colorado**

522.     Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Colorado. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen 's actions.

523.     Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

524.     Amgen retained the benefit bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to the plaintiffs and the class.

525.     Under the circumstances, it would be inequitable and unjust for Amgen to retain such benefits without compensating the plaintiffs and class members.

**7.     Connecticut**

526.     Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Connecticut. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

527.     Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

528.     Amgen has paid no consideration to any other person in exchange for this benefit.

529.     Amgen retained the benefits bestowed upon it under inequitable and unjust circumstances at the expense of the plaintiffs and class members.

530.     Under the circumstances, it would be inequitable and unjust for Amgen to retain such benefits.

**8.     Delaware**

531.     Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Delaware. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

532.     Amgen has been enriched by revenue resulting from unlawful overcharges for branded etanercept.

533.     The plaintiffs and the class have been impoverished by the overcharges for branded etanercept resulting from Amgen's unlawful conduct.

534.     Amgen's enrichment and the impoverishment of the plaintiffs and the class are connected. Amgen has paid no consideration to any other person for any benefits they received from the plaintiffs and class members.

535.     There is no justification for Amgen's receipt of the benefits causing its enrichment and the impoverishment of the plaintiffs and the class because the plaintiffs and the class paid supracompetitive prices that inured to Amgen's benefit, and it would be inequitable for Amgen to retain any revenue gained from its unlawful overcharges.

536.     The plaintiffs and the class have no remedy at law.

**9.     District of Columbia**

537.     Amgen unlawfully profited from overcharges paid by the plaintiffs and class

members who made purchases of or reimbursements for etanercept in the District of Columba. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

538. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen, to the economic detriment of the plaintiffs and the class.

539. Amgen accepted and retained the benefit bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to the class.

540. Under the circumstances, it would be inequitable and unjust for Amgen to retain such benefits.

**10. Florida**

541. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Florida. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

542. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

543. Amgen appreciated and retained the benefit bestowed upon it by the plaintiffs and class members.

544. It is inequitable and unjust for Amgen to accept and retain such benefits without compensating the plaintiffs and class members.

**11. Georgia**

545. Amgen unlawfully profited from overcharges paid by the plaintiffs and class

JA0330

members who made purchases of or reimbursements for etanercept in Georgia. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

546.   Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

547.   Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the plaintiffs and the class.

**12.   Hawaii**

548.   Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Hawaii. Class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

549.   Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

550.   It is unjust for Amgen to retain such benefits without compensating the plaintiffs and the class.

**13.   Idaho**

551.   Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Idaho. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

552.   Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the

benefit of Amgen and to the economic detriment of the plaintiffs and the class.

553.    Amgen appreciated the benefit conferred upon it by the class.

554.    Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

### 14.    Illinois

555.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Illinois. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

556.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

557.    Amgen retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to the class.

558.    It is against equity, justice, and good conscience for Amgen to be permitted to retain the revenue resulting from its unlawful overcharges without compensating the plaintiffs and class members.

### 15.    Iowa

559.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Iowa. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

560.    Amgen has been enriched by revenue resulting from unlawful overcharges for etanercept, which revenue resulted from anticompetitive prices paid by the class, which inured to

- 111 -

**JA0332**

Amgen's benefit.

561.   Amgen's enrichment has occurred at the expense of the class.

562.   It is against equity and good conscience for Amgen to retain such benefits without compensating the class.

### 16.   Kansas

563.   Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Kansas. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

564.   Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

565.   Amgen retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to the class.

566.   Amgen was unjustly enriched at the expense of the plaintiffs and the class members.

### 17.   Kentucky

567.   Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Kentucky. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

568.   Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

569.     Amgen appreciated the benefit bestowed upon it by the class.

570.     Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

**18.     Louisiana**

571.     Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Louisiana. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

572.     Amgen has been enriched by revenue resulting from unlawful overcharges for etanercept.

573.     The plaintiffs and class members have been impoverished by the overcharges for etanercept resulting from Amgen's unlawful conduct.

574.     Amgen's enrichment and the impoverishment of the plaintiffs and the class are connected.

575.     There is no justification for Amgen's receipt of the benefits causing its enrichment and the class's impoverishment because the plaintiffs and the class paid supracompetitive prices that inured to Amgen's benefit, and it would be inequitable for Amgen to retain any revenue gained from its unlawful overcharges.

576.     The plaintiffs and the class have no other remedy at law.

**19.     Maine**

577.     Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Maine. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

578.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

579.    Amgen was aware of or appreciated the benefit bestowed upon it by the plaintiffs and the class.

580.    Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

### 20.    Maryland

581.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Maryland. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

582.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen, to the economic detriment of the plaintiffs and the class.

583.    Amgen was aware of or appreciated the benefit bestowed upon it by the class.

584.    Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

### 21.    Massachusetts

585.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Massachusetts. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

586.    Amgen has received a benefit from the class in the form of revenue resulting from

the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

587. Amgen was aware of and/or appreciated the benefit conferred upon it by the class.

588. Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class. Fairness and good conscience require Amgen not be permitted to retain the revenue resulting from its unlawful overcharges at the expense of the plaintiffs and class members.

**22.    Michigan**

589. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Michigan. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

590. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen.

591. Amgen retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to the class.

592. Amgen was unjustly enriched at the expense of the plaintiffs and the class members.

**23.    Minnesota**

593. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Minnesota. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

594. Amgen appreciated and knowingly accepted the benefits bestowed upon it by the plaintiffs and class members. Amgen has paid no consideration to any other person for any of the benefits they have received from the plaintiffs and class members.

595. It would be inequitable for Amgen to accept and retain such benefits without compensating the class.

### 24. Mississippi

596. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Mississippi. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

597. Amgen received money from the class as a direct result of the unlawful overcharges. Amgen retains the benefit of overcharges received on the sales of brand etanercept, which in equity and good conscience belong to the class on account of Amgen's anticompetitive conduct.

598. Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

### 25. Missouri

599. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Missouri. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

600. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

**JA0337**

601. Amgen appreciated the benefit bestowed upon it by the class.

602. Amgen accepted and retained the benefit bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to the class.

**26.    Montana**

603. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Montana. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

604. The plaintiffs and the class have conferred an economic benefit upon Amgen in the form of revenue resulting from unlawful overcharges to the economic detriment of the plaintiffs and the class.

605. Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

**27.    Nebraska**

606. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Nebraska. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

607. Amgen received money from the class as a direct result of the unlawful overcharges and have retained this money. Amgen has paid no consideration to any other person in exchange for this money.

608. In justice and fairness, Amgen should disgorge such money and remit the overcharged payments back to the class.

### 28.   Nevada

609.   Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Nevada. Class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

610.   The plaintiffs and the class have conferred an economic benefit upon Amgen in the form of revenue resulting from unlawful overcharges.

611.   Amgen appreciated the benefits bestowed upon it by the class, for which it has paid no consideration to any other person.

612.   Amgen has knowingly accepted and retained the benefits bestowed upon it by the plaintiffs and class members.

613.   The circumstance under which Amgen has accepted and retained the benefits bestowed on it by the plaintiffs and the class are inequitable in that they result from Amgen's unlawful overcharges.

### 29.   New Hampshire

614.   Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in New Hampshire. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

615.   Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

616.   Under the circumstances, it would be unconscionable for Amgen to retain such benefits.

### 30. New Jersey

617. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in New Jersey. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

618. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

619. The benefits conferred upon defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the plaintiffs and class members.

620. Amgen has paid no consideration to any other person for any of the unlawful benefits they received from the plaintiffs and class members with respect to Amgen's sales of brand etanercept.

621. Under the circumstances, it would be unjust for defendants to retain such benefits without compensating the plaintiffs and class members.

### 31. New Mexico

622. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in New Mexico. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

623. Amgen has knowingly benefitted at the expense of the class from revenue resulting from unlawful overcharges for etanercept.

624. To allow Amgen to retain the benefits would be unjust because the benefits

**JA0340**

resulted from anticompetitive pricing that inured to Amgen's benefit and because Amgen has paid no consideration to any other person for any of the benefits it received.

### 32.    New York

625.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in New York. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

626.    Amgen has been enriched by revenue resulting from unlawful overcharges for brand etanercept, which revenue resulted from anticompetitive prices paid by the class, which inured to Amgen's benefit.

627.    Amgen's enrichment has occurred at the expense of the class.

628.    It is against equity and good conscience for Amgen to be permitted to retain the revenue resulting from its unlawful overcharges.

### 33.    North Carolina

629.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in North Carolina. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

630.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

631.    The class did not interfere with Amgen's affairs in any manner that conferred these benefits upon Amgen.

632.    The benefits conferred upon Amgen were not gratuitous, in that they comprised

revenue created by unlawful overcharges arising from Amgen's actions in delaying entry of generic versions of etanercept to the market and preventing fulsome generic competition in the market for etanercept.

633. The benefits conferred on Amgen are measurable, in that the revenue Amgen has earned due to unlawful overcharges are ascertainable by review of sales records.

634. Amgen consciously accepted the benefits conferred upon it and continues to do so as of the date of this filing.

**34.    North Dakota**

635. Amgen unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for etanercept in North Dakota. Class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

636. Amgen has been enriched by revenue resulting from unlawful overcharges paid by plaintiffs and members of the class.

637. The class has been impoverished by the overcharges for etanercept resulting from Amgen's unlawful conduct.

638. Amgen's enrichment and the class's impoverishment are connected. Amgen has paid no consideration to any other person for any benefits it received directly or indirectly from class members.

639. There is no justification for Amgen's receipt of the benefits causing its enrichment because the class paid supracompetitive prices that inured to Amgen's benefit, and it would be inequitable for Amgen to retain any revenue gained from its unlawful overcharges.

640. The class has no remedy at law.

**35.    Oklahoma**

641. Amgen unlawfully profited from overcharges paid by the plaintiffs and class

members who made purchases of or reimbursements for etanercept in Oklahoma. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

642.    Amgen received money from the plaintiffs and class members as a direct result of the unlawful overcharges and have retained this money.

643.    Amgen has paid no consideration to any other person in exchange for this money.

644.    The plaintiffs and class members have no remedy at law.

645.    It is against equity and good conscience for Amgen to be permitted to retain the revenue resulting from its unlawful overcharges.

### 36.    Oregon

646.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Oregon. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

647.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

648.    Amgen was aware of the benefit bestowed upon it by the class.

649.    Under the circumstances, it would be unjust for Amgen to retain any of the overcharges derived from its unfair conduct without compensating the plaintiffs and the class.

### 37.    Pennsylvania

650.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Pennsylvania. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for

Amgen's actions.

651.   Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

652.   Amgen was aware of and/or appreciated the benefit bestowed upon it by the class.

653.   Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

### 38.   Puerto Rico

654.   Amgen unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for etanercept in Puerto Rico. Class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

655.   Amgen has been enriched by revenue resulting from unlawful overcharges.

656.   The class has been impoverished by the overcharges for etanercept resulting from Amgen's unlawful conduct.

657.   Amgen's enrichment and the class's impoverishment are connected.

658.   There is no justification for Amgen's receipt of the benefits causing its enrichment and the class's impoverishment because the class paid supracompetitive prices that inured to Amgen's benefit, and it would be inequitable for Amgen to retain any revenue gained from its unlawful overcharges.

659.   The class has no remedy at law.

### 39.   Rhode Island

660.   Amgen unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for etanercept in Rhode Island. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

661.   Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the class.

662.   Amgen was aware of and/or recognized the benefit bestowed upon it by the class.

663.   Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

### 40.   South Carolina

664.   Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in South Carolina. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

665.   The benefits conferred upon Amgen were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from unlawful overcharges to the class.

666.   Amgen realized value from the benefit bestowed upon it by the class.

667.   Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

### 41.   South Dakota

668.   Amgen unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for etanercept in South Dakota. Class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

669.   Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the class.

670.   Amgen was aware of the benefit bestowed upon it by the class.

671. Under the circumstances, it would be inequitable and unjust for Amgen to retain such benefits without reimbursing the class.

**42. Tennessee**

672. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Tennessee. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

673. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

674. Amgen was aware of or appreciated the benefit bestowed upon it by the class.

675. Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

676. It would be futile for the class to seek a remedy from any party with whom they have privity of contract. Amgen has paid no consideration to any other person for any of the unlawful benefits they received indirectly from the class with respect to Amgen's sale of etanercept. It would be futile for the class to exhaust all remedies against the entities with which the class has privity of contract because the class did not purchase etanercept directly from any defendant.

**43. Texas**

677. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Texas. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

- 125 -

**JA0346**

678.   Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen, to the economic detriment of the plaintiffs and class members.

679.   Amgen was aware of and/or appreciated the benefit bestowed upon it by the plaintiffs and class members.

680.   The circumstances under which Amgen has retained the benefits bestowed upon it by the plaintiffs and class members are inequitable in that they result from Amgen's unlawful conduct.

681.   The plaintiffs and class members have no remedy at law.

**44.   Utah**

682.   Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Utah. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

683.   Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

684.   Amgen was aware of and/or appreciated the benefit bestowed upon it by the class.

685.   Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

**45.   Vermont**

686.   Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Vermont. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's

actions.

687. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

688. Amgen accepted the benefit bestowed upon it by the class.

689. Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

**46.   Virginia**

690. Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Virginia. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

691. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

692. Amgen was aware of the benefit bestowed upon it.

693. Amgen should reasonably have expected to repay the class.

694. The benefits conferred upon Amgen were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from the Amgen's illegal and unfair actions to inflate the prices of etanercept.

695. Amgen has paid no consideration to any other person for any of the benefits it has received from the class.

**47.   Washington**

696. Amgen unlawfully profited from overcharges paid by the plaintiffs and class

- 127 -
**JA0348**

members who made purchases of or reimbursements for etanercept in Washington. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

697.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

698.    Amgen was aware of and/or appreciated the benefit bestowed upon it by the class.

699.    Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

**48.    West Virginia**

700.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in West Virginia. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

701.    Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

702.    Amgen was aware of and/or appreciated the benefit bestowed upon it by the class.

703.    Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

**49.    Wisconsin**

704.    Amgen unlawfully profited from overcharges paid by the plaintiffs and class members who made purchases of or reimbursements for etanercept in Wisconsin. The plaintiffs and class members paid higher prices for etanercept than they would have paid but for Amgen's

actions.

705. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the plaintiffs and the class.

706. Amgen was aware of and/or appreciated the benefit bestowed upon it by the class.

707. Under the circumstances, it would be inequitable for Amgen to retain such benefits without compensating the class.

**50. Wyoming**

708. Amgen unlawfully profited from overcharges paid by class members who made purchases of or reimbursements for etanercept in Wyoming. Class members paid higher prices for etanercept than they would have paid but for Amgen's actions.

709. Amgen has received a benefit from the class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of the class.

710. Amgen accepted, used, and enjoyed the benefits bestowed upon it by the class under inequitable and unjust circumstances arising from unlawful overcharges to class members.

711. Under the circumstances, it would be inequitable for Amgen to retain such benefits.

**DEMAND FOR RELIEF**

WHEREFORE, the plaintiffs, on behalf of themselves and the class members, respectfully demand that this Court:

A. Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, direct that reasonable notice of this action, as provided by Rule 23(c)(2), be provided to the class, and declare the plaintiffs as

the class representatives;

B.      Grant permanent injunctive relief pursuant to Sections 7 and 16 of the Clayton Act to remedy the ongoing anticompetitive effects of Amgen's unlawful monopolization in the market for etanercept in the United States;

C.      Grant permanent injunctive relief pursuant to Sections 7 and 16 of the Clayton Act to remedy Amgen attempted monopolization in the market for etanercept in the United States;

D.      Conduct expedited discovery proceedings leading to a prompt trial on the merits before a jury on all claims and defenses;

E.      Enter judgment against Amgen and in favor of the plaintiffs and the class;

F.      Award the class damages (including double or treble damages, where appropriate) in an amount to be determined at trial, plus interest in accordance with law;

G.      Award the plaintiffs and the class members their costs of suit, including reasonable attorneys' fees as provided by law; and

H.      Award such further and additional relief as is necessary to correct for the anticompetitive market effects Amgen's unlawful conduct caused and as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the plaintiffs, on behalf of themselves and the proposed class, demand a trial by jury on all issues so triable.

**JA0351**

Dated: November 25, 2024

Respectfully submitted,

*/s/ William H. Monroe, Jr.*
William H. Monroe, Jr. (VSB No. 27441)
Marc C. Greco (VSB No. 41496)
GLASSER AND GLASSER, P.L.C.
Crown Center, Suite 600
580 East Main Street
Norfolk, VA 23510
(757) 625-6787
bill@glasserlaw.com
marcg@glasserlaw.com

Thomas M. Sobol (*pro hac vice*)
Abbye R. K. Ognibene (*pro hac vice*)
Rachel Downey (*pro hac vice*)
Claudia Morera (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
One Faneuil Hall Square, 5th Floor
Boston, MA 02109
(617) 482-3700
tom@hbsslaw.com
abbyeo@hbsslaw.com
racheld@hbsslaw.com
claudiam@hbsslaw.com

Peter D. St. Phillip (*pro hac vice*)
Uriel Rabinovitz (*pro hac vice*)
Raymond Girnys (*pro hac vice*)
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
(914) 997-0500
PStPhillip@lowey.com
URabinovitz@lowey.com
Rgirnys@lowey.com

- 131 -

**JA0352**

**CERTIFICATE OF SERVICE**

I, William H. Monroe, Jr., certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record, and parties may access the filing through the Court's system.

Dated: November 25, 2024                          /s/ William H. Monroe, Jr.
                                                  William H. Monroe, Jr. (VSB No. 27441)

**JA0353**

# EXHIBIT 1

JA0354



# LICENSE AGREEMENT FOR

# ETANERCEPT

# AMONG

# IMMUNEX CORPORATION,

# HOFFMANN-LA ROCHE INC., AND

# F.HOFFMANN-LA ROCHE LTD

JOINT EXHIBIT

**JTX-13**

CONFIDENTIAL

AMG-ENBNJ-00132941

# LICENSE AGREEMENT

This license agreement ("Agreement") is entered into effective as of November 6, 1998 (the "Effective Date") by Immunex Corporation ("Immunex"), a Washington corporation with its principal office at 51 University Street, Seattle, Washington 98101 with Hoffmann-La Roche Inc. ("Roche Nutley"), a New Jersey corporation with its principal office at 340 Kingsland Street, Nutley, New Jersey 07110 and F.Hoffmann-La Roche Ltd ("Roche Basel"), a Swiss corporation with its principal office at Grenzacherstrasse 124, CH-4070 Basel, Switzerland (Roche Nutley and Roche Basel are collectively referred to as "Roche").

WHEREAS, Immunex has commercialized Etanercept (defined below), a p75TNFR:Fc Fusion Protein (defined below), for therapeutic use, which it is currently selling under the trademark *ENBREL*®;

WHEREAS, Roche owns certain patent rights relating to p75TNFR:Fc Fusion Proteins;

WHEREAS, Immunex wishes to obtain a license from Roche under such patent rights to make, have made, use, sell, offer for sale, and import Etanercept for therapeutic and prophylactic uses;

WHEREAS, Genentech Inc. ("Genentech"), a Delaware Corporation having its principal office at 1 DNA Way, South San Francisco, California 94080, owns certain patent rights under the Genentech Immunoadhesin Patents (defined below) and together with Roche owns certain patent rights under the Genentech Process Patents (defined below);

WHEREAS, Immunex and Genentech have entered into an agreement executed on May 28, 1999 ("Immunex-Genentech Agreement") in which Genentech granted to Immunex, among other things, certain rights under the mentioned Genentech Immunoadhesin Patents as defined in the Immunex-Genentech Agreement, and certain rights under the mentioned Genentech Process Patents as defined in the Immunex-Genentech Agreement;

WHEREAS, Immunex is the exclusive licensee of certain patent rights relating to p55TNFR:Fc Fusion Proteins (defined below);

WHEREAS, Roche wishes to obtain an option for a nonexclusive license from Immunex under such patent rights to make, have made, use, sell, offer for sale, and import p55TNFR:Fc Fusion Proteins; and

WHEREAS, the parties wish to grant such license and option to each other under the terms and conditions set forth in this Agreement and for the consideration set forth herein;

Page 2

CONFIDENTIAL

AMG-ENBNJ-00132942

NOW, THEREFORE, in consideration of the mutual promises contained herein, the Parties agree as follows:

1.0    Definitions

1.1    "Affiliate", with respect to any Party, shall mean any entity, which controls, is controlled by, or under common control with such Party, excluding Genentech, a Delaware corporation. For these purposes, "control" shall refer to: (i) the possession, directly or indirectly, of the power to direct the management or policies of an entity, whether through ownership of voting securities, by contract or otherwise, or (ii) the ownership, directly or indirectly, of at least fifty percent (50%) of the voting securities or other ownership interest of an entity. For the purposes of this Agreement, American Home Products Corporation, and all entities presently or in the future controlling, controlled by, or under common control with American Home Products Corporation, shall be considered Immunex Affiliates regardless of any future change in ownership or control of Immunex. For the purposes of this Agreement, Roche and all entities presently or in the future controlling, controlled by, or under common control with Roche, except for Genentech and all entities presently or in the future controlled by Genentech, shall be considered Roche Affiliates regardless of any future change in ownership or control of Roche.

1.2    "Brockhaus Patent Rights" shall mean all of the legal rights throughout the world conferred upon Roche and its Affiliates by all Brockhaus patents and patent applications that issue from or that claim priority of Swiss Patent Application Nos. 3319/89, 746/90, and/or 1347/90, including, but not limited to, European Application No. 90116707.2 and U.S. Patent Application No. 07/580,013. A complete list of all patents and patent applications in existence as of the date of execution of this Agreement shall be provided to Immunex by Roche within thirty (30) days of the date of execution of this Agreement and such list shall be updated on the first business day of each Calendar Quarter thereafter during the Term of this Agreement.

1.3    "Calendar Quarter" shall mean each three-month period commencing January 1, April 1, July 1 and October 1 of each year during the Term of this Agreement.

1.4    "Etanercept" shall mean the recombinant molecule schematically depicted in Exhibit A attached hereto, which is a homodimer of two polypeptide chains, each chain consisting of the extracellular ligand-binding domain of p75TNFR fused at its carboxy terminus to the amino terminus of the hinge, CH2 and CH3 domains (including the first cysteine residue of the CH1 domain) of human immunoglobulin G1 and having the amino acid sequence set forth in Exhibit B, including N-terminal and C-terminal heterogeneity accompanying expression of the nucleic acid sequence encoding the amino acid sequence of Exhibit B (arising from, for example, post translational modifications or other cellular processing events), which recombinant molecule was commercially sold by Immunex or its Affiliates on the Effective Date.

Page 3

CONFIDENTIAL

AMG-ENBNJ-00132943

1.5 "Field" shall mean the field of administering to humans or animals a pharmaceutically active compound for the treatment or prevention of any disease or condition, including the administration by *in vitro* or gene therapy of materials, such as DNA or RNA, which produce the pharmaceutically active compound in the humans or animals, and including, without limitation, *ex vivo* exposure of cells to a pharmaceutically active compound within a course of treatment or prevention of any human or animal disease or condition.

1.6 "First Commercial Sale" shall mean, in each country in the Territory, the first sale by Immunex, its Affiliates or sublicensees of a Licensed Product to an independent Third Party after the required formal approval to sell such Licensed Product in that country has been granted by the relevant regulatory authority. A Licensed Product sale shall be deemed to occur on the earlier of (a) the date the Licensed Product is shipped, or (b) the date of the invoice to the purchaser of the Licensed Product.

1.7 "Lauffer Patent Rights" shall mean all of the legal rights throughout the world conferred by all Lauffer patents and patent applications that claim priority of German Patent Application No. 4 020 607 (for example, EP 464 533 B1) that are exclusively licensed to Immunex and its Affiliates.

1.8 "Lauffer U.S. Patents" shall mean all U.S. patents and patent applications within the scope of Lauffer Patent Rights.

1.9 "Licensed Product" shall mean Etanercept, including any different glycoforms, and any materials for use in the manufacture of Etanercept in humans and animals upon administration, including DNA or RNA, for use in the Field. "Licensed Product" shall also mean any formulation of Etanercept sold or distributed in any dosage size or type of packaging or vial sizes, including lyophilized, liquid, or sustained release formulations of Etanercept.

1.10 "Net Sales" shall mean, as to each Calendar Quarter, the gross invoiced sales prices charged for all Licensed Product sold by or for Immunex, its Affiliates and sublicensees in arm's length transactions to independent Third Parties during such Calendar Quarter, after deduction (if not already deducted in the amount invoiced) of the following items paid by Immunex, its Affiliates and sublicensees during such Calendar Quarter with respect to sales of Licensed Product, regardless of the Calendar Quarter in which such sales were made, provided and to the extent that such items are incurred or allowed (with the exception of Section 1.10(d) below) and do not exceed reasonable and customary amounts in the market in which such sales occurred:

(a) trade, cash, and/or quantity discounts or rebates actually taken and allowed, including discounts or rebates to governmental or managed care organizations;

Page 4

CONFIDENTIAL

AMG-ENBNJ-00132944

(b)    credits or allowances given or recorded for rejection or return of previously sold Licensed Product (including, without limitation, chargebacks);

(c)    any tax, tariff, duty or government charge (including any tax such as a value added or similar tax or government charge other than an income tax) levied on the sale, transportation or delivery of a Licensed Product and borne by the seller thereof without reimbursement from any Third Party;

(d)    one and one-half percent (1.5%) of the amount invoiced to cover bad debt, freight or other transportation costs, insurance charges, additional special packaging, and other governmental charges; and

(e)    the standard inventory cost (Immunex' actual acquisition cost) of devices used for dispensing or administering the Licensed Product that accompany the Licensed Product as it is sold; provided that, no deduction shall be taken for the cost of any packaging (for example, vials or cartons) into which Licensed Product or devices are placed in conjunction with their sale.

All of the foregoing deductions from the gross invoiced sales prices of Licensed Product shall be determined in accordance with GAAP.  In the event that Immunex, its Affiliates or sublicensees make any adjustments to such deductions after the associated Net Sales have been reported pursuant to this Agreement, the adjustments shall be reported and reconciled with the next report and payment of any royalties due. It is the intent of the Parties that Net Sales shall be based on arm's length sales transactions to independent wholesalers, hospitals and pharmacies.  Net Sales shall not be based on sales between Immunex and its Affiliates or its sublicensees.  In the event that Immunex, its Affiliates or its sublicensees sells to an independent Third Party who resells to wholesalers, hospitals or pharmacies, Net Sales shall be based on the Net Sales of such Third Party.  Licensed Product provided by Immunex, its Affiliates or its sublicensees, but not sold, for administration to patients enrolled in clinical trials, or distributed through a not-for-profit foundation at no charge to patients unable to purchase Licensed Product, shall not be included in Net Sales.

1.11   "Party" shall mean Roche or Immunex, and, when used in the plural, shall mean both of them.

1.12   "p55TNFR:Fc Fusion Protein" shall mean any polypeptide comprising at least a functional portion of the human 55 kilodalton (p55) tumor necrosis factor receptor (which receptor has the amino acid sequence set forth in Figure 1 of Gray et al., Proc. Natl. Acad. Sci. USA 87:7380-7384 (1990) in Exhibit C attached hereto) covalently joined to at least a portion of an immunoglobulin protein, and any homologs, muteins, variants and modifications thereof.  This term "p55TNFR:Fc Fusion Protein" shall not include within its meaning a "p75TNFR:Fc Fusion Protein" as defined below in Section 1.14.

Page 5

1.13 "p75TNFR" shall mean the extracellular ligand-binding domain of the human 75 kilodalton ("p75") tumor necrosis factor receptor having the amino acid sequence set forth as amino acids 23 through 257 of Figure 3B of Smith et al., Science 248:1019-1023 (1990) in Exhibit D attached hereto. For clarification, "p75TNFR" shall not include any polypeptide that differs from the Exhibit D amino acid sequence, for example by virtue of amino acid substitutions, additions or deletions in such sequence.

1.14 "p75TNFR:Fc Fusion Protein" shall mean any polypeptide comprising at least a functional portion of the human p75 tumor necrosis factor receptor (which receptor has the amino acid sequence set forth in Figure 3B of Smith et al., Science 248:1019-1023 (1990) in Exhibit D attached hereto) covalently joined to at least a portion of an immunoglobulin protein, and any homologs, muteins, variants and modifications thereof. This term "p75TNFR:Fc Fusion Protein" shall not include within its meaning a "p55TNFR:Fc Fusion Protein" as defined above in Section 1.12.

1.15 "Term" shall mean the term as defined in Section 9 below.

1.16 "Territory" shall mean worldwide.

1.17 "Third Party" shall mean any natural person or business or governmental entity that is not a Party or an Affiliate of a Party.

1.18 "Valid Claim" shall mean a claim of a pending patent application or an issued and unexpired patent, which has not been revoked, declared unpatentable or unenforceable, or held invalid by a decision of a court or other body of competent jurisdiction that is unappealable or unappealed within the time period allowed for appeal.

2.0 License Grant

2.1 License to Immunex

(a) Subject to the terms and conditions of this Agreement, Roche hereby grants to Immunex a license, under the Brockhaus Patent Rights, to make, have made, use, sell, offer for sale, and import Licensed Product in the Territory (all of these licensed rights are collectively referred to as "commercialize" or "commercializing"). Such license shall be deemed effective as of the Effective Date and is co-exclusive with Roche. For the purposes of this Agreement, "co-exclusive" shall mean that, in each country in the Territory, Immunex and Roche shall each have the right under the Brockhaus Patent Rights to commercialize Licensed Product in the Territory. Roche shall have the right to grant co-exclusive rights in each country to one (1) licensee in lieu of or in collaboration with Roche, and for any given country, to a single Third Party to distribute Licensed Product within that country in lieu of Roche and its licensee. Additionally, Roche and its licensees shall have the right, without the prior written consent of Immunex, to sublicense one or more contract manufacturers to manufacture Licensed Product for use, sale, importation, and/or distribution by Roche and Roche's

Page 6

CONFIDENTIAL

licensees; provided that Roche and its licensees shall be limited to one such contract manufacturer in any country in the Territory.

(b)     Roche agrees to only license to one (1) licensee in any country its rights under the Brockhaus Patent Rights to make, use, sell, offer for sale and import any p75TNFR:Fc Fusion Protein in the Field in the Territory.  Roche shall have the right to grant its co-exclusive rights in each country to one (1) licensee in lieu of or in collaboration with Roche, and for any given country, to a single Third Party to distribute Licensed Product within that country in lieu of Roche and its licensee.  Additionally, Roche and its licensees shall have the right, without the prior written consent of Immunex, to sublicense one or more contract manufacturers to manufacture Licensed Product for use, sale, importation, and/or distribution by Roche and Roche's licensees; provided that Roche and its licensees shall be limited to one such contract manufacturer in any country in the Territory.

(c)     Except as expressly granted herein, there are no licenses granted to Immunex under the Brockhaus Patent Rights or any other intellectual property rights owned or controlled by Roche.

(d)     The rights under this Section 2.1 may be terminated by Roche upon written notice, to the extent permitted by applicable law or regulation, in the event that Immunex, its Affiliates or sublicensees of the Brockhaus Patent Rights, challenges the validity of the Brockhaus Patent Rights, other than in an interference in the United States between Lauffer Patent Rights and Brockhaus Patent Rights.

### 2.2     Option to Roche

(a)     Immunex grants to Roche and its Affiliates an option to obtain a worldwide, non-exclusive, sublicense under the Lauffer Patent Rights to make, have made, use, sell, offer for sale, or import any single p55TNFR:Fc Fusion Protein product, as determined on a country-by-country basis, in the Field in the Territory.  The grant of the sublicense under the option is contingent upon:  (i) the exercise of the option by Roche in accordance with the terms of this Agreement; (ii) Immunex possessing the right to grant the sublicense at the time the option is exercised; and (iii) the execution by both parties of a written sublicense agreement incorporating royalty and payment provisions, field of use limitations, provisions and limitations on the right to sublicense, and all the other usual and customary provisions appropriate for such an agreement, to the extent such provisions and limitations are consistent with Immunex's obligations relating to the Lauffer Patent Rights and are in accordance with the terms of this Agreement.  Upon exercise of the option, Immunex and Roche agree to negotiate in good faith the terms of the written sublicense agreement.  Any royalties due under the sublicense shall be passed on by Immunex to one or both of those parties that have granted Immunex an exclusive license to the Lauffer Patent Rights.  In Immunex's sole discretion, the sublicense may be converted into a direct license between one or both of those parties that have granted Immunex an exclusive license to the Lauffer Patent Rights as licensor(s) and Roche as licensee.  Additionally, the sublicense to Roche

Page 7

CONFIDENTIAL

AMG-ENBNJ-00132947

shall permit Roche to further sublicense its rights in the Lauffer Patent Rights with respect to such single p55TNFR:Fc Fusion Protein exclusively to a single sublicensee in lieu of Roche and its Affiliates on a country-by-country basis. Such further sublicensee shall be required to assume all obligations of Roche placed on and assumed by Roche by the sublicense from Immunex to Roche, and Roche shall guarantee the performance of such obligations by such further sublicensee. If Roche exercises its option to said sublicense and Immunex pays to a Third Party, as a result of Roche exercising said sublicense, a royalty due to the making, having made, using, selling, offering for sale, or importing of a p55TNFR:Fc Fusion Protein product in the Territory for or by Roche, its Affiliates or its sublicensees (limited to one per country in lieu of Roche), then Roche shall be responsible for the payment of one hundred percent (100%) of such Third Party royalty. If Immunex pays such Third Party any milestone payments or other license fees due to the making, having made, using, selling, offering for sale, or importing of a p55TNFR:Fc Fusion Protein product in the Territory for or by Roche, its Affiliates or its sublicensees, then Roche shall pay a *pro rata* portion of these payments or fees that would be applicable to Roche's rights under Section 2.2(a) of this Agreement. This *pro rata* portion shall be just and equitable as determined by the Parties in good faith negotiations. Except for the above requirements, the license from Immunex to Roche, its Affiliates and its sublicensees, shall be free of financial obligations on the part of Roche to Immunex, i.e., no royalties, no milestones, and no other payments are due or payable by Roche to Immunex relating to sales of a p55TNFR:Fc Fusion protein product with respect to the license to the Lauffer Patent Rights.

(b)  Roche may exercise the option granted in Section 2.2(a) at any time during the life of the Lauffer Patent Rights on a country-by-country basis by providing Immunex with written notice at which point the parties shall commence negotiations of the written sublicense agreement in good faith.

(c)  Except as expressly granted herein, there are no licenses granted to Roche under the Lauffer Patent Rights or any other intellectual property rights owned or controlled by Immunex.

(d)  The rights under this Section 2.2 may be terminated by Immunex upon written notice, to the extent permitted by applicable law or regulation, in the event that Roche, its Affiliates or its sublicensees, or Genentech and its Affiliates, challenges the validity of the Lauffer Patent Rights, other than in an interference between Lauffer Patent Rights and Brockhaus Patent Rights in the United States.

(e)  Immunex shall not assign or otherwise transfer any of the Lauffer Patent Rights to a Third Party without ensuring Roche's option to a sublicense under the Lauffer Patent Rights under the terms set forth in this Section 2.2. This Section 2.2(e) shall not affect Immunex's right to abandon any of the patent rights included in the Lauffer Patent Rights or to terminate any license or other agreement that relates to or gives rise to Immunex's rights in the Lauffer Patent Rights.

Page 8

AMG-ENBNJ-00132948

2.3   Sublicense Rights

Immunex shall have the right, without the prior written consent of Roche, to sublicense the rights granted to it by Roche under Section 2.1 above to one Immunex Affiliate in each country in the Territory, and for any given country, to a single Third Party to distribute Licensed Product within that country in lieu of Immunex and its Affiliate. Any sublicensee shall be bound by all of the obligations of Immunex hereunder, and Immunex shall guarantee the performance by its sublicensees hereunder, including but not limited to payment of royalties. Additionally, Immunex shall have the right, without the prior written consent of Roche, to sublicense one or more contract manufacturers to manufacture Licensed Product for use, sale, importation, and/or distribution by Immunex, Immunex Affiliates, and/or Immunex sublicensees under the rights granted to it by Roche under this Section 2.3 and Section 2.1 above; provided that, Immunex shall be limited to one such contract manufacturer in any country in the Territory.

2.4   Release

(a)   For good and valuable consideration as set forth throughout this agreement, Roche hereby releases Immunex and its Affiliates from any and all claims, demands, and rights of action that Roche may have on account of any infringement or alleged infringement of any of the Brockhaus Patent Rights by the manufacture, use, sale, offer for sale, other disposition, or importation of Licensed Product which, prior to the Effective Date of this Agreement, was manufactured, used, sold, offered for sale, otherwise disposed of, or imported by or on behalf of Immunex or its Affiliates.

(b)   Immunex hereby releases Roche and its Affiliates from any and all claims, demands, and rights of action that Immunex may have on account of any infringement or alleged infringement of any Lauffer Patent Rights by the manufacture, use, sale, other disposition, or importation of any p55 TNFR:Fc Fusion Protein product which, prior to the Effective Date of this Agreement, was manufactured, used, sold, otherwise disposed of, or imported by or on behalf of Roche, its Affiliates or its sublicensees.

3.0   Intellectual Property Rights

3.1   Ownership

Roche shall retain ownership or control of the Brockhaus Patent Rights. Nothing in this Agreement shall transfer any ownership or control of the Lauffer Patent Rights to Roche or any Third Party. Except as expressly provided herein, each Party shall own and shall have the exclusive right to exploit all intellectual property rights owned or acquired by such Party.

CONFIDENTIAL

AMG-ENBNJ-00132949

### 3.2    p55TNFR:Fc Fusion Protein Patent Position and Immunity

With respect to any p55TNFR:Fc Fusion Protein product, Immunex represents and warrants that the Lauffer Patent Rights are the only patent rights owned or controlled by Immunex and/or its Affiliates (as to those entities that were Immunex Affiliates on the Effective Date) as of the Effective Date of this Agreement that could be infringed by the using, selling, offering for sale or importing of any p55TNFR:Fc Fusion Protein product in the Territory by Roche, its Affiliates or its sublicensees, or by the making or use of DNA encoding such p55TNFR:Fc Fusion Protein, vectors comprising such DNA, and/or cells comprising such DNA product in the Territory by Roche, its Affiliates or its sublicensees, apart from United States Patent Number 5,447,851. If Immunex breaches this warranty, then Immunex shall grant to Roche, its Affiliates and its sublicensees immunity from suit on such patent rights giving rise to such breach in each country in the Territory with respect to sales of any p55TNFR:Fc Fusion Protein product in the Territory by Roche, its Affiliates or its sublicensees. Immunex hereby grants to Roche, its Affiliates and sublicensees immunity from suit from United States Patent Number 5,447,851 with respect to the manufacture, use, importation, or sales of any p55TNFR:Fc Fusion Protein product by Roche, its Affiliates or sublicensees.

### 3.3    Infringement Determination

If Immunex determines in good faith that a Licensed Product does not infringe any claims within the  Brockhaus Patent Rights, then Immunex shall so notify Roche and provide to Roche the evidence and reasoning for such determination.  If Roche agrees, then Immunex shall be entitled to terminate its license with respect to such particular patent or patent application, without prejudice to its license under any remaining patents and patent applications within the Brockhaus Patent Rights.  If Roche disagrees with the determination of non-infringement by Immunex, then the Parties shall submit such infringement issue to resolution by binding arbitration pursuant to Section 10.14 hereof.  Notwithstanding the foregoing, any issue that arises under this Agreement related to the validity of a patent or any claim of a patent within the Brockhaus Patent Rights shall be determined solely and exclusively by litigation in Federal court, and shall not be submitted to, or resolved by, arbitration.

### 3.4    Patent Prosecution

Roche shall be responsible, at its sole discretion, for the prosecution and maintenance of the Brockhaus Patent Rights in the Territory, at Roche's expense. Roche shall not be responsible for any expenses relating to the prosecution and maintenance of the Lauffer Patent Rights.

### 3.5    Patent Infringement

(a)    If Immunex learns that a Third Party is infringing the Brockhaus Patent Rights by virtue of such Third Party's manufacture, use, sale, offer for sale or

CONFIDENTIAL

AMG-ENBNJ-00132950

importation of a p75TNFR:Fc Fusion Protein product in the Territory, then it shall promptly notify Roche in writing. The Parties shall use reasonable efforts in cooperation with each other to stop such patent infringement without litigation. "Infringing" or "infringement" as used in this Section shall not include licensed activities by a Third Party duly licensed pursuant to the provisions of Section 2.1 above.

(b) Roche shall have the sole right, but not the obligation, to take the appropriate steps to remove such infringement of Brockhaus Patent Rights, including, without limitation, initiating suit. Immunex agrees to provide reasonable assistance to Roche in taking such steps. Any legal action taken by Roche under this Section 3.5 will be under its control and at its expense. Immunex may choose to be represented in any such action by counsel of its own choice at its own expense. Roche shall retain all awards of damages and costs recovered as a result of any action Roche takes to enforce the Brockhaus Patent Rights, or to remove the infringement thereof; provided, however, that in the event Immunex is damaged by such infringement, Immunex shall have the right to join any litigation initiated by Roche at its own cost and Immunex shall be entitled to obtain any damages, including lost profits, awarded to it, subject to reimbursement by Immunex to Roche for (i) royalties due to Roche on such lost profits and (ii) a *pro rata* share of Roche's costs of litigation to be agreed upon by the Parties in good faith negotiations. Notwithstanding the foregoing, Roche shall have the right, in its sole discretion, to settle the litigation with the accused infringer, or otherwise dismiss or terminate the litigation at any time; provided, however, that Roche shall not have the right to settle any litigation initiated by Immunex that is consolidated with any litigation initiated by Roche pursuant to this Section 3.5 without Immunex' prior written consent.

(c) On or before the date six (6) months after Roche's receipt of written notice of such infringement from Immunex, Roche shall either (i) cause such infringement to terminate; or (ii) initiate suit against the alleged infringer. In the event that (i) Roche has not filed suit against the accused infringer or otherwise abated such infringement within such six (6) month period, (ii) Immunex demonstrates to Roche that its Net Sales of Licensed Product in the country wherein the infringement is occurring has decreased by at least ten percent (10%) for such six (6) month period as compared to the Net Sales for the six (6) month period prior to the notice of such infringement and that such decrease is directly caused by such infringing product (as demonstrated by market sales and share data) and not as a result of other causes (e.g., non-competing products or a declining product life cycle) or the activities of Roche, its Affiliates or its sublicensees consistent with the co-exclusive license granted in Section 2.1 above, and (iii) Immunex and its Affiliates have filed suit asserting any relevant patents owned by Immunex against the alleged infringer and/or exhausted all of their available legal and equitable remedies with respect to such infringement, then Immunex shall be relieved of its obligation to pay royalties on fifty percent (50%) of the Net Sales of Licensed Product made in the country wherein the infringement is occurring from the end of such six (6) month period until the earlier of such time as the infringement is abated or Roche initiates suit.

CONFIDENTIAL

AMG-ENBNJ-00132951

Joint Exhibit JTX-13   p. 11 of 46

Appx25875

**JA0365**

(d)     Immunex shall have no obligation to defend the Lauffer Patent Rights if the validity of any of the Lauffer Patent Rights is challenged by a Third Party, nor shall Immunex have an obligation to defend the Lauffer Patent Rights from infringement.

## 4.0     Confidentiality

In the course of performance of this Agreement, one Party may disclose to the other or receive information from the other relating to the subject matter of this Agreement, which information shall be considered to be the disclosing Party's confidential information, if in the case of a written disclosure, it is designated as confidential at the time of disclosure, or if in the case of oral disclosure, the specific nature of the oral disclosure and its confidentiality is confirmed in writing to the other Party within thirty (30) days of the oral disclosure (the "Confidential Information"). Each Party shall protect and keep confidential and shall not use, publish or otherwise disclose to any Third Party, except as permitted by this Agreement or with the other Party's written consent, the other Party's Confidential Information for a period of five (5) years from the date of disclosure of such Confidential Information. The foregoing notwithstanding, Confidential Information may be disclosed as may be reasonably required to comply with applicable governmental laws or regulations. For the purposes of this Agreement, Confidential Information shall not include such information that:

(a)     was known to the receiving Party at the time of disclosure;

(b)     was generally available to the public or was otherwise part of the public domain at the time of disclosure or became generally available to the public or otherwise part of the public domain after disclosure other than through any act or omission of the receiving Party in breach of this Agreement;

(c)     became known to the receiving Party after disclosure from a source that had a lawful right to disclose such information to others; or

(d)     was independently developed by the receiving Party without the use of Confidential Information of the other Party, as evidenced by written records.

## 5.0     License Fee and Royalties

In consideration for the licenses granted to Immunex by Roche pursuant to Section 2.1 above, Immunex shall make the following payments to Roche.

## 5.1     License Fee and Genentech Process Patent Royalties

(a)     Immunex and Roche hereby acknowledge and agree that the License Fee (as defined in the Immunex–Genentech Agreement) paid to Genentech pursuant to Section 5.1(a) of the Immunex–Genentech Agreement forms a portion of the consideration for the present Agreement and, except for the running royalties that

CONFIDENTIAL

AMG-ENBNJ-00132952

shall be due under this Agreement, shall constitute the sole license, milestone, and other fees due under this Agreement. Such license fee is not creditable against any royalties payable to Roche hereunder.

(b) Immunex and Roche hereby acknowledge and agree that if any royalties were paid to Genentech on behalf of Roche pursuant to Section 5.2(c) of the Immunex–Genentech Agreement, and such royalties were conditioned on the absence of royalties being payable with respect to the Brockhaus Patent Rights, and royalties did in fact accrue during the period of time in which Immunex made such royalty payments to Genentech on Roche's behalf, then such royalties shall be creditable against any royalties payable by Immunex to Roche hereunder.

## 5.2   Royalties

(a) Immunex shall pay to Roche Basel the following royalties for Net Sales of Licensed Product by Immunex, its Affiliates and its sublicensees:

(i) For Net Sales in countries within the Territory, excluding the United States, in which the commercializing of Licensed Product, but for the licenses granted hereinabove, would infringe a Valid Claim within the Brockhaus Patent Rights, Immunex shall pay to Roche Basel royalties of four percent (4%) of Net Sales of all Licensed Product commencing with First Commercial Sale on a country-by-country basis. Such royalties shall be reduced to two percent (2%) on a country-by-country basis, if a patent application, within the Brockhaus Patent Rights, in a given country fails to issue as a patent containing said infringed Valid Claim by May 1, 2000. If the patent application within the Brockhaus Patent Rights containing said infringed Valid Claim within the given country subsequently issues, then the royalties in that country shall increase to four percent (4%) of Net Sales as of the date the patent issues.

(ii) For Net Sales in countries within the Territory, excluding the United States, in which the commercializing of Licensed Product would not infringe a Valid Claim within the Brockhaus Patent Rights, but the Licensed Product was manufactured in a country, including the United States, in which the manufacture of Licensed Product would have infringed a Valid Claim in such country of manufacture within the Brockhaus Patent Rights, but for the grant of the license in Section 2.1 above, then Immunex shall pay to Roche fifty percent (50%) of the royalties that would have been due had the sales occurred in the country of manufacture but in no event shall such royalties be greater than two percent (2%) of Net Sales. If the country of manufacture is other than the United States, then Immunex shall pay the royalties under this Section 5.2(a)(ii) to Roche Basel. If the country of manufacture is the United States, then Immunex shall pay the royalties under this Section 5.2(a)(ii) to Roche Nutley, but such royalties shall be due only in the event that royalties are due on Net Sales in the United States pursuant to Section 5.2(b) below.

Page 13

CONFIDENTIAL



(b)     Immunex shall pay to Roche Nutley the following royalties for Net Sales of Licensed Product by Immunex, its Affiliates and its sublicensees:

(i)     For Net Sales in the United States, in which the commercializing of Licensed Product, but for the licenses granted hereinabove, would infringe a Valid Claim of an issued United States patent within the Brockhaus Patent Rights, Immunex shall pay to Roche Nutley royalties at a rate of four percent (4%) of Net Sales of all Licensed Product commencing with First Commercial Sale in the United States.  Such royalty rate shall be increased by one-half percent (1/2%) for Net Sales in the United States if Immunex is no longer paying royalties based on the Lauffer Patent Rights and is no longer obligated under the Immunex-Genentech Agreement to pay royalties to Genentech based on the Immunoadhesin Patents (defined in the Immunex-Genentech Agreement).  Such royalty rate shall further be increased by one-half percent (1/2%) for Net Sales in the United States if Immunex is no longer paying royalties based on the Lauffer Patent Rights and is no longer obligated under the Immunex-Genentech Agreement to pay royalties to Genentech based on the Genentech Process Patents (defined in the Immunex-Genentech Agreement).  Thus, it is envisioned that the royalty rate will increase from four percent (4%) to four and one-half percent (4 ½%) to five percent (5%) for Net Sales in the United States, provided that a United States patent issues within the Brockhaus Patent Rights, which contains an infringed Valid Claim.  Such royalty rate, however, shall not exceed two percent (2%) should such issued Brockhaus United States patent be subject to a reasonable attempt by Immunex to provoke an interference between such issued Brockhaus Patent and the Lauffer U.S. Patents.  If the infringed Valid Claims contained within the issued United States patent within the Brockhaus Patent Rights are involved in an interference with the Lauffer U.S. Patents, and the decision of the Board of Patent Appeals and Interferences does not award priority to the patent contained within the Brockhaus Patent Rights or otherwise determines that the formerly infringed Valid Claim is not valid or patentable, resulting in the issued United States patent within the Brockhaus Patent Rights containing no Valid Claim covering the commercializing of Licensed Product, then such two percent (2%) royalties shall accrue, but not be payable, for sales of Licensed Product occurring after the time of the Board's decision.  If no appeal is taken and/or a decision upholding the Board's decision is rendered by a court from which no appeal is or can be taken, then the royalties that have accrued from the time of the Board's decision shall be forgiven and future royalties for Net Sales in the United States shall no longer be due or payable except as may be payable under the provisions of Section 5.2(b)(iii) below or unless the United States Patent and Trademark Office subsequently issues a patent within the Brockhaus Patent Rights that contains a claim that would be infringed by the commercializing of Licensed Product, but for the licenses granted hereinabove.  On the other hand, if the Board's decision is overturned, resulting in a patent within the Brockhaus Patent Rights containing a Valid Claim covering the commercializing of Licensed Product, then such two percent (2%) royalties shall become due and payable for the period of time

Page 14

CONFIDENTIAL

AMG-ENBNJ-00132954

beginning at the Board's decision and royalties thereafter shall be collected at four percent (4%), four and one-half percent (4 ½%), or five percent (5%) as described above, until no Valid Claim covers the commercializing of the Licensed Product.

(ii)     For Net Sales in the United States, in which the commercializing of Licensed Product, but for the licenses granted hereinabove, would only infringe a Valid Claim of a pending United States patent application within the Brockhaus Patent Rights, Immunex shall pay to Roche Nutley royalties at a rate of two percent (2%) of Net Sales of all Licensed Product commencing with First Commercial Sale in the United States irrespective of the country where the Licensed Product is manufactured.  If the infringed Valid Claim contained within the United States patent applications within the Brockhaus Patent Rights are involved in an interference with the Lauffer U.S. Patents, and the decision of the Board of Patent Appeals and Interferences does not award priority to the application contained within the Brockhaus Patent Rights or otherwise determines that the formerly infringed Valid Claim is not valid or patentable, resulting in the United States patent applications within the Brockhaus Patent Rights containing no Valid Claim covering the commercializing of Licensed Product, then such two percent (2%) royalties shall accrue, but not be payable, for sales of Licensed Product occurring after the time of the Board's decision.  If no appeal is taken and/or a decision upholding the Board's decision is rendered by a court from which no appeal is or can be taken, then the royalties that have accrued from the time of the Board's decision shall be forgiven and future royalties for Net Sales in the United States shall no longer be due or payable except as may be payable under the provisions of Section 5.2(b)(iii) below or unless the United States Patent and Trademark Office subsequently issues a patent within the Brockhaus Patent Rights that contains a claim that would be infringed by the commercializing of Licensed Product, but for the licenses granted hereinabove.  On the other hand, if the Board's decision is overturned, resulting in a patent application within the Brockhaus Patent Rights containing a Valid Claim covering the commercializing of Licensed Product, then such two percent (2%) royalties shall become due and payable for the period of time beginning at the Board's decision and continuing thereafter until either no Valid Claim covers the commercializing of the Licensed Product or until the provisions of Section 5.2(b)(i) apply.

(iii)     For Net Sales in the United States, in which the commercializing of Licensed Product would not infringe a Valid Claim in the United States within the Brockhaus Patent Rights, but the Licensed Product was manufactured in a country outside the United States in which the manufacture of Licensed Product would have infringed a Valid Claim in such country outside the United States within the Brockhaus Patent Rights, but for the grant of the license in Section 2.1 above, then Immunex shall pay to Roche Basel fifty percent (50%) of the royalties that would have been due had the sales occurred in the country

Page 15

CONFIDENTIAL

AMG-ENBNJ-00132955

of manufacture but in no event shall such royalties be greater than two percent (2%) of Net Sales.

(c)     The obligation to pay royalties to Roche under this Section 5.2 shall be imposed only once with respect to the same unit of Licensed Product, at the highest royalty rate applicable under this Section 5.2, regardless of the number of patents and patent applications within the Brockhaus Patent Rights pertaining thereto.

### 5.3    Third Party Royalties

If Roche or Immunex is required to pay to a Third Party and/or Genentech any royalty due to the making, having made, using, selling, offering for sale, or importing of a p55TNFR:Fc Fusion Protein product in the Territory for or by Roche, its Affiliates or its sublicensees, then Roche shall be responsible for the payment of one hundred percent (100%) of such Third Party royalty, without deduction from the royalties payable to Immunex hereinabove.

### 5.4    Royalty Payments

(a)     All royalties payable under Section 5.2 above with respect to the Brockhaus Patent Rights shall be payable on Net Sales commencing from the date of First Commercial Sale until expiration of the Term.  Such royalties payable to Roche for Net Sales from the date of First Commercial Sale through the end of the Calendar Quarter immediately preceding the date of the execution of this Agreement shall be due and paid to Roche within thirty (30) days after the execution date of this Agreement.

(b)     Except as provided in Section 5.4(a) above, royalty payments under Section 5.2 above shall be made to Roche quarterly within sixty (60) days following the end of each Calendar Quarter for which royalties are due.  Each royalty payment made under Section 5.4(a) above shall be accompanied by a report, as described in Section 5.8(b) below, summarizing the total Net Sales during the relevant Calendar Quarter(s) and the calculation of royalties, if any, due thereon under Section 5.2.  All royalty payments not made when due shall bear interest, calculated from the date such payment was due, at the rate of two percent (2%) over the prime rate of interest as reported by the Bank of America in San Francisco, California from time to time.

### 5.5    Taxes

The royalty payments shall be free and clear of any taxes, duties, levies, fees or charges, except for withholding taxes (to the extent applicable).  Immunex shall make any withholding payments due on behalf of Roche and shall promptly provide Roche with copies of any tax certificate or other documentation evidencing such withholding as sufficient to satisfy the requirements of the United States Internal Revenue Service related to any application by Roche for a foreign tax credit for such payment.

Page 16

CONFIDENTIAL

AMG-ENBNJ-00132956

### 5.6 Mode of Payment

All payments due under this Agreement shall be made in United States dollars via wire transfer of immediately available funds, or by such other commercially reasonable means as may be designated by Roche. All payments due under this Agreement for royalties accrued in the United States shall be paid to Roche Nutley and all payments due under this Agreement for royalties accrued outside the United States shall be paid to Roche Basel. All payments shall be made in the manner as directed by Roche, which may change from time to time. Royalty payments due on Net Sales in countries or jurisdictions in the Territory outside the United States shall be made in United States dollars, after being converted by Immunex into United States dollars at the rate of exchange for such country's or jurisdiction's currency, or for the Euro, if applicable, as listed in the Wall Street Journal on the last business day of the Calendar Quarter in which such sales were made. If by law, regulations or fiscal policies, remittance of royalties in United States dollars is prohibited or restricted, Immunex will notify Roche and payment of the royalty obligation shall be made by deposit thereof in local currency to the credit of Roche in a recognized banking institution designated by Roche. If in any country or jurisdiction, the law, regulations or fiscal policies prohibit both the transmittal and deposit of royalties on sales in such country, royalty payments shall be suspended for as long as such prohibition is in effect, and as soon as such prohibition ceases, all royalties that Immunex would have otherwise been under an obligation to transmit or deposit but for the prohibition shall forthwith be deposited or transmitted to the extent allowable.

### 5.7 Termination

If the license granted to Immunex herein is terminated by the Parties, Immunex shall have no obligation to make any royalty payments to Roche that has not accrued prior to the effective date of such termination, but shall remain liable for all such payments accruing prior to termination.

### 5.8 Records and Reporting

(a) Records. Immunex, its Affiliates and sublicensees shall keep full, true and accurate books of account containing all particulars that may be necessary for the purpose of showing Net Sales. Such books of account shall be kept at the principal place of business of Immunex, its Affiliates or sublicensees, as the case may be. Subject to the provisions of Section 5.8(c) below, such books and the supporting data shall be open at all reasonable times, for three (3) calendar years following the end of the calendar year to which they pertain, to the inspection of an independent public accountant retained by Roche and reasonably acceptable to Immunex (or its Affiliate or its sublicensee) for the purpose of verifying Net Sales under this Agreement.

(b) Reports. Within thirty (30) days after the execution of this Agreement, Immunex shall deliver to Roche a true and accurate report, covering that period of time beginning with the Calendar Quarter of the First Commercial Sale of

CONFIDENTIAL

AMG-ENBNJ-00132957

Licensed Product in the Field by Immunex, its Affiliate or sublicensees until the end of the Calendar Quarter immediately preceding the date of execution of this Agreement, which sets forth such particulars of the business conducted by Immunex, its Affiliates and sublicensees during such preceding Calendar Quarters as are pertinent to an accounting for Net Sales and deductible expenses under this Agreement. Thereafter, Immunex shall deliver such a report setting forth such particulars within sixty (60) days after the end of each Calendar Quarter, beginning with the Calendar Quarter in which this Agreement was executed. Such reports shall include for each country in which sales of Licensed Product occurred: the gross sales and Net Sales in each country's currency or in the Euro, if applicable; the applicable royalty rate; the royalties payable in each country's currency or the Euro, if applicable, including an accounting of all deductions taken in the calculation of Net Sales and the formulas used in the calculation of royalties owed thereon; the applicable exchange rate to convert from each country's currency or the Euro, if applicable, to United States Dollars; and the royalties payable in United States Dollars. All such reports shall be deemed to be Immunex Confidential Information.

(c)     Auditing. At Roche's request and expense, Immunex shall permit an independent certified public accountant selected by Roche and acceptable to Immunex to examine, not more than once in any four consecutive Calendar Quarters during the term of this Agreement, but including one (1) post-termination audit, Immunex' books of account and records of all sales of Licensed Product by Immunex for the sole purpose of determining the correctness of the reports provided by Immunex under the above Section 5.8(b). Roche shall provide Immunex at least twenty (20) days' prior notice before any such audit, and all such audits shall be conducted during normal business hours. If such accountant reasonably determines that the royalties owed by Immunex to Roche under the above Section 5.2 have been, for any calendar year in total, understated by Immunex, Immunex shall immediately pay all understated royalties, together with interest on such royalties from the date accrued at a rate of two percent (2%) over the prime rate of interest as reported by Bank of America in San Francisco, California from time to time, and shall pay the reasonable costs of the examination if Immunex has understated such royalties by the greater of (i) $250,000 or (ii) five percent (5%) of the amount due under this Agreement so long as there has been actual notice to Immunex, prior to such audit, of the existence of patents or patent applications within the Brockhaus Patent Rights that cause such additional royalties to be payable to Roche. Roche agrees that any such independent certified public accountant shall be subject to an obligation to maintain any information reviewed (including, but not limited to, reports submitted under Section 5.8(b) above) in confidence.

6.0     Representations and Warranties

6.1     Disclaimer

Except as expressly provided herein, THE PARTIES DISCLAIM ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING

CONFIDENTIAL

AMG-ENBNJ-00132958

WITHOUT LIMITATION, WARRANTIES OF COMMERCIAL UTILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, VALIDITY OR SCOPE OF BROCKHAUS PATENT RIGHTS OR LAUFFER PATENT RIGHTS OR NON-INFRINGEMENT OF THIRD PARTY INTELLECTUAL PROPERTY RIGHTS.

6.2     Representations and Warranties

(a)     Each Party represents and warrants to the other that: (a) it is free to enter into this Agreement; (b) in so doing it will not violate any other agreement to which it is a party; (c) it is currently capable of making the grant of rights described in Section 2.0 above; and (d) it will not enter into any agreement in the future which conflicts with or violates any term or provision of this Agreement. Roche further represents and warrants that: (i) it is the owner or licensee of the Brockhaus Patent Rights and that it has the right to grant the licenses granted to Immunex hereunder and (ii) as of the execution date of this Agreement and to the best of its knowledge, it does not own any patent rights nor is it seeking any additional patent rights, based on patent applications filed on inventions conceived and reduced to practice before the date of execution of this Agreement by Roche, that claim the Licensed Product or its use, other than those disclosed to Immunex prior to such date. Roche makes no representation or warranty that all intellectual property rights necessary for Immunex, its Affiliates or its sublicensees to make, have made, use, sell, offer for sale and import Licensed Product in the Field in the Territory have been granted to Immunex under Section 2.0 of this Agreement. Immunex further represents and warrants that: (i) the royalty reports delivered to Roche under this Agreement shall be true and accurate to the best of its knowledge, and (iii) it is the exclusive licensee of the Lauffer Patent Rights and that it has the right to grant the option granted to Roche hereunder.

7.0     Indemnification

7.1     Immunex shall indemnify, defend and hold harmless Roche and its Affiliates from and against all costs, claims, suits, expenses (including reasonable attorneys' fees) and damages arising out of or resulting from: (a) any willful or negligent act or omission by Immunex relating to the subject matter of this Agreement or (b) the use by or administration to any person of a Licensed Product that is sold, distributed or otherwise provided to a Third Party by Immunex, its Affiliates and sublicensees; except where such costs, claims, suits, expenses or damages arose or resulted from any negligent act or omission by Roche, provided that Roche gives reasonable notice to Immunex of any such claim or action, tenders the defense of such claim or action to Immunex and assists Immunex at Immunex' expense in defending such claim or action and does not compromise or settle such claim or action without Immunex' prior written consent.

7.2     Roche shall indemnify, defend and hold harmless Immunex and its Affiliates from and against all costs, claims, suits, expenses (including reasonable attorneys' fees) and damages arising out of or resulting from: (a) any willful or negligent act or omission by Roche relating to the subject matter of this Agreement, or (b) the use

CONFIDENTIAL

AMG-ENBNJ-00132959

by or administration to any person of a p55TNFR:Fc Fusion Protein that is sold, distributed or otherwise provided to a Third Party by Roche, its Affiliates, its licensees and its sublicensees; except where such costs, claims, suits, expenses or damages arose or resulted from any negligent act or omission by Immunex, provided that Immunex gives reasonable notice to Roche of any such claim or action, tenders the defense of such claim or action to Roche and assists Roche at Roche's expense in defending such claim or action and does not compromise or settle such claim or action without Roche's prior written consent.

8.0    Insurance

8.1    At all times during the term of this Agreement, Immunex shall provide the following insurance at its sole cost and expense:

(a)    Commercial General Liability, including coverage for products and completed operations (maintained for a period of at least two (2) years after the termination of this Agreement) and contractual liability (including coverage for advertising and personal injury).  The policy shall have a limit of no less than $10 million.

(b)    Foreign Local Coverages.  Where required by law, Immunex will purchase foreign local coverages in an amount that, at a minimum, satisfies the legal requirements of that jurisdiction.

(c)    Workers' Compensation and Employer's Liability.  Workers' Compensation insurance or the foreign equivalent, to comply with the statutory requirements of the applicable jurisdictions.  Immunex will also purchase Employer's Liability insurance for an amount not less than $1 million each occurrence.

(d)    Policy Conditions: All policies shall:

(i)    Be written by insurance companies with an A.M. Best's rating of A:VIII or higher (or if Immunex' policies are not subject to the Best rating, then by carriers who are acceptable to Roche).

(ii)    Provide that coverage shall not be suspended, voided, canceled, non-renewed, reduced in scope or limits below $10 million, except after a thirty (30) day written notice by certified mail has been given to Roche.

(iii)    Add Roche as an additional insured.

(iv)    Be primary to any other insurance owned, secured or in place by Roche, which insurance shall not be called upon to contribute in any way.

CONFIDENTIAL

AMG-ENBNJ-00132960

Immunex shall provide Roche a certificate of insurance which shall reflect the above coverages and provision, with annual renewals as long as the contract continues.

## 9.0  Term and Termination

9.1  Term. This Agreement shall commence on the Effective Date and shall continue in full force and effect, unless earlier terminated pursuant to Sections 9.2, 9.3, or 9.4 below, on a product-by-product and country-by-country basis, until the revocation or expiration of the last to expire, or be revoked, patent or patent application within the Brockhaus Patent Rights that covers such Licensed Product in such country. Following expiration of this Agreement pursuant to this Section 9.1, all rights licensed hereunder with respect to such Licensed Product on a country-by-country basis, as appropriate, shall become nonexclusive, fully-paid up and irrevocable upon payment of any amounts due that have accrued hereunder prior to such expiration.

9.2  Termination for Default. If either Party shall default in a material manner with respect to any material provision of this Agreement and the other Party shall have given the defaulting Party written notice of such default, the defaulting Party shall have thirty (30) days from receipt of such written notice to cure such default. If such default is not cured within such thirty (30) day period, the nondefaulting Party shall have the right, upon notice to the defaulting Party and without prejudice to any other rights the non-defaulting Party may have, to terminate this Agreement, unless the defaulting Party is in the process of attempting in good faith to remedy such default, in which case, the thirty (30) day cure period shall be extended by an additional thirty (30) days. Upon such termination, any sublicenses granted under this Agreement shall not automatically terminate, but instead, the non-defaulting Party shall have the option to either terminate or continue this Agreement with each sublicensee.

9.3  Bankruptcy. Either Party may, in addition to any other remedies available to it by law or in equity, terminate this Agreement, in whole or in part as the terminating Party may determine, by written notice to the other Party in the event the other Party shall have become bankrupt, or shall have made an assignment for the benefit of its creditors or there shall have been appointed a trustee or receiver of the other Party or for all or a substantial part of its property or any case or proceeding shall have been commenced or other action taken by or against the other Party in bankruptcy or seeking reorganization, liquidation, dissolution, winding-up, arrangement, composition or readjustment of its debts or any other relief under any bankruptcy, insolvency, reorganization or other similar act or law of any jurisdiction now or hereafter in effect and any such event shall have continued for sixty (60) days undismissed, unbonded and undischarged. All rights and licenses granted under this Agreement by one Party to the other Party are, and shall otherwise be deemed to be, for purposes of Section 365 (n) of the Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 (56) of the Bankruptcy Code. The Parties agree that the each Party under this Agreement shall retain and may fully exercise all of its rights and elections under the Bankruptcy Code in the event of a bankruptcy by the other Party. The

Page 21

Parties further agree that in the event of the commencement of a bankruptcy proceeding by or against one Party under the Bankruptcy Code, the other Party shall be entitled to complete access to any such intellectual property pertaining to the rights granted in the licenses hereunder of the Party by or against whom a bankruptcy proceeding has been commenced and all embodiments of such intellectual property.

    9.4    Unilateral Termination. In addition to any other right of termination provided herein, Immunex shall have the right to terminate this Agreement for any reason, with or without cause, upon at least six (6) months' prior written notice to Roche. If Immunex terminates this Agreement pursuant to this Section 9.4, the licenses granted hereunder shall terminate, but the obligation of Immunex under Section 2.2 above shall survive such termination.

    9.5    Survival of Certain Provisions. Termination of this Agreement for any reason shall not release either Party from any obligation arising prior to the date of termination. The provisions of Sections 2.4, 3.1, 4.0, 5.8(a) and (c) with respect to pre-termination manufacture or sales of Licensed Product, 6.0, 7.0, 9.5 and 10.7 shall survive any termination or expiration of this Agreement. The provisions of Section 2.2 shall survive any termination of this Agreement by Immunex pursuant to Sections 9.2 or 9.4 hereof or the expiration of this Agreement.

10.0    General Provisions

    10.1    Notices

    All notices which may be required pursuant to this Agreement: (a) shall be in writing, (b) shall be addressed, in the case of Roche (except as otherwise specified herein), to the Corporate Secretary at the address set forth at the beginning of this Agreement, and in the case of Immunex, to the General Counsel at the address set forth at the beginning of this Agreement, (or to such other person or address as either Party may so designate from time to time), (c) shall be delivered personally or shall be mailed, postage-prepaid, by registered mail or certified mail, return receipt requested, or transmitted by courier for hand delivery or transmitted by facsimile and (d) shall be deemed to have been given on the date of receipt if sent by mail or on the date of delivery if transmitted personally or by courier or facsimile. Notices by facsimile may be sent to the following numbers: for Immunex, to 206-233-0644; for Roche, to (973) 235-3500 (or to such other numbers as either Party may so designate from time to time).

    10.2    Governing Law

    This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey (other than its choice of law principles).

CONFIDENTIAL

AMG-ENBNJ-00132962

## 10.3 Entire Agreement

This Agreement is the entire agreement between the Parties with respect to the specific subject matter hereof, and there are no prior written or oral promises or representations related thereto which are not incorporated herein. No amendment or modification of the terms of this Agreement shall be binding on either Party unless reduced to writing and signed by an authorized officer of the Party to be bound.

## 10.4 Binding Effect and Assignment

This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective permitted successors and assigns. This Agreement shall not be assignable by either Party without the other's prior written consent, which consent shall not be unreasonably withheld or delayed; provided however, that either Party may assign this Agreement, without the other Party's written consent but after providing at least thirty (30) days' prior written notice to the other Party, to any successor pursuant to a consolidation or merger of the Party with or into any other corporation or corporations.

## 10.5 Waiver

The waiver by a Party hereto of any breach of or default under any of the provisions of this Agreement or the failure of a Party to enforce any of the provisions of this Agreement or to exercise any right thereunder shall not be construed as a waiver of any other breach or default or as a waiver of any such rights or provisions hereunder.

## 10.6 Severability

If any part of this Agreement shall be invalid or unenforceable under applicable law, such part shall be ineffective only to the extent of such invalidity or unenforceability, without in any way affecting the remaining parts of this Agreement. In addition, the part that is ineffective shall be reformed in a mutually agreeable manner so as to as nearly approximate the intent of the Parties as possible.

## 10.7 Publicity

Immunex and Roche agree that, except as may otherwise be required by applicable laws, regulations, rules, or orders, including the disclosure requirements of the Securities and Exchange Commission ("SEC"), no information concerning this Agreement and the transactions contemplated herein (except information which is already in the public domain) shall be made public by either Party without the prior written consent of the other Party. Notwithstanding the foregoing, with respect to complying with the disclosure requirements of the SEC, in connection with any required SEC filing of this Agreement by Immunex, Immunex shall seek confidential treatment of portions of this Agreement from the SEC and Roche shall have the right to review and

Page 23

CONFIDENTIAL

AMG-ENBNJ-00132963

comment on such an application for confidential treatment prior to its being filed with the SEC. Roche shall provide its comments, if any, on such application as soon as practicable and in no event later than five (5) days after such application is provided to Roche. Notwithstanding the foregoing, each Party shall have the right to disclose information concerning this Agreement and the transactions contemplated herein to sublicensees and prospective sublicensees hereunder to the extent reasonably necessary and under obligations of confidentiality no less stringent than those provided for in Section 4 above.

10.8   Counterparts

This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original for all purposes, but all of which together shall constitute one and the same instrument.

10.9   Force Majeure

(a)    If either Party shall be delayed, interrupted or prevented with respect to the performance of any obligation under this Agreement by reason of any act of God, flood, fire, explosion, strike, lockout, labor dispute, casualty or accident, war, revolution, civil commotion, act of public enemies, blockage or embargo, injunction, law, order, proclamation, regulation, ordinance, demand or requirement of any government or subdivision, authority or representative of any such government, or any other cause beyond the reasonable control of such Party, such Party shall not be liable to the other therefor; and the time for performance of such obligation shall be extended for a period equal to the duration of the contingency that occasioned the delay, interruption or prevention.

(b)    Within fifteen (15) days after the beginning of the *force majeure*, the party invoking its *force majeure* rights must notify the other party of this fact in accordance with Section 10.9(a) above. The other party must also be notified of the termination of the *force majeure* within fifteen (15) days after such termination. If the *force majeure* renders either of the required notifications impossible, notification must be given as soon as possible.

(c)    If the delay resulting from the *force majeure* exceeds six (6) months, then the injured party may elect to treat such delay as a default and may terminate this Agreement pursuant to the provisions of Section 9.2 above. If no notice of such election is given prior to termination of *force majeure*, the Agreement will continue in effect without modification.

10.10   Headings

Headings are for the convenience of reference only and shall not control the construction or interpretation of any of the provisions of this Agreement.

CONFIDENTIAL

AMG-ENBNJ-00132964

### 10.11  No Partnership

Nothing in this Agreement is intended or shall be deemed to constitute a partnership, agency, employer-employee, or joint venture relationship between the Parties.

### 10.12  Further Assurances

At the request of either Party, the other Party shall execute and deliver from time-to-time such further instruments and shall provide reasonable cooperation in such proceedings or actions as shall be necessary or reasonably appropriate to effectuate the purposes of this Agreement.

### 10.13  Disclaimer of Express or Implied License

Notwithstanding all other provisions of this Agreement and the negotiations that led to this Agreement, the Parties agree that nothing in this Agreement grants to Roche, any Roche Affiliate, or any Roche licensee or sublicensee any right under any Immunex patent, patent application, or other intellectual property to make, have made, use, sell, offer for sale or import any product that includes all or a portion of any form, homolog, mutein, or variant of the human p75 tumor necrosis factor receptor.

### 10.14  Arbitration

The Parties agree that an infringement determination under Section 3.3 of this Agreement shall be resolved through binding arbitration as set forth below:

(a)     Initiation of Arbitration.  Any such dispute shall be finally resolved by arbitration in Washington, D.C. under the International Arbitration Rules of the American Arbitration Association ("AAA") as amended from time to time.

(b)     Selection of Arbitrators.  The arbitral tribunal shall consist of three (3) arbitrators. Roche shall appoint one arbitrator and Immunex shall appoint one arbitrator.  The Party commencing the arbitration proceeding shall designate its proposed arbitrator in its initial statement of its case, and the other Party shall designate its arbitrator within thirty (30) days thereafter.  The third arbitrator shall be appointed by mutual agreement of said two arbitrators and shall have experience in intellectual property law and specifically with patents held in the biotechnology industry.  In the event of failure of the two arbitrators to agree on the third arbitrator within thirty (30) days after their appointment, the third arbitrator shall be appointed in accordance with the then existing rules of the AAA.  All arbitrators shall be impartial and independent.

(c)     Confidential Proceedings.  The arbitration proceedings shall be confidential and the arbitral tribunal shall issue appropriate protective orders to safeguard each Party's Confidential Information.  Except as required by law, no Party shall make (or instruct the arbitral tribunal to make) any public announcement with

CONFIDENTIAL

AMG-ENBNJ-00132965

respect to the proceedings or decision of the arbitral tribunal without the prior written consent of each other Party. The Parties shall keep the existence of any dispute submitted to arbitration, and the award of the arbitral tribunal, in confidence and the arbitral tribunal, except as required in connection with the enforcement of such award or as otherwise required by applicable law.

(d)    Costs. The costs and fees of the arbitration shall be paid by Immunex in the event that the arbitration tribunal determines that the Licensed Product or new manufacturing process infringes any claim of a Roche Patent; provided however, that such costs and fees shall exclude Roche's costs (including, its attorney's fees) and expenses incurred in connection with such arbitration. Otherwise, the Parties shall each pay one-half of the costs and fees of the arbitration and each Party shall pay its own costs (including, its attorneys' fees) and expenses incurred in connection with such arbitration.

(e)    Choice of Law. The arbitration tribunal shall apply the law of the Court of Appeals for the Federal Circuit in making any determination of claim interpretation and infringement.

(f)    Records of Proceedings. A court reporter will record any hearing of the arbitration tribunal and that reporter's record will be the official transcript of the proceedings. The arbitration tribunal shall prepare a detailed statement specifying with particularity the details of any determination and the reasoning behind the determination.

10.15 Resolution of U.S. Inteferences

Any interferences involving Lauffer Patent Rights and Brockhaus Patent Rights shall be resolved according to the terms as set forth in Exhibit E attached hereto.

Page 26

CONFIDENTIAL

AMG-ENBNJ-00132966

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by its duly authorized representatives as of the date set forth below.

**HOFFMANN-LA ROCHE INC.**

By: _____

Name: GEORGE W. JOHNSTON

Title: VICE PRESIDENT

Date: 9/14/99

**F.HOFFMANN-LA ROCHE LTD**

By: _____

Name: WERNER HENRICH, STEFAN ARNOLD

Title: SR. VICE PRESIDENT, VICE PRESIDENT

Date: 9/14/99

**IMMUNEX CORPORATION**

By: _____

Name: SCOTT G. HALLQUIST

Title: SENIOR VICE PRESIDENT

Date: 9.15.99

Page 27

CONFIDENTIAL

AMG-ENBNJ-00132967

**Exhibit A**

CONFIDENTIAL

AMG-ENBNJ-00132968

## EXHIBIT A



Primary
Translation
Product

rhu TNFR:Fc

CONFIDENTIAL

AMG-ENBNJ-00132969

**Exhibit B**

CONFIDENTIAL

AMG-ENBNJ-00132970

AMG-ENBNJ-00132971

EXHIBIT B

```
LPAQVAFTPYAPEPGSTCRLREYYDQTAQMCCSKCSPGQHAKVFCTKTSDTVCDSCEDSTYTQLWNWVPECLSCG
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
         10        20        30        40        50        60        70

SRCSSDQVETQACTREQNRICTCRPGWYCALSKQEGCRLCAPLRKCRPGFGVARPGTETSDVVCKPCAPGTFSNT
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
    80        90       100       110       120       130       140       150

TSSTDICRPHQICNVVAIPGNASMDAVCTSTSPTRSMAPGAVHLPQPVSTRSQHTQPTPEPSTAPSTSFLLPMGP
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
        160       170       180       190       200       210       220

SPPAEGSTGDEPKSCDKTHTCPPCPAPELLGGPSVFLFPPKPKDTLMISRTPEVTCVVVDVSHEDPEVKFNWYVD
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
230       240       250       260       270       280       290       300

GVEVHNAKTKPREEQYNSTYRVVSVLTVLHQDWLNGKEYKCKVSNKALPAPIEKTISKAKGQPREPQVYTLPPSR
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
    310       320       330       340       350       360       370

EEMTKNQVSLTCLVKGFYPSDIAVEWESNGQPENNYKTTPPVLDSDGSFFLYSKLTVDKSRWQQGNVFSCSVMHE
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
    380       390       400       410       420       430       440       450

ALHNHYTQKSLSLSPGK
----|----|----|--
         460
```

JA0385

CONFIDENTIAL

**Exhibit C**

CONFIDENTIAL

AMG-ENBNJ-00132972

*Proc. Natl. Acad. Sci. USA*
Vol. 87, pp. 7380–7384, October 1990
Immunology

# Cloning of human tumor necrosis factor (TNF) receptor cDNA and expression of recombinant soluble TNF-binding protein

(cytokine/soluble receptor/receptor family/lymphotoxin)

Patrick W. Gray, Kathy Barrett, David Chantry, Martin Turner, and Marc Feldmann

Charing Cross Sunley Research Centre, Lurgan Avenue, Hammersmith, London, W6 8LW, England

Communicated by James Gowans, July 6, 1990

ABSTRACT    The cDNA for one of the receptors for human tumor necrosis factor (TNF) has been isolated. This cDNA encodes a protein of 455 amino acids that is divided into an extracellular domain of 171 residues and a cytoplasmic domain of 221 residues. The extracellular domain has been engineered for expression in mammalian cells, and this recombinant derivative binds TNF$\alpha$ with high affinity and inhibits its cytotoxic activity *in vitro*. The TNF receptor exhibits similarity with a family of cell surface proteins that includes the nerve growth factor receptor, the human B-cell surface antigen CD40, and the rat T-cell surface antigen OX40. The TNF receptor contains four cysteine-rich subdomains in the extracellular portion. Mammalian cells transfected with the entire TNF receptor cDNA bind radiolabeled TNF$\alpha$ with an affinity of $2.5 \times 10^{-9}$ M. This binding can be competitively inhibited with unlabeled TNF$\alpha$ or lymphotoxin (TNF$\beta$).

Tumor necrosis factor $\alpha$ (TNF$\alpha$) is a potent cytokine that elicits a broad spectrum of biological responses. TNF$\alpha$ causes the cytolysis or cytostasis of many tumor cell lines *in vitro*, induces the hemorrhagic necrosis of transplanted tumors in mice, enhances the phagocytosis and cytotoxicity of polymorphonuclear neutrophils, and modulates the expression of many proteins, including lipoprotein lipase, class I antigens of the major histocompatibility complex, and cytokines such as interleukin 1 and interleukin 6 (1–4). TNF$\alpha$ appears to be necessary for a normal immune response (5, 6), but large quantities produce dramatic pathogenic effects (7–9). TNF$\alpha$ has been termed "cachectin" since it is the predominant factor responsible for the wasting syndrome (cachexia) associated with neoplastic disease and parasitemia (1, 3). TNF is also a major contributor to toxicity in Gram-negative sepsis, since antibodies against TNF can protect infected animals (7, 10).

The many activities of TNF$\alpha$ are mediated by binding to a cell surface receptor. Radioligand binding studies have confirmed the presence of TNF receptors on a wide variety of cell types (11–14). Although these receptors are expressed in limited numbers (1000–10,000 per cell), they bind TNF$\alpha$ with high affinity ($K_a = 10^9$ M$^{-1}$ at 4°C). The TNF receptor has been characterized as a 55- to 80-kDa glycoprotein that binds both TNF$\alpha$ and the structurally related lymphotoxin (TNF$\beta$). Lymphotoxin has biological activities that are similar, if not identical, to those of TNF$\alpha$, presumably because both are recognized by the same receptor (4). Recently, several laboratories have detected heterogeneity in TNF receptor preparations (15, 16) and have proposed that at least two distinct cell surface molecules bind TNF$\alpha$. In addition, both of these receptors appear to be released from cells in soluble form, as TNF-binding proteins of 30 kDa have been isolated from urine and serum (16–18). This soluble extracellular domain

retains the capacity to bind ligand with high affinity and therefore may be important in regulating concentrations of TNF$\alpha$ *in vivo*.

To further elaborate the structure of the TNF receptor, we have identified a cDNA for one of the receptor forms.* COS cells transfected with this cDNA bind TNF$\alpha$ with high affinity and this binding can be inhibited by unlabeled TNF$\alpha$ or lymphotoxin. A derivative of the TNF receptor, the extracellular domain, has also been expressed in COS cells. This results in the secretion of a soluble recombinant receptor domain with characteristics similar to those of the TNF-binding protein.

## MATERIALS AND METHODS

**Reagents.** Recombinant human TNF$\alpha$ and TNF$\beta$ were generously supplied by Genentech as highly purified proteins derived from *Escherichia coli*. The specific activities of these preparations were approximately $10^7$ units/mg, as measured in the murine L929 cell cytotoxicity assay. The synthetic oligonucleotides were prepared by Oswel DNA Service (University of Edinburgh).

**Isolation of TNF Receptor cDNA Clones.** Purification and partial amino acid sequence analysis of the TNF-binding protein have been described (16, 17). The sequence of a peptide fragment (Glu-Met-Gly-Gln-Val-Glu-Ile-Ser-Ser-Thr-Val-Asp-Arg-Asp-Thr-Val-Cys-Gly) was used to design a synthetic oligodeoxynucleotide probe (5'-AAG-GAG-ATG-GGC-CAG-GTT-GAG-ATC-TCT-TCT-ACT-GTT-GAC-AAT-GAC-ACT-GTG-TGT-GGC-3'). The 57-mer DNA probe was labeled with $^{32}$P by T4 polynucleotide kinase (New England Biolabs) and used to screen a placental cDNA library in $\lambda$gt10 (19, 20). Approximately 800,000 phage were transferred to nitrocellulose filters and screened at reduced stringency (21). Filters were incubated for 2 hr at 42°C in 0.05 M sodium phosphate, pH 6.5/20% formamide/0.75 M sodium chloride/0.075 M sodium citrate/1% polyvinylpyrrolidone (Sigma)/1% Ficoll/1% bovine serum albumin (Sigma), and sonicated salmon sperm DNA (Sigma) at 50 ng/ml. The radiolabeled probe was then added to the filters ($10^6$ cpm/ml), which were hybridized for 16 hr. Filters were washed extensively in 0.06 M sodium chloride/0.006 M sodium citrate/1% SDS at 37°C and positive clones were identified by autoradiography. Ten hybridizing clones were plaque-purified (19) and cDNA insert size was determined by polyacrylamide gel electrophoresis of *Eco*RI-digested phage DNA. The inserts of two cDNA clones were sequenced by the dideoxy chain-termination technique (22).

**Southern and Northern Blot Analysis.** DNA was isolated from human lymphocytes by the method of Blin and Stafford (23) and used for Southern blot analysis (24). DNA was

---

The publication costs of this article were defrayed in part by page charge payment. This article must therefore be hereby marked "*advertisement*" in accordance with 18 U.S.C. §1734 solely to indicate this fact.

Abbreviations: TNF, tumor necrosis factor; PCR, polymerase chain reaction.
*The sequence reported in this paper has been deposited in the GenBank data base (accession no. M37764).

CONFIDENTIAL

AMG-ENBNJ-00132973

Case 2:24-cv-00482-AMA-LRL Document 60-1 Filed 12/30/2019 47 Page(ID# of 439)

*Proc. Natl. Acad. Sci. USA* 87 (1990)    7381

digested with restriction endonucleases (New England Bio-labs), fractionated in a 1% agarose gel, and transferred to nitrocellulose. Hybridization and washing were conducted under stringent conditions (20) using a $^{32}$P-labeled preparation of a 600-base-pair (bp) fragment of the TNF receptor cDNA. Northern blot analysis was performed (25) on oligo(dT)-selected RNA isolated from human placenta, spleen (generously provided by the Cooperative Human Tissue Network, Birmingham, AL), and fibroblast cell line 293. Following electrophoresis in a formaldehyde/1.2% agarose gel, the RNA was transferred to nitrocellulose and hybridized with the TNF receptor DNA probe under stringent conditions.

**Mammalian Cell Expression of the Human TNF Receptor and Derivatives.** The coding region of the majority of the human TNF receptor was isolated as an *Eco*RI fragment and cloned into a mammalian cell expression vector (26), resulting in plasmid prTNFR. The *Eco*RI fragment encodes 374 amino acids of the TNF receptor; 81 carboxyl-terminal residues of the cytoplasmic domain are therefore missing from this plasmid construction and 23 unrelated residues are added. A derivative of the TNF receptor was produced by engineering a termination codon just prior to the transmembrane domain (following Ile-159). The polymerase chain reaction (PCR) technique (27) was used to generate a 300-bp restriction fragment containing Bgl II site at the 5′ end and a *L* ⋅ III site preceded by a TAG stop codon at the 3′ end. The PCR primers were 5′-GCTGCTCCAAATGCCGAAAG-3′ and 5′-AGTTCAAGCTTTTACAGTGCCCTTAACAT-TCTAA-3′. The PCR product was purified by gel electrophoresis and cloned into the TNF receptor expression plasmid (described above) digested with *Bgl* II and *Hind*III. DNA sequencing confirmed that the resulting plasmid (pTNFRecd) contained the designed DNA sequence.

The TNF receptor expression plasmids were transfected into monkey COS-7 cells by using Lipofectin (GIBCO/BRL) according to the manufacturer's instructions. Cells were cultured in Dulbecco's modified Eagle's medium containing 10% fetal bovine serum.

**Analysis of Recombinant TNF Receptor Derivatives.** TNFα was radioiodinated with the Iodo-Gen method (Pierce) according to the manufacturer's directions. The specific activity of the $^{125}$I-labeled TNFα was 10–30 μCi/μg (1 μCi = 37 kBq). COS cells transfected with the TNF receptor cDNA (prTNFR, 1300-bp *Eco*RI fragment) were incubated for 24 hr and then seeded into six-well tissue culture plates (Nunc) at 4.5 × 10⁵ cells per well. The cells were incubated for a further 48 hr and then receptor expression was quantitated by radioligand binding for 2 hr at 4°C. Nonspecific binding of $^{125}$I-TNFα was determined in the presence of a 1000-fold molar excess of unlabeled TNFα. Binding data were analyzed by the method of Scatchard (28).

The TNF receptor derivative was analyzed for inhibition of $^{125}$I-TNFα binding to the natural receptor on human U-937 monocytic cells. Culture supernatant was harvested 72 hr after COS cells were transfected with pTNFRecd. U-937 cells (2 × 10⁶ cells in 200 μl) were incubated with 1 nM $^{125}$I-TNFα and dilutions of COS cell medium for 2 hr at 4°C. Cells were then centrifuged through 20% sucrose to remove unbound TNFα. Nonspecific binding was determined in the presence of μM unlabeled TNFα.

The TNF receptor derivative was also analyzed for inhibition of TNFα cytotoxic effects *in vitro*. The cytotoxicity assay was performed as described on the TNF-sensitive cell line WEHI 164 clone 13 (29). Serial dilutions of culture supernatant from COS cells transfected with pTNFRecd or mock-transfected controls were incubated with a constant amount of TNFα (1 ng/ml) for 1 hr at 37°C before the assay.

## RESULTS

**Isolation and Characterization of the TNF Receptor cDNA.** Partial amino acid sequence of the TNF-binding protein (16, 17) was used to design a synthetic oligonucleotide probe. The radiolabeled probe was used to screen a human placental cDNA library in λgt10, and 10 hybridizing phage were isolated. The nucleotide and deduced amino acid sequences of the longest cDNA clone are depicted in Fig. 1. The third potential ATG initiation codon occurs at position 156 of the nucleotide sequence; the first two ATG codons are closely followed by termination codons, and the third ATG is preceded by the best translation initiation consensus nucleotides (30). The cDNA encodes an open reading frame of 1365 bases that codes for a polypeptide of 455 residues. The peptide sequence determined by amino acid sequencing was identified in the encoded cDNA (18 of 19 matching residues). The amino-terminal end identified for the TNF-binding protein corresponds to the cDNA-encoded sequence (17 of 19 matching residues) beginning at residue 41. The first 35 amino acids are generally quite hydrophobic and probably represent a signal sequence. Residues 36–40 (−5 to −1 in Fig. 1) are highly charged (Asp-Arg-Glu-Lys-Arg) and such a sequence is not typically found in secretory signal sequences (31); perhaps the natural receptor is processed by proteolysis after residues 39 and 40, which comprise a dibasic cleavage site (Lys-Arg). Hydropathy analysis of the protein sequence predicts a signal transmembrane domain of 23 amino acids. This hydrophobic sequence divides the protein into an extracellular domain of 171 residues and a cytoplasmic domain of 221 residues. The amino acid composition determined for the TNF-binding protein (17) corresponds well with the predicted composition of the extracellular domain encoded by the cDNA (results not shown). The discrepancy between the predicted receptor size (49 kDa) and the size determined by SDS/polyacrylamide gel electrophoresis (55–60 kDa, refs. 12–14) is probably due to glycosylation; there are four potential N-linked glycosylation sites in the sequence, three of which are in the extracellular domain. The sequence contains a large number (i.e., 30) of cysteine residues, 24 of which are in the extracellular domain. The arrangement of these cysteines is similar to that of several other cell surface proteins (see *Discussion*), suggesting that the TNF receptor is structurally related to a family of receptors.

A Northern blot analysis is presented in Fig. 2A. The $^{32}$P-labeled 600-bp cDNA fragment hybridized to a single predominant band of oligo(dT)-selected RNA from human placenta or spleen. A minor larger transcript was also observed in RNA from a fibroblast cell line. The size of the hybridizing species is 2400 bases, in good agreement with the size of isolated cDNA. Fig. 2B shows a Southern blot of human genomic DNA hybridized with the same 600-bp probe from the cDNA. In each of the three different restriction digests, only a single hybridization signal was observed. Thus the TNF receptor that we have isolated appears to be encoded by a single gene.

**Expression of Recombinant TNF Receptor Sequences in Mammalian Cells.** To confirm that the cDNA shown in Fig. 1 indeed encodes the TNF receptor, the cDNA was engineered for expression in mammalian cells. The cDNA contains an *Eco*RI site at position 1270 of Fig. 1. The receptor coding sequence was isolated as a 1300-bp *Eco*RI fragment (containing all but the last 81 codons of the cytoplasmic domain) and inserted into the mammalian cell expression vector containing a cytomegalovirus promoter and simian virus 40 transcription termination sequences (26). The resulting plasmid was transfected into COS cells, which were analyzed for TNF receptor expression after 3 days. As shown in Fig. 3A, the transfected cells specifically bound radioiodinated TNFα in a saturable and dose-dependent fashion. The

CONFIDENTIAL

AMG-ENBNJ-00132974

```
1   ACCA GTGATCTCTA TGCCCGAGTC TCAACCCTCA ACTGTCACCC CAAGGCACTT GGGACGTCCT GGACAGACCG
75  AGTCCCGGGA AGCCCCAGCA CTGCCGCTGC CACACTGCCC TGAGCCCAAA TGGGGGAGTG AGAGGCCATA GCTGTCTGGC

-40   M   G   L   S   T   V   P   D   L   L   L   P   L   V   L   L   E   L   L   V   G   I   Y   P
156 ATG GGC CTC TCC ACC GTG CCT GAC CTG CTG CTG CCG CTG GTG CTC CTG GAG CTG TTG GTG GGA ATA TAC CCC

-16   S   G   V   I   G   L   V   P   H   L   G   D   R   E   K   R↓  D   S   V   C   P   Q   G   K
228 TCA GGG GTT ATT GGA CTG GTC CCT CAC CTA GGG GAC AGG GAG AAG AGA GAT AGT GTG TGT CCC CAA GGA AAA

9   Y   I   H   P   Q   N   N   S   I   C   C   T   K   C   H   K   G   T   Y   L   Y   N   D   C
300 TAT ATC CAC CCT CAA AAT AAT TCG ATT TGC TGT ACC AAG TGC CAC AAA GGA ACC TAC TTG TAC AAT GAC TGT

33  P   G   P   G   Q   D   T   D   C   R   E   C   E   S   G   S   F   T   A   S   E   N   H   L
372 CCA GGC CCG GGG CAG GAT ACG GAC TGC AGG GAG TGT GAG AGC GGC TCC TTC ACC GCT TCA GAA AAC CAC CTC

57  R   H   C   L   S   C   S   K   C   R   K   E   M   G   Q   V   E   I   S   S   C   T   V   D
444 AGA CAC TGC CTC AGC TGC TCC AAA TGC CGA AAG GAA ATG GGT CAG GTG GAG ATC TCT TCT TGC ACA GTG GAC

81  R   D   T   V   C   G   C   R   K   N   Q   Y   R   H   Y   W   S   E   N   L   F   Q   C   F
516 CGG GAC ACC GTG TGT GGC TGC AGG AAG AAC CAG TAC CGG CAT TAT TGG AGT GAA AAC CTT TTC CAG TGC TTC

105 N   C   S   L   C   L   N   G   T   V   H   L   S   C   Q   E   K   Q   N   T   V   C   T   C
558 AAT TGC AGC CTC TGC CTC AAT GGG ACC GTG CAC CTC TCC TGC CAG GAG AAA CAG AAC ACC GTG TGC ACC TGC

129 H   A   G   F   F   L   R   E   N   E   C   V   S   C   S   N   C   K   K   S   L   E   C   T
660 CAT GCA GGT TTC TTT CTA AGA GAA AAC GAG TGT GTC TCC TGT AGT AAC TGT AAG AAA AGC CTG GAG TGC ACG

153 K   L   C   L   P   Q   I   E   N   V   K   G   T   E   D   S   G   T   T│V   L   L   P   L
732 AAG TTG TGC CTA CCC CAG ATT GAG AAT GTT AAG GGC ACT GAG GAC TCA GGC ACC ACA GTG CTG TTG CCC CTG

177 V│  I   F   F   G   L   C   L   L   S   L   L   F   I   G   L   M   Y│R   Y   Q   R   W   K
804 GTC ATT TTC TTT GGT CTT TGC CTT TTA TCC CTC CTC TTC ATT GGT TTA ATG TAT CGC TAC CAA CGG TGG AAG

201 S   K   L   Y   S   I   V   C   G   K   S   T   P   E   K   E   G   E   L   E   G   T   T   T
876 TCC AAG CTC TAC TCC ATT GTT TGT GGG AAA TCG ACA CCT GAA AAA GAG GGG GAG CTT GAA GGA ACT ACT ACT

225 K   P   L   A   P   N   P   S   F   S   P   T   P   G   F   T   P   T   L   G   F   S   P   V
948 AAG CCC CTG GCC CCA AAC CCA AGC TTC AGT CCC ACT CCA GGC TTC ACC CCC ACC CTG GGC TTC AGT CCC GTG

249 P   S   S   T   F   T   S   S   S   T   Y   T   P   G   D   C   P   N   F   A   A   P   R   R
1020 CCC AGT TCC ACC TTC ACC TCC AGC TCC ACC TAT ACC CCC GGT GAC TGT CCC AAC TTT GCG GCT CCC CGC AGA

273 E   V   A   P   P   Y   Q   G   A   D   P   I   L   A   T   A   L   A   S   D   P   I   P   N
1092 GAG GTG GCA CCA CCC TAT CAG GGG GCT GAC CCC ATC CTT GCG ACA GCC CTC GCC TCC GAC CCC ATC CCC AAC

297 P   L   Q   K   W   E   D   S   A   H   K   P   Q   S   L   D   T   D   D   P   A   T   L   Y
1164 CCC CTT CAG AAG TGG GAG GAC AGT GCC CAC AAG CCA CAG AGC CTA GAC ACT GAT GAC CCC GCG ACG CTG TAC

321 A   V   V   E   N   V   P   P   L   R   T   L   E   F   V   R   R   L   G   L   S   D   H   E
1236 GCC GTG GTG GAG AAC GTG CCC CCG TTG GGC TGG AAG GAA TTC GTG CGG CGC CTA GGG CTG AGC GAC CAC GAG

345 I   D   R   L   E   L   Q   N   G   R   C   L   R   E   A   Q   Y   S   M   L   A   T   W   R
1308 ATC GAT CGG CTG GAG CTG CAG AAC GGG CGC TGC CTG CGC GAG GCG CAA TAC AGC ATG CTG GCG ACC TGG AGG

369 R   R   T   P   R   R   E   A   T   L   E   L   L   G   R   V   L   R   N   M   D   L   L   G
1380 CGG CGC ACG CCG CGG CGG GAG GCG ACG CTG GAG CTG CTG GGA CGC GTG CTC CGC GAC ATG GAC CTG CTG GGC

393 C   L   E   D   I   E   E   A   L   C   G   P   A   A   L   P   P   A   P   S   L   L   R
1452 TGC CTG GAG GAC ATC GAG GAG GCG CTT TGC GGC CCC GCC GCG CTC CCG CCC GCG CCC AGT CTT CTC AGA TGA
1521 GGCTGCGCCC TGCGGGGCAGC TCTAAGGACC GTCCTCGCAG ATCGCCTTCC AACCCCACTT TTTTCTGGAA AGGAGGGGTC
1601 CTGCAGGGGC AAGCAGGAGC TAGCAGCGGC CTACTTGGTG CTAACCCCTC GATGTACATA GCTTTTCTCA GCTGCCTGCG
1681 CGCCGCCGAC AGTCAGCGCT GTGCCGCGGG AGAGAGGTGC GCCGTGGGCT CAAGAGCCTG AGTGGGGTGGT TTGCGGAGGAT
1761 GAGGGACGCT ATGCCTCATG CCCGTTTTGG GTGTCCTCAC CAGCAAGGCT GCTCGGGGGC CCCTGGTTCG TCCCTGAGCC
1841 TTTTTCACAG TGCATAAGCA GTTTTTTTTG TTTTTGTTTT GTTTTGTTTT GTTTTTAAA TCAATCATGT TACACTAATA
1921 GAAACTTGGC ACTCCTGTGC CCTCTGCCTG GACAAGCAC ATAGCAAGCT GAACTGTCCT AAGGCAGGGG CGAGCACGGA
2001 ACAATGGGGC CTTCAGCTGG AGCTGTGGAC TTTTGTACAT ACACTAAAAT TCTGAAGTTA AG
```

FIG. 1. Nucleotide sequence of the human TNF receptor cDNA and encoded amino acid sequence. The predicted signal sequence is numbered −40 to −1. The first residue of the TNF-binding protein (16, 17) is preceded by an arrowhead, the transmembrane domain is boxed, and potential N-linked glycosylation sites in the extracellular domain are overlined. The sequence homologous with the designed oligonucleotide probe is found at nucleotide positions 477–533.

population of COS cells expressed ≈1 × 10⁵ receptors per cell. The measured binding affinity of recombinant receptors was 2.5 × 10⁹ M⁻¹ at 4°C, which is in close agreement with the value for the natural receptor on human cells (13, 14). The binding of ¹²⁵I-TNFα (1 nM) to these cells could be inhibited by the addition of unlabeled TNFα or lymphotoxin (Fig. 3B). COS cells transfected with just the expression vector did not significantly bind ¹²⁵I-TNFα (<2% of the binding seen with the cDNA transfection).

The extracellular domain of the TNF receptor is naturally shed from cells (16–18). To produce a similar recombinant derivative, at stop codon preceding the transmembrane domain was engineered into the cDNA by PCR mutagenesis. The modified DNA was inserted into the expression plasmid and subsequently transfected into COS cells. After 3 days, the COS cell medium was tested for inhibition of TNFα binding to human U-937 cells. As shown in Fig. 4A, the transfected-cell medium inhibited ≈70% of the binding of TNFα. The recombinant TNF receptor derivative was next tested for inhibition of TNFα biological activity. A sensitive bioassay for TNFα is measurement of cytolysis of mouse WEHI 164 (clone 13) cells. The transfected-cell medium inhibited 60% of TNFα cytotoxicity on this cell line (Fig. 4B).

Medium from mock-transfected COS cells did not inhibit TNFα cytotoxicity or binding. These experiments demonstrate that the recombinant extracellular domain of the TNF receptor is capable of binding TNF and inhibiting its biological activity.

### DISCUSSION

This paper describes the cDNA cloning of a human TNF receptor. The cDNA was isolated with a synthetic oligonucleotide probe based on partial amino acid sequence. The two peptide sequences determined for the purified TNF-binding protein correspond to sequences encoded in the cDNA. Confirmation that this cDNA encodes the TNF receptor was established by mammalian cell expression studies: this cDNA directs the expression of a cell surface protein that specifically binds TNFα with high affinity.

Southern hybridization suggests that the cDNA is encoded by a single gene. Several other laboratories have provided strong evidence for at least two structurally distinct human TNF receptors (15, 16). Consequently, other forms of the TNF receptor must differ significantly from that isolated here, since only single hybridization signals are observed in

CONFIDENTIAL

AMG-ENBNJ-00132975

Immunology: Gray *et al.*                    *Proc. Natl. Acad. Sci. USA 87 (1990)*    7383




FIG. 3. Binding characteristics of recombinant human TNF receptor expressed in COS-7 cells. (A) Direct binding of recombinant $^{125}$I-TNFα to COS-7 cells transfected with prTNFR. (*Inset*) Scatchard analysis derived from these data. (B) Competition analysis. Monolayers of COS-7 cells transfected with the TNF receptor cDNA were incubated with 1 nM $^{125}$I-TNF in the presence of various concentrations of unlabeled TNFα (●) or TNFβ (lymphotoxin, LT) (O).

th: 'outhern analysis (Fig. 2B). Similarly, the ligands for this receptor, TNFα and lymphotoxin, share 35% amino acid similarity but their coding sequences do not cross-hybridize (32).

The TNF receptor exhibits significant amino acid sequence homology to three other cell surface proteins: the low-affinity nerve growth factor receptor (28% similarity; ref. 33), human CD40 (a B-cell surface marker; 25% similarity, ref. 34), and rat OX40 (found on activated T cells that are CD4-positive; 24% identity; ref. 35). The similarity among these proteins is confined to the extracellular domain. As shown in Fig. 5, each of these contain four (three in OX40) cysteine-rich subdomains that probably evolved from a common motif. Consequently, these proteins are members of a family of cell surface molecules that are structurally related. The distinct functions of each of these molecules may be a result of their dissimilar cytoplasmic domains. The ligands for OX40 and CD40 have not been identified, but antibodies against them

can augment T-cell and B-cell responses, respectively (34, 35). TNFα and nerve growth factor do not share sequence similarity, but both ligands affect the growth and differentiation of target cells. Perhaps this family of cell surface molecules has evolved to recognize structurally distinct ligands but retained a common scaffold that is generally useful for recognition of polypeptide ligands. While th dissimilar cytoplasmic domains suggest independent mod of signal transduction, each receptor appears to function in the growth or differentiation of the cell.

The natural production of a soluble receptor domain has been observed for other cytokine receptors, including those for interleukins 2, 4, and 6 and interferon γ (36). The formation of a soluble extracellular domain can arise by several mechanisms—for example, by degradation of the receptor (as is the case for the interleukin 2 receptor) or by synthesis of an independent transcript that does not encode a transmembrane domain [as seen for the interleukin 4 receptor (37) and the soluble or cell-bound forms of immu-



FIG. 2. (A) Northern blot of oligo(dT)-selected RNA (10 μg per lane) from human 293 cells (fibroblast cell line) (lane 1), placenta (lane 2), and spleen (lane 3) hybridized with the TNF receptor cDNA EcoRI fragment). kb, Kilobases. (B) Southern blot of human DNA (5 μg per lane) digested with Pst I (lane 4), HindIII (lane 5) or EcoRI (lane 6) and hybridized with the same probe as used in the Northern blot.

FIG. 4. Effects of soluble TNF receptor on TNF binding biological activity. (A) Effect of culture supernatants from COS-7 cells transfected with a cDNA encoding a soluble form of the TNF receptor (pTNFRecd; ●) or mock-transfected (O) on $^{125}$I-TNF binding to U-937 cells. (B) Effect of these supernatants on TNF-mediated killing of WEHI 164 (clone 13) line.

CONFIDENTIAL                          AMG-ENBNJ-00132976

..................logy: Gray *et al.*     *Proc. Natl. Acad. Sci. USA* 87 (1990)

**First Subdomain**

| | |
|---|---|
| TNFR. 43-82 | V C P Q G K Y I H P Q N N S I C C T K C H K C G T Y L Y N D C P G P G Q D T D C R |
| NGFR. 32-66 | T C S T G L Y T H S G - - - E C C K A C N L G E G V A Q F C G - A N Q - T V C E |
| CD40. 25-60 | A C R E K Q Y L I N S - - - Q C C S L C Q P G Q K L V S D C T E F T E - T E C L |
| OX40. 25-60 | N C V K D T Y P S G H - - - K C C R E C Q P G H G M V S R C D H T R D - T V C H |

**Second Subdomain**

| | |
|---|---|
| TNFR. 83-125 | E C - E S G S F T A S E N H L R H C L S C S K C R K E M G Q V E I S S C T V Q R D T V C |
| NGFR. 67-104 | P C L D N V T F S D V V S A T E P C K P C T E C L G - - L Q S M S A P C V E A Q D A V C |
| CD40. 61-103 | P C G E S E F L D T W N R E - T H C H Q H K Y C D P N L G L R V Q Q K G T S E T D T C |
| OX40. 61-103 | P C L E P G F Y N E A V N Y - Q T C K Q C T Q C N H R S G S E L K Q N C T P T E D T V C |

**Third Subdomain**

| | |
|---|---|
| TNFR. 126-166 | G C R K N Q V R H Y W S E N L F Q C L N C S L - - - C L N G T - V H L S C Q E K Q N T V C L |
| NGFR. 109-148 | R C A Y G V Y Q D E E T - - - G H C E A C S V - - - C E V G S G L V F S C Q D K Q N T V C E |
| CD40. 104-144 | T C E E G W H C T S E A - - - - - C E S C V L H R S C S P G F G V K Q I A T G V S D T I C E |

**Fourth Subdomain**

| | |
|---|---|
| TNFR. 167-205 | T C H A G F F L R E N - - - - E C V S C S N C K K S L E C T K L C L P Q I E N V K G T |
| NGFR. 149-190 | E C P E G T Y S D E A N H V D P C L P C T V C E D T E R Q L R E C T P W A - D A E C E |
| CD40. 145-187 | P C P P G F F S N V S S A F E K C H P W T S C E T K D L V V Q Q A G T N K T D V V C G |
| OX40. 124-164 | P C P P G H F S P G S N Q - - A C K P W T N C T L S G K Q I R H P A S N S L D T V C E |

FIG. 5.   Alignment of the cysteine-rich subdomains of the extracellular portions of the human TNF receptor (TNFR), rat nerve growth factor receptor (NGFR; ref. 33), human CD40 (34), and rat OX40 (35). Common residues are boxed. OX40 contains only three subdomains and lacks the third. Residue numbers refer to the precursor form and begin with the initiating methionine.

noglobulin]. We observed a single predominant signal in a Northern blot of human spleen and placenta mRNA, suggesting that one size of transcript produces this form of the TNF receptor. Consequently, the formation of the TNF-binding protein is most likely a result of proteolytic cleavage from the membrane-bound receptor. Presumably the extra-cellular domain is cleaved by proteolysis near the transmembrane junction, resulting in the release of a soluble receptor fragment.

By introducing a termination codon prior to the transmembrane domain, we have expressed a soluble form of the extracellular domain. This recombinant product mimics the natural TNF-binding protein in its sequence, amino acid composition, and ability to inhibit TNF biological activity (16, 17). The natural TNF-binding protein may play an important role in the regulation of TNF-mediated responses by binding and sequestering the cytokine. The recombinant extracellular domain may similarly provide therapeutic benefit in disorders such as cachexia, sepsis, and autoimmune diseases where TNF has been shown to play a significant causative role, such as rheumatoid arthritis (38). Attempts to demonstrate the therapeutic potential of the recombinant soluble TNF receptor can now be instigated.

Note. After submission of this manuscript for review, two papers appeared (39, 40) describing the sequence of the human TNF receptor cDNA, which is identical to that reported here.

We thank Anne Hales, Peter Katsikis, and Maija Kissonerghis for their expert technical assistance and Brian Foxwell for helpful discussions. This work was supported by the Medical Research Council (England), the Arthritis and Rheumatism Council, the U.S. Navy Medical Research and Development Command, Xenova Ltd., and the Sunley Trust.

1. Beutler, B. & Cerami, A. (1989) *Annu. Rev. Immunol.* 7, 625–655.
2. Old, L. J. (1988) *Sci. Am.* 258, 41–49.
3. Beutler, B. & Cerami, A. (1988) *Annu. Rev. Biochem.* 57, 505–518.
4. Goeddel, D. V., Aggarwal, B. B., Gray, P. W., Nedwin, G. E., Palladino, M. A., Patton, J. S., Pennica, D., Shepard, H. M., Sugarman, B. J. & Wong, G. H. W. (1986) *Cold Spring Harbor Symp. Quant. Biol.* 51, 597–609.
5. Kindler, V., Sappino, A.-P., Grau, G. E., Pigeut, P.-F. & Vassali, P. (1989) *Cell* 56, 731–740.
6. Shalaby, M. R., Espevik, T., Rice, G. C., Ammann, A. J., Figari, I. S., Ranges, G. E. & Palladino, M. A., Jr. (1988) *J. Immunol.* 141, 499–503.
7. Tracey, K. J., Beutler, B., Lowry, S. F., Merryweather, J., Wolpe, S., Milsark, I. W., Hariri, R. J., Fahey, T. J., III, Zentella, A., Alpert, J. D., Shires, T. & Cerami, A. (1986) *Science* 234, 470–473.
8. Grau, G. E., Fajardo, L. F., Piquet, P.-F., Lambert, P.-H. & Vassali, P. (1987) *Science* 237, 1210–1213.
9. Piquet, P. F., Collart, M. A., Grau, G. E., Kapanci, Y. & Vassalli, (1989) *J. Exp. Med.* 170, 655–663.
10. Tracey, K. J., Fong, Y., Hesse, D. G., Manogue, K. R., Lee, A. Kuo, G., Lowry, S. F. & Cerami, A. (1987) *Nature (London)* 330, 662–664.
11. Aggarwal, B. B., Essalu, T. E. & Hass, P. E. (1985) *Nature (London)* 318, 665–667.
12. Creasy, A. A., Yamamoto, R. & Vitt, C. R. (1987) *Proc. Natl. Acad. Sci. USA* 84, 3293–3297.
13. Stauber, G. B., Aiyer, R. A. & Aggarwal, B. B. (1988) *J. Biol. Chem.* 263, 19098–19104.
14. Scheurich, P., Ucer, U., Kronke, M. & Pfizenmaier, K. (1986) *Int. J. Cancer* 38, 127–133.
15. Hohmann, H., Remy, R., Brockhaus, M. & van Loon, P. G. M. (1989) *J. Biol. Chem.* 264, 14927–14934.
16. Englemann, H., Novick, D. & Wallach, D. (1990) *J. Biol. Chem.* 265, 1531–1536.
17. Olsson, I., Lantz, M., Nilsson, E., Peetre, C., Thysell, H., Grubb, A. & Adolf, G. (1989) *Eur. J. Haematol.* 42, 270–275.
18. Seckinger, P., Isaaz, S. & Dayer, J.-M. (1989) *J. Biol. Chem.* 264, 11966–11973.
19. Maniatis, T., Hardison, R. C., Lacy, E., Lauer, J., O'Connell, C., Quon, D., Sim, G. K. & Efstratiadis, A. (1978) *Cell* 15, 687–701.
20. Lawn, R. M., Fritsch, E. F., Parker, R. C., Blake, G. & Maniatis, T. (1978) *Cell* 15, 1157–1174.
21. Gray, P. W., Leong, S. R., Fennie, E., Farrar, M. A., Pingel, J. T. & Schreiber, R. D. (1989) *Proc. Natl. Acad. Sci. USA* 86, 8497–8501.
22. Smith, A. J. H. (1980) *Methods Enzymol.* 65, 560–580.
23. Blin, N. & Stafford, D. W. (1976) *Nucleic Acids Res.* 3, 2303–2308.
24. Southern, E. M. (1975) *J. Mol. Biol.* 98, 503–517.
25. Dobner, P. R., Kawasaki, E. S., Yu, L. Y. & Bancroft, F. C. (1981) *Proc. Natl. Acad. Sci. USA* 78, 2230–2234.
26. Eaton, D. L., Wood, W. I., Eaton, D., Hass, P. E., Hollingshead, P., Wion, K., Mather, J., Lawn, R. M., Vehar, G. A. & Gorman, C. (1986) *Biochemistry* 25, 8343–8347.
27. Scharf, S. J., Horn, G. T. & Erlich, H. A. (1986) *Science* 233, 1076–1079.
28. Scatchard, G. (1949) *Ann. N.Y. Acad. Sci.* 51, 660–672.
29. Espevik, T. & Nissen-Meyer, J. (1986) *J. Immunol. Methods* 95, 99–105.
30. Kozak, M. (1989) *J. Cell Biol.* 108, 229–241.
31. von Heijne, G. (1986) *Nucleic Acids Res.* 14, 4683–4690.
32. Nedwin, G. E., Naylor, S. L., Sakaguchi, A. Y., Smith, D., Jarrett-Nedwin, J., Pennica, D., Goeddel, D. V. & Gray, P. W. (1985) *Nucleic Acids Res.* 13, 6361–6373.
33. Radeke, M. J., Misko, T. P., Hsu, C., Herzenberg, L. A. & Shooter, E. M. (1987) *Nature (London)* 325, 593–597.
34. Stamenkovic, I., Clark, E. A. & Seed, B. (1989) *EMBO J.* 8, 1403–1410.
35. Mallett, S., Fossum, S. & Barclay, A. N. (1990) *EMBO J.* 9, 1063–1068.
36. Novick, D., Englemann, H., Wallach, D. & Rubinstein, M. (1989) *J. Exp. Med.* 170, 1409–1414.
37. Mosley, B., Beckmann, M. P., March, C. J., Idzerda, R. L., Gimpel, S. D., Van den Bos, T., Friend, D., Alpert, A., Anderson, D., Jackson, J., Wignall, J. M., Smith, C., Gallis, B., Sims, J. E., Urdal, D., Widmer, M. B., Cosman, D. & Park, L. S. (1989) *Cell* 59, 335–348.
38. Brennan, F. M., Chantry, D., Jackson, A., Maini, R. N. & Feldmann, M. (1989) *Lancet* ii, 244–247.
39. Loetschere, H., Pan, Y.-C. E., Lahm, H.-W., Gentz, R., Brockhaus, M., Tabuchi, H. & Lesslauer, W. (1990) *Cell* 61, 351–359.
40. Schall, T. J., Lewis, M., Koller, K. J., Lee, A., Rice, G. C., Wong, G. H. W., Gatanaga, T., Granger, G. A., Lentz, R., Raab, H., Kohr, W. J. & Goeddel, D. V. (1990) *Cell* 61, 361–370.

AMG-ENBNJ-00132977

CONFIDENTIAL

**Exhibit D**

CONFIDENTIAL

AMG-ENBNJ-00132978



immunodominant region of the autoantigen MBP. This may provide insight into the molecular mechanisms of MS and help in the design of new specific therapeutic approaches.

REFERENCES AND NOTES

1. D. E. McFarlin and H. F. McFarland, N. Engl. J. Med. 307, 1183 (1982); D. A. Hafler and H. L. Weiner, Immunol. Today 10, 104 (1989).
2. E. C. Alvord, Jr., M. W. Kies, A. J. Suckling, Eds. Experimental Allergic Encephalomyelitis: A Useful Model for Multiple Sclerosis (Liss, New York, 1984).
3. M. Allegretta, J. A. Nicklas, S. Sriram, R. J. Albertini, Science 247, 718 (1990).
4. K. Ota, M. Matsui, H. L. Weiner, D. A. Hafler, FASEB J. 4, A1857 (abstr.) (1990); R. Martin et al., p. A1857 (abstr.); M. Pette et al., Neurology 40, 391 (abstr. 1005) (1990).
5. Sequences of MBP peptides: MBP(84–102): DENPVVHFFKNIVTPRTPP MBP(143–168): FKGVDAQGTLSKIFKLGGRD. Single-letter abbreviations for the amino acid residues are: A, Ala; C, Cys; D, Asp; E, Glu; F, Phe; G, Gly; H, His; I, Ile; K, Lys; L, Leu; M, Met; N, Asn; P, Pro; Q, Gln; R, Arg; S, Ser; T, Thr; V, Val; W, Trp; and Y, Tyr.
6. F. Mokhtarian, D. E. McFarlin, C. S. Raine, Nature 309, 356 (1984); A. Ben-Nun and I. Cohen, J. Immunol. 129, 303 (1982).
7. S. S. Zamvil et al., Nature 324, 258 (1986).
8. J. L. Urban et al., Cell 54, 577 (1988); H. Acha-Orbea et al., ibid., p. 263.
9. F. R. Burns et al., J. Exp. Med. 169, 27 (1989).
10. A. A. Vandenbark, G. H. Hashim, H. Offner, Nature 341, 541 (1989); M. D. Howell et al., Science 246, 668 (1989).
11. Myelin basic protein–specific T cell lines were grown from peripheral blood mononuclear cells at 200,000 cells per well in the presence of human MBP (10 μg/ml). Under these conditions 1 to 20% of the wells were positive for MBP; therefore, most lines are likely to have been generated from a single MBP-reactive T cell. Cells were stimulated two times with MBP and tested for their peptide specificity by use of a panel of 13 overlapping synthetic MBP peptides. All cell lines analyzed reacted specifically with one of the 13 synthetic MBP peptides (4). After a third stimulation with the specific MBP peptide, RNA was extracted from cell culture pellets (20,000 to 50,000 cells) by extraction with guanidinium isothiocyanate/phenol chloroform and isopropanol precipitation in the presence of carrier tRNA. Single-stranded cDNAs were synthesized with oligo-dT and avian myeloblastosis virus reverse transcriptase. PCR amplification was done with a panel of 19 oligonucleotides corresponding to the CDR2 region of the TCR β chain and a Cβ primer. Amplifications were done for 30 cycles (94°C, 1 min; 55°C, 2 min; and 72°C, 3 min) with 1 μg of each primer in 50-μl reactions. Amplified products were separated in 1% agarose gels, transferred to nitrocellulose, and hybridized with an internal oligonucleotide probe. Probes were end-labeled with [γ-³²P]ATP (adenosine triphosphate) and T4 polynucleotide kinase to a specific activity of 10⁸ cpm/μg and hybridized. Blots were washed at a final stringency of 6 × SSC (saline sodium citrate) at 70°C and autoradiographed for 2 to 18 hours. T cell lines that were positive for more than two Vβ segments were considered not to be derived from a single MBP-reactive T cell and were therefore excluded from analysis. For sequencing, amplification was performed with a Vβ17 primer specific for the leader segment, which contained an internal Pst I restriction site. Amplified DNA was treated with proteinase K, extracted with phenol chloroform, precipitated with ethanol, and digested with restriction endonucleases Bgl II and Pst I. Gel-purified DNA was ligated into M13mp19, and single-stranded DNA was sequenced by the dideoxy method. Negative controls were included during the procedure to test for possible contamination of RNA samples or reagents used for cDNA synthesis and amplification.
12. J. P. Tillinghast, M. A. Behlke, D. Y. Loh, Science 233, 879 (1986); N. Kimura, B. Toyonaga, Y. Yoshikai, M. D. Minden, T. W. Mak, J. Exp. Med. 164, 739 (1986); B. Toyonaga, Y. Yoshikai, V. Vadasz, B. Chin, T. W. Mak, Proc. Natl. Acad. Sci. U.S.A. 82, 8624 (1985); P. Concannon, L. Pickering, P. Kung, L. Hood, ibid. 83, 6598 (1986).
13. N. Kimura, B. Toyonaga, Y. Yoshikai, R. P. Du, T. W. Mak, Eur. J. Immunol. 17, 37 (1987).
14. Primers used for PCR: Vβ1, 5′ AAGAGAGAG-CAAAAGGAAACATTCTTGAAC 3′; Vβ2, 5′ GC-TCCAAGGCACACATACGAGCAAGGCGTCG 3′; Vβ3, 5′ AAAATGAAAGAAAAAGGAGATATTC-CTGAG 3′; Vβ4, 5′ CTGAGGCCACATATGAG-AGTGGATTTGTCA 3′; Vβ5, 5′ CAGAGAAAC-AAAGGAAACTTCCCTGGTGGA 3′; Vβ6, 5′ G-GGTGCGGCAGATGACTCAGGGCTGCCC-AA 3′; Vβ7, 5′ ATAAATGAAAGTGTGCCAAG-TGGCTTCTCA 3′; Vβ8, 5′ AACGTTCGGATAG-ATGATTCAGGGATGCCC 3′; Vβ9, 5′ CATTAT-AAATGAAACAGTTCCAAATGGCTT 3′; Vβ10, 5′ CTTATTCAGAAAGCAGAAATAATCAATG-AG 3′; Vβ11, 5′ TCCACAGAGAAGGGAGATC-TTTCCTCTGAG 3′; Vβ12, 5′ GATACTGACAA-AGGAGAAGTCTCAGATGGC 3′; Vβ14, 5′ GT-GACTGATAAGGGAGATGTTCCTGAAGGG 3′; Vβ15, 5′ GATATAAACAAAGGAGAGATCTC-TGATGGA 3′; Vβ16, 5′ CATGATAATCTTTAT-CGACGTGTTATGGGA 3′; Vβ17, 5′ TTTCAG-AAAGGAGATATAGCTGAAGGGTAC 3′; Vβ18, 5′ GATGAGTCAGGGAATGCCAAAGGAACGAT-TT 3′; Vβ19, 5′ CAAGAAACGGGAGATGCACAA-GAAGCGGATTC 3′; Vβ20, 5′ ACCGACAGGCT-GCAGGCAGGGGCTCCAGC 3′; Cβ, 5′ GGCA-GACAGGACCCCTTGCTGGTAGGACAC 3′; Cβ probe, 5′ TTCTGATGGCTCAAACACAGGAC-CTCGGG 3′; Vβ17 leader, 5′ AGCAAACCAGGTG-CTCTGCAGTGTGGGTOCTT 3′; and Jβ2.1, 5′ GC-CTGGCGGGAAGAAACTGCTCATTGTAGGA 3′.
15. A. Moretta, G. Pantaleo, L. J. Moretta, J. Cerottini, M. C. Mingari, J. Exp. Med. 157, 743 (1983). D. A. Hafler et al., ibid. 167, 1313 (1988).
16. E. Lai et al., Nature 331, 543 (1988).
17. A. Winoto et al., ibid. 324, 679 (1986).
18. E. Scboun et al., Cell 57, 1095 (1989); A. Svejgaard, P. Platz, P. Ryder, Immunol. Rev. 70, 193 (1983); O. Olcrup et al., Proc. Natl. Acad. Sci U.S.A. 86, 7113 (1989).
19. We thank M. Pette and H. Wekerle for helpful discussions and C. Keddy and L. Rhein for their expert technical assistance. Supported by grants from the National Institutes of Health (R01 NS 24247 and NS 00981), the National Multiple Sclerosis Society, the Howard Hughes Medical Institute, and by Autoimmune, Inc., Boston, MA. K.W.W. is a Susan Conroy Furbacher fellow for MS research, A.R. is a recipient of a physician scientist award by the NIH (1 K11 HL 02228-01) and D.A.H. is a Harry Weaver Scholar of the National Multiple Sclerosis Society.

28 February 1990; accepted 20 April 1990

# A Receptor for Tumor Necrosis Factor Defines an Unusual Family of Cellular and Viral Proteins

Craig A. Smith,* Terri Davis, Dirk Anderson, Lisabeth Solam, M. Patricia Beckmann, Rita Jerzy, Steven K. Dower, David Cosman, Raymond G. Goodwin

Tumor necrosis factor α and β (TNF-α and TNF-β) bind surface receptors on a variety of cell types to mediate a wide range of immunological responses, inflammatory reactions, and anti-tumor effects. A cDNA clone encoding an integral membrane protein of 461 amino acids was isolated from a human lung fibroblast library by direct expression screening with radiolabeled TNF-α. The encoded receptor was also able to bind TNF-β. The predicted cysteine-rich extracellular domain has extensive sequence similarity with five proteins, including nerve growth factor receptor and a transcriptionally active open reading frame from Shope fibroma virus, and thus defines a family of receptors.

**T**UMOR NECROSIS FACTOR α (TNF-α, cachectin) and β (TNF-β, lymphotoxin) are structurally and functionally homologous proteins secreted by activated macrophages and lymphocytes, respectively (1). These cytokines have pleiotropic activities in vitro and in vivo, including cytotoxic effects against tumors and virus-infected cells, stimulation of interleukin-1 secretion, stimulation of prostaglandin E2 and collagen production, inhibition of lipogenic gene expression in adipocytes, and stimulation of various immune effector cells (2). Clinical interest has focused on TNF because it appears to be a common mediator of inflammation, endotoxin-induced shock (1), and the wasting syndrome commonly observed in chronic infections and neoplastic disease (3). TNF receptors appear on virtually all somatic cells (1), and generally the ligands cross-compete for binding (4), suggesting they share a common receptor. As an aid to studying the TNF system in molecular detail, we isolated a cDNA clone of the receptor.

The SV40-transformed human lung fibroblast cell line WI26-VA4 was used as a source of mRNA for construction of a cDNA library. This cell line binds both TNF-α and -β and displays multiple affinity classes; approximately 23,000 binding sites per cell (N) were detected with ¹²⁵I–TNF-α that could be fit to two affinity classes, low ($K_{a1} = 0.16 \pm 0.10$ nM$^{-1}$, $N_1 = 19,700 \pm$

Immunex Corporation, Seattle, WA 98101.

*To whom correspondence should be addressed.

CONFIDENTIAL    AMG-ENBNJ-00132979

4,800) and high ($K_{a2}$ = 6.2 ± 3.9 nM$^{-1}$, $N_2$ = 3,000 ± 1,400) (Fig. 1A). TNF-β binds with lower affinity than TNF-α and the ligands cross-compete for binding (Fig. 1B). Double-stranded cDNA was synthesized by standard procedures, inserted into the mammalian expression vector pDC302 (5) and a TNF receptor clone isolated by a direct expression approach. Plasmid DNA from about 1000 *Escherichia coli* (DH5α) transformants were pooled, transfected into COS cells, and screened by contact autoradiography (6), which detects positive pools by the ability of those COS cells expressing TNF receptor inserts to bind $^{125}$I-labeled TNF-α. After screening 175,000 clones, one positive pool (#737) was obtained, subdivided, and converged to a single clone in two cycles of this procedure. By autoradiographic plate binding (6), the pure clone when transfected into COS cells expressed a receptor that bound both $^{125}$I–TNF-α and -β; binding of either ligand was completely inhibited by a 200-fold excess of the same or homologous unlabeled cytokine (7). Quantitative in situ binding studies of the COS-expressed receptor with $^{125}$I–TNF-α agreed with these results and showed the binding to be complex (Fig. 1C). As with the native

WI26-VA4 receptor, the recombinant COS receptor displayed both low ($K_{a1}$ = 0.18 ± 0.06 nM$^{-1}$) and high ($K_{a2}$ = 10.1 ± 1.0 nM$^{-1}$) affinity classes for $^{125}$I–TNF-α. TNF-β bound with lower affinity and competitively inhibited $^{125}$I–TNF-α binding (Fig. 1D). Thus, ligand binding properties of both the native and recombinant receptor appear similar. The origin of the multiple affinity classes for TNF-α is unclear. Indeed, most workers (*1, 4, 8, 9*), but not all (*10*), have reported monophasic Scatchard plots for TNF-α. However, TNF-α is predominantly a homotrimer (*11*) and therefore intrinsically capable of multivalent binding. In one report (*12*), differential biological effects could be related to biphasic binding of TNF-α. While not necessarily sharing a common origin, multiple affinity classes are a common feature of many receptor systems (*13*).

The isolated TNF receptor cDNA was used as a probe to analyze the mRNA expressed in a variety of cell lines and tissues (Fig. 2). A single size class of transcripts of ~4.5 kb was detected in WI26-VA4, Raji cells (a B lymphoblastoid line), LPS-stimulated peripheral blood monocytes (PBM), induced peripheral blood T cells (PBL), and



Fig. 2. RNA blot analysis of TNF receptor mRNA. Polyadenylated RNA (3.5 μg) was used from each source, except placental tissue (5 μg total RNA). PBL were cultured for 6 days in IL-2 and OKT3 monoclonal antibody, then restimulated for 8 hours with concanavalin A (Con A) and PMA (6). RNA was fractionated on a 1.1% agarose-formaldehyde gel, blotted onto Hybond N (Amersham), and hybridized with a labeled antisense RNA probe prepared from the 630 Not I–Bgl II fragment of the TNF receptor cDNA that had been subcloned into a Bluescript plasmid (Stratagene). Filter hybridization washing conditions were as described (5). Variable exposure times were used in preparing the figure.

placental tissue. A transcript of slightly larger size (~5.0 kb) was detected in thymus tissue, and splenic tissue contained transcripts of both size classes. The origin of these differences is not clear, but the presence of TNF receptor transcripts in different cells is consistent with the ubiquitous distribution of the receptor.

The 3.7-kb insert of clone 737 was subcloned and sequenced (5) (Fig. 3). The cDNA contains a string of adenines at the 3' end and an upstream consensus polyadenylation signal. The discrepancy between the size of the isolated cDNA and that of transcripts estimated from Northern analysis may be due to a deficiency of 5' sequence in this clone. It is also possible that alternate polyadenylation signals are utilized. Upstream of the polyadenylation site is a 27-bp segment that has homology to the family of repetitive sequences (*14*). The sequence contains a single large open reading frame encoding 461 amino acids with features typical of an integral membrane protein (*15*). The initiating methionine precedes 22 hydrophobic residues characteristic of a leader sequence; the most probable cleavage site (*16*) predicts Leu$^{23}$ as the mature NH$_2$-terminus. Another hydrophobic region of 30 amino acids is located between residues 258 and 287, bordered by charged residues at either end (Asp$^{257}$ · Lys$^{288-290}$), consistent with a transmembrane segment that makes a single helical span. Immediately upstream of this element is a region of 57 amino acids rich in threonine, serine, and proline residues. Such a composition is indicative of O-linked glycosylation sites containing sialic acid and is found in similar extracellular regions of several receptors, including those for nerve growth factor (NGF) (*17*) and low density lipoprotein (LDL) (*18*). The NH$_2$-terminal 162 amino acids (positions 39 to 200) are rich



Fig. 1. TNF binding characteristics of native and recombinant TNF receptors (*31*). (A) Direct binding of $^{125}$I–TNF-α to WI26-VA4 cells (Scatchard coordinate system). (B) Inhibition of $^{125}$I–TNF-α binding to WI26-VA4 cells by unlabeled TNF-α (●) and TNF-β (O). TNF-α inhibition: $K_{i,1}$ (low affinity) = 1.6 ± 0.2 nM; $K_{i,2}$ (high affinity) = 0.8 ± 0.1 pM. TNF-β inhibition: $K_{i,1}$ (low affinity) = 0.29 ± 0.06 nM; $K_{i,2}$ (high affinity) = 1.3 ± 0.6 pM. (C) Direct binding of $^{125}$I–TNF-α to recombinant (COS) TNF receptor. (D) High affinity site inhibition of $^{125}$I–TNF-α binding to recombinant (COS) TNF receptor by unlabeled TNF-α (●) or -β (O). $K_i$ (α) = 6.7 ± 2.9 nM; $K_i$ (β) = 3.3 ± 0.8 nM. C, free concentration of TNF (molar); r, molecules of TNF bound per cell. All parameter values are ± standard error. Data fit to one or two site models as described (*32*).

CONFIDENTIAL

AMG-ENBNJ-00132980

Joint Exhibit JTX-13    p. 40 of 46
Appx25904
JA0394

cysteines (22 residues) and also contain two potential N-linked glycosylation sites. The receptor terminates in a cytoplasmic domain 174 amino acids, rich in serines (18%), of which are contiguous. Five cysteines and one potential N-linked glycosylation site are also present in this domain.

A computer search of several sequence databases (19) queried with the entire 439-residue sequence of the mature TNF receptor revealed five proteins with striking similarity: human and rat NGF receptor, CD40,

cDNA clone 4-1BB, and T2 (Fig. 4). Four of these are transmembrane proteins, two of which are known receptors (for human and rat NGF). CD40 is a B cell-localized surface antigen, found also on neoplastic cells of epithelial origin, that becomes phosphorylated in the cytoplasmic domain after binding the CD40-specific monoclonal antibody G28-5 (20). Clone 4-1BB was identified as a murine cDNA from induced helper and cytolytic T cell clones (21). Both molecules have been suggested to be cytokine recep-

tors for unidentified ligands. All identity between these four proteins is localized to the cysteine-rich regions of the extracellular domains; no homology was detected between the TNF receptor cytoplasmic domain and any proteins in the database. T2 is a transcriptionally active open reading frame from the Shope fibroma virus (SFV), a poxvirus that produces invasive malignancies in newborn rabbits (22). Although dominated by 22 conserved cysteines, the alignment is also reinforced by other conserved amino acids, particularly tyrosine, glycine, and proline. Thus, the extracellular domains of these molecules, presumably heavily disulfide bonded, probably share a common structural motif. Central to this motif would appear to be repeating homologous domains. Several groups have shown that the cysteine-rich regions of NGF receptor and CD40 can be resolved into either pseudo twofold repeats of about 80 amino acids or pseudo fourfold repeats of about 40 residues (17, 20). Similar repeats can be shown with the TNF receptor and T2, consistent with all these genes having arisen by duplication and divergence from a common gene. Since both NGF and TNF are oligomeric, repeating substructures in their receptors may aid in binding and predicts that the putative ligands for CD40 and 4-1BB may also be oligomers. The net charge associated with the cysteine-rich domains of these family members varies (−19 for NGF receptor; +1 for TNF receptor), which may be related to ligand specificity. Presumably, it is this NH2-terminal region that contains the TNF binding site. Multiple lines of evidence have localized the (apoprotein B) ligand binding site of the LDL receptor to the NH2-terminal (60-kD), cysteine-rich



**A**

**B**

| 1 | MAPVAVWAAL | AVGLELWAAA | HALPAQVAFT | PYAPEPGSTC | RLREYYDQTA |
|---|---|---|---|---|---|
| 51 | QMCCSKCSPG | QHAKVFCTKT | SDTVCDSCED | STYTQLWNWV | PECLSCGSRC |
| 101 | SSDQVETQAC | TREQNRICTC | RPGWYCALSK | QEGCRLCAPL | RKCRPGFGVA |
| 151 | RPGTETSDVV | CKPCAPGTFS | NTTSSTDICR | PHQICNVVAI | PGNASMDAVC |
| 201 | TSTSPTRSMA | PGAVHLPQPV | STRSQHTQPT | PEPSTAPSTS | FLLPMGPSPP |
| 251 | AEGSTGD FAL | PVGLIVGVTA | LGLLIIGVVN | CVIMTQV KKK | PLCLQREAKV |
| 301 | PHLPADKARG | TQGPEQQHLL | ITAPSSSSSS | LESSASALDR | RAPTRNQPQA |
| 351 | PGVEASGAGE | ARASTGSSSDS | SPGGHGTQVN | VTCIVNVCSS | SDHSSQCSSQ |
| 401 | ASSTMGDTDS | SPSESPKDEQ | VPFSKEECAF | RSQLETPETL | LGSTEEKPLP |
| 451 | LGVPDAGMKP | S | | | |

Fig. 3. Sequence of the human TNF receptor cDNA clone. (A) Schematic representation and restriction map of the cDNA. The entire coding region is boxed. The leader is hatched, the cysteine-rich region is shown stippled, and the transmembrane segment is solid. B = Bgl II; P = Pvu II. (B) The deduced amino acid sequence of cDNA coding region. The leader region is singly underlined, the transmembrane domain is shown boxed, potential N-linked glycosylation sites are doubly underlined, and cysteines are identified by an asterisk. The entire nucleotide sequence is available upon request and has been deposited at GenBank, accession number M32315.

Fig. 4. Sequence similarities among the TNF receptor superfamily. Consensus alignment of residues from the cysteine-rich regions of human TNF receptor (huTNFR), T2 open reading frame of Shope fibroma virus (SFV-T2), human CD40 (huCD40), human and rat nerve growth factor receptor (huNGFR and rNGFR), and murine cDNA clone 4-1BB (mu4-1BB). Numbers at NH2- and COOH-termini refer to residues as cited in publications describing cDNA cloning (17, 20, 21, 22); numbers at top right of each block mark residues from NH2-terminus at top left. Shaded residues reflect those common to huTNF receptor and at least one other protein. Cysteines are in bold, and boxed residues are invariant.



REPORTS 1021

CONFIDENTIAL

AMG-ENBNJ-00132981

domain (*18*).

Sequences containing cysteine-rich repeats are present in a number of proteins, including the CD18 adhesion molecules (*23*), epidermal growth factor (EGF) precursor, *Drosophila notch* protein, the *neu* oncogene, and the external domains of receptors for LDL, EGF, and insulin (*18, 24*). Although many of these proteins show homology to each other, we detect little similarity to the TNF receptor. Optimal alignments of family members using the National Biomedical Research Foundation (NBRF) ALIGN program (*19*) show the strongest similarity is between the TNF receptor and T2, with a score of 19 standard deviations (SD) above the mean score for an ensemble of randomly permuted molecules of the same lengths and amino acid composition. ALIGN scores greater than 3.0 are considered significant and indicate common ancestry. Almost 40% of the residues are identical, approaching the conservation level between many murine and human cytokines and their receptors (*25*). Slight variants of T2 may also exist in other poxvirus family members, and some of these viruses are strongly immunosuppressive (*22*). Although T2 possesses a signal peptide sequence, the molecule appears to lack a hydrophobic segment typical of transmembrane regions, suggesting that T2 may be a soluble entity secreted from virally infected cells. Thus, perhaps T2 may bind TNF, or another cytokine, serving to locally dampen the host immune response. The protective effects of such a "soluble receptor" would no doubt confer a selective advantage to the pathogen. CD40, however, is also similar to this TNF receptor (38.5% amino acid identity; 15.2 SD), yet does not bind TNF-α when expressed in COS cells at high levels in an immunoreactive form (*26*). TNF receptor is more distantly related to 4-1BB and NGF receptor (9.0 and 12.3 SD, respectively).

The signal transduction mechanism of TNF is unclear. The receptor cytoplasmic domain, as with other family members, shows no similarity with known proteins, including the cytoplasmic domain of the human T cell interleukin-1 (IL-1) receptor (*6*), despite the fact that TNF and IL-1 mediate many common biological activities (*1*). The TNF receptor expressed in COS cells does not bind radiolabeled human IL-1α or -β, nor does the recombinant human IL-1 receptor bind TNF (*7*). No sequences present are typical of tyrosine kinases, protein kinase C, or phosphorylation sites corresponding to substrates for these kinases (*27*). The cytolytic activity of TNF, however, appears to depend on the presence of a 200-kD protein distinct from the receptor, and with which it comodulates (*28*).

Several groups have characterized TNF binding proteins from urine. Uromodulin is a renal glycoprotein that binds IL-1, IL-2, and TNF-α with high affinity, but does not inhibit ligand binding to their respective receptors and shows no sequence similarity to the TNF receptor reported here (*29*). Two groups have recently reported purification and sequencing of soluble TNF-α binding proteins from urine with molecular weights of 27 to 30 kD (*30*). However, the NH₂-terminal sequence of these proteins is not found in the predicted sequence of clone 737. TNF-α receptors on myeloid cells are probably different from those on cells of epithelial origin (*8*). An 80-kD form of the receptor contains O- and N-linked carbohydrate; a 60-kD form lacks O-linked carbohydrate, possesses a different form of N-linked carbohydrate, and displays different tryptic peptide maps. Monoclonal antibodies to these two receptors also do not cross-react. The receptor we have described may correspond to the 80-kD form. Affinity cross-linking of the recombinant receptor using either ¹²⁵I–TNF-α or -β shows a single species of 80 kD (*7*). Because the calculated protein is 46 kD, carbohydrate appears to be attached, and both O- and N-linked glycosylation sites are present in the sequence.

The availability of a full-length cDNA clone for a human TNF receptor will now permit detailed studies into the molecular mechanisms by which ligand-receptor interactions produce the pleiotropic effects of this important cytokine. Soluble, recombinant forms of this receptor may also be produced to explore the clinical value of TNF inhibition in pathological settings.

### REFERENCES

1. B. Beutler and A. Cerami, *Annu. Rev. Immunol.* 7, 625, 1989.
2. E. A. Carswell *et al.*, *Proc. Natl. Acad. Sci. U.S.A.* 72, 3666 (1975); G. H. W. Wong and D. V. Goeddel, *Nature* 323, 819 (1986); C. A. Dinarello *et al.*, *J. Exp. Med.* 163, 1433 (1986); J.-M. Dayer, B. Beutler, A. Cerami, *ibid.* 162, 2163 (1985); R. Zechner, T. Newman, B. Sherry, A. Cerami, J. Breslow, *Mol. Cell Biol.* 8, 2394 (1988); J. Gamble, J. Harlan, S. Klebanoff, A. Lopez, M. Vadas, *Proc. Natl. Acad. Sci. U.S.A.* 82, 8667 (1985); J. Djeu, B. Blanchard, D. Halkias, H. Friedman, *J. Immunol.* 137, 2980 (1986); D. Silberstein and J. David, *Proc. Natl. Acad. Sci. U.S.A.* 83, 1055 (1986); H. Kashiwa, S. Wright, B. Bonavida, *J. Immunol.* 138, 1383 (1987).
3. A. Oliff, *Cell* 54, 141 (1988); K. Tracey *et al.*, *J. Exp. Med.* 167, 1211 (1988); A. Oliff *et al.*, *Cell* 50, 555 (1987).
4. B. Aggarwal, T. Eessalu, P. Hass, *Nature* 318, 665 (1985).
5. R. G. Goodwin *et al.*, *Cell* 60, 941 (1990). Briefly, double-stranded cDNA was modified with Eco RI linker-adapters containing internal Not I sites (Invitrogen), and cloned into λgt10. Following packaging and amplification of the resulting phage, cDNA inserts larger than 2 kb were isolated after Not I digestion and ligated into pDC302.
6. J. Sims *et al.*, *Science* 241, 585 (1988). J. Sims *et al.*, *Proc. Natl. Acad. Sci. U.S.A.* 86, 8946 (1989). COS

cells express about 800 endogenous TNF-α receptors (*7*), or ~0.1% of the level typical of COS expressing receptor inserts. COS cell autoradiographic backgrounds at the ¹²⁵I–TNF-α concentration used in screening (0.1 nM) were undetectable.
7. C. Smith and R. Goodwin, unpublished.
8. H.-P. Hohmann, R. Remy, M. Brockhaus, L. van Loon, *J. Biol. Chem.* 264, 14927 (1989).
9. P. Hass, A. Hotchkiss, M. Mohler, B. Aggarwal, *Biol. Chem.* 260, 12214 (1985); G. Stauber and B. Aggarwal, *ibid.* 264, 3573 (1989); K. Imamura, D. Spriggs, D. Kufe, *ibid.* 263, (1988); R. Munker, J. Dispersio, H. Koeffler, *70*, 1730 (1987).
10. J. Rutka *et al.*, *Int. J. Cancer* 41, 573 (1988); Imamura, D. Spriggs, D. Kufe, *J. Immunol.* 2989 (1987).
11. E. Jones, D. Stuart, N. Walker, *Nature* 338 (1989); R. Smith and C. Baglioni, *J. Biol.* 262, 6951 (1987).
12. H. Ishikura, K. Hori, A. Block, *Blood* 75 (1989).
13. L. Park *et al.*, *J. Biol. Chem.* 264, 5420 (1989); Yamasaki *et al.*, *Science* 241, 825 (1989); R. Foster *et al.*, *J. Exp. Med.* 154, 1455 (1984); D. Gearing, N. Gough, N. Nicola, *EMBO J.* 8 (1989); T. Bird and J. Saklatvala, *Nature* 324 (1986); A. Sutter, R. Riopelle, R. Harris-Warrick, E. Shooter, *J. Biol. Chem.* 254, 5972 (1979).
14. C. Schmid and W. Jelinek, *Science* 216, (1982).
15. Single letter abbreviations for the amino acids are: A, Ala; C, Cys; D, Asp; E, Glu; F, Phe; G, His; I, Ile; K, Lys; L, Leu; M, Met; N, Asn; P, Pro; Q, Gln; R, Arg; S, Ser; T, Thr; V, Val; W, Trp; and Y, Tyr.
16. G. von Heijne, *Nucleic Acids Res.* 14, 4683 (1986).
17. D. Johnson *et al.*, *Cell* 47, 545 (1986); M. R. T. Misko, C. Hsu, L. Herzenberg, E. Shooter, *Nature* 325, 593 (1987).
18. J. Goldstein *et al.*, *Annu. Rev. Cell Biol.* 1, 1 (1985).
19. Databases from GenBank (December 1989 edition), European Molecular Biology Laboratory 1989 edition), and the National Biomedical Research Foundation (December 1989 edition) were analyzed with software from the University of Wisconsin Genetics Computer Group [J. Devereux, Haeberli, O. Smithies, *Nucleic Acids Res.* 12 (1984)] and the NBRF ALIGN and FastP programs.
20. I. Stamenkovic, E. Clark, B. Seed, *EMBO J.* 8, (1989).
21. B. Kwon and S. Weissman, *Proc. Natl. Acad. Sci. U.S.A.* 86, 1963 (1989).
22. C. Upton, A. DeLange, G. McFadden, *Virology* 160, 20 (1987); G. McFadden, in *Viral Diseases: Laboratory and Captive Animals*, G. Darai, Ed. (Nijhoff, Boston, MA 1988), pp. 37–62.
23. T. Kishimoto, K. O'Connor, A. Lee, T. Roberts, B. Springer, *Cell* 48, 681 (1987).
24. R. Doolittle, D. Feng, M. Johnson, *Nature* 558 (1984); A. Ullrich *et al.*, *ibid.* 313, 756 (1985); K. Wharton, K. Johansen, T. Xu, S. Artavanis-Tsakonas, *Cell* 43, 567 (1985); C. Bargmann, Hung, R. Weinberg, *Nature* 319, 226 (1986); Ebina *et al.*, *Cell* 40, 747 (1985).
25. N. Nicola, *Annu. Rev. Biochem.* 58, 45 (1989).
26. The CD40 and human TNF receptor clones were separately transfected into COS cells (CD40-COS and TNFr-COS) and expression was monitored by radiolabeled ligand binding using contact autoradiography (*6*). CD40-COS clearly and specifically bound ¹²⁵I–G28 antibody, but did not bind ¹²⁵I–TNF (0.2 nM). ¹²⁵I–G28 binding was not inhibited by 500-fold molar excess of unlabeled TNF-α. Similarly, TNFr-COS specifically bound ¹²⁵I–TNF-α and -β but not ¹²⁵I–G28 (0.2 nM).
27. Y. Yarden, and A. Ullrich, *Annu. Rev. Biochem.* 443 (1988); U. Kikkawa, A. Kishimoto, Y. Nishizuka, *ibid.* 58, 31 (1989); A. Edelman, D. Blumenthal, E. Krebs, *ibid.* 56, 567 (1987).
28. S. Yonehara, A. Ishii, M. Yonehara, *J. Exp. Med.* 169, 1747 (1989).
29. A. Sherblom, J. Decker, A. Muchmore, *J. Biol. Chem.* 263, 5418 (1988); C. Hession *et al.*, *Science* 237, 1479 (1987).

1022

AMG-ENBNJ-00132982

CONFIDENTIAL

Joint Exhibit JTX-13   p. 42 of 46
Appx25906
JA0396

Joint Exhibit JTX-13 p. 43 of 46
Appx25907

L. Olsson et al., Eur. J. Haematol. 42, 270 (1989); H. Engelman, D. Aderka, M. Rubinstein, D. Rotman, D. Wallach, J. Biol. Chem. 264, 11974 (1989). COS cells were transfected with the vector pDC302 containing the TNF receptor cDNA insert (clone 737) or control vector lacking insert as described (5, 6). For quantitative in situ binding studies, transfected COS cells were replated (24 hours after transfection) into six well trays (CoStar) and analyzed 48 hours later at near confluence ($6 \times 10^5$ cells per well). COS monolayers were washed once with phosphate-buffered saline (PBS), then incubated with $^{125}I$-TNF-$\alpha$ at various concentrations in bind-

ing media [RPMI 1640, bovine serum albumen (10%), NaN$_3$ (0.1%), 20 mM Hepes, pH 7.4] at 4°C for 2 hours. Free $^{125}I$-TNF-$\alpha$ was determined by counting gamma emissions in the supernatant. Monolayers were then washed once with ice-cold RPMI, detached with 0.1% trypsin in PBS, and counted to determine bound ligand. Nonspecific ligand binding was determined by inclusion of a 200-fold molar excess of unlabeled ligand. Inhibition assays used $^{125}I$-TNF-$\alpha$ at 0.2 nM. Data were analyzed and theoretical curves plotted as described (6, 32). TNF-$\alpha$ and TNF-$\beta$ (R&D Sciences) were radiolabeled using Iodogen (Pierce) to a specific

activity of $2 \times 10^{15}$ cpm/mmol (4). Radiolabeled TNF-$\alpha$ gel filtered as a single peak with an apparent molecular weight of 55 kD (7), consistent with a trimeric status (11).

32. S. Dower, K. Ozato, D. Segal, J. Immunol. 132, 751 (1984).
33. We thank J. Wignall, D. Friend, J. Jackson, U. Martin, J. Slack, and T. VandenBos for excellent technical assistance and E. Clark for the generous gift of a full-length CD40 cDNA clone in a CDM8 vector.

16 February 1990; accepted 26 April 1990



*"The good news is we have the human genome. The bad news is the computer alphabetized it."*

CONFIDENTIAL     AMG-ENBNJ-00132983

**Exhibit E**

CONFIDENTIAL

AMG-ENBNJ-00132984

## Interference procedures

1.  Hoffmann-La Roche ("Roche") has represented that it currently has one or more applications claiming TNFR:Fc fusion proteins or DNA currently before the Board of Patent Appeals and Interferences, which application's *ex parte* prosecution has been suspended pending the declaration of an interference. If and when a patent or a pending application owned or exclusively licensed by Immunex claiming TNFR:Fc fusion proteins or DNA has its *ex parte* prosecution suspended pending declaration of an interference, Immunex shall promptly notify Roche of the fact of this suspension. Within two weeks of the giving of this notice by Immunex, both parties shall exchange the complete file wrappers of the potentially interfering patents/applications and any applications (including any non-U.S. patent applications) having a filing date for which a party believes that it is entitled to claim benefit. This exchange shall be pursuant to a secrecy/confidentiality agreement acceptable to the parties.

2.  Thereafter, counsel for Immunex and Roche shall meet in a timely manner and attempt in good faith to reach an amicable agreement on a count or counts, as well as the claims of each involved application/patent that correspond to each such count. In the event such an amicable agreement is reached, but differs in any respect from the interference declaration, the parties agree to jointly propose to the APJ such agreed count or counts and the correspondence of the respective claims thereto.

3.  Counsel for Immunex and Roche shall also meet in a timely manner after review of the file wrappers and attempt in good faith to reach an amicable agreement regarding any other issues, including issues of patentability or priority, that either party desires to raise in the interference. To the extent that the parties fail to reach agreement concerning an issue of substance, the parties shall endeavor to reach agreement with respect to the nature and scope of motions to be filed with respect to the disputed matter. Where such motions are filed, the parties shall attempt to agree amicably as to the relevant facts and, where such amicable agreement is reached, shall file appropriate stipulations as to relevant facts to the extent so agreed. Where such amicable agreement on factual matters cannot be reached, the parties shall attempt to agree amicably as to the general nature and scope of evidence to be adduced with respect to disputed factual matters to support or oppose such motions. The parties shall also endeavor to agree in good faith, whenever appropriate, to jointly waive their rights of cross-examination or submission of interrogatories in lieu of cross-examination.

4.  If any party does not have and will not rely on acts of invention within the United States, that party shall file a stipulation upon the declaration of the interference that it will not present any priority proofs. This provision does not preclude that party from arguing that it is entitled to the benefit of the filing date of any application.

CONFIDENTIAL

AMG-ENBNJ-00132985

5.      In the event that an interference is declared between a Roche application/patent and a Lauffer application/patent, issues arising under 35 U.S.C. § 112 may be raised by either party, directly or through a grant or request for benefit. If and when any such issue is raised, but is not amicably resolved as set out above, the parties shall endeavor to limit the expert testimony to no more than two experts on each such issue. The parties shall also endeavor to agree in good faith, whenever appropriate, to jointly waive their rights of cross-examination or submission of interrogatories in lieu of cross-examination of such expert witnesses.

6.      No party shall appeal a final decision of the Board by filing an action pursuant to 35 U.S.C. § 146, nor shall any party respond to an appeal filed pursuant to 35 U.S.C. § 141 by filing notice with the Commissioner that such responding party elects to have all further proceedings conducted as provided in 35 U.S.C. § 146.

ai091102.910 9/13/99

CONFIDENTIAL

AMG-ENBNJ-00132986

# EXHIBIT 2

JA0401

# ACCORD AND SATISFACTION

THIS ACCORD AND SATISFACTION ("A&S") is by and among Hoffmann-La Roche Inc., a New Jersey corporation with offices at 340 Kingsland Street, Nutley, New Jersey 07110 ("Roche Nutley"), and F. Hoffmann-La Roche Ltd, a Swiss corporation with offices at Grenzacherstrasse 124, CH-4070 Basel, Switzerland ("Roche Basel", collectively Roche Nutley and Roche Basel are referred to as "Roche"), and Wyeth, a Delaware corporation with offices at Five Giralda Farms, Madison, New Jersey, 07940 ("Wyeth"), AHP Manufacturing B.V., a Netherlands corporation, acting through its Medica Ireland Branch ("Wyeth BV," and, together with Wyeth, the "Wyeth Entities"), Amgen Inc., a Delaware corporation with offices at One Amgen Center Drive, Thousand Oaks, California 91320-1799 ("Amgen"), and Immunex Corporation, a Washington corporation with offices at One Amgen Center Drive, Thousand Oaks, California 91320-1799 ("Immunex").

WHEREAS, pursuant to a License Agreement, effective November 6, 1998 ("Roche-Immunex Agreement"), Roche granted Immunex a license under the Brockhaus Patent Rights (defined below) in consideration for which Immunex agreed to pay royalties to Roche on the sales of products comprising Etanercept in accordance with the terms of the Roche-Immunex Agreement;

WHEREAS, pursuant to a License Agreement, effective November 6, 1998 ("Genentech-Immunex Agreement"), Genentech, Inc. a Delaware corporation having offices in South San Francisco, California ("Genentech"), granted Immunex a license under, among other things, the Process Patent Rights (defined below) in consideration for which Immunex agreed to pay certain royalties to Genentech on the sales of products comprising Etanercept in accordance with the terms of the Genentech-Immunex Agreement, a portion of such royalties if attributable to the Process Patent Rights may in turn be payable by Genentech to Roche;

WHEREAS, in situations where the Process Patent Rights are jointly owned by Genentech and Roche, Roche is entitled to half of all compensation paid to Genentech under such jointly owned Process Patent Rights;

WHEREAS, Wyeth has the exclusive right to distribute products comprising Etanercept outside North America, Immunex has the exclusive right to distribute products comprising Etanercept within North America, and Immunex and Wyeth co-promote products comprising Etanercept within North America, all in accordance with the terms of the agreements between Immunex and Wyeth, and;

WHEREAS, Immunex, Amgen, which owns Immunex, and Wyeth wish to acquire all rights licensed pursuant to the Roche-Immunex Agreement and to eliminate the continuing obligations to pay royalties to Roche under the Roche-Immunex Agreement and to Genentech for the benefit of Roche under the Genentech-Immunex Agreement, and Roche is willing to sell such rights in accordance with the terms of this A&S.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants set forth below, the Parties (as defined below) agree, as follows:

AMGEN INC
**Attachment 3(d)(1)**
June 2004

#200415309                                        1



CONFIDENTIAL

AMG-ENBNJ-00015505

## Article 1 Definitions

1.1 "Affiliate", with respect to any Party, means any entity which, as of the Effective Date, controls, is controlled by, or is under common control with such Party, excluding both Genentech and Chugai Pharmaceutical Co. Ltd. ("Chugai"). For purposes of this definition, "control" and cognates thereof means (a) possession, directly or indirectly, of the power to direct the management or policies of an entity, whether through ownership of voting securities, by contract or otherwise, or (b) the ownership, directly or indirectly, of at least fifty percent (50%) of the voting securities or other ownership interest of an entity. For purposes of this A&S, Immunex will be considered an Affiliate of Amgen, and Genentech and Chugai will not be considered Affiliates of Roche.

1.2 "Brockhaus Patent Rights" means the patents and patent applications listed in Exhibit A attached hereto, and any other patent and patent application owned or controlled at any time during the term of this A&S by Roche or any Roche Affiliate that rely for priority on any one or more of the patents or patent applications listed in Exhibit A, any continuation, divisional, or continuation-in-part applications of any of the foregoing patent applications, any patents issuing on any of the foregoing patent applications, any applications for reissue, reexamination or supplemental protection of any of the foregoing patents and all reissued patents, reexamination certificates and supplemental protection certificates issuing from such applications.

1.3 "Closing Date" means (i) August 1, 2004, or, (ii) the second business day following the date on which all waiting periods associated with the HSR Act or other mandatory premerger notification law or regulations have expired or been terminated, and all required governmental agency approvals have been obtained regarding this A&S, whichever is later.

1.4 "Effective Date" means the date of signature of the last of the Parties to sign this A&S.

1.5 "Etanercept" means the recombinant molecule schematically depicted in Exhibit B attached hereto, which is a homodimer of two polypeptide chains, each chain consisting of the extracellular ligand-binding domain of p75TNFR fused at its carboxy terminus to the amino terminus of the hinge, CH2 and CH3 domains (including the first cysteine residue of the CH1 domain) of human immunoglobulin G1 and having the amino acid sequence set forth in Exhibit B, including the N-terminal and C-terminal heterogeneity accompanying the expression of the nucleic acid sequence encoding the amino acid sequence of Exhibit B (arising from, for example, post translational modifications or other cellular processing events), which recombinant molecule was commercially sold by Immunex or its Affiliates as of November 6, 1998.

1.6 "Ex-North America Brockhaus Patents" means all Brockhaus Patent Rights issued or pending at any time anywhere outside North America.

#200415309

2

CONFIDENTIAL

AMG-ENBNJ-00015506

1.7     "Field" means the manufacture, use, sale, offer for sale or import of products comprising or the practice of methods that employ TNF inhibitors containing a biologically active portion of a p55 or a p75 TNF receptor.

1.8     "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a.

1.9     "Licensed Product" means Etanercept, any glycoforms, fragments and/or formulations thereof, prodrugs, compositions, containing same, and any products the manufacture, use, sale, offer for sale or import of which, but for the rights granted in this A&S, would infringe a claim of any Brockhaus Patent Right.

1.10    "North America" means Canada, the United States, and their respective territories and possessions.

1.11    "North American Brockhaus Patents" means all Brockhaus Patent Rights issued or pending at any time in North America.

1.12    "Party" means Amgen, Immunex, Roche, Wyeth, or Wyeth BV, and "Parties" means Amgen, Immunex, Roche, Wyeth, and Wyeth BV.

1.13    "Process Patent Rights" means the patents and patent applications listed in Exhibit C attached hereto, and any other patent and patent application owned at any time during the term of this A&S by Genentech, Roche or their Affiliates that rely for priority on any one or more of the patents or patent applications listed in Exhibit C, any continuation, divisional, or continuation-in-part applications of any of the foregoing patent applications, any patents issuing on any of the foregoing patent applications, any applications for reissue, reexamination or supplemental protection of any of the foregoing patents and all reissued patents, reexamination certificates and supplemental protection certificates issuing from such applications.

### Article 2    Assignment to Wyeth BV

2.1     Roche Basel hereby agrees to assign, and will cause its Affiliates to assign, to Wyeth BV

(a) all right, title and interest in and to all Ex-North America Brockhaus Patents; and

(b) the right to sue and recover for any acts of infringement of any Ex-North America Brockhaus Patent that occurred anywhere outside North America before the Closing Date.

2.2     On the Closing Date, Roche Basel or its Affiliates will deliver to Wyeth BV properly executed assignments of the patents and patent applications within the Ex-North America Brockhaus Patents substantially in the form as attached hereto in Exhibit D.  Roche Basel or its Affiliates will execute and deliver any other

#200415309                                        3

documents reasonably necessary to confirm and perfect Wyeth BV's ownership of all Ex-North America Brockhaus Patents.

2.3 On the Closing Date, Roche Basel will deliver or have delivered to Wyeth BV or Wyeth BV's designated agent all files in the possession of Roche, a Roche Affiliate or an agent of Roche or a Roche Affiliate that pertain to the preparation, filing, prosecution, issuance and maintenance of all Ex-North America Brockhaus Patents. Roche Basel or its Affiliates will also deliver to Wyeth BV on the Closing Date properly executed documents that transfer to Wyeth BV or Wyeth BV's designated agent control of the prosecution and maintenance of all Ex-North America Brockhaus Patents.

2.4 Roche Basel will, and will cause its Affiliates to, cooperate using reasonable efforts with Wyeth BV to the extent necessary to allow Wyeth BV to prosecute, issue, maintain, defend and enforce any Ex-North America Brockhaus Patent, including, without limitation, providing evidence and testimony in connection with any proceeding affecting the validity of or the right, title, interest, or benefit of Wyeth BV in, and regarding the conception and reduction to practice of inventions disclosed and claimed in, the Ex-North America Brockhaus Patents. Notwithstanding the above, Roche shall have no obligation to conduct experiments or other scientific activities, or solicit assistance from any third party, including former employees of Roche or its Affiliates. Wyeth BV will reimburse Roche Basel and any Roche Affiliates for the reasonable costs of any assistance provided pursuant to this Section 2.4.

2.5 Roche Basel and its Affiliates hereby acknowledge that from the Closing Date forward, Wyeth BV has succeeded to all of Roche's and its Affiliates' right, title, interest, benefit, and standing to receive all rights and benefits pertaining to the Ex-North America Brockhaus Patents, to institute and to prosecute all suits and proceedings, and to take all actions that Wyeth BV, in its sole discretion, may deem necessary or proper to collect, assert, or enforce any claim, right, or title of any kind under any and all of the Ex-North America Brockhaus Patents, whether arising before or after the Closing Date, to defend and compromise any and all such actions, suits, or proceedings relating to such transferred and assigned rights, title, interest, and benefits, and to do all other such acts in relation thereto.

**Article 3    License to Amgen**

3.1 Subject only to the reservation in Section 3.2, as of the Closing Date Roche Nutley grants to Amgen and its Affiliates a paid-up, irrevocable, exclusive license, with the sole right to grant sublicenses, under the North America Brockhaus Patents to make, have made, use, sell, offer for sale and import Licensed Products for the life of such patents.

3.2 Roche Nutley reserves for itself and its Affiliates the right to practice under the North American Brockhaus Patents for internal, non-clinical research only.

CONFIDENTIAL                                    AMG-ENBNJ-00015508

3.3  After the Closing Date, Roche Nutley will, at Amgen's expense and sole direction, prosecute and maintain all North American Brockhaus Patents using outside counsel selected by Amgen. All costs incurred in such prosecution and maintenance shall be billed through selected outside counsel directly to Amgen and Amgen shall be solely responsible and liable for paying such costs. On the Closing Date, Roche will deliver or have delivered to the selected outside counsel all files in the possession of Roche, a Roche Affiliate or an agent of Roche or a Roche Affiliate that pertain to the preparation, filing, prosecution, issuance and maintenance of all North America Brockhaus Patents. Roche will also deliver to selected outside counsel on the Closing Date properly executed documents that transfer to Amgen and the selected outside counsel control of the prosecution and maintenance of all North America Brockhaus Patents. Since the selection of outside counsel under this Section 3.3 is solely within the control of Amgen, Amgen shall indemnify and hold harmless Roche and its Affiliates (including their officers, directors, employees, and agents) from and against any liabilities, fines, penalties, damages, expenses (including reasonable attorney's fees and expenses and expenses incurred in connection with the enforcement of this provision), actions and claims, which arise from or result through the prosecution and maintenance of the North American Brockhaus Patents. If requested by Amgen and upon the payment by Amgen of additional consideration in the amount of fifty thousand U.S. dollars ($50,000.00), Roche shall execute an assignment of North American Brockhaus Patents to Amgen.

3.4  Roche Nutley will, and will cause its Affiliates to, cooperate using reasonable efforts with Amgen to the extent necessary to allow outside counsel selected by Amgen to prosecute, issue, maintain, defend and enforce any North America Brockhaus Patent, including, without limitation, providing evidence and testimony in connection with any proceeding affecting the validity of or the right, title, interest, or benefit of Roche and/or Amgen in, and regarding conception and reduction to practice of inventions disclosed and claimed in, the North America Brockhaus Patents. Notwithstanding the above, Roche shall have no obligation to conduct experiments or other scientific activities, or solicit assistance from any third party, including former employees of Roche or its Affiliates. Amgen will reimburse Roche Nutley and any Roche Affiliates for the reasonable costs of any assistance provided pursuant to this Section 3.4.

3.5  Each of Roche and its Affiliates and Amgen will promptly notify the other of any suspected infringement of any North America Brockhaus Patent. Amgen, at its sole expense and under its sole control, will have the first right, but not the obligation, to rectify any such infringement by sublicense, by instituting suit for infringement, or by causing the alleged infringement to cease. Roche Nutley will cooperate with Amgen in any such suit, including participating as a party in the suit only to the extent required by the court in order to bring suit. Amgen may retain the entirety of any award of damages or lost profits as a result of such suit. Since the right to rectify infringement under this Section 3.5 is solely within the control of Amgen, Amgen shall indemnify and hold harmless Roche and its Affiliates (including their officers, directors, employees, and agents) from and

CONFIDENTIAL                                    AMG-ENBNJ-00015509

against any liabilities, fines, penalties, damages, expenses (including reasonable attorney's fees and expenses and expenses incurred in connection with the enforcement of this provision), actions and claims, which arise from or result through the actions taken by or on behalf of Amgen with regard to infringement of the North American Brockhaus Patents.

3.6     In the event Amgen fails to rectify any infringement of a North America Brockhaus Patent or initiate an action for such infringement within one hundred eighty (180) days after written request by Roche to do so, Roche at its sole discretion and under its sole control may initiate an action for such infringement, at its expense, against the alleged infringer identified in the request. Amgen will cooperate with Roche in any such suit, including participating as a party in the suit to the extent required by the court in order to bring suit. Roche may retain the entirety of any award of damages or lost profits as a result of such suit. Roche may not enter into any settlement agreement rectifying such infringement without the prior written approval of Amgen, which approval will not be unreasonably delayed or withheld. Since the right to rectify infringement under this Section 3.6 is solely within the control of Roche Nutley, Roche Nutley shall indemnify and hold harmless Amgen and its Affiliates (including their officers, directors, employees, and agents) from and against any liabilities, fines, penalties, damages, expenses (including reasonable attorney's fees and expenses and expenses incurred in connection with the enforcement of this provision), actions and claims, which arise from or result through the actions taken by or on behalf of Roche with regard to infringement of the North American Brockhaus Patents. Nothing contained herein shall obligate Roche Nutley to rectify any infringement of a North America Brockhaus Patent or initiate an action for such infringement.

### Article 4     Covenant Not to Sue Roche

4.1     Wyeth and Wyeth BV, for themselves and their Affiliates, hereby covenants not to sue Roche or its Affiliates for infringement of any of the Brockhaus Ex-North America Patents based on internal, non-clinical research activities conducted by Roche or its Affiliates outside North America.

4.2     Nothing herein will prevent Amgen, Immunex or Wyeth from instituting actions against Roche or any of its Affiliates for infringement of any of the Brockhaus Patent Rights based on any clinical activities claimed in such Patent Rights, any manufacture of products claimed in such Patent Rights, or any commercial sale to third parties of products or services claimed in such Patent Rights.

### Article 5     Covenant Not to Sue Amgen, Immunex or the Wyeth Entities

5.1     Roche, for itself and its Affiliates, to the extent of its and their the right to do so, hereby covenants not to sue Amgen, Immunex, the Wyeth Entities or any of their Affiliates, sublicensees, distributors, agents or customers under any Process Patent Rights for any activity in the Field. Nothing in this A&S shall limit in any manner Genentech's rights under the Genentech-Immunex Agreement, including

#200415309

6

CONFIDENTIAL

AMG-ENBNJ-00015510

their right to royalties under the Process Patent Rights, except to the extent such royalties are transferred to Roche from Genentech as provided for in Section 6.3. In particular, if it is required by the law of the forum for Roche to be a party to an action brought by Genentech to enforce the Process Patent Rights, even if against Amgen, Immunex, the Wyeth Entities or any of their Affiliates, sublicensees, distributors, agents or customers, then Roche may do so solely to the extent necessary to secure Genentech's rights and will not state a claim independent of Genentech against Amgen, Immunex, the Wyeth Entities, or any of their Affiliates, sublicensees, distributors agents, or customers in the Field. To the extent Roche is entitled to proceeds from any such action, it will promptly refund such proceeds to Amgen, Immunex, or the Wyeth Entities after taking out such minimal costs as necessary to satisfy their obligations to Genentech pursuant to this paragraph 5.1.

5.2     In addition to the covenant granted in Section 5.1, Roche, for itself and its Affiliates, hereby covenants not to sue Amgen, Immunex, or the Wyeth Entities or any of their Affiliates, sublicensees, distributors, agents or customers for infringement based on any activity in the Field of any other patent or any patent issuing from any other patent application owned or controlled by Roche as of the Closing Date. Roche, for itself and its Affiliates, hereby covenants not to sue Amgen, Immunex, or the Wyeth Entities or any of their Affiliates, sublicensees, distributors, agents or customers for infringement of any patent in-licensed after the Effective Date by Roche or its Affiliates based on any activity in the Field; except, notwithstanding the above, if Roche were to acquire after the Closing Date a patent as a part of an acquisition of a company, another business entity, or a product, then Roche shall not be precluded from asserting such patent against Amgen, Immunex, or the Wyeth Entities or any of their Affiliates, sublicensees, distributors, agents or customers for infringement based on any activity in the Field.

5.3     Roche, for itself and its Affiliates, hereby covenants not to sue Amgen, Immunex, the Wyeth Entities or any of their Affiliates, sublicensees, distributors, agents or customers for infringement of any Brockhaus Patent Right.

## Article 6    Consideration

6.1     On the Closing Date: (i) Amgen shall pay to Roche Nutley the sum of forty-five million, three hundred and seventy-five thousand U.S. dollars ($45,375,000.00) plus interest at the annual interest rate of one and a half percent (1.5%) accrued on this amount between the Effective Date and the Closing Date; (ii) Wyeth and/or any of its Affiliates shall pay to Roche Nutley the sum of thirty-seven million, one hundred twenty-five thousand U.S. dollars ($37,125,000.00) plus interest at the annual rate of one and a half percent (1.5%) accrued on this amount between the Effective Date and the Closing Date; and (iii) Wyeth BV shall pay to Roche Basel the sum of sixty-seven million, five hundred thousand U.S. dollars ($67,500,000.00) plus interest at the annual rate of one and a half percent (1.5%) accrued on this amount between the Effective Date and the Closing Date. On and

#200415309            7

CONFIDENTIAL                        AMG-ENBNJ-00015511

after the Closing Date, all amounts received by Roche shall be irrevocable, non-refundable, and non-creditable.

Amounts payable to Roche Basel shall be made to:

F. Hoffmann-La Roche AG, Basel
Swift code: UBSWCHZH80A
Account for USD: 230-10345032.0

Amounts payable to Roche Nutley shall be made to:

| Bank Name: | Citibank, n.a. |
| | New York, NY |
| Bank ABA Routing: | 021000089 |
| Account Name: | Hoffmann-La Roche Inc. |
| Account No.: | 30551217 |

6.2 Roche hereby irrevocably and forever waives any right it may have to any royalties or any other compensation payable by Amgen, Immunex and/or Wyeth to Genentech for activities under the Process Patent Rights in the Field.

6.3 If Roche were to receive compensation from Genentech based on activities by Amgen, Immunex and/or Wyeth under the Genentech-Immunex Agreement for activities in the Field under the Process Patent Rights, then Roche will promptly refund to Amgen any amounts received. Roche will cooperate with Amgen, Immunex and/or Wyeth and request that Genentech agree to modify the Genentech-Immunex Agreement to eliminate any requirement for such royalties to be paid to Genentech and thereby extinguish any obligation by Roche to make any refund payments. Nothing in this A&S shall be construed as an admission regarding the existence of a right for Roche to receive compensation from Genentech under the Genentech-Immunex Agreement.

6.4 Unless authorized in advance in writing by Amgen, Immunex and Wyeth, Roche will not amend or modify any agreement or relationship it has with Genentech in any way that would adversely affect Amgen's right to a refund under Section 6.3 of royalties paid to Genentech by Amgen, Immunex and/or Wyeth under the Genentech-Immunex Agreement for activities in the Field.

6.5 To the extent permitted by law, Roche and its Affiliates will, for each of the Process Patent Rights where at least one Roche inventor contributed to the claimed subject matter, (i) diligently pursue all reasonable efforts to register Roche as a co-owner of the Process Patent Rights in all countries in which Roche is not registered as a co-owner, and (ii) use all reasonable efforts to amend inventorship in all countries in which the inventorship reflected in the records of the relevant patent office in such country respecting such Process Patent Rights is

#200415309                               8

CONFIDENTIAL                               AMG-ENBNJ-00015512

in error, provided that the relevant patent laws of such country require that the recordal of such inventorship be accurate to preserve validity.

6.6     Roche will keep books and records regarding amounts subject to Section 6.3 for at least three (3) years after any receipt or refund of any such amount. Upon at least thirty (30) days advance written notice, Roche Nutley will make such books and records and any agreement between Roche Nutley and Genentech relating to such payments available for inspection by an independent accountant, reasonable acceptable to Roche Nutley and paid for by Amgen, Immunex, and/or Wyeth, for the purpose of verifying that Roche Nutley has complied with the terms of Section 6.3. Upon thirty (30) days advance written notice, at the time of Roche Basel's annual auditing period, Roche Basel will make such books and records and any agreement between Roche Basel and Genentech relating to such payments available for inspection by an independent accountant, reasonably acceptable to Roche Basel and paid for by Amgen, Immunex, and/or Wyeth, for the purpose of verifying that Roche Basel has complied with the terms of Section 6.3. The accountant will keep all information obtained in confidence and will report to Amgen, Immunex and Wyeth only the accuracy or inaccuracy of refunds by Roche.

### Article 7     Accord, Waiver and Release

7.1     Compliance with the terms of this A&S by Amgen, Immunex and Wyeth will constitute an accord and satisfaction of all obligations owed to and all claims of Roche or its Affiliates under or relating to the Roche-Immunex Agreement, including, but not limited to, (a) any payments to Roche or an Affiliate that will have accrued as of the Closing Date but will not have been paid and (b) any rights or options granted to Roche or any of its Affiliates in the Roche-Immunex Agreement.

7.2     Compliance with the terms of this A&S by Roche will constitute an accord and satisfaction of all obligations owed to and all claims of Amgen, Immunex and/or Wyeth or their Affiliates under or relating to the Roche-Immunex Agreement, including, but not limited to, (a) any refunds of overpayments that might be due to Amgen, Immunex and/or Wyeth or their Affiliates as of the Closing Date and (b) any rights granted to Amgen, Immunex and/or Wyeth or their Affiliates in the Roche-Immunex Agreement.

7.3     Roche and its Affiliates waive any claim they may have after the Effective Date for any payment based on or arising from the manufacture, use, sale, offer for sale or import by or for Amgen, Immunex and/or Wyeth and their Affiliates of any Licensed Product under the Process Patent Rights or Brockhaus Patent Rights.

7.4     On the Closing Date, the Roche-Immunex Agreement will terminate and all rights and obligations contained therein will terminate, including all rights and obligations identified in Section 9.5 thereof as surviving termination. The only accrued obligations in the Roche-Immunex Agreement that will survive such

#200415309                                    9

CONFIDENTIAL                                                    AMG-ENBNJ-00015513

termination are (a) the obligations of confidentiality provided in Section 4.0 as to Confidential Information disclosed by one party to the other prior to the Closing Date, (b) the indemnity obligations set forth in Sections 7.1(a) and 7.2(a) solely with respect to breach of the confidentiality obligations of Section 4.0, and (c) the restrictions on publicity as set forth in Section 10.7.

7.5     Except as to such rights and obligations specifically created by this A&S, Roche, for itself, its Affiliates, and each of its and their directors, officers, employees and agents, successors and assigns, does hereby release, remise and forever discharge Amgen, Immunex and Wyeth, and each of their directors, officers, employees, customers, insurers, sureties, administrators, trustees, agents, successors and assigns, of and from all manner of action, suits, debts, claims, liabilities, damages and demands of every kind and nature whatsoever, whether in law or in equity, contract or tort, known or unknown, which they or any of them, ever had from the beginning of time to the present date, now has, or hereafter may have or claim to have against them or any of them arising out of or based upon or incidental to, in whole or in part, (a) the Roche-Immunex Agreement (except for the provisions surviving its termination as set forth in Section 7.4) or (b) any claim Roche may have for royalties under the Process Patents.

7.6     Except as to such rights and obligations specifically created by this A&S, Amgen, Immunex and Wyeth, for themselves, their Affiliates, and each of their directors, officers, employees and agents, successors and assigns, does hereby release, remise and forever discharge Roche, and each of its directors, officers, employees, customers, insurers, sureties, administrators, trustees, agents, successors and assigns, of and from all manner of action, suits, debts, claims, liabilities, damages and demands of every kind and nature whatsoever, whether in law or in equity, contract or tort, known or unknown, which they or any of them, ever had from the beginning of time to the present date, now has, or hereafter may have or claim to have against them or any of them arising out of or based upon or incidental to, in whole or in part, the Roche-Immunex Agreement (except for the provisions surviving its termination as set forth in Section 7.4).

7.7     The Parties each acknowledge that (i) they have been advised by legal counsel and (ii) they are familiar with and specifically waive, to the full extent that it may be applicable to this A&S and permitted under the laws of any applicable jurisdiction, the benefit of any provision of state or other local law providing in substance that:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

#200415309                                     10

CONFIDENTIAL

AMG-ENBNJ-00015514

7.8    Nothing in this A&S is intended to be or shall be deemed or construed to be, a release of any person, firm or corporation that is not, as of the Effective Date, a Party, a Party's Affiliate, or a director, officer, employee, customer, insurer, surety, administrator, trustee, agent of a Party or Party's Affiliate, nor is any person, firm or corporation intended to be a third party beneficiary of any part of this A&S.

**Article 8    Representations and Warranties**

8.1    Each Party hereby represents, warrants and covenants to the other Parties that:

(a) the execution, delivery to any other Party and performance by it of this A&S and its compliance with the terms and provisions of this A&S does not and will not conflict, in any material respect, with or result in a breach of any of the terms or provisions of (i) any other contractual obligations of such Party, (ii) the provisions of its charter, operating documents or bylaws, or (iii) any order, writ, injunction or decree of any court or governmental authority entered against it or by which it or any of its property is bound except where such breach or conflict would not materially impact the Party's ability to meet its obligations hereunder;

(b) it has not granted and will not grant to any third party any right which would conflict in any material respect with the rights granted by it to any of the other Parties hereunder;

(c) this A&S is a legal and valid obligation binding upon such Party and enforceable in accordance with its terms except as (i) enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights and (ii) equitable principles of general applicability;

(d) such Party is a corporation duly organized, validly existing and in good standing under the laws of the state or other jurisdiction of incorporation or formation and has full corporate power and authority to enter into this A&S and to carry out the provisions hereof except where failure to be in good standing would not materially impact the Party's ability to meet its obligations hereunder;

(e) such Party is duly authorized, by all requisite corporate action, to execute and deliver this A&S and the execution, delivery and performance of this A&S by such Party does not require any shareholder action or approval, and the Person executing this A&S on behalf of such Party is duly authorized to do so by all requisite corporate action; and

(f) no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of such Party in connection with the valid execution, delivery and performance of this A&S, except for (i) any filing or approval that may be required by the HSR Act and (ii) any filings that may be required under any applicable securities laws.

#200415309                                      11

CONFIDENTIAL                                      AMG-ENBNJ-00015515

8.2    Roche represents, warrants and covenants to the other Parties that:

(a) that it owns unencumbered, all right, title and interest in and to the Brockhaus Patent Rights;

(b) that it has the right to assign to Wyeth BV the Ex-North America Brockhaus Patents as provided in Article 2 of this A&S;

(c) that it has the right to grant to Amgen an exclusive license to the North America Brockhaus Patents as provided in Article 3 of this A&S;

(d) that they are not aware of any third party that has asserted or intends to assert a claim of ownership or other ownership or license interest in and to any Brockhaus Patent Right;

(e) that inventorship as recorded in the Brockhaus Patent Rights is accurate to the best of Roche's knowledge, and that if Roche becomes aware of any inaccuracy in inventorship as recorded in the Brockhaus Patent Rights, Roche promptly will notify Amgen and the Wyeth Entities and upon request of Amgen and/or the Wyeth Entities, Roche will, or will cause its Affiliates, to correct the inventorship or assist Amgen and/or the Wyeth Entities in all reasonable respects to effect a correction thereof in the relevant patent offices;

(f) that it is not aware of any challenge to the validity of any of the Brockhaus Patent Rights, with the exception of the pending opposition to European Patent No. 417 563 filed by Serono International S.A. (now Appeal case T 889/03-338) and the pending opposition to European Patent No. 939 121 filed by Intellectual Property Services.

(g) that it is not aware of any claim of any third party challenging Roche's right, title, and interest in the Brockhaus Patent Rights, except as noted under Section 8.2(f) above;

(h) that all patents and patent applications relating to TNFR in which Roche has or had an ownership interest and wherein Avi Ashkenazi and/or David Goeddel are named inventors, have been irrevocably abandoned.

(i) that to the best of Roche's knowledge at least one claim of the Brockhaus Patent Rights, either currently pending or that could be made in the future, has priority of invention under U.S. patent law as to any and all claims that could have been made on the basis of any patent applications relating to TNFR in which Roche had an ownership interest and wherein Avi Ashkenazi and/or David Goeddel were named inventors; and

(j) that it will be responsible for its Affiliates complying with the terms of this A&S.

#200415309                                    12

CONFIDENTIAL                              AMG-ENBNJ-00015516

## Article 9    Term and Termination

9.1    All terms of this A&S will be effective as of the Closing Date. This A&S will continue in effect until expiration of the last to expire of the Brockhaus Patent Rights and Process Patent Rights.

9.2    After receipt of payment pursuant to Section 6.1, Roche will have no right to terminate this A&S for any reason.

9.3    Amgen, Immunex, Wyeth, and Wyeth BV may, by written notice to Roche signed by all four Parties, terminate this A&S without cause at any time after payment to Roche pursuant to Section 6.1. Such termination will not relieve Amgen, Immunex, Wyeth, and Wyeth BV of their obligations under Sections 3.6, 4.1 and 7.6.

9.4    In the event of any breach by Roche of any obligation in this A&S, Amgen, Immunex, Wyeth, and Wyeth BV together or separately, may seek damages and/or specific performance if Roche does not cure the breach within sixty (60) days after written notice thereof by Amgen, Immunex, Wyeth, or Wyeth BV to Roche. Each Party hereby agrees that (a) the obligations under Articles 2-5, Sections 6.1, 6.2, 6.3, 6.4, 6.5, 7.1, 7.2, 7.3, and Article 8 of the A&S are material; and (b) a breach of any of these obligation may cause the non-breaching Party irreparable harm.

## Article 10    HSR Act

The Parties will agree in good faith as to whether the transaction subject to this A&S must be reported under the HSR Act. If they determine it must be reported for review, the Parties will share equally the filing fee. Each Party will cooperate in the process and will promptly respond to any government request.

## Article 11    Miscellaneous

11.1    The licenses granted in Article 3 by Roche are, and will otherwise be deemed to be, for purposes of Section 365 (n) of the U.S. Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 of the U.S. Bankruptcy Code.

11.2    If the Parties are unable to resolve informally a dispute among them arising from performance of this A&S, any Party, by written notice to the other Parties, may have such dispute referred to their respective executive officers designated for attempted resolution by good faith negotiations. Within thirty (30) days after the Closing Date, each Party will advise all other Parties of the name and title of its designated executive officer, and each Party thereafter may change the designated executive by written notice to all other Parties. Any such dispute will be submitted to the designated executive officers no later than thirty (30) days following such request by a Party. In the event the designated executive officers are not able to resolve any such dispute within sixty (60) days after submission of

#200415309      13

CONFIDENTIAL

AMG-ENBNJ-00015517

the dispute to such executive officers, the aggrieved Party may pursue whatever measures are legally available to them to resolve such dispute. All negotiations pursuant to this Section 11.2 will be treated as compromise and settlement negotiations. Nothing said or disclosed, nor any document produced, in the course of such negotiations which is not otherwise independently discoverable will be offered or received as evidence or used for impeachment or for any other purpose in any current or future arbitration or litigation.

11.3    No Party will make any public announcement regarding this A&S nor release to any third party or publish in any way any non-public information with respect to the terms of this A&S or concerning their cooperation without the prior written consent of the other Parties, which consent will not be unreasonably withheld or delayed. Notwithstanding the foregoing, each Party may disclose the terms of this A&S to the extent required to comply with applicable laws, including, without limitation the rules and regulations promulgated by the United States Securities and Exchange Commission, *provided, however*, that prior to making any such disclosure, the Party intending to so disclose the terms of this A&S (i) will provide the non-disclosing Parties with written notice of the proposed disclosure and a opportunity to review and comment on the intended disclosure which is reasonable under the circumstances and (ii) will seek confidential treatment for as much of the disclosure as is reasonable under the circumstances, including, without limitation, seeking confidential treatment of any information as may be requested by the other Parties.

11.4    Neither this A&S nor any interest hereunder will be assignable by any Party without the prior written consent of the other Party; provided however, that each Party may assign this A&S; (a) to a successor, whether by merger, consolidation, reorganization or acquisition of stock or assets affecting substantially all of the assets or actual voting control; or (b) to an Affiliate of a Party. This A&S will be binding upon the successors and permitted assigns of the Parties and the name of a Party appearing herein will be deemed to include the names of such Party's successors and permitted assigns to the extent necessary to carry out the intent of this A&S. Any assignment not in accordance with this Section 11.4 will be void.

11.5    Notwithstanding the provisions of Section 11.4, Wyeth BV may freely assign any Ex-North America Brockhaus Patent.

11.6    Each Party agrees to execute, acknowledge and deliver such further instruments, and to do all such other acts, as may be necessary or appropriate in order to carry out the purposes and intent of this A&S.

11.7    No Party will be liable to the other Parties for loss or damages or will have any right to terminate this A&S for any default or delay attributable to any Force Majeure, if the Party affected will give prompt notice of any such cause to the other Parties. The Party giving such notice will thereupon be excused from such of its obligations (except obligations to make payments) hereunder as it is thereby disabled from performing for so long as it is so disabled, *provided, however, that*

CONFIDENTIAL                                                    AMG-ENBNJ-00015518

such affected Party commences and continues to use its commercially reasonable efforts to cure such cause. Force Majeure will not excuse obligations to pay amounts due.

11.8 Notices and other communications hereunder (including, without limitation, any notice of Force Majeure, breach, termination, change of address, exercise of rights to negotiate additional agreements, etc.) will be in writing and will be deemed given if delivered personally or by facsimile transmission (receipt verified), mailed by registered or certified mail (return receipt requested), postage prepaid, or sent by nationally recognized express courier service, to the Parties at the following addresses (or at such other address for a Party as will be specified by like notice, *provided, however*, that notices of a change of address will be effective only upon receipt thereof):

| **Roche Nutley** | **Roche Basel** |
|---|---|
| **Hoffmann-La Roche Inc.** | **F.Hoffmann-La Roche Ltd** |
| **340 Kingsland Street** | **Grenzacherstrasse 124** |
| **Nutley, New Jersey 07401 USA** | **CH-4070 Basel, Switzerland** |
| **Attn: Corporate Secretary** | **Attn: Corporate Law** |

**Amgen**

**Amgen Inc.**

**One Amgen Center Drive**

**Thousand Oaks, California 91320-1799 USA**

**Attention: Corporate Secretary**

**Immunex**

**Immunex Corporation**

**One Amgen Center Drive**

**Thousand Oaks, California 91320-1799 USA**

**Attention: Corporate Secretary**

**Wyeth and Wyeth BV**

**Five Giralda Farms, 3E**

**Madison, New Jersey 07940 USA**

**Attention: General Counsel**

#200415309

15

CONFIDENTIAL

AMG-ENBNJ-00015519

11.9 No amendment, modification or supplement of any provision of this A&S will be valid or effective unless made in writing and signed by a duly authorized officer of each Party.

11.10 No provision of this A&S will be waived by any act, omission or knowledge of a Party or its agents or employees except by an instrument in writing expressly waiving such provision and signed by a duly authorized officer of the waiving Party.

11.11 This A&S may be executed in any number of counterparts, each of which need not contain the signature of more than one Party but all such counterparts taken together will constitute one and the same agreement.

11.12 This A&S will be governed by and interpreted in accordance with the substantive laws of the State of Delaware (without regard to conflict of law principles).

11.13 This A&S constitutes and contains the complete, final and exclusive understanding and agreement of the Parties and cancels and supersedes any and all prior negotiations, correspondence, understandings and agreements, whether oral or written, among some or all of the Parties respecting the subject matter hereof and thereof.

CONFIDENTIAL     AMG-ENBNJ-00015520

**IN WITNESS WHEREOF,** duly authorized representatives of the Parties have duly executed this A&S to be effective as of the Effective Date.

HOFFMANN-LA ROCHE INC.

Apprv'd As To Form
LAW DEPT.

By

Signature

George W. Johnston

Print Name

Vice President

Title

June 7, 2004

Date

F. HOFFMANN-LA ROCHE LTD

Signature                          Signature

Print Name                         Print Name

Title                              Title

Date                               Date

WYETH.

Signature

Print Name

Title

Date

#200415309                        17

CONFIDENTIAL                      AMG-ENBNJ-00015521

**IN WITNESS WHEREOF,** duly authorized representatives of the Parties have duly executed this A&S to be effective as of the Effective Date.

HOFFMANN-LA ROCHE INC.

_____
Signature

_____
Print Name

_____
Title

_____
Date

F. HOFFMANN-LA ROCHE LTD

_____          _____
Signature                                            Signature

_____          _____
Eric Notegen                                      Beat Krattenmacher
Print Name                                          Print Name

_____          _____
Direktor                                              Deputy Director
Title                                                    Title

_____          _____
June 7, 2004                                      8.6. 2004
Date                                                   Date

WYETH.

_____
Signature

_____
Print Name

_____
Title

_____
Date

#200415309                                         17

CONFIDENTIAL                                         AMG-ENBNJ-00015522

**IN WITNESS WHEREOF,** duly authorized representatives of the Parties have duly executed this A&S to be effective as of the Effective Date.

HOFFMANN-LA ROCHE INC.

_____

Signature

_____

Print Name

_____

Title

_____

Date

F. HOFFMANN-LA ROCHE LTD

| _____ | _____ |
| Signature | Signature |
| | |
| _____ | _____ |
| Print Name | Print Name |
| | |
| _____ | _____ |
| Title | Title |
| | |
| _____ | _____ |
| Date | Date |

WYETH.

_____

Signature

William M. Haskel

Print Name

Vice President

Title

6/7/04

Date

#200415309      17

CONFIDENTIAL

AMG-ENBNJ-00015523

AHP MANUFACTURING B.V.

_Jack M. O'Connor_
Signature

_Jack M. O'Connor_
Print Name

_Vice President & Treasurer_
Title

_6/7/04_
Date

AMGEN, INC.

_____
Signature

_____
Print Name

_____
Title

_____
Date

IMMUNEX CORPORATION

_____
Signature

_____
Print Name

_____
Title

_____
Date

#200415309                                    18

CONFIDENTIAL                                    AMG-ENBNJ-00015524

AHP MANUFACTURING B.V.

_____
Signature

_____
Print Name

_____
Title

_____
Date

AMGEN, INC.

*[signature]*

Signature

*Richard Nanula*
Print Name

*Executive V-P. & Chief Financial Officer*
Title

*June 7, 2004*
Date

IMMUNEX CORPORATION

*[signature]*

Signature

*Richard Nanula*
Print Name

*Chief Financial Officer*
Title

*June 7, 2004*
Date

#200415309

18

CONFIDENTIAL

AMG-ENBNJ-00015525

**EXHIBIT A**

| | | | | |
|---|---|---|---|---|
| Austria | 08/31/1990 | 90116707.2 | 07/05/2000 | 194384 |
| Austria | 01/15/1999 | 991900703.0 | 04/02/2003 | 0939121 |
| Austria | 07/02/2003 | 300129 | | |
| Belgium | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Belgium | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| Belgium | 07/07/2003 | 2003C/018 | | |
| Brazil | 12/11/1996 | PI1100095.3 | | |
| Bulgaria | 02/28/1994 | 98609 | 08/31/2001 | 63284 |
| Bulgaria | 10/27/2000 | 104893 | | |
| Denmark | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Denmark | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| Denmark | 09/24/2003 | CA200300025 | | |
| Ecuador | 12/16/1994 | 1251/94 | | |
| Europe | 08/31/1990 | 90116707.2 | 07/05/2000 | 017563 |
| Europe | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| Europe | 03/30/2001 | 01108117.1 | | |
| France | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| France | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| France | 07/11/2003 | 03C0026 | | |
| Germany | 08/31/1990 | 90116707.2 | 07/05/2000 | 59010908.1 |
| Germany | 01/15/1999 | 99100703.0 | 04/02/2003 | 59010933.2 |
| Germany | 06/26/2003 | 10399023.2 | | |
| Italy | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Italy | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| Italy | 07/21/2003 | C-UB2003CCP | 09/30/2003 | C-UB2003CCP |
| Japan | 09/12/1990 | 240176/90 | 12/12/1997 | 2728968 |
| Japan | 08/18/1997 | 257432/97 | | |
| Japan | 08/18/1997 | 257433/97 | | |
| Netherlands | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Netherlands | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| Netherlands | 07/02/2003 | 300129 | | |
| Switzerland | 09/12/1989 | 3319/89 | | |
| Switzerland | 03/08/1990 | 746/90 | | |
| Switzerland | 04/20/1990 | 1347/90 | | |
| Switzerland | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Switzerland | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| Switzerland | 07/23/03 | C00939121/01 | | |
| United | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| United | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| United | 06/30/2003 | SPC/GB03/027 | | |
| USA | 09/10/1990 | 07/580013 | | |
| USA | 07/21/1993 | 08/095640 | 03/11/1997 | 5610279 |
| USA | 05/19/1995 | 08/444790 | | |
| USA | 05/19/1995 | 08/444791 | | |
| USA | 05/15/1995 | 08/444793 | 09/15/1998 | 5808029 |
| USA | 05/19/1995 | 08/444797 | | |
| USA | 11/18/2003 | 10/715609 | | |

#200415309                                   19

CONFIDENTIAL                                   AMG-ENBNJ-00015526

AMG-ENBNJ-00015527

EXHIBIT B

JA0424

```
LPAQVAFTPYAPEPGSTCRLREYYDQTAQMCCSKCSPGQHAKVFCTKTSDTVCDSCEDSTYTQLWNWVPECLSCG
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
         10        20        30        40        50        60        70

SRCSSDQVETQACTREQNRICTCRPGWYCALSKQEGCRLCAPLRKCRPGFGVARPGTETSDVVCKPCAPGTFSNT
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
    80        90       100       110       120       130       140       150

TSSTDICRPHQICNVVAIPGNASMDAVCTSTSPTRSMAPGAVHLPQPVSTRSQHTQPTPEPSTAPSTSFLLPMGP
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
        160       170       180       190       200       210       220

SPPAEGSTGDEPKSCDKTHTCPPCPAPELLGGPSVFLFPPKPKDTLMISRTPEVTCVVVDVSHEDPEVKFNWYVD
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
    230       240       250       260       270       280       290       300

GVEVHNAKTKPREEQYNSTYRVVSVLTVLHQDWLNGKEYKCKVSNKALPAPIEKTISKAKGQPREPQVYTLPPSR
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
        310       320       330       340       350       360       370

EEMTKNQVSLTCLVKGFYPSDIAVEWESNGQPENNYKTTPPVLDSDGSFFLYSKLTVDKSRWQQGNVFSCSVMHE
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
    380       390       400       410       420       430       440       450

ALHNHYTQKSLSLSPGK
----|----|----|--
        460
```

CONFIDENTIAL

**EXHIBIT C**

| Country | Filing Date | Filing Number | Grant Date | Patent No. |
|---|---|---|---|---|
| Argentina | 06.06.1996 | P960103001 | | |
| Argentina | 12.02.1998 | P980100640 | | |
| Australia | 06.06.1996 | 60952/96 | | 717847 |
| Azerbaijan | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Belarus | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Brazil | 06.06.1996 | PI9609150.9 | | |
| Bulgaria | 06.06.1996 | 102101 | 27.12.2000 | 63213 |
| Canada | 06.06.1996 | 2220684 | | |
| China | 06.06.1996 | 96194449.8 | | |
| Czech | 06.06.1996 | PV3909/97 | | |
| Eurasia | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Europe | 06.06.1996 | 96918251.8 | | |
| Georgia | 06.06.1996 | 2949 | 15.09.2000 | 10567 |
| Hong Kong | 06.06.1996 | 98114966.4 | | |
| Hungary | 06.06.1996 | 42722/97 | | |
| Iceland | 06.06.1996 | 4626 | | |
| India | 05.06.1996 | 979/MAS/96 | | |
| Indonesia | 06.06.1996 | P961562 | 08.03.2000 | ID0004849 |
| Israel | 06.06.1996 | 122398 | | |
| Japan | 06.06.1996 | 09-501638 | | |
| Kazakhstan | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Kenya | 06.06.1996 | PCT/US96/09284 | 22.03.2000 | KE 93 |
| Kyrgyzstan | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Macedonia | 06.06.1996 | P-120/97 | | |
| Malaysia | 06.06.1996 | PI9602265 | | |
| Mexico | 06.06.1996 | 9709452 | | |
| Moldova | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| New Zealand | 06.06.1996 | 310202 | 08.02.2000 | 310202 |
| Norway | 06.06.1996 | 975674 | | |
| OAPI | 06.06.1996 | 70153 | 14.10.1999 | 1553 |
| Philippines | 05.06.1996 | 53298 | | |
| Poland | 06.06.1996 | P323737 | 07.01.2003 | 185484 |
| Romania | 06.06.1996 | 97-02262 | | |
| Russian | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Saudi Arabian | 07.10.1996 | 96170351 | | |
| Singapore | 06.06.1996 | 9705182.5 | 25.05.1999 | 46871 |
| Slovakia | 06.06.1996 | 1670-97 | | |
| South Africa | 06.06.1996 | 96/4776 | 25.02.1998 | 96/4776 |
| South Korea | 06.06.1996 | 708954/1997 | | |
| Sri Lanka | 06.06.1996 | 11346 | | |
| Taiwan*[1] | 05.06.1996 | 85106712 | 14.08.2001 | 130534 |
| Taiwan*[1] | 05.06.1996 | 89111534 | 02.06.2003 | 171272 |

#200415309

21

CONFIDENTIAL

AMG-ENBNJ-00015528

| Country | Filing Date | Filing Number | Grant Date | Patent No. |
|---|---|---|---|---|
| Tajikistan | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Thailand | 05.06.1996 | 31782 | | |
| Turkey | 06.06.1996 | 1543 | 15.01.1999 | TR199701543B |
| Turkmenista | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Ukraine | 06.06.1996 | PCT/US96/09284 | | |
| USA*2) | 06.06.1995 | 08/469348 | 06.01.1998 | 5705364 |
| USA*2) | 06.06.1995 | 08/466845 | 24.02.1998 | 5721121 |
| USA*2) | 06.06.1995 | 08/470849 | 02.12.2003 | 6656466 |
| USA*2) | 01.11.2000 | 09/705285 | | |
| Uzbekistan | 06.06.1996 | IHAP9700969.2 | | |
| Viet Nam | 06.06.1996 | S19971087 | 10.08.2001 | 2262 |
| WIPO | 06.06.1996 | US96/09284 | | |

*1) Currently in the name of Genentech but believed to be co-owned with Roche Basel.
*2) Currently in the name of Genentech but believed to be co-owned with Roche Nutley.

#200415309

22

CONFIDENTIAL

AMG-ENBNJ-00015529

# EXHIBIT D

# ASSIGNMENT

**WHEREAS**, F. Hoffmann-La Roche AG., a Swiss Corporation with offices at Grenzacherstrasse 124, CH-4070, Basel, Switzerland (hereinafter called Assignor), is the owner of:

**EP 417563B, EP 939121B, and EP 1132471 and all equivalents and extensions such as Supplementary Protection Certificates thereof as well as counterpart patents and patent applications outside of European Patent Convention countries and outside of the United States, as more specifically set forth in Exhibit 1 attached hereto;**

and the inventions disclosed and claimed therein, and are entitled to the benefit of same in the following designated EPC states: Austria, Belgium, Denmark, France, Germany, Italy, Netherlands, Switzerland/Liechtenstein, and Great Britain **(hereinafter referred to as the Patent Rights);**

**WHEREAS**, Wyeth, a corporation organized under the laws of the State of Delaware, U.S.A., having a place of business at Five Giralda Farms, Madison, New Jersey 07940 United States of America and AHP Manufacturing B.V., a Netherlands corporation having a place of business at Spicalaan 31, 2132 JG Hoofddorp, The Netherlands and hereinafter referred to as Assignee, has acquired the entire right, title and interest of the Assignor in and to said inventions and any Letters Patent (including extensions such as Supplementary Protection Certificates) that may be granted thereon by operation of that certain Accord and Satisfaction Agreement dated _____, 2004, and wishes to perfect such assignment;

**NOW, THEREFORE**, in consideration of $1 and other valuable and good consideration as set forth in the Accord and Satisfaction Agreement, the receipt of which is hereby acknowledged, Assignor, by these presents, has sold, assigned and transferred, and does hereby sell, assign and transfer to Assignee, its successors, legal representatives and assigns the entire right, title and interest in and to the Patent Rights (including all divisions, continuations, and extensions thereof whenever filed) and in and to any Letters Patent that may be granted thereon, and the right to apply, in its own name, for Letters Patent and such other forms of protection of industrial property as may be provided by any country through affiliation with the members of the EPC or otherwise, with full benefit of such priorities as may now or hereafter be granted to Assignee by local laws or by treaty or by international convention, together with the right to extend the protection of the Patent Rights where possible and the right to undertake any proceedings in patent offices, courts or otherwise, relative thereto, for the full term for which said Patent Rights or other forms of protection may be granted. Assignor hereby authorises and directs that the Patent Rights and any and all proceedings taken with respect thereto proceed in the name of the Assignee.

#200415309                                          23

CONFIDENTIAL                                          AMG-ENBNJ-00015530

**On behalf of the ASSIGNOR:**

F. Hoffmann-La Roche AG

By_____     Date _____
Name: (Print)
Title:_____


**On behalf of the ASSIGNEE:**

AHP Manufacturing B.V.

By _____     Date _____

**Name: <u>Eileen M. Lach</u>_____**

Title: _____

#200415309            24

CONFIDENTIAL            AMG-ENBNJ-00015531

**EXHIBIT 1**

| Country | Filing Date | Filing Number | Grant Date | Patent No. |
|---|---|---|---|---|
| Austria | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Austria | 08/31/1990 01/15/1999 (divisional) | 991900703.0 | 04/02/2003 | 0939121 |
| Austria | 07/02/2003 | 18/2003 | | |
| Belgium | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Belgium | 08/31/1990 01/15/1999 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Belgium | 07/07/2003 | 2003C/018 | | |
| Brazil | 12/11/1996 | PI1100095.3 | | |
| Bulgaria | 02/28/1994 | 98609 | 08/31/2001 | 63284 |
| Bulgaria | 10/27/2000 | 104893 | | |
| Denmark | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Denmark | 08/31/1990 01/15/1999 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Denmark | 09/24/2003 | CA200300025 | | |
| Ecuador | 12/16/1994 | 1251/94 | | |
| Europe | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Europe | 08/31/1990 01/15/1999 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Europe | 03/30/2001 | Pub. #1132471 | | |
| France | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| France | 08/31/1990 01/15/1999 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| France | 07/11/2003 | 03C0026 | | |
| Germany | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Germany | 08/31/1990 01/15/1999 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Germany | 06/26/2003 | 10399023.2 | | |
| Italy | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Italy | 08/31/1990 01/15/1999 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Italy | 07/21/2003 | C-UB2003CCP818 | 09/30/2003 | C-UB2003CCP818 |
| Japan | 09/12/1990 | 240176/90 | 12/12/1997 | 2728968 |
| Japan | 08/18/1997 | 257432/97 | | |
| Japan | 08/18/1997 | 257433/97 | | |
| Netherlands | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Netherlands | 08/31/1990 08/31/1990 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Netherlands | 07/02/2003 | 300129 | | |
| Switzerland | 09/12/1989 | 3319/89 | | |
| Switzerland | 03/08/1990 | 746/90 | | |

#200415309

25

CONFIDENTIAL

AMG-ENBNJ-00015532

| Switzerland | 04/20/1990 | 1347/90 | | |
|---|---|---|---|---|
| Switzerland/ Liechtenstein | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Switzerland/ Liechtenstein | 08/31/1990 08/31/1990 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Switzerland/ Liechtenstein | 07/23/03 | C00939121/01 Note: could not verify SPC No. | | |
| Great Britain | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Great Britain | 08/31/1990 08/31/1990 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Great Britain | 06/30/2003 (divisional) | SPC/GB03/027 | | |

#200415309

26

CONFIDENTIAL

AMG-ENBNJ-00015533

# EXHIBIT 3

JA0431

**<u>VENUE AFFIDAVIT</u>**

I, Jeffrey Blend, declare as follows:

1.  I serve as Senior Assistant General Counsel for Plaintiffs CareFirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc., and CareFirst BlueChoice, Inc.

2.  Plaintiffs' Amended Class Action Complaint is based in part on violations of the Consumer Legal Remedies Act, CAL. CIV. CODE § 1750 *et seq.*

3.  Plaintiffs file this Affidavit pursuant to CAL. CIV. CODE § 1780(d).

4.  The Amended Class Action Complaint has been filed in the proper place for the trial of this action.

5.  Defendants Amgen Inc., Amgen Manufacturing Limited, LLC, and Immunex Corporation all do business in the Eastern District of Virginia, and the transactions, or any substantial portion thereof, underlying Plaintiffs' claims occurred in the Eastern District of Virginia.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

DATED: 9/25/24

Jeffrey Blend

JA0432

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

CAREFIRST OF MARYLAND, INC. et al.,

          Plaintiffs,

   v.

AMGEN INC. et al.,

          Defendants.

No. 2:24-cv-00484-AWA-LRL

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**THE SECOND AMENDED COMPLAINT**

.

JA0433

## TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................................1

Background..........................................................................................................................5

I.       Immunex and Roche Research TNF Inhibitors.................................................5

II.      Immunex Receives FDA Approval for Enbrel and Enters into a License with Roche ................................................................................................................6

III.    Amgen Acquires Immunex and Buys Out Its Running Royalty Obligation to Roche ................................................................................................................7

IV.    Amgen Petitions the Patent Office to Issue Patent Claims Covering Etanercept ..............8

V.     A Federal Court Permanently Enjoins Marketing of the Sandoz and Bioepis Biosimilars .....................................................................................................9

VI.    Plaintiffs File This Lawsuit Complaining That Biosimilar Versions of Enbrel Have Not Entered .......................................................................................11

Legal Standard ..................................................................................................................12

Argument...........................................................................................................................13

I.       Plaintiffs' Claims Fail Because Plaintiffs Have Not Alleged Actionable Exclusionary Conduct....................................................................................14

         A.     The First Amendment Forecloses Antitrust Liability for Conduct That Depends on Protected Petitioning.........................................................14

         B.     Plaintiffs Cannot Avoid This Result by Framing the Challenged Conduct as the License Alone ............................................................18

II.      Plaintiffs' Claims Fail Because Their Alleged Injuries Resulted from Court Action ...........................................................................................................21

Conclusion.........................................................................................................................23

JA0434

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbott Laboratories v. Adelphia Supply USA*,
 2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017)....................................................................22

*Advanced Health-Care Services, Inc. v. Radford Community Hospital*,
 910 F.2d 139 (4th Cir. 1990) ...........................................................................................4

*American Sales Co., LLC v. Pfizer, Inc.*,
 2015 WL 13264206 (E.D. Va. Nov. 6, 2015)....................................................................12

*Andrx Pharmaceuticals, Inc. v. Biovail Corp. International*,
 256 F.3d 799 (D.C. Cir. 2001) ............................................................................... 5, 21, 23

*Asahi Glass Co. v. Pentech Pharmaceuticals, Inc.*,
 289 F. Supp. 2d 986 (N.D. Ill. 2003)....................................................................12

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ..............................................................................................12

*Associated Bodywork & Massage Professionals v. American Massage Therapy
 Ass'n*, 897 F. Supp. 1116 (N.D. Ill. 1995)...............................................................22

*Baltimore Scrap Corp. v. David J. Joseph Co.*,
 237 F.3d 394 (4th Cir. 2001) ......................................................................... 3, 14

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007) ..............................................................................................12

*Biltmore Co. v. NU U, Inc.*,
 2016 WL 7494474 (W.D.N.C. Dec. 30, 2016)....................................................................13

*Brown v. Duchesne*,
 60 U.S. (19 How.) 183 (1857) ........................................................................18

*In re Buspirone Patent Litigation*,
 185 F. Supp. 2d 363 (S.D.N.Y. 2002)....................................................................21

*California Motor Transport Co. v. Trucking Unlimited*,
 404 U.S. 508 (1972) ..............................................................................................14

*CareFirst of Maryland, Inc. v. Johnson & Johnson*,
 2024 WL 3858249 (E.D. Va. Aug. 16, 2024)..................................................... 19, 20, 21, 23

**JA0435**

*Colonial Penn Insurance Co. v. Coil,*
    887 F.2d 1236 (4th Cir. 1989) ..................................................................................................2

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961) ................................................................................................................21

*Eli Lilly & Co. v. Barr Laboratories, Inc.,*
    251 F.3d 955 (Fed. Cir. 2001).................................................................................................10

*Hospital Building Co. v. Trustees of the Rex Hospital,*
    691 F.2d 678 (4th Cir. 1982) .................................................................................................15

*In re Humira (Adalimumab) Antitrust Litigation,*
    465 F. Supp. 3d 811 (N.D. Ill. 2020), *aff'd sub nom. Mayor & City Council of*
    *Baltimore v. AbbVie Inc.,* 42 F.4th 709 (7th Cir. 2022) ............................................ 16, 17, 19

*Hynix Semiconductor Inc. v. Rambus, Inc.,*
    527 F. Supp. 2d 1084 (N.D. Cal. 2007).......................................................................... 20, 21

*Immunex Corp. v. Sandoz Inc.*:

    395 F. Supp. 3d 366 (D.N.J. 2019) ............................................................................. 2, 7, 10

    964 F.3d 1049 (Fed. Cir. 2020)........................................................................................ 6, 10

*Intellectual Ventures I LLC v. Capital One Financial Corp.,*
    280 F. Supp. 3d 691 (D. Md. 2017) ........................................................................ 16, 17, 19

*Lawline v. American Bar Ass'n,*
    956 F.2d 1378 (7th Cir. 1992) ...............................................................................................22

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995) .................................................................................................18

*Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n,*
    107 F.3d 1026 (3d Cir. 1997).................................................................................................22

*Mayor & City Council of Baltimore v. AbbVie Inc.,*
    42 F.4th 709 (7th Cir. 2022) ..................................................................................................17

*McGuire Oil Co. v. Mapco, Inc.,*
    958 F.2d 1552 (11th Cir. 1992)..............................................................................................20

*Mercatus Group, LLC v. Lake Forest Hospital,*
    641 F.3d 834 (7th Cir. 2011) .................................................................................................15

*North Carolina Electric Membership Corp. v. Carolina Power & Light Co.,*
    666 F.2d 50 (4th Cir. 1981) .....................................................................................................3

iii

*Nobelpharma AB v. Implant Innovations, Inc.*,
   141 F.3d 1059 (Fed. Cir. 1998)......................................................................................14

*Novo Nordisk of North America, Inc. v. Genentech, Inc.*,
   77 F.3d 1364 (Fed. Cir. 1996).......................................................................................18

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*,
   508 U.S. 49 (1993) .......................................................................................................15

*RE/MAX LLC v. M.L. Jones & Associates, Ltd.*,
   2013 WL 4647517 (E.D.N.C. Aug. 29, 2013)..............................................................13

*Sandoz Inc. v. Amgen Inc.*,
   582 U.S. 1 (2017) .........................................................................................................9

*Sandoz Inc. v. Immunex Corp.*,
   141 S. Ct. 2623 (2021) .................................................................................................10

*Sessions Tank Liners, Inc. v. Joor Manufacturing, Inc.*,
   17 F.3d 295 (9th Cir. 1994) .........................................................................................22

*Syngenta Crop Protection, LLC v. Atticus, LLC*,
   2022 WL 842938 (E.D.N.C. Mar. 21, 2022)................................................................13

*United Mine Workers of America v. Pennington*,
   381 U.S. 657 (1965) ...........................................................................................*passim*

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*,
   382 U.S. 172 (1965) ...............................................................................................15, 19

**STATUTES**

15 U.S.C. § 2.....................................................................................................................11

35 U.S.C. § 154(a) ............................................................................................................18

35 U.S.C. § 271(e)(4)(D)....................................................................................................9

**REGULATORY MATERIALS**

*In re Amgen Inc. & Immunex Corp.*,
   No. C-4053 (FTC July 12, 2002),
   www.ftc.gov/sites/default/files/documents/cases/2002/07/amgencomplaint.pdf.....................7

**OTHER AUTHORITIES**

Arthur Allen, *Drug Brokers Steer Americans to Humira over Cheaper Options*,
   L.A. Times, Sept. 18, 2023, at A8, *available at* 2023 WLNR 32177873 ...............................7

iv

**JA0437**

## INTRODUCTION

In this antitrust lawsuit, Plaintiffs complain that they are unable to purchase two "biosimilar" alternatives to Immunex's drug ENBREL® (etanercept).  However, the sale of those drugs has been, and will continue to be, barred by injunctions issued by a federal court in the District of New Jersey, which found infringement of valid patents asserted by Immunex and its parent company, Amgen.  Thus, Plaintiffs' antitrust theory is that illegal competition by patent-infringing products has been excluded.

Plaintiffs' claims fail as a matter of law and must be dismissed with prejudice.  Under Supreme Court and Fourth Circuit precedent, the First Amendment protects Amgen's efforts (on behalf of its subsidiary, Immunex) to have the U.S. Patent and Trademark Office issue patents covering Enbrel biosimilars and Amgen's successful litigation to enforce those patents.[1] Plaintiffs cannot separate their claims from Amgen's protected activity—and even if they could, Plaintiffs make no factual allegations that any other conduct by Amgen excluded competition. After Amgen raised these arguments in its initial motion to dismiss, Plaintiffs amended their complaint to remove allegations and obscure the facts about Amgen's years of petitioning activity that are the basis of their claims.  But Plaintiffs cannot plead around the fundamental problem that their theory of antitrust liability hinges on conduct protected by the First Amendment: the successful prosecution and assertion of valid patents.  Separately, Plaintiffs' claims fail because the federal-court injunctions break the causal chain between Amgen's conduct and Plaintiffs' alleged harm.

---

[1] For simplicity, we generally use "Amgen" to refer to all Defendants when the differences among them are not material for purposes of this motion.

**JA0438**

As Plaintiffs themselves allege, Enbrel is approved to treat rheumatoid arthritis and other autoimmune disorders affecting millions of Americans.  ECF No. 52, Second Amended Complaint ("Compl.") ¶¶ 50-55.[2]  Enbrel is a "biologic" medicine, meaning it is made in living cells.  Its active ingredient is an artificially engineered "fusion protein" called etanercept.  *Id.* ¶¶ 60, 68.  In 2004, Amgen entered into an agreement with Roche for an exclusive license to certain pending patent applications (and issued patents not at issue here) relating to technology that both companies had researched, including the responsibility to direct prosecution of the pending applications before the Patent Office.  *Id.* ¶¶ 7, 64, 101, 106.  Amgen then spent "about seven years" petitioning the Patent Office to issue patents from the pending applications.  *Id.* ¶ 119.  The Patent Office ultimately issued two patents, which will expire in 2028 and 2029.  *Id.* ¶¶ 119-123.

Amgen successfully enforced those two patents against infringing "biosimilar" products developed by Sandoz and Bioepis.  Amgen sued both companies for patent infringement in the U.S. District Court for the District of New Jersey—and won.  That court found that the biosimilars infringed valid patents, *Immunex Corp. v. Sandoz Inc.*, 395 F. Supp. 3d 366 (D.N.J. 2019), and it permanently enjoined the sale of those biosimilars until those patents expire.  ECF No. 49-1; ECF No. 49-2.[3]

These allegations fail to state a claim for two separate reasons.

*First*, Plaintiffs have failed to allege any actionable exclusionary conduct, and their attempt to rewrite their complaint to evade that deficiency has not succeeded.  As a matter of

---

[2] Citations of the Second Amended Complaint take Plaintiffs' allegations as true solely for purposes of this motion, as required by Rule 12(b)(6).

[3] Because these permanent injunctions are part of the court record from the patent-infringement lawsuits, the Court can take judicial notice of them.  *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989).

law, the *Noerr-Pennington* doctrine—"guarantee[ing] citizens their First Amendment right to petition the government for redress without fear of antitrust liability"—protects Amgen's years of work petitioning the Patent Office to issue patents and its successful lawsuits enforcing those patents in the federal courts. *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 398 (4th Cir. 2001); *N.C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 666 F.2d 50, 52 (4th Cir. 1981). The Supreme Court has held that such protected activity "is not illegal" even if "part of a broader scheme." *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965). Accordingly, the First Amendment forecloses liability for the entire series of events alleged in the operative Complaint that resulted in biosimilar versions of Enbrel not being able to enter the market.

Plaintiffs appear to recognize that fatal flaw. In their First Amended Complaint, Plaintiffs alleged that the exclusive license, Amgen's patent prosecution, and the successful lawsuits were part of the alleged "anticompetitive scheme." ECF No. 40, ¶ 200. After Amgen moved to dismiss on the ground that such First-Amendment protected activity "is not illegal" even if "part of a broader scheme," *Pennington*, 381 U.S. at 670, Plaintiffs amended their complaint to try to obscure the role of the patent prosecution and enforcement in the "scheme." Plaintiffs now allege that the license to the patent applications "was the violation of the antitrust laws" and that Amgen's "prosecution" and "enforcement" efforts only "caused anticompetitive harm" somehow without being part of the "scheme." Compl. ¶ 198.

But the First Amendment's protection for petitioning activity cannot be evaded through wordplay. Regardless of labels, the fact remains that the alleged antitrust claim centers on the prosecution and enforcement of two patents. There is no allegation that the license *standing alone* was a "violation of the antitrust laws" because Plaintiffs still do not (and cannot) allege

3

**JA0440**

that the license alone gave Amgen any rights to exclude biosimilar versions of Enbrel.  Plaintiffs thus cannot show that the license itself constituted exclusionary conduct creating an antitrust claims.  *See Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990) ("exclusionary" conduct is an essential element of a monopolization claim).

Notably, in their First Amended Complaint, Plaintiffs specifically alleged just the opposite—that the patents and applications licensed by Roche to Amgen did not have any exclusionary effect because they "*did not cover etanercept*" at the time of the license.  ECF No. 40, ¶ 117.  That was such a key allegation that Plaintiffs italicized the point.  The First Amended Complaint explained that Amgen "substantially rewrote" the patent applications, "reshap[ing] them to cover Enbrel" and exclude biosimilar products.  *Id.* ¶ 119.  When Amgen argued in its motion to dismiss that this meant that the antitrust claim challenged First Amendment-protected content, Plaintiffs amended their complaint to delete what they had previously italicized to emphasize the point that Roche's patent applications did not cover etanercept.  Critically, Plaintiffs have not alleged the contrary in their Second Amended Complaint.  They have not alleged that the Roche license gave Amgen any rights to exclude biosimilar versions of Enbrel.  The Complaint continues to allege instead that Amgen gained the power to exclude biosimilars only through its protected petitioning of the Patent Office, which included amending the patent applications five times, overcoming the patent examiner's rejections on multiple grounds, and taking a "successful appeal to the Board of Patent Appeals."  *Id.* ¶¶ 120-122.  The First Amendment therefore forecloses any antitrust claim based on Amgen's license of the Roche patent applications as a matter of law.

***Second***, the Complaint fails to state a claim because the two federal-court injunctions are an independent cause of any lack of competition from biosimilar versions of etanercept.  When

4

**JA0441**

"anticompetitive harm is caused by the decision of a court, even though granted at the request of a private party, no private restraint of trade occurs because the intervening government action breaks the causal chain." *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 818 (D.C. Cir. 2001).  Here, permanent injunctions by the U.S. District Court for the District of New Jersey prohibit companies from marketing the two FDA-approved biosimilar products.  Thus, to the extent Plaintiffs allege that they paid inflated prices for Enbrel because Enbrel did not face competition from biosimilars, the federal-court injunctions prohibiting the sale of those biosimilars are the independent cause of that alleged harm.  Plaintiffs are improperly asking this Court to nullify permanent injunctions issued by the District of New Jersey and affirmed by the Federal Circuit.

These deficiencies in Plaintiffs' claims require dismissal with prejudice.  Plaintiffs cannot plead facts showing that Defendants took a license to exclusionary power that Roche never had, or that would negate the First Amendment protection for Defendants' petitioning the Patent Office and winning patent-infringement lawsuits.  Nor could further amendments to the Complaint wipe away the permanent injunctions issued by another federal court that break the chain of causation.

## BACKGROUND

**I.      Immunex and Roche Research TNF Inhibitors**

Tumor necrosis factor ("TNF") is a chemical messenger that activates inflammation in the body when it binds to receptors called tumor necrosis factor receptors ("TNFRs").  Compl. ¶¶ 58-59.  Excess TNF can cause autoimmune disorders such as rheumatoid arthritis, plaque psoriasis, psoriatic arthritis, ankylosing spondylitis, and polyarticular juvenile idiopathic arthritis. *Id.* ¶ 58.

**JA0442**

In the 1990s, researchers at two different pharmaceutical companies, Roche and Immunex, were studying how synthetic proteins containing fragments of TNFRs could bind to and "soak up" TNF, lowering the amount in the body and reducing the inflammation that excessive TNF causes.  *Id.* ¶¶ 61-72; *Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1054-55 (Fed. Cir. 2020) (recounting this history).  Some of that research involved fragments of a TNFR called p55 (because its molecular weight is 55 kilodaltons); other research involved fragments of a TNFR called p75 (because its molecular weight is 75 kilodaltons).  Compl. ¶¶ 62-72.  For a number of years, Roche prioritized approaches using p55 TNFR, and Immunex prioritized approaches using p75 TNFR.  *Id.* ¶¶ 66-67.

Both Roche and Immunex applied for patents on technologies related to TNFRs.  In 1990, Roche filed a European patent application related to TNFRs, and in 1993, it filed a U.S. patent application for inventions related to both p55 TNFR and p75 TNFR.  *Id.* ¶ 66.  In 1995, Roche filed U.S. Patent Application No. 08/444,790 (the "'790 application") and U.S. Patent Application No. 08/444,791 (the "'791 application").  *Id.*

## II.     Immunex Receives FDA Approval for Enbrel and Enters into a License with Roche

Immunex developed a TNFR-based treatment called Enbrel, which received FDA approval in 1998.  *Id.* ¶¶ 50, 73.  Enbrel is a biologic medicine approved to treat autoimmune disorders—specifically, rheumatoid arthritis, plaque psoriasis, psoriatic arthritis, ankylosing spondylitis, and polyarticular juvenile idiopathic arthritis.  *Id.* ¶ 50.  Enbrel's active ingredient is a fusion protein known as etanercept, which contains a portion of the p75 TNFR protein.  *Id.* ¶ 60.  Enbrel reduces inflammatory responses by binding to and inhibiting TNF.  *Id.* ¶¶ 58-59. Immunex launched Enbrel in the United States on November 6, 1998.  *Id.* ¶ 73.

In 1999, Roche granted Immunex a co-exclusive license under the family of patent applications relating to the 1990 European application to make, use, sell, and import etanercept.

*Id.* ¶ 77; ECF No. 52-1, § 2.1.  This family of patent applications, along with any patents issuing from them, was known as the "Brockhaus" patent rights because Dr. Manfred Brockhaus was the first named inventor.  *Immunex*, 395 F. Supp. 3d at 377 n.2.  In exchange for the license, Immunex agreed to pay Roche a royalty on its net sales of etanercept.  Compl. ¶ 79.  Immunex also granted Roche an option to take a royalty-bearing license under a patent family controlled by Immunex, to make, use, sell, and import a p55 TNFR product.  ECF No. 52-1, § 2.2.

**III.     Amgen Acquires Immunex and Buys Out Its Running Royalty Obligation to Roche**

In 2002, Amgen acquired Immunex.  Compl. ¶ 85.  The Federal Trade Commission ("FTC") reviewed that transaction for potential antitrust issues.  *Id.* ¶ 89.  According to the FTC's submissions following its review of the transaction, Enbrel competes in a market for "the research, development, manufacture, and sale of TNF Inhibitors," which included a product being developed by Abbott Laboratories.  Complaint ¶ 25, *In re Amgen Inc. & Immunex Corp.*, No. C-4053 (FTC July 12, 2002), www.ftc.gov/sites/default/files/documents/cases/2002/07/amgencomplaint.pdf, *cited in* Compl. ¶ 90 n.38.  Abbott later launched that product under the name Humira, "another autoimmune drug used to treat similar conditions as Enbrel."  Compl. ¶ 160.  Humira went on to become the "bestselling drug in history."  Arthur Allen, *Drug Brokers Steer Americans to Humira over Cheaper Options*, L.A. Times, Sept. 18, 2023, at A8, *available at* 2023 WLNR 32177873.  Thus, although Plaintiffs here allege that Enbrel competes only with biosimilar versions of Enbrel, Compl. ¶ 192, the FTC asserted that Enbrel competes with Humira and other drugs that treat the same condition.[4]

In June 2004, Roche and Amgen signed an agreement titled Accord and Satisfaction, "to eliminate the continuing obligations to pay royalties to Roche" under the 1998 license.  *Id.*

---

[4] Whether Enbrel and Humira compete in the same antitrust market is not at issue in this motion.

¶¶ 102-103; ECF No. 52-2.  In that agreement, Roche obtained a large up-front payment instead of ongoing royalty payments.  Compl. ¶ 103.  Roche also granted Amgen an exclusive license to the Brockhaus patent rights in the United States.  *Id.* ¶¶ 105-106.  Roche retained the Brockhaus patent rights for internal research.  *Id.* ¶ 105.  Although the Complaint in passing calls Roche a "would-be competitor" had it not exclusively licensed the Brockhaus patent rights to Amgen, *id.* ¶ 1, the Complaint does not allege that Roche ever succeeded in developing or received FDA approval of an etanercept product or any other TNF inhibitor.

It is critical to distinguish among (i) the *issued patents* licensed to Amgen, (ii) the patent *applications* licensed to Amgen (which the complaint calls the "Brockhaus Patent Applications"), and (iii) the patents that Amgen obtained from the Patent Office based after rewriting those applications (which the complaint calls the "Brockhaus Patents").  *Id.* ¶ 64.  The already-issued patents licensed to Amgen are not at issue here.  *See* ECF No. 52-2, PageID# 764 (exhibit to the Accord and Satisfaction listing the already-issued patents in the right-most column).  As for the licensed applications, the Complaint does not allege that they covered Enbrel at the time of the exclusive license.  Nor could Plaintiffs make such an allegation, given that they previously alleged (with liberal use of emphatic italics) that Roche's pending patent claims "did not cover etanercept" until Amgen "rewrote" them.  ECF No. 40, ¶¶ 117, 119, 155 (emphases omitted).  Thus, the Complaint makes no allegation that Roche's license itself gave Amgen any right to exclude etanercept products, or that Roche owned any patents covering etanercept, when it exclusively licensed its patent rights to Amgen.

**IV.    Amgen Petitions the Patent Office to Issue Patent Claims Covering Etanercept**

Amgen spent "about seven years" petitioning the Patent Office to grant patents on etanercept from the patent applications.  Compl. ¶ 119.  That effort required Amgen to amend Roche's patent applications five times, overcome "reject[ions]" by the patent examiner "for

8

**JA0445**

obviousness and insufficient written description," and take a "successful appeal to the Board of Patent Appeals." *Id.* ¶¶ 120-122. In 2011, seven years after the Accord and Satisfaction, the Patent Office granted a patent from one of the Brockhaus applications as U.S. Patent No. 8,063,182 (the "'182 patent"). *Id.* ¶ 121. In 2012, the Patent Office granted another of the Brockhaus applications as U.S. Patent No. 8,163,522 (the "'522 patent"). *Id.* ¶ 123. The '182 and '522 patents will expire in 2028 and 2029, respectively. *Id.* ¶¶ 121, 123.

## V. A Federal Court Permanently Enjoins Marketing of the Sandoz and Bioepis Biosimilars

Under legislation passed in 2010, a company may apply to the FDA for approval of a biosimilar. A biosimilar "is a biologic product that is highly similar to a biologic product that has already been approved," which is known as a reference product. *Sandoz Inc. v. Amgen Inc.*, 582 U.S. 1, 5 (2017). FDA approval of a biosimilar does not necessarily mean that the biosimilar can lawfully be sold. The sponsor of the reference product "may hold multiple patents covering the biologic, its therapeutic uses, and the processes used to manufacture it," which "may constrain [the biosimilar] applicant's ability to market its biosimilar." *Id.* at 7. The statute "sets forth a carefully calibrated scheme for preparing to adjudicate, and then adjudicating, claims of infringement." *Id.* at 8. In some circumstances, a reference product sponsor that prevails in a patent-infringement lawsuit against a biosimilar sponsor is automatically entitled to a permanent injunction prohibiting commercialization of the biosimilar until the patent expires. *Id.* at 10; 35 U.S.C. § 271(e)(4)(D).

In 2015, Sandoz applied to the FDA to market Erelzi, a biosimilar version of etanercept. Compl. ¶ 127. In 2016, Amgen filed a lawsuit against Sandoz in the U.S. District Court for the District of New Jersey alleging that Erelzi infringed the '182 and '522 patents (among others). *Id.* ¶ 128. In August 2016, the FDA approved Erelzi, but Sandoz chose not to launch the product

at risk of being found liable to Amgen for damages for infringing the patents.  *Id.* ¶¶ 130-131.

The district court held a two-week trial in September 2018.  *Immunex*, 395 F. Supp. 3d at 374.

Sandoz did not contest that Erelzi infringed the '182 and '522 patents, but argued that the patents

were invalid.  *Id.* at 375.  One of Sandoz's arguments invoked the doctrine of "obviousness-type

double patenting," which prohibits a patent from claiming an obvious variation of (*i.e.*, subject

matter "not patentably distinct from") a "commonly owned earlier patent."  *Eli Lilly & Co. v.

Barr Lab'ys, Inc.*, 251 F.3d 955, 967 (Fed. Cir. 2001).  The purpose of that doctrine is to prevent

an "unjustified timewise extension of the right to exclude."  *Id.* at 968.  The New Jersey court

rejected that argument and found the patents valid.  Compl. ¶ 133; *Immunex*, 395 F. Supp. 3d at

408-23.

On the basis of its ruling in Amgen's favor, the district court permanently enjoined

Sandoz from making, using, selling, or importing Erelzi or any other product containing

etanercept until the '182 and '522 patents expire.  ECF No. 49-1.  The Federal Circuit affirmed.

Compl. ¶ 135; *Immunex*, 964 F.3d at 1053.  The Supreme Court denied certiorari.  Compl. ¶ 136;

*Sandoz Inc. v. Immunex Corp.*, 141 S. Ct. 2623 (2021).

Samsung Bioepis Co., Ltd. ("Bioepis") developed Eticovo, another biosimilar version of

etanercept.  The FDA approved Eticovo on April 25, 2019.  Compl. ¶ 139.  On April 30, 2019,

Amgen filed a lawsuit against Bioepis in the District of New Jersey alleging that Eticovo

infringed the '182 and '522 patents (among others), *id.* ¶ 140, where the case was assigned to the

same district judge who had presided over the trial in the Sandoz case.  After the Federal Circuit

affirmed that district court's rejection of Sandoz's invalidity arguments and the Supreme Court

denied certiorari in 2021, the district court permanently enjoined Bioepis from making, using,

selling, or importing Eticovo or any other product containing etanercept until the '182 and '522 patents expire.  *Id.* ¶ 142; ECF No. 49-2.

Accordingly, today, federal-court injunctions prohibit Sandoz and Bioepis from marketing biosimilar versions of etanercept in the United States.

## VI.   Plaintiffs File This Lawsuit Complaining That Biosimilar Versions of Enbrel Have Not Entered

Plaintiffs' theory is that Amgen's conduct unlawfully "prevent[ed] competition from biosimilar versions of" Enbrel.  Compl. ¶ 4.  The operative Complaint, like the previous complaint, alleges four counts.  Count 1 seeks declaratory and injunctive relief under section 2 of the Sherman Act, 15 U.S.C. § 2.  Compl. ¶¶ 213-227.  Count 2 asserts claims under the antitrust laws of 31 states and the District of Columbia.  *Id.* ¶¶ 228-246.  Count 3 asserts claims under the consumer protection laws of 36 states and the District of Columbia.  *Id.* ¶¶ 247-487.  Count 4 asserts claims for unjust enrichment under the laws of 49 states and the District of Columbia.  *Id.* ¶¶ 488-711.

As discussed above, Plaintiffs' First Amended Complaint alleged in italics that the claims in the patent applications originally did not cover etanercept, and that Amgen engaged in an anticompetitive "scheme" to "rewr[ite]" and "reshape[]" those patent applications, prosecuting them "relentlessly for nearly a decade" until the Patent Office granted the '182 and '522 patents. ECF No. 40, ¶¶ 117, 119.  Plaintiffs' Second Amended Complaint removes the allegation that the patent applications did not cover etanercept and scrubs the word "scheme," instead characterizing the license itself as a "violation of the antitrust laws" and labeling the patent prosecution and judicial enforcement activity as "cause[s] of harm."  Compl. ¶ 198.

11

**JA0448**

**LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Satisfying that burden "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A legal conclusion couched as a factual allegation—such as an assertion that a defendant committed an unlawful act—is "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 678-80. Moreover, a complaint alleging "facts that are 'merely consistent with' a defendant's liability" fails Rule 12(b)(6) because it shows only a possible claim, not a plausible one. *Id.* at 678.

With respect to antitrust claims in particular, the Supreme Court has urged courts to dismiss claims that do not show a plausible entitlement to relief on the merits. Because "antitrust discovery can be expensive," it is "only by taking care to require allegations that reach the level suggesting" a violation that a court can "hope to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence'" to support a claim. *Twombly*, 550 U.S. at 558-59 (alteration in original). Thus, "some threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase." *Asahi Glass Co. v. Pentech Pharm., Inc.*, 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003) (Posner, J.), *quoted in Twombly*, 550 U.S. at 558.

As this Court recognized in *American Sales Co., LLC v. Pfizer, Inc.*, 2015 WL 13264206, at *4 n.4 (E.D. Va. Nov. 6, 2015), the *Noerr-Pennington* doctrine is a basis to dismiss an antitrust complaint on the pleadings as long as the relevant facts are pled in the complaint or

**JA0449**

subject to judicial notice.  *See, e.g.*, *Biltmore Co. v. NU U, Inc.*, 2016 WL 7494474, at *3-4 (W.D.N.C. Dec. 30, 2016) (dismissing counterclaims under *Noerr-Pennington* doctrine at the Rule 12(b)(6) stage); *RE/MAX LLC v. M.L. Jones & Assocs., Ltd.*, 2013 WL 4647517, at *3-4 (E.D.N.C. Aug. 29, 2013) (same); *Syngenta Crop Prot., LLC v. Atticus, LLC*, 2022 WL 842938, at *3-5 (E.D.N.C. Mar. 21, 2022) (same, because "the facts alleged in [the] counterclaims . . . contain facts sufficient to resolve whether the *Noerr-Pennington* doctrine applies").

## ARGUMENT

Plaintiffs' federal and state law claims are premised on the same theory.  Compl. ¶ 217 (Count 1); *id.* ¶¶ 231-233 (Count 2); *id.* ¶¶ 249-252 (Count 3); *id.*  ¶¶ 488-490 (Count 4). Plaintiffs allege "exclusionary, anticompetitive conduct that was designed to create and maintain Amgen's improper monopoly over etanercept and exclude or substantially exclude its biosimilars from the market." *Id.* ¶ 230.  In particular, Plaintiffs allege that Amgen "(i) willfully and unlawfully maintained and extended its monopoly power in the U.S. market for etanercept through the unlawful acquisition of the Brockhaus Patent Rights, and then by reason of that acquisition, (ii) prosecuted the [Brockhaus] '790 and '791 Applications to obtain the '182 and '552 Patents, and (iii) used those patents to buttress and entrench its monopoly and delay competition from would-be etanercept biosimilar competitors." *Id.* ¶ 198.  Plaintiffs do not allege, however, that Roche's licensing of the "Brockhaus Patent Rights" itself provided Amgen with any ability to block the biosimilar drugs at issue here.  According to the Complaint, Amgen obtained the right to stop sales of biosimilars only through rewriting the licensed applications and nearly a decade of petitioning efforts at the Patent Office, followed by successfully petitioning the federal courts to enforce those patents.

The First Amendment protects both forms of petitioning.  And without the protected petitioning, nothing is left of Plaintiffs' allegations.  Putting aside that a claim focusing solely on

13

**JA0450**

a 20-year-old license would be time-barred, the Complaint concedes that the license, as distinct from Amgen's petitioning the Patent Office to grant patents and petitioning the courts to enforce them, did not block competition or provide Amgen with the power to do so.

Plaintiffs also fail to state a claim for an additional and independent reason: their alleged injury was caused by federal-court injunctions, not by Amgen.  Plaintiffs claim that they paid inflated prices for Enbrel because Enbrel did not have to compete with biosimilars, but the District of New Jersey's injunctions are the reason that the biosimilars for etanercept are not on the market.  The federal court's decisions to issue injunctions break the causal chain as a matter of law.

**I.      Plaintiffs' Claims Fail Because Plaintiffs Have Not Alleged Actionable Exclusionary Conduct**

### A.      The First Amendment Forecloses Antitrust Liability for Conduct That Depends on Protected Petitioning

"The *Noerr-Pennington* doctrine guarantees citizens their First Amendment right to petition the government for redress without fear of antitrust liability."  *Baltimore Scrap*, 237 F.3d at 398.  The "right to petition extends to all departments of the Government," *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972), including petitioning the Patent Office to issue patents, *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068-71 (Fed. Cir. 1998), and filing lawsuits in the courts, *Baltimore Scrap*, 237 F.3d at 399 ("*Noerr-Pennington* immunity from antitrust laws extends to petitioning the courts as well.").

The First Amendment bars liability for petitioning even when it is designed and intended to harm competition.  An "anticompetitive purpose" does not make "attempts to influence public officials" illegal even if the defendant's "sole purpose" is to "destroy" competitors and "the resulting official action damaged other competitors at whom the campaign was aimed." *Pennington*, 381 U.S. at 669.

**JA0451**

None of the narrow exceptions to the First Amendment's protections applies here.  First, the *Noerr-Pennington* doctrine does not protect fraudulent enforcement of a patent, such as when a patent is obtained by "knowing and willful fraud" and then enforced with knowledge of that fraud.  *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 179 (1965).  But Plaintiffs do not allege that Amgen committed any fraud in connection with its patent prosecution or enforcement efforts.  Second, the First Amendment does not protect "sham" litigation, but Plaintiffs concede that Amgen's patent-infringement lawsuits succeeded on the merits: a federal district court in New Jersey found in favor of Amgen and issued permanent injunctions against both Sandoz and Biogen.  Compl. ¶¶ 137-138, 144.  A successful lawsuit is "by definition a reasonable effort at petitioning for redress and therefore not a sham."  *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 61 (1993).

Amgen's First Amendment immunity for its petitioning of the Patent Office and of a federal court forecloses liability for the series of events challenged in the Complaint.  The Supreme Court has made clear that constitutionally protected petitioning activity "is not illegal" even "*as part of a broader scheme* itself violative of the Sherman Act." *Pennington*, 381 U.S. at 670 (emphasis added).  The Fourth Circuit has confirmed that even "[i]f the courts are used or litigation is filed as part of an overall scheme to attempt to monopolize or exclude competition from the marketplace or otherwise violate the antitrust laws, that conduct" still enjoys antitrust immunity.  *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 691 F.2d 678, 688 (4th Cir. 1982).  Plaintiffs cannot impose liability on Amgen's petitioning activity by combining it with non-immunized conduct.  Courts do not "aggregate the effects of conduct immunized from antitrust liability with the effects of conduct not so immunized" because doing so "would nullify the immunity." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 839 (7th Cir. 2011).

15

**JA0452**

The decision of another district court in this Circuit in *Intellectual Ventures I LLC v. Capital One Financial Corp.*, 280 F. Supp. 3d 691 (D. Md. 2017), is instructive.  In that case, Capital One filed an antitrust counterclaim against Intellectual Ventures challenging its "acquir[ing]" patents from other entities on "technology essential to the types of services offered by commercial banks."  *Id.* at 696.  But Capital One could not show an anticompetitive effect solely through the asset acquisitions; it could "establish this effect" only by "rel[ying] on" Intellectual Ventures' "purported 'campaign'" of asserting some of its patents in court.  *Id.* at 706.  Like Amgen's patent-infringement lawsuits against Sandoz and Bioepis, Intellectual Ventures' campaign of patent-infringement lawsuits "was not sham litigation."  *Id.* at 716.  The court thus dismissed the *entire* antitrust claim because the litigation was "integral to Capital One's antitrust claims," *id.*, and Intellectual Ventures' "purported [anticompetitive] 'campaign[]' . . . could not succeed absent" the protected petitioning activity.  *Id.* at 706.

The court in *In re Humira (Adalimumab) Antitrust Litigation* similarly dismissed antitrust claims involving an alleged scheme to obtain and enforce valid patents relating to Humira, a product that competes with Enbrel.  In that case, AbbVie was accused of obtaining and then enforcing a so-called "thicket" of patents to prevent the sale of biosimilar versions of Humira.  *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811 (N.D. Ill. 2020), *aff'd sub nom. Mayor & City Council of Baltimore v. AbbVie Inc.*, 42 F.4th 709 (7th Cir. 2022).  The court found that "what plaintiffs allege[d] to be the heart of their monopolization claim" was "not immunized by the *Noerr-Pennington* doctrine."  *Id.* at 834.  Nonetheless, because the alleged scheme was also dependent on non-sham patent litigation protected by the First Amendment, the entire claim was subject to dismissal.  The court explained that "the entirety of [the] alleged monopolization scheme [was] immune, because plaintiffs' theory depends on all the components

16

**JA0453**

of AbbVie's conduct"—including the non-sham patent litigations—"as the means to suppress competition." *Id.*

The same is true here.  As in *Intellectual Ventures* and *Humira*, any alleged effect on competition depends on Amgen's protected activity.  Plaintiffs do not allege that Enbrel was covered by any of Roche's patents or patent applications at the time of their license to Amgen.  On the contrary, Plaintiffs allege that Amgen needed "about seven years" to overcome "reject[ions] . . . for obviousness and insufficient written description" and prevail in an "appeal to the Board of Patent Appeals" in order for the '182 and '522 patents to issue.  Compl. ¶¶ 119-123.  Plaintiffs' prior Complaint went into explicit details about how Roche's pending patent claims "*did not cover etanercept*" until Amgen obtained the right to prosecute the applications and "rewrote" the pending claims.  ECF No. 40, ¶¶ 117, 119, 155.  While Plaintiffs have removed some of those details from the First Amended Complaint in the hopes of skirting the arguments raised in Amgen's original motion to dismiss, the only allegations in the current Complaint about when Amgen gained the ability to exclude biosimilars still relate to Amgen's successful petitioning efforts before the Patent Office.  *See* Compl. ¶¶ 117-124 (allegations about Amgen's successful prosecution of the patent applications that issued as the '182 and '522 patents); *id.* ¶¶ 125-143 (allegations about Amgen's successful enforcement of the '182 and '522 patents, which "block[ed] biosimilar entrants . . . for etanercept").

Plaintiffs' failure to allege that the patent applications Amgen licensed from Roche conferred the power to exclude biosimilar etanercept products is fatal because "[p]atent applications, successful or not, do not impose costs on rivals; only issued patents do so." *Mayor & City Council of Baltimore*, 42 F.4th at 714.  The "right to exclude others from making, using, offering for sale, or selling [an] invention" does not "begin" until "the date on which the patent

17

**JA0454**

issues."  35 U.S.C. § 154(a).  That principle has been engrained in the patent laws for over 150 years.  *See Brown v. Duchesne*, 60 U.S. (19 How.) 183, 195 (1857) ("[A]n inventor has no right of property in his invention, upon which he can maintain a suit, unless he obtains a patent.").

Plaintiffs' observation that the claims of the '182 and '522 patents "were supported" by the "original specification" that Roche filed before entering into the exclusive license agreement adds nothing.  Compl. ¶¶ 120, 122.  Exclusive rights are demarcated by a patent's claims, not by a patent's or patent application's specification.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) ("The written description part of the specification itself does not delimit the right to exclude.  That is the function and purpose of claims."); *Novo Nordisk of N. Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1369 (Fed. Cir. 1996) ("The claims, however, not the specification, measure the protected patent right to exclude others.").  Filing a patent application that can "support" a claim to an invention does not provide the patent applicant with any right to exclude others from practicing the invention.

In short, Plaintiffs allege that Amgen was able to prevent biosimilar competition ***only*** through protected activities: petitioning the Patent Office and petitioning the federal courts.  Absent that protected activity, Amgen could not have excluded biosimilars.  And such protected activity "is not illegal" even if "part of a broader scheme itself violative of the Sherman Act."  *Pennington*, 381 U.S. at 670.

### B.   Plaintiffs Cannot Avoid This Result by Framing the Challenged Conduct as the License Alone

Plaintiffs' wordplay, such as editing the word "scheme" out of their complaint, does not avoid the clear legal rule that the First Amendment forecloses antitrust liability for a course of conduct that includes petitioning the government.  No matter how they frame their antitrust allegations, Plaintiffs cannot avoid the reality that their theory of competitive harm depends on

protected activity—namely, Amgen's petitioning the Patent Office and a federal court.  Without that activity, there is no alleged exclusion, and therefore the rule that protected activity is not actionable as "part of a broader scheme" still applies.  As in *Intellectual Ventures* and *Humira*, Amgen "could not succeed" in excluding competition without engaging in protected activity.  *Intell. Ventures*, 280 F. Supp. 3d at 706.  That is, any exclusion of competition "depends on" protected activity "as the means to suppress competition."  *Humira*, 465 F. Supp. 3d at 834.

Plaintiffs also cannot wedge this case into alignment with Judge Walker's decision in *CareFirst of Maryland, Inc. v. Johnson & Johnson*, 2024 WL 3858249 (E.D. Va. Aug. 16, 2024), by recharacterizing Amgen's petitioning of the Patent Office and successful litigation as having "caused anticompetitive harm."  Compl. ¶ 198.  Critically, the plaintiffs in *Johnson & Johnson* "sufficiently alleged *Walker Process* fraud" in prosecuting some of the patents at issue, piercing Johnson & Johnson's First Amendment immunity.  *Johnson & Johnson*, 2024 WL 3858249, at *11.  But there is no analogous allegation here.

Further, the *Johnson & Johnson* plaintiffs also challenged the defendant's enforcement of patents that it acquired from a third party, Momenta.  Unlike in this case, those patents conferred the power to block competition from biosimilars *at the time they were acquired*.  *Id.* (explaining that the acquired "patent portfolio included four patents covering technologies used to manufacture biosimilars").  Johnson & Johnson therefore did not need to petition the Patent Office with respect to the rights that it acquired from Momenta.  In other words, the plaintiffs in that case alleged that Johnson & Johnson obtained the right to exclude biosimilar competitors *through the acquisition itself*; thus, Johnson & Johnson's alleged ability to exclude competition did not depend on prosecution of the rights that it acquired.  On those facts, Judge Walker held that *Noerr-Pennington* did not bar the plaintiffs' claims.  Because the "plaintiffs' basis for

19

**JA0456**

antitrust *liability* is the acquisition of the Momenta patents" that itself enabled Johnson & Johnson to exclude competition, the Court found that later "enforcement lawsuits only constitute" the cause of the plaintiffs' "antitrust *injury*" from the exclusion created by the acquisition. *Id.* at \*15. In other words, Judge Walker held that Johnson & Johnson's unimmunized acquisition of the Momenta patents was sufficiently alleged to be independently anticompetitive. In those circumstances, the fact that Johnson & Johnson's enforcement of the patents was part of the causal chain that led to the exclusion of biosimilars and allegedly higher prices did not negate liability for the independently anticompetitive acquisition of patents.

The *Johnson & Johnson* case does not stand for the proposition that *any* combination of immunized activity and prior unimmunized activity can be actionable whenever the immunized activity is labeled the "cause" of the higher prices paid by the plaintiffs. To the contrary, Judge Walker's opinion recognized that immunized conduct such as bringing patent-infringement "litigation is *not* antitrust injury when there was no separate predicate anticompetitive act." *Id.* (emphasis added) (citing *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1564 (11th Cir. 1992)). That is exactly the situation here. As explained in another case on which Judge Walker relied, before a court can "ask whether the accused patent litigation was causally connected to these anticompetitive harms," the court "must first find that the other aspects of the scheme independently produce anticompetitive harms." *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007), *cited in Johnson & Johnson*, 2024 WL 3858249, at \*15. Because Plaintiffs here, unlike the plaintiffs in *Johnson & Johnson*, do not (and cannot) allege that the license itself gave Amgen any power to block biosimilar competition, they have not alleged that the license "independently produce[d] anticompetitive harms." Accordingly, Amgen's later protected activity cannot be characterized as merely "causally connected" to that

harm, as was the case in *Johnson & Johnson*.  Any other conclusion would "represent[] hostility to patent rights inconsistent with a modern understanding of intellectual property and competition law."  *Id.* at 1096.

*          *          *          *

In short, Plaintiffs cannot use artful pleading to evade the Supreme Court's holding that a plaintiff must allege anticompetitive conduct separate from protected activity in order to state an antitrust claim.  *Pennington*, 381 U.S. at 670.  If Amgen's alleged wrongdoing includes Amgen's petitioning of the Patent Office and successful litigation, then the First Amendment precludes liability as a matter of law.  But if Amgen's alleged wrongdoing does *not* include Amgen's protected activity, then Plaintiffs have not alleged that Amgen did anything that gave it the power to block competition.  Either way, Plaintiffs have failed to allege actionable anticompetitive conduct and their Complaint fails to state a claim.

## II.      Plaintiffs' Claims Fail Because Their Alleged Injuries Resulted from Court Action

Plaintiffs' claims fail for the additional, independent reason that any alleged injuries were caused by the decisions of the federal courts in the patent-infringement lawsuits.  Where alleged "monopolization is the result of valid governmental action, as opposed to private action, no violation of the [antitrust laws] can be made out."  *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961).  That is because when "anticompetitive harm is caused by the decision of a court [or other government entity], even though granted at the request of a private party, no private restraint of trade occurs because the intervening government action breaks the causal chain."  *Andrx*, 256 F.3d at 818; *see also In re Buspirone Pat. Litig.*, 185 F. Supp. 2d 363, 370 (S.D.N.Y. 2002) (when "private parties . . . obtain the anticompetitive effects in question by first convincing the government of the merits of their views and by obtaining a

21
**JA0458**

valid and independent governmental decision," the governmental decision "intervenes between the private parties' actions and these anticompetitive results").

Courts routinely rely on this principle to dismiss antitrust cases for failure to allege causation.  For example, in *Abbott Laboratories v. Adelphia Supply USA*, 2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017), Abbott was accused of violating the antitrust laws by prohibiting foreign dealers from reselling Abbott diabetes test strips into the United States.  The court dismissed that antitrust claim because it had enjoined the sale of those test strips in a trademark-infringement suit.  The court explained that the "inability to obtain and sell international test strips [] result[ed] not from any alleged anticompetitive activity, but from Abbott's protected First Amendment activity of filing this underlying trademark infringement law suit and this Court's granting of an injunction prohibiting the sale of diverted international strips in the domestic retail market."  *Id.* at *4.  The same principle has been widely applied elsewhere.[5]

This principle mandates dismissal here because Plaintiffs' Complaint alleges that the entry of the etanercept biosimilars was prevented by two federal-court injunctions.  Compl. ¶¶ 130-133, 142.  In the case against Sandoz, after a two-week bench trial the court upheld the validity of the '182 and '522 patents and permanently enjoined Sandoz from launching its product.  *Id.* ¶ 133; ECF No. 49-1.  The Federal Circuit affirmed, and the Supreme Court denied

---

[5] *See, e.g.*, *Associated Bodywork & Massage Pros. v. Am. Massage Therapy Ass'n*, 897 F. Supp. 1116, 1120 (N.D. Ill. 1995) (dismissing antitrust claim on the pleadings because "where . . . the alleged injury stems from a competitor's success in influencing legislation, that injury is caused by the state legislatures' political decisions, not by the competitor itself"); *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*, 17 F.3d 295, 300 (9th Cir. 1994) (dismissing antitrust claim alleging that defendant successfully advocated for standards-setting organization to amend code which local governments elected to adopt via legislation); *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026 (3d Cir. 1997) (dismissing antitrust claim by unaccredited law school alleging that American Bar Association had failed to accredit law school because the state, not the ABA, decided that graduates of unaccredited law schools could not take bar exam); *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378 (7th Cir. 1992) (similar).

22

**JA0459**

certiorari.  Compl. ¶¶ 135-136.  Similarly, in 2019, Amgen filed suit against Bioepis, asserting infringement of the '182 and '522 patents before the same district court that decided the Sandoz case.  *See id.* ¶ 140.  In 2021, after the Supreme Court denied certiorari in the Sandoz case, Bioepis consented to the federal court issuing another permanent injunction against it given the futility of pursuing the same patent invalidity arguments that Sandoz had already made and lost through appeals.  *Id.* ¶ 142; ECF No. 49-2.

Here again, the facts of this case distinguish it from *Johnson & Johnson*.  There, the sale of biosimilars was prevented not by a court order but by private litigation settlements.  *Johnson & Johnson*, 2024 WL 3858249, at *2; *see also id.* at *15 (observing that "defendants argue that the alleged use of their patents to settle with biosimilar manufacturers is not an actionable source of alleged anticompetitive behavior").  A settlement agreement generally constitutes "private conduct"—"not the result of a court decision" or other petitioning activity—and therefore does "not enjoy *Noerr-Pennington* immunity" afforded to petitions to agencies or the courts.  *Andrx*, 256 F.3d at 818-19.

In this case, by contrast, the barriers to entry of etanercept biosimilars are not private settlements but rather federal-court orders.  Those orders are "intervening government action" that "br[oke] the causal chain" as a matter of law.  *Id.* at 818.  Plaintiffs' claims therefore fail and must be dismissed with prejudice because no amended complaint could change the force of the District of New Jersey's permanent injunctions.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Second Amended Complaint with prejudice.

**JA0460**

Dated: January 8, 2025

Respectfully submitted,

  /s/ *Stephen E. Noona*
Stephen E. Noona (VSB No. 25367)
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510-1665
Telephone: (757) 624-3239
Facsimile: (888) 360-9092
senoona@kaufcan.com

Jonathan I. Kravis (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500 E
Washington, DC 20001
Telephone: (202) 220-1100
jonathan.kravis@mto.com

Rohit K. Singla (*pro hac vice*)
Justin P. Raphael (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
rohit.singla@mto.com
justin.raphael@mto.com

Faye P. Teller (*pro hac vice*)
Adam R. Lawton (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
faye.teller@mto.com
adam.lawton@mto.com

*Attorneys for Defendants Amgen Inc., Amgen
Manufacturing Limited LLC, and Immunex
Corporation*

24

**JA0461**

**CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2025, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

all counsel of record.

    /s/ *Stephen E. Noona*
Stephen E. Noona (VSB No. 25367)
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA  23510
Telephone: (757) 624-3239
Facsimile: (888) 360-9092
senoona@kaufcan.com

*Counsel for Defendants Amgen Inc., Amgen
Manufacturing Limited LLC, and Immunex
Corporation*

25
**JA0462**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

|  |  |
|---|---|
| CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., and CAREFIRST BLUECHOICE, INC., on behalf of themselves and all others similarly situated, <br><br>                     Plaintiffs,<br><br>          v.<br><br>AMGEN INC., AMGEN MANUFACTURING LIMITED LLC, and IMMUNEX CORPORATION,<br><br>                     Defendants. | Civil Action No. 2:24-cv-00484-AWA-LRL |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

JA0463

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................1

II.   FACTS ................................................................................................................3

      A.    Roche and Immunex researchers race to develop and patent TNFR fusion
            proteins...................................................................................................4

      B.    Immunex launches Enbrel and enters the 1998 License Agreement. ......................4

      C.    Amgen acquires Immunex. ......................................................................6

      D.    Amgen acquires the 2004 Exclusive License. ...........................................6

      E.    Amgen uses the rights conferred by the 2004 Exclusive License to obtain
            the '182 and '522 patents...........................................................................8

      F.    Amgen uses the '182 and '522 patents to block would-be biosimilar
            competitors..............................................................................................8

III.  LEGAL STANDARD..........................................................................................10

IV.   ARGUMENT.......................................................................................................10

      A.    Amgen violated the Sherman Act by acquiring an exclusive license to the
            Brockhaus patent rights............................................................................10

      B.    Amgen's antitrust violation is not retroactively immunized under *Noerr-
            Pennington.* ...........................................................................................14

      C.    Amgen's antitrust violation applies to the Brockhaus Patent Applications...........16

      D.    Amgen's implication that the '790 and '791 applications did not cover
            etanercept is demonstrably false. ............................................................20

      E.    Amgen's antitrust violation was a material and but-for cause of the
            plaintiffs' injury. ......................................................................................21

V.    CONCLUSION....................................................................................................27

i

**JA0464**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott Labs. v. Adelphia Supply USA*,
    No. 15-cv-5826, 2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017) ............................................25

*ABS Global, Inc. v. Inguran, LLC*,
    No. 14-cv-503, 2016 WL 3963246 (W.D. Wis. July 21, 2016)..................................... *passim*

*In re Actos End-Payor Antitrust Litig.*,
    848 F.3d 89 (2d Cir. 2017)....................................................................................................24

*In re Amgen Inc. & Immunex Corp.*,
    Docket No. C-4056 (F.T.C. 2002) .........................................................................................19

*Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*,
    297 F. Supp. 3d 222 (D. Mass. 2018) ....................................................................................23

*Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*,
    850 F.3d 52 (1st Cir. 2017)................................................................................................2, 14

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
    256 F.3d 799 (D.C. Cir. 2001) ..............................................................................................25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................................................10

*Associated Bodywork & Massage Prof'ls v. Am. Massage Therapy Ass'n*,
    897 F. Supp. 1116 (N.D. Ill. 1995) .......................................................................................25

*Automated Bldg. Components v. Trueline Truss Co.*,
    318 F. Supp. 1252 (D. Or. 1970) ...........................................................................................18

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979)...................................................................................................11

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
    483 F. Supp. 3d 38 (D. Mass. 2020) ......................................................................................14

*In re Buspirone Patent Litig.*,
    185 F. Supp. 2d 363 (S.D.N.Y. 2002).....................................................................................25

*CareFirst of Maryland, Inc. v. Johnson & Johnson*,
    --- F. Supp. 3d ---, No. 23-cv-629, 2024 WL 3858249 (E.D. Va. Aug. 16,
    2024) .............................................................................................................................. *passim*

ii

**JA0465**

*City of Long Beach v. Standard Oil Co. of Cal.*,
  872 F.2d 1401 (9th Cir. 1989) ...............................................................................22

*Coleman v. Md. Ct. of Appeals*,
  626 F.3d 187 (4th Cir. 2010) .................................................................................10

*Colonial Penn Ins. Co. v. Coil*,
  887 F.2d 1236 (4th Cir. 1989) .................................................................................3

*Com. Tankers Corp. v. Nat'l Mar. Union of Am., AFL-CIO*,
  553 F.2d 793 (2d Cir. 1977).................................................................................22

*In re Dr. Reddy's Labs., Ltd.*,
  No. 01-cv-10102, 2002 WL 31059289 (S.D.N.Y. Sept. 13, 2002) ........................24

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
  637 F.3d 435 (4th Cir. 2011) ...........................................................................10, 11

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)...............................................................................................19

*In re Engage, Inc.*,
  544 F.3d 50 (1st Cir. 2008)....................................................................................17

*Exxon Co., U.S.A. v. Sofec, Inc.*,
  517 U.S. 830 (1996)...............................................................................................26

*Fawzy v. Wauquiez Boats SNC*,
  873 F.3d 451, 455 (4th Cir. 2017) .........................................................................16

*In re Flonase Antitrust Litig.*,
  798 F. Supp. 2d 619 (E.D. Pa. 2011) .....................................................................23

*FTC v. Actavis, Inc.*,
  570 U.S. 136 (2013)...............................................................................................19

*In re Humira (Adalimumab) Antitrust Litig.*,
  465 F. Supp. 3d 811, 819, 830 (N.D. Ill. 2020), ...................................................16

*Int'l Wood Processors v. Power Dry, Inc.*,
  792 F.2d 416 (4th Cir. 1986) .................................................................................19

*Intel Corp. v. Fortress Inv. Grp. LLC*,
  No. 19-cv-7651, 2020 WL 6390499 (N.D. Cal. July 15, 2020) .............................15

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
  280 F. Supp. 3d 691 (D. Md. 2017).......................................................................16

**JA0466**

*Iron Workers Dist. Council of New Eng. Health & Welfare Fund v. Teva Pharms. USA, Inc.*,
   No. 23-11131, 2024 WL 4700248 (D. Mass. Nov. 6, 2024) ...................................................24

*Keen, Inc. v. Gecker*,
   264 F. Supp. 2d 659 (N.D. Ill. 2003) ...................................................................................17

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991).................................................................................................3

*Lawline v. Am. Bar Assoc.*,
   956 F.2d 1378 (7th Cir. 1992) ............................................................................................26

*Mason City Tent & Awning Co. v. Clapper*,
   144 F. Supp. 754 (W.D. Mo. 1956) ...................................................................................18

*Mass. Sch. of Andover, Inc. v. Am. Bar Assoc.*,
   107 F.3d 1026 (3d Cir. 1997)..............................................................................................26

*Mayor & City Council of Balt. v. Actelion Pharms. Ltd.*,
   995 F.3d 123 (4th Cir. 2021) ................................................................................................7

*Microsoft Corp. v. Motorola, Inc.*
   795 F.3d 1024 (9th Cir. 2015) ............................................................................................26

*In re NC & VA Warranty Co., Inc.*,
   554 B.R. 110 (M.D.N.C. 2016).............................................................................................3

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   42 F. Supp. 3d 231, 268 (D. Mass. 2014) ..........................................................................23

*Provepharm, Inc. v. Akorn, Inc.*,
   No. 17-cv-7087, 2019 WL 2443185 (E.D.N.Y. June 11, 2019)............................................24

*SCM Corp. v. Xerox Corp.*,
   645 F.2d 1195 (2d Cir. 1981)..................................................................................11, 12, 17

*Sessions Tank Liners, Inc. v. Joor Mf'g, Inc.*,
   17 F.3d 295 (9th Cir. 1994) ...............................................................................................26

*Spear Pharms., Inc. v. William Blair & Co., LLC*,
   610 F. Supp. 2d 278 (D. Del. 2009).....................................................................................24

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
   345 F. Supp. 3d 614, 682 (E.D. Va. 2018) .........................................................................26

*United States v. Griffith*,
   334 U.S. 100 (1948)...........................................................................................................11

iv

**JA0467**

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966)........................................................................................................10

*United States v. Hartford-Empire Co.*,
  46 F. Supp. 541 (N.D. Ohio 1942)...................................................................................18

*United States v. Singer Mfg. Co.*,
  374 U.S. 174 (1963)........................................................................................................18

*United States v. Walters*,
  510 F.2d 887 (3d Cir. 1975)..............................................................................................3

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*,
  156 F.3d 535 (4th Cir. 1998) ..........................................................................................21

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  395 U.S. 100 (1969)..................................................................................................21, 24

**Statutes**

35 U.S.C. § 102.....................................................................................................................17

35 U.S.C. § 135.....................................................................................................................18

35 U.S.C. § 261.....................................................................................................................17

**Other Authorities**

37 C.F.R. § 1.137..................................................................................................................18

37 C.F.R. § 41.202................................................................................................................18

Br. of the Fed. Trade Comm'n, *Amphastar Pharms., Inc. v. Momenta Pharms.*,
  No. 16-2113, 2016 WL 6833812 (1st Cir. Nov. 7, 2016).................................................15

Charles A. Wright et al., *Federal Practice and Procedure* (3d ed. 2002 & Supp.
  2024) ...............................................................................................................................16

Erik Hovenkamp & Herbert Hovenkamp, *Buying Monopoly: Antitrust Limits on
  Damages for Externally Acquired Patents*, 25 Tex. Intell. Prop. L.J. 39 (2017).....................16

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (5th ed. 2021)......................................12

v

## I.      INTRODUCTION

This civil action alleges that biopharmaceutical giant Amgen,[1] while monopolizing the United States market for the TNF inhibitor etanercept, unlawfully acquired exclusive rights to an etanercept-related patent portfolio held by drug maker Roche (known as the "Brockhaus patent rights") and later used some of those rights to preclude biosimilar competition for Amgen's blockbuster etanercept product Enbrel. Amgen's period of a lawful monopoly over the U.S. etanercept market should have ended by 2019 (and potentially as early as 2016). But, through its use of the unlawfully acquired exclusive license to two key patent applications included in the Brockhaus patent rights (the '790 and '791 applications), Amgen has extended its multi-billion-dollar monopoly by years already and, if not enjoined, will continue to extend it until 2029—securing Amgen an unprecedented *30 years* of patent exclusivity. The plaintiffs, health benefit plans that pay for the medical needs of their beneficiaries, have brought this suit on behalf of themselves and similar U.S. payers seeking injunctive relief and recovery of overcharges they paid as a result of Amgen's wrongful monopolistic acts.

Amgen's Rule 12(b)(6) effort is more notable for what it concedes than for what it argues. Amgen appears to acknowledge that a monopolist's acquisition of exclusive patent rights related to the subject matter of the monopoly can constitute anticompetitive conduct, a legal proposition this Court recently embraced in *CareFirst of Maryland, Inc. v. Johnson & Johnson*, --- F. Supp. 3d ---, No. 23-cv-629, 2024 WL 3858249, at *12 (E.D. Va. Aug. 16, 2024). Amgen does not challenge the adequacy of the complaint's allegations that Amgen holds a monopoly in the U.S. market for etanercept or that, while it held that monopoly in 2004, it purchased an

---

[1] As used herein, "Amgen" refers to all three defendants (Amgen Inc., Amgen Manufacturing Limited LLC, and Immunex Corporation) when any distinctions among the entities are immaterial.

1

exclusive license to the Brockhaus patent rights with anticompetitive purpose and effect. Nor does Amgen dispute the allegations that it used those patent rights to procure, and prosecute litigation over, patents that extend its monopoly for at least a decade. And Amgen does not contest the allegations that biosimilar competition has been, and continues to be, delayed by reason of these acts, causing billions of dollars in overcharges to etanercept purchasers.

The arguments Amgen does make lack merit.

*First*, Amgen argues that actions it took *after* it purchased the Brockhaus patent rights (i.e., prosecuting the '790 and '791 applications and filing infringement actions using the issued patents) are *Noerr-Pennington*-protected acts that somehow immunize it for its earlier unlawful acquisition. But this argument has repeatedly been discarded by federal courts; as the FTC succinctly states*, "Noerr* does not retroactively protect unlawful agreements or schemes to acquire, maintain, or jointly exercise market power that defendants subsequently exploit through litigation." *Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*, 850 F.3d 52, 57 n.3 (1st Cir. 2017).

*Second*, Amgen argues that, when it acquired exclusive rights to the '790 and '791 patent applications in 2004, these applications had not yet matured into issued patents. But this is a distinction without a legal difference. Patent applications are a powerful form of intellectual property that enable the holder to pursue patent protection and, in the meantime, exclude all others who may seek to patent the same invention. And that is why numerous courts hold that monopolistic acts of buying rights to patent applications, like issued patents, can violate antitrust law.

*Third*, Amgen repeatedly suggests that the '790 and '791 patent applications did not claim etanercept, but that is simply false. Roche was first to invent etanercept, and its

2

**JA0470**

applications covered p75 fusion proteins, including etanercept. Indeed, when Amgen enforced the patents it obtained from the Brockhaus patent rights, it represented to the federal court that when it "learned that Roche's pending patent applications covered etanercept, [Amgen's subsidiary] took a license" to those applications. Corrected Br. for Appellees at 1, *Immunex Corp. v. Sandoz Inc.*, No. 20-1037 (Fed. Cir. Dec. 13, 2019).[2]

*Finally,* Amgen argues that its unlawful purchase of exclusive patent rights from Roche should not be blamed for the supra-competitive overcharges in this case. It posits that the court judgments entered when it successfully enforced the patents against would-be biosimilar competitors allow the ten-year monopoly extension. But the law provides no such defense. Delayed biosimilar entry from patent litigation is a foreseeable consequence of the unlawful acquisition, and it does not break the causal chain.[3]

Amgen's motion should be denied. The parties should proceed to a Rule 26(f) conference, discovery, and trial.

## II.    FACTS

Enbrel is a brand-name biologic approved for the treatment of rheumatoid arthritis, plaque psoriasis, psoriatic arthritis, ankylosing spondylitis, and polyarticular juvenile idiopathic arthritis. Second Am. Class Action Compl. & Jury Demand ¶ 50, ECF No. 52 ("Compl."). The

---

[2] The Court may take judicial notice of documents filed in other courts. *See, e.g.*, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts . . . ."); *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) (taking judicial notice of pleas in related criminal case); *United States v. Walters*, 510 F.2d 887, 890 n.4 (3d Cir. 1975) (taking judicial notice of petitions and briefs filed in state courts); *In re NC & VA Warranty Co., Inc.*, 554 B.R. 110, 120–21 (M.D.N.C. 2016) (taking judicial notice of district court complaint).

[3] Amgen does not argue for dismissal of the plaintiffs' claims under state consumer protections laws or assert any statute-specific challenges to the plaintiffs' state antitrust law claims.

3

**JA0471**

active ingredient in Enbrel is etanercept, part of class of medications known as tumor necrosis factor (TNF) blockers. *Id.* ¶¶ 50, 59. TNF, a type of protein called a cytokine, activates inflammatory pathways by binding to one of two naturally existing TNF receptors (TNFRs), the p55 and the p75. *Id.* ¶¶ 58–60. Etanercept, a fusion protein combining a region of a p75 TNFR with a human immunoglobulin (IgG1), reduces inflammatory responses by making a protein that binds to and inhibits the activity of TNF. *Id.* ¶¶ 58–60.

**A. Roche and Immunex researchers race to develop and patent TNFR fusion proteins.**

In the mid-1980s, advances in the understanding of cytokines' role in inflammatory diseases sparked interest in the study and development of TNF blockers for therapeutic purposes, particularly at the drug companies Roche and Immunex. *Id.* ¶ 61. But it was the Roche inventors who were first to invent etanercept. *Id.* ¶¶ 62–66. Roche researchers were the first to isolate and sequence the p55 TNFR and investigate combining it with immunoglobulins (IgGs) to create fusion proteins to inhibit immune responses, and Roche published the amino acid sequences for both the p55 and p75 TNFRs in 1990. *Id.* ¶¶ 62–65. Roche was thus the first to file applications for patents covering etanercept, including three Swiss applications filed in 1989 and 1990. *Id.* ¶ 64 & n.23. The Swiss patents and their progeny are known as the Brockhaus patents. *Id.* ¶¶ 64–66 & fig. 1.

Meanwhile, Immunex's parallel research led to the development of the first etanercept product, Enbrel. *Id.* ¶¶ 67–73. Immunex applied for and was granted its own patents on etanercept, but these post-dated Roche's patents. *Id.* ¶¶ 70–72.

**B. Immunex launches Enbrel and enters the 1998 License Agreement.**

In November 1998, Immunex launched Enbrel into the United States marketplace. *Id.* ¶ 73. Heralded as an unrivaled breakthrough in rheumatoid arthritis treatment, Enbrel was an

**JA0472**

instant commercial success, earning Immunex $13 million in U.S. sales in its first few weeks on the market. *Id.* ¶¶ 74, 80.

When Immunex learned that Roche's pending patent applications covered etanercept, Immunex sought and obtained a license from Roche. *Id.* ¶ 76. On September 15, 1999, Immunex and Roche executed a license agreement, with retroactive effect to the date of Enbrel's launch, for the "Brockhaus patent rights," i.e., all "patents and patent applications that issue from or that claim priority of Swiss Patent Application Nos. 3319/89, 746/90, and/or 1347/90." *Id.* ¶¶ 76–77. (the "1998 License Agreement"). The 1998 License Agreement was non-exclusive in that Roche retained the right for itself or for a single third-party to make and distribute etanercept. *Id.* ¶ 77. Roche also "maintained all core patent rights—the right to prosecute, maintain and enforce" the Brockhaus patent rights. *Id.* ¶ 78.

**Figure 1. Brockhaus Patent Tree**

**JA0473**

### C.      Amgen acquires Immunex.

In December 2001, Amgen announced it was buying Immunex for $16 billion. *Id.* ¶ 85. Enbrel was the key driver of the deal for Amgen, which had not launched a significant new drug in a decade. *Id.* ¶ 86. The acquisition, completed on July 16, 2002, gave Amgen all rights to Enbrel in the United States. *Id.* ¶ 92.

Amgen immediately set out to maximize returns by increasing Enbrel sales, expanding its approved indications, and raising the price. *Id*. ¶¶ 93, 95. Sales of Enbrel skyrocketed to $1.25 billion in 2003 and $1.83 billion in 2004 and were projected to exceed $3 billion in the years thereafter, reaping massive profits for Amgen. *Id.* ¶¶ 96, 98. Free of competition, Amgen was able to raise the price of Enbrel every single year post-acquisition with no loss of sales. *Id.* ¶ 97. The complaint details at length how, by 2004, Amgen had substantial monopoly power over the U.S. market for etanercept. *Id*. ¶¶ 80–84, 177–96.

Though Amgen had built a thicket of peripheral patents around Enbrel, Immunex's core patents preventing biosimilars from launching were set to expire in 2012. *Id.* ¶ 99. So Amgen turned to another strategy: entrenching its Enbrel monopoly by acquiring exclusive patent rights it could use to block its competitors and extend its monopoly. *Id.*

### D.      Amgen acquires the 2004 Exclusive License.

In 2004, Amgen undertook to extend its monopoly over the U.S. market for etanercept by precluding the use of the Brockhaus patent rights by Roche or a Roche assignee and using those rights to keep all others out of the market. *Id.* ¶ 101. On June 7, 2004, Amgen and Roche signed an exclusive license agreement (the "2004 Exclusive License").[4] *Id.* ¶ 102. The 2004 Exclusive

---

[4] The complaint details how the agreement's title, "Accord and Satisfaction," is misleading. *Id.* ¶ 108.

License grants Amgen (i) a paid-up, irrevocable exclusive license to the Brockhaus patent rights in North America for the commercialization of etanercept, (ii) the right to prosecute any patent applications in the Brockhaus family, and (iii) the first right to sue for suspected infringement of any existing or future Brockhaus patents at its sole expense and under its sole control. *Id.* ¶¶ 105–06.

Key among the Brockhaus patent rights over which Amgen gained control via the exclusive license were the 08/444,790 ('790) and 08/444,791 ('791) applications. Both were divisional applications of Roche's earlier 08/095,640 ('640) application. Because that application claimed both the p55 and p75 fusion proteins, in response to a restriction requirement from the PTO, Roche opted to pursue claims related to the p75 fusion protein—i.e., covering etanercept— in the '790 and '791 applications. *Id.* ¶ 117. Roche filed those applications on May 19, 1995, just a few weeks before a GATT, a World Trade Organization treaty on patent rights, went into effect. As a result of the GATT amendments, patents issuing from applications filed before June 8, 1995, were entitled to the greater of 20 years from the application filing date or *17 years from the date of patent issuance*. *Id.* ¶ 118.[5]

As the complaint alleges, "[t]he purpose and effect of Amgen's acquisition of the 2004 Exclusive License was wholly anticompetitive." *Id.* ¶ 111. Amgen already had significant exclusivity rights under its own patents; it had used those patents to launch and protect Enbrel sales. *Id.* ¶ 112. To the extent Amgen needed a license from Roche, it already had one in the 1998 License Agreement; it did not need to further exclude others. *Id.* ¶ 113. The elimination of

---

[5] While Amgen opted to "[p]ut[] aside [whether] a claim focusing solely on a 20-year-old license would be time-barred," it plainly would not. *See Mayor & City Council of Balt. v. Actelion Pharms. Ltd.*, 995 F.3d 123, 132 (4th Cir. 2021) (cause of action accrues only when alleged damages occur, and a new cause of action accrues with each sale at allegedly supracompetitive prices).

Roche's (or a Roche's assignee's) rights to etanercept, and the shifting to Amgen of the ability to prosecute the applications and control future litigation was unnecessary for the development or sales of Enbrel. *Id.* ¶ 115. It was simply a method to extend and entrench an already-existing monopoly. *See id*. ¶¶ 111–16.

**E.      Amgen uses the rights conferred by the 2004 Exclusive License to obtain the '182 and '522 patents.**

From 2004 to 2011, Amgen prosecuted the '790 and '791 applications before the PTO without adding any new matter (and thereby maintaining the original priority date). *Id*. ¶¶ 117, 119–20, 122. On November 22, 2011, the PTO approved the '790 application and issued the 8,063,182 ('182) patent, which claims a fusion protein comprising the p75 TNFR and all but one domain of the constant region of an IgG heavy chain (i.e., etanercept). *Id*. ¶ 121. The '182 patent does not expire until November 22, 2028. *Id*. Five months later, the PTO approved the '791 application and issued the 8,163,522 ('522) patent, which claims a method of producing the fusion protein defined in the '182 patent. *Id*. ¶ 123. The '522 patent does not expire until April 24, 2029. Amgen had thus achieved its goal in seeking the exclusive license: securing two new Enbrel patents that would extend its monopoly for 17 more years. *Id.*

**F.      Amgen uses the '182 and '522 patents to block would-be biosimilar competitors.**

Using statutory and regulatory processes established to foster competition by biosimilar products, drug companies Sandoz and Bioepis, believing Amgen's market exclusivity for etanercept was nearing an end, began developing biosimilar versions of Enbrel. On September 5, 2015, Sandoz submitted an abbreviated biologics license application (aBLA) seeking FDA approval to market its biosimilar, Erelzi. *Id.* ¶ 127. In response, on February 26, 2016, Amgen sued Sandoz in federal court asserting infringement of '182 and '522 patents and seeking an

**JA0476**

injunction preventing Sandoz from commercializing Erelzi.[6] *Id.* ¶¶ 128, 131. The court entered a preliminary injunction on August 11, 2016, prohibiting Sandoz from launching Erelzi when the FDA approved the aBLA a few weeks later. *Id.* ¶ 130. The court subsequently entered an order stating that commercialization of Erelzi would infringe the '182 and '522 patents. *Id.* ¶ 132.

During a bench trial, Sandoz argued, *inter alia*, that Amgen's decision to take over the prosecution of and amend the '790 and '791 applications was "a clear indication that the original specifications as filed by Roche were deficient" and, because Amgen's amendments to the specifications constituted "new matter" not included in the original applications, the patents were invalid. *Id.* ¶ 134. Amgen opposed these arguments. *Id.* In its August 9, 2019 decision, the court sided with Amgen, agreeing that "the material added in the [patent application] amendments was sufficiently described in the applications as originally filed and that the amendments did not add new matter." *Id.* The court therefore affirmed the validity of the '182 and '522 patents and enjoined Sandoz from manufacturing or selling Erelzi (or any other etanercept product) until the patents expire. *Id.* ¶ 130.

Sandoz appealed to the Federal Circuit, arguing that Amgen's amendments to the '790 and '791 applications "show[ed] that the Roche inventors did not have possession of the full p75 sequence [i.e., etanercept] at the time of invention." *Id.* ¶ 135. The Federal Circuit disagreed, affirming the district court's decision on July 1, 2020. *Id.*

On April 25, 2019, the FDA approved an aBLA for Eticovo, an Enbrel biosimilar manufactured by Samsung Bioepis. *Id.* ¶ 139. On April 30, 2019, Amgen sued Bioepis in the District of New Jersey alleging that commercialization of Eticovo would infringe the '182 and

---

[6] While the complaint also alleged infringement of three of Amgen's own patents (U.S. Patent Nos. 7,915,225, 8,119,605, and 8,722,631), Amgen later dropped its claims for these patents, proceeding exclusively on the basis of the '182 and '522 patents. *Id.* ¶¶ 128–29.

'522 patents.[7] *Id.* ¶ 140. After, and as a result of, the Federal Circuit's affirmance of the *Sandoz*

decision, the court permanently enjoined Bioepis's launch of Eticovo until the '182 and '522

patents expire. *Id.* ¶ 142.

## III.     LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 540, 570 (2007)). But a

complaint "need only give the defendant fair notice of what the claim is and the grounds upon

which it rests." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (quoting

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). When ruling on the motion, the Court must "accept

as true all of the factual allegations contained in the complaint" and "draw all reasonable

inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637

F.3d 435, 440 (4th Cir. 2011) (quoting *Erickson*, 551 U.S. at 94, *and Nemet Chevrolet, Ltd. v.

Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009)).

## IV.     ARGUMENT

**A.     Amgen violated the Sherman Act by acquiring an exclusive license to the Brockhaus
       patent rights.**

To plead monopolization under Section 2 of the Sherman Act, a plaintiff must adequately

allege the defendant (1) "possess[ed] monopoly power in the relevant market" and (2)

"willful[ly] acqui[red] or maint[ained] that power as distinguished from growth or development

as a consequence of a superior product, business acumen, or historic accident." *United States v.*

---

[7] As in the Sandoz lawsuit, Amgen's original complaint against Bioepis also alleged infringement of the '225, '605, and '631 patents, but Amgen promptly dropped those claims. *Id.* ¶¶ 140–41.

*Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).[8] Courts have long recognized that "[c]onduct that might otherwise be lawful may be impermissibly exclusionary under antitrust law when practiced by a monopolist." *E.I. du Pont de Nemours*, 637 F.3d at 441; *see also id.* ("[A] monopolist is not free to take certain actions that a company in a competitive . . . market may take, because there is no market constraint on a monopolist's behavior." (quoting *LePage's, Inc. v. 3M*, 324 F.3d 141, 151–52 (3d Cir. 2003))). The "use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." *United States v. Griffith*, 334 U.S. 100, 107 (1948); *see also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir. 1979) ("The mere possession of monopoly power does not ipso facto condemn a market participant. But, to avoid the proscriptions of [Section] 2, the firm must refrain at all times from conduct directed at smothering competition.").

Conduct of a monopolist that can run afoul of Section 2 of the Sherman Act includes acquiring patent rights. This Court recently recognized in *Johnson & Johnson* that "a monopolist's acquisition of exclusive rights to patents related to the subject matter of the monopoly can constitute anticompetitive conduct as a matter of law." 2024 WL 3858249, at *12. Because determining when otherwise lawful patent acquisitions become unlawful requires balancing the competing goals of antitrust law (which proscribes monopolies) and patent law (which creates them), "the focus should be on the market power that will be conferred by the patent in relation to the market position acquired by the acquiring party." *Id.* (quoting *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1208 (2d Cir. 1981)); *see also SCM*, 645 F.2d at 1207 ("[A]nalyzing the lawfulness of the acquisition of a patent necessitates that we primarily focus

---

[8] The complaint alleges violations under both federal and state antitrust law. Amgen's motion draws no distinction between the two, and so for purposes of this motion the laws are treated the same.

**JA0479**

upon the circumstances of the acquiring party and the status of the relevant product and geographic markets at the time of the acquisition.").

An antitrust violation occurs when "the *dominant* competitor in a market acquires a patent covering a substantial share of the same market that he knows when *added* to his existing share will afford him monopoly power." *SCM*, 645 F.2d at 1205 (emphasis added); *see also ABS Global, Inc. v. Inguran, LLC*, No. 14-cv-503, 2016 WL 3963246, at *18 (W.D. Wis. July 21, 2016) ("[A]cquiring and asserting valid patents is absolutely protected by the patent laws 'in the absence of monopoly but, because of their tendency to foreclose competitors from access to markets or customers or some other inherently anticompetitive tendency, they are unlawful under § 2 if done by a monopolist[.]'" (second alteration in original) (quoting *City of Mishawaka, Ind.*, 616 F.2d at 976, 986 (7th Cir. 1980))); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 707a (5th ed. 2021) ("Acquisition by a monopolist of exclusive rights in related patents should presumptively be a § 2 'exclusionary practice.'"). The fact that "the asset acquired is a patent is irrelevant; in such a case the patented invention already has been commercialized successfully, and the magnitude of the transgression of the antitrust laws' proscription against willful aggregations of market power outweighs substantially the negative effect that the elimination of that class of purchasers for commercialized patents places upon the patent system." *SCM*, 645 F.2d at 1205.

Here, the complaint alleges—and Amgen does not dispute—that the relevant market is the United States market for etanercept and that, at all relevant times, Amgen had monopoly power in that market.[9] *See* Compl. ¶¶ 177–96. Nor does Amgen challenge the adequacy of the

_____

[9] While Amgen's motion suggests Amgen will later argue that Enbrel competes with other TNF inhibitors like Humira, Amgen concedes that "[w]hether Enbrel and Humira compete in the same antitrust market is not at issue in this motion." Defs.' Br. at 7 & n.4.

12

allegations that, (i) while controlling 100% of the etanercept market, it paid to convert its non-exclusive license with Roche to an exclusive license, and (ii) that, under the 2004 Exclusive License, Amgen acquired the rights to prosecute any pending Brockhaus patent applications, to sue potential competitors for infringement of any existing or future Brockhaus patents, and to exclude Roche or its assignees from entering the etanercept market. *See id.* ¶¶ 101, 106.

Amgen also does not challenge—as it cannot—the sufficiency of the allegations that its acquisition of the 2004 Exclusive License "was wholly anticompetitive" and served no procompetitive purpose.[10] *Id.* ¶¶ 111–15. As alleged, biosimilar competition in the U.S. etanercept market should have begun in 2019, if not earlier. *Id.* ¶ 150. But, through its acquisition of the 2004 Exclusive License, Amgen acquired patent rights enabling it to extend its monopoly for at least an additional *ten years* until 2029.

*Johnson & Johnson* is directly on point. The allegations here mirror those in *Johnson & Johnson*, where this Court denied a motion to dismiss the claim that the defendants' acquisition of Momenta's patent portfolio and use of those patent rights to exclude competitors from the ustekinumab market violated Section 2 of the Sherman Act. *See* 2024 WL 3858249, at *11–14. Based on the plaintiffs' allegations that the defendants (i) were monopolists in the U.S. market for ustekinumab, (ii) acquired, through their acquisition of Momenta, exclusive rights in four patents covering some of the processes used to manufacture biosimilars, (iii) are not biosimilar producers and thus had no procompetitive use for the acquired patents, and (iv) asserted the acquired patents against competitors in subsequent litigation, the Court held that the complaint

---

[10] Even if Amgen had given a procompetitive justification for the acquisition, it would be "a classic issue of disputed fact" inappropriate for resolution at the Rule 12 stage. *ABS*, 2016 WL 3963246, at *19; *see also Johnson & Johnson*, 2024 WL 385249, at *14 ("It may very well be true that defendant had a procompetitive reason for acquiring Momenta and its patent portfolio, and at a later stage of the litigation, defendants may pursue this argument.").

adequately established that the patent acquisition was presumptively a Section 2 exclusionary practice. 2024 WL 3858249, at *14. And *Johnson & Johnson* follows other courts presented with similar fact patterns. *See, e.g.*, *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 62, 67 (D. Mass. 2020) (denying motion to dismiss purchaser's claim that Bio-Rad, while possessing a 90% share of ddPCR market, further entrenched its monopoly and consolidated its hold on the market by acquiring a competitor and its patent portfolio); *ABS*, 2016 WL 3963246, at *3, *18–21 (denying defendants' motion for summary judgment on the plaintiff's claim that Inguran, a monopolist in the sexed bovine semen market, unlawfully maintained its monopoly by acquiring or obtaining exclusive licenses to dozens of patents related to this market).

**B.     Amgen's antitrust violation is not retroactively immunized under *Noerr-Pennington*.**

Implicitly conceding the legal proposition that a monopolist's acquisition of exclusive patent rights related to the subject matter of the monopoly can constitute anticompetitive conduct, Amgen argues that its actions *after* the unlawful acquisition—i.e., prosecuting patent applications and litigating infringement cases—are *Noerr-Pennington*-protected and thereby absolve it of any liability. But Amgen cannot launder its antitrust violation with later acts of enforcing unlawfully obtained rights.

This Court aptly noted in *Johnson & Johnson* that "there is a distinction between antitrust *liability* and antitrust *injury*. *Noerr-Pennington* stands for the proposition that litigation enforcing lawfully acquired patents cannot serve as a basis for antitrust liability. It does not, however, serve as a bar to asserting that patent enforcement litigation constitutes antitrust injury." 2024 WL 3858249, at *15; *see also Amphastar*, 850 F.3d at 57 ("Courts have recognized that '[t]here is an important difference, for purposes of the *Noerr-Pennington* doctrine, between using litigation . . . as a basis of antitrust liability and awarding damages for efforts to use the courts to carry out private cartel agreements.' *The mere existence of a lawsuit does not retroactively immunize prior*

14

**JA0482**

*anti-competitive conduct*." (emphasis added) (citations omitted) (quoting *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 374 (7th Cir. 1987)) (citing *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1561 (11th Cir. 1992))); *Intel Corp. v. Fortress Inv. Grp. LLC*, No. 19-cv-7651, 2020 WL 6390499, at *16 (N.D. Cal. July 15, 2020) ("[L]iability cannot be predicated on petitioning activity but if a defendant engages in anticompetitive conduct which does not constitute petitioning activity, it cannot immunize itself from liability for litigation-related damages if it asserts or tries to assert its unwarranted accumulation of market power through litigation."). As the FTC has explained:

> *Noerr* does not retroactively protect unlawful agreements or schemes to acquire, maintain, or jointly exercise market power that defendants subsequently exploit through litigation. [T]he defendants here seek to retroactively shield their alleged antitrust misconduct behind their right to bring a patent infringement action . . . . But while [an] infringement lawsuit might *itself* be protected by *Noerr*—in the sense that it cannot *alone* give rise to antitrust liability—when the lawsuit exploits market power acquired through an unlawful . . . agreement, the lawsuit cannot alone shield the . . . agreement from antitrust liability.

Br. of the Fed. Trade Comm'n, *Amphastar Pharms., Inc. v. Momenta Pharms.*, No. 16-2113, 2016 WL 6833812, at *11 (1st Cir. Nov. 7, 2016).

Despite Amgen's insistence otherwise, *see* Defs.' Br. at 18–21, the complaint does not allege a multi-part anticompetitive scheme in which Amgen's patent prosecution and litigation to enforce those patents are essential components of the violation: to the contrary, the complaint states explicitly that "*[t]he unlawful acquisition was the violation of the antitrust laws*, and the subsequent prosecution of the '790 and '791 Applications and enforcement of the '182 and '522

15

**JA0483**

Patents issued therefrom caused anticompetitive harm." Compl. ¶ 198 (emphasis added).[11] The scheme liability cases on which Amgen relies are therefore inapposite. The complaints at issue in *Intellectual Ventures* and *Humira* both alleged monopolistic schemes that, at their core, relied on the filing of serial sham infringement lawsuits to suppress competition; neither claimed that the defendants' patent acquisitions alone had the effect of extending or entrenching a monopoly. *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 280 F. Supp. 3d 691, 666–97, 706 (D. Md. 2017); *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 819, 830 (N.D. Ill. 2020), *aff'd sub nom. Mayor & City Council of Baltimore v. AbbVie Inc.,* 42 F.4th 709 (7th Cir. 2022).

**C.      Amgen's antitrust violation applies to the Brockhaus Patent Applications.**

Amgen argues that because the 2004 Exclusive License only provided an exclusive license to patent applications that had yet to ripen into issued patents, there should be no liability. This fails as a matter of law.

The alleged Section 2 violation was complete when Amgen, a monopolist with full control over the U.S. etanercept market, obtained in 2004 the exclusive license to the Brockhaus patent rights. *See* Erik Hovenkamp & Herbert Hovenkamp, *Buying Monopoly: Antitrust Limits on Damages for Externally Acquired Patents*, 25 Tex. Intell. Prop. L.J. 39, 56 (2017) ("[T]he

---

[11] The fact that the plaintiffs' first amended complaint at times erroneously characterized their claims as an anticompetitive scheme is irrelevant for purposes of the defendants' present motion. *See Fawzy v. Wauquiez Boats SNC*, 873 F.3d 451, 455 (4th Cir. 2017) ("Because a properly filed amended complaint supersedes the original one and becomes the operative in the case, it renders the original complaint 'of no effect.'" (quoting *Young v. City of Mt. Ranier*, 238 F.3d 567, 573 (4th Cir. 2001))); Charles A. Wright et al., *Federal Practice and Procedure* § 1476 (3d ed. 2002 & Supp. 2024) ("A pleading that has been amended under Rule 15(a) supersedes the pleading it modifies . . . . Once an amended pleading is interposed, the original pleading no longer performs any function in the case and any subsequent motion made by an opposing party should be directed at the amended pleading.").

**JA0484**

antitrust violation (the anticompetitive acquisition) arises at the time of the patent's assignment . . . ."). While the actionable injury—i.e., preventing Sandoz and Bioepis from launching competing biosimilars—did not materialize until the '182 and '522 patents issued and were enforced through litigation, the relevant question "is *not* whether the patent acquisitions actually enhanced [the monopolist's] market power, but rather whether they reflect [its] intent to *maintain* monopoly power through anticompetitive means." *ABS,* 2016 WL 3963246, at \*19. And where "the acquisition itself is unlawful, the subsequent exercise of the ordinarily lawful exclusionary power inherent in the patent [is] a continuing wrong, a continuing unlawful exclusion of potential competitors." *SCM*, 645 F.2d at 1206.

While only an issued patent confers the right to bring litigation, a patent application is nonetheless a valuable property right. Patent applications, like patents, are transferrable legal interests that can be assigned by written instrument. 35 U.S.C. § 261. The "rights afforded to a patent applicant put him in a strong bargaining position," even if the applicant fails to exercise those rights or the patent never issues. *Keen, Inc. v. Gecker*, 264 F. Supp. 2d 659, 663 (N.D. Ill. 2003) (quoting *Meehan v. PPG Indus., Inc.*, 802 F.2d 881 (7th Cir. 1986)). Courts have recognized that patent applications are sufficiently valuable to be included under the definition of bankruptcy property and subjected to attorney's liens. *See id.*; *In re Engage, Inc.*, 544 F.3d 50, 53–54 (1st Cir. 2008). The filing of a patent application also determines the priority date for any patent that issues from that application or any divisional or continuation applications that claim priority to it, which confers certain exclusionary rights. Since an application becomes invalidating prior art for any subsequently filed applications for the same invention, it can be used as a defense to block the issuance of other patents. 35 U.S.C. § 102(a)(2). An applicant can also, through the filing of an application, provoke an interference with another application or

17

**JA0485**

patent or petition to institute a derivation proceeding and thereby exclude other applicants from patenting the same invention. *See* 35 U.S.C. § 135 (pre-AIA); 37 C.F.R. §§ 1.137, 41.202.

For these reasons, courts do not distinguish between issued patents and patent applications in evaluating whether acquisitions of exclusive patent rights are anticompetitive. In *ABS*, for example, the court denied motions for summary judgment on the plaintiffs' claim that the defendant's acquisition of patents related to sexed semen sorting technology—which included the purchase of a competitor's *pending* patent applications—violated Section 2 of the Sherman Act. 2016 WL 3963246, at *31. The patent acquisitions the *ABS* court found unlawful consisted of (1) two patents owned by XY, Inc. to which the defendant became the sole licensee after it acquired that company; (2) several pending patent applications the defendant purchased from Monsanto, which later matured into 24 issued patents; and (3) 46 patents owned by Cytonome, Inc. to which the defendant obtained an exclusive license. *See id.* at *3. Courts also routinely find that agreements among dominant competitors to eliminate competition through cross-licenses to patent applications violate the antitrust laws. *See, e.g.*, *United States v. Singer Mfg. Co.*, 374 U.S. 174, 194–95 (1963) (finding agreements between sewing machine manufacturers to cross-license and assign patent applications in order to suppress competition from Japanese manufacturers violated Sherman Act); *Automated Bldg. Components v. Trueline Truss Co.*, 318 F. Supp. 1252, 1259–61 (D. Or. 1970) (holding that plaintiffs' acquisition of a patent application as part of a conspiracy to eliminate defendants from the industrial truss market constituted violations of the Sherman and Clayton Acts); *Mason City Tent & Awning Co. v. Clapper*, 144 F. Supp. 754, 767 (W.D. Mo. 1956) (agreement among three tent and awning manufacturers to grant licenses to each other's pending patent applications that included ability to veto additional licensees violated Sherman Act); *United States v. Hartford-Empire Co.*, 46 F.

18

**JA0486**

Supp. 541, 553 (N.D. Ohio 1942) (concerted acquisition of patent and patent applications covering methods of manufacturing glass containers by two dominant companies in the industry in order to eliminate competition violated Sherman and Clayton Acts). Indeed, Amgen's argument that there is a material difference between patents and patent applications is contradicted by Amgen's own experience during the FTC's review of its acquisition of Immunex. There, when Amgen entered a consent order agreeing to license certain patents to Serono to settle the FTC's claim that Amgen's proposed acquisition of Immunex could eliminate competition in the TNF inhibitor market, *see* Compl. ¶¶ 91–92, the FTC's final decision broadly defined "patents" to include "all patents, *patent applications* and statutory invention registrations . . . ." *In re Amgen Inc. & Immunex Corp.*, Docket No. C-4056 at 12–13 (F.T.C. 2002) (emphasis added).

All of this is consistent with the Supreme Court's directive that antitrust law should eschew "formalistic distinctions" in favor of "actual market realities" assessed "on a case-by-case basis, focusing on the particular facts disclosed by the record." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466–67 (1992); *see also FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) ("'There is always something of a sliding scale in appraising reasonableness,' and as such, 'the quality of proof required should vary with the circumstances.'" (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 780 (1999))). Here, Amgen's acquisition of exclusive patents rights for which it had no procompetitive use and use of those rights to prolong its Enbrel monopoly for an additional decade is precisely the type of situation where the anticompetitive effects substantially outweigh any "risk that application of the antitrust laws will frustrate the purposes of the patent laws." *Int'l Wood Processors v. Power Dry, Inc.*, 792 F.2d 416, 427 (4th Cir. 1986). Amgen cites no case that would compel this Court to find otherwise.

**JA0487**

**D.      Amgen's implication that the '790 and '791 applications did not cover etanercept is demonstrably false.**

Amgen's suggestion here that the '790 and '791 applications did not cover etanercept when Amgen acquired the 2004 Exclusive License, *see* Defs.' Br. at 4, 11, is a stunning reversal from the position it took throughout the underlying patent litigation in the District of New Jersey and in the Federal Circuit. There, Amgen insisted:

- "From the very first filing in August of 1990, the contents of the ['790 and '791] applications . . . described and enabled the p75 TNFR and fusions based on it." Amgen's Post-Trial Br. at 12, *Immunex Corp. v. Sandoz Inc.*, No. 16-cv-1118 (D.N.J. Oct. 23, 2018), ECF No. 645.

- "The Roche inventors were first to invent etanercept . . . . [W]hen Immunex learned that Roche's pending patent applications covered etanercept, Immunex took a license and agreed to pay substantial royalties." Corrected Br. for Appellees at 1, *Immunex Corp. v. Sandoz Inc.*, No. 20-1037 (Fed. Cir. Dec. 13, 2019).

- "Roche sought claims relating to p75 TNF fusions in the United States . . . well before Immunex . . . ." *Id*. at 16.

- "Immunex sought and obtained a license [to the '790 and '791 applications] because it expected that Roche would obtain U.S. patents covering etanercept." *Id.* at 17.

- "Immunex came up with etanercept, *after* Roche's invention." *Id*. at 76 (emphasis added).

As the complaint explains, the '790 and '791 applications *must* have covered etanercept when acquired because Roche filed them in response to the PTO's restriction requirement on the parent '640 application so it could pursue the non-elected claims related p75 fusion proteins. Nor did Amgen's amendments to those applications during prosecution fundamentally alter the nature of the original patents. If they had, Amgen would have risked forfeiting the pre-GATT filing dates and losing its patent infringement suit against Sandoz. That is why Amgen insisted throughout the patent litigation that its amendments to the applications "were supported by the original

20

**JA0488**

specification" and "brought the application into consonance with the earlier PTO restriction requirement." *Id.* ¶¶ 120, 122. Amgen's self-serving implications otherwise here are false.

**E.      Amgen's antitrust violation was a material and but-for cause of the plaintiffs' injury.**

To plead causation, the complaint must plausibly allege that the antitrust violation was a material and but-for cause of the plaintiff's injury. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n.9 (1969) ("It is enough that the illegality is shown to be a material cause of the injury."). On a motion to dismiss, a plaintiff "need only make a 'colorable' showing that it was 'reasonably probable' that the behavior in question caused their injury." *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 156 F.3d 535, 540 (4th Cir. 1998) (quoting *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 149 (4th Cir. 1990)). As this Court stated when presented with the same legal theory and similar facts in *Johnson & Johnson*, adequately pleading causation requires merely showing that the "acquisition of the [] patents caused a biosimilar to delay its entry into the market." 2024 WL 3858249, at *14 (citing *Crawl Space Door Sys. Inc. v. SmartVent Prods., Inc.*, No. 23-cv-629, 2020 WL 13691776, at *5 (E.D. Va. Apr. 8, 2020)).

The complaint easily satisfies this standard. It alleges that Amgen's anticompetitive conduct (acquiring, while a monopolist in the U.S. etanercept market, exclusive rights to patent applications covering Enbrel to extend its monopoly) was a material and direct cause of CareFirst's and the putative class's antitrust injury (paying higher prices for etanercept because Amgen's enforcement of the resulting patents against competitors prevented the launch of less expensive biosimilars). It alleges that Amgen's anticompetitive conduct (acquiring, while a monopolist in the U.S. etanercept market, exclusive rights to patent applications covering Enbrel to extend its monopoly) was a material and direct cause of CareFirst's and the class's antitrust

injury (paying higher prices for etanercept because Amgen's enforcement of the resulting patents against competitors prevented the launch of less expensive biosimilars). *See* Compl. ¶¶ 9–11, 100–16, 125–43, 151–55, 165. The complaint also alleges that, but for Amgen's anticompetitive conduct, Sandoz and Bioepis would have launched their etanercept biosimilars years earlier. *See id*. ¶¶ 149–55, 197–208; *see also infra* pp. 26–27 (discussing causation paths).

Amgen attempts to distinguish *Johnson & Johnson* by arguing that there is a difference between enforcement litigation that results in court orders as opposed to private settlements. *See* Defs.' Br. at 23. But *Johnson & Johnson* is not grounded on the notion of private settlements. As *Johnson & Johnson* reasons*,* "the patent enforcement litigation constitutes antitrust injury" and thus *Noerr-Pennington*, which only relates to whether an antitrust violation is immunized, is inapplicable. *See Johnson & Johnson*, 2024 WL 3858249, at \*15 ("Here, plaintiffs' basis for antitrust *liability* is the acquisition of the Momenta patents. And the enforcement lawsuits only constitute antitrust *injury*. Thus, *Noerr-Pennington* does not bar plaintiffs' claims.").

Amgen's assertions that court-ordered injunctions against Sandoz and Bioepis were an intervening government action that "'broke the causal chain' as a matter of law," Defs.' Br. at 1, 5, 14, 21, 23, are wrong on the law. *See, e.g.*, *Com. Tankers Corp. v. Nat'l Mar. Union of Am., AFL-CIO*, 553 F.2d 793, 800–01 (2d Cir. 1977) (citing *Noerr* and *Pennington* in rejecting the argument that "boycott under the antitrust laws can be immunized from liability by a later law suit to enforce it . . . the notion of [an injunction as a] superseding cause urged on us by [defendant] on appeal is simply inapplicable"); *id.* at 800 n.7 ("It is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute." (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11 (1972))); *City of Long Beach v. Standard Oil Co. of Cal.*, 872 F.2d 1401,

1409 (9th Cir. 1989) ("Mere ratification by government officials does not absolve an otherwise illegal conspiracy."). Intervening conduct "does not sever the chain of causation where that [third-party] conduct was a foreseeable consequence of the original antitrust violation." *In re Flonase Antitrust Litig.*, 798 F. Supp. 2d 619, 629–33 (E.D. Pa. 2011) (denying summary judgment where genuine issues of fact as to whether government actions were the foreseeable consequences of defendant's antitrust violations); *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 268 (D. Mass. 2014) (where the allegedly intervening government act "followed from a defendant's conduct in some way, liability may still attach"), *aff'd* 842 F.3d 34 (1st Cir. 2016).

The complaint plausibly alleges the court orders enforcing the Roche patents are the foreseeable consequences of Amgen's unlawful acquisition of exclusive patent rights. *See, e.g.*, Compl. ¶¶ 9–10, 111–16. Amgen nowhere analyzes foreseeability because foreclosure of biosimilar competition was the *only* plausible rationale for seeking the 2004 Exclusive License —Amgen had already sold Enbrel for six years without the Brockhaus patent rights and thus could not have plausibly needed the patent rights for any procompetitive purpose (such as to enable them to make and market Enbrel). *See id.* ¶¶ 2, 4, 6–7, 99, 101. These well-pleaded facts place this case squarely in line with numerous cases sustaining allegations of causation where government action was the foreseeable consequence of an independent antitrust violation. *See Johnson & Johnson*, 2024 WL 3858249, at *14–16 (allegations that unlawful acquisition of patents were then used to exclude competition sufficiently pleaded causation); *Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*, 297 F. Supp. 3d 222, 228 (D. Mass. 2018) (finding causation plausibly pleaded where defendant's deceptive behavior before the USP led to adoption of standard, causing the FDA to make generic approval conditional on use of procedure

23

**JA0491**

over which defendant held patent, thereby excluding rival from market); *Provepharm, Inc. v. Akorn, Inc.*, No. 17-cv-7087, 2019 WL 2443185, at *13–14 (E.D.N.Y. June 11, 2019) (similar allegations "sufficient to state a plausible claim that [counterclaim defendant's] conduct before the USP was a material cause of the antitrust injury"); *Spear Pharms., Inc. v. William Blair & Co., LLC*, 610 F. Supp. 2d 278, 287 (D. Del. 2009) (holding that defendant's filing of a citizen petition with the FDA, which led to a delay in the approval of plaintiff's ANDA, was not so "highly unforeseeable" as to be a superseding cause); *In re Dr. Reddy's Labs., Ltd.,* No. 01-cv-10102, 2002 WL 31059289, at *11 (S.D.N.Y. Sept. 13, 2002) (holding that allegations that defendant submitted data to the FDA, knowing that the FDA would use that data to delay ANDA review, satisfied proximate cause requirements for purposes of motion to dismiss).

Amgen asserts that the injunctions issued by the courts in the patent litigation are "*the reason*" for delayed competition. Defs.' Br. at 14 (emphasis added). But this ignores the plaintiffs' allegations of a prior antitrust violation and the principle that plaintiffs need not allege that defendant's anticompetitive conduct was the *sole* cause of its injury, only a material and but-for cause. *See In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 98 (2d Cir. 2017); *see Zenith Radio*, 395 U.S. at 114 n.9. The complaint clearly does so. *See supra* pp. 7–10.[12]

---

[12] A recent case in an analogous setting rejected the same argument that patent injunctions foreclose causation for antitrust violations. In *Iron Workers District Council of New England Health & Welfare Fund v. Teva Pharmaceuticals USA, Inc.*, the defendants argued that claims arising from a "pay-for-delay" agreement with the first-filer generic were foreclosed by a later district court decision upholding patent validity against a later-filer generic. No. 23-11131, 2024 WL 4700248, at *4–6 (D. Mass. Nov. 6, 2024). The court rejected this argument, noting that the "decision proves only that the specific design at issue violated Teva's patents, not that there is no plausible way for another company to design a different product without infringement." *Id.* at *6. Here, the complaint goes further, plausibly alleging three (uncontested) causation pathways under which the '182 and '522 patents would not have infringed an Amgen patent. *See infra* pp. 26–27.

Amgen's cases are inapposite, as each only addresses the *Noerr-Pennington* issue of *violation*, not causation. *See* Defs.' Br. at 21; *see also id.* (quoting *Noerr* as it relates to the issue of "violation"). And none were presented with the controlling legal issue here: whether an intervening cause qualifies as a superseding cause where the plaintiff pleads a prior antitrust violation.[13] For example, with respect to *Abbott Laboratories v. Adelphia Supply USA*, No. 15-cv-5826, 2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017), Amgen attempts to spin that court's statement of *fact* into a statement of *law*. *See* Defs.' Br. at 22 (quoting *Abbott* as saying competitor's exclusion "result[ed] not from any alleged anticompetitive activity"). *Abbott* nowhere addressed the legal question of whether the government action was superseding as a matter of law. Rather, it found that the plaintiff had failed to plead an independent *violation*, observing that while the plaintiff asserted claims under Section 1 of the Sherman Act, it did not allege any concerted action (the *sine qua non* of a Section 1 violation) or even *any* harm to competition. *See Abbott Labs.*, 2017 WL 5992355, at *2 ("Abbott principally argues that H&H fails to plead that Abbott's alleged vertical agreement has an actual adverse effect on the market such that it violates the antitrust laws . . ."); *id.* at *4 ("Because H&H does not allege that Abbott's packaging choices were anything other than 'wholly unilateral' . . . these alleged acts cannot form the basis of a § 1 claim."); *id.* at *5 (finding that the alleged unilateral conduct "is not even plausibly anticompetitive"); *see also In Associated Bodywork & Massage Prof'ls v. Am. Massage Therapy Ass'n*, 897 F. Supp. 1116, 1120 (N.D. Ill. 1995) (finding the "complaint

---

[13] Amgen cites (Defs.' Br. at 21–22) to inapposite quotations addressing *Noerr-Pennington* immunity where petitioning was the *only* challenged conduct. *See Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 818 (D.C. Cir. 2001) (pay-for-delay agreement not immune under *Noerr-Pennington*); *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 370 (S.D.N.Y. 2002) (fraudulent listing of patent in Orange Book not immune).

**JA0493**

contains assertions of no more" than petitioning).[14] Here, the complaint pleads that, by obtaining the 2004 Exclusive License, Amgen unlawfully extended its Enbrel monopoly for at least a decade and thereby caused the plaintiffs and class members to pay supracompetitive prices for etanercept.

Amgen's accusation that the plaintiffs are "asking this Court to nullify" or "change" injunctions, Defs.' Br. at 5, 23, is baseless. The complaint pleads damages through three plausible causation paths, none of which involve collateral review of, or modification to, the injunctions.[15] *See* Compl. ¶¶ 151–53. The complaint alleges that, absent Amgen's unlawful acquisition of the 2004 Exclusive License, either: (1) Roche would have developed and launched an etanercept biosimilar; (2) Roche would have licensed the Brockhaus patent rights to either or both of Sandoz and Bioepis, allowing for at least one licensed biosimilar launch, or (3) the '182 and '522 may not have issued at all (or issued in a form that did not block biosimilar entry). The first two causation paths do not implicate the injunctions, and the third posits a but-for scenario in which the injunctions do not exist in their current form and thus do not question the injunction. At the motion to dismiss stage, that is more than sufficient. *See e.g.*, *Exxon Co., U.S.A. v. Sofec,*

---

[14] Amgen's bid for an expansive reading of *Sessions Tank Liners, Inc. v. Joor Manufacturing, Inc.*, 17 F.3d 295 (9th Cir. 1994), in which petitioning was the *only* alleged activity, is incompatible with other Ninth Circuit cases. *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.* 795 F.3d 1024, 1047 (9th Cir. 2015) (*Noerr–Pennington* does not protect a patent holder from liability for filing infringement actions in violation of its covenant to negotiate with a RAND-rate license-seeker). Nor is causation even addressed in *Massachusetts School of Andover, Inc. v. American Bar Association*, 107 F.3d 1026 (3d Cir. 1997), or *Lawline v. American Bar Association*, 956 F.2d 1378 (7th Cir. 1992).

[15] Moreover, Amgen ignores that injunctive relief, including divestiture of the Roche patents, would not require collateral review of the patent infringement injunctions. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 345 F. Supp. 3d 614, 682 (E.D. Va. 2018), *aff'd in part and rev'd in part*, 988 F.3d 690 (4th Cir. 2021) (affirming order of divestiture after jury finding of antitrust violation where competitor acquired an input supplier).

*Inc.*, 517 U.S. 830, 840–41 (1996) ("The issues of proximate causation and superseding cause involved application of law to fact, which left to the factfinder, subject to limited review).

## V.    CONCLUSION

The Court should deny Amgen's motion to dismiss the plaintiffs' Second Amended Complaint.

January 29, 2025

Respectfully submitted,

/s/ William H. Monroe, Jr.
William H. Monroe, Jr. (Bar No. 27441)
Marc C. Greco (Bar No. 41496)
Kip A. Harbison (Bar No. 38648)
Michael A. Glasser (Bar No. 17651)
GLASSER AND GLASSER, P.L.C.
Crown Center, Suite 600
580 East Main Street
Norfolk, VA 23510
Telephone: (757) 625-6787
Facsimile: (757) 625-5959
bill@glasserlaw.com
marcg@glasserlaw.com
kip@glasserlaw.com
michael@glasserlaw.com

Thomas M. Sobol *(pro hac vice)*
Abbye R. Klamann Ognibene *(pro hac vice)*
Rachel Downey *(pro hac vice)*
Claudia Morera *(pro hac vice)*
HAGENS BERMAN SOBOL
SHAPIRO LLP
One Faneuil Hall Square, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
tom@hbsslaw.com
abbyeo@hbsslaw.com
racheld@hbsslaw.com
claudiam@hbsslaw.com

Peter D. St. Phillip *(pro hac vice)*
Uriel Rabinovitz *(pro hac vice)*
Raymond Girnys *(pro hac vice)*
Thomas K. Griffith *(pro hac vice)*

27

**JA0495**

LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: 914-997-0500
PStPhillip@lowey.com
URabinovitz@lowey.com
Rgirnys@lowey.com
tgriffith@lowey.com

*Counsel for Plaintiffs CareFirst of
Maryland, Inc., Group Hospitalization and
Medical Services, Inc., and CareFirst
BlueChoice, Inc.*

28

**JA0496**

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 29, 2025, I caused to be served a copy of the foregoing

Opposition to Defendants' Motion to Dismiss Second Amended Complaint on all counsel of

record via the Court's CM/ECF system.

/s/ William H. Monroe, Jr.
William H. Monroe, Jr.

29

**JA0497**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | |
|---|---|
| CAREFIRST OF MARYLAND, INC. et al.,<br><br>Plaintiffs,<br><br>v.<br><br>AMGEN INC. et al.,<br><br>Defendants. | No. 2:24-cv-00484-AWA-LRL |

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

.

**JA0498**

## TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................................1

Argument ..............................................................................................................................4

I.      Plaintiffs Have Not Alleged Actionable Exclusionary Conduct ........................................4

        A.      The Complaint Challenges Protected Petitioning Activity ......................................4

        B.      Even if the Exclusive License Could Be Considered in Isolation, Plaintiffs
                Cannot Allege That It Gave Amgen the Power to Exclude Biosimilars ..................5

                1.      Patent Applications Alone Do Not Exclude Competitors ............................7

                2.      Amgen Obtained the Right to Exclude Competitors Only Through
                        Its Constitutionally Protected Prosecution of the Patent
                        Applications ..............................................................................................10

II.     The District of New Jersey's Injunctions Break the Causal Chain ....................................13

Conclusion ............................................................................................................................17

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbey v. Mercedes Benz of North America, Inc.*,
138 F. App'x 304 (Fed. Cir. 2005) ......................................................................2, 7

*Abbott Laboratories v. Adelphia Supply USA*,
2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017).........................................................14

*ABS Global, Inc. v. Inguran, LLC*,
2016 WL 3963246 (W.D. Wis. July 21, 2016)..........................................................9

*American Science & Engineering, Inc. v. United States*,
8 Cl. Ct. 129 (1985) ..................................................................................................6

*Amphastar Pharmaceuticals, Inc. v. Momenta Pharmaceuticals, Inc.*,
297 F. Supp. 3d 222 (D. Mass. 2018) .....................................................................16

*Andrx Pharmaceuticals, Inc. v. Biovail Corp. International*,
256 F.3d 799 (D.C. Cir. 2001).................................................................................13

*Automated Building Components, Inc. v. Trueline Truss Co.*,
318 F. Supp. 1252 (D. Or. 1970) ..............................................................................9

*Baltimore Scrap Corp. v. David J. Joseph Co.*,
237 F.3d 394 (4th Cir. 2001) ....................................................................................5

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................................5

*Bio-Rad Laboratories, Inc. v. 10X Genomics, Inc.*,
483 F. Supp. 3d 38 (D. Mass. 2020) .........................................................................8

*Biocad, JSC v. F. Hoffman-La-Roche, Ltd.*,
2017 WL 4402564 (S.D.N.Y. Sept. 30, 2017).........................................................17

*CareFirst of Maryland, Inc. v. Johnson & Johnson*,
2024 WL 3858249 (E.D. Va. Aug. 16, 2024)................................................ *passim*

*In re Ciprofloxacin Hydrochloride Antitrust Litigation*,
261 F. Supp. 2d 188 (E.D.N.Y. 2003) .....................................................................17

*Commerce Tankers Corp. v. National Maritime Union of America*,
553 F.2d 793 (2d Cir. 1977).....................................................................................14

**JA0500**

*In re Dr. Reddy's Laboratories, Ltd.*,
    2002 WL 31059289 (S.D.N.Y. Sept. 13, 2002)........................................................16

*In re Flonase Antitrust Litigation*,
    798 F. Supp. 2d 619 (E.D. Pa. 2011) .....................................................................16

*Hartford-Empire Co. v. United States*,
    323 U.S. 386 (1945).................................................................................................8

*IGEN International, Inc. v. Roche Diagnostics GmbH*,
    335 F.3d 303 (4th Cir. 2003) ..................................................................................4

*Iron Workers District Council of New England Health & Welfare Fund v. Teva
    Pharmaceuticals USA, Inc.*,
    2024 WL 4700248 (D. Mass. Nov. 6, 2024) ........................................................15

*Laurel Sand & Gravel, Inc. v. CSX Transportation, Inc.*,
    924 F.2d 539 (4th Cir. 1991) ..................................................................................5

*Markman v. Westview Instruments, Inc.*:

    517 U.S. 370 (1996).............................................................................................13

    52 F.3d 967 (Fed. Cir. 1995).................................................................................12

*Mason City Tent & Awning Co. v. Clapper*,
    144 F. Supp. 754 (W.D. Mo. 1956) ........................................................................9

*Mayor & City Council of Baltimore v. AbbVie Inc.*,
    42 F.4th 709 (7th Cir. 2022) ...................................................................................7

*In re Nexium (Esomeprazole) Antitrust Litigation*,
    42 F. Supp. 3d 231 (D. Mass. 2014) .....................................................................16

*Novo Nordisk of North America, Inc. v. Genentech, Inc.*,
    77 F.3d 1364 (Fed. Cir. 1996)...............................................................................13

*Provepharm, Inc. v. Akorn, Inc.*,
    2019 WL 2443185 (E.D.N.Y. June 11, 2019) ......................................................16

*SCM Corp. v. Xerox Corp.*,
    645 F.2d 1195 (2d Cir. 1981)............................................................................8, 12

*Spear Pharmaceuticals, Inc. v. William Blair & Co., LLC*,
    610 F. Supp. 2d 278 (D. Del. 2009).......................................................................16

*United Mine Workers of America v. Pennington*,
    381 U.S. 657 (1965)............................................................................................1, 4

iii

**JA0501**

*United States v. Singer Manufacturing Co.*,
   374 U.S. 174 (1963)...................................................................................................9

*Wiseman v. First Mariner Bank*,
   2013 WL 5375248 (D. Md. Sept. 23, 2013) .......................................................1, 5, 6

**FEDERAL STATUTES**

35 U.S.C. § 154(a) ...................................................................................................2, 7

35 U.S.C. § 281...............................................................................................................7

35 U.S.C. § 283...............................................................................................................7

**FEDERAL RULES**

Fed. R. Civ. P. 65(c) .................................................................................................15

**TREATISES**

Philip E. Areeda & Herbert Hovenkamp,
   *Antitrust Law*, ¶ 202c (5th ed. 2021) .....................................................................14

**INTRODUCTION**

Plaintiffs' opposition confirms that permitting their claims to proceed would require ignoring Supreme Court precedent, violating the First Amendment, and abrogating fundamental principles of patent law.

*First*, Plaintiffs do not dispute that, under Supreme Court precedent, the First Amendment forecloses any claim based on Amgen's petitioning of the PTO and lawsuits in federal court either alone or as part of an alleged scheme. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965). That is fatal to Plaintiffs' case because Plaintiffs' Complaint alleges that the exclusion of biosimilar competitors depended entirely on Amgen's protected activity, including years of patent prosecution. The connection between Amgen's right to exclude and Amgen's protected activity explains why Plaintiffs alleged in their prior complaints that the 2004 agreement, the patent prosecution, and the patent-infringement lawsuits were all part of the supposedly anticompetitive "scheme."

Plaintiffs' response is that they have dropped the word "scheme" from their current Complaint supposedly because the prior complaints "erroneously characterized" the alleged facts, Opp. 16 n.11, but Plaintiffs cannot use wordplay to evade Supreme Court precedent and the First Amendment. Whether Plaintiffs have stated a claim depends on the facts that Plaintiffs have alleged, not on how Plaintiffs characterize their factual allegations. And the facts Plaintiffs continue to allege are that Amgen took a license to patent applications from Roche, prosecuted those applications for seven years, and then enforced the patents that it petitioned the PTO to issue. That set of conduct consists of activity protected by the First Amendment and thus, under Supreme Court precedent, cannot support a claim.

Plaintiffs insist that they are now alleging that the 2004 agreement "alone" was unlawful. Opp. 16. But Plaintiffs do not and cannot allege that Amgen's acquisition of rights to patent

1

**JA0503**

*applications* in 2004—before seven years of petitioning the PTO—gave Amgen any power to exclude competition.  For one thing, the Patent Act expressly provides that only a "patent" grants "the right to exclude others."  35 U.S.C. § 154(a).  Plaintiffs concede that "only an issued patent confers the right to bring litigation."  Opp. 17.  It is a fundamental rule of patent law that a "patent application cannot be infringed."  *Abbey v. Mercedes Benz of N. Am., Inc.*, 138 F. App'x 304, 307 (Fed. Cir. 2005).  Accordingly, Plaintiffs can cite no case holding that the acquisition of rights to patent applications alone can violate the antitrust laws or exclude competition.  Plaintiffs focus on *CareFirst of Maryland, Inc. v. Johnson & Johnson*, 2024 WL 3858249 (E.D. Va. Aug. 16, 2024), but that case involved the acquisition of issued *patents—*not the licensing of rights to pending patent applications.

Even if in theory the licensing of patent applications could be anticompetitive on some set of facts, Plaintiffs have not pled such facts here.  Amgen, through Roche, obtained patents conferring the right to exclude only after Amgen spent seven years prosecuting the patent applications before the PTO.  Thus, this is not a case where obtaining rights to patent applications was essentially the same as obtaining rights to issued patents.  Indeed, Plaintiffs do not even allege that the then-pending claims of the patent applications that Amgen licensed from Roche covered etanercept at the time that Amgen took the license.  Therefore, according to Plaintiffs' complaint, the patent applications would not have excluded competing biosimilar etanercept products if they had issued as patents at the time they were licensed.  Accordingly, there is no basis to treat licensing the patent applications as equivalent to acquiring patents.

In short, Plaintiffs' claims fail regardless of whether the 2004 agreement is part of a scheme or stands alone.  If the agreement was part of a scheme that included Amgen's petitioning of the PTO and filing infringement lawsuits in federal court, then Supreme Court

2

precedent holds that the First Amendment bars liability. But if the supposed antitrust violation consists only of the 2004 agreement to license pending patent applications, then Plaintiffs have not alleged any exclusionary conduct because the license to pending patent applications did not give Amgen any power to exclude biosimilar competitors. Amgen acquired that right only after petitioning the PTO for seven years. When the PTO issued patents following Amgen's petitioning, the claims in those patents were different from the claims in the patent applications when Amgen took a license to them from Roche.

*Second*, even if Plaintiffs could overcome all those obstacles, Plaintiffs' claims also fail because they run directly into another federal court's injunction. The District of New Jersey has issued orders prohibiting the sale of the only two FDA-approved biosimilar versions of Enbrel— the competitors that Plaintiffs say have been wrongfully excluded. Plaintiffs cite no case in which a court permitted an antitrust plaintiff to seek damages arising from a lack of competition that was permanently enjoined by a court order. Such a claim would be a collateral attack by one federal court on the orders issued by another. Plaintiffs cite the *Johnson & Johnson* case, but it did not involve a claim of injury stemming from another court's injunction. Plaintiffs provide no sound reason why this Court should be the first to recognize an antitrust claim premised on the inability to purchase products that another district court has enjoined.

The Second Amended Complaint should be dismissed with prejudice. Plaintiffs cannot change the facts about either the 2004 agreement giving Amgen rights to patent applications or the District of New Jersey's injunctions.[1]

---

[1] Amgen's motion addresses all claims in the Complaint, contrary to Plaintiffs' assertion that "Amgen does not argue for dismissal of the plaintiffs' claims under state consumer protection[] laws." Opp. 3 n.3. As Amgen's motion papers explained, and Plaintiffs do not dispute, all of Plaintiffs' claims "are premised on the same theory." ECF No. 56 at 13. Thus, Amgen's motion requests dismissal of the entire Complaint rather than only a subset of claims. *Id.* at 23. Indeed,

**ARGUMENT**

**I.**     **Plaintiffs Have Not Alleged Actionable Exclusionary Conduct**

**A.**     **The Complaint Challenges Protected Petitioning Activity**

Plaintiffs do not dispute that the *Noerr-Pennington* doctrine and the First Amendment foreclose liability for both (a) Amgen's efforts to prosecute the patent applications that issued as the '182 and '522 patents and (b) Amgen's successful enforcement of those patents against Sandoz and Bioepis in the District of New Jersey.  Plaintiffs also cannot dispute that, under Supreme Court precedent, the *Noerr-Pennington* doctrine and the First Amendment foreclose liability for an anticompetitive "scheme" that includes patent prosecution and patent lawsuits. *See Pennington*, 381 U.S. at 670.

That should be the end of this case.  According to the Complaint, Amgen's 2004 license and its later patent prosecution and patent lawsuits are part of the same course of conduct alleged to have excluded competition.  After all, Plaintiffs previously alleged in this Court that Amgen's patent prosecution and patent lawsuits were part of a "scheme" that included an exclusive license from Roche.  ECF No. 40, ¶¶ 1, 5, 200, 201, 220.  Their current Complaint continues to allege that the "prosecution" and "enforcement" of patents "caused anticompetitive harm."  Compl. ¶ 198.  And Plaintiffs' opposition argues that it was "Amgen's enforcement" of "patents against competitors that prevented the launch of less expensive biosimilars."  Opp. 21.

In a footnote, Plaintiffs say that their "first amended complaint at times erroneously characterized their claims as an anticompetitive scheme."  Opp. 16 n.11.  But Plaintiffs cannot

---

because the *Noerr-Pennington* doctrine is premised on the exercise of a federal constitutional right, it immunizes Amgen's conduct not only from antitrust liability, but also from liability under all manner of state-law business torts.  *See IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003).  Likewise, state law cannot undo the effect of federal-court injunctions.

4

plead around Supreme Court precedent and the First Amendment by using different words to describe their allegations. Whether a complaint surmounts Rule 12(b)(6)'s plausibility threshold depends upon its "[f]actual allegations," not its "labels and conclusions, [or] a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[A] reviewing court must disregard 'labels and conclusions.'" *Wiseman v. First Mariner Bank*, 2013 WL 5375248, at \*18 (D. Md. Sept. 23, 2013). Accordingly, it does not matter that Plaintiffs have added the legal conclusion that "[t]he unlawful acquisition was the violation of the antitrust laws." Opp. 15 (quoting Compl. ¶ 198).

The *Noerr-Pennington* doctrine "guarantees citizens their First Amendment right to petition the government for redress without fear of antitrust liability." *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 398 (4th Cir. 2001). Deleting the word "scheme" does not wipe away that constitutional guarantee. The First Amendment bars Plaintiffs' claims that Amgen excluded competition by licensing patent applications, petitioning the PTO for seven years, and then enforcing the resulting patents.

**B.     Even if the Exclusive License Could Be Considered in Isolation, Plaintiffs Cannot Allege That It Gave Amgen the Power to Exclude Biosimilars**

In their amended complaint, Plaintiffs try to carve off the 2004 exclusive license from Amgen's constitutionally protected patent prosecution and successful lawsuits as if their claim challenged the exclusive license standing alone. Plaintiffs allege that the 2004 agreement was "the violation of the antitrust laws," Compl. ¶ 198, and argue in their opposition that the "violation was complete when Amgen . . . obtain[ed] in 2004 the exclusive license to the Brockhaus patent rights." Opp. 16. But Plaintiffs do not dispute that exclusionary conduct is an essential element of their claims. *See Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 544 (4th Cir. 1991); *Johnson & Johnson*, 2024 WL 3858249, at \*3. Thus, to allege that a

5

**JA0507**

"violation was complete" when Amgen executed the 2004 license—*before* Amgen exercised its First Amendment right to petition the PTO—Plaintiffs must allege that the 2004 license *itself* was exclusionary at the time it was executed.

Plaintiffs do not—and as a matter of law cannot—allege this necessary fact. *First*, at the time of the 2004 license, the '182 and '522 patents that Amgen successfully enforced against biosimilars had not issued. While Roche had filed *applications* that ultimately led to those patents being issued, the patents were not granted until after Amgen spent seven years petitioning the PTO.[2] Taking Amgen's constitutionally protected efforts before the PTO out of the picture, this case is about the acquisition of rights to patent *applications*. But unlike patents, which grant "the right to exclude others from making, using, or selling the invention," there is "no such right in a patent application." *Am. Sci. & Eng'g, Inc. v. United States*, 8 Cl. Ct. 129, 142-43 (1985).

*Second*, even if taking a license to patent applications that do not create any right to exclude could be exclusionary in some situations, Plaintiffs have not alleged facts supporting the inference that Amgen's license of patent applications from Roche was exclusionary. To the contrary, Plaintiffs allege a wide gulf between the patent applications that Amgen licensed from Roche and the patents that the PTO issued to Amgen. Plaintiffs allege that Amgen spent seven years prosecuting the patent applications before the PTO issued patents from them. And Plaintiffs do not allege that the claims in the patent applications even covered etanercept at the time Amgen licensed them from Roche, meaning that the claims would not have excluded etanercept biosimilars if they had issued at that time. That set of facts does not support a novel

---

[2] The exclusive license also included issued U.S. patents, but Plaintiffs do not allege that those patents related to etanercept or that Amgen sought to enforce those patents against biosimilars. Accordingly, those patents are immaterial to Plaintiffs' theory.

claim that licensing patent applications can be exclusionary even though patent applications do not confer a right to exclude.

**1.      Patent Applications Alone Do Not Exclude Competitors**

Plaintiffs' theory that an agreement giving Amgen the right to prosecute patent applications was exclusionary fails out of the gate because patent applications do not exclude competitors.  Acquiring patent rights cannot have "the effect of increasing or prolonging the monopolist's market power" unless those rights "exclude rivals from the market." *Johnson & Johnson*, 2024 WL 3858249, at *14.  Courts have thus held that some acquisitions of a patent can have "the effect of increasing or prolonging the monopolist's market power because competitors cannot use the patented invention." *Id.*  But a patent application does not prevent competitors from doing anything.

A "patent" is "a grant to the patentee . . . of the right to exclude others."  35 U.S.C. § 154(a).  A patent application is not.  The "right to exclude others from making, using, offering for sale, or selling [an] invention" does not "begin" until "the date on which the patent issues." *Id.*  As Plaintiffs concede, "only an issued patent confers the right to bring litigation."  Opp. 17. The law provides a remedy for "infringement of [a] patent," 35 U.S.C. § 281, whereas "[a] patent application cannot be infringed," *Abbey, Inc.*, 138 F. App'x at 307.  Courts have the power to "grant injunctions" to prevent violations of "right[s] secured by patent," not by patent application.  35 U.S.C. § 283.  In short, "[p]atent applications, successful or not, do not impose costs on rivals; only issued patents do so." *Mayor & City Council of Baltimore v. AbbVie Inc.*, 42 F.4th 709, 714 (7th Cir. 2022).

Because patent applications do not exclude competition, Plaintiffs cannot allege that an agreement granting Amgen an exclusive license to patent applications and the right to prosecute those applications excluded competition.  Roche's rights gave Amgen the power to exclude

**JA0509**

biosimilar versions of etanercept in the United States only when the PTO issued the '182 and '522 patents after Amgen's seven years of prosecution efforts—the conduct protected by the First Amendment that Plaintiffs are trying to carve out of their claim.

Plaintiffs do not cite any case in which a court has recognized a claim that a defendant violated the antitrust laws simply by acquiring rights under pending patent applications. Plaintiffs' cases involve the acquisition of *patents*. For example, Plaintiffs cite *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir. 1981), in which the Second Circuit held that the "acquisition of a *patent*" can, in some circumstances, violate the antitrust laws. *Id.* at 1207 (emphasis added). Similarly, the court in *Bio-Rad Laboratories, Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38 (D. Mass. 2020), explained that "[t]he acquisition of *patents* can constitute monopolization." *Id.* at 63 (emphasis added). Likewise, in *Hartford-Empire Co. v. United States*, 323 U.S. 386 (1945), "[t]he charge" was that "the defendants agreed, conspired, and combined to monopolize, and did monopolize and restrain interstate and foreign commerce by acquiring *patents*" without which other companies could not compete. *Id.* at 392 (emphasis added).

Similarly, in *Johnson & Johnson*, the court denied a motion to dismiss because it recognized that "there are circumstances where the acquisition of *patents* can constitute an antitrust violation." 2024 WL 3858249, at *12 (emphasis added). The allegedly unlawful transaction in that case involved the sale to Johnson & Johnson of four patents that had already issued: "The acquisition gave J&J exclusive rights to Momenta's four biosimilar manufacturing *patents*." *Id.* at *2 (emphasis added). Accordingly, *Johnson & Johnson* is not "directly on point" as Plaintiffs contend (Opp. 13) because that case, unlike this one, involved the acquisition of issued patents.

**JA0510**

None of Plaintiffs' other authorities involved a claim that a single firm monopolized a market by acquiring the right to prosecute patent applications alone, so Plaintiffs are incorrect that "courts do not distinguish between issued patents and patent applications in evaluating whether acquisitions of exclusive patent rights are anticompetitive." Opp. 18. Plaintiffs cite *ABS Global, Inc. v. Inguran, LLC*, 2016 WL 3963246 (W.D. Wis. July 21, 2016), but the Court in that case held that the "acquisition of *patents* may qualify as unlawful under the Sherman Act." *Id.* at *18 (emphasis added). In *United States v. Singer Manufacturing Co.*, 374 U.S. 174 (1963), the claim was that two competitors "engaged in a series of transactions" to block "their common competitors." *Id.* at 189. It was that "concerted action to restrain trade, clearly established by the course of dealings, that condemn[ed] the transactions under the Sherman Act." *Id.* at 195. Here, by contrast, Plaintiffs allege that Amgen acted unilaterally to maintain a *monopoly* by acquiring patent applications. That also distinguishes Plaintiffs' other cases. *See Automated Bldg. Components, Inc. v. Trueline Truss Co.*, 318 F. Supp. 1252, 1261 (D. Or. 1970) ("joint effort to eliminate" the antitrust plaintiff); *Mason City Tent & Awning Co. v. Clapper*, 144 F. Supp. 754, 770 (W.D. Mo. 1956) (defendants "had no legal right to act in concert").

In sum, Plaintiffs have cited no authority that acquiring rights to a patent application alone can be exclusionary conduct. Plaintiffs instead ask the Court to ignore the distinction between patents and patent applications. Plaintiffs observe that patent applications can be "valuable property right[s]" like patents. *See* Opp. 17. But the issue here is not whether the applications were valuable, but whether the 2004 agreement licensing those applications was exclusionary. Plaintiffs also point to the 2002 consent order between the FTC and Amgen, which defined "patents" for purposes of that order to include "patent applications." Opp. 19. A definition in a consent decree is not a precedent that patent applications are exclusionary or that

9

**JA0511**

acquiring patent applications alone can be anticompetitive. Finally, Plaintiffs argue that the distinction between patents and patent applications is "formalistic." Opp. 19. That is absurd. The difference between a pending patent application and an issued patent is not just substantive, it is fundamental to patent law. An issued patent is a legally enforceable right to exclude, but a pending patent application is simply a petition to the government. The two are no more the same than an application to rent an apartment and the signed lease. An apartment-hunter who applies to rent an apartment cannot exclude anyone else from the property based on just her application. She does not acquire that right until and unless she and the landlord sign a lease.

When Amgen's constitutionally protected patent prosecution and successful lawsuits are taken out of the equation, all that remains of Plaintiffs' Complaint is an agreement granting Amgen exclusive rights to patent applications. But patent applications do not exclude competition. Accordingly, Plaintiffs' allegations do not show that Amgen obtained any exclusionary rights, and therefore fail to state a claim.

**2. Amgen Obtained the Right to Exclude Competitors Only Through Its Constitutionally Protected Prosecution of the Patent Applications**

Even if this Court were to reach the novel conclusion that licensing pending patent applications alone could be exclusionary in some circumstances, Plaintiffs have not stated such a claim in this case because Amgen prosecuted the applications for seven years before any patents issued from them. Thus, the patent applications that Amgen licensed from Roche did not give Amgen the power to exclude biosimilar etanercept products until Amgen spent the better part of a decade exercising its First Amendment right to petition the PTO. No claim based on licensing patent applications can lie on those facts, regardless of whether such a claim might be cognizable if the applications were on the cusp of being issued as patents.

10

**JA0512**

Even Plaintiffs acknowledge that not every acquisition of patent rights is anticompetitive. As the Court in *Johnson & Johnson* recognized, "determining when otherwise lawful patent acquisitions become unlawful requires balancing the competing goals of antitrust law (which proscribes monopolies) and patent law (which creates them)." Opp. 11 (quoting *Johnson & Johnson*, 2024 WL 3858249 at *12). Again, acquiring rights under pending applications cannot have "the effect of increasing or prolonging the monopolist's market power" if those rights do not confer the power to "exclude rivals from the market." *Johnson & Johnson*, 2024 WL 3858249, at *14.

The Complaint's allegations show that Amgen did not obtain the rights to exclude biosimilar competitors that it used to obtain injunctions until after many years of petitioning the PTO. Plaintiffs allege that Amgen spent "about seven years" petitioning the Patent Office to issue the '182 and '522 patents from the applications that were pending in 2004. Compl. ¶ 119. During that period, Amgen amended the applications five times and was faced with rejections "for obviousness and insufficient written description." *Id.* ¶¶ 120, 122. And "[d]espite the amendments, the '791 Application"—which later would issue as the '522 patent—"was still rejected." *Id.* ¶ 122. Ultimately, the patents did not issue until 2011 and 2012, "after a successful appeal to the Board of Patent Appeals following an examiner rejection." *Id.* ¶¶ 120-123. The First Amendment protects all of this conduct. It makes no sense to treat the licensing of patent applications as equivalent to the acquisition of patents where Amgen had to spend seven years petitioning the PTO to obtain patents.

Treating the patent applications as if Amgen had licensed enforceable patents would be particularly unsound because Plaintiffs do not allege that the applications would have excluded etanercept products even if they had issued as patents at that time. After all, Plaintiffs

11

**JA0513**

themselves agree that "[a]n antitrust violation occurs when 'the *dominant* competitor in a market acquires a patent *covering* a substantial share of the same market.'"  Opp. 12 (second emphasis added) (quoting *SCM*, 645 F.2d at 1205).  But Plaintiffs do not allege that the claims in the patent applications covered etanercept at the time that Amgen licensed them from Roche.

In their First Amended Complaint, Plaintiffs alleged that the patent applications "*did not cover etanercept*" at the time of the license.  ECF No. 40, ¶ 117.  They also alleged that Amgen "substantially rewrote" the patent applications, "reshap[ing] them to cover Enbrel" and exclude biosimilar products.  *Id.* ¶ 119.  After Amgen filed its initial motion to dismiss, Plaintiffs tellingly dropped those allegations (which their opposition does not even mention).  But Plaintiffs' amended complaint still does not allege that the patent applications covered etanercept at the time of the 2004 agreement.  Thus, according to Plaintiffs' allegations, if patents had issued from the applications the day after Amgen licensed them from Roche, then those patents would not have excluded biosimilar versions of etanercept.  Where Plaintiffs fail to allege that the applications would have excluded rivals if they had issued as patents, there is no basis to treat the applications as the equivalent of patents that excluded rivals.

Plaintiffs are wrong that Amgen conceded the contrary in prior litigation.  None of the Amgen submissions Plaintiffs cite says that the patent claims in the applications for the '182 and '552 patents covered etanercept at the time of the 2004 agreement.  The language from Amgen's submissions that Plaintiffs quote on page 20 of the opposition relates to the patent *specification*, not the scope of the pending patent *claims*.  That distinction reflects one of the most basic principles of patent law: the claims, not the specification, "delimit the right to exclude." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995).  "[A] so-called patent claim" is "the portion of the patent document that defines the scope of the patentee's rights."

12

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  This use of the term claim is "peculiar to patent law."  *Id.* at 374.  "[A]ll that appears in the specification is not necessarily within the scope of the claims and thus entitled to protection."  *Novo Nordisk of N. Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1369 (Fed. Cir. 1996).  Plaintiffs cite no statement saying that the patent *claims* in the applications for the '182 and '552 patents covered etanercept at the time of the 2004 license.  Again, Plaintiffs' prior complaint alleged the opposite.

In short, Plaintiffs' claim is that the 2004 agreement was exclusionary, but their own complaint alleges that Amgen did not acquire any rights to exclude competing etanercept products until years after the agreement following petitioning activity protected by the First Amendment.  Plaintiffs therefore have failed to state a claim that the agreement was exclusionary.

## II.   The District of New Jersey's Injunctions Break the Causal Chain

Plaintiffs' principal theory of harm is that they are unable to purchase biosimilars sponsored by Sandoz and Bioepis—the only FDA-approved etanercept biosimilars.  *See, e.g.*, Compl. ¶¶ 154-155.  But it is undisputed, and indisputable, that the sale of those products has been enjoined by orders from the District of New Jersey.  ECF No. 49-1; ECF No. 49-2.  Thus, it was the action of a federal court that prevented—and still prevents—competition from etanercept biosimilars and is causing Plaintiffs' alleged harm.  Plaintiffs' causation theory therefore fails: "If anticompetitive harm is caused by the decision of a court, even though granted at the request of a private party, no private restraint of trade occurs because the intervening government action breaks the causal chain."  *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 818 (D.C. Cir. 2001).

Plaintiffs do not cite any case permitting a plaintiff to avoid this fundamental rule of antitrust law merely because they can imagine a counterfactual, hypothetical world without the

**JA0515**

government order excluding competition.  To the contrary, "defendants are not liable for injury resulting from the government's actions."  Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 202c (5th ed. 2021).  When a "lawsuit is successful, . . . the injury of which the antitrust plaintiff complains was 'caused' by the government itself."  *Id.*  The "government's decision . . . breaks the link between [the] private party's request and the plaintiff's injury."  *Id.*

Antitrust law does not recognize claims for injuries resulting from government action. For example, in *Abbott Laboratories v. Adelphia Supply USA*, 2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017), the court rejected an antitrust claim premised on an "inability to obtain and sell international test strips" that resulted from the "[c]ourt's granting of an injunction prohibiting the sale of diverted international strips."  *Id.* at *4.  While Plaintiffs suggest that this passage in *Abbott* was merely a "statement of *fact*," Opp. 25, the decision clearly states that the court found the antitrust defendant's "argu[ment]" to be "persuasive[]."  *Abbott*, 2017 WL 5992355, at *4. That the antitrust claim in *Abbott* also was deficient for other reasons, as Plaintiffs detail in their brief, is beside the point.

Plaintiffs cite no contrary case in which a court permitted an antitrust plaintiff to seek damages arising from a lack of competition by products that another court permanently enjoined. The Second Circuit's decision in *Commerce Tankers Corp. v. National Maritime Union of America*, 553 F.2d 793 (2d Cir. 1977), on which Plaintiffs rely, is not such a case.  In that case, the district court issued a *preliminary* injunction enforcing a collective bargaining agreement to prohibit a company from selling a ship.  *Id.* at 797.  The preliminary injunction was reversed, meaning that the Second Circuit held that competition should *not* have been enjoined.  *Id.* at 798. In those circumstances, the Second Circuit held that the company whose sale was prohibited by the agreement could pursue antitrust damages from the agreement.  That ruling is unremarkable.

14

**JA0516**

A preliminary injunction generally requires a bond, *see* Fed. R. Civ. P. 65(c), precisely because it could be erroneous and cause cognizable harm to the enjoined party.  The setting aside of a preliminary injunction is legally equivalent to its never having been issued in the first place.  Here, the District of New Jersey issued a *permanent* injunction prohibiting competition from Sandoz and Bioepis biosimilars, which was upheld by the Federal Circuit and remains in place.

The court orders enjoining sales of the Sandoz and Bioepis biosimilars also distinguish this case from *Johnson & Johnson*.  Unlike this case, *Johnson & Johnson* did not involve any court order prohibiting biosimilar competition.  Rather, in *Johnson & Johnson*, the patent lawsuits were settled and the settlement agreements prohibited biosimilar competition for a number of years.  *Johnson & Johnson*, 2024 WL 3858249, at *15.  *Johnson & Johnson* therefore does not implicate, let alone undermine, the principle that a court order prohibiting competition breaks the causal chain as a matter of law.  The court's statement that "patent enforcement litigation constitutes antitrust injury" in some instances says nothing about the effect of a court order on the causal chain.  *Id.*

Plaintiffs' other cases (Opp. 23-24 & n.12) are similarly inapposite because none of them involved a claim of injury resulting from court order, or other governmental decision.  In *Iron Workers District Council of New England Health & Welfare Fund v. Teva Pharmaceuticals USA, Inc.*, 2024 WL 4700248 (D. Mass. Nov. 6, 2024), the Amneal product that was alleged to have been wrongfully delayed was not excluded by a court decision; the court decision referenced in the *Iron Workers* opinion applied to a different product whose unavailability was not at issue.  *Id.* at *5-6.

In most of Plaintiffs' other cited cases, the defendants' conduct allegedly delayed a decision by the government about whether to approve the sale of a competing product.  The

15

**JA0517**

question was "whether a government agency would have approved a product earlier in time, but for certain allegedly anticompetitive events"—not whether a government official had affirmatively decided that competition should be excluded. *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 268 (D. Mass. 2014) (whether FDA would have approved generic version of defendant's product if allegedly anticompetitive settlement was not reached); *see also In re Flonase Antitrust Litig.*, 798 F. Supp. 2d 619, 630 (E.D. Pa. 2011) (whether citizen petition using misappropriated information delayed FDA approved of generic product); *Spear Pharms., Inc. v. William Blair & Co., LLC*, 610 F. Supp. 2d 278, 285 (D. Del. 2009) (same); *In re Dr. Reddy's Lab'ys, Ltd.*, 2002 WL 31059289, at *11 (S.D.N.Y. Sept. 13, 2002) (same).

Plaintiffs' remaining cases, *Provepharm, Inc. v. Akorn, Inc.*, 2019 WL 2443185 (E.D.N.Y. June 11, 2019), and *Amphastar Pharmaceuticals, Inc. v. Momenta Pharmaceuticals, Inc.*, 297 F. Supp. 3d 222 (D. Mass. 2018), are even further afield because they involved alleged anticompetitive conduct directed to a private standard-setting organization, not a governmental decisionmaker. Those cases did not involve a court order excluding competing products.

It is not surprising that Plaintiffs identify no case recognizing an antitrust claim of injury arising from a court order. Recognizing such an antitrust claim would permit a collateral attack inconsistent with judicial comity and cast a chill over patent litigation. Here, Sandoz attacked the 2004 license agreement on grounds similar to the gravamen of Plaintiffs' claims here. Just as Plaintiffs here complain that Amgen's 2004 exclusive license created "an unprecedented *30 years* of patent exclusivity," Opp. 1, Sandoz argued that an injunction against its biosimilar would not be "equitable" because the exclusive license gave Amgen "an unjustified timewise extension of its etanercept monopoly," resulting in "a total of 30 years of market exclusivity for Enbrel" that the laws are "designed to prevent." ECF No. 646 at 6, *Immunex Corp. v. Sandoz*

16

**JA0518**

*Inc.*, No. 16-cv-1118 (D.N.J. Oct. 24, 2018). But the District of New Jersey rejected that argument and enjoined Sandoz. Plaintiffs cannot seek damages on a similar theory by wiping away the District of New Jersey's order. (If Sandoz or Bioepis believed those facts supported an antitrust claim, then they could have pursued that also, but they did not.)

Unable to get past a court injunction against the Sandoz and Bioepis biosimilars, Plaintiffs also suggest that they could have been damaged by the inability to purchase a biosimilar from Roche itself or "another" unidentified company. *See* Opp. 26 (citing Compl. ¶ 151). But Plaintiffs do not allege that Roche or some other company ever conducted the necessary clinical trials for an etanercept biosimilar or ever prepared an application for FDA approval of an etanercept biosimilar. Generalized allegations of speculative harm without plausible factual detail are not sufficient to plead antitrust causation. *See, e.g.*, *Biocad, JSC v. F. Hoffman-La-Roche, Ltd.*, 2017 WL 4402564, at *5 (S.D.N.Y. Sept. 30, 2017) (granting motion to dismiss complaint that failed to show would-be competitor had anything "more than 'a hope or expectation'" of commercializing a biosimilar); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 207 (E.D.N.Y. 2003) (without allegations that a would-be generic drug manufacturer "filed an [application]" with the FDA "or that FDA approval was probable," the manufacturer's absence from the marketplace merely reflected "operation of the regulatory scheme" that prevents sale of unapproved drugs).

## CONCLUSION

The Court should dismiss the Second Amended Complaint with prejudice.

**JA0519**

Dated: February 19, 2025

Respectfully submitted,

  /s/ *Stephen E. Noona*
Stephen E. Noona (VSB No. 25367)
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510-1665
Telephone: (757) 624-3239
Facsimile: (888) 360-9092
senoona@kaufcan.com

Jonathan I. Kravis (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500 E
Washington, DC 20001
Telephone: (202) 220-1100
jonathan.kravis@mto.com

Rohit K. Singla (*pro hac vice*)
Justin P. Raphael (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
rohit.singla@mto.com
justin.raphael@mto.com

Faye P. Teller (*pro hac vice*)
Adam R. Lawton (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
faye.teller@mto.com
adam.lawton@mto.com

*Attorneys for Defendants Amgen Inc., Amgen
Manufacturing Limited LLC, and Immunex
Corporation*

18

**JA0520**

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2025, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

/s/ *Stephen E. Noona*
Stephen E. Noona (VSB No. 25367)
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA  23510
Telephone: (757) 624-3239
Facsimile: (888) 360-9092
senoona@kaufcan.com

*Counsel for Defendants Amgen Inc., Amgen Manufacturing Limited LLC, and Immunex Corporation*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CAREFIRST OF MARYLAND, INC.,
GROUP HOSPITALIZATION AND
MEDICAL SERVICES, INC., and CARE-
FIRST BLUECHOICE, INC., on behalf of
themselves and all others similarly situ-
ated,

          Plaintiffs,

      v.

AMGEN, INC., IMMUNEX CORPORA-
TION, and AMGEN MANUFACTURING
LIMITED LLC,

          Defendants.

Civil No. 2:24cv484

**<u>ORDER</u>**

Pending before the Court are a Motion for Certification Under 28 U.S.C. § 1292(b) (the "Motion") (ECF No. 69) and a Memorandum in Support thereof (ECF No. 70) filed by Defendants Amgen, Inc., Immunex Corporation, and Amgen Manufacturing Limited LLC (collectively, "Defendants" or "Amgen"). The Court has determined that a hearing on the Motion is unnecessary, as the issues for decision are adequately presented in the briefs. *See* E.D. Va. Local Civ. R. 7(J). Amgen's request for a hearing on the Motion (ECF No. 85) is therefore **DENIED**. For the following reasons, the Motion (ECF No. 69) is **GRANTED**.

1

## I.   BACKGROUND

### A.   Factual Background

The Court incorporates the factual background of this case from its September 30, 2025 Order. *See* Order at 2–15, ECF No. 66. Plaintiffs Carefirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc., and CareFirst BlueChoice, Inc. (collectively, "Plaintiffs" or "CareFirst") bring this case against Amgen, alleging that Amgen unlawfully delayed competition for its blockbuster drug, Enbrel. Second Am. Compl. ¶ 1, ECF No. 52.

### B.   Procedural History

On November 25, 2024, CareFirst, on behalf of themselves and all others similarly situated, filed its Second Amended Complaint in this Court. *See generally id.* Therein, CareFirst brings 1 federal claim and 3 state claims for relief. *Id.* ¶¶ 213–711. Count 1 alleges that Amgen knowingly, willfully, and improperly maintained its monopoly power and engaged in anticompetitive conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. *Id.* ¶¶ 213–227. Count 2 alleges that Amgen engaged in monopolization and monopolistic conduct in violation of the laws of 30 states, Puerto Rico, and the District of Columbia. *Id.* ¶¶ 228–246. Count 3 alleges that Amgen violated the consumer protection laws of 36 states and the District of Columbia. *Id.* ¶¶ 247–487. Count 4 alleges that Amgen engaged in inequitable conduct constituting unjust enrichment in violation of the laws of 48 states, Puerto Rico, and the District of Columbia. *Id.* ¶¶ 488–711.

On January 8, 2025, Amgen filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion to Dismiss"). Mot., ECF No. 55. On January 29, 2025, CareFirst filed its response in opposition to the Motion to Dismiss. Resp. Opp'n, ECF No. 57. On February 19, 2025, Amgen filed its reply. Reply, ECF No. 58.

On September 30, 2025, the Court issued an Order granting in part and denying in part Amgen's Motion to Dismiss. Order, ECF No. 66. Therein, the Court grappled with 2 unsettled legal questions. First, the Court found that CareFirst had "plausibly alleged anticompetitive conduct" based upon Amgen's acquisition of certain pending patent applications in 2004. *Id.* at 30–35. In so finding, the Court acknowledged that Plaintiffs did not cite any authority establishing that acquiring rights to a *patent application alone* could constitute exclusionary conduct. *Id.* at 30. However, the Court also noted that Defendants did not cite any authority "finding that the acquisition of pending patent applications *does not* constitute an effort to monopolize a market." *Id.* The Court acknowledged that CareFirst's theory of anticompetitive conduct was "novel." *Id.* Second, the Court grappled with whether the causal chain of an antitrust violation which causes a downstream antitrust injury is broken by intervening government action. *Id.* at 36–39. Specifically, the Court noted:

> [W]hile recognizing the existing disagreement among courts regarding whether *Noerr-Pennington* immunizes antitrust injury which was created in part by government action, absent precedent from the Fourth Circuit and given the recent decision of our sister court,[1] the Court declines to dismiss this case at the motion to dismiss stage, and allows Plaintiffs' federal claim to proceed on the merits.

---

[1] *Carefirst of Md., Inc. v. Johnson & Johnson*, 745 F. Supp. 3d 288 (E.D. Va. 2024).

*Id.* at 38. Based on those findings, *inter alia*, the Court denied the Motion to Dismiss in full as to Counts 1 and 3 and denied it in part as to Counts 2 and 4.[2]

On October 20, 2025, Amgen filed the instant Motion. Mot., ECF No. 69. Therein, Amgen requests that the Court certify its September 30, 2025 Order ruling on Amgen's Motion to Dismiss (ECF No. 66) for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) to allow the United States Court of Appeals for the Fourth Circuit to resolve 2 legal questions: (1) whether the acquisition of pending patent applications alone can constitute anticompetitive conduct ("Question 1"); and (2) whether the causal chain of an antitrust violation which causes a downstream antitrust injury is broken by intervening government action ("Question 2"). Mem. Supp. at 6–7, ECF No. 70.[3] On November 3, 2025, Plaintiffs filed a response in opposition to the Motion. Resp. Opp'n, ECF No. 75. On November 10, 2025, Amgen filed its reply. Reply, ECF No. 80. The Motion is ripe for adjudication.

## II.   LEGAL STANDARD

"Certification for interlocutory review under § 1292(b) is an 'extraordinary remedy' available only in 'exceptional situations.'" *Cooke-Bates v. Bayer Corp.*, No. 3:10cv261, 2010 WL 4789838, at *2 (E.D. Va. Nov. 16, 2010) (quoting *Fannin v. CSX Transp., Inc.*, No. 88-8120, 1989 WL 42583, at *2 (4th Cir. Apr. 26, 1989)). The burden is on the party moving for certification to persuade the court that such exceptional

---

[2] Specifically, the Court denied Amgen's Motion to Dismiss as to Count 2 as to all states except Puerto Rico. Order at 56, ECF No. 66. The Court denied Amgen's Motion to Dismiss as to Count 4 as to all states except Idaho, Kentucky, Montana, New Jersey, Ohio, Oklahoma, Washington, and Puerto Rico. *Id.* at 57.

[3] This Order uses ECF-generated pagination.

4

**JA0525**

circumstances exist. *See Crawl Space Door Sys., Inc. v. Smartvent Prods., Inc.*, No. 2:19cv320, 2020 WL 13691775, at *1 (E.D. Va. June 12, 2020) (citing *McDaniel v. Mehfoud*, 708 F. Supp. 754, 756 (E.D. Va. 1989)).

"To grant an interlocutory appeal, a district court must certify that the order sought to be appealed: '(1) involves a controlling question of law (2) as to which there is substantial ground for difference of opinion and (3) that an immediate appeal from the order may materially advance the ultimate termination of the litigation[.]'" *Advanced Training Grp. Worldwide, Inc. v. Proactive Techs. Inc.*, No. 19cv505, 2020 WL 13605310, at *1 (E.D. Va. Mar. 13, 2020) (quoting 28 U.S.C. § 1292(b)). However, even if all 3 of these requirements are met, "the decision to certify issues for interlocutory appeal rests solely within the district court's discretion." *Crawl Space Door Sys., Inc.*, 2020 WL 13691775, at *1. "Section 1292(b) is not intended to allow interlocutory appeals in ordinary suits . . . but instead should be utilized for orders deemed pivotal and debatable." *Virginia ex rel. Integra Rec LLC v. Countryside Sec. Corp.*, No. 3:14cv706, 2015 WL 3540473, at *3 (E.D. Va. June 3, 2015) (internal quotation marks and citations omitted).

After certification in the district court, the court of appeals makes a separate determination as to the appropriateness of an interlocutory appeal. 28 U.S.C. § 1292(b). The certification in and of itself does not stay proceedings in the district court. *Id.*

5

**JA0526**

III.   ANALYSIS

A.   **The Order Sought to be Appealed Involves Controlling Questions of Law**

Our sister court in Richmond astutely summarized what constitutes a "controlling question of law" based upon Fourth Circuit, Eastern District of Virginia, and Western District of Virginia precedent:

> While controlling questions may include those whose resolution will be completely dispositive of the litigation, either as a legal or practical matter, whichever way it goes, a question need not prove completely dispositive of litigation to present a controlling question of law. When the resolution of a question would not completely end the litigation altogether, district courts look to whether the immediate appeal would be serious to the conduct of the litigation, either practically or legally. A legal issue is controlling if it could materially affect the outcome of the case. The Fourth Circuit has observed that § 1292(b) review may be appropriate where the court of appeals can rule on a pure, controlling question of law without having to delve beyond the surface of the record in order to determine the facts.

*Hutchens v. Cap. One Servs., LLC*, No. 3:19cv546, 2020 WL 6121950, at *4 (E.D. Va. Oct. 16, 2020) (internal quotation marks and citations omitted). Here, if the Fourth Circuit agrees with Amgen and reverses this Court's ruling on either Question 1 or Question 2, this case will be dismissed in its entirety. That result would necessarily be "completely dispositive" of this case. *Id.*

Moreover, "[a] question of law may be controlling if interlocutory reversal might save time for the district court, and time and expense for the litigants." *United States ex rel. Schnupp v. Blair Pharmacy*, No. 17cv2335, 2025 WL 1331906, at *12 (D. Md. May 7, 2025) (internal quotation marks omitted). If the Fourth Circuit accepts interlocutory review and deems that a reversal on either Question 1 or 2 is

6

**JA0527**

necessary—while reversal is certainly not desired by this Court—such an outcome would save the judiciary, Plaintiffs, and Defendants, years of costly litigation. Furthermore, "[i]t could also reduce the risk of a post-judgment appeal that results in re-litigation or retrial of some or all of this case." Mem. Supp. at 8, ECF No. 70.

On the other hand, if the Fourth Circuit affirms this Court's ruling on both Questions 1 and 2, such an affirmation would still materially affect the outcome of this case. If the Fourth Circuit finds that the acquisition of pending patent applications *can* constitute anticompetitive conduct, this would resolve a significant question of law for the ultimate factfinder in this case. The same is true if the Fourth Circuit affirms that the causal chain of an antitrust violation which causes a downstream antitrust injury is not broken by intervening governmental action.

The analysis of Questions 1 and 2 "will apply with equal vigor at later stages of litigation, impacting how the case will be litigated moving forward . . . [s]ince the answer to the[se] question[s] . . . is one that seriously impacts the litigation of the case, the [c]ourt finds that a controlling question of law exists[.]" *Bradley v. DentalPlans.com*, No. 20cv1094, 2024 WL 5158791, at *4 (D. Md. Dec. 18, 2024) (internal quotation marks omitted). Here, Plaintiffs have requested a jury trial. *See* Second Am. Compl. at 134, ECF No. 52. Jury instructions must "adequately inform[] the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of [either] party." *United States v. Smithers*, 92 F.4th 237, 248 (4th Cir. 2024) (quoting *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011)). Clarification of these legal issues before trial would therefore bolster the jury instructions and "affect the [jury's]

**JA0528**

analysis and treatment of the surviving [] claims[.]" *Chamberlain v. Crown Asset Mgmt.*, 622 F. Supp. 3d 1068, 1072 (D. Utah 2022).

Furthermore, Questions 1 and 2 involve pure questions of law—the Fourth Circuit need not delve into the factual record to determine whether the acquisition of pending patent applications can constitute anticompetitive conduct, or whether antitrust injury which causes a downstream antitrust injury is broken by intervening governmental action. Questions 1 and 2 are "abstract legal issue[s] that the court of appeals can decide quickly and cleanly." *United States ex rel. Michaels v. Agape Senior Cmty., Inc.,* 848 F.3d 330, 340 (4th Cir. 2017) (quoting *Mamani v. Berzain*, 825 F.3d 1304, 1312 (11th Cir. 2016)).

Finally, Plaintiffs do not dispute that Questions 1 and 2 are controlling questions of law. *See* Resp. Opp'n at 9 n.1, ECF No. 75 ("To the extent that Amgen's first question encompasses cases, like this one, in which the anticompetitive conduct at issue is a private, commercial agreement through which a party acquires rights that it later asserts in court, CareFirst does not dispute that the questions Amgen poses are 'controlling' for purposes of the first prong of the § 1292(b) test."). Therefore, the Court finds that Questions 1 and 2 present controlling questions of law, and the first element of the § 1292(b) analysis is met.

### B. There is Substantial Ground for Difference of Opinion on these Legal Issues

"An issue presents a substantial ground for difference of opinion if courts, as opposed to parties, disagree on a controlling question of law." *Cooke-Bates*, 2010 WL 4789838, at *2. "A ground for dispute is substantial where, for example, the

8

**JA0529**

controlling circuit has made no comment on conflicting opinions among the various circuits, or where the dispute raises a novel and difficult issue of first impression." *Id.* (internal quotation marks and citations omitted).

Beginning with whether there is a substantial ground for difference of opinion as to Question 1, to this Court's knowledge, no court has commented directly on whether the acquisition of pending patent applications alone can constitute anticompetitive conduct. *See* Order at 30–35, ECF No. 66 (acknowledging that neither Plaintiffs, Defendants, nor the Court identified any cases where a court has held that the acquisition of a pending patent application constitutes anticompetitive conduct). The Court has already acknowledged that CareFirst's theory of anticompetitive conduct in this case is novel. *Id.* at 30. Although cases of first impression do not necessarily create a substantial ground for difference of opinion, "when a matter of first impression also had other grounds for difference of opinion—and met the other two criteria— district courts in this circuit have certified the issue for interlocutory appeal." *Kennedy v. St. Villa St. Catherine, Inc.*, No. 9cv3021, 2010 WL 9009364, at *2 (D. Md. June 16, 2010) (collecting cases); *see also Hawaii ex rel. Louie v. JP Morgan Chase & Co.*, 921 F. Supp. 2d 1059, 1067 (D. Haw. 2013) ("In sum, there are legal issues that are neither easy to decide nor well-settled, and this Court therefore finds that there is substantial ground for difference of opinion regarding the questions of law that the [defendant] will raise in the interlocutory appeal."); *Int'l Refugee Assistance Project v. Trump*, 404 F. Supp. 3d 946, 950 (D. Md. 2019) ("[C]ourts find substantial grounds .

JA0530

. . if novel and difficult questions of first impression are presented." (internal quotation marks omitted)).

Here, in their pleadings on the Motion to Dismiss, the parties did not cite any cases directly addressing Question 1, confirming that it is a matter of first impression. Additionally, each party identified numerous cases which demonstrate that there is a substantial ground for difference of opinion on this question of law. *See* Resp. Opp'n at 17–20, ECF No. 57 ("Conduct of a monopolist that can run afoul of Section 2 of the Sherman Act includes acquiring patent rights." (citing cases where courts considered pending patent applications and their relevance to Sherman Act violations in the context of a broader patent portfolio or as part of a broader conspiracy or agreement to restrict competition)); Reply at 12–15, ECF No. 58 ("Plaintiffs' theory that an agreement giving Amgen the right to prosecute patent applications was exclusionary fails out the gate because patent applications do not exclude competitors." (citing cases which stand for the proposition that a patent application does not grant the patent application holder with exclusionary power)).

Taken together, this split in reasoning demonstrates that "[t]his legal question is one on which there could be a substantial difference of opinion." *Karanik v. Cape Fear Acad., Inc.*, No. 7:21cv169, 2022 WL 16556774, at *5 (E.D.N.C. Oct. 31, 2022). Furthermore, "[t]he [legal] issue is relatively novel and remains unsettled, and [Defendants'] arguments concerning [the legal issue] are not frivolous." *Id.* Although the Court found that Plaintiffs have stated a plausible claim upon which relief could be granted, Defendants' arguments to the contrary are not frivolous. Accordingly, the

Court finds that there is a substantial ground for difference of opinion as to Question 1.

As for Question 2, the Court acknowledged within its September 30, 2025 Order that there is a substantial ground for difference of opinion as to whether the causal chain of an alleged antitrust violation which causes a downstream antitrust injury is broken by intervening government action. *See* Order at 36–38, ECF No. 66 ("Therefore, while recognizing the existing disagreement amongst courts regarding whether *Noerr-Pennington* immunizes antitrust injury which was created in part by government action, absent precedent from the Fourth Circuit and given the recent decision of our sister court, the Court declines to dismiss this case at the motion to dismiss stage, and allows Plaintiffs' federal claim to proceed on the merits."). Therein, the Court explored cases decided by the District of Columbia Circuit, the Third Circuit, the Central District of California, and the Eastern District of Virginia—but found no comment from the Fourth Circuit on these conflicting decisions. *Id.* Therefore, there is a substantial ground for difference of opinion as to Question 2.

### C. An Immediate Appeal from the Court's Previous Order May Materially Advance the Ultimate Termination of the Litigation

"In determining whether certification will materially advance the ultimate termination of the litigation, a district court is to examine whether an immediate appeal would (1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, and (3) eliminate issues to make discovery easier and less costly." *Kennedy*, 2010 WL 9009364, at *4 (quoting *Orson, Inc. v. Miramax Film Corp.*, 867 F. Supp. 319, 322 (E.D. Pa. 1994); *see also Primavera Familienstifung v. Askin*, 139 F. Supp.

JA0532

2d 567, 570 (S.D.N.Y. 2021) ("Although technically the question of whether there is a controlling issue of law is distinct from the question of whether certification would materially advance the ultimate termination of the litigation, in practice the two questions are closely connected.").

As discussed *supra* pp. 6–7, the Court easily finds that an immediate appeal may materially advance the ultimate termination of this litigation. If the Fourth Circuit reverses this Court on either Question 1 or 2, this case will be dismissed—and the need for trial will be necessarily terminated. If the Fourth Circuit affirms this Court's rulings on Questions 1 and 2, such a ruling would provide crucial—and currently lacking—legal guidance on 2 questions of paramount importance for the jury, thereby simplifying key, complex legal issues in this case.

The fact that this case is still in the early stages of litigation—a Rule 16(b) conference has not yet occurred, and discovery has not yet commenced—also weighs in favor of finding that certification would materially advance the case. *Ekstrom v. Cong. Bank*, No. 20cv1501, 2021 WL 119000, at *4 (D. Md. Jan. 13, 2021) ("[B]ecause the case is still in an early phase of litigation and substantive discovery has not yet occurred, an immediate appeal would materially advance the termination of litigation."); *see also Katz v. Live Nation, Inc.*, No. 9cv3740, 2010 WL 3522792, at *3 (D.N.J. Sept. 2, 2010) ("Certification is more likely to materially advance the litigation where the appeal occurs early in the litigation, because extensive discovery has taken place and a trial date has been set."). Accordingly, the Court finds that an immediate appeal

from its previous Order (ECF No. 66) would materially advance the ultimate termination of this litigation.

*    *    *

In conclusion, the Court finds all 3 elements of the analysis pursuant to 28 U.S.C. § 1292(b) are met. Accordingly, the Motion should be granted.

## IV.    CONCLUSION

For the foregoing reasons, the Motion (ECF No. 69) is **GRANTED**. The Court hereby **CERTIFIES** its September 30, 2025 Order (ECF No. 66) for interlocutory appeal. If either party intends to move to stay this case pending the Fourth Circuit's review, such a motion **SHALL** be filed no later than April 1, 2026. Responses to any such motion are due within 14 days, and replies to any such response are due within 6 days.[4] The Clerk is **REQUESTED** to forward a copy of this Order to counsel of record for all parties.

   **IT IS SO ORDERED.**


/s/<br>
Arenda L. Wright Allen<br>
United States District Judge

March 18, 2026
Norfolk, Virginia

---

[4] "The decision to 'stay proceedings in the district court' pending resolution of an interlocutory appeal is left 'to the district judge or the Court of Appeals.'" *Bradley*, 2024 WL 5158791, at *7 n.4 (citing 28 U.S.C. § 1292(b)).

13

**JA0534**

No. _____

# United States Court of Appeals for the Fourth Circuit

CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., CAREFIRST BLUECHOICE, INC.,

*Plaintiffs-Respondents*,

*v.*

AMGEN INC., AMGEN MANUFACTURING LIMITED LLC, IMMUNEX CORPORATION,

*Defendants-Petitioners*.

Petition from the United States District Court for the Eastern District of Virginia, Hon. Arenda Wright Allen
Case No. 2:24-cv-484-AWA-LRL

## PETITION FOR PERMISSION TO APPEAL PURSUANT TO 28 U.S.C. § 1292(b)

Rohit K. Singla
Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission St.
San Francisco, CA 94105
(415) 512-4000

Adam R. Lawton
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave.
Los Angeles, CA 90071
(213) 683-9100

Elaine J. Goldenberg
Sarah E. Weiner
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 220-1100

JA0535

## CORPORATE DISCLOSURE STATEMENT

Amgen Inc. has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Amgen Manufacturing Limited LLC is an indirect, wholly owned subsidiary of Amgen Inc., a publicly traded company.

Immunex Corporation is a wholly owned subsidiary of Amgen Inc., a publicly traded company.

**JA0536**

**TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

INTRODUCTION ..................................................................................1

QUESTIONS PRESENTED.........................................................................4

STATEMENT ......................................................................................5

I.      Factual Background ...................................................................5

II.     Procedural History ..................................................................8

REASONS THE APPEAL SHOULD BE ALLOWED ...........................................12

I.      The District Court's Order Involves Controlling Questions of Law on Which There Is a Substantial Ground for Difference of Opinion .................13

II.     Immediate Appeal Could Materially Advance the Ultimate Termination of the Litigation and May Well Be Dispositive........................17

III.    An Appeal Under Section 1292(b) Is Especially Warranted in This Case..............................................................................20

CONCLUSION AND RELIEF REQUESTED ....................................................23

CERTIFICATE OF COMPLIANCE...............................................................25

CERTIFICATE OF SERVICE ....................................................................26

**JA0537**

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A.D. Bedell Wholesale v. Philip Morris*,
263 F.3d 239 (3d Cir. 2001) ...................................................................14

*A1 Procurement v. Thermcor*,
173 F. Supp. 3d 320 (E.D. Va. 2016) ......................................................13

*ABS Global v. Inguran*,
2016 WL 3963246 (W.D. Wis.) ...............................................................16

*Adams v. S. Produce Distribs.*,
2021 WL 394842 (E.D.N.C.).............................................................13, 14

*Advanced Health-Care Servs. v. Radford Cmty. Hosp.*,
910 F.2d 139 (4th Cir. 1990) ...................................................................15

*Automated Building Components v. Trueline Truss*,
318 F. Supp. 1252 (D. Or. 1970) .............................................................16

*Baltimore v. AbbVie*,
42 F.4th 709 (7th Cir. 2022) ....................................................................16

*Boland v. Consol. Multiple Listing Serv.*,
868 F. Supp. 2d 506 (D.S.C. 2011) .........................................................21

*CareFirst of Md. v. Johnson & Johnson*,
745 F. Supp. 3d 288 (E.D. Va. 2024) ......................................................14

*Coal. for Equity v. Md. Higher Educ. Comm'n*,
2015 WL 4040425 (D. Md.) ...............................................................18, 19

*Cooke-Bates v. Bayer*,
2010 WL 4789838 (E.D. Va.) ..................................................................13

*Ekstrom v. Cong. Bank*,
2021 WL 119000 (D. Md.) .......................................................................19

*Eli Lilly v. Barr Lab'ys*,
251 F.3d 955 (Fed. Cir. 2001) ...................................................................7

**JA0538**

*Fannin v. CSX Transp.*,
    1989 WL 42583 (4th Cir.) (unpub.) (per curiam)................................................13

*Hengle v. Asner*,
    2020 WL 855970 (E.D. Va.) ........................................................................19

*Hutchens v. Capital One Servs.*,
    2020 WL 6121950 (E.D. Va.) ......................................................................13

*ICTSI Oregon v. Int'l Longshore & Warehouse Union*,
    22 F.4th 1125 (9th Cir. 2022) ................................................................17, 18

*Immunex v. Sandoz*,
    395 F. Supp. 366 (D.N.J. 2019)....................................................................7

*Immunex v. Sandoz*,
    964 F.3d 1049 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2623
    (2021) ........................................................................................................7

*In re Health Diagnostic Lab'y*,
    2017 WL 2129849 (E.D. Va.) ......................................................................18

*Kennedy v. Villa St. Catherine*,
    2010 WL 9009364 (D. Md.) ........................................................................19

*Lynn v. Monarch Recovery Mgmt.*,
    953 F. Supp. 2d 612 (D. Md. 2013).............................................................17

*Michaels v. Agape Senior Cmty.*,
    848 F.3d 330 (4th Cir. 2017) ......................................................................13

*In re Microsoft*,
    355 F.3d 322 (4th Cir. 2004) ......................................................................21

*Mohawk Indus. v. Carpenter*,
    558 U.S. 100 (2009).....................................................................................17

*Molock v. Whole Foods Market*,
    317 F. Supp. 1 (D.D.C. 2018).....................................................................18

*Moore v. Frazier*,
    941 F.3d 717 (4th Cir. 2019) ......................................................................22

**JA0539**

*Novell v. Microsoft*,
  505 F.3d 302 (4th Cir. 2007) ..................................................................21

*Oksanen v. Page Mem. Hosp.*,
  945 F.2d 696 (4th Cir. 1991) .................................................................20

*Pennsylvania v. Mid-Atl. Toyota Distribs.*,
  704 F.2d 125 (4th Cir. 1983) .................................................................21

*Premier Elec. Constr. v. Nat'l Elec. Contractors Ass'n*,
  814 F.2d 358 (7th Cir. 1987) .................................................................14

*Reese v. BP Exploration (Alaska)*,
  643 F.3d 681 (9th Cir. 2011) .............................................................17, 19

*Robertson v. Sea Pines Real Estate*,
  679 F.3d 278 (4th Cir. 2012) .................................................................21

*Sandoz v. Amgen*,
  582 U.S. 1 (2017)...................................................................................7

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) .................................................................21

*In re Travelstead*,
  250 B.R. 862 (D. Md. 2000) ..................................................................18

*United States v. Woodbury*,
  263 F.2d 784 (9th Cir. 1959) .................................................................19

*In re Va. Elec. & Power*,
  539 F.2d 357 (4th Cir. 1976) .................................................................18

*Wal-Mart Stores v. Visa U.S.A.*,
  396 F.3d 96 (2d Cir. 2005) ....................................................................20

**FEDERAL STATUTES**

28 U.S.C. § 1292(b) ................................................................... 1, passim

**LEGISLATIVE MATERIALS**

S. Rep. No. 2434, 85th Cong., 2d Sess. (1958), *reprinted in* 1958
  U.S.C.C.A.N. 5255 ...............................................................................20

**JA0540**

**OTHER AUTHORITIES**

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 30 (2004) .....................................20

6 WILLIAM B. RUBENSTEIN, NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 20:59 (6th ed. 2022).........................................................................21

**JA0541**

## TABLE OF EXHIBITS TO THE PETITION

| **Exhibit** | **D. Ct. ECF No.** | **Description** |
| --- | --- | --- |
| Exhibit A | 97 | Order Granting Motion for Certification Under 28 U.S.C. § 1292(b) |
| Exhibit B | 66 | Order Granting in Part and Denying in Part Motion to Dismiss for Failure to State a Claim |
| Exhibit C | 49-1 | Final Judgment and Order of Permanent Injunction in *Immunex Corp. v. Sandoz Inc.*, No. 2:16-cv-1118 (D.N.J.) |
| Exhibit D | 49-2 | Final Judgment and Order of Permanent Injunction in *Immunex Corp. v. Samsung Bioepis Co., Ltd.*, No. 2:19-cv-11755 (D.N.J.) |

vii

**JA0542**

## INTRODUCTION

This petition seeks interlocutory review under 28 U.S.C. § 1292(b) of important questions of law that this Court has not resolved: (1) whether a plaintiff can state a claim for alleged antitrust injury resulting from a federal-court injunction prohibiting the sale of products that infringe valid patents, and (2) whether taking an exclusive license to pending patent applications, as distinct from issued patents, can constitute exclusionary or anticompetitive conduct as required to state a claim under the antitrust laws. As the district court recognized in certifying its order denying a motion to dismiss, those are purely legal questions on which there is substantial ground for difference of opinion. And as the court also recognized, an immediate appeal would resolve this case entirely or, at minimum, simplify complex legal issues that arise not only in this case but also in other antitrust litigation—thereby preventing significant wasted effort and expense. This Court should grant interlocutory review.

Plaintiffs-Respondents (collectively, "CareFirst") claim that they have been overpaying for Enbrel®, a medicine that treats debilitating autoimmune disorders, because biosimilar versions of Enbrel are not available for sale in the United States. Such sales are barred by injunctions issued in 2019 and 2021 by a federal court in New Jersey, which found after a trial that sales of the biosimilars would

1

**JA0543**

infringe valid patents asserted by Immunex and its parent company, Amgen Inc.[1] CareFirst now seeks to impose antitrust liability on Amgen based on injury inflicted by the federal-court injunctions. According to CareFirst, the antitrust violation is long-ago action by Amgen that underlay the litigation in which the injunctions issued: Amgen's exclusive licensing of another company's pending patent applications, which—after Amgen petitioned the U.S. Patent and Trademark Office ("PTO") for years—ultimately issued as patents that Amgen sued to enforce.

The district court in this case denied Amgen's motion to dismiss because it found no on-point precedent from this Court on either of the two legal issues noted above, but it certified its order under Section 1292(b). There are three requirements for interlocutory review under that provision, and all are met here.

First, as CareFirst agreed below, both issues are controlling questions of law. If this Court agrees that a plaintiff cannot state a cognizable claim for alleged harm resulting from a federal court's permanent injunctions *or* that taking a license to patent applications cannot satisfy the exclusionary conduct element of an antitrust claim, that decision will entirely resolve this case in Amgen's favor.

---

[1] This petition generally refers to all three Defendants-Petitioners as "Amgen."

Second, substantial ground for difference of opinion exists on both issues, because—as the district court explained—reasonable minds can disagree and have disagreed as to each. There is an "existing disagreement amongst courts" on whether federal-court injunctions can give rise to cognizable antitrust injury. Ex. A at 11. And as to whether an exclusive license to pending patent applications can constitute exclusionary conduct, there are no directly on-point precedents, including from this Court—but various decisions articulate general principles that appear to point in different directions on that novel issue. *Id.* at 9-10. Both issues are of first impression in this Circuit; both have arisen in multiple cases and are likely to recur; and both are important, because clear rules should exist in the antitrust context on the role court injunctions can play in a chain of causation and on the scope of liability for licensing patent applications.

Third, an immediate appeal could materially advance the resolution of this case. This case is at its earliest stages; no Rule 16 conference has yet occurred. But the parties are about to embark on complex, expensive, and time-consuming discovery—a process that is especially onerous where, as here, a putative class asserts claims for antitrust damages. An interlocutory appeal could end the case entirely. And even if it did not do so, a decision from this Court on the key legal issues would conserve the district court's and the parties' resources.

In addition, interlocutory review is especially appropriate here because a related case is pending in this Court. One of the enjoined biosimilar manufacturers, Sandoz, filed its own antitrust complaint making allegations that are substantively identical to CareFirst's. The district court dismissed Sandoz's complaint and entered final judgment; this Court docketed Sandoz's appeal (*Sandoz v. Amgen*, No. 26-1309) just last week. Permitting an interlocutory appeal would allow the Court to coordinate the two cases efficiently—and allowing Sandoz's appeal alone to proceed would not necessarily resolve all of the critical issues common to both cases.

This is exactly the kind of case for which Section 1292(b) was designed. Immediate review would give this Court the opportunity to resolve the case entirely at the threshold, thereby avoiding the extraordinary burdens and costs that continued proceedings in the district court will impose in this sprawling antitrust action. This Court should grant the petition.

## QUESTIONS PRESENTED

1.      Whether a plaintiff can state a claim for alleged antitrust injury resulting from a federal-court injunction prohibiting the sale of products that infringe valid patents.

**JA0546**

2.     Whether taking an exclusive license to pending patent applications, as distinct from taking such a license as to issued patents, can constitute exclusionary conduct as required to state a claim for monopolization.

## STATEMENT

### I.     Factual Background

A.  Amgen markets Enbrel, a biologic medicine that treats autoimmune disorders.  Ex. B at 6.  The active ingredient in Enbrel is etanercept, a synthetic protein that blocks the activity of a chemical messenger that promotes inflammation.  *Id.* at 2-3, 6.  That chemical messenger is called TNF.  *Id.*

Immunex developed Enbrel, obtained FDA approval for it, and brought it to market in 1998.  But another company, F. Hoffmann-La Roche ("Roche"), had been independently researching TNF-blocking proteins and invented etanercept before Immunex did.  *Id.* at 4.  Roche filed patent applications all over the world relating to the TNF-blocking protein technology it invented.  *Id.* at 4-5.

In 1998, Immunex took a license to Roche's patent rights and agreed to pay an ongoing royalty on sales of Enbrel.  *Id.* at 6-7.  The license was co-exclusive, meaning that Roche retained rights either for its own use or for use by one designee, but agreed not to license others.  *Id.* at 7.

5

Enbrel became a great clinical and commercial success, and Amgen acquired Immunex in 2002. *Id.* at 7-8. But Roche never received FDA approval for etanercept or any other TNF blocker.

In 2004, Roche and Amgen agreed to restructure their license agreement. Amgen agreed to buy out the ongoing royalty obligation; Roche agreed to grant Amgen an exclusive license to the commercial rights under Roche's then-pending patent applications relating to TNF blockers; and the parties agreed that Amgen would thereafter be responsible for prosecuting those pending patent applications. *Id.* at 10-11.

Among the Roche patent applications to which Amgen obtained that license were two applications that Roche had filed in 1995. *Id.* at 5, 11. Beginning in 2004, Amgen prosecuted those two applications for "about seven years," *id.* at 11, including by successfully appealing to the PTO's appellate tribunal and overcoming rejections "for obviousness and insufficient written description," D. Ct. ECF No. 52, ¶¶ 120-122. Those years of petitioning culminated in issuance of two patents: No. 8,063,182 (the '182 patent) in 2011, and No. 8,163,522 (the '522 patent) in 2012. Ex. B at 5, 11. The patents will expire in 2028 and 2029, respectively. *Id.*

B. Under a statute enacted in 2010, a company may apply to the FDA for approval of a biosimilar—i.e., "a biologic product that is highly similar to a

6

**JA0548**

biologic product that has already been approved." *Sandoz v. Amgen*, <u>582 U.S. 1, 5</u> (2017). But the manufacturer of the previously approved product "may hold multiple patents covering the biologic," its uses, and its manufacturing "processes." *Id.* at 7. The statute sets forth a "calibrated scheme" for addressing any "claims of infringement" of such patents. *Id.* at 8.

In 2015, Sandoz applied to the FDA to market Erelzi, a biosimilar version of Enbrel. Ex. B at 12. Amgen sued Sandoz in the District of New Jersey, alleging that the commercialization of Erelzi would infringe the '182 and '522 patents. *Id.* Sandoz "did not contest infringement" of either patent. *Immunex v. Sandoz*, <u>395 F. Supp. 3d 366, 380</u> (D.N.J. 2019). Instead, Sandoz argued that the patents were invalid, including under a specific doctrine that is intended to prevent an "unjustified timewise extension of the right to exclude." *Eli Lilly v. Barr Lab'ys*, <u>251 F.3d 955, 967-68</u> (Fed. Cir. 2001).

After a two-week trial, *see Immunex*, <u>395 F. Supp. 3d at 374</u>, the New Jersey district court rejected Sandoz's invalidity arguments, Ex. B at 12-13. The court then permanently enjoined Sandoz from making, using, selling, or importing Erelzi until the '182 and '522 patents expire. Ex. C. The Federal Circuit affirmed, and the Supreme Court denied a petition for certiorari. Ex. B at 13; *Immunex v. Sandoz*, <u>964 F.3d 1049</u> (Fed. Cir. 2020), *cert. denied*, <u>141 S. Ct. 2623</u> (2021). The permanent injunction has remained in effect since its issuance.

7

The New Jersey district court issued a similar permanent injunction in another case involving a biosimilar version of Enbrel. Samsung Bioepis ("Samsung") received FDA approval to market a biosimilar called Eticovo in 2019, and Amgen promptly sued for infringement of the '182 and '522 patents. Ex. B at 13. After the Supreme Court denied certiorari in the *Sandoz* case, the district court permanently enjoined Samsung from making, using, selling, or importing Eticovo until the '182 and '522 patents expire. Ex. D. That injunction, too, has been in effect since issuance.

## II.    Procedural History

A. Acting putatively on behalf of a class of insurance companies and other entities, CareFirst filed this lawsuit in the Eastern District of Virginia alleging monopolization under federal antitrust law and related state-law claims under the law of virtually every state. Ex. B at 14-15.

The operative complaint alleges that Amgen engaged in monopolization and that the putative class members have overpaid for Enbrel as a result. *Id.* at 14-16. CareFirst says that the only anticompetitive conduct is "Amgen's acquisition of the Roche Patent Rights"—that is, Amgen's entering into an exclusive license agreement in 2004 for Roche's then-pending patent applications, which issued as patents some seven years after Amgen began prosecuting the applications. *Id.* at 24-25. CareFirst does *not* allege that Amgen's prosecution of the applications or

**JA0550**

enforcement of the patents violated the antitrust laws, that Amgen defrauded the PTO, or that Amgen brought sham litigation. *Id.* Rather, CareFirst contends that Amgen's exclusive license to the patent rights led to a chain of events that ultimately "result[ed] in permanent court injunctions against Sandoz and Samsung," and that absent those injunctions prices would be lower because infringing biosimilars from one or both of those companies would be available for purchase. *Id.* at 35-36.

In an action separate from this one, Sandoz filed an antitrust complaint in the Eastern District of Virginia, making factual allegations that are substantively identical to CareFirst's and seeking to recover the profits it lost by having been permanently enjoined from marketing its infringing biosimilar. *Sandoz v. Amgen*, No. 25-cv-218 (E.D. Va. Apr. 11, 2025), ECF No. 1. Sandoz designated its lawsuit as related to the *CareFirst* case, and both were assigned to the Honorable Arenda L. Wright Allen. *Sandoz*, No. 25-cv-218 (E.D. Va. Apr. 11, 2025), ECF No. 6.

B. The district court denied Amgen's motion to dismiss CareFirst's federal antitrust claim and most of the state-law claims. Ex. B. First, having found no on-point precedent from this Court, the district court refused to dismiss based on the argument that the federal-court injunctions prohibiting sales of Sandoz's and Samsung's biosimilars foreclosed CareFirst from alleging a cognizable injury. *Id.* at 26-27, 36. Second, the district court refused to dismiss on the ground that an

9

JA0551

exclusive license to pending patent *applications* cannot satisfy the "exclusionary conduct" element of a monopolization claim, although the court recognized that CareFirst's argument that such a license can be exclusionary was "novel." *Id.* at 30.

In the separate *Sandoz* case, meanwhile, the district court dismissed the claims in full and entered final judgment in Amgen's favor. The court dismissed the federal antitrust claim on the ground that it was a compulsory counterclaim that Sandoz was required to have brought in the patent-infringement lawsuit that Amgen filed in New Jersey a decade ago, and declined to exercise supplemental jurisdiction over the remaining state-law claims. *Sandoz*, No. 25-cv-218 (E.D. Va. Feb. 17, 2026), ECF No. 39. Amgen also raised as grounds for dismissal, and the parties fully briefed, the same two arguments that the district court rejected here (about the significance of permanent injunctions in a causal chain of alleged injury and about whether taking rights to patent applications can be exclusionary under antitrust law). But the court did not reach those issues because its other rulings disposed of the case.

Sandoz appealed to this Court (No. 26-1309). Sandoz's opening brief is due on April 28, 2026.

**JA0552**

C.  In this case, the district court granted Amgen's motion to certify the order denying the motion to dismiss for immediate appeal under Section 1292(b). Ex. A.

First, CareFirst "d[id] not dispute," and the district court found, that the order on the motion to dismiss involves controlling questions of law. *Id.* at 8.  The court identified two such questions:  (1) whether another court's permanent injunctions prohibiting the sale of infringing products constitute "intervening government action" that breaks the "causal chain of an antitrust violation which causes a downstream antitrust injury," and (2) whether "acquiring rights to a *patent application alone*," as distinct from rights to an issued patent, "could constitute exclusionary conduct" under federal antitrust law. *Id.* at 3.  The court found those purely legal questions to be "controlling" because, if this Court "agrees with Amgen and reverses . . . on either" question, "this case will be dismissed in its entirety." *Id.* at 6.

Second, the district court found a substantial ground for difference of opinion on both questions.  On the permanent-injunction-related question, the court found an "existing disagreement amongst courts" but no controlling precedent. *Id.* at 11.  And on the patent-application-related question, the court explained that "no court has commented directly," but that both sides "identified numerous cases"

11

**JA0553**

articulating high-level principles that point in different directions.  *Id.* at 9-10.  The court concluded that the issue is "novel" and a "split in reasoning" exists.  *Id.*

Third, the district court "easily" found that an immediate appeal may materially advance the ultimate termination of this litigation.  *Id.* at 12.  If this Court were to reverse on either controlling question of law, the case would end.  *Id.*  Or, if this Court were to affirm, that "ruling would provide crucial—and currently lacking—legal guidance on [two] questions of paramount importance for the jury, thereby simplifying key, complex legal issues."  *Id.*  Moreover, the court explained that this case is still at an "early stage[]" and "a Rule 16(b) conference has not yet occurred"—which further "favor[s]" a "finding that certification would materially advance the case."  *Id.*

## REASONS THE APPEAL SHOULD BE ALLOWED

An interlocutory appeal should be allowed here.  Section 1292(b) allows review when a district court's order (1) "involves a controlling question of law," (2) "as to which there is substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  All those requirements are met here.  In addition, permitting an appeal under Section 1292(b) is especially warranted in this case because the appeal would create unusual efficiencies and would allow this Court to provide much-needed guidance on important antitrust issues.

### I.     The District Court's Order Involves Controlling Questions of Law on Which There Is a Substantial Ground for Difference of Opinion

Controlling questions of law are ones whose resolution is "serious to the conduct of the litigation, either practically or legally," *Hutchens v. Capital One Servs.*, 2020 WL 6121950, at *4 (E.D. Va.), and that the Court "can decide . . . without having to delve beyond the surface of the record in order to determine the facts," *Michaels v. Agape Senior Cmty.*, 848 F.3d 330, 340-41 (4th Cir. 2017); *see Fannin v. CSX Transp.*, 1989 WL 42583, at *5 (4th Cir.) (unpub.) (per curiam).  A substantial ground for difference of opinion exists when reasonable jurists' minds can differ—that is, where "courts themselves disagree as to what the law is," *Cooke-Bates v. Bayer*, 2010 WL 4789838, at *2 (E.D. Va.), or when the question is "a novel and difficult" one and the "controlling circuit" has not provided guidance, *A1 Procurement v. Thermcor*, 173 F. Supp. 3d 320, 323 (E.D. Va. 2016); *see Adams v. S. Produce Distribs.*, 2021 WL 394842, at *3 (E.D.N.C.).

As the district court correctly concluded, the court's decision denying Amgen's motion to dismiss involves two separate controlling questions of law, Ex. A at 8 (noting that CareFirst conceded as much), and a substantial ground for difference of opinion exists as to each question, *id.* at 8-11.

A.  One controlling question of law is whether a plaintiff can sue for alleged harm resulting from federal-court injunctions that issued in due course in standard litigation—i.e., as a result of constitutionally protected petitioning activity.  If this

13
**JA0555**

Court agrees with Amgen that CareFirst cannot allege cognizable harm that arises from another federal court's orders, then the entire case would be dismissed. The question is purely legal in nature—either a federal injunction breaks "the causal chain of an alleged antitrust violation," *id.* at 11, or it does not. And no facts are relevant to resolving the question beyond the allegations in CareFirst's complaint and the contents of two injunctions publicly issued by federal courts.

There also is a substantial ground for difference of opinion on that question. The district court identified "several out of circuit cases" that stand "for the proposition that where the government plays a discretionary role in the antitrust injury, such injury is not actionable." Ex. B at 36-38; *see, e.g.*, *A.D. Bedell Wholesale v. Philip Morris*, 263 F.3d 239, 251 (3d Cir. 2001) ("[P]arties are immune from liability arising from the antitrust injuries caused by government action which results from the petitioning."); *Premier Elec. Constr. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358, 376 (7th Cir. 1987) (similar). The court below also identified a nonbinding decision holding that even though "litigation enforcing lawfully acquired patents cannot serve as a basis for antitrust liability," the "patent enforcement litigation" nonetheless may "constitute[] antitrust injury." Ex. B at 38 (citing *CareFirst of Md. v. Johnson & Johnson*, 745 F. Supp. 3d 288, 317 (E.D. Va. 2024)). The tension between cases like *A.D. Bedell* and *Johnson & Johnson*

14
JA0556

led the district court to "recogniz[e]"—correctly—an "existing disagreement amongst courts" and to "find[] the law unclear." *Id.* at 38-39; *see* Ex. A at 11.

The district court also found an "absen[ce]" of "precedent from the Fourth Circuit" on this issue. Ex. A at 11; *see* Ex. B at 38-39. The lack of a controlling, on-point decision from this Court likewise demonstrates a substantial ground for difference of opinion—especially in light of the disagreement among other courts. Indeed, that very disagreement was what led the court below to refuse to dismiss this case on the ground that CareFirst's asserted harms arise directly from federal-court injunctions. Ex. A at 11.

B. Another controlling question of law is whether taking an exclusive license to pending patent applications, without more, can constitute exclusionary or anticompetitive conduct within the meaning of antitrust law.

That is a controlling legal question because it would be dispositive if decided in Amgen's favor and because its resolution does not depend on any facts other than the basic ones alleged in CareFirst's complaint. An antitrust plaintiff "must show that the defendant's conduct was 'exclusionary,' 'anticompetitive,' or 'predatory.'" *Advanced Health-Care Servs. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990). The only "violation of the Sherman Act" that CareFirst purports to allege is "Amgen's acquisition of the Roche Patent Rights," which as relevant here consisted of pending patent applications, not issued patents. Ex. B at

15

24-25.  Thus, if obtaining an exclusive license to pending patent applications is not exclusionary conduct, CareFirst has not alleged any wrongful conduct.

In addition, there is a substantial ground for difference of opinion on the question.  First, although the district court did not find any decision directly on point, it correctly identified a "split in reasoning" among courts.  Ex. A at 10; *see* Ex. B at 30.  Amgen "cit[ed] cases which stand for the proposition that a patent application does not grant the patent application holder . . . exclusionary power."  Ex. A at 10.  For instance, as the Seventh Circuit explained in a recent antitrust case involving a pharmaceutical company that was alleged to have improperly obtained patent applications that prevented biosimilar competition, patent applications "do not impose costs on rivals; only issued patents do so."  *Baltimore v. AbbVie*, 42 F.4th 709, 714 (7th Cir. 2022).  By contrast, CareFirst "cit[ed] cases where courts considered pending patent applications and their relevance to Sherman Act violations in the context of a broader patent portfolio or as part of a broader conspiracy or agreement to restrict competition."  Ex. A at 10.  For example, in *ABS Global v. Inguran*, 2016 WL 3963246 (W.D. Wis.), the court held that a company's purchase of two issued patents and two pending applications sufficed to make a prima facie showing of anticompetitive conduct.  *Id.* at *18, *cited in* Ex. B at 30.  And in *Automated Building Components v. Trueline Truss*, 318 F. Supp. 1252 (D. Or. 1970), "acquisition of a patent application" was held to

16

JA0558

be "part of" a cognizable antitrust "conspiracy."  Ex. B at 31.  Thus, it is unclear whether and when acquisition of an exclusive license to patent applications can show anticompetitive conduct.

Second, the district court recognized that the issue is "novel" and "unsettled" and that this Court's decisions do not provide controlling guidance.  Ex. A at 3. The Supreme Court has indicated that interlocutory review is particularly appropriate when an issue "involves a new legal question."  *Mohawk Indus. v. Carpenter*, 558 U.S. 100, 111 (2009); *see, e.g.*, *Lynn v. Monarch Recovery Mgmt.*, 953 F. Supp. 2d 612, 624 (D. Md. 2013).  A dearth of authority increases the likelihood that another district court in the same Circuit will reach a different result, leading to inconsistent decisions and general confusion.  *See Reese v. BP Exploration (Alaska)*, 643 F.3d 681, 688 & n.5 (9th Cir. 2011).  The district court's decision here is the first decision in this Circuit to address whether an exclusive license to a mere patent application can constitute exclusionary conduct. Accordingly, an appeal under Section 1292(b) would provide needed guidance to courts and litigants in this Circuit that confront that issue.

## II.    Immediate Appeal Could Materially Advance the Ultimate Termination of the Litigation and May Well Be Dispositive

Section 1292(b)'s third element is satisfied when an interlocutory appeal "may appreciably shorten the time, effort, or expense of conducting the district court proceedings."  *ICTSI Oregon v. Int'l Longshore & Warehouse Union*, 22

F.4th 1125, 1131 (9th Cir. 2022).  Courts assessing that requirement consider whether an immediate appeal could "(1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly."  *In re Health Diagnostic Lab'y*, 2017 WL 2129849, at *5 (E.D. Va.); *see Molock v. Whole Foods Market*, 317 F. Supp. 3d 1, 6 (D.D.C. 2018); *In re Va. Elec. & Power*, 539 F.2d 357, 364 (4th Cir. 1976) (accepting interlocutory appeal where "much time, expense and effort" may be "needlessly wasted").

As the district court concluded, that element is "easily" satisfied here.  Ex. A at 12.  Reversal by this Court on either of the two controlling questions of law would result in complete dismissal of CareFirst's complaint, thereby eliminating the need for discovery and trial, conserving judicial resources, and saving the parties from substantial expense.  And it is well established that the "materially advance" requirement is met where, as here, reversal would terminate the case.  *See, e.g.*, *Coal. for Equity v. Md. Higher Educ. Comm'n*, 2015 WL 4040425, at *6-7 (D. Md.); *In re Travelstead*, 250 B.R. 862, 866 (D. Md. 2000).

That immediate resolution of the controlling questions of law will not *guarantee* the termination of the case is of no moment.  The statute requires only that an appeal "may materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), because it has the *potential* to end the case or simplify

important issues, *see Reese*, <u>643 F.3d at 688</u> (Section 1292(b)'s "text" does not "require" that the appeal "have a final, dispositive effect on the litigation" whatever its outcome); *see also, e.g.*, *Hengle v. Asner*, <u>2020 WL 855970</u>, at *8 (E.D. Va.); *Kennedy v. Villa St. Catherine*, <u>2010 WL 9009364</u>, at *4 (D. Md.). As the district court observed, that is certainly true here, as even an affirmance from this Court would eliminate highly complex issues from the case and streamline remaining proceedings considerably. Ex. A at 7, 12; *see Coal. for Equity*, <u>2015 WL 4040425</u>, at *7.

The fact that this case is at such an early stage also weighs strongly in favor of finding that an interlocutory appeal may materially advance the ultimate termination of the litigation. *See* Ex. A at 12. A potentially dispositive appeal at an early stage maximizes the prospect of conserving significant court and party resources. Here, the district court has not held a Rule 16(b) conference or entered a protective order, and discovery is just beginning. An interlocutory appeal thus could well save the burden and expense of essentially the whole action—and thereby advance one of the core purposes of Section 1292(b). *See, e.g.*, *United States v. Woodbury*, <u>263 F.2d 784, 787</u> (9th Cir. 1959) (Section 1292(b) is "intended primarily as a means" of "permitting appellate consideration during the early stages of litigation" when expense and burden can be largely avoided); *Ekstrom v. Cong. Bank*, <u>2021 WL 119000</u>, at *4 (D. Md.) (relying on fact that

19

**JA0561**

"case is still in an early phase of litigation and substantive discovery has not yet occurred").

### III.   An Appeal Under Section 1292(b) Is Especially Warranted in This Case

Because all three factors are satisfied here, this Court can grant permission to appeal without going further.  But the Court's exercise of its discretion to permit an interlocutory appeal is especially warranted in this case.  Absent such an appeal, this case would likely consume an unusually large amount of judicial and party resources in the district court.  By contrast, coordinating an interlocutory appeal in this case with the already-pending appeal in the *Sandoz* matter would be highly efficient—and, by doing so, this Court would give much-needed guidance to district courts and parties on important and recurring issues of antitrust law.

A.  The drafters of Section 1292(b) envisioned that certification would be particularly appropriate "in antitrust . . . cases."  S. Rep. No. 2434, 85th Cong., 2d Sess. (1958), *reprinted in* 1958 U.S.C.C.A.N. 5255, 5260.  Such cases, "by their nature, are highly complex," *Wal-Mart Stores v. Visa U.S.A.*, 396 F.3d 96, 122 (2d Cir. 2005), and their "concomitant burdens of discovery" are notoriously onerous, *Oksanen v. Page Mem. Hosp.*, 945 F.2d 696, 707 (4th Cir. 1991).  That is because they often "involve voluminous documentary and testimonial evidence, extensive discovery," and "complicated legal, factual, and technical (particularly economic) questions."  MANUAL FOR COMPLEX LITIGATION (FOURTH) § 30 (2004).  In

recognition of those complexities and burdens, this Court has frequently permitted interlocutory appeals under Section 1292(b) to resolve the adequacy of federal antitrust claims at the pleading stage. *See, e.g.*, *Robertson v. Sea Pines Real Estate*, 679 F.3d 278, 283-84 (4th Cir. 2012) (accepting appeal where district court certified antitrust decision and explained that case would "involve lengthy and costly discovery," *Boland v. Consol. Multiple Listing Serv.*, 868 F. Supp. 2d 506, 519 (D.S.C. 2011)); *Novell v. Microsoft*, 505 F.3d 302, 307 (4th Cir. 2007); *In re Microsoft*, 355 F.3d 322, 325 (4th Cir. 2004); *Pennsylvania v. Mid-Atl. Toyota Distribs.*, 704 F.2d 125, 127 (4th Cir. 1983); *see also, e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010).

This case promises to be especially resource intensive, even for an antitrust case, because it is a putative damages class action. "Damages in antitrust cases often require complex analyses of how markets operate and are invariably based on expert testimony," which means that "the court will need to assess the qualifications of proposed experts and the reliability of their testimony." 6 WILLIAM B. RUBENSTEIN, NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 20:59 (6th ed. 2022). "Normally, these events occur at trial, but in most antitrust cases they are moved up to the time of class certification," which sets antitrust class actions "apart from most other class action cases." *Id.* Also, CareFirst asserts claims under the laws of dozens of different states, which will require the district

court to resolve choice-of-law issues and decide similar legal issues many times over under different states' laws.  An appeal under Section 1292(b) could avoid expenditure of all that time and effort.

B.  Allowing this interlocutory appeal to go forward also would be an uncommonly efficient and valuable use of this Court's own resources considering the specific antitrust issues at stake here.

The dismissal of the complaint in the separate *Sandoz* action, which involves factual allegations and legal theories that are substantively identical to CareFirst's, is already before this Court on appeal from a final judgment in Amgen's favor. That appeal is just beginning; it was docketed on March 19, 2026.  Although the district court dismissed Sandoz's complaint on grounds that do not apply to CareFirst, Amgen also raised in *Sandoz* both issues that the district court identified in *this* case as grounds for interlocutory appeal.  That means that in Sandoz's appeal those same arguments will be alternative grounds for affirmance.  *See Moore v. Frazier*, 941 F.3d 717, 725 (4th Cir. 2019).  In other words, this Court will almost certainly consider briefing and argument on those issues in the *Sandoz* appeal, but will not necessarily *resolve* the issues there, because the Court might simply rest on the district court's reasoning.

Given the overlap between the cases, permitting this interlocutory appeal would allow the Court to adjudicate them in an efficient, coordinated fashion—for

22

example, by assigning them to the same merits panel and consolidating them for oral argument. It would also ensure that the Court does reach and resolve the important antitrust issues presented here. As *Sandoz* concretely illustrates, those issues have already arisen in multiple cases. They present fundamental issues about how antitrust law functions, including whether an antitrust injury can be premised on the effects of a duly issued federal-court order. Yet district courts in this Circuit are currently lacking guidance on how to resolve them. This Court's clarification of the law is greatly needed. *See* Ex. A at 10-11 (issues are "unsettled" and lacking "comment from the Fourth Circuit").

## CONCLUSION AND RELIEF REQUESTED

The petition for permission to appeal under Section 1292(b) should be granted.

23

**JA0565**

Dated:  March 27, 2026

Rohit K. Singla
Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission St.
San Francisco, CA 94105
(415) 512-4000
rohit.singla@mto.com
justin.raphael@mto.com

Adam R. Lawton
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave.
Los Angeles, CA 90071
(213) 683-9100
adam.lawton@mto.com

Respectfully submitted,

/s/ *Elaine J. Goldenberg*

Elaine J. Goldenberg
Sarah E. Weiner
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 220-1100
elaine.goldenberg@mto.com
sarah.weiner@mto.com

24

**CERTIFICATE OF COMPLIANCE**

This petition complies with the word limit of <u>Federal Rule of Appellate Procedure 5(c)(1)</u> because it contains 5,184 words, excluding the portions exempted by <u>Federal Rules of Appellate Procedure 5(b)(1)(E)</u> and 32(f).

The petition complies with the typeface requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)(A)</u> and the type-style requirements of <u>Federal Rule of Appellate Procedure 32(a)(6)</u> because it has been prepared in 14-point Times New Roman font.

Dated:  March 27, 2026

/s/ *Elaine J. Goldenberg*
Elaine J. Goldenberg

**JA0567**

**CERTIFICATE OF SERVICE**

I certify that on March 27, 2026, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.

I further certify that on March 27, 2026, the foregoing document was emailed and sent by FedEx to the following case participants:

Marc C. Greco
William H. Monroe, Jr.
Kip A. Harbison
Michael A. Glasser
GLASSER AND GLASSER, P.L.C.
Crown Center, Suite 600
580 East Main Street
Norfolk, VA 23510
(757) 625-6787
bill@glasserlaw.com
marcg@glasserlaw.com
kip@glasserlaw.com
michael@glasserlaw.com

Peter D. St. Phillip
Uriel Rabinovitz
Raymond Girnys
Thomas K. Griffith
Margaret Maclean
LOWEY DANNENBERG, P.C.
44 South Broadway, Ste. 1100
White Plains, NY 10601
(914) 997-0500
pstphillip@lowey.com
urabinovitz@lowey.com
rgirnys@lowey.com
tgriffith@lowey.com
mmaclean@lowey.com

Thomas M. Sobol
Hannah Brennan
Whitney Street
Abbye R. Klamann Ognibene
Rachel Downey
Claudia Morera
HAGENS BERMAN SOBOL SHAPIRO LLP
One Faneuil Hall Square, 5th Fl.
Boston, MA 02109
(617) 482-3700
tom@hbsslaw.com
hannahb@hbsslaw.com
whitneyst@hbsslaw.com
abbyeo@hbsslaw.com
racheld@hbsslaw.com
claudiam@hbsslaw.com

John D. Radice
April D. Lambert
Charles Kopel
Kenneth Pickle
Luke Smith
Daniel Rubenstein
RADICE LAW FIRM, P.C.
475 Wall Street
Princeton, NJ 08540
(646) 245-8502
jradice@radicelawfirm.com

26

**JA0568**

David Zimmer
Eric Citron
Edwina Clarke
ZIMMER, CITRON & CLARKE, LLP
130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9421
david@zimmercitronclarke.com
eric@zimmercitronclarke.com
edwina@zimmercitronclarke.com

alambert@radicelawfirm.com
ckopel@radicelawfirm.com
kpickle@radicelawfirm.com
lsmith@radicelawfirm.com
drubenstein@radicelawfirm.com

Kenneth Wexler
Justin Boley
Tyler Story
WEXLER BOLEY & ELGERSMA LLP
311 S. Wacker Dr., Suite 5450
Chicago, IL 60606
(312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com
tjs@wbe-llp.com

Dated: March 27, 2026

/s/ *Elaine J. Goldenberg*
Elaine J. Goldenberg

27

**JA0569**

FILED:  April 20, 2026

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 26-139
(2:24-cv-00484-AWA-LRL)
_____

AMGEN INC.; IMMUNEX CORPORATION; AMGEN MANUFACTURING
LIMITED LLC

      Petitioners

v.

CAREFIRST OF MARYLAND, INC.; GROUP HOSPITALIZATION AND
MEDICAL SERVICES, INC.; CAREFIRST BLUECHOICE, INC.

      Respondents

_____

O R D E R

_____

Upon consideration of submissions relative to the petition for permission to

appeal, the court grants the petition. This case is transferred to the regular docket

and assigned docket number 26-1473. The record shall be retained in the court

below unless requested by this court.

A copy of this order shall be sent to the clerk of the district court.

For the Court

/s/ Nwamaka Anowi, Clerk

**JA0570**